No. 26- 1229

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, JOHN MICHAEL BANE, ANDRE BLAND, SEDRICK CLAYTON, URSHAWN MILLER, AND CORINIO PRUITT,

*Petitioners*,

*v.*

TODD BLANCHE, UNITED STATES ATTORNEY GENERAL, AND THE UNITED STATES OF AMERICA,

*Respondents*.

## PETITION FOR REVIEW


JENNIFER WARE-PHILLIPS
KEVIN ADAM
**WHITE & CASE LLP**
75 STATE STREET
BOSTON, MA 02109

KUFERE LAING
**WHITE & CASE LLP**
701 THIRTEENTH STREET, NW
WASHINGTON, D.C. 20005

*Counsel for Petitioners Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, Bane, Bland, Clayton, and Miller*

JOHN G. BAKER
**FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GERALD W. KING, JR.
**CAPITAL HABEAS UNIT FOR THE FOURTH CIRCUIT**
129 WEST TRADE STREET, SUITE 300
CHARLOTTE, NC 28202

*Counsel for Petitioner Pruitt*

Pursuant to 28 U.S.C. § 2265(c), 28 U.S.C. §§ 2341 *et seq.*, Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, Petitioners hereby petition the Court for review of the final action of Respondents Todd Blanche, United States Attorney General, and the United States of America in the determination captioned "Certification of Tennessee Capital Counsel Mechanism" (the "Certification") by the Department of Justice released on July 10, 2026. 91 Fed. Reg. 42761. A copy of that Certification is attached hereto. Venue is appropriate in this Court pursuant to 28 U.S.C. § 2265(c)(2).

In the Certification, Respondent Attorney General Blanche found that Tennessee has established a mechanism for the appointment of post-conviction counsel in capital proceedings brought by indigent prisoners that meets the requirements of 28 U.S.C. §§ 2261 *et seq.* and 28 C.F.R. §§ 26.20 *et seq*. The certification of Tennessee places severe restrictions on the ability of capital prisoners in Tennessee to challenge their convictions and sentences in federal habeas proceedings. Petitioners ask this Court to set aside the Certification because Tennessee's mechanism does not, in fact, satisfy the statutory requirements for certification, because Respondent Attorney General Blanche did not apply the operative implementing regulations for certification procedure, and because the certification process itself is fundamentally flawed and unconstitutional.

Petitioners John Michael Bane, Andre Bland, Sedrick Clayton, Urshawn Miller, and Corinio Pruitt are each currently under a sentence of death imposed by the State of Tennessee. Petitioner Federal Defender Services of Eastern Tennessee, Inc. represents six individuals sentenced to death by the State of Tennessee and appointed post-conviction counsel on or after July 1, 1997. Petitioner Federal Public Defender for the Middle District of Tennessee represents eighteen individuals sentenced to death by the State of Tennessee and appointed post-conviction counsel on or after July 1, 1997, including Petitioners Bane and Bland. Petitioner Pruitt is represented by the Federal Public Defender for the Western District of North Carolina in both this petition for review and his federal habeas proceedings.

The Federal Public Defender of the Middle District of Tennessee and Federal Defender Services of Eastern Tennessee, Inc. were participants in the proceeding below. All Petitioners are aggrieved by the Certification.

*[Remainder of page left intentionally blank.]*

Dated: September 4, 2026

Respectfully submitted,


*/s/Jennifer Ware-Phillips*
Jennifer Ware-Phillips
Kevin Adam
**White & Case LLP**
75 State Street
Boston, MA 02109

Kufere Laing
**White & Case LLP**
701 Thirteenth Street, NW
Washington, D.C. 20005

*Counsel for Petitioners Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, Bane, Bland, Clayton, and Miller*

John G. Baker
**Federal Public Defender for the Western District of North Carolina**

*/s/Gerald W. King Jr.*
Gerald W. King Jr.
**Capital Habeas Unit for the Fourth Circuit**
129 West Trade Street, Suite 300
Charlotte, NC 28202

*Counsel for Petitioner Pruitt*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Federal Defender Services of Eastern Tennessee, Inc. states that it is a non-profit corporation with no parent corporation and that no publicly held corporation owns 10% or more of its stock, as Petitioner Federal Defender Services of Eastern Tennessee, Inc. does not issue stock. Federal Defender Services of Eastern Tennessee, Inc. operates as the federal public defender in the Eastern District of Tennessee pursuant to 18 U.S.C. § 3006A(g). Federal Defender Services of Eastern Tennessee, Inc. includes a Capital Habeas Unit, which is appointed to serve in all non-conflicted capital habeas cases arising from the Eastern District of Tennessee and in other federal districts.

*/s/Jennifer Ware-Phillips*
Jennifer Ware-Phillips

*Counsel for Petitioner Federal Defender Services of Eastern Tennessee, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2026, I electronically filed the foregoing Petition for Review with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.

I further certify I caused a true and correct copy of the foregoing Petition for Review to be served, by registered mail with request for return receipt as required by 28 U.S.C. § 2344, upon Todd Blanche, Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530.

*/s/Jennifer Ware-Phillips*
Jennifer Ware-Phillips

**ADDENDUM**

The Attorney General's July 10, 2026 Certification of the

State of Tennessee's Capital Counsel Mechanism

91 Fed. Reg. 42761

(f), 1301.46. RFAA, at 1; *see also* 21 CFR 1316.67.

## Findings of Fact

The Agency finds that, in light of Registrant's default, the factual allegations in the OSC are deemed admitted. According to the OSC, effective September 25, 2025, the California Board of Registered Nursing revoked Registrant's California registered nurse license and Registrant's California nurse practitioner license. RFAAX 1, at 2. According to California online records, of which the Agency takes official notice,[2] both Registrant's California registered nurse license and Registrant's California nurse practitioner license are revoked. California DCA License Search, *https://search.dca.ca.gov* (last visited date of signature of this Order). Accordingly, the Agency finds that Registrant is not licensed to practice as a nurse practitioner in California, the state in which she is registered with DEA.[3]

## Discussion

Pursuant to 21 U.S.C. 824(a)(3), the Attorney General is authorized to suspend or revoke a registration issued under 21 U.S.C. 823 ''upon a finding that the registrant . . . has had his State license or registration suspended . . . [or] revoked . . . by competent State authority and is no longer authorized by State law to engage in the . . . dispensing of controlled substances.''

With respect to a practitioner, DEA has also long held that the possession of authority to dispense controlled substances under the laws of the state in which a practitioner engages in professional practice is a fundamental condition for obtaining and maintaining a practitioner's registration. *Gonzales* v. *Oregon,* 546 U.S. 243, 270 (2006) (''The Attorney General can register a physician to dispense controlled substances 'if the applicant is authorized to dispense . . . controlled substances under the laws of the State in which he practices.' . . . The very definition of a 'practitioner' eligible to prescribe includes physicians 'licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices' to dispense controlled substances. 802(21).''). The Agency has applied these principles consistently. *See, e.g., James L. Hooper, M.D.,* 76 FR 71371, 71372 (2011), *pet. for rev. denied,* 481 F. App'x 826 (4th Cir. 2012); *Frederick Marsh Blanton, M.D.,* 43 FR 27616, 27617 (1978).[4]

According to California statute, ''dispense'' means ''to deliver a controlled substance to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, furnishing, packaging, labeling, or compounding necessary to prepare the substance for that delivery.'' Cal. Health & Safety Code § 11010 (West 2026). Further, a ''practitioner'' means a person ''licensed, registered, or otherwise permitted, to distribute, dispense, conduct research with respect to, or administer, a controlled substance in the course of professional practice or research in [the] state.'' *Id.* at § 11026(c).

Here, the undisputed evidence in the record is that Registrant currently lacks authority to practice as a nurse practitioner in California. As discussed above, an individual must be a licensed practitioner to dispense a controlled substance in California. Thus, because Registrant currently lacks authority to practice as a nurse practitioner in California and, therefore, is not authorized to handle controlled substances in California, Registrant is not eligible to maintain a DEA registration. Accordingly, the Agency will order that Registrant's DEA registration be revoked.

## Order

Pursuant to 28 CFR 0.100(b) and the authority vested in me by 21 U.S.C. 824(a), I hereby revoke DEA Certificate of Registration No. MM5261982 issued to Mariana Moualem, F.N.P. Further, pursuant to 28 CFR 0.100(b) and the authority vested in me by 21 U.S.C. 823(g)(1), I hereby deny any pending applications of Mariana Moualem, F.N.P., to renew or modify this registration, as well as any other pending application of Mariana Moualem, F.N.P., for additional registration in California. This Order is effective August 10, 2026.

## Signing Authority

This document of the Drug Enforcement Administration was signed on June 22, 2026, by Administrator Terrance Cole. That document with the original signature and date is maintained by DEA. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DEA Federal Register Liaison Officer has been authorized to sign and submit the document in electronic format for publication, as an official document of DEA. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Leslie Mayer,**

*Federal Register Liaison Officer, Drug Enforcement Administration.*

[FR Doc. 2026–13990 Filed 7–9–26; 8:45 am]

**BILLING CODE 4410–09–P**

[2] Under the Administrative Procedure Act, an agency ''may take official notice of facts at any stage in a proceeding—even in the final decision.'' United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act 80 (1947) (Wm. W. Gaunt & Sons, Inc., Reprint 1979).

[3] Pursuant to 5 U.S.C. 556(e), ''[w]hen an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.'' The material fact here is that Registrant, as of the date of this Order, is not licensed to practice as a nurse practitioner in California. Accordingly, Registrant may dispute the Agency's finding by filing a properly supported motion for reconsideration of findings of fact within fifteen calendar days of the date of this Order. Any such motion and response shall be filed and served by email to the other party and to the Office of the Administrator, Drug Enforcement Administration, at *dea.addo.attorneys@dea.gov.*

[4] This rule derives from the text of two provisions of the Controlled Substances Act (CSA). First, Congress defined the term ''practitioner'' to mean ''a physician . . . or other person licensed, registered, or otherwise permitted, by . . . the jurisdiction in which he practices . . . , to distribute, dispense, . . . [or] administer . . . a controlled substance in the course of professional practice.'' 21 U.S.C. 802(21). Second, in setting the requirements for obtaining a practitioner's registration, Congress directed that ''[t]he Attorney General shall register practitioners . . . if the applicant is authorized to dispense . . . controlled substances under the laws of the State in which he practices.'' 21 U.S.C. 823(g)(1). Because Congress has clearly mandated that a practitioner possess state authority in order to be deemed a practitioner under the CSA, DEA has held repeatedly that revocation of a practitioner's registration is the appropriate sanction whenever he is no longer authorized to dispense controlled substances under the laws of the state in which he practices. *See, e.g., James L. Hooper, M.D.,* 76 FR at 71371–72; *Sheran Arden Yeates, M.D.,* 71 FR 39130, 39131 (2006); *Dominick A. Ricci, M.D.,* 58 FR 51104, 51105 (1993); *Bobby Watts, M.D.,* 53 FR 11919, 11920 (1988); *Frederick Marsh Blanton, M.D.,* 43 FR at 27617.

# DEPARTMENT OF JUSTICE

## Office of the Attorney General

**[Docket No. OLP180; AG Order No. 7011–2026]**

## Certification of Tennessee Capital Counsel Mechanism

**AGENCY:** Office of the Attorney General, Department of Justice.

**ACTION:** Notice.

**SUMMARY:** Federal law makes certain procedural benefits available to States in federal habeas corpus review of capital cases, where the Attorney General certifies that the State has established a postconviction capital counsel mechanism satisfying the requirements of chapter 154 of title 28 of the United States Code. The Attorney General certifies in this notice that Tennessee

has such a mechanism, which was established on July 1, 1997.

**DATES:** Pursuant to 28 U.S.C. 2265(a)(2), the effective date of the certification in this notice is July 1, 1997.

**FOR FURTHER INFORMATION CONTACT:** Aaron Haviland, Counsel, Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530; telephone (202) 514–4601.

**SUPPLEMENTARY INFORMATION:**

*Certification:* Chapter 154 of title 28, United States Code, provides special federal habeas corpus review procedures for state capital cases where (i) the Attorney General has certified that the State has established a counsel appointment mechanism for indigent capital defendants in state postconviction proceedings that meets the requirements stated in the chapter, and (ii) counsel was appointed pursuant to the certified mechanism, the defendant validly waived or retained counsel, or the defendant was not indigent. 28 U.S.C. 2261(b). Chapter 154 directs the Attorney General to determine, if requested by an appropriate state official, whether the State has established a qualifying mechanism for the appointment of postconviction capital counsel, the date on which the mechanism was established, and whether the State provides standards of competency for such appointments. *Id.* 2265(a)(1).

Having considered the relevant statutes, rules, and policies in Tennessee, the application of the Tennessee Attorney General, and the public comments thereon, and exercising the authority conferred on me by 28 U.S.C. 2265, I determine and certify that Tennessee has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in state postconviction proceedings brought by indigent prisoners who have been sentenced to death, including provision of standards of competency for the appointment of counsel in such proceedings, which satisfies the requirements of chapter 154. I further determine and certify that Tennessee had an established capital counsel mechanism satisfying the requirements of chapter 154 as of July 1, 1997, and that Tennessee has continuously had a capital counsel mechanism satisfying the requirements of chapter 154 since that date. This certification reflects no judgment or opinion whether Tennessee had a postconviction capital counsel mechanism satisfying the requirements of chapter 154 before that date.

## I. Procedural History

Chapter 154 applies to cases arising under 28 U.S.C. 2254 brought by prisoners in state custody who are subject to a capital sentence if ''(1) the Attorney General of the United States certifies that a State has established a mechanism for providing counsel in postconviction proceedings as provided in section 2265,'' and ''(2) counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent.'' 28 U.S.C. 2261(b).

Where the chapter applies, federal habeas review is conducted in conformity with special provisions relating to stays of execution, the time available for federal habeas filing, the scope of federal habeas review, and the time for completing the adjudication of federal habeas petitions.

Congress enacted chapter 154 as part of the Antiterrorism and Effective Death Penalty Act of 1996. *See* Public Law 104–132, sec. 107(a), 110 Stat. 1214, 1221–26. It was derived from a proposal developed in 1989, under the leadership of Justice Lewis F. Powell, to address the problem of protracted and repetitive litigation in capital cases and to fill a gap in representation for capital defendants at the stage of state postconviction review. Under chapter 154 in its original form, federal habeas courts determined the applicability of chapter 154's expedited federal habeas review procedures in the context of adjudicating federal habeas petitions filed by state capital defendants. Litigation relating to States' satisfaction of chapter 154's requirements ensued in various States, resulting in a substantial body of district court and court of appeals precedent interpreting chapter 154, as well as a related decision by the Supreme Court in *Calderon* v. *Ashmus,* 523 U.S. 740 (1998).

In 2006, Congress enacted amendments that brought chapter 154 into its current form. *See* Public Law 109–177, sec. 507, 120 Stat. 250, 250–51 (codified in part at 28 U.S.C. 2265). The amendments transferred responsibility for determining a State's satisfaction of chapter 154's requirements from the courts to the Attorney General, subject to de novo review by the D.C. Circuit Court of Appeals. *See* 28 U.S.C. 2265. Under the revised scheme, the Attorney General, if requested by an appropriate state official, certifies whether the State has established a postconviction capital counsel mechanism satisfying the chapter's requirements, with exclusive review of the certification by the D.C. Circuit. *See id.* 2265(a), (c).

The 2006 amendments also added a provision stating that ''[t]here are no requirements for certification or for application of'' chapter 154 ''other than those expressly stated in this chapter.'' *Id.* 2265(a)(3). The addition of this provision reflected Congress's concern that some courts had declined to apply chapter 154 for reasons other than a failure to satisfy the requirements of the statute. *See* 152 Cong. Rec. 2441, 2445–46 (2006) (remarks of Sen. Kyl); 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake).

Chapter 154 directs the Attorney General to promulgate regulations to implement the certification procedure. *See* 28 U.S.C. 2265(b). Attorney General Mukasey in 2008 issued an initial implementing rule for chapter 154. *See* 73 FR 75327 (Dec. 11, 2008). The rule generally tracked the statutory requirements, recognizing that 28 U.S.C. 2265(a)(3) precludes certification requirements other than those expressly stated in the chapter. *See id.* at 75327–39. Attorney General Holder in 2013 replaced the original rule with the current regulations (''2013 Regulations''), which prescribe additional requirements for certification. *See* 28 CFR 26.20–26.23; 78 FR 58160, 58160–84 (Sept. 23, 2013). On March 16, 2026, Attorney General Bondi published a notice of proposed rulemaking to rescind the requirements of the 2013 Regulations that are not expressly required by chapter 154 itself. *See* 91 FR 12525 (Mar. 16, 2026); *see also Reconsidering State Procedures for Appointment of Competent Counsel in Postconviction Review of Capital Sentences,* 50 Op. O.L.C. __ (Feb. 18, 2026). Notwithstanding this proposed rulemaking, the 2013 Regulations remain in effect and continue to guide the Attorney General's adjudication of States' requests for certification.

Tennessee has requested that the Attorney General certify its capital counsel mechanism under chapter 154. The materials relating to Tennessee's request are available at *www.justice.gov/olp/pending-requests-final-decisions.*

Tennessee initially requested chapter 154 certification by letter from its Attorney General, dated June 6, 2025. On August 7, 2025, the Department of Justice published a notice in the **Federal Register** inviting public comment on Tennessee's request for certification and providing a 60-day comment period. *See* 90 FR 38182 (Aug. 7, 2025). Three capital public defender offices in Tennessee submitted requests for extension of the comment period, which

the Department denied. Two of these offices also sought a temporary restraining order to enjoin the Attorney General from deciding whether to certify Tennessee's capital counsel mechanism, but a district court denied their motion. *See* Order, *Bland* v. *Bondi,* No. 25–cv–3499 (D.D.C. Oct. 10, 2025), ECF No. 20. As an accommodation, the Department permitted the capital public defender offices to submit a late comment on Tennessee's certification request. The Department also received one other comment, submitted by the American Bar Association.

**II. Assessment of Tennessee's Mechanism Under Chapter 154**

Chapter 154 directs the Attorney General, if requested by an appropriate state official, to determine (i) whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in state postconviction proceedings brought by indigent prisoners who have been sentenced to death, and (ii) whether the State provides standards of competency for the appointment of such counsel. 28 U.S.C. 2265(a).

Before turning to specific issues, I will discuss the significance of previous judicial interpretations of chapter 154. I will then examine whether Tennessee's mechanism for the appointment of counsel, its standards of competency, its mechanism for compensation, and its mechanism for the payment of reasonable litigation expenses comply with chapter 154 and the 2013 Regulations.

*A. Judicial Opinions Interpreting Chapter 154*

In addressing Tennessee's request for certification, I do not write on a clean slate. Prior to 2006, the Attorney General was not involved in chapter 154 determinations, which were instead made by the federal courts in adjudicating individual habeas petitions filed by state prisoners. In 2002, for example, the Ninth Circuit concluded that Arizona had established a capital counsel mechanism satisfying chapter 154's requirements. *See Spears* v. *Stewart,* 283 F.3d 992, 1007–19 (9th Cir. 2002). The analysis in *Spears* may still be relevant to the extent that elements of an adequate state capital counsel mechanism now required by chapter 154 overlap with those required by chapter 154 at the time of that decision.

For example, the Ninth Circuit clarified in *Spears* that capital-case litigation experience is not a prerequisite for appointment under chapter 154. *See id.* at 1013; *see also Ashmus* v. *Calderon,* 123 F.3d 1199, 1208 (9th Cir. 1997) (holding that postconviction litigation experience is not required under chapter 154). Other holdings in *Spears*—including with respect to counsel competency, compensation, and payment of reasonable litigation expenses—may also remain relevant as persuasive authority in assessing the capital counsel mechanisms of Tennessee and other States under the 2013 Regulations. *See* 85 FR 20705, 20708 (Apr. 14, 2020).

In other respects, however, the pre-2006 case law may no longer be relevant because of changes in chapter 154. For example, in *Ashmus* v. *Calderon,* the Ninth Circuit held that California's capital counsel mechanism did not satisfy chapter 154 because its standards of counsel competency were not articulated in a statute or by a rule of the State's court of last resort. 123 F.3d at 1207–08. The 2006 amendments, however, rejected this ''hypertechnical'' reading of the statute and removed the language relied upon by the *Ashmus* court, thereby affording the States ''flexibility on how to establish the mechanism.'' 152 Cong. Rec. 2446 (remarks of Sen. Kyl). As another example, the Ninth Circuit concluded in *Spears* that Arizona's capital counsel mechanism satisfied chapter 154 but nevertheless declined to apply the expedited federal habeas procedures because of a delay in appointing counsel. *See* 283 F.3d at 1018–19. The 2006 amendments likewise repudiated this aspect of *Spears,* providing instead that there are no requirements for certification or for application of chapter 154 other than those expressly stated in the statute. *See* 28 U.S.C. 2265(a)(3); 152 Cong. Rec. 2446 (remarks of Sen. Kyl).

Another important change in chapter 154 concerns whether I must undertake a case-specific review of the operation of a State's capital counsel mechanism. Public comments have supposed that I must deny certification if a State's mechanism is deficient in practice—*e.g.,* if counsel are not appointed quickly after the conclusion of direct review or do not consistently provide high-quality representation after appointment. These comments claim support in pre-2006 decisions that held that the procedural benefits of chapter 154 are not available in a particular case if the State did not comply with the requirements of its capital counsel mechanism in that case. *See, e.g., Spears,* 283 F.3d at 1018–19 (failure to appoint counsel within the time required by state mechanism); *Tucker* v. *Catoe,* 221 F.3d 600, 604–05 (4th Cir. 2000) (failure to appoint counsel meeting state competency standards).

Judicial decisions of this nature reflected the pre-2006 version of chapter 154, under which requests to apply chapter 154's procedures were presented to federal habeas courts in particular cases. In that posture, courts could consider both the general question of whether the State has established a mechanism satisfying chapter 154—an issue that was typically determined by examination of state laws and policies—and the specific question of whether counsel for the petitioner in a particular case had been appointed in compliance with that mechanism. Following the 2006 amendments to chapter 154, however, only the general question is assigned to the Attorney General. *See* 28 U.S.C. 2265. The case-specific question of whether counsel was appointed pursuant to the certified mechanism is reserved to the courts that adjudicate prisoners' habeas petitions. *See* 28 U.S.C. 2261(b)(2); 78 FR at 58162–63, 58165. Consequently, comments supposing that I must undertake a case-specific review of the operation of a State's capital counsel mechanism misapprehend the current division of labor under chapter 154 between the Attorney General and federal courts. *See* 85 FR at 20708, 20711–12; 78 FR at 58162–63; 73 FR at 75334–35.

*B. Appointment of Counsel*

1. Appointment of Counsel and Chapter 154

Section 2265(a)(1) of title 28 directs the Attorney General to determine whether the State has established a mechanism for the appointment of counsel in state postconviction proceedings brought by indigent prisoners who have been sentenced to death.

Tennessee's capital counsel mechanism satisfies this requirement. Tennessee Supreme Court Rule 13 provides for court-ordered appointment of postconviction counsel for indigent prisoners under sentence of death. The Tennessee Supreme Court adopted Rule 13 on April 3, 1997, and the rule took effect on July 1, 1997. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997), *https://perma.cc/CYQ8-VXRH;* Tenn. Sup. Ct. Order (Apr. 10, 1997), *https://perma.cc/7ZJ9-FEC6* (setting effective date of amendment to July 1, 1997). The substantive requirements of the relevant provisions have not changed in the years since Rule 13 was adopted. *See* Tenn. Sup. Ct. Order (June 1, 2004), *https://perma.cc/YP6K-DTYS;* Tenn. Sup. Ct. Order (June 1, 2004), App'x A,

*https://perma.cc/XTM3-JJM6;* Tenn. Sup. Ct. Order (Oct. 4, 2024), *https://perma.cc/6BX3-6KWN.* Accordingly, Tennessee has continually satisfied the requirements of chapter 154 with respect to the appointment of counsel since July 1, 1997.

2. Appointment of Counsel and the 2013 Regulations

The 2013 Regulations augment chapter 154's express requirements relating to appointment of counsel. Under the regulations, counsel must be provided in a manner that is ''reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.'' 28 CFR 26.21. Tennessee satisfies the timeliness requirement. Upon the filing of an initial petition for postconviction relief, the trial court must complete a preliminary consideration of the petition within 30 days. *See* Tenn. Code Ann. sec. 40–30–106(a). At this stage, the trial court may dismiss the petition only if it is not in the court of conviction, is untimely, is successive, fails to show that the petitioner is entitled to any relief, or fails to show that the claims for relief were not waived or previously determined. *See id.* sec. 40–30–106(b), (f). If the petition is not dismissed, the trial court must enter a preliminary order directing further proceedings. *See id.* sec. 40–30–107(a). If the petitioner is not already represented by counsel, the trial court determines the petitioner is indigent, and the petitioner requests counsel, the trial court's preliminary order must also appoint counsel to represent the petitioner. *See id.* sec. 40–30–107(b)(1).

In addition, the 2013 Regulations provide that the attorney appointed as postconviction counsel ''may not be counsel who previously represented the prisoner at trial unless the prisoner and counsel expressly requested continued representation.'' 28 CFR 26.22(a). Tennessee also satisfies this requirement. Tennessee Supreme Court Rule 13 provides that postconviction counsel ''must not have previously represented the defendant at trial or on direct appeal in the case for which the appointment is made, unless the defendant and counsel expressly consent to continued representation.'' Tenn. Sup. Ct. R. 13, sec. 3(h).

3. Specific Criticisms

One public comment faulted Tennessee for requiring the appointment of two attorneys at the trial and appellate stages of capital cases but only one attorney at the postconviction stage. On this requirement, Tennessee law parallels federal law. *See* 18 U.S.C. 3005, 3599. Neither chapter 154 nor the 2013 Regulations subject Tennessee to a higher requirement than the requirement Congress has adopted for federal capital cases.

Other comments objected that Tennessee does not require the appointment of counsel in successive postconviction proceedings or in proceedings for the testing or analysis of biometric identifiers—*i.e.,* DNA and fingerprints. These objections are without merit because chapter 154 requires a mechanism for the appointment of counsel only in the initial collateral proceedings. It imposes no requirements in either successive collateral proceedings or proceedings related to the testing or analysis of biometric identifiers. *See* 28 U.S.C. 2261–66; 135 Cong. Rec. 24659 (Powell Committee Report: ''Capital cases should be subject to one complete and fair course of collateral review in the state and federal system, free from the time pressure of impending execution, and with the assistance of competent counsel for the defendant. When this review has concluded, litigation should end.''); *see also* 73 FR at 75337; 78 FR at 58177.

The text of section 2263 confirms that chapter 154 does not apply to successive collateral proceedings. Section 2263 imposes a 180-day time limit for seeking federal habeas relief that runs from the conclusion of state direct review. The limitation period is tolled upon the filing of ''the first petition for post-conviction review or other collateral relief.'' 28 U.S.C. 2263(b)(2). There is no provision for tolling the time limit for successive petitions for post-conviction relief. The scope of chapter 154 is limited to the initial round of state and federal postconviction review, and the statute does not create any right to appointed counsel for successive petitions.

Chapter 154 likewise does not apply to motions related to postconviction biometric testing procedures. The chapter applies only to proceedings for collateral relief; it has no application to other proceedings occurring after conviction aside from collateral relief, such as biometric testing. *See* 73 FR at 75337; 78 FR at 58177. In addition, federal law leaves the appointment of counsel to represent an indigent defendant with a federal conviction in a motion for post-conviction DNA testing in the discretion of the court, *see* 18 U.S.C. 3600(b)(3), but extending chapter 154 to postconviction biometric proceedings would make the appointment of counsel in such proceedings mandatory for the States. Again, nothing in chapter 154 suggests that Congress intended to hold the States to a higher standard than the federal government. Finally, applying chapter 154 to postconviction biometric proceedings raises the same timing problem as applying the statute to successive collateral proceedings because the statute does not provide for tolling the 180-day time limit upon the filing of a motion for biometric testing. *See* 28 U.S.C. 2263.

Another comment faulted Tennessee for not requiring that prisoners be notified of their right to replacement counsel under section 2261(e). Section 2261(e) provides that ''[t]he ineffectiveness or incompetence of counsel during State or Federal post-conviction proceedings in a capital case shall not be a ground for relief in a'' federal habeas proceeding, but this limitation does ''not preclude the appointment of different counsel, on the court's own motion or at the request of the prisoner, at any phase of State or Federal post-conviction proceedings on the basis of the ineffectiveness or incompetence of counsel in such proceedings.'' 28 U.S.C. 2261(e). This provision safeguards against the invalidation of capital judgments based on counsel incompetence in postconviction proceedings. It does not require the replacement of counsel if counsel does not perform competently, nor does it require the State to inform prisoners of any such right. Accordingly, section 2261(e) has no bearing on my certification decision.

One comment asserted that Tennessee should be denied certification because its application to the Attorney General contains misrepresentations, inaccuracies, and material omissions. The substance of this complaint is that, in the commenters' view, Tennessee's application does not rebut the commenter's many objections to certification. This comment is not germane to my certification determination because chapter 154 does not condition certification on the State's submission of an application that is free of errors and that convincingly rebuts all objections. Furthermore, I have determined that Tennessee satisfies the requirements of chapter 154 based on a review of the relevant law and for the reasons stated in this certification. Insofar as either Tennessee's request or the public comments contain any inaccuracies or omissions, they were immaterial to my decision.

Another comment argued that Tennessee does not satisfy chapter 154 because it does not require that

postconviction counsel be formally appointed until a prisoner files an initial petition for postconviction relief. The comment noted that some prisoners under sentence of death may not be competent to file *pro se* petitions on their own and may need a ''next friend'' to file on their behalf, but the State has no mechanism for identifying such prisoners. Furthermore, the comment objected that Tennessee has no mechanism in place to inform prisoners under sentence of death of the postconviction process and requirements. In support of this objection, the comment quoted language from Attorney General Holder's response to public comments on the 2013 Regulations asserting that chapter 154 contemplates that States will provide ''the opportunity for petitioners to file *counseled* State habeas petitions.'' 78 FR at 58167.

This comment misunderstands the requirements of chapter 154. The statute requires a mechanism for the appointment of counsel ''in''—not before—''State postconviction proceedings brought by indigent prisoners who have been sentenced to death.'' 28 U.S.C. 2265(a)(1). The state postconviction review proceedings begin on ''the date on which the first petition for post-conviction review or other collateral relief is filed.'' *Id.* 2263(b)(2). Before the petition is filed, chapter 154's requirement that counsel must be appointed does not apply. I am aware that one federal district court has suggested in dicta that chapter 154 might apply before the filing of a state postconviction petition, *see Mills* v. *Anderson,* 961 F. Supp. 198, 201 n. 4 (S.D. Ohio 1997), but that conclusion is inconsistent with the text of chapter 154. The 2013 Regulations likewise do not require a State to identify and to provide counsel to prisoners under sentence of death who might want to file a postconviction petition but have not yet done so. To the extent that remarks in the preamble to the 2013 Regulations suggest otherwise, those remarks are inconsistent with both the statutory and the regulatory text.

The same comment cited 28 U.S.C. 2261(c), which requires that ''[a]ny mechanism for the appointment, compensation, and reimbursement of counsel as provided in subsection (b) must offer counsel to all State prisoners under capital sentence.'' 28 U.S.C. 2261(c). But the comment takes that language out of context. Section 2261(c) refers to a mechanism ''provided in subsection (b).'' 28 U.S.C. 2261(c). Subsection (b), in turn, refers to ''a mechanism for providing counsel in postconviction proceedings as provided in section 2265.'' *Id.* 2261(b)(1). And section 2265 refers to ''a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death.'' *Id.* 2265(a)(1)(A). Neither section 2261(c) nor any other provision of chapter 154 requires a State to seek out prisoners under sentence of death who might have collateral claims but have not filed petitions for postconviction relief. The ''offer'' language in section 2261(c) applies only when a prisoner under sentence of death has filed ''the first petition for post-conviction review or other collateral relief,'' *id.* 2263(b)(2), which begins the ''State postconviction proceedings,'' *id.* 2265(a)(1)(A).

Several features of Tennessee's system ameliorate any potential concerns about the requirement to file an initial petition for postconviction relief. In Tennessee, counsel from the Office of the Post-Conviction Defender (''OPCD'') may help prisoners prepare and file their petitions prior to any formal appointment of counsel. A court may appoint counsel if necessary to secure the filing of a complete petition. *See* Tenn. Code Ann. sec. 40–30–106(e). It cannot dismiss a *pro se* petition for failure to follow the prescribed form until the court has given the petitioner a reasonable opportunity to amend the petition with the assistance of counsel. *See* Tenn. Sup. Ct. R. 28 sec. 6(B)(4)(b). After the filing of the initial petition and the appointment of counsel, a prisoner has the opportunity to amend the petition to raise additional issues. *See* Tenn. Code Ann. sec. 40–30–107(b)(2); Tenn. Sup. Ct. R. 28 sec. 6(B)(3)(b); *id.* R. 28 sec. 8(D)(5).

The comment asserted that if an initial *pro se* petition is not sufficiently detailed and does not present complex factual allegations and legal claims, then a court will summarily dismiss the petition for failure to show that the petitioner is entitled to any relief. That characterization of Tennessee law is incorrect. A court will dismiss an initial *pro se* petition if it contains ''[a] bare allegation that a constitutional right has been violated'' or ''mere conclusions of law.'' Tenn. Code Ann. sec. 40–30–106(d). But a court will not dismiss a petition that states a ''colorable claim,'' which is defined as a claim ''that, if taken as true, in the light most favorable to petitioner, would entitle petitioner to relief under the Post-Conviction Procedure Act.'' Tenn. Sup. Ct. R. 28 sec. 2(H); *see also id.* R. 28 sec. 6(B). The presence of even minimal facts in an initial *pro se* petition is sufficient for the purpose of a court's preliminary consideration. *See, e.g., Arnold* v. *State,* 143 SW3d 784, 785–87 (Tenn. 2004) (reversing the summary dismissal of the initial *pro se* petition of a convicted child rapist alleging ineffective assistance of counsel with minimal factual support).

Nevertheless, the comment suggested that Tennessee should be denied certification based on the bare possibility that postconviction counsel will not be appointed for an indigent prisoner in some capital case, where the petition is dismissed based on failure to state a colorable claim or other deficiency. As discussed above, Tennessee's system incorporates extensive assistance, procedures, and rights for petitioners which may foreclose the occurrence of such cases. If such a case were to occur despite these protections, counsel would not be ''appointed pursuant to [the certified] mechanism'' in the case, because not appointed at all, potentially bringing into play the inapplicability of chapter 154's expedited federal habeas review procedures in the individual case. 28 U.S.C. 2261(b)(2). But the actual occurrence or theoretical possibility of such a case would not contradict my conclusion, for the reasons explained above, that Tennessee ''has established a mechanism for the appointment . . . of . . . counsel'' for indigent prisoners in capital postconviction proceedings, which suffices for certification of Tennessee's mechanism. 28 U.S.C. 2261(b)(1), 2265(a)(1)(A).

Another comment argued that Tennessee does not guarantee that counsel will be appointed in a timely manner. Although chapter 154 does not contain a timeliness requirement, the 2013 Regulations define ''Appointment'' to mean the ''provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.'' 28 CFR 26.21; *see also* 73 FR at 75332; 91 FR at 12528. The commenter's objection is without merit because, as noted above, Tennessee provides a process for the prompt appointment of postconviction counsel.

Furthermore, even if there were instances where postconviction counsel for an indigent defendant had not been appointed in a timely manner, that would not be a basis to deny certification. As discussed above, chapter 154 requires that a State have a mechanism for the appointment of postconviction counsel, *see* 28 U.S.C. 2265(a). If ''appointment'' of counsel is understood to mean appointment in a

reasonably timely manner, as provided in 28 CFR 26.21, the section 2265 certification determination looks to whether the State has a mechanism for appointing counsel in a reasonably timely manner, not the timeliness of appointment in any individual case. Section 2265 certification is not a case-specific assessment.

Relatedly, one comment asserted that, as a factual matter, many initial *pro se* habeas petitions in Tennessee have not been filed until after the expiration of the 180-day time limit of 28 U.S.C. 2263 that would be established by certification under chapter 154. The comment argued that Tennessee does not satisfy chapter 154 and the 2013 Regulations because postconviction counsel may be appointed weeks or months after a final judgment. That argument lacks merit. Cases are litigated, petitions are prepared and filed, and counsel are provided to assist in such petitions in conformity with the applicable time limits when the litigation occurs. The fact that litigants use more time when it is available to them says nothing about whether they could comply with a shorter deadline if the available time were reduced. And, in any event, the applicable time limit reflects a judgment by Congress about what amount of time is needed, assuming the State has established a postconviction capital counsel mechanism that meets the requirements of chapter 154.

The comment also expressed concern that certification of Tennessee's mechanism would apply retroactively to pending federal habeas petitions seeking postconviction relief and would result in many of those petitions—those that were already, when filed, past the 180-day time limit for federal habeas filing under 28 U.S.C. 2263—being dismissed as untimely. *Cf.* 85 FR at 20719 (same concern noted and addressed in certification of Arizona's mechanism in 2020). But section 2265 dictates the effective date of a certification, *see* 28 U.S.C. 2265(a)(2), and gives the Attorney General no discretion to adjust that date. To the extent any individual habeas cases present retroactivity questions, those issues may be raised to the federal courts adjudicating those petitions. Regardless of how the courts may address this issue, it is not a matter under the control of the Attorney General or the State of Tennessee, and it does not bear on whether Tennessee has established a capital counsel mechanism satisfying the requirements of chapter 154.

One comment asserted that significant time and resources are required to prepare and present claims in capital collateral litigation and that the time and conditions for adding claims after a federal habeas petition has been filed would be limited by 28 U.S.C. 2266 if chapter 154 applies. The comment interpreted the statute as requiring that a State requesting certification must guarantee that postconviction counsel will be appointed quickly so that all claims can be developed and presented consistent with the time limit in section 2263 and the limit on amending petitions in section 2266. However, neither chapter 154 nor the 2013 Regulations prescribe, as a condition of certification, a specific timeframe for appointing counsel after a judgment becomes final. Federal law similarly provides no specific timeframe for appointing counsel in federal habeas litigation or litigation arising under 28 U.S.C. 2255, yet such litigation is still subject to statutory time limits. *See* 18 U.S.C. 3599; *see also* 28 U.S.C. 2244(d), 2255(f), 2263. Nothing in the text of chapter 154 suggests that Congress intended to hold the States to a higher standard than the federal government in this regard as a condition of certification.

The comment also overlooks statutory provisions that narrow the difference between the 180-day time limit for filing a federal habeas petition under chapter 154, *see* 28 U.S.C. 2263, and the one-year time limit under normal habeas procedures, *see id.* 2244(d). Chapter 154 provides a 180-day period for the filing of a federal habeas petition, extendable to 210 days for good cause and subject to tolling during the pendency of a petition for certiorari to the Supreme Court and during the pendency of state collateral proceedings. *See id.* 2263. Amendments to a petition are permitted until the filing of an answer, after which subsequent amendments are conditioned on satisfaction of the requirements for successive petitions under 28 U.S.C. 2244(b). *See id.* 2266(b)(3)(B). Both the time limit of section 2244(d) and the time limit of section 2263, as well as the limitation on amendments in section 2266, were enacted by Congress in 1996 in the Antiterrorism and Effective Death Penalty Act. In defining the limitations under chapter 154 somewhat more narrowly, Congress was attempting to solve the acute problems of delay and obstruction that thwart the execution of capital sentences. *See* 152 Cong. Rec. 2240–50 (remarks of Sen. Kyl).

The comment also fails to acknowledge that a chapter 154 certification could, in a number of ways, lighten the load of defense counsel and enable them to meet shorter deadlines. Where chapter 154 applies, the automatic stay provisions of section 2262 are available, reducing the need to engage in litigation over stays of execution. Section 2264 also provides clearer and tighter rules concerning the range of cognizable claims in federal habeas corpus review under chapter 154, in comparison with the general federal habeas review standards, which relieves counsel of the need to prepare and to present claims precluded under section 2264. *See* 152 Cong. Rec. 2448–49 (remarks of Sen. Kyl) (explaining differences). Furthermore, chapter 154 relieves federal habeas counsel of the need to litigate questions concerning the exhaustion of state remedies, as well as other litigation burdens incident to the movement of cases between state and federal court, because the exhaustion requirement does not apply under chapter 154. *See* 28 U.S.C. 2264(b) (''Following review subject to subsections (a), (d), and (e) of section 2254, the court shall rule on the claims properly before it.''); 152 Cong Rec. 2447–48 (remarks of Sen. Kyl); 135 Cong. Rec. 24695, 24698 (Powell Committee Report); 73 FR at 75336; 85 FR at 20720.

In light of these considerations, Congress concluded that the time limits and the limitation on amending petitions in chapter 154 strike the right balance between removing obstructions to the execution of capital sentences and affording prisoners under sentence of death the opportunity to seek postconviction relief. To the extent the commenters do not believe that chapter 154 provides adequate time for preparing and presenting claims, the place to raise that argument is before Congress.

### *C. Counsel Competency*

#### 1. Counsel Competency Standards and Chapter 154

Chapter 154 also requires, as a condition of certification, that the State establish standards of competency for appointment of counsel in capital postconviction proceedings. 28 U.S.C. 2265(a)(1).

Tennessee satisfies this requirement. Tennessee Supreme Court Rule 13, section 3(h), establishes competency standards for attorneys to be appointed as postconviction counsel in capital cases. There are two alternative paths to qualify as appointed postconviction counsel. Under the first path, an attorney qualifies to serve as appointed postconviction counsel if he also qualifies to serve as appointed appellate counsel. *See* Tenn. Sup. Ct. R. 13 sec. 3(h). The criteria for appointed appellate counsel are ''three years of

litigation experience in criminal trials and appeals'' and experience as counsel of record in the appeal of either one capital case or three felony convictions. *Id.* R. 13 sec. 3(g). If the attorney's experience is based on the appeal of three felony convictions, that experience must have been ''within the past three years,'' and the attorney must also complete ''a minimum of six hours of specialized training in the trial and appeal of capital cases.'' *Id.*

Under the second path, if an attorney does not meet the qualifications of appointed appellate counsel, he may still qualify to serve as appointed postconviction counsel if he has ''experience as counsel of record in state post-conviction proceedings in three felony cases, two murder cases, or one capital case.'' *Id.* R. 13 sec. 3(h). Regardless of whether he qualifies under the first or the second path, an attorney must also ''have a working knowledge of federal *habeas corpus* practice, which may be satisfied by six hours of specialized training in the representation in federal courts of defendants under the sentence of death.'' *Id.* These competency standards have not materially changed since Rule 13 went into effect on July 1, 1997. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 3(g)–(h).

In addition, Tennessee law provides that indigent capital defendants are generally represented in postconviction proceedings by qualified attorneys from the OPCD, unless those attorneys have a conflict of interest. *See* Tenn. Sup. Ct. R. 13 sec. 1(e)(4)(A); *see also* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 1(h); Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 1(e)(4)(A). In the event of a conflict, the court will assign replacement counsel from a roster of qualified private attorneys maintained by the court. *See* Tenn. Sup. Ct. R. 13 sec. 1(e)(4)(B). The OPCD has existed in Tennessee since 1995 and has been primarily responsible for capital postconviction representation throughout the period of this certification. *See* Tenn. Code Ann. secs. 40–30–205(g), 40–30–206(a), (c); *see also* 1995 Tenn. Pub. Acts ch. 510 sec. 1. The required use of OPCD counsel in most cases provides an additional standard of competency because the attorneys appointed as postconviction counsel have been found fit for employment by a dedicated capital postconviction defender office whose regular work is postconviction capital representation. Moreover, by virtue of their employment in the OPCD, those attorneys are embedded in a community of coworkers who work on similar matters and can provide oversight and assistance.

2. Counsel Competency Standards and the 2013 Regulations

The 2013 Regulations provide that a State's ''mechanism must provide for appointment of competent counsel as defined in State standards of competency for such appointments.'' 28 CFR 26.22(b). To aid in the determination regarding this requirement, paragraph (b)(1) provides two benchmark criteria. *See id.* 26.22(b)(1). A State's standards of competency are presumptively adequate if they meet or exceed either of the benchmarks. *See id.* Paragraph (b)(2) further states that competency standards will also ''be deemed adequate'' if they ''reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases.'' 28 CFR 26.22(b)(2).

Tennessee's counsel competency standards satisfy paragraph (b)(2) because they compare favorably to the federal standards for attorneys appointed to serve as postconviction counsel in capital cases. *See* 18 U.S.C. 3599(c)–(d). The federal statutory competency standards are appropriate reference points in assessing corresponding state standards because Congress likely would not have deemed inadequate state competency standards that are similar to those it deemed adequate for federal postconviction proceedings in capital cases. *See* 78 FR at 58169–70. The federal competency standard requires at least five years of admission to the applicable court of appeals and at least three years of experience in handling felony appeals. *See* 18 U.S.C. 3599(c). The federal standard does not require postconviction or capital litigation experience or training. By contrast, both of Tennessee's alternative paths to qualify as appointed postconviction counsel require some degree of training or experience in postconviction proceedings or capital cases. *See* Tenn. Sup. Ct. R. 13 sec. 3(g)–(h). Moreover, Tennessee's standards require three years of litigation experience in criminal trial and appeals and experience in the appeal of a capital case or three felony convictions *or* experience in state postconviction proceedings in three felony cases, two murder cases, or one capital case. An attorney who satisfies Tennessee's competency standards is therefore likely at least as prepared to serve as appointed postconviction capital counsel as an attorney who satisfies the federal standard.

With respect to public defenders from the OPCD, I find that the creation and use of a dedicated capital post-conviction defender office, with the structure, functions, and responsibilities described in Tenn. Code Ann. sec. 40–30–205 *et seq.,* likewise satisfies paragraph (b)(2) because it ''reasonably assure[s] a level of proficiency appropriate for State postconviction litigation in capital cases.'' 28 CFR 26.22(b)(2). In addition to providing counsel whose day-to-day work is representing prisoners in capital postconviction proceedings, Tennessee's approach promotes proficient representation by using attorneys embedded in a community of similarly employed coworkers, who can provide oversight and assistance, and who can potentially be substituted if the individual counsel becomes unable to provide representation or to do so effectively.

The conclusion that Tennessee's competency standards satisfy paragraph (b)(2) is reinforced by comparing Tennessee's standards to the benchmarks in paragraph (b)(1). Even if a State's capital counsel standards do not satisfy the benchmarks under paragraph (b)(1), those benchmarks continue to function as reference points in the evaluation of adequacy under paragraph (b)(2). State competency standards that are likely to result in significantly lower levels of proficiency than the benchmarks risk being found inadequate under chapter 154, whereas state competency standards that are likely to result in similar or even higher levels of proficiency than the benchmarks weigh in favor of a finding of adequacy under chapter 154. *See* 78 FR at 58172, 58179.

The first benchmark, appearing in paragraph (b)(1)(i), is appointment of counsel ''who have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience.'' *Id.* 26.22(b)(1)(i). This standard is an adaptation of the federal competency standard under 18 U.S.C. 3599, with postconviction litigation experience substituted for appellate litigation experience. *See* 78 FR at 58178. The basic standard is subject to the proviso that ''a court, for good cause, may appoint other counsel whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty and the unique and complex nature of the litigation.'' 28 CFR 26.22(b)(1)(i).

Tennessee's standards compare favorably to the first benchmark for much the same reason that they compare favorably to the federal competency standards under 18 U.S.C.

3599. The benchmark could be satisfied by handling one or two postconviction proceedings over a period of three years in any type of case. In comparison, Tennessee's standards, as discussed above, include more robust criminal litigation experience and training requirements that can help in providing effective representation in capital postconviction proceedings. Therefore, an attorney who satisfies the Tennessee competency standards is likely at least as prepared to serve as appointed postconviction capital counsel as an attorney who satisfies the first benchmark in paragraph (b)(1)(i).

The second benchmark, appearing in paragraph (b)(1)(ii), is appointment of counsel ''meeting qualification standards established in conformity with'' provisions of the federal Innocence Protection Act. *Id.* 26.22(b)(1)(ii). This benchmark requires that a State must ''invest[ ] the responsibility for appointing qualified attorneys to represent indigent defendants in capital cases . . . in a public defender program that relies on staff attorneys, members of the private bar, or both, to provide representation in capital cases.'' 34 U.S.C. 60301(e)(1)(A). The public defender program must ''establish qualifications for attorneys who may be appointed to represent indigents in capital cases,'' ''establish and maintain a roster of qualified attorneys,'' ''conduct, sponsor, or approve specialized training programs for attorneys representing defendants in capital cases,'' ''monitor the performance of attorneys who are appointed and their attendance at training programs,'' and ''remove from the roster attorneys who'' provide inadequate representation, have been sanctioned, or fail to comply with training requirements. *Id.* 60301(e)(2)(A)–(B), (D)–(E).

Tennessee's use of the OPCD compares favorably to the second benchmark. The OPCD employs, trains, and supervises staff attorneys who represent indigent capital defendants in postconviction proceedings. *See* Tenn. Code Ann. secs. 40–30–206, –208. In addition, the OPCD is directed to provide training, consulting services, and sample materials and briefs to public defenders and private counsel representing indigent capital defendants. *See id.* sec. 40–30–206(d). The use of the OPCD creates ''an effective system for providing competent legal representation,'' which is the goal of the federal Innocence Protection Act and the second benchmark. 34 U.S.C. 60301(e).

3. Specific Criticisms

The comments suggested that certification should be denied because it is possible to satisfy Tennessee's competency standards without any postconviction litigation experience or capital experience—for example, by serving as counsel of record in the appeal of three felony convictions within the past three years. *See* Tenn. Sup. Ct. R. 13 sec. 3(g)–(h). These comments lack merit because chapter 154 does not require either postconviction litigation experience or capital litigation experience as a prerequisite for appointment as counsel in capital postconviction proceedings. In *Spears* v. *Stewart,* the Ninth Circuit rejected the argument that Arizona's competency standards were insufficient because they permitted the appointment of attorneys who did not have capital litigation experience. *See* 283 F.3d at 1013. The court reasoned that ''[n]othing in 28 U.S.C. 2261(b) or in logic requires that a lawyer must have capital experience to be competent.'' *Id.* Likewise, in *Ashmus* v. *Calderon,* the Ninth Circuit rejected the argument that California's competency standards were insufficient because they did not require any familiarity with or experience in postconviction litigation. *See* 123 F.3d at 1208. The court concluded that ''[m]any lawyers who could competently represent a condemned prisoner would not qualify under such a standard.'' *Id.*

The benchmark criteria in the 2013 Regulations likewise do not mandate postconviction or capital litigation experience in all cases. The second benchmark requires that state qualification standards must conform to certain provisions of the federal Innocence Protection Act, *see* 28 CFR 26.22(b)(1)(ii), and none of those provisions expressly requires either postconviction or capital litigation experience, *see* 34 U.S.C. 60301(e)(1), (e)(2)(A)–(B), (e)(2)(D)–(E). The first benchmark mandates three years of postconviction litigation experience as the default standard, but it provides that this standard may be waived ''for good cause,'' and it does not require any capital litigation experience. 28 CFR 26.22(b)(1)(i).

Some comments asserted that certification should also be denied because the six hours of specialized training required by Tennessee are inadequate and fail to cover numerous topics that an attorney in a capital postconviction proceeding should know. But neither chapter 154 nor the 2013 Regulations require any specialized training and, for that matter, neither do the competency requirements for appointed counsel in federal proceedings in capital cases. *See* 18 U.S.C. 3599; 28 CFR 26.22(b). Any policy disagreement about the adequacy of Tennessee's specialized training requirement provides no legal ground for me to deny certification.

The comments also argued that the Attorney General should not certify Tennessee's capital counsel mechanism because there have been cases in which capital postconviction counsel have not performed competently in practice. This argument misconceives the requirements for certification and the Attorney General's role in the certification process. *See* 85 FR at 20712 (discussing the role of the Attorney General in the Arizona certification). Chapter 154 provides that the Attorney General ''shall determine'' whether a State ''has established a mechanism for the appointment . . . of competent counsel'' in state capital postconviction proceedings, and whether the State ''provides standards of competency for the appointment of counsel'' in such proceedings. 28 U.S.C. 2265(a). The statute does not authorize or require the Attorney General to inquire into counsel's performance following appointment. Instead, it frames its requirements regarding counsel competency as matters relating to appointment, contemplating an inquiry into whether a State has standards determining eligibility for appointment. *See* 78 FR at 58162–63, 58165. This understanding is supported by the Powell Committee Report, from which chapter 154 derives. The report explained that federal review would examine whether a State's mechanism for appointing capital postconviction counsel comports with the statutory requirements ''as opposed to [examining] the competency of particular counsel.'' 135 Cong. Rec. 24696. It further explained that, in contrast to the focus on ''the performance of a capital defendant's trial and appellate counsel,'' ''[t]he effectiveness of State and Federal postconviction counsel is a matter that can and must be dealt with in the appointment process.'' *Id.; see also* 78 FR at 58162–63, 58165. The 2013 Regulations accordingly rejected public comments suggesting that ''chapter 154 requires the Attorney General to certify a state mechanism only if he or she examines and is satisfied by the actual performance of postconviction counsel following appointment.'' 78 FR at 58163.

As discussed above, the 2006 amendments to chapter 154 bifurcated responsibility for determinations

affecting chapter 154's applicability. The Attorney General's function is to determine whether a State has established a capital counsel mechanism satisfying chapter 154's requirements, a determination that turns on an examination of the State's laws and policies and does not involve reviewing how counsel performs after appointment. *See* 28 U.S.C. 2261(b)(1), 2265. The federal district court reviewing a habeas petition is responsible for determining whether counsel was appointed pursuant to the State's mechanism. *See id.* 2261(b)(2). Counsel performance in particular cases does not have any bearing on my determination whether Tennessee's competency standards satisfy the requirements of chapter 154 or the 2013 Regulations.

Some comments asserted that it is unclear whether the Tennessee Supreme Court Rule 13 standards of competency are enforced against OPCD counsel. As discussed above, employment by the OPCD is itself a sufficient standard of competency under the 2013 Regulations because, among other reasons, the day-to-day work of the office is representing prisoners under sentence of death in postconviction proceedings. *See* Tenn. Code Ann. sec. 40–30–205 *et seq.* Moreover, even if a new attorney hired by the OPCD lacks the requisite experience, it does not follow that the competency standards have been violated in a particular case because the junior attorney may be serving as co-counsel alongside a more experienced OPCD attorney. And experience gained in working for OPCD may qualify an attorney, even if inexperienced when hired, for subsequent appointments under the standards of Rule 13 sec. 3(h), which treat as sufficient experience in state postconviction proceedings in a capital case—OPCD's regular work—plus a training requirement.

Regardless, any failure to satisfy the Rule 13 competency standards in some instances does not mean that Tennessee fails to satisfy the requirements for certification under chapter 154 or the 2013 Regulations. Prisoners who believe that counsel appointed in their cases do not meet the State's counsel competency standards for appointment could raise the matter before the federal district courts reviewing their habeas petitions. Those courts are responsible for determining whether counsel was appointed pursuant to a State's capital counsel mechanism. *See* 28 U.S.C. 2261(b)(2). Whatever federal courts may determine in such cases, it is not relevant to my determination whether Tennessee's capital counsel mechanism satisfies the requirements for certification.

Finally, one comment argued that certification should be denied because Tennessee's competency standards do not comply with the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* which were issued in 2003. As an example of this failure, the comment observed that Tennessee does not have an agency responsible for ensuring that appointed counsel meet competency standards and monitoring the post-appointment performance of counsel. The comment also objected that Tennessee law allows courts to rely on attorneys' representations regarding their qualifications.

None of these objections is grounded in the text of chapter 154 or the 2013 Regulations. Moreover, the statute providing for the appointment of counsel in federal postconviction proceedings does not create any requirements for an agency to oversee and enforce attorney competency standards or for courts to require evidence of competency beyond an attorney's representations. *See* 18 U.S.C. 3599. Nothing in chapter 154 suggests that Congress intended to hold the States to a higher standard than the federal government in this regard.

More broadly, my responsibility is to determine whether Tennessee has established a capital counsel mechanism that satisfies the requirements of chapter 154, not the requirements of any guidelines issued by the American Bar Association. Congress adopted standards modeled on the American Bar Association's *Guidelines* in the context of a grant program when it enacted the Innocence Protection Act in 2004. *See* 34 U.S.C. 60301. Had Congress intended to make those standards a requirement of chapter 154 certification, it could have done so when it amended chapter 154 in 2006. But Congress chose not to do so, and it instead decided to afford the States broad latitude in developing mechanisms for the appointment of competent counsel.

*D. Compensation of Counsel*

1. Compensation of Counsel and Chapter 154

Chapter 154 requires the Attorney General to determine whether a state has established a mechanism for the compensation of appointed postconviction capital counsel. 28 U.S.C. 2265(a)(1). I find that Tennessee has established such a mechanism.

In Tennessee, the representation of indigent capital defendants is normally provided by salaried post-conviction defenders who have no conflict of interest. *See* Tenn. Sup. Ct. R. 13 sec. 1(e)(4)(A); Tenn. Code Ann. secs. 40–30–206, –207, –208; *see also* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 1(h); Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 1(e)(4)(A). The salary of the Post-Conviction Defender—*i.e.,* the head of the OPCD—is equal to that of the district public defenders and in 2025 was $218,256 per year. *See* Tenn. Code Ann. sec. 40–30–209(a); Tennessee Office of the Post-Conviction Defender Salaries, *GovSalaries, https://bit.ly/4u4fhRN* (last visited Apr. 30, 2026). The salaries of the Assistant Post-Conviction Defenders are based on experience level and are determined in accordance with the assistant public defender's pay schedule. *See* Tenn. Code Ann. sec. 40–30–209(b). In 2025, these salaries ranged from $75,336 per year to $190,824 per year. *See* Tennessee Office of the Post-Conviction Defender Salaries, *GovSalaries, https://bit.ly/4u4fhRN* (last visited Apr. 30, 2026).

If the OPCD counsel have conflicts of interest, Tennessee courts are then required to designate private attorneys to represent indigent capital defendants. *See* Tenn. Sup. Ct. R. 13 sec. 1(e)(4)(B); Tenn. Code Ann. sec. 40–30–207; *see also* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 1(h); Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 1(e)(4)(B). Between July 1, 1997, and November 30, 2024, private attorneys appointed to serve as postconviction counsel for indigent capital defendants were compensated at a rate of $60 per hour for out-of-court work and $80 per hour for in-court work. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 3(j)(5)–(6); *see also* Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 3(k)(5)–(6). Beginning on December 1, 2024, private attorneys appointed to serve as postconviction counsel for indigent capital defendants are compensated at a rate of $90 per hour, which would equate to $180,000 per year on a 2000-hours-per-year basis. Tenn. Sup. Ct. R. 13 sec. 3(k)(3).

2. Compensation of Counsel and the 2013 Regulations

The Department's rule addressing compensation of counsel is 28 CFR 26.22(c), which provides that a State's ''mechanism must provide for compensation of appointed counsel.'' 28 CFR 26.22(c). The rule lists four benchmark criteria in paragraph (c)(1) and provides that a State's provision for compensation is presumptively

adequate if it is comparable to or exceeds any of the benchmarks. *See id.* 26.22(c)(1). The benchmarks are: (i) compensation of appointed capital federal habeas counsel; (ii) compensation of retained state postconviction capital counsel meeting state standards of competency; (iii) compensation of appointed state capital trial or appellate counsel; and (iv) compensation of state attorneys in state capital postconviction proceedings, taking account of private counsel overhead costs. *See id.* The rule further states in paragraph (c)(2) that provisions for compensation not satisfying the benchmarks will be deemed adequate only if the state mechanism is otherwise reasonably designed to ensure the availability for appointment of counsel who meet state standards of competency sufficient under paragraph (b). *See id.* 26.22(c); 78 FR at 58172–73, 58179–80 (further explaining the regulatory provisions). The preamble of the 2013 Regulations explains that paragraph (c)(2) recognizes that compensation provisions ''have been deemed adequate for purposes of chapter 154 . . . independent of any comparison to the benchmarks in paragraph (c)(1).'' 78 FR at 58180.

I find that Tennessee's compensation mechanism for both OPCD counsel and appointed private attorneys satisfies paragraph (c). *See* 28 CFR 26.22(c). With respect to public defenders, the fact that Tennessee has created the OPCD and compensates the attorneys in that office by salary is sufficient. The Department explained when it promulgated the 2013 Regulations that ''a State may secure representation for indigent capital petitioners in postconviction proceedings by means not dependent on any special financial incentive for accepting appointments, such as by providing sufficient salaried public defender personnel to competently carry out such assignments as part of their duties.'' 78 FR at 58180; *see also* 85 FR at 20714 (concluding that use of salaried public defenders in Arizona satisfies 28 CFR 26.22(c)(2)).

With respect to private attorneys, the compensation rates are ''presumptively adequate'' because they are ''comparable'' to ''[t]he compensation of appointed counsel in State appellate or trial proceedings in capital cases.'' 28 CFR 26.22(c)(1)(iii). Between July 1, 1997, and June 30, 2018, Tennessee's compensation rates for appointed lead counsel in a capital case were $75 per hour for out-of-court work and $100 per hour for in-court work. Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 3(j)(1)–(2). For appointed co-counsel in a capital case, the compensation rates were $60 per hour for out-of-court work and $80 per hour for in-court work. *See id.* R. 13 sec. 3(j)(3)–(4). The compensation rates for appointed post-conviction counsel during this period—$60 per hour for out-of-court work and $80 for in-court work—were identical to the rates for appointed co-counsel in the trial and appellate stages. *See id.* R. 13 sec. 3(j)(5)–(6).

Tennessee amended its compensation rates on June 29, 2018, and those rates took effect on July 1, 2018. *See* Tenn. Sup. Ct. Order (June 29, 2018), *https://perma.cc/6HRJ-D55B;* Tenn. Sup. Ct. Order (July 2, 2018), *https://perma.cc/H474-6XUB.* Beginning on July 1, 2018, and until the rates were amended again on July 1, 2024, the compensation rate for appointed lead counsel in a capital case was $100 per hour. *See* Tenn. Sup. Ct. Order (July 2, 2018), R. 13 sec. 3(k)(1) (July 2, 2018). For appointed co-counsel in a capital case, the rate was $80 per hour. *See id.* R. 13 sec. 3(k)(2). The compensation rate for appointed postconviction counsel during this period—$80 per hour—was identical to the rate for appointed co-counsel in the trial and appellate stages. *See id.* R. 13 sec. 3(j)(3).

Tennessee increased its compensation rates to their current levels on July 2, 2024, with an effective date for those rates of July 1, 2024. *See* Tenn. Sup. Ct. Order (July 2, 2024), *https://perma.cc/XML5-VCEL.* The current rate for appointed lead counsel in a capital case is $110 per hour. *See* Tenn. Sup. Ct. R. 13 sec. 3(k)(1). The current rate for appointed co-counsel in a capital case is $90 per hour. *See id.* R. 13 sec. 3(k)(2). The compensation rate for appointed postconviction counsel—$90 per hour—is identical to the rate for appointed co-counsel in the trial and appellate stages. *See id.* R. 13 sec. 3(k)(3).

Tennessee satisfies paragraph (c)(1)(iii). *See* 28 CFR 26.22(c)(1)(iii). Since July 1, 1997, Tennessee's compensation rate for appointed postconviction counsel in capital cases has been identical to the compensation rate for co-counsel in capital trials and appeals. *See* Tenn. Sup. Ct. R. 13 sec. 3(k); Tenn. Sup. Ct. Order (June 29, 2018), R. 13 sec. 3(k); Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 3(j). Although the compensation rate for postconviction counsel is less than the compensation rate for lead counsel at the trial and appellate stages, paragraph (c)(1)(iii) does not distinguish between lead counsel and co-counsel. The benchmark is satisfied when the compensation rate of postconviction counsel ''is comparable to or exceeds'' the compensation rate of ''appointed counsel'' in the trial or appellate stages. 28 CFR 26.22(c)(1)(iii). Tennessee law, like federal law, requires the initial appointment of two attorneys in the trial stage of capital litigation but only one attorney in the postconviction stage. *See* 18 U.S.C. 3005, 3599; Tenn. Sup. Ct. R. 13 sec. 3(b)(1). Nothing in chapter 154 or the 2013 Regulations prohibits Tennessee from relying on the same distinction and compensating lead counsel in the trial stage at a higher rate than co-counsel or postconviction counsel. Although solo postconviction counsel would lack the assistance provided by lead counsel to co-counsel at earlier stages, postconviction counsel would be rewarded for any resulting additional work by being compensated for however many additional hours he works.

Tennessee's compensation mechanism also satisfies paragraph (c)(2) because it compares favorably to the fourth benchmark in paragraph (c)(1)(iv) and is therefore ''reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency.'' 28 CFR 26.22(c)(2); *see also* 78 FR at 58172, 58179. Paragraph (c)(1)(iv) provides that a State's provision for compensation is ''presumptively adequate'' if it ''is comparable to or exceeds . . . [t]he compensation of attorneys representing the State in State postconviction proceedings in capital cases, subject to adjustment for private counsel to take account of overhead costs not otherwise payable as reasonable litigation expenses.'' 28 CFR 26.22(c)(1)(iv). Before 2023, the offices of the Tennessee district attorneys general represented the State in all capital postconviction litigation. *See* Tenn. Code Ann. sec. 40–30–108(a). Since 2023, the offices of the district attorneys general have continued to represent the State in capital postconviction litigation for death sentences imposed after March 1, 2023. *See id.* secs. 40–30–108(a); 40–30–114(c). The Office of the Tennessee Attorney General now represents the State in capital postconviction litigation for death sentences imposed on or before March 1, 2023. *See id.* sec. 40–30–114(c)(1), (c)(4)(B).

The salaries of the assistant district attorneys general are determined by a pay scale set by statute, subject to annual adjustment reflecting the average percentage pay increase for state employees set by general appropriations bills. *See* Tenn. Code Ann. sec. 8–7–226. For example, on July 1, 2023, the entry-level salary for an assistant district attorney general was $63,853 per year, and the salary after 25 years of experience was $167,325 per year. *See id.* The compensation rates for assistant

postconviction defenders exceed these compensation rates. *See* Tennessee Office of the Post-Conviction Defender Salaries, *GovSalaries, https://bit.ly/4u4fhRN* (last visited Apr. 30, 2026); *see also* Tenn. Code Ann. secs. 8–14–107(b)(1) (pay scale for assistant district public defenders); 40–30–209(b) (compensation for assistant postconviction defenders set ''in compliance with the assistant public defender's pay schedule'').

Thus, throughout most of the period of this certification, the authorized compensation for OPCD counsel, who represent indigent defendants in most capital postconviction proceedings, has been comparable to the compensation of the assistant district attorneys general representing the State in such proceedings. The information provided in Tennessee's application is not sufficient to make comparisons to the compensation of private attorneys appointed as postconviction counsel or to the compensation of attorneys from the Office of the Tennessee Attorney General. As a result, there is not enough information to determine conclusively whether Tennessee's compensation mechanism satisfies paragraph (c)(1)(iv). However, Tennessee's compensation mechanism compares favorably overall to this benchmark and, therefore, satisfies paragraph (c)(2).

3. Specific Criticisms

The public comments argued that Tennessee's compensation rates are too low to attract and retain competent counsel to provide postconviction representation in capital cases. But the comments did not identify any cases in which the State was unable to secure postconviction representation for an indigent defendant under sentence of death because of inadequate compensation. If the compensation mechanisms for OPCD attorneys and private attorneys were not ''reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency,'' surely there would be some evidence of this. 28 CFR 26.22(c)(2). To the extent the comments suggest that the compensation Tennessee affords is insufficient to ensure the availability of counsel who perform adequately following appointment, that argument misconceives the applicable standard under the 2013 Regulations. A State's compensation mechanism must be ''reasonably designed to ensure the availability for appointment of counsel who meet'' only the State's ''standards of competency'' for appointment, not any other standard of competency or performance. *Id.*

Regardless, even if there were some exceptional case where the State was unable to secure counsel meeting the State's standards of competency because of inadequate compensation, the failure to do so in that particular case would not be a basis to deny certification. The 2013 Regulations require a compensation mechanism that is ''reasonably designed to ensure'' the availability for appointment of such counsel, not one that will infallibly ensure the appointment of such counsel in every case. 28 CFR 26.22(c)(2). And as a case-specific matter, a failure to appoint counsel pursuant to the certified mechanism, because of inadequate compensation or other reasons, could be raised under 28 U.S.C. 2261(b)(2).

Another comment argued that the salaries paid by Tennessee to OPCD counsel are inadequate because OPCD counsel are generally less experienced and, therefore, compensated at lower rates than both the public defenders who handle capital cases at the trial and appellate phases and the attorneys who represent the State in capital postconviction proceedings. This comment misapprehends the 2013 Regulations and the benchmarks. The 2013 Regulations ''recognize[ ] that the options set out in paragraph (c)(1) of 26.22 are not necessarily the only means by which a State may provide compensation for competent counsel.'' 78 FR at 58180. Tennessee's salary-based compensation mechanism need not satisfy the (c)(1) benchmarks because its use of salaried postconviction defenders—compensated comparably to district attorneys general and public defenders—to serve as postconviction counsel for indigent capital defendants satisfies the 2013 Regulations under paragraph (c)(2). *See* 78 FR at 58180; 85 FR at 20714. Regardless, Tennessee authorizes identical compensation scales for OPCD counsel, district public defenders who represent capital defendants at the trial and appellate stages, and district attorney generals and their assistants who represent capital defendants in postconviction proceedings. *See* Tenn. Code Ann. sec. 8–14–107(a); *id.* sec. 40–30–209(a)–(b). The 2013 Regulations do not require that a postconviction defender's salary must meet or exceed the salary of the trial and appellate counsel or the attorneys representing the State in every particular capital case.

With respect to private attorneys appointed as postconviction counsel, one comment objected that the compensation rate of $90 per hour is less than the corresponding rate for federally appointed counsel under 18 U.S.C. 3599. But chapter 154 does not require that the compensation rate for appointed counsel in state postconviction proceedings must be commensurate with the compensation for appointed counsel in federal postconviction proceedings. Moreover, in the 2013 Regulations, the federal compensation rate is only one of four benchmarks, each of which independently establishes presumptive adequacy. *See* 28 CFR 26.22(c)(1). I have concluded that Tennessee's compensation rate for private attorneys is presumptively valid under paragraph (c)(1)(iii) because it is comparable to the compensation rates for appointed co-counsel in state trial or appellate proceedings in capital cases. I have also concluded in the alternative that Tennessee's compensation rate satisfies paragraph (c)(2) because it is comparable to the compensation rates for attorneys representing the State in state postconviction proceedings and therefore compares favorably to the benchmark in paragraph (c)(1)(iv). Any failure of Tennessee's compensation rate to satisfy other benchmarks in paragraph (c)(1) does not undermine my conclusion.

Another comment suggested that Tennessee's request for certification should be denied because Attorney General Garland purportedly denied Arizona's request for certification on January 17, 2025, on the ground of inadequate compensation. The Ninth Circuit held in *Spears* v. *Stewart* that Arizona's compensation rate of $100 per hour was adequate under chapter 154. 283 F.3d at 1015. Attorney General Barr made the same finding when he certified that Arizona had established a capital counsel mechanism satisfying the requirements of chapter 154 on April 14, 2020. *See* 85 FR at 20713–15. In 2025, however, Attorney General Garland concluded that the value of $100 had been eroded by inflation and that, as a result, Arizona's compensation rate no longer satisfied chapter 154. The comment on Tennessee's request for certification argues that, based on Attorney General Garland's reasoning, Tennessee's compensation rate of $90 per hour cannot satisfy chapter 154 because it is less than Arizona's compensation rate.

Attorney General Garland's determination regarding Arizona's request for certification was intrinsically flawed. Its factual premise was that $100 per hour was worth less in 2025 than when Attorney General Barr certified Arizona in 2020. But the relevant standard under the 2013 Regulations asks only whether the State's compensation mechanism is

reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency. 28 CFR 26.22(c)(2). Arizona had advised the Department as late as June 4, 2022, that its compensation rate of $100 per hour continued to attract attorneys meeting the State's competency standards to serve as postconviction counsel for indigent capital defendants. *See* Letter from the Arizona Deputy Solicitor General to the Department of Justice at 6 (June 24, 2022), *www.justice.gov/olp/pending-requests-final-decisions.* Attorney General Garland's determination pointed to no evidence that this was no longer the case.

Moreover, regardless of its flaws, Attorney General Garland's purported denial of Arizona's certification request does not affect my determination that Tennessee's capital counsel mechanism satisfies chapter 154 and the 2013 Regulations. Neither the statute nor the regulations require that a State's compensation rate must exceed or be comparable to a compensation rate that would be adequate in another State or to a nationwide compensation rate. Tennessee's compensation mechanism stands on its own and is adequate under chapter 154 and the 2013 Regulations for the reasons explained above.

Finally, one comment argued that Tennessee's compensation mechanism is inadequate under the 2013 Regulations based on findings in two state reports: a 2017 report by the Tennessee Supreme Court's Indigent Representation Task Force and a 2024 report by the Tennessee Comptroller. According to the comment, these reports concluded that Tennessee's compensation rate for appointed attorneys does not measure up to current market rates for attorneys in the State and that, as a result, many attorneys cannot afford to take on indigent clients. But claims about current market rates and what many attorneys can afford do not mean that a State is unable to provide counsel who meet the State's standards of competency—*i.e.,* the fact that some subset of attorneys might choose not to take on indigent clients hardly establishes more broadly that Tennessee cannot attract counsel to take on such clients. The comment does not alter my conclusion that Tennessee's compensation mechanism for capital counsel satisfies chapter 154 and the 2013 Regulations.

*E. Payment of Reasonable Litigation Expenses*

1. Payment of Reasonable Litigation Expenses and Chapter 154

Chapter 154 requires the Attorney General to determine whether a State has established a mechanism for the payment of reasonable litigation expenses of appointed postconviction counsel in capital cases. 28 U.S.C. 2265(a).

Tennessee's capital counsel mechanism satisfies this requirement. By rule, Tennessee provides for the reimbursement of ''certain necessary expenses directly related to the representation of indigent parties,'' Tenn. Sup. Ct. R. 13 sec. 4(a)(1), and has done so since 1997, *see* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 4(a)(1). By statute and rule, Tennessee also authorizes the reimbursement of investigative services, expert services, and other similar services. *See* Tenn. Code Ann. sec. 40–14–207(b); Tenn. Sup. Ct. R. 13 sec. 5(a)(1); *see also Owens* v. *State,* 908 SW2d 923, 924 (Tenn. 1995) (holding that Tenn. Code Ann. sec. 40–14–207(b) ''applies in post-conviction capital cases''). A court ''may grant prior authorization for . . . necessary services in a reasonable amount'' and ''shall provide for the payment or reimbursement of reasonable and necessary expenses.'' Tenn. Sup. Ct. R. 13 sec. 5(a)(2); *see also* Tenn. Code Ann. sec. 40–14–207(b) (same).

Tennessee law also provides standards and procedures for effectuating the payment of reasonable litigation expenses. To obtain reimbursement for expert and investigative services, the appointed counsel must demonstrate a ''particularized need for the requested services'' in a hearing before the court. Tenn. Sup. Ct. R. 13 sec. 5(c)(1); *see also* Tenn. Sup. Ct. Order, R. 13 sec. 5(b) (Apr. 3, 1997) (''the trial court must . . . determine if the requested services are necessary to ensure the protection of the defendant's constitutional rights''). Since July 1, 2004, all requests for reimbursement of investigative, expert, and other services have required final approval by either the Director of the Administrative Office of the Courts or, if denied, the Chief Justice. *See* Tenn. Sup. Ct. R. 13 sec. 5(e)(4)–(5); Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 5(e)(4)–(5); *see also* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 5(c) (prior rule requiring approval by the Chief Justice for requests exceeding $150 per hour or $5,000 in total expected costs). Although these provisions establish certain conditions for reimbursement, there is no conflict with chapter 154 because they do not prohibit the payment of reasonable litigation expenses.

2. Payment of Reasonable Litigation Expenses and the 2013 Regulations

The 2013 Regulations reiterate the statutory requirement that a state capital counsel mechanism must provide for payment of reasonable litigation expenses of appointed counsel. *See* 28 CFR 26.22(d). Paragraph (d) provides a nonexhaustive list of types of litigation expenses that includes expenses for ''investigators, mitigation specialists, mental health and forensic science experts, and support personnel.'' *Id.* It further states that presumptive limits on payment are allowed, but only if means are authorized for payment of necessary expenses above such limits. *See id.*

Tennessee's capital counsel mechanism satisfies the 2013 Regulations with respect to the payment of reasonable litigation expenses through the same provisions that satisfy chapter 154 itself, which are described above. With respect to ''presumptive limits on payment'' for services, Tennessee's mechanism satisfies the 2013 Regulations because ''means are authorized for payment of necessary expenses above [these] limits.'' 28 CFR 26.22(d). Tennessee initially established presumptive caps on payments for expert and investigative services in 2004, and those caps became effective on July 1, 2004. *See* Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 5(d)(4)–(5). From July 1, 2004, to November 30, 2024, courts in post-conviction capital cases were not permitted to authorize more than $25,000 for expert services or more than $20,000 for investigative services unless the court, ''in its sound discretion,'' determined that ''extraordinary circumstances,'' ''proven by clear and convincing evidence,'' justified exceeding these limits. *Id.* Beginning December 1, 2024, these presumptive limits and the means for exceeding them apply only when the capital defendant in a post-conviction proceeding is represented by a private attorney appointed as postconviction counsel. *See* Tenn. Sup. Ct. R. 13 sec. 5(d)(4)–(5); Tenn. Sup. Ct. Order (Oct. 4, 2024), App'x, R. 13 sec. 5(d)(4)–(5). The OPCD is authorized to secure investigative and expert services through other funds appropriated by statute. *See* Tenn. Code Ann. sec. 40–30–208.

Since July 1, 2004, Tennessee has also maintained maximum hourly rates for particular types of expert services, which are currently set by the Director of the Administrative Office of Courts

and the Chief Justice. *See* Tenn. Sup. Ct. R. 13 sec. 5(d)(1); *see also* Tenn. Sup. Ct. Order, App'x A, R. 13 sec. 5(d)(1) (June 1, 2004). Appointed counsel are expected to ''make every effort to obtain individuals or entities who are willing to provide services at an hourly rate less than the maximum.'' Tenn. Sup. Ct. R. 13 sec. 5(d)(1). Requests for experts ''not listed on the published rate list'' are ''considered on a case by case basis.'' *Id.* Appointed counsel may request ''additional funding for the same investigator or expert,'' and such requests are ''subject to additional review by the [Director of the Administrative Office of the Courts].'' *Id.*

3. Specific Criticisms

Some comments argued that Tennessee's capital counsel mechanism is inadequate because, in some cases, judges do not allow the reimbursement of requested litigation expenses. But the federal statute assumes that a State can assess the reasonableness of litigation expenses as part of its process; chapter 154 does not require that judges must agree in all instances with appointed defense counsel about what expenses are reasonable. Determinations about whether requested expenses are reasonable can be left to the courts. *See* 78 FR at 58173; *Spears,* 283 F.3d at 1016.

Other comments objected both to the requirement that expenses must be authorized by the Administrative Office of the Courts or the Chief Justice and to the presumptive caps of $25,000 for expert services and $20,000 for investigative services. But Tennessee's mechanism is similar to the federal statute governing the appointment of counsel for indigent capital defendants in federal proceedings, which imposes a presumptive cap of $7,500 on litigation expenses and requires approval of the chief judge of the circuit or his delegee for payments exceeding this limit ''as necessary to provide fair compensation for services of an unusual character or duration.'' *See* 18 U.S.C. 3599(g)(2); 78 FR at 58180. Moreover, as discussed above, the 2013 Regulations permit presumptive limits on payment so long as means are authorized for exceeding these limits. *See* 28 CFR 26.22(d); *cf. Spears,* 283 F.3d at 1015 (finding presumptive ceiling on compensable hours valid where means were provided for allowing more hours); *Mata* v. *Johnson,* 99 F.3d 1261, 1266 (5th Cir. 1996) (finding inflexible caps on compensation and expenses adequate under chapter 154), *vacated in part on reh'g,* 105 F.3d 209 (5th Cir. 1997).

Another comment argued that Tennessee's maximum hourly rates for expert services are lower than the rates permitted for federal expert services, and that these rate limits make it difficult for appointed counsel to find qualified experts. But neither chapter 154 nor the 2013 Regulations require that state experts and investigators must be paid at the same rate as their federal counterparts. Nor do they require that securing expert and investigative services must be expeditious or convenient to any particular degree, so long as the State has a mechanism for payment of reasonable litigation expenses.

Finally, one comment objected to changes that have occurred over time regarding the extent to which litigation expenses must be sought from the courts, paid from OPCD's budget with latitude to seek more from the courts, or paid fully from OPCD's budget. The comment asserted that this shifting system provides no assurance that indigent prisoners will receive adequate payment of their litigation expenses. However, neither chapter 154 nor the 2013 Regulations require that defense litigation expenses must be paid by the courts instead of from the budget of a public defender agency conducting the litigation. To the extent this comment is speculating that the Tennessee legislature might in the future decide not to provide the OPCD with sufficient funds to pay for reasonable litigation expenses, that concern applies just as well to whether the Tennessee legislature will provide sufficient funds to the courts for this purpose. In either case, this speculation has no bearing on whether Tennessee has established and currently maintains a mechanism for the payment of reasonable litigation expenses.

## III. Date the Mechanism Was Established

Tennessee has requested that I determine it established its qualifying capital counsel mechanism as of October 23, 1995, referring to the date the Tennessee Supreme Court held that the statute authorizing the payment of investigative and expert services in capital cases applies to postconviction proceedings. *See Owens,* 908 SW 2d at 924 However, the State's certification request rests partly on features of its capital counsel mechanism that were adopted at later times. In particular (and as discussed in detail above), the Tennessee Supreme Court adopted amendments to its Rule 13 on April 3, 1997, effective July 1, 1997, for the purpose of meeting the standards of chapter 154. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997); Tenn. Sup. Ct. Order (Apr. 10, 1997). Accordingly, the earliest date on which I can certify Tennessee's capital counsel mechanism, based on the information provided by Tennessee, is July 1, 1997.

Although there have been some changes in the relevant Tennessee statutes and rules since that time, I find that those differences are not material to Tennessee's satisfaction of chapter 154's requirements. I accordingly determine and certify that Tennessee has continuously had a capital counsel mechanism satisfying chapter 154's requirements since July 1, 1997.

Some of the comments argued that two federal cases that considered Tennessee's capital counsel mechanism prevent me from certifying the mechanism. The first case is *Austin* v. *Bell,* in which a federal district court concluded that chapter 154 did not apply in Tennessee because the State ''imposes insufficient standards to ensure that only qualified competent counsel will be appointed to represent habeas petitioners in capital cases.'' 927 F. Supp. 1058, 1061–62 (M.D. Tenn. 1996). Following this decision, the Tennessee Supreme Court amended its Rule 13 to meet the standards of chapter 154, which included the adoption of minimum experience requirements for postconviction counsel. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 secs. 1(a), 3(h); Tenn. Sup. Ct. Order (Apr. 10, 1997). In light of that amendment, I have certified Tennessee's capital counsel mechanism as complying with chapter 154 since July 1, 1997, and have expressed no opinion as to whether it complied with chapter 154 prior to that date. The district court decision in *Austin* v. *Bell,* issued on May 9, 1996, preceded the effective date of my current certification of Tennessee and related to Tennessee's capital counsel mechanism as it was before that date. A federal court of appeals subsequently affirmed the district court decision and concluded that ''[t]here is no indication that Tennessee has complied with'' chapter 154. *Austin* v. *Bell,* 126 F.3d 843, 846 n.3 (6th Cir. 1997). But that decision concerned Tennessee's capital counsel mechanism as it existed before the establishment of key elements of the current system, including the adoption of Tennessee Supreme Court Rule 13. Accordingly, the district court and court of appeals opinions in *Austin* v. *Bell* are neither controlling nor informative with respect to Tennessee's present satisfaction of chapter 154's requirements.

The second case cited by the commenters is *King* v. *Bell,* in which a prisoner under sentence of death argued

in his federal habeas petition that his claims were not procedurally defaulted because ''Congress eliminated the doctrine of procedural default in all habeas cases except those falling under Chapter 154.'' 392 F. Supp. 2d 964, 1014 (M.D. Tenn. 2005). The district court concluded that this argument was ''without merit.'' *Id.* at 1015. In rejecting the argument, the court undertook no assessment of whether Tennessee's capital counsel mechanism satisfies the requirements of chapter 154, merely observing that the petitioner ''concede[d] Tennessee is not an 'opt in' state'' and that the chapter 154 procedures did not apply to the case. *Id.* A meritless legal argument and a concession made in litigation by a prisoner under sentence of death have no relevance to whether Tennessee satisfies the requirements of chapter 154.

## IV. Other Matters

### *A. Constitutionality of Chapter 154*

The comments raised several constitutional objections to chapter 154. My responsibility under chapter 154 is to determine whether a State has established a postconviction capital counsel mechanism that satisfies the statute's requirements. After reviewing the constitutional objections raised in the public comments, I have concluded that they have no bearing on my certification determination and that they are, in any event, not well founded.

### *B. Validity of the Implementing Rule*

Some comments challenged the implementing rule for chapter 154, Subpart B of 28 CFR part 26—*i.e.,* the 2013 Regulations—arguing that the regulations are invalid on procedural and substantive grounds. These criticisms provide no ground for denying certification to Tennessee. *See* Br. for Appellants at 28–49 and Reply Br. for Appellants at 15–28, *Habeas Corpus Res. Ctr.* v. *U.S. Dep't of Just.,* 816 F.3d 1241 (9th Cir. 2016) (No. 14–16928); Br. for Respondents at 52–65, *Off. of the Fed. Pub. Def. for the Dist. of Ariz.* v. *Rosen,* No. 20–1144 (D.C. Cir. 2020).

### *C. Request for Supplemental Process*

Some commenters objected that they had inadequate time to develop a full record for their public comments. They also argued that Tennessee's application for certification does not accurately describe the State's capital counsel mechanism and should be denied for this reason. If the application is not denied, they requested that I order Tennessee to supplement its application in order to correct the alleged misrepresentations and to provide additional information on how the capital counsel mechanism has operated in practice. They also requested that I authorize an additional public comment period for responses to Tennessee's supplemental submission.

I deny these requests because the information available is sufficient to determine that Tennessee has established a capital counsel mechanism that satisfies the requirements of chapter 154 and the 2013 Regulations. The organizations that provided public comments had sufficient time to prepare and to file lengthy comments with numerous attachments. The commenters have not explained how the additional information they seek to provide would change my determination. Chapter 154 directs me to certify only whether a State ''has established a mechanism for the appointment . . . of competent counsel'' in state capital postconviction proceedings, the date on which this mechanism was established, and whether the State ''provides standards of competency for the appointment of counsel'' in such proceedings. 28 U.S.C. 2265(a)(1). It does not direct or authorize me to carry out a case-specific review of the operation of a State's capital counsel mechanism.

### *D. Request for a Stay*

One comment requested that I stay my certification of Tennessee's mechanism pending review of my determination. The comment argued the matter on the terms a court would consider in deciding whether to order a stay—*i.e.,* likelihood that the determination will be overturned on judicial review, alleged irreparable harm to the commenters and their clients, the balance of the equities, and the public interest. Chapter 154 creates no requirement that I grant a stay, and I decline to do so.

Chapter 154 conditions its applicability on the Attorney General's determination that a State has established a capital counsel mechanism satisfying its requirements, not on the completion of judicial review of my determination. *See* 28 U.S.C. 2261(b), 2265. The statute directs me to determine the date on which the state capital counsel mechanism was established and makes that date the effective date of the certification. 28 U.S.C. 2265(a)(1)(B), (a)(2). Thus, chapter 154 applies to cases in which postconviction counsel was appointed pursuant to the mechanism, though the appointment occurred prior to the publication of this notice. *See* 152 Cong. Rec. at 2449 (remarks of Sen. Kyl) (explaining effect of section 2265(a)(2)); 151 Cong. Rec. at E2640 (extension of remarks of Rep. Flake) (same); *Habeas Corpus Resource Ctr.,* 816 F.3d at 1245 (''The certification is effective as of the date the Attorney General finds the state established its adequate mechanism; as this date can be in the past, a certification decision may apply retroactively.''). A stay would mean, however, that the certification would not yet be effective in relation to cases in which state postconviction counsel was appointed on or after July 1, 1997—notwithstanding my determination that Tennessee established a capital counsel mechanism satisfying chapter 154 on that date—but would take effect only at some unpredictable future time when litigation relating to the certification has run its course.

Additionally, the comment's arguments for a stay are unpersuasive. It is not likely that a challenge to the certification will prevail on the merits because Tennessee has in fact established a mechanism satisfying the requirements of chapter 154, as explained in this notice. Even if there were a likelihood of a challenge succeeding on the merits, there is no public interest or prospect of irreparable injury that justifies a stay. The comment contended that the time available to seek federal habeas review will be severely curtailed or eliminated if the time limit of 28 U.S.C. 2263 becomes applicable. This concern is not well founded and does not bear on the validity of the certification, as explained above. The comment also suggested that declining to grant a stay will result in additional burdens on the federal courts in the form of litigation challenging whether the chapter 154 procedures and deadlines apply to pending cases. To the contrary, permitting the chapter 154 review procedures to go into effect will streamline federal habeas review and will relieve federal courts and litigants of unnecessary burdens.

By contrast, Tennessee will be harmed if it is denied the benefits of the chapter 154 review procedures to which it is legally entitled based on its establishment of a capital counsel mechanism satisfying the requirements of chapter 154. As the Supreme Court has recognized, ''[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence.'' *Bucklew* v. *Precythe,* 587 U.S. 119, 149 (2019). The survivors of victims murdered by persons under sentence of death in Tennessee will be harmed by a stay, prolonging their suffering and further denying them the closure of a final disposition of the cases

that concern them. *See* 152 Cong. Rec. at 2441–47 (remarks of Sen. Kyl); 151 Cong. Rec. at E2639 (extension of remarks of Rep. Flake). There will also be harm to any persons under sentence of death in Tennessee who would be granted relief on a final disposition of their federal habeas petitions but whose cases now linger for years or decades because there is no requirement that the cases be accorded priority or concluded within any specific time frame. Staying the implementation of the chapter 154 procedures that Congress enacted, to which Tennessee is entitled, would be harmful to many and not in the public interest.

Consequently, I do not stay my certification of Tennessee's postconviction capital counsel mechanism, and the effective date of the certification is July 1, 1997, in conformity with 28 U.S.C. 2265(a)(2).

Dated: July 6, 2026.

**Todd Blanche,**

*Acting Attorney General.*

[FR Doc. 2026–13970 Filed 7–9–26; 8:45 am]

**BILLING CODE 4410–BB–P**

## DEPARTMENT OF LABOR

### Bureau of Labor Statistics

### Proposed Information Collection; ATUS Artificial Intelligence (AI) Questions

**AGENCY:** Bureau of Labor Statistics, Department of Labor.

**ACTION:** Request for comment.

**SUMMARY:** The Department of Labor, as part of its continuing effort to reduce paperwork and respondent burden, conducts a pre-clearance consultation program to provide the general public and Federal agencies with an opportunity to comment on proposed and/or continuing collections of information in accordance with the Paperwork Reduction Act of 1995. This program helps to ensure that requested data can be provided in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the impact of collection requirements on respondents can be properly assessed. The Bureau of Labor Statistics (BLS) is soliciting comments concerning the proposed new collection, the ''American Time Use Survey (ATUS) Artificial Intelligence (AI) Questions.'' A copy of the proposed information collection request can be obtained by contacting the individual listed below in the Addresses section of this notice.

**DATES:** Written comments must be submitted to the office listed in the **ADDRESSES** section of this notice on or before September 8, 2026.

**ADDRESSES:** Send comments to Erin Good, BLS Clearance Officer, Division of Management Systems, Bureau of Labor Statistics, by email to *BLS_PRA_Public@bls.gov.*

**FOR FURTHER INFORMATION CONTACT:** Erin Good, BLS Clearance Officer, at 202–691–7628 (this is not a toll free number). (See **ADDRESSES** section.)

**SUPPLEMENTARY INFORMATION:**

### I. Background

The increasing availability of Artificial Intelligence (AI) tools has raised important questions about how these technologies are being adopted by individuals and how they affect daily activities across work and non-work domains. Despite the rapid growth of AI applications, there are currently no federal surveys that link individuals' use of AI to a detailed record of their activities.

The American Time Use Survey (ATUS) is uniquely positioned to fill this gap. By pairing new AI questions with the ATUS time diary, the collection will allow researchers and policymakers to understand when, how, and for which tasks people use AI tools. No other national survey provides this level of behavioral insight; existing federal surveys may collect limited information on technology use, but none provide activity-level detail or link AI use to a continuous 24-hour record.

Collecting information on AI use supports the BLS mission under 29 U.S.C. 2 to develop and disseminate data on labor market activity and emerging economic trends. As AI becomes increasingly integrated into work, education, and household management, understanding who uses these tools—and for what purposes is essential for assessing potential implications for productivity, job tasks, skill requirements, and overall time allocation.

### II. Current Action

Office of Management and Budget clearance is being sought for a new module to the ATUS with a set of questions regarding AI. These questions will provide the first nationally representative data linking AI use to detailed, activity level time use information. The AI items will supplement the ATUS by identifying:

- Whether individuals have used AI tools;
- The tasks for which individuals use AI;
- How AI use varies across demographic and occupational groups; and
- How AI use relates to time spent in work, education, household production, and leisure.

The information collected will allow BLS and external researchers to examine how AI interacts with individuals' daily activities, analyses that cannot be conducted using any existing federal data sources. The data will be used to produce public-use microdata files, tabulations, and technical documentation.

The proposed AI questions will be fielded beginning in January 2027 for a two-year period, allowing BLS to capture early patterns of adoption during a time of rapid technological and behavioral change.

### III. Desired Focus of Comments

The Bureau of Labor Statistics is particularly interested in comments that:

- Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility.
- Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used.
- Enhance the quality, utility, and clarity of the information to be collected.
- Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submissions of responses.

*Title of Collection:* ATUS Artificial Intelligence (AI) Questions.

*OMB Number:* 1220–NEW.

*Type of Review:* New collection.

*Affected Public:* Individuals or Households.

*Annual Number of Respondents:* 7,672.

*Frequency:* Annually.

*Total Annual Responses:* 7,672.

*Average Time per Response:* 2 minutes.

*Estimated Annual Total Burden Hours:* 256 hours.

Comments submitted in response to this notice will be summarized and/or included in the request for Office of Management and Budget approval of the information collection request; they also will become a matter of public record.