No. 26-1229

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, JOHN MICHAEL BANE, ANDRE BLAND, SEDRICK CLAYTON, URSHAWN MILLER, AND CORINIO PRUITT,

*Petitioners*,

*v.*

TODD BLANCHE, UNITED STATES ATTORNEY GENERAL, AND THE UNITED STATES OF AMERICA,

*Respondents*.

## PETITIONERS' MOTION FOR STAY OF CERTIFICATION PENDING JUDICIAL REVIEW AND TO HOLD PETITION IN ABEYANCE PENDING RELATED LITIGATION


JENNIFER WARE-PHILLIPS
KEVIN ADAM
DAN MEDICI
JAMES PATRICK BUTLER
**WHITE & CASE LLP**
75 STATE STREET
BOSTON, MA 02109

KUFERE LAING
**WHITE & CASE LLP**
701 THIRTEENTH STREET, NW
WASHINGTON, D.C. 20005

*Counsel for Petitioners Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, Bane, Bland, Clayton, and Miller*

JOHN G. BAKER
**FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

GERALD W. KING JR.
**CAPITAL HABEAS UNIT FOR THE FOURTH CIRCUIT**
129 WEST TRADE STREET,
SUITE 300
CHARLOTTE, NC 28202

*Counsel for Petitioner Pruitt*

## TABLE OF CONTENTS


INTRODUCTION .......... 1
BACKGROUND .......... 2
ARGUMENT .......... 6
- I. This Court Should Stay the Certification Pending De Novo Review .......... 6
  - A. Petitioners Have a Substantial Case on the Merits .......... 7
    - 1. The Certification Did Not Apply the Operative Regulations .......... 7
    - 2. Tennessee's Mechanism Does Not Meet the Requirements for Certification .......... 10
    - 3. The TN-AGR Lacked the Authority to Request Certification of Tennessee's Mechanism .......... 13
    - 4. The Certification Process Under § 2265 Is Unconstitutional .......... 16
  - B. Petitioners Will Suffer Irreparable Harm Absent a Stay of the Certification .......... 17
  - C. A Stay of the Certification Will Not Prejudice the Respondents or Tennessee .......... 20
  - D. Public Interest Strongly Favors a Stay of the Certification .......... 20
- II. Judicial Economy Strongly Favors an Abeyance of This Litigation Pending Resolution of Related State and Federal Litigation .......... 22

CONCLUSION .......... 23

## TABLE OF AUTHORITIES

### Cases

*Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000) .................................................. 8

*Bland, et al. v. Blanche, et al.*, No. 26-5305 (D.C. Cir. 2026) ................................ 2

*Bland, et al. v. Bondi*, No. 1:25-cv-3499-AMP (D.D.C. 2025) ...... 2, 4, 6, 16, 22, 23

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ................ 7

*Federal Defender Services of Eastern Tennessee, Inc., et al. v. Skrmetti*, No. 26-0660-II (Tenn. Ch. Ct. Davidson Cnty. 2026) ...................... 2, 5, 6, 16, 22, 23

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, No. C 13-41517 CW, 2014 WL 3908220 (N.D. Cal. Aug. 7, 2014) ................................................................ 7

*Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77 (1975) ...................................... 23

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936) ........................................................... 22

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ........................................................................................................... 8

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................... 7

*Spears v. Stewart*, 283 F.3d 992 (9th Cir. 2002) ..................................................... 3

*U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ................................. 7, 8

### Statutes

5 U.S.C. § 705 ................................................................................................... 1, 6

18 U.S.C. § 3599 .................................................................................................. 11

Antiterrorism and Effective Death Penalty Act, Chapter 154 of Title 28

28 U.S.C. § 2244(d) ........................................................................ 18, 19

28 U.S.C. § 2254(b)(2)(B) .................................................................... 18

28 U.S.C. § 2261(b) ........................................................................ 13, 18

28 U.S.C. § 2262(c) .......... 3
28 U.S.C. § 2263 .......... 3, 18
28 U.S.C. § 2264(a) .......... 3, 18
28 U.S.C. § 2265 .......... 10, 16, 22
28 U.S.C. § 2265(a)(1) .......... 13, 15
28 U.S.C. § 2265(a)–(b) .......... 3
28 U.S.C. § 2265(c) .......... 3, 5
28 U.S.C. § 2266 .......... 3
28 U.S.C. §2266(b)(3)(B) .......... 3, 18
28 U.S.C. § 2349(b) .......... 1, 6
28 C.F.R. §§ 26.20 et seq. .......... 1
28 C.F.R. § 26.21 .......... 12, 15
28 C.F.R. §§ 26.21–26.22 .......... 10
28 C.F.R. § 26.22(b)(1)(i) .......... 10
28 C.F.R. § 26.22(b)(2) .......... 9
28 C.F.R. § 26.22(c) .......... 14
28 C.F.R. § 26.22(c)(1) .......... 13
28 C.F.R. § 26.22(c)(2) .......... 8

**Rules**

Fed. R. App. P. 18 .......... 1
Fed. R. App. P. 18(a) .......... 6
Fed. R. App. P. 18(a)(2) .......... 6

**EXHIBITS**

Exhibit A Declaration of Amy Harwell

Exhibit B Declaration of Deborah Drew

Exhibit C Declaration of Emily Elison

## ADDENDUM


Executive Order 14164, Restoring the Death Penalty and Protecting Public Safety, 90 Fed. Reg. 8,463 (Jan. 30, 2025) .............................Add.1

Memorandum to DOJ Employees, Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions (Feb. 5, 2025) .............................Add.4

Letter from Aaron Reitz, Assistant Att'y Gen., U.S. Dep't of Just. to State Att'ys Gen. (May 15, 2025) .............................Add.8

Letter from Jonathan Skrmetti, Tenn. Att'y Gen., Tennessee's Request for Certification under 28 U.S.C. § 2265 .............................Add.9

Notice of Request for Certification of Tennessee Capital Counsel Mechanism, 90 Fed. Reg. 38,182 (Aug. 7, 2025) .............................Add.21

Comment in Opposition to Certification of Tennessee Submitted by the Federal Public Defender for the Middle District of Tennessee and Federal Defender Services of Eastern Tennessee, Inc. (Oct. 10, 2025) .............................Add.23

Certification Process for State Capital Counsel Systems, 78 Fed. Reg. 58,160 (Sept. 23, 2013) .............................Add.120

Certification Process for State Capital Counsel Systems, 91 Fed. Reg. 12,525 (March 16, 2026) .............................Add.145

*Federal Defender Services of Eastern Tennessee, Inc., et al., v. Skrmetti*, No. 26-0660-II, Amended Complaint for Declaratory and Injunctive Relief (Tenn. Ch. Ct. Davidson Cnty. July 17, 2026) .............................Add.153

*Bland, et al., v. Bondi*, No. 1:25-cv-3499-AMP, First Amended Complaint for Declaratory and Injunctive Relief (D.D.C. Jan. 20, 2026) ECF No. 29 .............................Add.195

*Bland, et al., v. Bondi*, No. 1:25-cv-3499-AMP, Memorandum Opinion (D.D.C. July 10, 2026) ECF No. 44 .............................Add.239

Certification of Tennessee Capital Counsel Mechanism, 91 Fed. Reg. 42,761 (July 10, 2026) .............................Add.249

*Pruitt v. Nelson*, No. 2:22-cv-2855-BCL-atc, Answer to Amended Petition for Writ of Habeas Corpus (M.D. Tenn. Aug. 24, 2026) ECF No. 5 .......... Add.264

*Pruitt v. Nelson*, No. 2:22-cv-2855-BCL-atc, Respondent's Response in Opposition to Petitioner's Motion to Suspend Scheduling Order (M.D. Tenn. Sept. 18, 2026) ECF No. 59 .......... Add.493

*Pruitt v. Nelson*, No. 2:22-cv-2855-BCL-atc, Order Granting Motion to Suspend Scheduling Order (M.D. Tenn. Sept. 24, 2026), ECF No. 60 .......... Add.497

## INTRODUCTION

In the final action captioned "Certification of Tennessee Capital Counsel Mechanism" (the "Certification"), Respondent Attorney General Blanche retroactively certified that on July 1, 1997, Tennessee established a mechanism for the appointment of counsel in state post-conviction proceedings brought by indigent prisoners that meets the requirements of Title 28, Chapter 154, U.S. Code (28 U.S.C. §§ 2261 *et seq.*) and its implementing regulations, 28 C.F.R. §§ 26.20 *et seq*. As a result, Tennessee will and has sought to invoke limits on federal judicial review of capital judgments. Petitioners have filed a Petition for Review in this Court to set aside the Certification.

Petitioners now respectfully ask this Court to stay the Certification pending this Court's *de novo* review. *See* 5 U.S.C. § 705; 28 U.S.C. § 2349(b); Fed. R. App. P. 18. Each of the stay factors strongly favors Petitioners. Petitioners are likely to succeed on the merits, and their Petition undeniably raises serious legal questions. Without a stay, Petitioners and other individuals sentenced to death in Tennessee will immediately suffer irreparable harms that no after-the-fact remedy can undo. A stay pending this Court's review, by contrast, causes no harm and merely maintains the status quo that has governed federal capital habeas litigation in Tennessee and everywhere else for nearly three decades. Finally, the public interest strongly favors

ensuring that this Court has a meaningful opportunity to reach the merits of a certification decision for the first time ever before it takes irreversible effect.

In addition, if this Court stays the Certification, Petitioners also ask this Court to hold the litigation of this Petition in abeyance pending the resolution of *Federal Defender Services of Eastern Tennessee, Inc. v. Skrmetti*, No. 26-0660-II (Tenn. Ch. Ct. Davidson Cnty.) ("*FDSET v. Skrmetti*"), and *Bland et al. v. Bondi*, No. 1:25-cv-03499 (D.D.C.) ("*Bland v. Bondi*"), which is currently on appeal as *Bland et al. v. Blanche, et al.*, No. 26-5305 (D.C. Cir.). These cases present overlapping and directly related questions that bear heavily on the issues before this Court. Staying the Certification will prevent irreparable injury while the related proceedings resolve threshold questions that will materially narrow the issues before this Court.

## BACKGROUND

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs federal habeas review for both state and federal prisoners under sentences of death. Chapter 153 of AEDPA sets out the general framework for federal habeas petitions. *See* 28 U.S.C. §§ 2241–2255. Chapter 154 provides an alternative and never before used framework that offers expedited and sharply curtailed federal review of capital cases in states certified by the Attorney General that have a mechanism that guarantees indigent death-sentenced prisoners timely appointment of competent counsel, adequate compensation for counsel, and payment of reasonable litigation

expenses in state post-conviction proceedings. Where applicable, Chapter 154 would halve the statute of limitations for filing a federal habeas petition—from one year to 180 days—while adding new and more restrictive tolling rules. 28 U.S.C. § 2263. Chapter 154 also severely limits a petitioner's ability to raise procedurally defaulted claims, *id.* § 2264(a), amend a habeas petition, *id.* § 2266(b)(3)(B), or obtain a stay of execution from a federal court, *id.* § 2262(c). Chapter 154 requires courts to decide capital habeas cases within strict time limits. *Id.* § 2266.

When AEDPA was enacted, the responsibility for determining whether a state met Chapter 154's requirements rested with the federal district court in each individual petitioner's federal habeas case. In every such instance, federal courts found that states lacked an adequate appointment mechanism or had failed to appoint counsel pursuant to the mechanism. *See, e.g.*, *Spears v. Stewart*, 283 F.3d 992, 997 n.2 (9th Cir. 2002) (Reinhardt, J. dissenting from denial of rehearing *en banc*) (collecting decisions). In 2006, Congress transferred the authority to review states' application for certification and to promulgate regulations for the implementation of the certification procedure to the Attorney General. 28 U.S.C. § 2265(a)–(b). This Court reviews the Attorney General's Certification determinations *de novo*. 28 U.S.C. § 2265(c).

On the first day of his second term, President Trump directed the Attorney General to "take all appropriate action [on] any pending request for certification"

under Chapter 154. Add.1–3.[1] On February 5, 2025, then-Attorney General Bondi directed the Office of Legal Policy ("OLP") to "promptly address states' pending requests for certification." Add.4–7. On May 15, 2025, OLP sent a letter to all state attorneys general inviting applications to "get certified" and offering that the "office is ready to assist" states interested in certification. Add.8.

Soon after, the Tennessee Attorney General and Reporter ("TN-AGR") submitted a certification request seeking certification as of October 23, 1995. Add.9-20. On August 7, 2025, DOJ published notice of that certification request and invited public comment. Add.21–22.

Comments submitted to DOJ detailed the many ways in which Tennessee does not satisfy and has never satisfied Chapter 154's requirements. The comment submitted by Federal Defender Services of Eastern Tennessee, Inc. and Federal Public Defender for the Middle District of Tennessee ("Organizational Petitioners") urged DOJ to deny certification and asked that DOJ stay any certification decision pending this Court's review. *See* Add.117–18.

During the comment period litigants—including several of these Petitioners—filed *Bland v. Bondi* before the United States District Court for the District of Columbia, challenging the constitutionality of Chapter 154. Complaint (Sept. 30, 2025) ECF No. 1; *see* Amended Complaint (Jan. 20, 2026) ECF No. 29. On July 10,

[1] Citations to "Add.__" refer to the attached addendum.

2026, the district court concluded that it lacked jurisdiction to decide that case on the theory that the constitutional challenges to Chapter 154's certification scheme might fall under this Court's exclusive jurisdiction over certification questions pursuant to 28 U.S.C. § 2265(c). Add.240–41. Plaintiffs have appealed.

Soon after the comment period on Tennessee's application closed, DOJ initiated rulemaking proceedings to establish a new rule governing certification ("Proposed Regulations"), Add.145-52, and replace the operative rules codified at 28 C.F.R. §§ 26.20, *et seq.* ("Operative Regulations"). Add.120–44. The Proposed Regulations' more lenient requirements "would remove impediments to certification," "enable more prompt decisions on State's requests for certification," and "expedite and strengthen the certification process." Add.145, 146.

On May 21, 2026, Organizational Petitioners filed *FDSET v. Skrmetti* in state court seeking a declaration that the TN-AGR's request for Chapter 154 certification exceeded his authority under Tennessee law and violated the Tennessee Constitution. Organizational Petitioners and Petitioners Bland and Bane, among others, filed an amended complaint on July 17, 2026. Add.153–94. The State moved to dismiss, and a hearing on its motion is scheduled for October 23, 2026.

On July 10, 2026, Attorney General Blanche issued the Certification, concluding that Tennessee established a mechanism satisfying Chapter 154's requirements as of July 1, 1997. Add.250. The Certification also rejected the

Organizational Petitioners' request to stay the Certification's effect pending judicial review, reasoning Chapter 154 does not require one and that Petitioners do not meet the requirements for a stay. Add.262–63; *Cf.* Fed. R. App. P. 18(a).[2]

On September 4, 2026, Petitioners timely petitioned for review of the Certification.

## ARGUMENT

Petitioners now move to stay the Certification pending this Court's *de novo* review. *See* 28 U.S.C. § 2349(b); 5 U.S.C. § 705; Fed. R. App. P. 18(a)(2). Petitioners separately ask this Court to hold its consideration of the Petition in abeyance pending the resolutions of *FDSET v. Skrmetti* and *Bland v. Bondi*, the results of which could significantly affect the resolution of this matter.

### I. This Court Should Stay the Certification Pending *De Novo* Review

This Court "in its discretion may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the petition." 28 U.S.C. § 2349(b); *accord* 5 U.S.C. § 705 (authorizing Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings"). When deciding whether to grant a stay pending judicial review, this Court considers: (1) petitioners' likelihood of success on the merits; (2) whether petitioners will suffer

[2] Petitioners provided notice to Respondents of their intent to file this motion. Respondents oppose the motion.

irreparable injury absent a stay; (3) whether other parties will suffer harm if the stay is granted; and (4) the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Moreover, when the balance of harms favors a stay, as here, a stay may be appropriate where the Petition raises serious legal questions. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). Here, each factor strongly favors a stay.

### A. Petitioners Have a Substantial Case on the Merits

A stay is warranted because Petitioners have a substantial case on the merits and are likely to prevail.

#### 1. The Certification Did Not Apply the Operative Regulations[3]

While purporting to acknowledge that the Operative Regulations remain in effect and apply to TN-AGR's certification request, Add.250, the Certification in effect applied the Proposed Regulations. An agency remains bound by its own regulations until they are properly amended or repealed and may not depart from them in an individual adjudication merely because it has proposed, but not finalized, a different standard. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954). "[A]gency action may be set aside as arbitrary and capricious if the agency

---

[3] Petitioners do not concede the lawfulness or validity of the 2013 Regulations. *See Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, No. C 13-41517 CW, 2014 WL 3908220 (N.D. Cal. Aug. 7, 2014) (finding 28 C.F.R. §§ 26.20–26.23 invalid under the Administrative Procedure Act), *vacated and remanded on standing grounds*, 816 F.3d 1241 (9th Cir. 2016).

fails to comply with its own regulations." *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quotation marks omitted).

One sharp distinction between the Operative Regulations and the Proposed Regulations concerns the scope of the Attorney General's review. Under the Operative Regulations, the Attorney General must determine that a state's mechanism satisfies the criteria for certification in practice, not merely on paper. For example, the Operative Regulations contemplate that "a wholesale failure to implement one or more material elements of a mechanism" could require the Attorney General to deny certification even when the state requesting certification has a facially adequate mechanism. Add.122. Further, the Operative Regulations acknowledge "a State standard authorizing what normally should be sufficient compensation may not in fact make competent lawyers available for appointment in postconviction proceedings, considering the context of a particular State system and its distinctive market conditions for legal services," Add.128 (citing *Baker v. Corcoran*, 220 F.3d 276, 285–86 (4th Cir. 2000)), which would necessitate an assessment of how the mechanism operates in practice. The Operative Regulations also contain several "catch-all" provisions that require consideration of how a state's mechanism functions. *See* 28 C.F.R. § 26.22(c)(2) (stating compensation may be adequate if rates ensure competent counsel are available for appointment); 28 C.F.R.

§ 26.22(b)(2) (stating competency standards may be adequate if they reasonably assure a level of proficiency appropriate for capital post-conviction litigation).

In contrast to the Operative Regulations' focus on real-world application, the Proposed Regulations would authorize the Attorney General to certify a state's mechanism based on his conclusion that a state's policies, as written, meet Chapter 154's requirements—without regard to how those policies operate in practice and with no comparison to federal standards. Add.147, 150.

The Certification is pervaded with statements demonstrating that the Attorney General focused exclusively on whether Tennessee's mechanism for the appointment of post-conviction counsel meets Chapter 154's requirements in the abstract and not in practice. He states repeatedly that "certification is not a case-specific assessment," Add.254, and must be limited to "an examination of the State's laws and policies . . . ." Add.257. This approach is fundamentally inconsistent with the Operative Regulations.

As a result, the Certification deems immaterial the abundant evidence of the mechanism's systemic, pervasive failures. But the operation of Tennessee's mechanism in practice is not merely anecdotal or case-specific evidence; it bears directly on whether the mechanism reasonably assures timely appointment, competent representation, and adequate compensation as the operative regulations require. The Certification is perhaps most explicit in its refusal to apply the Operative

Regulations when considering the timeliness of Tennessee's appointment of counsel in capital post-conviction proceedings. The preamble to the Operative Regulations addresses a scenario where counsel is provided *after* the federal habeas statute of limitations has run, concluding such a mechanism cannot "logically be regarded as providing for appointment of counsel within the meaning of chapter 154." Add.137. And yet, Tennessee's mechanism does exactly that. *See infra* I(A)(2)(ii).

**2. Tennessee's Mechanism Does Not Meet the Requirements for Certification**

Under the Operative Regulations, a state's mechanism may be certified only if it provides for the appointment of (i) competent counsel, (ii) in a timely manner, who are (iii) adequately compensated, and (iv) provided with sufficient litigation resources. 28 C.F.R. §§ 26.21–26.22; 28 U.S.C. § 2265. Tennessee's mechanism is deficient in all respects.

(i) Competence: Tennessee's competency standards for counsel are facially inadequate. The principal benchmark for private appointed counsel under the Operative Regulations requires appointment of counsel who "have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience." 28 C.F.R. § 26.22(b)(1)(i). But Tennessee permits appointment of post-conviction counsel who have been practicing law for only three years and have no post-conviction litigation or capital case experience. Add.53–56.

The Certification nevertheless concludes that Tennessee satisfies the Operative Regulations because its standard compares favorably to federal appointment standards under 18 U.S.C. § 3599, which require no post-conviction experience. Add.255–57. But the Operative Regulations deliberately departed from the 18 U.S.C. § 3599 standard and substituted a post-conviction litigation experience requirement because "postconviction litigation experience would be a better measure of competency for State postconviction proceedings." Add.129-30. The Certification's conclusion that compliance with 18 U.S.C. § 3599 suffices is contrary to the Operative Regulations.

Comments submitted to DOJ also demonstrate the systemic failure of both the Tennessee Office of the Post-Conviction Defender ("OPCD") and private counsel to provide competent representation to indigent petitioners on death row in Tennessee. During the relevant period, appointed post-conviction counsel in Tennessee have defaulted claims, failed to investigate cases, been removed by trial courts for lack of candor and failing to diligently prepare cases, missed deadlines, been appointed despite not meeting the State's training and experience standards, and been suspended from duty while representing capital prisoners. Add.56–63. The Certification does not meaningfully engage with that record. *See supra* I(A)(1).

(ii) <u>Timeliness</u>: The Operative Regulations require that counsel be appointed "in a manner that is reasonably timely in light of the time limitations for seeking

State and Federal postconviction review." 28 C.F.R. § 26.21. As Attorney General Holder noted when promulgating the Operative Regulations, a provision cannot "logically be regarded as providing for appointment of counsel within the meaning of chapter 154" if it occurs "belatedly," such as "only after the deadline for pursuing State postconviction proceedings has passed," or "only after the … time limit for Federal habeas filing." Add.137.

In Tennessee, a prisoner must file an initial *pro se* petition before counsel is appointed. Add.37–40. The uncontroverted evidence submitted to DOJ shows that *pro se* petitions in Tennessee are frequently not filed and no post-conviction counsel is appointed until well after the expiration of the 180-day limitations period that Chapter 154 would impose. Add.46-47. More often than not, post-conviction counsel is not appointed until more than 180 days after a case becomes final on direct appeal, Add.47-48, making Tennessee's provision for the belated appointment of counsel exactly the kind that cannot be "logically regarded" as satisfying Chapter 154 per Attorney General Holder's commentary. Add.137.

The Certification reasons that if Chapter 154 were in effect, capital petitioners might file their *pro se* petitions sooner and thus be appointed state post-conviction counsel more quickly. Add.254. The Certification's decision ignores both that it is the State's burden to show that a qualifying mechanism is already in place, not that it might exist in the future, 28 U.S.C. §§ 2261(b)(1), 2265(a)(1)(A), and the reality

that Tennessee law requires *pro se* petitions to contain specific facts supporting each claim for relief asserted by the petitioner as well as an explanation for why each claim for relief was not previously presented in an earlier proceeding. Add.38–39, 50. These substantial burdens are placed on petitioners *before* counsel is appointed.

(iii) Compensation: As of December 1, 2024, Tennessee pays appointed private post-conviction counsel $90 per hour, a rate that is substantially lower than what federal courts in the Sixth Circuit pay appointed capital habeas counsel, what Tennessee's lead capital trial counsel receive, and market rates for experienced criminal defense counsel. Add.71–74. The Certification relies on the fact that $90 per hour is comparable to co-counsel rates at the trial stage, but co-counsel are second-chair behind a lead attorney. Add.258. Post-conviction counsel are not.

OPCD staff salaries also do not satisfy the Operation Regulations. They are not comparable to those received by federal habeas counsel, retained private counsel, public defenders who are appointed in capital cases, or staff attorneys at the Office of the Attorney General who represent the state in post-conviction proceedings. They are, thus, not presumptively adequate under the Operative Regulations, which identify benchmarks for presumptively adequate compensation. Add.132–33; 28 C.F.R. § 26.22(c)(1).

Rather than grapple with the evidence presented in the record, the Certification simply states, "the fact that Tennessee has created the OPCD and compensates the

attorneys in that office by salary is sufficient." Add.258. That conclusion bears no resemblance to the requirements set forth in the Operative Regulations. 28 C.F.R. § 26.22(c).

(iv) Litigation Expenses: Tennessee sets maximum hourly rates for experts and caps investigative expenses unless the trial court determines by clear and convincing evidence that extraordinary circumstances justify exceeding those caps. Add.64–67. Such caps are inconsistent with the Operative Regulations, which allow for limitations on reimbursement "only if means are authorized for payment of necessary expenses above such limits." Add.144. The hourly rates available for expert services are much lower than those approved in federal capital cases, and state capital post-conviction counsel find it difficult to retain qualified experts who are willing to accept Tennessee's below-market rates. Add.65.

While Tennessee's mechanism fails to meet all of the requirements of Chapter 154, each of these independently provides a reason for the Court to set aside the Certification in its *de novo* review.

### 3. The TN-AGR Lacked the Authority to Request Certification of Tennessee's Mechanism

Chapter 154 provides that if an "appropriate State official" requests certification, the Attorney General "shall determine" whether the state's mechanism for appointing post-conviction counsel qualifies. 28 U.S.C. § 2265(a)(1). The statute does not identify which state officials are appropriate to initiate certification

proceedings. Although the Operative Regulations identify state attorneys general as *likely* appropriate state officials, 28 C.F.R. § 26.21, "the rule . . . does not preempt State law," and that "if State law were to prohibit a State attorney general from requesting Chapter 154 Certification, then the State attorney general would be barred by State law from making such a request." Add.128.

The TN-AGR's request for Chapter 154 certification was *ultra vires* and unconstitutional under state law. Unlike the attorney general of any other state, the TN-AGR sits in Tennessee's Judicial Department and has long been recognized as a quasi-judicial officer whose powers are limited strictly to those the General Assembly has conferred by statute. See Add.162-63. None of the TN-AGR's enumerated statutory powers authorizes him to initiate a federal administrative certification proceeding of this kind. Add.175–87. By unilaterally seeking certification, the TN-AGR sought to aggrandize his authority and violated the Tennessee Constitution's separation-of-powers provisions by usurping the General Assembly's legislative authority, since the decision whether to subject Tennessee prisoners and courts to Chapter 154's regime is a choice reserved to the General Assembly. Add.184–87.

Because the TN-AGR was not an appropriate state official to initiate the certification proceedings, the Certification rests on an invalid and unlawful predicate and should be set aside.

The constitutionality of the TN-AGR's unilateral action is before the Tennessee Chancery Court in *FDSET v. Skrmetti*. *See infra* § II.

#### 4. The Certification Process Under § 2265 Is Unconstitutional

A stay is warranted because of the serious constitutional concerns raised by the Chapter 154 certification process itself. Chapter 154 delegates the responsibility to decide certification requests to the nation's highest prosecutor—an unconstitutionally biased decision maker—to assess whether a state post-conviction counsel mechanism affords an adequate defense sufficient to justify restricting the right to federal habeas review. *See* Add.199-202. The Attorney General has repeatedly asserted these institutional interests in capital and habeas corpus proceedings, overwhelmingly arguing on the side of the States against challenges to state convictions and sentences and never in support of the petitioners. Add.224-35. The delegation of authority to the Attorney General flouts the Due Process Clause's guarantees of impartiality, disinterest, and independence, and encroaches upon the powers of Article III courts. *See* Add.236-37. Because the certification process under § 2265 is unconstitutional, the process underlying the Certification was illegitimate and carried out by an illegitimate decision maker. The constitutionality of Chapter 154 has been challenged in *Bland v. Bondi*. *See infra* § II.

### B. Petitioners Will Suffer Irreparable Harm Absent a Stay of the Certification

The threatened harm here is neither speculative nor remote. On August 24, 2026, the TN-AGR invoked Chapter 154 for the first time against Petitioner Pruitt. Tennessee seeks retroactive enforcement of Chapter 154 in Pruitt's case, contending that because Tennessee has been certified and Mr. Pruitt's post-conviction counsel was appointed pursuant to the terms of the certified mechanism, Mr. Pruitt's claims are barred by Chapter 154's 180-day limitations period and by its stringent procedural default rules. Add.353-57. While the U.S. District Court has stayed Mr. Pruitt's habeas proceedings pending this litigation, *see infra* § I(D), in asserting Chapter 154 against Mr. Pruitt, the TN-AGR made clear its intention to apply Chapter 154 even as this Court reviews the Certification *de novo*, including cases in which relevant appointments and filing decisions occurred long before the Certification decision.

Irreparable harm is further demonstrated by the myriad circumstances afflicting several other Petitioners. Petitioner Bane is currently pursuing DNA testing that Tennessee has agreed to conduct; when the results return, he will need to amend his pending federal habeas petition to reflect them. Ex. A (Decl. of Harwell) ¶ 17. Under Chapter 153, Mr. Bane's amendment would be subject to the Federal Rule of Civil Procedure 15(a)(2)'s liberal standard, which directs courts to grant leave to amend "freely" "when justice so requires." However, the TN-AGR will likely argue

that Chapter 154's heightened amendment standard applies, which would require Mr. Bane to show that the factual predicate for his claim "could not have been discovered previously through the exercise of due diligence" and that the new facts would establish innocence by clear and convincing evidence. 28 U.S.C. §§ 2254(b)(2)(B), 2261(b), 2264(a), 2266(b)(3)(B).

Petitioner Bland's federal habeas petition is presently stayed while he litigates an intellectual disability claim in state court. Ex. A ¶ 16. If Chapter 154 governs his petition, its compressed deadlines and amendment restrictions would truncate the time he has to present those claims upon his return to federal court. Further, the TN-AGR may cite the docketing date of Mr. Bland's 1998 petition for a writ of *certiorari* to contend that his petition was filed over 180 days after his conviction was affirmed and is thus untimely under Chapter 154. *Id.* ¶ 15.

Petitioners Miller and Clayton are currently in state post-conviction proceedings in Tennessee. Ex. B (Decl. of Drew) ¶ 12–14. Under Chapter 153, Petitioner Miller has almost eleven months remaining to file a federal habeas petition if he is not granted relief in those state post-conviction proceedings. *Id.* ¶ 14; *see* 28 U.S.C. § 2244(d). But under Chapter 154's 180-day statute of limitations and more restrictive tolling provisions, 28 U.S.C. § 2263, the TN-AGR may assert that Mr. Miller is out of time to file his federal habeas petition by five days. *Id.* Under Chapter 153, Petitioner Clayton has almost 200 days remaining to file his federal habeas

petition. *Id.* ¶ 13; *see* 28 U.S.C. § 2244(d). If Chapter 154 is applied, however, the TN-AGR may assert he is out of time to file a habeas petition by approximately 70 days. *Id.*

Regardless of the stage of their cases, prisoners and their counsel must immediately investigate and prepare to litigate whether and how Chapter 154 applies to each of them. Ex. A ¶ 18; Ex. C (Decl. of Elison) ¶ 13– 15. Those who are still in state post-conviction review must now understand and account for the potentially truncated statute of limitations. Ex. A ¶ 20; Ex. B 9–11. Those who are already in federal habeas proceedings must prepare to litigate Chapter 154's shorter deadlines, restricted amendment rights, and limitations on defaulted claims apply. Ex. A ¶ 13, 19; Ex. C ¶ 15– 16, 18. To the extent that prisoners are forced to file rushed petitions to protect against the tighter Chapter 154 deadlines, there is no after-the-fact remedy that can compensate for the opportunity they lost to develop and present constitutional claims challenging their death sentences.

Organizational Petitioners, who together represent almost all of the capital habeas petitioners on death row in Tennessee, will also be irreparably harmed. Enforcement of Chapter 154 will immediately shorten the time that the Organizational Petitioners have to file habeas petitions and will force the Organizational Petitioners to investigate and prepare to litigate on an emergency basis whether and how Chapter 154 applies to each of their clients, thereby

consuming resources that would otherwise be devoted to developing and presenting claims for the Organizational Petitioners' clients. Ex. A ¶ 18; Ex. C ¶ 13– 16, 18. Since the Certification, Organizational Petitioners' staff have already had to postpone other habeas work to counsel clients and develop litigation strategy and significantly expand the staffing in their offices to accommodate the additional workload imposed by Chapter 154. Ex. A ¶ 21–23; Ex. C ¶ 19.

### C. A Stay of the Certification Will Not Prejudice the Respondents or Tennessee

The balance of hardships strongly favors Petitioners. Even as it prevents irreparable harm to Petitioners, a stay will simply maintain the status quo that has governed federal capital habeas litigation in Tennessee and elsewhere for nearly three decades. Tennessee never previously sought state-wide certification under Chapter 154 despite now claiming that Tennessee has met the requirements for certification since October 23, 1995. Maintaining the status quo while this Court conducts its statutorily mandated *de novo* review will cause no cognizable prejudice to Tennessee or the United States.

### D. Public Interest Strongly Favors a Stay of the Certification

This is only the second time any state has been certified under Chapter 154, Add.146, and the first certification was retracted by the Attorney General before it was applied. This Court has never issued a merits ruling on a Chapter 154 case and thus has never construed the various requirements of the statute. The TN-AGR's

assertion of Chapter 154 against Petitioner Pruitt is the first ever attempted application of Chapter 154 against a death-sentenced prisoner.

If allowed to go into immediate effect, parties across Tennessee's capital cases in state and federal court will have to litigate a myriad of unresolved issues simultaneously with this Court's consideration of the Petition. Unleashing a flood of litigation before this Court has exercised its *de novo* judicial review does not serve the public interest.

Both Attorney General Blanche and the TN-AGR have recognized the serious legal questions raised by certification. The Certification concedes that the application of Chapter 154 will force parties to litigate a range of novel and complex questions and acknowledges that these questions will have to be taken up by the courts. *See* Add.254. The TN-AGR also recognized in Petitioner Pruitt's federal habeas case that if the district court determined that Chapter 154 was dispositive, "the interests of judicial economy might weigh in favor of a stay." Add.495. Acknowledging that this Court's review of the Certification could impact its analysis of Petitioner Pruitt's case, the court has stayed those proceedings on the merits pending adjudication of this Petition. Add.497–98.

While the court in *Pruitt* issued a stay of litigation pending this Court's review of this Petition, without a stay of the Certification the TN-AGR is still free to invoke Chapter 154 in other proceedings. In service of judicial economy and to avoid

inconsistent rulings, this Court should grant Petitioners' request for a stay of the Certification.

### II. Judicial Economy Strongly Favors an Abeyance of This Litigation

If this Court grants the requested stay of Certification requested above, it should hold this Petition in abeyance until the conclusion of *FDSET v. Skrmetti* and *Bland v. Bondi*, subject to periodic status reports or such other conditions as the Court deems appropriate. Every court possesses the inherent power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," including the power to stay proceedings pending the outcome of another case whose resolution will settle or simplify the questions presented. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

First, no court has addressed whether the TN-AGR has the authority to initiate administrative proceedings like an application for certification under 28 U.S.C. § 2265. If the Tennessee Chancery Court concludes in *FDSET v. Skrmetti* that the TN-AGR's request for certification was extra-statutory and unconstitutional, then the Certification before this Court rests on an invalid and unlawful predicate. Because litigation requiring an interpretation of Tennessee constitutional and statutory law is pending before a Tennessee court, Petitioners ask that this Court stay litigation of the Petition pending the resolution of that Tennessee state court litigation.

Furthermore, holding federal litigation in abeyance is proper under abstention principles where the resolution of an uncertain issue of state law could permit the federal court to avoid unnecessarily reaching constitutional questions. *See, e.g., Harris Cnty. Comm'rs Ct. v. Moore,* 420 U.S. 77, 83–84 (1975). A ruling against the TN-AGR in *FDSET v. Skrmetti* could eliminate the need for this Court to reach the constitutional issues raised by the Certification and certification procedures.

Second, *Bland v. Bondi* presents questions concerning the lawfulness of the process by which DOJ arrived at the Certification that Petitioners will also raise for consideration before this Court, including the adequacy of the notice-and-comment proceedings and DOJ's handling of Organizational Petitioners' objections during that process, as well as challenges to the constitutionality of Chapter 154. Staying this Court's consideration of the Petition avoids the risk of duplicative litigation and inconsistent appellate rulings on closely related questions arising from the same certification proceeding.

**CONCLUSION**

The Court should stay the Certification pending its consideration of the Petition and hold its resolution of the Petition in abeyance pending *FDSET v. Skrmetti* and *Bland v. Bondi*.

Respectfully submitted,

*/s/Jennifer Ware-Phillips*
Jennifer Ware-Phillips

*Counsel for Petitioners Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, Bane, Bland, Clayton, and Miller*

*/s/Gerald W. King Jr.*
Gerald W. King Jr.

*Counsel for Petitioner Pruitt*

September 30, 2026

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Fed. R. App. P. 32(g) and Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,185 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Date: September 30, 2026

*/s/Jennifer Ware-Phillips*
Jennifer Ware-Phillips

*Counsel for Petitioners Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, Bane, Bland, Clayton, and Miller*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on September 30, 2026.

Date: September 30, 2026

*/s/Jennifer Ware-Phillips*
Jennifer Ware-Phillips

*Counsel for Petitioners Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, Bane, Bland, Clayton, and Miller*

## CERTIFICATE AS TO PARTIES AND AMICI CURIAE

In accordance with D.C. Circuit Rules 18(a)(4), 27(a)(4) and 28(a)(1)(A), Petitioners certify that the following persons are parties, intervenors, or amici curiae in this Court:

**Parties**

Petitioners are Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, John Michael Bane, Andre Bland, Sedrick Clayton, Urshawn Miller, and Corinio Pruitt.

Respondents are Todd Blanche, Attorney General, and the United States of America.

**Intervenors**

At present, no parties have moved to intervene in this action.

**Amici Curiae**

At present, no parties have moved for leave to participate as *amici curiae*.

Date: September 30, 2026

*/s/Jennifer Ware-Phillips*
Jennifer Ware-Phillips

*Counsel for Petitioners Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, Bane, Bland, Clayton, and Miller*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Federal Defender Services of Eastern Tennessee, Inc. states that it is a non-profit corporation with no parent corporation and that no publicly held corporation owns 10% or more of its stock, as Petitioner Federal Defender Services of Eastern Tennessee, Inc. does not issue stock. Federal Defender Services of Eastern Tennessee, Inc. operates as the federal public defender in the Eastern District of Tennessee pursuant to 18 U.S.C. § 3006A(g). Federal Defender Services of Eastern Tennessee, Inc. includes a Capital Habeas Unit, which is appointed to serve in all non-conflicted capital habeas cases arising from the Eastern District of Tennessee and in other federal districts.

Date: September 30, 2026

*/s/Jennifer Ware-Phillips*
Jennifer Ware-Phillips

*Counsel for Petitioners Federal Defender Services of Eastern Tennessee, Inc., Federal Public Defender for the Middle District of Tennessee, Bane, Bland, Clayton, and Miller*

# EXHIBIT A

## DECLARATION OF AMY HARWELL

I, Amy Harwell, declare that the following is true and correct:

1. I am an attorney licensed to practice in the States of Tennessee and Texas. I currently serve as the First Assistant Federal Public Defender for the Office of the Federal Public Defender for the Middle District of Tennessee ("Office"), as well as Acting Chief of that office's Capital Habeas Unit ("TNM-CHU"), where I have worked since 2007. My position requires me to supervise a staff of attorneys, investigators, and paralegals and to remain closely aware of the resource demands facing both the TNM-CHU and the Office more generally.

2. The Criminal Justice Act provides that all capital habeas petitioners are entitled to the appointment of counsel. 18 U.S.C. § 3599(a)(2). The appointment requires counsel to represent the petitioner in all available and ancillary proceedings. 18 U.S.C. §3599(e); 18 U.S.C. § 3006A(c). The United States Supreme Court has held that these statutes provide capital petitioners "enhanced rights to representation." *Martel v. Clair*, 565 U.S. 648, 649 (2012). To meet the need for qualified counsel in federal capital habeas cases, the Defender Services Office developed specialized units within Federal Public Defender Offices known as Capital Habeas Units ("CHUs"). Currently, there are twenty-two CHUs housed in Federal Public Defender Offices throughout the country. These offices are charged with representing petitioners whose cases arise from convictions and sentences that occurred primarily within the district of the Defender office. However, over time, CHUs have undertaken representation for capital petitioners outside their districts when invited to do so by the various district courts either because of a conflict of interest with the local CHU or the lack of a CHU in the district.

3. The TNM-CHU's mission is to fulfill this statutory mandate and protect the constitutional rights and inherent dignity of indigent persons sentenced to death. The TNM-CHU

wields this statutory mandate by ensuring full and fair review of each client's conviction and sentence through exhaustive investigation, collaborative case development, and zealous advocacy, including challenging systemic injustices and securing the full benefit of federal constitutional rights in post-conviction proceedings. Absent a conflict, the TNM-CHU accepts federal habeas appointments for all death sentenced prisoners whose cases arise from state criminal convictions in any county within either the Western or Middle District of Tennessee. If the grounds for a successive state post-conviction proceeding arise after the prisoner has initiated federal habeas corpus proceedings, often their Federal Defender will represent them in state court, will recruit pro bono counsel, or will request that the Tennessee Office of the Post-Conviction Defender take the case.

4. The TNM-CHU currently represents clients in at least:

a. Nine pending federal habeas corpus petitions challenging their Tennessee death sentences and underlying convictions.

b. Two pending federal habeas corpus petitions involving federal convictions and sentences.

c. One pending federal habeas corpus petition challenging a death sentence and conviction imposed by a Texas state court.

d. Eight proceedings in Tennessee state courts involving claims of intellectual disability, untested DNA evidence, or other issues relating to the correctness and/or lawfulness of convictions or sentences.

e. One pending post-conviction proceeding in Texas state court.

f. One declaratory judgment action in state court involving the anticipated method of execution for six clients.

g. One 42 U.S.C. § 1983 case in federal court involving another client's anticipated method of execution.

5. We expect those numbers to vary as litigation progresses, but we do not expect to face any foreseeable reduction in our litigation burdens.

6. TNM-CHU submitted a comment opposing the Tennessee Attorney General & Reporter's ("TN-AGR") request for certification.

7. The request for Chapter 154 certification filed by the TN-AGR forced the TNM-CHU to divert limited attorney and staff time from its mission-critical, time-sensitive representations to respond to Tennessee's application and compile a comprehensive comment record. The TNM-CHU has calculated that it was required to divert approximately 1,170 hours of staff time to prepare its initial public comment for the administrative proceeding in response to Tennessee's certification application.

8. As a result of the Tennessee application and the Department of Justice's ("DOJ") refusal to extend the time for submitting comments, TNM-CHU staff were designated as essential workers and were required to work during the shutdown of the federal government. TNM-CHU staff regularly worked late into the evenings and weekends on this project, with several staff members working late into the night for several days prior to critical stages of the process. The administrative process substantially diverted the TNM-CHU's work capacity away from other pending legal matters on behalf of its clients.

9. Tennessee sought retroactive certification for a period stretching back approximately thirty years, to 1995. In response, the TNM-CHU was required to undertake extensive research into decades of historic development of the capital counsel mechanism, including accessing off-site storage units, gathering county court records, submitting public

records requests, and conducting interviews of persons with knowledge of Tennessee's post-conviction proceedings over that entire period. The TN-AGR's failure to provide any supporting documentation to the DOJ with its application compounded the burden, requiring the TNM-CHU to independently identify relevant cases from these time periods, review thousands of pages of case materials, interview relevant actors, attempt to obtain fee vouchers for attorneys and expert funding requests, and synthesize that data into a comprehensive comment for the DOJ's review. The many unsupported statements and misrepresentations in Tennessee's application required the TNM-CHU to compile extensive rebuttal information. These burdens are extraordinary demands imposed by the United States Attorney General's administrative process that the TNM-CHU would not have incurred but for the certification proceeding.

10. Subsequent actions by the DOJ and TN-AGR further increased the resource burden on the Office. When the DOJ promulgated a new rule regarding the consideration of certification applications, the Office was forced to expend additional hours responding to the proposed change. Then, when the DOJ published its letter inviting the TN-AGR to select his preference of which rule would apply, we were required to expend yet more time and effort to assess and respond to that unusual step. To date, neither the DOJ nor the TN-AGR has informed the public or the commenters on Tennessee's application which rule the TN-AGR has selected or intends to select.

11. In the time since Tennessee was certified, TNM-CHU has been forced to expend additional resources in cases involving pending or future federal petitions for federal habeas corpus. Should Petitioners request to stay the certification be denied, TNM-CHU will be required to spend hundreds, if not thousands, of hours determining and litigating (1) whether each client's post-conviction counsel was appointed according to the approved mechanism, validly waived counsel, or was properly found not to be indigent, 28 U.S.C. § 2261(b)(1), and (2) if it is even

proper for Chapter 154 and the individual provisions thereof to apply retroactively given that our clients previously lacked notice that Chapter 154's procedures would apply. Uncovering whether Chapter 154 will apply to our cases will require extensive investigation including poring through thousands of pages of off-site case records, interviewing witnesses, and requesting public records.

12. For example, the 28 U.S.C. § 2261(b)(1) inquiry in each client's case requires substantial research regarding whether post-conviction counsel actually received payment for all reasonable litigation expenses. This may require detailed research into market rates and prevailing practices going back decades.

13. Because there is no existing case law explaining how Chapter 154 post-certification will apply in individual cases, we are preparing to face numerous novel legal questions that will consume significant amounts of attorney time and attention to litigate. These issues include, but will not be limited to, questions of timeliness, whether petitions may be amended, and whether certain claims are barred by the statutory exhaustion/default framework imposed by Chapter 154. And we will have to litigate these issues more quickly given the expedited timeframe Chapter 154 imposes on federal courts.

14. Certification has the potential to affect every TNM-CHU client who is sentenced to death by the State of Tennessee and who is the subject of a pending and/or future habeas corpus petition. Among the clients represented by TNM-CHU whose federal habeas corpus petitions may be impacted are Andre Bland and Michael Bane.

15. Mr. Bland's direct review concluded on December 1, 1997. Mr. Bland's first petition for a writ of certiorari was docketed by the Supreme Court of the United States on February 23, 1998, and denied on April 20, 1998. Mr. Bland then filed a petition for postconviction review on July 16, 1998.

16. Mr. Bland's federal habeas petition is currently stayed pending the litigation of an intellectual disability claim in Tennessee state court. The compressed deadlines and amendment restrictions of Chapter 154 could truncate the time he has to present those claims upon the expiration of the stay.

17. Tennessee has agreed to conduct DNA testing of critical evidence in Mr. Bane's underlying case. Once the results of those DNA tests are returned, he will need to amend his pending federal habeas petition accordingly. Under Chapter 153, Mr. Bane's motion to amend his petition would be subject to Federal Rule of Civil Procedure 15(a)(2), which directs courts to grant leave to amend "freely" "when justice so requires." However, the TNM-CHU anticipates the TN-AGR will likely argue that Chapter 154's heightened amendment standard applies, which would require Mr. Bane to show that the factual predicate for his claim "could not have been discovered previously through the exercise of due diligence" and that the new facts would establish innocence by clear and convincing evidence. 28 U.S.C. §§ 2254(b)(2)(B), 2261(b), 2264(a), 2266(b)(3)(B).

18. Given the uncertainty that has followed Tennessee's certification and should that certification not be stayed, TNM-CHU attorneys will be forced to litigate every case as potentially (1) covered by Chapter 154 in its entirety, (2) covered by Chapter 154 with regard to some provisions, which can lawfully be applied retroactively, but not others, which cannot, and (3) not covered by Chapter 154 either because the post-conviction representation actually provided did not satisfy 28 U.S.C. § 2261(b)(2) or because the certification itself was erroneous. This three-track litigation process will be highly demanding and will force the TNM-CHU to divert resources that otherwise would be used to develop and pursue substantive claims.

19. To the extent we determine that Chapter 154's procedures may apply to a case, we will have to act hastily and protectively file petitions for any new client, curtailing further

investigation of other potentially meritorious claims. Upon doing so, we will also likely be required to litigate the issue of whether Chapter 154 applies and to protect claims vulnerable to Chapter 154's stricter procedural default rules. We may also be severely restricted in our ability to amend petitions and potentially add claims we were unable to fully develop given the haste with which we were forced to file.

20. The shortened statute of limitations imposed by Chapter 154 will also negatively affect the TNM-CHU and our clients by placing enormous pressure on state post-conviction counsel to quickly file their petitions for certiorari to the United States Supreme Court and state post-conviction review to toll the statute of limitations. A failure to do so would cause individual clients to lose their federal habeas rights before state post-conviction review was even complete. A rushed state post-conviction process, however, would create even greater investigatory and litigation burdens for the TNM-CHU, especially where state post-conviction counsel may have had to curtail their investigation of potentially meritorious claims unless they secured additional resources to assist in preparing their cases.

21. The TNM-CHU must also now engage in efforts to not only counsel our clients about the potential impact Chapter 154 may have on their cases, but also to train and develop resources for attorneys, staff, and external stakeholders in capital habeas representation. *See* Criminal Justice Act Plan for the Eastern District of Tennessee § VII(D), (G) (2025); United States District Court for the Middle District of Tennessee Criminal Justice Act (CJA) Plan § VII(D), (G) (2018).

22. Although TNM-CHU attorneys are accustomed to navigating and responding to changes in the law affecting our clients, the wholesale reworking of the structure of litigation that Chapter 154 would impose is different from ordinary changes in the law in both magnitude and

kind, requiring us not merely to adapt but to fundamentally restructure our apparatus for pursuing our statutory mission.

23. Following Tennessee's certification and in light of the truncated deadlines of Chapter 154, TNM-CHU was required to seek a significant increase in its staff size to deal sufficiently with the deadlines and additional added work required to respond to the state's assertion of the application of Chapter 154 in individual cases. To support Chapter 154-related work in light of Tennessee certification, the Administrative Office of the Courts granted the TNM-CHU's request to increase our staff by ten full-time employees during fiscal year 2027.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 30th day of September, 2026.

Amy Harwell

# EXHIBIT B

# DECLARATION OF DEBORAH DREW

I, Deborah Drew, declare as follows:

1. I currently reside in Davidson County, Tennessee. I am over the age of eighteen (18) and am competent to make this declaration.

2. I have been the Deputy Director of the Tennessee Office of the Post-Conviction Defender ("OPCD") since October 2013. After graduating from the University of California, Berkeley, School of Law, I worked for the Contra Costa County Public Defender Office as a post-bar law clerk and later rejoined the office as a deputy public defender, where I spent two years defending criminal cases in the trial courts. I then joined the Habeas Corpus Resource Center ("HCRC") in San Francisco, as a staff attorney, where for nine years I worked exclusively on capital state and federal habeas corpus cases as well as assisted privately appointed counsel in their capital state habeas corpus cases. In 2012, I relocated to Tennessee and in April 2013 joined the OPCD. For 23 of the 29 years since I graduated law school, my primary practice has been in capital post-conviction defense.

3. The OPCD is the designated, presumptive counsel in all capital post-conviction litigation filed in Tennessee. This presumption is established by Tennessee Code Annotated § 40-30-205, which provides for the creation and maintenance of the office and establishes that its primary function is "to provide legal representation to indigent individuals convicted of capital offenses and sentenced to death."

4. The Post-Conviction Defender Commission Act was signed into law in 1995 creating the OPCD, which opened its doors on April 1, 1996, under the director, Post-Conviction Defender Don Dawson. The agency was created after the defunding and closure of the Tennessee Capital Case Resource Center ("CCRC") in 1995, which handled many aspects of capital defense work in all stages of litigation, including direct representation, recruitment of law firms for pro bono work, and providing assistance to appointed private counsel. Unlike the CCRC, the OPCD was established to represent all capital state post-conviction petitioners, except for cases in which the office had a conflict of interest.

5. Capital post-conviction petitioners may only receive access to state-funded counsel from the OPCD or appointed counsel *after* they file for post-conviction relief and a request for the appointment of counsel and upon a finding of indigency. Tenn. Code Ann. §§ 40-30-107, 40-30-206; Tenn. S. Ct. R. 28, § 6.

6. In some cases, the OPCD assists pro se capital petitioners with their pro se petitions. However, the OPCD cannot contact any capitally sentenced defendant without permission from appellate counsel and cannot conduct any investigation on the case before being formally appointed. Thus, while the OPCD attorneys may be helpful to the pro se petitioner, they cannot serve as the petitioner's post-conviction attorney until authorized by formal appointment.

7. The trial court's initial review of a pro se petition is conducted prior to the appointment of counsel. Tenn. Code Ann. § 40-30-106. The "preliminary consideration" by the trial court requires that the court examine the pro se petition "together with all the files, records, transcripts, and correspondence relating to the judgment under attack, and enter" a preliminary order. Tenn. Code Ann. § 40-30-106. The court must dismiss the petition if the petition is deemed untimely, successive, or filed in the wrong court. *Id.* If the court determines that the

petition fails to plead an adequate factual basis, the court shall dismiss the petition, unless the petition was filed pro se. *Id.* For inadequately pled pro se petitions, the court "may enter an order stating that the petitioner must file an amended petition" within fifteen days. *Id.*

8. Once a pro se petition has been filed, if the petition survives the post-conviction court's preliminary review and the petitioner is indigent, the post-conviction court appoints the OPCD or other counsel, if the OPCD has a conflict. Tenn. Code Ann. § 40-30-107.

9. Now that Tennessee has been certified under 28 U.S.C. § 2265, the OPCD expects the Tennessee Attorney General will assert the procedural restrictions of 28 U.S.C. §§ 2261-2266 ("Chapter 154") against most if not all of the OPCD's clients who are not granted relief in their state post-conviction proceedings. If these provisions are enforceable against our office's clients, some of those clients will have materially less time to investigate, prepare, and file their federal habeas petitions as a result of the certification of Tennessee's mechanism. The Attorney General's Office may also assert the truncated statute of limitations of Chapter 154 against other clients and seek dismissal of their federal habeas petitions altogether on the grounds that they are untimely under Chapter 154, though they would have been timely under 28 U.S.C. §§ 2241-2255 ("Chapter 153").

10. People sentenced to death who are on direct appeal in Tennessee courts will also be significantly impacted by the certification. If their direct appeals are denied, they will have less time to prepare and file a writ of certiorari, and then—if certiorari is denied—they will have to file their pro se petition initiated state post-conviction proceedings on a severely condensed timeline in order to avoid losing time for the eventual preparation and filing of a federal habeas petition or even running out of time to bring a federal habeas petition altogether.

11. Meeting the stringent deadlines of Chapter 154 is all the more challenging because indigent petitioners in Tennessee cannot be appointed state post-conviction counsel during the relevant time—prior to the filing of their pro se petitions, which is what will ultimately stop the clock on the statute of limitations for their federal habeas petitions.

12. Sedrick Clayton and Urshawn Miller are among the OPCD's clients.

13. Mr. Clayton's direct appeal of his conviction and capital sentence was denied on November 20, 2017. A petition for certiorari was filed in the United States Supreme Court on February 20, 2018, which was denied on May 14, 2018. Mr. Clayton filed a pro se petition initiating his post-conviction proceedings on October 23, 2018. Under Chapter 153, Mr. Clayton would have nearly 200 days to file a federal habeas petition following the state court's disposition of his state post-conviction proceedings, should he not be granted relief therein, whereas under Chapter 154, the Tennessee Attorney General may argue that he is out of time to file a federal habeas petition by approximately 70 days.

14. Mr. Miller's direct appeal of his conviction and sentence was denied on December 7, 2021. A petition for certiorari was filed in the United States Supreme Court on May 4, 2022, and denied on October 3, 2022. Mr. Miller filed a pro se petition initiating his post-conviction proceedings on November 9, 2022. Under Chapter 153, Mr. Miller would have almost eleven months to file a federal habeas petition following the state court's disposition of his state post-conviction proceedings, should he not be granted relief therein, whereas under Chapter 154, the Tennessee Attorney General may argue that he is out of time to file a federal habeas petition by 5 days.

I declare under penalty of perjury that the foregoing is true and correct.

Deborah Drew, Declarant

Dated: 09.30.2025

# EXHIBIT C

**DECLARATION OF EMILY ELISON**

I, Emily Elison, declare that the following is true and correct.

1. I, Emily Elison, am the Capital Habeas Unit Supervisor at Federal Defender Services of Eastern Tennessee, Inc. ("FDSET"). I am an attorney licensed to practice in Oregon since 2010. I have been the supervisor of the FDSET's Capital Habeas Unit ("FDSET-CHU") since June 2026. I have been employed as an attorney at FDSET-CHU since 2022. Prior to my employment at FDSET, I was the death penalty staff attorney and career clerk for a federal judge in the District of Alaska (2019–2022); prior to that I was a capital trial attorney and CJA Panel attorney in Oregon (2010–2019). My position requires me to supervise a staff of attorneys, investigators, and paralegals and to remain closely aware of the resource demands facing both FDSET-CHU and the office more generally. I am older than eighteen years old and am competent to make this declaration. The facts set forth herein are based upon my personal knowledge, and if called upon to testify, I could and would testify competently thereto.

2. The Criminal Justice Act provides that all capital habeas petitioners are entitled to the appointment of counsel. 18 U.S.C. § 3599(a)(2). The appointment requires counsel to represent the petitioner in all available and ancillary proceedings. 18 U.S.C. §3599(e); 18 U.S.C. § 3006A(c). The United States Supreme Court has held that these statutes provide capital petitioners "enhanced rights to representation." *Martel v. Clair*, 565 U.S. 648, 649 (2012). To meet the need for qualified counsel in federal capital habeas cases, the Defender Services Office developed specialized units within Federal Public Defender Offices known as Capital Habeas Units ("CHUs"). Currently, there are twenty-two CHUs housed in Federal Public Defender Offices throughout the country. These offices are charged with representing petitioners whose cases arise from convictions and sentences that occurred primarily within the district of the Defender office. However, over time, CHUs have

undertaken representation for capital petitioners outside their districts when invited to do so by the various district courts either because of a conflict of interest with the local CHU or the lack of a CHU in the district.

3. FDSET's mission is to zealously advocate in federal courts for those who have been accused or convicted of federal or capital crimes, and to provide client-centered, vigorous, and compassionate representation to all, and to believe in the worth, dignity, and humanity of every client. FDSET fulfills its statutory mandate by ensuring full and fair review of each client's conviction and sentence through exhaustive investigation, collaborative case development, and zealous advocacy, including challenging systemic injustices and securing the full benefit of federal constitutional rights in post-conviction proceedings. Absent a conflict, FDSET-CHU accepts federal habeas appointments for all death sentenced prisoners whose cases arise from state criminal convictions in counties that are within the Eastern District of Tennessee. If the grounds for a successive state post-conviction proceeding arise after the prisoner has initiated federal habeas corpus proceedings, often their Federal Defender will seek state court counsel to represent the client in state court, will recruit pro bono counsel, or will represent the client in state collateral proceedings.

4. FDSET currently represents at least:

   a. Three clients with scheduled executions in two different states (Tennessee and Ohio), one of whom has an execution date of today, September 30, 2026;

   b. Two clients in two different federal courts of appeals (6th Circuit and 11th Circuit);

c. Six clients with habeas cases in federal district courts in three different jurisdictions (D. Neb., S.D. Ohio, and D. Ariz.)
d. Six clients with habeas cases in Tennessee federal district courts;
e. One client in Guantanamo Bay with habeas proceedings in district court (D. D.C.);
f. One client with habeas proceedings in district court (S.D. Fla.) arising out of a federal conviction and sentence; and
g. Seven clients who have pending state collateral proceedings.

5. I expect those numbers to vary as litigation progresses but do not expect to face any foreseeable reduction in our litigation burdens.

6. The request for Chapter 154 certification filed by the Tennessee Attorney General & Reporter ("TN-AGR") forced FDSET-CHU to divert limited attorney and staff time from its mission-critical, time-sensitive representations to respond to Tennessee's application and compile a comprehensive comment record. The FDSET-CHU has calculated that it was required to divert approximately 381 hours of staff time to prepare its initial public comment for the administrative proceeding in response to Tennessee's certification application.

7. As a result of the Tennessee application and the Department of Justice's ("DOJ") refusal to extend the time for submitting comments, FDSET-CHU staff regularly worked long hours on this project, with several staff members devoting the majority of their working time for several weeks prior to critical stages of the process. The administrative process substantially diverted FDSET-CHU's work capacity away from other pending legal matters on behalf of its clients.

8. Tennessee sought retroactive certification for a period stretching back approximately thirty years, to 1995. In response, FDSET-CHU was required to undertake extensive research into decades of historic development of the capital counsel mechanism. The TN-AGR's failure to provide any supporting documentation to the DOJ with its application compounded the burden, requiring FDSET-CHU to independently identify relevant cases from these time periods, review numerous case files, interview relevant actors, attempt to obtain fee vouchers for attorneys and expert funding requests, and synthesize that data into a comprehensive Comment for the Department's review. The many unsupported statements and misrepresentations in Tennessee's application required FDSET-CHU to compile extensive rebuttal information. These burdens are extraordinary demands imposed by the United States Attorney General's administrative process that FDSET-CHU would not have incurred but for the certification proceeding.

9. Subsequent actions by the DOJ and TN-AGR further increased the resource burden on FDSET-CHU. When the DOJ promulgated a new rule regarding the consideration of certification applications, the FDSET-CHU was forced to spend additional time responding to the proposed change. Then, when the DOJ published its letter inviting the TN-AGR to select his preference of which rule would apply, we were required to expend yet more additional time and effort to assess and respond to that unusual step.

10. Now that Tennessee has been certified, FDSET-CHU must spend hundreds, if not thousands, of hours determining and litigating (1) whether each client's post-conviction counsel was appointed according to the approved mechanism, validly waived counsel, or was properly found not to be indigent, 28 U.S.C. § 2261(b)(1); and (2) if it is even proper for Chapter 154 and the individual provisions thereof to apply retroactively given that our clients previously lacked notice that Chapter 154's procedures would apply. Uncovering whether Chapter 154 will apply to

our cases will require extensive investigation including poring through thousands of pages of off-site case records, interviewing clients, and requesting public records.

11. For example, the 28 U.S.C. § 2261(b)(1) inquiry will require a substantial amount of research regarding whether post-conviction counsel actually received payment for all reasonable litigation expenses. This may require detailed research into market rates and prevailing practices going back numerous years.

12. Because there is no existing case law explaining how Chapter 154 post-certification will apply in individual cases, I expect that we will face numerous novel legal questions that will consume significant amounts of attorney time and attention to litigate. These issues will include, but not be limited to, questions of timeliness, whether petitions may be amended, and whether certain claims are barred by the statutory exhaustion/default framework imposed by Chapter 154. And we will have to litigate these issues more quickly given the expedited timeframe Chapter 154 imposes on federal courts.

13. Certification has the potential to affect every FDSET-CHU client who is sentenced to death by the State of Tennessee and who is the subject of a pending and/or future habeas corpus petition.

14. It is possible that multiple clients have a pending federal habeas petition that was arguably untimely filed under the Chapter 154 framework, although their petitions were timely under the framework applicable when actually filed. I anticipate that, in such cases, we will be required to litigate both whether Chapter 154 applies generally and whether the statute of limitations can be applied retroactively to defeat an already-filed petition.

15. Given the uncertainty that has followed certification, FDSET-CHU must litigate every case as potentially (1) covered by Chapter 154 in its entirety; (2) covered by Chapter 154

with regard to some provisions, which can lawfully be applied retroactively, but not others, which cannot; and (3) not covered by Chapter 154 because the post-conviction representation actually provided did not satisfy 28 U.S.C. § 2261(b)(2). This three-track litigation process is highly demanding and will force the FDSET-CHU to divert resources that otherwise would be used to develop and pursue substantive claims.

16. To the extent we determine that Chapter 154's procedures may apply to a case, we will have to act protectively and hastily file petitions, curtailing further investigation of other potentially meritorious claims. Upon doing so, we will also likely be required to litigate the issue of whether Chapter 154 applies and to protect claims vulnerable to Chapter 154's stricter procedural default rules. We may also be severely restricted in our ability to amend petitions and potentially add claims we were unable to fully develop given the haste with which we were forced to file.

17. The shortened statute of limitations imposed by Chapter 154 will also negatively affect the FDSET-CHU and our clients by placing enormous pressure on state post-conviction counsel to quickly file their petitions for certiorari to the United States Supreme Court and state post-conviction review to toll the statute of limitations. A failure to do so would cause individual clients to lose their federal habeas rights before state post-conviction review was even complete. A rushed state post-conviction process, however, would create even greater investigatory and litigation burdens for the FDSET-CHU, especially where state post-conviction counsel may have had to curtail their investigation of potentially meritorious claims unless they secured additional resources to assist in preparing their cases.

18. The shortened statute of limitations will also require our office to prepare and file federal habeas petitions on behalf of our clients with very little time, an enormous task given the

volume of information that must be reviewed and the complexity of the constitutional issues that must be addressed.

19. Following Tennessee's certification and in light of the truncated deadlines of Chapter 154, FDSET-CHU was required to seek a significant increase in its staff size to deal sufficiently with the deadlines and additional added work required to respond to the state's assertion of the application of Chapter 154 in individual cases. To support Chapter 154-related work in light of Tennessee certification, the Administrative Office of the Courts granted the FDSET-CHU's request to increase our staff by six full-time employees during fiscal year 2027. This is a more than 50 percent increase in the size of our staff.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 30th day of September, 2026.

____________________________

Emily Elison

# ADDENDUM

# Presidential Documents

**Executive Order 14164 of January 20, 2025**

## Restoring the Death Penalty and Protecting Public Safety

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* Capital punishment is an essential tool for deterring and punishing those who would commit the most heinous crimes and acts of lethal violence against American citizens. Before, during, and after the founding of the United States, our cities, States, and country have continuously relied upon capital punishment as the ultimate deterrent and only proper punishment for the vilest crimes. Our Founders knew well that only capital punishment can bring justice and restore order in response to such evil. For this and other reasons, capital punishment continues to enjoy broad popular support.

Yet for too long, politicians and judges who oppose capital punishment have defied and subverted the laws of our country. At every turn, they seek to thwart the execution of lawfully imposed capital sentences and choose to enforce their personal beliefs rather than the law. When President Biden took office in 2021, he allowed his Department of Justice to issue a moratorium on Federal executions, in defiance of his duty to faithfully execute the laws of the United States that provide for capital punishment. And on December 23, 2024, President Biden commuted the sentences of 37 of the 40 most vile and sadistic rapists, child molesters, and murderers on Federal death row: remorseless criminals who brutalized young children, strangled and drowned their victims, and hunted strangers for sport. He commuted their sentences even though the laws of our Nation have always protected victims by applying capital punishment to barbaric acts like theirs. Judges who oppose capital punishment have likewise disregarded the law by falsely claiming that capital punishment is unconstitutional, even though the Constitution explicitly acknowledges the legality of capital punishment.

These efforts to subvert and undermine capital punishment defy the laws of our nation, make a mockery of justice, and insult the victims of these horrible crimes. The Government's most solemn responsibility is to protect its citizens from abhorrent acts, and my Administration will not tolerate efforts to stymie and eviscerate the laws that authorize capital punishment against those who commit horrible acts of violence against American citizens.

**Sec. 2**. *Policy.* It is the policy of the United States to ensure that the laws that authorize capital punishment are respected and faithfully implemented, and to counteract the politicians and judges who subvert the law by obstructing and preventing the execution of capital sentences.

**Sec. 3**. *Federal Capital Punishment.* (a) The Attorney General shall pursue the death penalty for all crimes of a severity demanding its use.

(b) In addition to pursuing the death penalty where possible, the Attorney General shall, where consistent with applicable law, pursue Federal jurisdiction and seek the death penalty regardless of other factors for every federal capital crime involving:

(i) The murder of a law-enforcement officer; or

(ii) A capital crime committed by an alien illegally present in this country.

The Attorney General shall encourage State attorneys general and district attorneys to bring State capital charges for all capital crimes with special

attention to the crimes described in Subsections (i) and (ii), regardless of whether the federal trial results in a capital sentence.

(d) The Attorney General shall take all appropriate action to modify the Justice Manual based on the policy and purpose set forth in this Executive Order.

(e) The Attorney General shall evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden, and the Attorney General shall take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose. The Attorney General shall further evaluate whether these offenders can be charged with State capital crimes and shall recommend appropriate action to state and local authorities.

**Sec. 4**. *Preserving Capital Punishment in the States.* (a) The Attorney General shall take all necessary and lawful action to ensure that each state that allows capital punishment has a sufficient supply of drugs needed to carry out lethal injection.

(b) The Attorney General shall take all appropriate action to approve or deny any pending request for certification made by any State under 28 U.S.C. 2265.

**Sec. 5**. *Seeking The Overruling of Supreme Court Precedents That Hinder Capital Punishment.* The Attorney General shall take all appropriate action to seek the overruling of Supreme Court precedents that limit the authority of State and Federal governments to impose capital punishment.

**Sec. 6**. *Prosecuting Crime to Protect Communities.* (a) The Attorney General shall appropriately prioritize public safety and the prosecution of violent crime, and take all appropriate action necessary to dismantle transnational criminal activity in the United States.

(b) To ensure the fullest protection of American communities from violence, the Attorney General shall encourage state attorneys general and district attorneys to adopt policies and practices aligned with subsection (a). Federal law enforcement should coordinate with State and local law enforcement where possible to facilitate these objectives.

**Sec. 7**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02012
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

**Office of the Attorney General**
**Washington, D.C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM: THE ATTORNEY GENERAL

SUBJECT: REVIVING THE FEDERAL DEATH PENALTY AND LIFTING THE MORATORIUM ON FEDERAL EXECUTIONS[1]

Since our Nation's founding, the federal government, and nearly every state, has relied upon the death penalty as a just punishment for the most egregious crimes. The American people, through their elected representatives, have repeatedly reaffirmed the effectiveness of capital punishment in deterring crime, achieving justice for victims, and closure for their loved ones. At the federal level, the Department of Justice is charged with determining whether to seek death sentences for certain federal crimes and, when imposed, carrying out those sentences. This is among the Department's most serious and solemn responsibilities.

Throughout much of its nearly 155-year history, the Department of Justice career prosecutors and political leadership have appropriately secured federal death sentences against the very worst criminals. Consistent with Congress's mandate, the Department has consistently and faithfully fulfilled its duty to carry out those sentences in accordance with the law. The American people undoubtedly are safer, and more secure, as a result of this critical work.

Recently, however, the Department's political leadership disregarded these important responsibilities and supplanted the will of the people with their own personal beliefs. Those at the very highest levels of the Department failed to seek death sentences against child rapists, mass murderers, terrorists, and other criminals. More appalling, the Department's leadership sought—and received from former President Biden—commutations for the death sentences of 37 murderers that Department of Justice prosecutors had tirelessly secured over the past three decades. These actions severely undermined the rule of law and grievously damaged the public's trust in the justice system. For the victims of these horrific crimes and the loved ones left behind, these actions betrayed our sacred duty and broke our promise to achieve justice.

This shameful era ends today. Going forward, the Department of Justice will once again act as the law demands—including by seeking death sentences in appropriate cases and swiftly implementing those sentences in accordance with the law. Consistent with this principle and

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

President Trump's Executive Order 14164 entitled, "Restoring the Death Penalty and Protecting Public Safety," I am ordering the following actions effective immediately:

## I. Lifting the Moratorium on Federal Executions

President Trump's Executive Order established that "[i]t is the policy of the United States to ensure that the laws that authorize capital punishment are respected and faithfully implemented." Therefore, the moratorium imposed by the prior Attorney General in a July 1, 2021, Memorandum entitled "Moratorium on Federal Executives Pending Review of Policies and Procedures" on federal executions is lifted, effective immediately. When a death sentence is imposed by a federal court, the Department will carry out its mandate to implement that sentence consistent with the law.

## II. Seeking the Death Penalty

Pursuant to President Trump's Executive Order, federal prosecutors at the Department, including at U.S. Attorney's Offices, shall seek the death penalty— if that is a penalty proscribed by Congress—for the most serious, readily provable offenses, and if doing so is consistent with the relevant statutory considerations and other applicable regulations and Department of Justice guidance. Absent significant mitigating circumstances, federal prosecutors are expected to seek the death penalty in cases involving the murder of a law-enforcement officer and capital crimes committed by aliens who are illegally present in the United States. This policy applies to the recent murder of U.S. Customs and Border Patrol agent David Maland during a traffic stop in Vermont. It would also apply to the murder of Debrina Kawam who was burned to death while she was riding the New York City subway, to the extent these are federal capital crimes.

The policy set forth in the March 20, 2018, Memorandum entitled "Guidance Regarding Use of Capital Punishment in Drug-Related Prosecutions" is hereby reinstated. In addition to drug-related prosecutions, the policy shall also be applied to cases involving non-drug capital crimes by cartels, transnational criminal organizations, and aliens who traverse our borders and remain in the United States without legal status.

Federal prosecutors are strongly encouraged to use applicable statutes, when appropriate, to aid in the Department's continuing fight against drug trafficking and the violence it brings. This includes charging capital crimes and pursuing capital punishment in cases involving use of interstate commerce facilities to commit murder-for-hire resulting in death, 18 U.S.C. § 1958(a); murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(1); murder in furtherance of a continuing criminal enterprise, 21 U.S.C. § 848(e); use of a firearm that causes death in connection with a crime of violence or drug-trafficking offense, if the killing is a murder, 18 U.S.C. § 924(j)(1); certain murders during a drive-by shooting, 18 U.S.C. § 36(b)(2)(A); and certain offenses involving extremely large quantities of drugs, 18 U.S.C. § 3591(b)(1). The murder of a law-enforcement officer, or a capital crime by an alien illegally present in the United States, are the types of aggravating circumstances that, absent significant mitigating circumstances, will warrant the Department seeking the death penalty. See 18 U.S.C. §§ 3592(c)–(d). The Department will support state and local law enforcement in lawful efforts to seek capital punishment based on crimes committed under similar circumstances and in other appropriate cases.

### III. Reviewing No-Seek Decisions Since January 20, 2021

The Attorney General's Capital Review Committee is directed to review no-seek decisions in all pending capital-eligible cases (*i.e.*, death-eligible cases that have not yet resulted in a conviction) charged between January 20, 2021, and January 19, 2025. This group shall reevaluate no-seek decisions and whether additional capital charges are appropriate. Particular attention shall be paid to cases involving defendants associated with cartels or transnational criminal organizations,[2] capital crimes committed by defendants present in the United States illegally, and capital crimes committed in Indian Country or within the federal special maritime and territorial jurisdictions. The review required by this paragraph shall be completed within 120 days.

### IV. Strengthening the Federal Death Penalty

President Trump's Executive Order directed the Department "to modify the Justice Manual based on the policy and purpose set forth" in Executive Order 14164. Therefore, all previous Department policies relating to the death penalty that are inconsistent with the Executive Order and the policies set forth herein—including former Attorney General Garland's January 15, 2025, Memorandum entitled "Determination Following Review of the Federal Execution Protocol and the Manner of Execution Regulations," which directed the Federal Bureau of Prisons to rescind the July 25, 2019, addendum to the execution protocol—are rescinded effective immediately. All revisions to Justice Manual § 9-10.000, et seq., that occurred between January 20, 2021, and January 19, 2025, are suspended for period of 45 days during which time the Office of Legal Policy, in coordination with additional components as appropriate, will review such revisions and make recommendations to the Deputy Attorney General concerning whether such revisions should be retained, amended, or rescinded. Further, the Office of Legal Policy will lead an evaluation, in coordination with additional components as appropriate, of all internal policies and procedures concerning capital crimes and propose revisions to the Deputy Attorney General that will strengthen the federal death penalty.

In addition, the Office of Legal Policy, in coordination with additional components as appropriate, will evaluate whether the Federal Bureau of Prisons should readopt the July 2019 addendum to the execution protocol. The review should focus on whether the use of pentobarbital as a single-drug lethal injection comports with the Eighth Amendment. As part of this review, the Office of Legal Policy will evaluate whether the Federal Bureau of Prisons should revise the addendum to include other manners of execution in accordance with 18 U.S.C. § 3596(a) and 28 C.F.R. § 26.3.

The Office of Legal Policy is also directed to evaluate all potential avenues to strengthen the federal death penalty as a valid means of punishment for the heinous crimes it is intended to punish, including by promptly achieving finality in cases where a court has imposed a death

---

[2] Further information concerning cartels and transnational criminal organizations is provided in a companion February 5, 2025, Memorandum, "Total Elimination of Cartels and Transnational Criminal Organizations."

sentence. The Office of Legal Policy shall complete the evaluations required by these paragraphs and provide a report to the Office of the Deputy Attorney General within 90 days.

Finally, the Department's Criminal Division, Civil Division, and Office of the Solicitor General are directed to take all appropriate action to seek to cabin or obtain reassessment of Supreme Court precedents that limit the authority of state and federal governments to impose capital punishment.

## V. Assisting with the Implementation of State and Local Death Sentences

The President's Executive Order directs the Attorney General to assist states in prosecuting capital crimes and implementing death sentences. Consistent with that Executive Order, the Federal Bureau of Prisons is directed to work with each state that allows capital punishment to ensure the states have sufficient supplies and resources to impose the death penalty. This includes transferring federal inmates with state or local death sentences to the appropriate authorities to carry out those sentences. The Office of Legal Policy is also directed to promptly address states' pending requests for certification pursuant to 28 U.S.C. § 2265.

**U.S. Department of Justice**

Office of Legal Policy

*Washington, D.C. 20530*

May 15, 2025

Dear State Attorneys General,

On his first day in office, President Trump issued Executive Order 14164, *Restoring the Death Penalty and Protecting Public Safety*, directing the U.S. Attorney General "to take all appropriate action to approve or deny any pending request for certification made by any State under 28 U.S.C. § 2265."

Attorney General Bondi then issued her own memo, *Reviving the Federal Death Penalty*, instructing the Office of Legal Policy (OLP) to promptly address states' requests for certification for limited federal habeas corpus review in capital cases.

Some of your states have already reached out to my Office requesting certification for expedited habeas review procedures. The purpose of this letter is to notify others that this may be an option for them as well.

To get certified, submit a written package to OLP Senior Counsel Alida Kass at alida.kass@usdoj.gov that:

- Describes your state's mechanism for appointing and compensating competent counsel and paying reasonable litigation expenses in state post-conviction proceedings brought by indigent prisoners in capital cases,

- Explains how your state's mechanism meets the standards for certification (28 U.S.C. §§ 2261 et seq. and 28 CFR §§ 26.20 et seq.), and

- Requests certification as of the date when your state established the qualifying capital counsel mechanism.

Additional information and examples of certification packages are posted on the OLP website under State Capital Counsel Mechanism Certification and Pending Requests and Final Decisions.

My Office is ready to assist should your state choose to navigate this process.

Sincerely,

Aaron Reitz
Assistant Attorney General

STATE OF TENNESSEE

**Office of the Attorney General**

**JONATHAN SKRMETTI**
ATTORNEY GENERAL AND REPORTER

P.O. BOX 20207, NASHVILLE, TN 37202
TELEPHONE (615)741-3491
FACSIMILE (615)741-2009

June 6, 2025

Alida Kass
Senior Counsel
Office of Legal Policy
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

**Submitted via Email to alida.kass@usdoj.gov**

Re: Tennessee's Request for Certification under 28 U.S.C. § 2265

Dear Ms. Kass,

Consistent with Executive Order 14164, dated January 20, 2025, for "Restoring the Death Penalty and Protecting Public Safety," and the Attorney General's guidance memorandum, dated February 5, 2025, for "Reviving the Federal Death Penalty"—and pursuant to 28 U.S.C. §§ 2261 and 2265 and 28 C.F.R. §§ 26.20, et seq.—the State of Tennessee now seeks Attorney General certification for limited federal habeas corpus review in Tennessee's capital cases. Tennessee "has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death," and it "provides standards of competency for the appointment of counsel" in those proceedings. 28 U.S.C. § 2265(a)(1).

As shown more fully below, Tennessee has long provided a state-court process for collateral review of a criminal conviction. *State v. Whitehead*, 402 S.W.3d 615, 621 n.2 (Tenn. 2013). Since at least 1995, Tennessee has authorized the appointment of competent counsel for all indigent capital defendants, upon request, when collaterally challenging their convictions and death sentences in Tennessee's state courts. Tennessee has likewise provided adequate compensation and expense payment to counsel appointed in those cases. Appointed counsel has largely come from Tennessee's post-conviction defender office, established in 1995 as exclusive and dedicated counsel for Tennessee's capital defendants in its state-court collateral review process.

Tennessee fully satisfies all relevant statutory and regulatory criteria for certification. In view of Tennessee's fulsome state-court collateral review process for capital cases and its mechanism for providing counsel within it—and as authorized by 28 C.F.R. § 26.21—I respectfully request certification of Tennessee's capital counsel mechanism.

## I. Criteria for Attorney General Certification of State Mechanism for Appointment, Compensation, and Expense Payment of Competent Counsel in State Court Collateral Review of Capital Cases

A state may request certification from the Attorney General when the state (1) "has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death" and (2) "provides standards of competency for the appointment of counsel" in those proceedings. 28 U.S.C. § 2265(a)(1). A state's "mechanism for the appointment, compensation, and reimbursement of counsel . . . must offer counsel to all State prisoners under capital sentence." 28 U.S.C. § 2261(c).

The mechanism for appointing counsel "must provide for the entry of an order by a court of record" noting (1) the appointment of counsel, upon a finding of indigency and a finding of the prisoner's acceptance of appointed counsel or incompetency to accept or reject the appointment, (2) the prisoner's rejection of appointed counsel, made while understanding the legal consequences of rejection, or (3) the denial of appointed counsel, because the prisoner is not indigent. 28 U.S.C. § 2261(c). An indigent prisoner is one "whose net financial resources and income are insufficient to obtain qualified counsel." 28 C.F.R. § 26.21. To qualify as an "appointment" of counsel, the provision of counsel must occur in a "reasonably timely" manner, in light of the time limitations for seeking state and federal collateral review and the time required for developing and presenting post-conviction claims. 28 C.F.R. § 26.21. Appointed counsel may not "have previously represented the prisoner at trial in the case for which the appointment is made unless the prisoner and counsel expressly request continued representation." 28 U.S.C. § 2261(d).

A state's standards for appointing competent counsel in capital post-conviction cases are presumptively adequate if the standards conform to certain existing federal statutory standards for appointing counsel in state capital cases[1] or if they meet or exceed the following criteria:

> Appointment of counsel who have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience. But a court, for good cause, may appoint other counsel whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty and the unique and complex nature of the litigation.

---

[1] The regulation references 42 U.S.C. § 14163(e), which has been reclassified as 34 U.S.C. § 60301. That statute authorizes the Attorney General to "award grants to States for the purpose of improving the quality of legal representation provided to indigent defendants in State capital cases." 34 U.S.C. § 60301(a).

28 C.F.R. § 26.22(b)(1). "Competency standards not satisfying the benchmark criteria in paragraph (b)(1) of this section will be deemed adequate only if they otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases." 28 C.F.R. § 26.22(b)(2).

Regarding the compensation of appointed counsel in capital post-conviction cases, a state's compensation system is presumptively adequate if it is comparable to or exceeds one of the following:

1. The compensation of counsel appointed pursuant to 18 U.S.C. § 3599 in Federal habeas corpus proceedings reviewing capital cases from the State;

2. The compensation of retained counsel in State postconviction proceedings in capital cases who meet State standards of competency sufficient under [28 C.F.R. § 26.22(b)];

3. The compensation of appointed counsel in State appellate or trial proceedings in capital cases; or

4. The compensation of attorneys representing the State in State postconviction proceedings in capital cases, subject to adjustment for private counsel to take account of overhead costs not otherwise payable as reasonable litigation expenses.

28 C.F.R. § 26.22(c)(1). "Provisions for compensation not satisfying the benchmark criteria in paragraph (c)(1) of this section will be deemed adequate only if the State mechanism is otherwise reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency sufficient under" 28 C.F.R. § 26.22(b). 28 C.F.R. § 26.22(c)(2).

As for the payment of expenses, the state "must provide for payment of reasonable litigation expenses of appointed counsel," including, but not limited to, "payment for investigators, mitigation specialists, mental health and forensic science experts, and support personnel." 28 C.F.R. § 26.22(d). "Provision for reasonable litigation expenses may incorporate presumptive limits on payment only if means are authorized for payment of necessary expenses above such limits." 28 C.F.R. § 26.22(d).

From the above, a state must show (1) that it has established a mechanism for appointing, compensating, and paying expenses for competent counsel for indigent capital defendants in state-court post-conviction cases and (2) that it has competency standards for the appointment of such counsel. The state's mechanism must require an individualized assessment of indigency and the defendant's acceptance (or knowing rejection) of appointed counsel. It may not require prior counsel to serve as post-conviction counsel absent a joint request by the defendant and prior counsel. A state's competency standards are presumptively adequate under certain benchmark criteria, but standards not meeting those criteria are still adequate if they reasonably assure an appropriate level of proficiency by counsel in capital post-conviction litigation. Likewise, a state's compensation system is presumptively adequate under certain circumstances, but if the system

does not meet the presumption, it is still adequate if it ensures the availability of competent counsel. Finally, the mechanism must pay or reimburse reasonable litigation expenses, including those for investigative and expert services. If it places presumptive limits on payments, then it should allow for payment of necessary expenses above those limits.

## II. Application to Tennessee's Provision of Counsel in Capital Post-Conviction Cases

In view of its robust procedures for the state-court collateral review of capital cases and its provision of specialized counsel in that review, Tennessee readily qualifies for certification under the above-referenced statutory and regulatory requirements. As shown, Tennessee has established a mechanism for the appointment, compensation, and expense-payment of counsel for indigent criminal defendants in all capital collateral review cases. Likewise, Tennessee provides competency standards in the appointment of counsel in those cases.

### A. Post-Conviction Review in Tennessee

In Tennessee, a criminal defendant may collaterally challenge a conviction by filing a verified petition for post-conviction relief within one year of the judgment's finality. Tenn. Code Ann. §§ 40-30-102(a) and 40-30-104(e). Post-conviction relief is authorized "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petition "shall include allegations of fact supporting each claim for relief set forth in the petition and allegations of fact explaining why each ground for relief was not previously presented in an earlier proceeding." Tenn. Code Ann. § 40-30-104(e). Upon the petition's filing, the trial court must conduct a preliminary consideration of the petition within 30 days. Tenn. Code Ann. § 40-30-106(a). At that stage, the petition "shall be dismissed" only if it is untimely, premature, or successive or "[i]f the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined." Tenn. Code Ann. § 40-30-106(b) and (f); *see also* Tenn. Sup. Ct. R. 28, § 5(F).[2] Otherwise, the trial court shall enter a preliminary order for further proceedings on the petition and at that time "shall appoint counsel" if the petitioner is unrepresented, is indigent, and requests counsel. Tenn. Code Ann. §§ 40-30-106(i) and 40-30-107(b)(1); Tenn. Sup. Ct. R. 28, § 6(B)(3).

Following this preliminary consideration, the petitioner, through counsel, may file an amended petition or notice of no amended petition, and the State must file a response to the petition and any amended petition. Tenn. Code Ann. §§ 40-30-107(b)(2) and 40-30-108(a). Unless the trial court, from a review of the pleadings and the record, "determines conclusively that the petitioner is entitled to no relief," the court must set an evidentiary hearing. Tenn. Code Ann. § 40-30-109(a). "If a colorable claim is stated, the court shall enter an order . . . setting an evidentiary hearing." Tenn. Sup. Ct. R. 28, § 6(B)(6).

[2] Outside of two narrow exceptions, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing" in which the petitioner was "afforded the opportunity to call witnesses and otherwise present evidence." Tenn. Code Ann. § 40-30-106(h).

Discovery consistent with state criminal discovery rules is expressly authorized. Tenn. Code Ann. § 40-30-109(b). "[T]he state shall provide to petitioner discovery of all those items deemed discoverable under Rule 16, Tennessee Rules of Criminal Procedure, if relevant to the issues raised in the post-conviction petition, and shall provide any other disclosure required by the state or federal constitution." Tenn. Sup. Ct. R. 28, § 6(C)(7). In addition, "[e]ach party shall have the right to subpoena witnesses for appearance at the evidentiary hearing." Tenn. Sup. Ct. R. 28, § 8(C)(3). Investigative and expert services "necessary to ensure that the constitutional rights of the defendant are properly protected" are available for indigent petitioners in capital post-conviction cases. Tenn. Sup. Ct. R. 13, § 5(a)(1)(B); *see also* Tenn. Sup. Ct. R. 28, § 6(B)(8).

At the evidentiary hearing, the petitioner must testify unless confined out-of-state, in which case the petitioner may seek submission of an affidavit or deposition. Tenn. Code Ann. § 40-30-110(a) and (b). The petitioner must prove factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). After the hearing, the trial court must make written findings of fact and conclusions of law. Tenn. Code Ann. § 40-30-111(b). An order granting or denying post-conviction relief is appealable to the Tennessee Court of Criminal Appeals. Tenn. Code Ann. § 40-30-116.

**B. Appointment of Counsel**

Tennessee has enacted a mechanism for appointing counsel for all indigent capital defendants upon initiation of the state-court post-conviction review process, fully consistent with 28 U.S.C. § 2261(c). This provision of counsel is "reasonably timely" under 28 C.F.R. § 26.21 in view of time limitations on state and federal collateral review and the time necessary to develop and present collateral review claims. On the first point, a timely, properly filed petition for post-conviction relief tolls the one-year statute of limitations for filing a subsequent federal habeas corpus petition under 28 U.S.C. § 2244(d)(2). *Pinchon v. Myers*, 615 F.3d 631, 641 (6th Cir. 2010).

On the second point, the state-court provision of counsel occurs before the development and presentation of all collateral review claims. After a defendant files an initial post-conviction review petition stating the factual basis of a proper claim for relief, newly appointed counsel then must file an amended petition or a notice that no amended petition will be filed. Tenn. Code Ann. § 40-30-107(b)(2).[3] Even where the initial filing is *pro se*, "[n]o pro se petition shall be dismissed for failure to follow the prescribed form until the court has given petitioner a reasonable opportunity to amend the petition with the assistance of counsel." Tenn. Sup. Ct. R. 28, § 6(B)(4)(b). Appointed counsel may also file successive amendments to the petition raising additional constitutional claims. *Smith v. State*, 357 S.W.3d 322, 358 n. 6 (Tenn. 2011) (noting that trial court has "discretion to allow free amendment of post-conviction petitions"). Indeed, the

[3] Even when an initial, pro se petition for post-conviction relief fails to state the factual basis to support a claim, the trial court may allow the petitioner to file an amended petition prior to the court's preliminary consideration of the petition. Tenn. Code Ann. § 40-30-106(d). If that amended petition is likewise incomplete, then the trial court "shall determine whether the petitioner is indigent and in need of counsel," and the court "may appoint counsel and enter a preliminary order if necessary to secure the filing of a complete petition." Tenn. Code Ann. § 40-30-106(e).

court may allow amendments at the evidentiary hearing itself "and shall do so freely when the presentation of the merits of the cause will otherwise be subserved." Tenn. Sup. Ct. R. 28, § 8(D). Even on appeal, Tennessee's appellate courts can consider an unasserted claim that was "argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland v. State*, 620 S.W.3d 450, 458 (Tenn. 2020). The provision of counsel early in the litigation, well before various opportunities to develop and present claims pass, is thus "reasonably timely."

Tennessee's mechanism for appointing counsel in post-conviction review cases provides for an individualized determination of indigency. When assessing indigency in these cases, the trial court utilizes the same standards that govern the appointment of counsel during a criminal prosecution. Tenn. Code Ann. § 40-30-115. Those standards, codified in Tenn. Code Ann. §§ 40-14-201, et seq., define an "indigent person" as "any person who does not possess sufficient means to pay reasonable compensation for the services of a competent attorney." Tenn. Code Ann. § 40-14-201(1). This fully matches the definition of an "indigent prisoner" within 28 C.F.R. § 26.21.

"Whenever an accused informs the court that the accused is financially unable to obtain the assistance of counsel, it is the duty of the court to conduct a full and complete hearing as to the financial ability of the accused to obtain the assistance of counsel and, thereafter, make a finding as to the indigency of the accused." Tenn. Code Ann. § 40-14-202(b). The defendant must submit a uniform affidavit of indigency, and all statements by the defendant supporting the requested appointment of counsel must be made "by sworn testimony in open court or written affidavit sworn to before the judge." Tenn. Code Ann. § 40-14-202(b) and (i). The trial court must weigh various considerations about the petitioner's income and assets and the nature and costs of the expected services. Tenn. Code Ann. § 40-14-202(c). The withdrawal of appointed counsel is only by leave of court, and successor counsel shall be immediately appointed. Tenn. Code Ann. § 40-14-205(a).

Consistent with 28 U.S.C. § 2261(c), Tennessee's provision for appointed counsel in capital post-conviction review cases requires entry of an individualized order by a court of record upon an assessment of indigency and a petitioner's acceptance of counsel. As noted above, the trial court during its preliminary consideration of a post-conviction review petition "shall appoint counsel" if an unrepresented petitioner is indigent and if that petitioner requests counsel. Tenn. Code Ann. §§ 40-30-107(b)(1). Under Tenn. Code Ann. § 40-14-202(a), if a criminal defendant is not represented by counsel, is indigent, and "has not competently waived the right to counsel," then the court shall appoint counsel for the defendant. *See also* Tenn. Sup. Ct. R. 13, § 1(e)(3) ("Upon finding a party indigent, the court shall enter an order appointing counsel. If the indigent party rejects the offer of appointment of counsel with an understanding of the legal consequences of the rejection, the court shall enter an order stating the indigent party refused representation."). Tennessee's individualized indigency assessment and counsel appointment process fully comports with 28 U.S.C. § 2261(c).

Once an indigent capital defendant qualifies for appointed counsel in a post-conviction review case, the office of the post-conviction defender, established in 1995, is presumptive counsel for that appointment. Tenn. Code Ann. § 40-30-201. This office "provide[s] for the representation of any person convicted and sentenced to death in this state who is unable to secure counsel due to indigence." Tenn. Code Ann. § 40-30-202(a). Its "exclusive function . . . [is] to provide legal

representation to persons convicted of capital offenses." Tenn. Code Ann. § 40-30-205(g). And its "primary responsibility" is to represent an indigent capital defendant "for the purpose of instituting and prosecuting collateral actions challenging the legality of the judgment and sentence imposed against that person in state court." Tenn. Code Ann. § 40-30-206(a).[4] In fact, the post-conviction defender often assists capital defendants in preparing and filing an initial post-conviction review petition, prior to formal appointment as counsel. *Jones v. State*, No. W2020-01347-CCA-R10-PD, 2022 WL 601074, at *1 (Tenn. Crim. App. Mar. 1, 2022) (no perm. app. filed); *Davidson v. State*, No. E2019-00541-CCA-R3-PD, 2021 WL 3672797, at *12 (Tenn. Crim. App. Aug. 19, 2021), *perm. app. denied* (Tenn. Dec. 8, 2021); *Jordan v. State*, No. W2015-00698-CCA-R3-PD, 2016 WL 6078573, at *79 (Tenn. Crim. App. Oct. 14, 2016), *perm. app. denied* (Tenn. Jul. 19, 2017).

If the post-conviction defender represents multiple capital defendants and determines that "the interests of those persons are so adverse or hostile that they cannot all be counseled by the post-conviction defender or the post-conviction defender's staff without conflict of interest," then separate counsel should be appointed for those persons. Tenn. Code Ann. § 40-30-207. "[T]he statutory right to counsel in a post-conviction case contemplates a conflict-free counsel," and this statute "provides certain assurances of conflict-free counsel." *Frazier v. State*, 303 S.W.3d 674, 680, 682 n.5 (Tenn. 2010); *see also* Tenn. Sup. Ct. R. 13, § 1(e)(4)(A) (including "the state post-conviction defender's office" among list of available counsel for appointment to indigent defendant "if qualified pursuant to this rule and no conflict of interest exists").

Finally, Tennessee's system for appointing counsel in capital post-conviction cases disallows the appointment of counsel who previously represented the defendant at trial, absent an affirmative waiver by the petitioner, fully consistent with 28 U.S.C. § 2261(d). The post-conviction defender may not represent a capital defendant on collateral review if the post-conviction defender represented the defendant on direct appeal. Tenn. Code Ann. § 40-30-205(h). Also, Tenn. Sup. Ct. R. 13, § 3(h) disallows the appointment of counsel in a capital post-conviction case who "previously represented the defendant at trial or on direct appeal in the case for which the appointment is made, unless the defendant and counsel expressly consent to continued representation."

---

[4] The post-conviction defender is authorized to represent a capital defendant on direct appeal if the post-conviction defender determines that doing so is in the interest of justice and if "that person is without counsel and is unable to secure counsel due to indigency, or is determined by a state court with competent jurisdiction to be indigent and where that state court has determined competent counsel is unavailable." Tenn. Code Ann. § 40-30-206(b). The post-conviction defender also may represent a capital defendant on federal habeas corpus review if "compensation for representation and reimbursement for expenses is provided by 18 U.S.C. § 3006A or any other non-state funded source." Tenn. Code Ann. § 40-30-206(c). The post-conviction defender is further charged with representing indigent capital defendants in clemency and competency proceedings, if the post-conviction defender determines that doing so is in the interest of justice. Tenn. Code Ann. § 40-30-206(e). And the post-conviction defender is directed to offer certain services and training to public defenders and private defense counsel concerning capital litigation. Tenn. Code Ann. § 40-30-206(d).

The above establishes that appointed post-conviction counsel—either counsel from the post-conviction defender's office or private counsel in the event of a conflict—is available to any indigent capital defendant in the state-court post-conviction review process, as required by 28 U.S.C. § 2261(c).

### C. Competency of Appointed Counsel

Tennessee's competency requirements for appointing counsel in capital post-conviction cases are both presumptively adequate, under 28 C.F.R. § 26.22(b)(1), and reasonably assuring of an appropriate level of proficiency, under 28 C.F.R. § 26.22(b)(2). Pursuant to Tenn. Code Ann. § 40-30-205(c), the post-conviction defender "shall be an attorney in good standing with the Tennessee supreme court and shall possess a demonstrated experience in the litigation of capital crimes." Under Tenn. Sup. Ct. R. 13, § 3(h), "[c]ounsel eligible to be appointed as post-conviction counsel in capital cases must have the same qualifications as appointed appellate counsel, or have trial and appellate experience as counsel of record in state post-conviction proceedings in three felony cases, two murder cases, or one capital case." In addition, appointed post-conviction counsel in a capital case "must have a working knowledge of federal *habeas corpus* practice, which may be satisfied by six hours of specialized training in the representation in federal courts of defendants under the sentence of death imposed in state courts." *Id*. Regarding the minimum qualifications for appointed appellate counsel in capital cases, these include "three years of litigation experience in criminal trials and appeals," as well as either (1) "experience as counsel of record in the appeal of a capital case," or (2) "experience as counsel of record in the appeal of at least three felony convictions within the past three years and a minimum of six hours of specialized training in the trial and appeal of capital cases." Tenn. Sup. Ct. R. 13, § 3(g). And as noted above, "the state post-conviction defender's office" is among the list of available counsel for appointment to indigent defendants "if qualified pursuant to this rule and no conflict of interest exists." Tenn. Sup. Ct. R. 13, § 1(e)(4)(A).

Although Tennessee's competency standards for appointed counsel in capital post-conviction cases do not require the term-of-years stated in 28 C.F.R. § 26.22(b)(1), the various requirements detailed here remain presumptively adequate under that subsection because they certainly provide for appointed counsel "whose background, knowledge, or experience . . . enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty and the unique and complex nature of the litigation." But even if the presumption of adequacy does not apply, Tennessee's appointment system—and particularly its 30-year utilization of a specialized post-conviction defender office working exclusively on state-court capital collateral review cases—"reasonably assure[s] a level of proficiency appropriate for State postconviction litigation in capital cases." 28 C.F.R. § 26.22(b)(2).

### D. Compensation of Appointed Counsel

Tennessee's system of compensation for appointed counsel in capital post-conviction cases is presumptively adequate under 28 C.F.R. § 26.22(c)(1). At the very least, appointed post-conviction counsel is compensated comparably to appointed counsel in the trial or direct appeal of a capital case. Under Tenn. Sup. Ct. R. 13, § 3(b)(1), the district public defender for the respective judicial district "whenever possible" should serve as lead counsel for an indigent capital defendant

during the prosecution. As discussed more fully above, the post-conviction defender is charged with representing capital post-conviction petitioners unless prevented by a conflict from doing so. Tenn. Code Ann. §§ 40-30-205(g) and 40-30-207. The post-conviction defender is paid the same as the various district public defenders, while assistant post-conviction defenders are compensated under the same pay scale utilized by assistant district public defenders. Tenn. Code Ann. § 40-30-209(a) and (b).

Outside of the public defender and post-conviction defender pay systems, if counsel is appointed to represent a capital defendant at trial, on direct appeal, or on post-conviction review, the rates of compensation for counsel at those different levels are comparable to each other. Effective July 1, 2024, the hourly compensation rate for lead counsel is $110 while the hourly rate for co-counsel[5] and for post-conviction counsel is $90. Tenn. Sup. Ct. R. 13, § 3(k).[6] Appointed counsel in capital cases may file interim claims for payment of compensation every 30 to 180 days during the course of the litigation. Tenn. Sup. Ct. R. 13, § 6(a)(4). There are no limits on the number of hours authorized for compensation to appointed counsel in capital cases. Tenn. Sup. Ct. R. 13, §§ 2(d) and 3(k). This compensation comparability among appointed defense counsel at the various stages throughout the duration of a capital case fully satisfies the presumption of adequacy in 28 C.F.R. § 26.22(c)(1).[7]

In addition, Tennessee's compensation system is presumptively adequate under 28 C.F.R. § 26.22(c)(1) because appointed post-conviction counsel receive compensation comparable to the State's post-conviction counsel. Prior to 2023, the respective district attorneys general represented the State in all capital post-conviction trial litigation. Since 2023, under Tenn. Code Ann. § 40-30-114(c)(1) and (c)(4)(B), the attorney general and reporter represents the State in pending capital post-conviction trial litigation for death sentences imposed on or before March 1, 2023. *See*

[5] Two appointed counsel are provided to an indigent capital defendant at trial and on direct appeal, with one designated as lead counsel and the other designated as co-counsel. Tenn. Sup. Ct. R. 13, § 3(b)(1), (e), and (f).

[6] Prior to July 1, 2024, and effective July 1, 2018, the compensation rate for lead counsel was $100 per hour while the rate for co-counsel and for post-conviction counsel was $80 per hour. *In Re: Rule 13, Section 2 and 3, Rules of the Tennessee Supreme Court*, No. ADM2018-00796 (Tenn. Jul. 2, 2018) (order substituting appendix), https://www.tncourts.gov/sites/default/files/order_amending_appendix_sct_r13_admin2018-00796_revised.pdf (last accessed June 3, 2025). From 1997 until 2018, the compensation rate for lead counsel was $100 per hour for in-court work and $75 per hour for out-of-court work, and the compensation rate for co-counsel and for post-conviction counsel was $80 per hour for in-court work and $60 per hour for out-of-court work. *In Re: Rule 13, Supreme Court Rules*, (Tenn. Apr. 3, 1997) (order), https://www.tncourts.gov/sites/default/files/sc_rule_13_order_indigent_def_qual.pdf (last accessed June 3, 2025).

[7] Even when the relevant hourly rates for appointed counsel are considered alongside salaries paid to assistant district public defenders and assistant post-conviction defenders, the respective compensations are comparable. For example, assistant district public defenders and assistant post-conviction defenders are currently paid, based on experience level, between $180,960 and $69,060 per year. *See State Employee Salary Search*, https://salary.app.tn.gov/public/searchsalary (last accessed June 3, 2025).

*generally State v. McKay*, 706 S.W.3d 338 (Tenn. 2025). The respective district attorneys general continue to represent the State in capital post-conviction trial litigation for death sentences imposed after March 1, 2023. Tenn. Code Ann. § 40-30-108(a). The attorney general and reporter represents the State in all matters before Tennessee's appellate courts. Tenn. Code Ann. §§ 8-6-109(b)(2) and 8-6-110. District attorneys general are compensated the same as district public defenders and as the post-conviction defender while assistant district attorneys general are paid under the same compensation system as assistant district public defenders and assistant post-conviction defenders. Tenn. Code Ann. §§ 8-7-105, 8-7-226, 8-14-107 and 40-30-209(a) and (b). Although staff within the office of the attorney general and reporter are not paid under the same systems, the compensation is sufficiently comparable so as to render Tennessee's appointment system for capital post-conviction review presumptively adequate. Tenn. Code Ann. § 8-6-104.

From the above, Tennessee fully satisfies 28 C.F.R. § 26.22(c)(1) and the presumption of adequacy in its compensation for appointed counsel in capital post-conviction review cases.

**E. Expense Payment for Appointed Counsel**

Tennessee's process for expense payment meets the requirement to pay "reasonable litigation expenses of appointed counsel," including "payment for investigators, mitigation specialists, mental health and forensic science experts, and support personnel." 28 C.F.R. § 26.22(d). Tennessee has a process for paying expenses incident to the representation of indigent criminal defendants. *See* Tenn. Sup. Ct. R. 13, § 4. In *Owens v. State*, 908 S.W.2d 923, 924 (Tenn. 1995), the Tennessee Supreme Court concluded that this expense payment system established by Tenn. Code Ann. § 40-14-207(b) and Tenn. Sup. Ct. R. 13 applies in capital post-conviction cases. Thus, Tennessee has procedures for authorizing experts, investigators, and other support services not only in the trial and the direct appeal of criminal cases but also in the post-conviction review of capital cases. *See* Tenn. Sup. Ct. R. 13, § 5; Tenn. Code Ann. 40-14-207(b). This process involves the defendant, through counsel, establishing a particularized need for the service in an ex parte proceeding. Tenn. Sup. Ct. R. 13, § 5(c). It culminates in the authorization of funding by approval from the trial court and the director of the administrative office of the courts (AOC) or, if denied by the director, the chief justice. Tenn. Sup. Ct. R. 13, § 5(e).

Review by the AOC director and by the chief justice is not "substantive." Instead, their denial "can be based on a prior authorization order that is noncompliant with Rule 13 or an administrative funding decision." *Dotson v. State*, 673 S.W.3d 204, 215 (Tenn. 2023). "Funds are limited, and there has to be a mechanism for regulating the flow of funds. That is the role of" the AOC director and the chief justice under Rule 13. *Id*. The Tennessee Supreme Court has analogized that task to the role played by a chief circuit judge or designee circuit judge in federal court under the Criminal Justice Act (CJA), upon review when a district or magistrate judge has authorized expert services in a federal criminal case beyond presumptive funding caps. *Id*. at 220. "The CJA, like Rule 13, also allows a litigant to seek funds in excess of the cap if the district court or magistrate judge certifies that the additional funds are necessary to provide fair compensation for services of an unusual character or duration and the amount of the excess payment is certified by the chief judge of the circuit." *Id*. (citing 18 U.S.C. § 3006A(e)(3)).

This process "incorporate[s] presumptive limits on payment," and "means are authorized for payment of necessary expenses above such limits." 28 C.F.R. § 26.22(d). In a capital post-conviction case, the trial court ultimately may authorize investigative services beyond a total of $20,000 and expert services beyond a total of $25,000 if, "in its sound discretion, the trial court determines that extraordinary circumstances exist that have been proven by clear and convincing evidence." Tenn. Sup. Ct. R. 13, § 5(d)(5). Maximum hourly rates apply for particular types of expert services. Tenn. Sup. Ct. R. 13, § 5(d)(1).[8] Still, the system allows for the trial court to exceed the $25,000 limit for expert services overall, and as of October 2024, the AOC director may consider "[s]ubsequent requests for additional funding for the same investigator or expert giving due consideration to state revenues." *Id.*[9]

### F. Effective Date of Tennessee's Mechanism

Pursuant to 28 U.S.C. § 2265(a)(2), the Attorney General must determine the date on which a state's mechanism for the appointment, compensation, and expense-payment of appointed counsel became effective. In view of the above analysis, at the latest, the effective date of Tennessee's mechanism is October 23, 1995, when the Tennessee Supreme Court decided *Owens v. State*, 908 S.W.2d 923 (Tenn. 1995). In that case, the court construed state law to conclude that state-paid investigative and expert services are authorized for indigent petitioners within capital post-conviction cases under then-existing statutory and rule authority. This was mere weeks after September 1, 1995, when the office of the post-conviction defender came into existence. 1995 Tenn. Pub. Acts, ch. 510, § 2. In view of the expense-payment system provided by *Owens* and the counsel-appointment structure enhanced by creation of the post-conviction defender office, the proposed effective date for Tennessee's current mechanism satisfying the relevant certification criteria is October 23, 1995.

[8] The rates were previously stated within this rule; however, they are now accessible online at https://www.tncourts.gov/sites/default/files/docs/Guidance%20on%20Expert%20and%20Investigator%20with%20Forms.pdf (last accessed June 3, 2025).

[9] The post-conviction defender is authorized to hire investigators and other clerical and support personnel "from funds appropriated for that purpose." Tenn. Code Ann. § 40-30-208. Beginning July 1, 2023, the Tennessee General Assembly appropriated separate funding to that office for expert services, obviating the need going forward for it to request expert funding on a case-by-case basis under the process laid out above. 2023 Tenn. Pub. Acts, ch. 418, § 54, Item 1, Line 124; 2024 Tenn. Pub. Acts, ch. 966, § 36, Item 207; 2025 Tenn. Pub. Acts, ch. 530, § 36, Item 23. For that reason, "[i]n a post-conviction capital case where the Office of the Post-Conviction Defender represents a petitioner, funding for investigative services and expert services and tests shall not be paid pursuant to" Rule 13. Tenn. Sup. Ct. R. 13, § 5(d)(4).

## III. Conclusion

For the reasons stated, Tennessee fully meets the requirements for certification of its mechanism for appointing, compensating, and paying expenses for competent counsel in capital collateral review proceedings. Pursuant to 28 C.F.R. § 26.21, I am the appropriate State official to seek certification, and I request that the Attorney General certify this mechanism under 28 U.S.C. § 2265. Please contact my office if you have any questions or need any additional information regarding this request.

Sincerely,

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

—Enhance the quality, utility, and clarity of the information to be collected; and/or

—Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Written comments and recommendations for this information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function and entering either the title of the information collection or the OMB Control Number 1125–0016. This ICR may be viewed at *www.reginfo.gov.* Follow the instructions to view Department of Justice information collections currently under review by OMB.

DOJ seeks PRA authorization for this information collection for three (3) years. OMB authorization for an ICR cannot be for more than three (3) years without renewal. The DOJ notes that information collections submitted to the OMB for existing ICRs receive a month-to-month extension while they undergo review.

**Overview of This Information Collection**

1. *Type of Information Collection:* Extension and Revision of a previously approved collection.

2. *Title of the Form/Collection:* Notice of Entry of Limited Appearance for Document Assistance Before the Board of Immigration Appeals; and Notice of Entry of Limited Appearance for Document Assistance Before the Immigration Court.

3. *Agency form number, if any, and the applicable component of the Department of Justice sponsoring the collection:* The agency form numbers are EOIR–60 and EOIR–61, and the sponsoring DOJ component is EOIR.

4. *Affected public who will be asked or required to respond, as well as a brief abstract:*

*Affected Public:* Individuals, Attorneys and Representatives entering a limited appearance to assist a pro se respondent with a legal filing or other document to be filed with EOIR.

*Abstract:* This information collection reauthorization and revision is necessary to allow an attorney or representative to notify the Board of Immigration Appeals (Board) or the Immigration Court that he or she is entering a limited appearance to assist a pro se respondent with a legal filing or other document to be filed with EOIR. Pursuant to the Final Rule, Professional Conduct for Practitioners—Rules and Procedures, and Representation and Appearances, 87 FR 56247 (Sept. 14, 2022) (effective Nov. 14, 2022), amending the regulations at 8 CFR 1003.2(g)(1), 1003.17(b) and (c), and 1003.38(g)(2), the agency received OMB approval to issue separate stand-alone forms for the entry of a limited appearance for document assistance before each adjudicatory component as the most appropriate method for the collection of this information. The separate forms EOIR–60 and EOIR–61 are intended to provide greater clarity to the practitioners using the forms, the pro se respondents who are only engaging with the practitioners in a limited capacity, and for the EOIR staff processing the forms. EOIR is revising the forms to account for expanded electronic filing options with the launch of the online EOIR Courts and Appeals System (ECAS) Respondent Access Portal (RAP) in July 2024. EOIR made revisions to Forms EOIR–60 and EOIR–61 to include updates to remove the mail only filing restrictions and inform the users that they may review the EOIR Policy Manual for filing guidance. The Proof of Service section has been revised to include an option for individuals to indicate that they are serving the opposing party electronically through ECAS. The Privacy Act notice is also revised to correct the citation to the system of records notice (SORN) for the Attorney Discipline System, JUSTICE/EOIR–003, published at 85 FR 32423 (May 29, 2020), and to inform respondents that limited case information is also available online in English or Spanish through the EOIR Automated Case Information System at *https://acis.eoir.justice.gov/en/.* Finally, a sentence was added to the second page of the Form EOIR–60 to clarify and emphasize that limited appearances for document assistance are not available in Department of Homeland Security (DHS) proceedings that the Board has jurisdiction over.

5. *Obligation to Respond:* This information collection is mandatory and required to enter an appearance before EOIR as authorized by 8 U.S.C. 1229(a), 1362 and 8 CFR 1003.38. Failure to provide the requested information will result in an inability to enter a limited appearance for document assistance.

6. *Total Estimated Number of Respondents:* It is estimated that 40 respondents will complete Form EOIR–60 filed with the Board. It is estimated that 22,018 respondents will complete Form EOIR–61 filed with the Immigration Courts.

7. *Estimated Time per Respondent:* 6 minutes (0.1 hour).

8. *Frequency:* Once a year.

9. *Total Estimated Annual Time Burden:* The total annual burden hours for Forms EOIR–60 and EOIR–61 is 2,206 hours.

10. *Total Estimated Annual Other Costs Burden:* There are no capital or start-up costs associated with these forms. There are no fees to file the forms. The forms may be filed electronically to eliminate printing and postage costs. Attorneys or other authorized representatives are expected to complete the forms. The United States Bureau of Labor Statistics estimates the median hourly fee for attorneys at $72.67. Therefore, the cost for an attorney or other authorized representative to complete the form in 6 minutes is estimated at $7.27 per submission ($72.67 per hour × 0.10 hours × 1 response = $7.27 per response). The total annual estimated cost burden to individuals is $160,310.02 (2,206 total estimated burden hours × $72.67 per hour).

If additional information is required, contact: Darwin Arceo, Department Clearance Officer, Policy and Planning Staff, Justice Management Division, United States Department of Justice, Two Constitution Square, 145 N Street NE, 4W–218 Washington, DC 20530.

Dated: August 5, 2025.

**Darwin Arceo,**

*Department Clearance Officer for PRA, U.S. Department of Justice.*

[FR Doc. 2025–15001 Filed 8–6–25; 8:45 am]

**BILLING CODE 4410–30–P**

---

## DEPARTMENT OF JUSTICE

**[Docket No. OLP180]**

## Notice of Request for Certification of Tennessee Capital Counsel Mechanism

**AGENCY:** Department of Justice.

**ACTION:** Notice.

**SUMMARY:** This notice advises the public that the State of Tennessee has requested certification of its capital counsel mechanism by the Attorney General and that public comments may be submitted to the Department of Justice regarding Tennessee's request.

**DATES:** Written and electronic comments must be submitted on or before October 6, 2025. Comments received by mail will be considered timely if they are postmarked on or before that date. The electronic Federal Docket Management System (FDMS) will accept comments until Midnight Eastern Time at the end of that day.

**ADDRESSES:** To ensure proper handling of comments, please reference ''Docket No. OLP180'' on all electronic and written correspondence. The Department encourages that all comments be submitted electronically through *http://www.regulations.gov* using the electronic comment form provided on that site. Paper comments that duplicate the electronic submission should not be submitted. Individuals who wish to submit written comments may send those to the contact listed in the **FOR FURTHER INFORMATION** section immediately below.

**FOR FURTHER INFORMATION CONTACT:** Levi Lall, Counsel, Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530; telephone 202–598–0771.

**SUPPLEMENTARY INFORMATION:**

*Chapter 154 of title 28, United States Code,* provides special procedures for federal habeas corpus review of cases brought by indigent prisoners in State custody who are subject to capital sentences. These special procedures may be available to a State only if the Attorney General of the United States has certified that the State has established a qualifying mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings for indigent capital prisoners. *28 U.S.C. 2261, 2265; 28 CFR part 26.*

This notice advises the public, pursuant to *28 CFR 26.23(b),* that the State of Tennessee has requested certification of its capital counsel mechanism by the Attorney General. Public comment is solicited regarding Tennessee's request. Tennessee's request and supporting materials may be viewed at *https://www.justice.gov/olp/pending-requests-final-decisions.*

Dated: August 4, 2025.

**Nicholas J. Schilling Jr.,**

*Supervisory Official, Office of Legal Policy.*

[FR Doc. 2025–15037 Filed 8–6–25; 8:45 am]

**BILLING CODE 4410–BB–P**

## DEPARTMENT OF LABOR

### Agency Information Collection Activities; Submission for OMB Review; Comment Request; Multiple Employer Welfare Arrangement Administrative Law Judge Administrative Hearing Procedures

**ACTION:** Notice of availability; request for comments.

**SUMMARY:** The Department of Labor (DOL) is submitting this Employee Benefits Security Administration (EBSA)-sponsored information collection request (ICR) to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995 (PRA). Public comments on the ICR are invited.

**DATES:** The OMB will consider all written comments that the agency receives on or before September 8, 2025.

**ADDRESSES:** Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Michael Howell by telephone at 202–693–6782, or by email at *DOL_PRA_PUBLIC@dol.gov.*

**SUPPLEMENTARY INFORMATION:** Section 521 of ERISA, 29 U.S.C. 1151, provides that the Secretary of Labor may issue ex parte cease and desist orders when it appears to the Secretary that the alleged conduct of a multiple employer welfare arrangement (MEWA) under section 3(40) of the Act, 29 U.S.C. 1002(40), is fraudulent, or creates an immediate danger to the public safety or welfare, or is causing or can be reasonably expected to cause significant, imminent, and irreparable public injury. Section 521(b) provides that a person that is adversely affected by the issuance of a cease and desist order may request an administrative hearing regarding the order. The Department has promulgated a final regulation that is the subject of this information collection request, which describes the procedures before an administrative law judge (ALJ) when a person seeks an administrative hearing for review of such an order.

Under section 2571.3 of the rule, the party that is subject to a cease and desist order issued under ERISA section 521 has the burden to initiate an adjudicatory proceeding before an ALJ. Section 2571.3 governs the service of documents necessary to initiate ALJ proceedings by such a party on the Secretary of Labor and the ALJ. For additional substantive information about this ICR, see the related notice published in the **Federal Register** on January 6, 2025 (90 FR 671).

*Comments are invited on:* (1) whether the collection of information is necessary for the proper performance of the functions of the Department, including whether the information will have practical utility; (2) the accuracy of the agency's estimates of the burden and cost of the collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility and clarity of the information collection; and (4) ways to minimize the burden of the collection of information on those who are to respond, including the use of automated collection techniques or other forms of information technology.

This information collection is subject to the PRA. A Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless the OMB approves it and displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information that does not display a valid OMB Control Number. *See* 5 CFR 1320.5(a) and 1320.6.

DOL seeks PRA authorization for this information collection for three (3) years. OMB authorization for an ICR cannot be for more than three (3) years without renewal. The DOL notes that information collection requirements submitted to the OMB for existing ICRs receive a month-to-month extension while they undergo review.

*Agency:* DOL–EBSA.

*Title of Collection:* Multiple Employer Welfare Arrangement Administrative Law Judge Administrative Hearing Procedures.

*OMB Control Number:* 1210–0148.

*Affected Public:* Private sector.

*Total Estimated Number of Respondents:* 10.

*Total Estimated Number of Responses:* 10.

*Total Estimated Annual Time Burden:* 1,220 hours.

*Total Estimated Annual Other Costs Burden:* $500.

(Authority: 44 U.S.C. 3507(a)(1)(D))

**Michael Howell,**

*Senior Paperwork Reduction Act Analyst.*

[FR Doc. 2025–14988 Filed 8–6–25; 8:45 am]

**BILLING CODE 4510–29–P**

**Docket No. OLP 180: Tennessee Capital Counsel Mechanism**

# COMMENT IN OPPOSITION TO CERTIFICATION

***Submitted by the Federal Public Defender for the Middle District of Tennessee and Federal Defender Services of Eastern Tennessee, Inc.***

**October 10, 2025**

**I. STATEMENT OF INTEREST** ........ 10
**II. INTRODUCTION** ........ 10
**III. RELEVANT BACKGROUND** ........ 12
**A. History of Chapter 154** ........ 12
**B. Capital Habeas Proceedings in Tennessee** ........ 15
**C. Tennessee's Application for Certification** ........ 18
**IV. TENNESSEE'S APPOINTMENT SCHEME DOES NOT GUARANTEE TIMELY APPOINTMENT OF COUNSEL** ........ 21
**A. Counsel Has Not Been Appointed in a Timely Manner in Most If Not All Post-Conviction Proceedings in Tennessee During the Relevant Period.** ........ 22
**B. *Pro Se* Petitions, Which Must Be Filed Before Counsel is Appointed, Take Time to Prepare and File.** ........ 28
**C. Once Appointed, State Post-Conviction Counsel Only Has 30 Days to File an Amended Petition.** ........ 28
**V. TENNESSEE'S APPOINTMENT SCHEME FAILS TO PROVIDE ADEQUATE STANDARDS OF COMPETENCY AND DOES NOT ASSURE THE APPOINTMENT OF COMPETENT COUNSEL** ........ 30
**A. Tennessee's Experience and Competency Standards Fail the Final Rule's Benchmark.** ........ 31
**B. Tennessee's Inadequate Experience and Competency Standards are Not Met in Practice.** ........ 34
*1. Persistent incompetent representation by the OPCD* ........ 34
*2. Persistent incompetent representation by private appointed counsel* ........ 39
**VI. TENNESSEE'S APPOINTMENT SCHEME DOES NOT GUARANTEE ADEQUATE COMPENSATION AND PAYMENT OF REASONABLE LITIGATION EXPENSES** ........ 41
**A. Tennessee's Appointment System Does Not Guarantee Adequate Reimbursement of Reasonable Litigation Expenses.** ........ 42
*1. Tennessee Imposes Unreasonable Caps on Litigation Expenses Reimbursed Under Rule 13.* ........ *42*
*2. District Judges Frequently Refuse to Approve Reasonable Litigation Expenses as Defined by the Final Rule* ........ *43*
*3. The mechanism by which the OPCD funds litigation expenses has radically changed twice in the last two years* ........ *45*
**B. Tennessee Underfunds the OPCD, which Cannot Attract and Retain Competent Counsel.** ........ 46

**C. Tennessee's Private Appointments System Fails to Adequately Compensate Appointed Post-Conviction Counsel in Capital Cases.** .................................... 49

**VII. TENNESSEE'S APPOINTMENT OF COUNSEL SCHEME DOES NOT GUARANTEE APPOINTMENT OF COUNSEL AT ALL CRITICAL POST CONVICTION PROCEEDINGS** .................................................................... 52

**A. Tennessee Does Not Appoint Counsel for the Initial Petition.** ........................ 53

**B. Tennessee Does Not Guarantee Appointment of Counsel for Successive Post-Conviction Proceedings.** ........................................................................ 54

**C. Tennessee Does Not Guarantee Appointment of Counsel for Post-Conviction Forensic DNA Testing of Biological Evidence or Forensic Fingerprint Analysis.** ........................................................................................ 56

**VIII. TENNESSEE'S APPLICATION DOES NOT ACCURATELY REFLECT THE REALITIES OF TENNESSEE'S POST-CONVICTION MECHANISM** ................ 57

**IX. THE ATTORNEY GENERAL CANNOT CERTIFY TENNESSEE'S MECHANISM BECAUSE CHAPTER 154 IS UNCONSTITUTIONAL** ....................... 59

**A. Chapter 154 Violates the Nondelegation Doctrine.** .......................................... 60

*1. The Constitution Prohibits Congress from Delegating Its Legislative Powers.* ........................................................................................ *60*

*2. Chapter 154 Impermissibly Delegates "Legislative" Powers.* ................. *61*

*3. Congress's Delegation to the Attorney General Fails the Intelligible Principle Test.* ........................................................................ *62*

**B. Chapter 154 Unconstitutionally Delegates Judicial Functions to the Attorney General.** ........................................................................................ 64

*1. The Judicial Power to Decide Federal Habeas Cases Belongs Exclusively to an Independent Federal Judiciary.* ....................................................... *64*

*2. Chapter 154 Transfers Judicial Power from the Federal Judiciary to the Attorney General.* ........................................................................ *67*

*3. Judicial Review Before the D.C. Circuit Does Not Cure Chapter 154's Constitutional Defects.* ................................................................ *70*

**C. Chapter 154 Violates Due Process by Giving the Attorney General Authority Over Certification Decisions.** ............................................................ 72

*1. Due Process Requires a Structurally Independent Judiciary to Decide Whether a Jurisdiction is Entitled to Chapter 154's Opt-In Provisions...* *73*

*2. Chapter 154 Circumvents the Independent Judiciary, Empowering the Attorney General Who is Biased in Favor of the State and Against Petitioners.* ........................................................................................ *74*

3. *Judicial Review After-the-Fact is Insufficient to Cure the Structural Due Process Violation* ........ *84*

4. *The Legislative History Confirms that the Attorney General was Granted the Certification Authority Precisely Because He or She is Biased.* ........ *84*

**X. THE ATTORNEY GENERAL SHOULD WITHDRAW THE FINAL RULE** ........ 85

**A. The Final Rule Is Arbitrary and Capricious** ........ 86

**B. The Department of Justice Violated the Administrative Procedure Act in Promulgating the Final Rule** ........ 93

**XI. IF THE ATTORNEY GENERAL CERTIFIES TENNESSEE, SHE SHOULD STAY HER CERTIFICATION DECISION PENDING REVIEW BY THE D.C. CIRCUIT AND SUPREME COURT** ........ 95

**XII. CONCLUSION** ........ 96

| Exhibit Letter | Exhibit |
|---|---|
| **A** | DOJ Letter to State Atty's Gen., May 15, 2025 |
| **B** | Tenn.'s Request for Certification under 28 U.S.C. § 2265 |
| **C** | Eastern District's Request for Extension |
| **D** | Middle District's Request for Extension |
| **E** | Middle District's First Request for a Response |
| **F** | Middle District's Second Request for a Response |
| **G** | DOJ's Denial of Middle District's Request for Extension |
| **H** | DOJ's Denial of OPCD's Request for Extension |
| **I** | DOJ's Denial of Eastern District's Request for Extension |
| **J** | [no exhibit J] |
| **K** | Amy Harwell Declaration |
| **L** | Stephen Ferrell Declaration |
| **M** | Previously Submitted Comments Regarding Proposed and Final Rules |
| **N** | Richard Austin file |
| **O** | James Blanton file |
| **P** | John Michael Bane file |
| **Q** | Devin Banks file |
| **R** | Rickey Bell file |
| **S** | G'Dongalay Berry file |
| **T** | Andre Bland file |

| | |
|---|---|
| **U** | Kevin Burns file |
| **V** | Michael Dean Bush file |
| **W** | Tony Carruther file |
| **X** | Ronald Cauthen file |
| **Y** | Tyrone Chalmers file |
| **Z** | Sedrick Clayton file |
| **AA** | Derrick Cole file |
| **BB** | Perry Cribbs file |
| **CC** | Jerry Ray Davidson file |
| **DD** | LeMaricus Davidson file |
| **EE** | Christopher Davis file |
| **FF** | James Dellinger file |
| **GG** | Jessie Dotson file |
| **HH** | Robert Faulkner file |
| **II** | John Freeland file |
| **JJ** | Jon Hall file |
| **KK** | Leroy (Lee) Hall file |
| **LL** | William (Billy) Hall file |
| **MM** | Hawkins file |
| **NN** | Kennath Henderson file |
| **OO** | John Patrick (Jack) Henretta file |

| | |
|---|---|
| **PP** | Harold (H.R.) Hester file |
| **QQ** | Anthony (Darell) Hines file |
| **RR** | Henry Hodges file |
| **SS** | Darryl Holton file |
| **TT** | Robert Hood file |
| **UU** | Stephen Hugueley file |
| **VV** | David Ivy file |
| **WW** | Akil Jahi (Preston Carter) file |
| **XX** | Nickolus Johnson file |
| **YY** | Henry Jones file |
| **ZZ** | David Jordan file |
| **AAA** | David Keen file |
| **BBB** | Roy Keough file |
| **CCC** | Marlan Duane Kiser file |
| **DDD** | Robert Lee Leach file |
| **EEE** | Glenn Mann file |
| **FFF** | Timothy McKinney file |
| **GGG** | Donald Middlebrooks file |
| **HHH** | Urshawn Miller file |
| **III** | Farris Morris file |
| **JJJ** | Clarence Nesbit file |

| | |
|---|---|
| **KKK** | Richard Odom file |
| **LLL** | Christa Pike file |
| **MMM** | Gerald Lee Powers file |
| **NNN** | Corinio Pruitt file |
| **OOO** | Derrick Desmond Quintero file |
| **PPP** | Paul Dennis Reid, Jr. file |
| **QQQ** | Charles Rice file |
| **RRR** | Michael Rimmer file |
| **SSS** | Gregory Robinson file |
| **TTT** | William Glenn Rogers file |
| **UUU** | Steven James Rollins file |
| **VVV** | Joel Schmeiderer file |
| **WWW** | Vincent Sims file |
| **XXX** | Leonard Smith file |
| **YYY** | Jonathan Stephenson file |
| **ZZZ** | William Stevens file |
| **AAAA** | James Patrick Stout file |
| **BBBB** | Dennis Suttles file |
| **CCCC** | Gary Sutton file |
| **DDDD** | John David Terry file |
| **EEEE** | Stevn Ray Thacker file |

| | |
|---|---|
| **FFFF** | Andrew Thomas file |
| **GGGG** | Gussie Willis Vann file |
| **HHHH** | Howard Willis file |
| **IIII** | Leonard Jasper Young file |
| **JJJJ** | Debbie Drew Declaration |
| **KKKK** | Amendment to Tenn. Sup. Ct. R. 13, April 3, 1997 |
| **LLLL** | Shawn Nolan Declaration |
| **MMMM** | Michael Laurence Declaration |
| **NNNN** | Kelley Henry Declaration |
| **OOOO** | OPCD Annual Report to the Post-Conviction Defender Commission, 2005 |
| **PPPP** | Fee Schedule for Experts and Investigators published by the Administrative Office of the Courts |
| **QQQQ** | CJA Sixth Circuit Service Provider Hourly Rates |
| **RRRR** | Annual Report to the Post-Conviction Defender Oversight Commission, 2019 |
| **SSSS** | OPCD Government Attorney Pay Comparisons |
| **TTTT** | Opening Brief, *Habeas Corpus Res. Ctr. v. DOJ*, No. CR14-16928 (9th Cir. Feb. 11, 2015) |

## I. STATEMENT OF INTEREST

The Office of the Attorney General and Reporter of Tennessee has requested that the United States Department of Justice certify that Tennessee qualifies for expedited federal habeas corpus proceedings pursuant to Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996. Certification of Tennessee's application would restrict the availability of federal habeas corpus relief for indigent prisoners sentenced to death in Tennessee, regardless of the meritoriousness of their claims, by reducing the statute of limitations in half, requiring the court to abide by an accelerated schedule, and limiting the circumstances in which a federal habeas corpus petition could be amended.

The additional burdens on federal habeas litigation created by the application of Chapter 154 in Tennessee cases will be borne by the attorneys and staff of the Federal Public Defenders for the Middle District of Tennessee and the Federal Defender Services of Eastern Tennessee (jointly "the Federal Defenders"), both in the cases in which they have been appointed and in future cases. Certifying the State of Tennessee and thus permitting the TN AG to seek the application of Chapter 154 in individual cases will have a devastating impact on the defense entities' resources, funding, and clients.

The Capital Habeas Unit for the Middle District of Tennessee was created by the Office of Defender Services of the Administrative Office of the Court and authorized by the Court of Appeals for the Sixth Circuit in 1995. The Federal Public Defenders for the Middle District of Tennessee currently represents twenty capital habeas petitioners. The Middle District is also the office that will presumptively be appointed in several other cases currently pending in state post-conviction proceedings and on direct appeal.

Federal Defender Services of Eastern Tennessee, Inc. is a Community Defender Organization, which was created by Defender Services Organization and approved by the Defender Services Office in 1997. The Capital Habeas Unit of Federal Defender Services of Eastern Tennessee, Inc. currently represents seven capital habeas petitioners in Tennessee and will presumptively be appointed in one additional case pending at the trial level.

At least some clients of these offices are mentally incompetent and unable to understand Tennessee's Application or its implications for their cases. Those clients must rely on their appointed counsel in order to comment on Tennessee's Application.

## II. INTRODUCTION

Tennessee's mechanism for appointing state capital post-conviction counsel has not qualified for Chapter 154 certification at any point in the last thirty years, the period during which Tennessee brazenly asserts the state's mechanism has met the requirements of certification. Tennessee's mechanism still does not qualify today. Tennessee submitted its application to "opt-in" to Chapter 154 after the President and the Department of Justice urged states to apply for the expedited provisions. But the Department of Justice's encouragement cannot change the real-world facts.

Tennessee fails on every metric that the Department of Justice has articulated in the Department of Justice's "Final Rule," Certification of State Capital Counsel Systems.[1] Indeed, Tennessee's appointment scheme does not provide for timely offer of counsel, let alone a timely appointment of counsel; it fails to provide adequate standards of competency; it cannot and does not assure the appointment of competent counsel; it cannot and does not assure adequate compensation of counsel and reimbursement of litigation expenses; and it does not guarantee appointed counsel at all critical post-conviction proceedings. Tennessee's application for certification is devoid of any fact that would suggest otherwise.

Tennessee's unsupported retroactive request merely underscores the fundamental problems that make it clear its Chapter 154 application must fail. Chapter 154 is an unconstitutional delegation of both judicial and legislative powers to the Executive Branch. And, even more, the Department of Justice's administration of this process flouts the Administrative Procedure Act's safeguards.

In contrast to Tennessee's Application, which contains a dearth of information about how the state's mechanism works in practice, in submitting this Comment the Federal Defenders aim to provide evidence about the reality of capital post-conviction proceedings in Tennessee. Compiling this information has required the Federal Defenders to engage in an extensive review of 30 years' worth of client records to attempt to document the reality of capital post-conviction representation under Tennessee's purported mechanism.[2]

As the process of certifying Tennessee request to opt-in to Chapter 154 is governed by notice and comment rulemaking, members of the public—including these Federal Defenders—are entitled to the opportunity to meaningfully comment on the notice that has been issued. The Federal Public Defenders for the Middle District of Tennessee and Federal Defender Services of Eastern Tennessee, Inc. have requested extensions of the administrative comment period to permit sufficient time to fully develop the factual record and provide appropriate context for the Attorney General's consideration of Tennessee's application. Those requests were denied by the Department of Justice. Because the Federal Defenders have not been granted adequate time to develop the full record, what is provided here is necessarily incomplete. But even from this incomplete record, it is abundantly clear that Tennessee's mechanism for the appointment of state post-conviction counsel for indigent defendants falls far short of the requirements for Chapter 154 certification.

[1] Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58,160 (Sept. 23, 2013) (to be codified at 28 C.F.R. § 26).
[2] FDO Decl.

## III. RELEVANT BACKGROUND

### A. History of Chapter 154

Chapter 154 was added to Title 28 by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[3] The AEDPA was enacted as a response to the 1995 Oklahoma City bombing and implemented several restrictions on reviewing state court criminal judgments in federal habeas corpus proceedings, along with other provisions aimed at fighting domestic terrorism.[4] Before the enactment of the AEDPA, petitioners seeking federal judicial review of their criminal judgments were not subject to any explicit time limits for filing a federal habeas corpus petition. The AEDPA created a one-year statute of limitations for the filing of a petition challenging a state court judgment.[5] In addition, the AEDPA created a new statutory scheme to provide states with an opportunity to "opt-in" to expedited procedures for capital habeas corpus proceedings with stricter time limits, including a 180-day statute of limitations for filing a federal habeas petition with limited tolling provisions,[6] the district court must render a final determination on the federal habeas petition within 180 days of filing,[7] and the court of appeals must render a determination on any appeal of the district court's determination within 120 days of the last responsive brief.[8] In order for a state to "opt-in" to the expedited procedures, it must first show that it has established a mechanism for the timely appointment and compensation of competent counsel in state post-conviction proceedings and that it provides appointed attorneys with adequate resources to conduct the representation.[9]

Chapter 154 was primarily modeled on the recommendations of the 1988 Ad Hoc Committee of the Judicial Conference on Federal Habeas Corpus in Capital Cases, referred to as the Powell Committee after retired Associate Justice Lewis Powell, who was appointed to chair the Committee.[10] Chief Justice Rehnquist, acting as the chief executive officer of the Judicial Conference, ordered the formation of the Powell Committee to examine "the necessity and desirability of legislation directed toward avoiding delay and the lack of finality" in federal habeas corpus proceedings in capital cases.[11] The Powell Committee shared its findings and conclusions in a report published in 1989 (the "Powell Committee Report").[12]

---

[3] Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (relevant portions codified as amended at 28 U.S.C. §§ 2241–66 (1996)).
[4] *See, e.g.*, 141 Cong. Rec. 7,877 (1995) (statement of Sen. Dole) ("The most critical element of this bill, and the one that bears most directly on the tragic events in Oklahoma City, is the provision reforming the so-called habeas corpus rules.").
[5] 28 U.S.C. § 2244(d).
[6] AEDPA, § 107, 110 Stat. at 1223.
[7] 28 U.S.C. § 2265.
[8] 28 U.S.C. § 2266.
[9] 28 U.S.C. §§ 2262–66.
[10] Powell Comm. Rep., 135 Cong. Rec. 24,694 (1989).
[11] *Id.*
[12] *Id.*

In its report, the Powell Committee detailed three fundamental problems with the capital habeas corpus system: first, that there were significant delays in the processing of federal habeas cases; second, that most indigent capital defendants did not receive counsel until shortly before their execution date; and third, that habeas petitions were often meritless.[13] As a remedy, the Committee recommended that a mechanism be created for capital cases to limit each prisoner to a single opportunity to litigate all available claims in federal court.[14] The Committee reasoned that this limitation on federal habeas rights could only apply if the state had provided the prisoner with "capable and committed" post-conviction counsel who would guard against the possibility of mistake or prejudice in carrying out the death sentence.[15] The Committee concluded by recognizing that competent post-conviction counsel is "crucial to ensuring fairness and protecting the constitutional rights of capital litigants" and by noting that "[w]ith the counsel provided by the statute, there should be no excuse for failure to raise claims in state court."[16]

The history and purpose of Chapter 154 thus make clear that the Chapter's limitations on review in federal court are justified and permitted only when the state has guaranteed the opportunity for "one complete and fair course of collateral review" in the state court, which includes the timely appointment of qualified post-conviction counsel, adequate pay, and sufficient litigation resources.[17] The United States Supreme Court confirmed the quid pro quo design of Chapter 154, observing that it is available only when a state already has "done its part to promote sound resolution of prisoners' petitions in just the way Congress sought to encourage[.]"[18]

In 2006, Congress amended Chapter 154 in the USA PATRIOT Improvement and Reauthorization Act of 2005 and vested the power to determine whether a state has met the certification requirements in the United States Attorney General.[19] As amended, § 2265(a)(1) of Title 28 provides:

> (A) whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings;
>
> (B) the date on which the mechanism described in subparagraph (A) was established; and

[13] *Id.* at 24,694–95.
[14] *Id.* at 24,695.
[15] *Id.* at 24,696.
[16] *Id.* at 24,695.
[17] *Id.*
[18] *Lindh v. Murphy*, 521 U.S. 320, 331 (1997); *see also Ashmus v. Calderon*, 31 F. Supp. 2d 1175, 1181 (N.D. Cal. 1998) (noting that "[t]he conditional language in sections 2261 and 2265 (i.e., that Chapter 154 shall apply *if* qualifying mechanisms are established) reflects an explicit incorporation of the quid pro quo arrangement envisioned by the Powell Committee") (emphasis in original), *aff'd*, 202 F.3d 1160 (9th Cir.), *cert. denied*, 531 U.S. 916 (2000).
[19] USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 507, 120 Stat. 250-51 (2006) (codified as amended at 28 U.S.C. § 2265).

(C) whether the State provides standards of competency for the appointment of counsel in proceedings described in subparagraph (A).

The PATRIOT Act charged the Attorney General with promulgating regulations to implement the certification process in accordance with the Administrative Procedure Act ("APA") and established that the Attorney General's certification is reviewed de novo in the Court of Appeals for the District of Columbia Circuit.[20] The Department of Justice first published a proposed rule to govern certification determinations in 2007.[21] The rule never went into effect, and the Department withdrew it in November 2010.[22] The Department published a second notice of proposed rulemaking in March 2011[23] and also published a supplemental notice of rulemaking thereafter requesting further comment on five potential changes to the proposed rule.[24] The Department published a Final Rule on September 23, 2013.[25]

The commentary to the Final Rule states that the mechanism for appointment of counsel must afford indigent prisoners access to attorneys in a "reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings."[26] The statute of limitations for filing a post-conviction petition in Tennessee is 1 year.[27] The statute of limitations for filing a federal habeas corpus petition in a capital case is 1 year under AEDPA,[28] and is 6 months in states that have opted-in to Chapter 154.[29]

Under the Final Rule, a qualifying state's mechanism for appointing counsel to represent indigent prisoners in capital post-conviction cases must impose and enforce certain competency standards. A state's competency standards are "presumptively adequate if they meet or exceed either of the following criteria:" 1) appointed counsel have been admitted to the bar for at least 5 years and have at least 3 years of post-conviction litigation experience,[30] or 2) have established

---

[20] 28 U.S.C. § 2265(c); *see also* 152 Cong. Rec. 2,426–27 (2006).
[21] Certification Process for State Cap. Couns. Sys., 72 Fed. Reg. 31,217 (Jun. 6, 2007) (to be codified at 28 C.F.R. § 26).
[22] Certification Process for State Cap. Couns. Sys., 75 Fed. Reg. 71,353 (Nov. 23, 2010) (to be codified at 28 C.F.R. § 26).
[23] Certification Process for State Cap. Couns. Sys., 76 Fed. Reg. 11,705 (Mar. 3, 2011) (to be codified at 28 C.F.R. § 26).
[24] Certification Process for State Cap. Couns. Sys., 77 Fed. Reg. 7,559 (Feb. 13, 2012) (to be codified at 28 C.F.R. § 26).
[25] Certification Process for State Cap. Couns. Sys. ("Final Rule"), 78 Fed. Reg. 58,160 (Sept. 23, 2013) (codified at 28 C.F.R. §§ 26.20, *et seq.*). In arguing that Tennessee's appointment scheme fails to meet the requirements of the Final Rule, the Federal Defenders in no way waive their right to challenge the substantive and procedural adequacy of the Final Rule, either on appeal, in the event certification is granted, or in a separate legal challenge or in any individual death row inmate's case.
[26] 28 C.F.R. § 26.21.
[27] Tenn. Code Ann. § 40-30-102(a).
[28] 28 U.S.C. §2255(f).
[29] 28 U.S.C. §2263(a).
[30] 28 C.F.R. § 26.22(b).

an effective system that invests the responsibility for appointing qualified attorneys in a dedicated entity or from a roster of maintained by the government, so long as those entities establish qualifications for who may be appointed and meet other requirements.[31] If a state's competency standards do not meet these benchmark criteria, they are to be deemed adequate "only if they otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases."[32]

The Final Rule also requires that a state's mechanism for compensation is presumptively adequate if it is comparable to or exceeds the compensation of counsel appointed in federal capital habeas corpus proceedings, the compensation available to retained counsel representing prisoners in capital state post-conviction cases; the compensation available for appointed counsel in state capital appellate or trial cases, or the compensation available to attorneys representing the state in capital state post-conviction cases.[33] If none of these criteria are met, then compensation "will be deemed adequate only if the State mechanism is otherwise reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency" identified in the Rule.[34]

Finally, the Final Rule states that qualifying state's "mechanism must provide for payment of reasonable litigation expenses of appointed counsel," including but not limited to, "payment for investigators, mitigation specialists, mental health and forensic science experts, and support personnel."[35]

## B. Capital Habeas Proceedings in Tennessee

In Tennessee, post-conviction proceedings in capital cases are governed by the Post-Conviction Procedure Act, Tennessee Code Annotated §§ 40-30-101 to -413, and Rule 28 of the Tennessee Supreme Court Rules. A criminal defendant in Tennessee may initiate a collateral challenge of their conviction by filing a verified petition for post-conviction relief within one year of the judgment's finality.[36] A judgment is final on either the date of the final action of the highest state appellate court to which an appeal is taken or the date on which the judgment became final, if not appeal is taken.[37] Tennessee law expressly prohibits the tolling of the statute of limitations for post-conviction proceedings for any reason, including any tolling or saving provision otherwise available at law or equity,[38] unless mental incompetence prevents compliance with the statute of limitations.[39]

---

[31] 28 C.F.R. § 26.22(b) (citing 42 U.S.C. 14163(e)).
[32] 28 C.F.R. § 26.22(b).
[33] 28 C.F.R. § 26.22(c)(1).
[34] 28 C.F.R. § 26.22(c)(2).
[35] 28 C.F.R. § 26.22(d).
[36] Tenn. Code Ann. §§ 40-30-102(a) and 40-30-104(e).
[37] Tenn. Code Ann. § 40-30-102(a).
[38] Tenn. Code Ann. § 40-30-102(a).
[39] *See Seals v. State*, 23 S.W.3d 272, 279 (Tenn. 2000) (permitting the court to toll the statute of limitations when necessary to comport with due process).

It is the prisoner who must initiate proceedings by filing a *pro se* post-conviction petition.[40] In the *pro se* petition, the prisoner has the burden to identify each and every known and available ground for post-conviction relief, including a description of how the prisoner was prejudiced by the error(s),[41] and allegations of fact explaining why each ground for relief was not previously presented in any earlier proceeding.[42] If a prisoner fails to state a factual basis for the grounds for relief they allege, that failure "shall result in immediate dismissal of the petition,"[43] though if "the petition was filed *pro se*, the judge may enter an order stating that the petitioner must file an amended petition that complies with this section within fifteen (15) days or the petition will be dismissed."[44] While a court may order a prisoner to file an amended petition without the benefit of counsel, "[n]o *pro se* petition shall be dismissed for failure to follow the prescribed form until the court has given petitioner a reasonable opportunity to amend the petition with the assistance of counsel."[45] While this rule sounds protective of *pro se* petitioners, in practice it has been held to mean that *pro se* petitions may be dismissed without the appointment of counsel for reasons other than "failure to follow the prescribed form" and that counsel is required prior to dismissal only if the dismissal is based solely on format rather than a substantive omission.[46]

After a *pro se* petition has been filed, the court has 30 days to decide whether it meets the statutory pleading standards and presents at least one colorable claim.[47] If so, the court is to consider whether the prisoner is indigent and, if so, to appoint counsel within 30 days.[48]

Tennessee's restrictions on the timeline of post-conviction proceedings are the same for capital and non-capital cases, despite the fact that capital cases are many times more complex than non-capital cases. The only difference in the statutory requirements that apply to capital versus non-capital cases in post-conviction proceedings is that capital cases must be fully resolved within one year of the filing of the petition.[49] No such requirement for expedited disposition applies to non-capital cases. Upon appointment of counsel, an amended petition must be filed within 30

[40] Tenn. Code Ann. § 40-30-102(a).
[41] Tenn. Sup. Ct. R. 28, § 5(E)(3).
[42] Tenn. Code Ann. § 40-30-104(d-e).
[43] Tenn. Code Ann. § 40-30-106(d).
[44] Tenn. Code Ann. § 40-30-106(d).
[45] Tenn. Sup. Ct. R. 28, § 6(B)(4)(b).
[46] ***Carter v. State***, No. W2018-00285-CCA-R3-PC, 2018 WL 6266166, at *2 (Tenn. Crim. App. Nov. 30, 2018) ("Subdivision (a) of Rule 28, section 6(B)(4) speaks to the substance of the petition. If the substance is lacking, the petition may be summarily dismissed. Subdivision (b) of Rule 28, section 6(B)(4) speaks to the form of the petition. If the petition is merely lacking in form and was filed *pro se*, a post-conviction court cannot dismiss it based upon a flaw in the form until the petitioner has been given the opportunity to amend the petition with the assistance of counsel."); *see also Hutcherson v. State*, 75 S.W.3d 929, 931 (Tenn. Crim. App. 2001) (reversing dismissal based on form to allow petitioner a chance to comply); *Price v. State*, No. M2010-01633-CCA-R3-PC, 2011 WL 2671821, at *4 (Tenn. Crim. App. July 7, 2011) (reversing dismissal based solely on failure to verify the petition); *Harrison v. State*, No. E2009-00222-CCA-R3-PC, 2010 WL 3949344, at *2 (Tenn. Crim. App. Oct. 11, 2010) (same).
[47] Tenn. Code Ann. § 40-30-106(a).
[48] Tenn. Code Ann. § 40-30-106(e).
[49] Tenn. Code Ann. § 40-30-111(d).

days,[50] and in those 30 days counsel must investigate, develop, and present all colorable claims of relief. Tennessee then has 30 days to file an answer to the amended petition.[51] Within 30 days of the answer, the court must either dismiss the petition or set an evidentiary hearing to be held within four months.[52] Extensions are to be granted only when "unforeseeable circumstances render a continuance a manifest necessity."[53]

By default, the Office of the Post-Conviction Defender ("OPCD") (previously the Post-Conviction Defender Office) currently is appointed to represent indigent prisoners unless there is a conflict of interest, such as the OPCD having represented the petitioner during his/her direct appeal or having represented a co-defendant.[54] In such cases, the court must appoint private counsel.[55] OPCD was established in 1995 by the Tennessee General Assembly to provide post-conviction capital defense to indigent prisoners.[56] Under Tennessee law,

> It is the primary responsibility of the post-conviction defender to represent . . . any person convicted and sentenced to death in this state who is without counsel and who is unable to secure counsel due to indigency or determined by a state court with competent jurisdiction to be indigent, for the purpose of instituting and prosecuting collateral actions challenging the legality of the judgment and sentence imposed against that person in state court, and who the court determines requires the appointment of counsel.[57]

A claim that is not presented in an initial petition is considered waived and as a general rule will not be considered in any successive application filed in state court. A petitioner may move to reopen his initial petition where: (1) the claim is based on a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required; or (2) the claim is based on new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or (3) the claim seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid; and (4) the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced.[58]

Likewise, a federal court will generally not consider a claim raised in a federal habeas corpus application that was not fairly presented to the state court and which, if presented to the

---

[50] Tenn. Code Ann. § 40-30-106(e), 107(b).
[51] Tenn. Code Ann. § 40-30-108(a).
[52] Tenn. Code Ann. § 40-30-109(a).
[53] *Id.*
[54] *See* Tenn. Sup. Ct. R. 13, § 1(e)(4)(A).
[55] Tenn. Sup. Ct. R. 13, § 1(e)(4)(B).
[56] *See* Tenn. Code Ann. § 40-30-202(a); Tenn. Code Ann. § 40-30-206(a).
[57] Tenn. Code Ann. § 40-30-206(a).
[58] Tenn. Code Ann. § 40-30-117.

state court in a subsequent application, would not be considered by it because the claim was not presented in compliance with state procedural default rules.[59] Exceptions exist where the applicant can establish cause for the failure to present the claim to the state court and actual prejudice therefrom, or where a miscarriage of justice would result by the failure to consider the claim.[60] Thus, unless an applicant can establish one of these narrow exceptions, claims that are not raised in an initial state post-conviction petition will not receive review by any court, state or federal.

### C. Tennessee's Application for Certification

On May 15, 2025, the United States Department of Justice provided to all state attorneys general instructions for how states could "get certified" for "expedited habeas review procedures."[61] In that letter, Assistant Attorney General Aaron Reitz assures interested state attorneys general that "[his] office is ready to assist should your state choose to navigate this process."[62] In case the Department of Justice's position favoring certification was not clear enough, the letter reminds state attorneys general that "[o]n his first day in office, President Trump issued Executive Order 14164, *Restoring the Death Penalty and Protecting Public Safety*, directing the U.S. Attorney General 'to take all appropriate action to approve or deny any pending request for certification made by any State under 28 U.S.C. § 2265.'" Attorney General Pamela Bondi then issued her own memo days after the Executive Order entitled "*Reviving the Federal Death Penalty*," instructing the Office of Legal Policy (OLP) to promptly address states' requests for certification.[63]

On June 6, 2025, the Tennessee Attorney General and Reporter Jonathan Skrmetti took the United States Department of Justice up on its offer to "get certified," Skrmetti submitted a request that Tennessee be certified under 28 U.S.C. § 2265,[64] asserting that "Tennessee fully meets the requirements for certification of its mechanism for appointing, compensating, and paying expenses for competent counsel in capital collateral review proceedings" and has met those requirements since October 23, 1995, "at the latest."[65]

Over the last 30 years, Tennessee has made several attempts to get certified and access the expediting and limited federal habeas corpus procedures provided for under Chapter 154, but these efforts have consistently failed in the courts due to the state's inability to demonstrate that it established "a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings."[66]

---

[59] *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).
[60] *Id.* at 750.
[61] Ex. A (DOJ Letter to State Attys' Gen., May 15, 2025).
[62] *Id.*
[63] Memorandum from the Office of the Att'y Gen. to All Dep't Emps. on Reviving the Fed. Death Penalty and Lifting the Moratorium on Fed. Executions, at 4 (Feb. 4, 2025), available at https://www.justice.gov/ag/media/1388561/dl?inline (last visited Oct. 8, 2025).
[64] Ex. B (Tenn.'s Request for Certification under 28 U.S.C. § 2265) ("Tenn. Appl.").
[65] *Id.* at 11-12.
[66] Former 28 U.S.C. § 2261(b) and current 28 U.S.C. § 2265(a)(1)(A).

In 1996, a Tennessee federal district court explicitly held that Chapter 154 did not apply to the proceedings.[67] That court found Tennessee's system lacked sufficient statutory standards to ensure that only qualified counsel would be appointed in capital post-conviction cases.[68] On appeal, the Sixth Circuit affirmed that Tennessee had not complied with statutory requirements that include minimum standards for counsel competence and a functioning mechanism for the timely appointment of counsel.[69] Thus, the court reaffirmed that Chapter 154 did not apply to Tennessee proceedings.[70]

In 2005, while considering whether Congress eliminated procedural default for cases falling under Chapter 154 in *King v. Bell*, the court stated that "[Chapter 154] applies only if the State establishes a mechanism for the appointment of counsel and the payment of reasonable litigation expenses in state post-conviction proceedings in capital cases."[71] The court explained that "[i]n return for a state's success in setting up such a system, Congress provides that capital habeas proceedings will be subject to a shorter limitations period and federal district courts may consider only claims that have been raised and decided on the merits in the state courts, unless certain restrictions apply."[72] The court then rejected the of application of the provisions of Chapter 154 in adjudicating the petitioner's habeas corpus petition.[73]

Tennessee is now seeking certification once again, though for the first time it seeks certification through the Department of Justice. Tennessee's application rests largely on its contention the State's "30-year utilization of a specialized post-conviction defender office working exclusively on state-court capital collateral review cases," ensures that Tennessee's appointment mechanism meets the criteria for certification.[74] Tennessee requests certification dating back to October 23, 1995, because (1) on that date the Tennessee Supreme Court issued a ruling authorizing the use of state funds to pay for investigative and expert services for indigent prisoners with capital post-conviction cases and (2) OPCD was established less than two months earlier .[75]

On August 7, 2025, the United States Department of Justice issued a Notice of Request for Certification of Tennessee Capital Counsel Mechanism, advising the public that public comments would be accepted until October 6, 2025.[76] On September 3, the Federal Defender Services of Eastern Tennessee submitted a request for a 90-day extension of the public comment period.[77] On September 9, 2025, the Capital Habeas Unit for the Federal Public Defender's Office for the

[67] ***Austin v. Bell***, 927 F. Supp. 1058 (M.D. Tenn. 1996).
[68] *Id.* at 1061–62.
[69] ***Austin v. Bell***, 126 F.3d 843, 846 n.3 (6th Cir. 1997).
[70] *Id.*
[71] *King v. Bell*, 392 F. Supp. 2d 964, 1014–15 (M.D. Tenn. 2005).
[72] *Id.* at 1015.
[73] *Id.*
[74] Tenn. Appl., at 8; 9-11.
[75] *Id.* at 11.
[76] Fed. Reg. Docket No. OLP 180: Tenn. Cap. Couns. Mechanism.
[77] Ex. C (Eastern District's Request for Extension).

Middle District of Tennessee submitted a separate request for a 90-day extension.[78] The Federal Defenders are aware that OPCD also filed a request for an extension of time on September 11, 2025, and filed a supplemental request for extension of time on September 19, 2025. Each office sought additional time so that it could more fully develop the relevant record.[79] All of these requests for extensions were denied several weeks later by the Department of Justice on September 29, 2025.[80]

The next day on September 30, 2025, the ACLU filed a lawsuit—*Bland v. Bondi*, 1:25-cv-3499 (D.D.C.)—on behalf of various individuals and organizations, including the Federal Defender Services of Eastern Tennessee and the Federal Public Defender for the Middle District of Tennessee.[81] Therein, Plaintiffs challenge the constitutionality Patriot Act amendments to Chapter 154, citing violations of the separation of powers doctrine and the Due Process Clause by conferring on the United States Attorney General's the authority to decide Tennessee's application for certification.[82] Plaintiffs simultaneously filed a motion for a temporary restraining order to "prevent the further ongoing and irreparable harm they are suffering by being required to vindicate their constitutional rights in an unconstitutional proceeding before an unconstitutional decision maker," by enjoining the Attorney General and the Department of Justice from considering Tennessee's application.[83] On October 2, 2025, the Department of Justice agreed to a mere 4-day extension, moving the deadline for the submission of comments to October 10, 2025, to allow for a less hurried briefing schedule in response to Plaintiffs' motion for a temporary restraining order.[84]

---

[78] Ex. D (Middle District's Request for Extension); Ex. E. (Middle District's Request First Request for a Response; Ex. F (Middle District's Second Request for a Response).

[79] *See* Ex. K (Harwell Decl. ¶ 3-4) (stating efforts to develop the record were constrained by factors including, but not limited to, "the fact that some cases have not been scanned into any electronic database, the cumbersome process to access federal court archives for cases that are not imaged in PACER, time constraints related to visiting individual county courthouses in person to obtain post-conviction trial court records, and the fact that some materials in some cases persist under seal by court order and there was insufficient time to petition the courts to unseal that information."); Ex. L (Ferrell Decl. Decl. ¶¶ 14-15).

[80] Ex. G (DOJ's Denial of Middle District's Request for Extension); Ex. H (DOJ's Denial of OCPD's Request for Extension); Ex. I (DOJ's Denial of Eastern District's Request for Extension).

[81] *See* Complaint, *Bland v. Bondi*, No. 1:25-cv-3499 (D.D.C. Sep. 30, 2025), ECF No. 1.

[82] *See id.* at 32-33.

[83] *See* Motion for Temporary Restraining Ord., *Bland v. Bondi*, No. 1:25-cv-3499 (D.D.C. Sep. 30, 2025), ECF No. 4, at 1–3.

[84] *See* Joint Status Rep., *Bland v. Bondi*, No. 1:25-cv-3499 (D.D.C. Oct. 2, 2025), ECF No. 13. Because the Federal Defenders have not had sufficient time to fully investigate, evaluate, and account for all of the critical facts, the information that is provided here is necessarily incomplete and limited. When examples are provided or overviews of case statistics or features are reported in this Comment, those should not be understood to be exhaustive or to represent the entirety of the relevant factual record.

Furthermore, the Federal Defenders have spoken with fact sources and other witnesses who would be able and willing to testify under oath in support of the Federal Defenders' objections to Tennessee's application, but who have been unwilling to submit a declaration that cannot be filed under seal. Requests to allow comments to be filed under seal were denied during administrative proceedings related to the Final Rule, and therefore, it is not possible to produce all of the relevant information known to the Federal

## IV. TENNESSEE'S APPOINTMENT SCHEME DOES NOT GUARANTEE TIMELY APPOINTMENT OF COUNSEL

Appointment of counsel, by its very definition in the Code of Federal Regulations, means not only the provision of counsel but also the provision of counsel in a timely manner. Attorney General Eric Holder highlighted the importance of timely appointments in promulgating the Final Rule:

> The quid pro quo arrangement of chapter 154 requires provision of counsel to capital petitioners in State postconviction proceedings in return for Federal habeas review carried out with generally more limited time frames and scope. Against this background, not every conceivable provision for making postconviction counsel available, however belatedly—e.g., only after the deadline for pursuing State postconviction proceedings had passed; or only after the expiration of section 2263's time limit for Federal habeas filing; or only after such delay that the time available for preparing for and pursuing either State or Federal postconviction review had been seriously eroded—can logically be regarded as providing for appointment of counsel within the meaning of chapter 154.[85]

Although the Department of Justice has not specified a certain "number of days or weeks" in which competent counsel is to be appointed, the commentary accompanying the publication of the Final Rule expressly provides that states seeking certification must demonstrate that their mechanisms are "reasonably timely," both in light of the applicable state and federal time limits and "the effort involved in the investigation, research, and filing of effective habeas petitions, which protect a petitioner's right to meaningful habeas review."[86]

The Final Rule therefore defines "appointment" as "provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings."[87] Failing to appoint counsel with sufficient time to develop and present habeas claims is therefore insufficient to constitute "appointment."

The Final Rule does not define "timeliness." However, although the Department of Justice has not specified a certain "number of days of weeks" in which competent counsel is to be

---

Defenders in this comment. *See* Ex. M (Previously Submitted Comments Regarding Proposed and Final Rules), at 559 (Although much of the information relevant to whether Tennessee's mechanism actually satisfies Chapter 154 requirements is protected by the attorney-client privilege and work product doctrine, all information submitted during the public comment for certification determination is included in the public docket file. *See* Office of the Attorney General; Certification Process for State Capital Counsel Systems, 76 Fed. Reg. 11,705, 11,706 (Mar. 3, 2011) (explaining that material redacted for online publication because of confidentiality issues is placed in the public docket where it can be inspected).

[85] Final Rule, 78 Fed. Reg. at 58,165.

[86] Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58,160, 58,167 (Sept. 23, 2013) (to be codified at 28 C.F.R. § 26).

[87] 28 C.F.R. § 26.21.

appointed, it stated in its commentary accompanying the publication of the Final Rule that states seeking certification must demonstrate that their mechanisms are "reasonably timely," both in light of the applicable state and federal time limits and "the effort involved in the investigation, research, and filing of effective habeas petitions, which protect a petitioner's right to meaningful habeas review."[88]

### A. Counsel Has Not Been Appointed in a Timely Manner in Most If Not All Post-Conviction Proceedings in Tennessee During the Relevant Period.

Under controlling case law and the Attorney General's description of the regulations, Tennessee fails to satisfy Chapter 154's requirements. 28 U.S.C. section 2261(c) requires that the state "offer counsel to all State prisoners under capital sentence" and appoint "one or more counsels to represent the prisoner upon a finding that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer." The offer of counsel would be meaningless if a state is permitted to wait weeks or months after the 180-day federal statute of limitations has begun to run. In reviewing previous states' claims of entitlement to Chapter 154, courts uniformly have determined that "[t]he timely appointment of counsel at the conclusion of direct review is an essential requirement in the opt-in structure. Because the abbreviated 180-day statute of limitations begins to run immediately upon the conclusion of direct review, time is of the essence. Without a requirement for the timely appointment of counsel, the system is not in compliance."[89] It is not surprising, therefore, that Attorney General Holder identified the requirement that a state mechanism appoint counsel prior to the commencement of post-conviction proceedings:

> [C]hapter 154 contemplates that in exchange for substantial benefits on Federal habeas review, States will provide not the opportunity for petitioners to file *pro se* State habeas petitions, but the opportunity for petitioners to file *counseled* State habeas petitions. *See Mills v. Anderson*, 961 F. Supp. 198, 201 n.4 (S.D. Ohio

---

[88] Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58,160, 58,167 (Sept. 23, 2013) (to be codified at 28 C.F.R. § 26).

[89] *Brown v. Puckett*, No. 01-cv-197-D, 2003 WL 21018627, at *3 (N.D. Miss. Mar. 12, 2003); *see also Ashmus v. Calderon*, 123 F.3d 1199, 1204, 1208 (9th Cir. 1997) (concluding that California was not in compliance with Chapter 154, inter alia, because counsel had not been appointed for "over 130 of the condemned California inmates," and "that counsel often is not appointed until years after a prisoner accepts the offer of counsel"); *Mills v. Anderson*, 961 F. Supp. 198, 201 n.4 (S.D. Ohio 1997) (observing that the timing of appointment of counsel, where Ohio statute provided for appointment of counsel after the post-conviction petition had been filed, "might well" preclude the application of Chapter 154); *Hill v. Butterworth*, 941 F. Supp. 1129, 1147 (N.D. Fla. 1996) ("[A]ny offer of counsel pursuant to Section 2261 must be a meaningful offer. That is, counsel must be immediately appointed after a capital defendant accepts the state's offer of postconviction counsel. The present backlog of unrepresented capital defendants who are in a position to seek post-conviction review, demonstrates that Florida has not made the requisite meaningful offer of counsel.").

1997) (questioning whether State mechanism that provides for appointment of counsel only after filing of *pro se* petition is inadequate under chapter 154).[90]

Contrary to Chapter 154 requirements Tennessee's mechanism does not "offer" or appoint post-conviction counsel until after death-sentenced individual files a *pro se* petition that satisfies the statutory requirements and presents a colorable claim. As a result, indigent prisoners in Tennessee are not appointed counsel for *months* following denial of their direct appeals. The Federal Defenders undertook an extensive review of the case files available to them during the time available,[91] identifying 74 prisoners whose capital judgments were affirmed and final after October 23, 1995,[92] the date on which *Owens v. State*[93] was decided and the date to which Tennessee seeks retroactive certification.[94] **In each and every one of the cases that the Federal Defenders had sufficient information to assess, no prisoner's *pro se* petition was filed for at least 125 days following the Tennessee courts' denial of a prisoner's direct appeal**.[95] In 56—or 82 percent—of those cases, no petition was filed until more than 200 days had passed. Several petitions were filed mere days before the end of the one-year statute of limitations.[96]

---

[90] Final Rule, 78 Fed. Reg. at 58,167 (emphasis in original). The citation to *Mills v. Anderson* reflects the continuing viability of judicial interpretations of Chapter 154 following the Patriot Act amendments. Under cannons of statutory interpretation, Congress is presumed to be aware of the court decisions interpreting the requirements for certification embodied in the terms of the statute, *see Keene Corp. v. United States*, 508 U.S. 200, 212 (1993), and to act to alter statutory language if judicial rulings incorrectly interpret congressional intent, *see Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989). Because no changes were made to the statutory terms that form the requirements for certification, the Attorney General's certification decision must reflect the interpretations of prior judicial rulings. *See* Certification of Arizona Capital Counsel Mechanism, 85 Fed. Reg. 20,705, 20,707 (Apr. 14, 2020) (Attorney General Barr stating that he does not "write on a clean slate in addressing Arizona's request for certification" as "the case law under chapter 154, and particularly *Spears* [*v. Stewart*, 283 F.3d 992 (9th Cir. 2002], provided the background for the development of the Department's implementing regulations for chapter 154 that I now apply. The judicial precedent accordingly elucidates and supports many aspects of the Department's rule in its application to Arizona.").

[91] Ex. L (Ferrell Decl. Decl. ¶ 9-10); Ex. K (Harwell Decl. ¶ 5).

[92] Ex. L (Ferrell Decl. Decl. ¶ 8); Ex. K (Harwell Decl. ¶ 6). *See* Exs. N-IIII (Client files).

[93] 908 S.W.2d 923 (Tenn. 1995).

[94] Tennessee Application, at 11.

[95] Ex. K (Harwell Decl. ¶ 7(a)); *see also* Ex. L (Ferrell Decl. Decl. ¶ 8-10).

[96] Ex. K (Harwell Decl. ¶ 7(b)).

| **Time Between Denial of Direct Appeal and Initial Pro Se Filing** | **Number of Cases** |
|---|---|
| Less than 100 days | 0 |
| 100-199 days | 12 |
| 200-299 days | 33 |
| 300-364 days | 22 |
| More than 365 days | 1 |
| *Insufficient information to determine* | *6* |
| | Total: 74 |

Tennessee law permits the court another 30 days *after* a *pro se* petition is filed to determine whether it states a "colorable claim," and if so, to make a finding of indigency and finally appoint counsel.[97] Thus, the time frames for actual appointments of counsel are even more egregious.

| **Time Between Denial of Direct Appeal and Appointment of Counsel** | **Number of Cases** |
|---|---|
| Less than 90 days | 2 |
| 90-179 days | 42 |
| More than 180 days | 11 |
| *Insufficient information to determine* | *19* |
| | Total: 74 |

Such delinquent appointment of counsel cannot be described as anything other than untimely, particularly in light of "the effort involved in the investigation, research, and filing of effective habeas petitions, which protect a petitioner's right to meaningful habeas review."[98]

While the untimeliness of the appointment of counsel in an overwhelming number of capital cases in Tennessee is, on its own, reason to deny Tennessee's Application, it also has dire consequences for the statute of limitations for the filing of federal habeas corpus petitions. In its application, Tennessee writes that "a timely, properly filed petition for post-conviction relief tolls the one-year statute of limitations for filing a subsequent federal habeas corpus petition under 28 U.S.C. Section 2244(d)(2),"[99] but this statement completely ignores the fact that, should Tennessee's application be granted, the statute of limitations for subsequent federal habeas corpus petitions would *be reduced from one year to 180 days*.[100]

**Should the reduced statute of limitations of Chapter 154 be applied retroactively as Tennessee has requested, at least 24 of the federal habeas corpus petitions filed on behalf of prisoners who filed for state post-conviction relief since October 23, 1995, would become retroactively untimely, as they were filed more than 180 days after the close of state**

[97] Tenn. Sup. Ct. R. 28, § 6(B)(2-3).
[98] *Supra* pp. 21-22.
[99] Tenn. Appl. at 5.
[100] 28 U.S.C. § 2263.

**proceedings,**[101] excluding time during which any petition for a writ of certiorari to the Supreme Court may have been pending.[102] Thus, if certified, Tennessee will seek to deny federal habeas corpus review for at least one-third of prisoners who have sought state capital post-conviction relief in the last 30 years, by claiming that the statute of limitations has expired before those individuals even had the opportunity to be appointed state post-conviction counsel.

**In 63 of the 67 cases that the Federal Defenders had enough information to analyze, no *pro se* state post-conviction petition was filed for more than 90 days** following the denial of their direct appeal, excluding time tolled while a prisoner's petition for a writ of certiorari may be pending before the United States Supreme Court, **meaning in 94% of those cases, counsel would have less than 90 days to file a federal habeas corpus petition should post conviction relief be denied.**[103]

| **Time Between Denial of Direct Appeal and Initial Pro Se Filing, Excluding Time Tolled When Cert was Pending** | **Number of Cases** |
|---|---|
| Less than 90 days | 4 |
| 90-179 days | 39 |
| More than 180 days | 24 |
| *Insufficient information to determine* | *7* |
| | Total: 74 |

Again, the time frames for actual appointments of counsel are even more grossly untimely. **In nearly 60% of the cases for which information is available appointment of counsel occurred more than 180 days after the 180-day statute of limitations had begun to run**, even after excluding the time that a petition for a writ of certiorari was pending.[104] In four cases, the delay in appointment ranged between 146 and 297 days after the filing of the pro se petition.[105]

[101] Ex. K (Harwell Decl. ¶ 5 7(d)).
[102] *See* 28 U.S.C. § 2263(b)(1).
[103] Ex. K (Harwell Decl. ¶ 7(e)).
[104] *Id*.
[105] *Id*.

| **Time Between Denial of Direct Appeal and Appointment of Counsel, Excluding Time Tolled When Cert was Pending** | **Number of Cases** |
|---|---|
| Less than 90 days | 0 |
| 90-179 days | 23 |
| More than 180 days | 32 |
| *Insufficient information to determine* | *19* |
| | Total: 74 |

The Final Rule requires a timeliness evaluation to take into consideration how the timeliness (or untimeliness) of appointment of post-conviction counsel interacts with the statute of limitations for filing a federal habeas corpus petition.[106] As the Final Rule notes commentary recognizes, a state mechanism must appoint counsel "in a manner that is reasonably timely, in light of the time limits for seeking State and Federal collateral review and the effort involved in the investigation, research, and filing of effective habeas petitions, which protect a petitioner's right to meaningful habeas review."[107] And per the Final Rule notes commentary, mechanisms that appoint counsel "only after the expiration of section 2263's [180 day] time limit for Federal habeas filing" cannot "logically be regarded as providing for appointment of counsel within the meaning of chapter 154."[108]

**Had Chapter 154 been in effect since October 23, 1995, at least 58% of the 74 prisoners whose capital judgments have been affirmed since that date would not have been appointed counsel in state post-conviction proceedings until *after* the statute of limitations for filing a federal habeas corpus petition had already run.** Under any interpretation of Chapter 154, any mechanism that systematically delays the appointment of state post-conviction counsel for more than 180 days following denial of a prisoner's direct appeal is untimely.

Were Tennessee's application for Chapter 154 certification to be granted, federal habeas corpus counsel would not only have less time to file an initial petition in federal court, the circumstances in which a federal habeas petition could be amended would also be severely constrained. Currently, under AEDPA, federal habeas corpus petitions may be amended "as provided in the rules of procedure applicable to civil actions."[109] Per Federal Rule of Civil Procedure 15(a), amendments must be permitted "once as a matter of course" if sought within 21 days of the filing of the initial petition or within 21 days after the filing of the answer to the petition.[110] Courts are instructed to "freely give leave" for further amendments "when justice so requires."[111] Under Chapter 154, however, Tennessee will argue that no amendments would be permitted after an answer to the petition is filed unless the amendment met the high standards

106 Final Rule, 78 Fed. Reg. at 58,167.
107 *Id*. at 58,167.
108 Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58,160, 58,165 (Sept. 23, 2013) (to be codified at 28 C.F.R. § 26).
109 28 U.S.C. § 2242.
110 Fed. R. Civ. Pro. 15(a)(1).
111 Fed. R. Civ. Pro 15(a)(2).

required for second or successive petitions.[112] Amendments would be permitted only if (1) the claim relies on a new rule of constitutional law, made retroactive by the Supreme Court, that was previously unavailable or (2) the factual predicate for the claim could not have been previously discovered through due diligence, and the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the offense.[113]

Because Chapter 154 greatly restricts the circumstances in which a prisoner may amend an initial federal habeas corpus petition, it is critical that a federal petition states and properly supports all possible claims for relief. Of course, this requires that state post-conviction counsel conduct a full investigation, development, and presentation of all potentially meritorious claims.[114] **Even when state counsel has fulfilled these responsibilities, in nearly all circumstances, it is simply not possible for counsel to investigate and assemble a thorough federal habeas corpus petition in less than 90 days, which is how much time would remain for the filing of a federal petition in 93% of the cases evaluated during the relevant period (excluding the 21 cases where the federal statute of limitations would have already completely run before a state post-conviction petition was even filed). In nearly 70% of the cases evaluated during the relevant period (excluding the 21 cases where the federal statute of limitations would have already completely run before a state post-conviction petition was even filed), counsel would have had less than two months to investigate, prepare, and file a federal habeas petition.**[115]

Among the prisoners whose federal habeas corpus petitions could be rendered untimely by the reduced statute of limitations should Tennessee's application for certification be granted is Ronald Cauthern, whose sentence was ultimately reduced to life in prison during federal habeas corpus proceedings. Mr. Cauthern's *pro se* petition was filed more than 200 days after his direct appeal was denied, excluding the time tolled while he had a petition for a writ certiorari pending before the United States Supreme Court.[116] If Tennessee's application were granted, and had Mr. Cauthern not already received relief, he would be barred from pursuing valid, meritorious claims in federal court and would be unjustly executed.

During the period for which Tennessee seeks certification, the State's mechanism has not appointed post-conviction representation in a reasonably timely manner. Instead, in practice, Tennessee's mechanism has permitted the entire 180-day statute of limitations to run in many cases and has otherwise severely limited the time available to prepare federal habeas corpus

[112] 28 U.S.C. § 2266(b)(3)(B) (citing 28 U.S.C. § 2244(b)).
[113] *Id.*
[114] *See, e.g., Cullen v. Pinholster*, 563 U.S. 170 (2010) (limiting federal habeas review of state court proceedings pursuant to 28 U.S.C. section 2254(d)(1) to the record before the state court); *O'Sullivan v. Boerckel*, 526 US 838, 839 (1999) ("Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court.").
[115] Ex. K (Harwell Decl. ¶ 7(f)).
[116] Ex. X (Cauthen File).

petitions in all those with abbreviated time remaining. For this reason, among others that follow, Tennessee's application for Chapter 154 certification must be denied.

### B. *Pro Se* Petitions, Which Must Be Filed Before Counsel is Appointed, Take Time to Prepare and File.

The Tennessee Application implies that the filing of a *pro se* petition imposes only a slight barrier to the appointment of counsel, which "occurs before the development and presentation of all collateral review claims."[117] Contrary to the Attorney General's assertions, Tennessee's requirement that death-sentenced individuals must file *pro se* petitions prior to the appointment of counsel imposes substantial burdens on those without legal training or the resources to identify, investigate, and present challenges to their judgments. These burdens are magnified because the *pro se* petitions must nonetheless meet rigorous pleading standards. A prisoner's initial petition must identify "each and every error that petitioner asserts as a grounds for relief, including a description of how petitioner was prejudiced by the errors,"[118] "specific facts supporting each claim for relief asserted by petitioner,"[119] and "specific facts explaining why each claim for relief was not previously presented in any earlier proceeding."[120] Failure to comply with the requirements set out in Tennessee Supreme Court Rule 28, § 5 may result in the petition being dismissed without a hearing.[121] Furthermore, state court judges may dismiss claims brought in a *pro se* petition prior to the appointment of counsel.[122] For example, Marlon Duane Kiser filed a *pro se* petition in October 2009.[123] The judge reviewing his petition dismissed all but two of his claims before appointing counsel.

Because Tennessee's mechanism for the appointment of counsel does not guarantee the timely appointment of counsel in principle, nor does it result in the timely appointment of counsel in practice, Tennessee's application for certification must be denied.

### C. Once Appointed, State Post-Conviction Counsel Only Has 30 Days to File an Amended Petition.

Capital post-conviction cases are comparable to complex civil litigation. These cases are high stakes, often politicized, and require post-conviction counsel to render high quality representation in line with national capital defense standards.[124] Before an amendment may be filed a multi-layered review is required that includes the investigation of all guilt phase issues, all sentencing phase issues, the performance of trial and direct appellate counsel, performance of the

---

[117] Application at 5.
[118] Tenn. Sup. Ct. R. 28 § 5(E)(3).
[119] Tenn. Sup. Ct. R. 28 § 5(E)(4).
[120] Tenn. Sup. Ct. R. 28 § 5(E)(5).
[121] *Id.* at 5(F).
[122] *See* Tenn. Sup. Ct. R. 28 § 6(b)(3) (stating that "[i]n the event that a colorable claim is stated," then the judge shall assess indigency and appoint counsel).
[123] Ex. CCC (Kiser file, at Ex. p. 15).
[124] Ex. JJJJ (Drew Decl. ¶ 16).

prosecution and any state investigators, and the conduct of all decision makers.[125] Capital cases require the collection and review of thousands of documents, many of which can take several months to collect. Intensive document review then leads to additional record collection and the development of an investigation plan that typically involves the need to interview well over 100 witnesses, sometimes multiple times, who are located throughout and outside Tennessee.[126] Historically, across cases, much of the necessary record collection and investigation that should have been completed prior to trial has not been performed which requires OPCD or private counsel to undertake the task prior to amendment.

Further, the development of post-conviction claims requires not only investigation of the crime but also investigation of the client's life story that could have been—but invariably was not—presented in the penalty phase.[127] It also requires investigation into the trial itself to determine whether counsel was effective and also whether the district attorney, jurors, court, and court staff comported with constitutional protections. Each of these tasks is time sensitive and delicate and requires in-person interviews to establish rapport and trust between the investigator and witness. Because state post-conviction is very likely a petitioner's last opportunity to expand the record before the court, post-conviction teams must ensure that the presentation of claims and supporting evidence is exhaustive to ensure adequate review in subsequent federal habeas corpus proceedings. Moreover, case teams do not develop one case in isolation but must perform this immense work simultaneously in multiple cases.[128]

Finally, capital post-conviction litigation involves complex and ever-changing legal procedures and case law. Post-conviction counsel must not only develop claims for relief pursuant to existing jurisprudence but also develop claims that could become meritorious in the future and diligently monitor any developments in federal or state law that could potentially support additional claims for relief.[129]

In sum, evidence shows that in Tennessee prior to the amendment of the PCPA in 2009, the Tennessee Administrative Office of the Courts ("AOC") reported to the Tennessee legislature that of the approximately 60 post-conviction petitions that were filed after the one-year deadline was established in 1995, *no* petition had been resolved within the one-year period.[130] In 2020, the OPCD unsuccessfully advocated for changes to the statutory post-conviction timelines in capital cases, recommending 18-month deadline for filing of an amended petition and leaving the scheduling of the evidentiary hearing up to the discretion of the judge.[131]

---

[125] *Id.*
[126] Ex. JJJJ (Drew Decl. ¶ 17).
[127] *Id.*
[128] *Id.* ¶ 20).
[129] *Id.* ¶ 19).
[130] *Id.*¶ 21).
[131] *Id.* ¶ 22).

## V. TENNESSEE'S APPOINTMENT SCHEME FAILS TO PROVIDE ADEQUATE STANDARDS OF COMPETENCY AND DOES NOT ASSURE THE APPOINTMENT OF COMPETENT COUNSEL

Chapter 154 requires that, in order to certify a state, the Attorney General must that "the State has established a mechanism for the appointment . . . of *competent* counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death" and that "the State provides standards of competency for the appointment of counsel."[132] Consistent with this mandate, the Final Rule requires that the "mechanism must provide for appointment of *competent* counsel."[133] The Attorney General must assess whether a state's mechanism "ensur[es] that it will result in the appointment of competent counsel."[134]

Under the Final Rule, state "standards of competency are presumptively adequate if they meet or exceed" various quantitative benchmarks regarding the time counsel has been admitted to the bar and counsel's post-conviction litigation experience.[135] The Department of Justice provides those benchmark criteria for competency of appointed counsel in 28 C.F.R. § 26.22(b)(1)(i). Specifically, a state's competency standards are presumptively adequate if they meet or exceed either: (1) appointment of counsel who have been "admitted to the bar for at least five years and have at least three years of post-conviction litigation experience," or, "for good cause," the court may appoint someone "whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty and the unique and complex nature of the litigation" or (2) appointment of counsel meeting existing federal statutory standards[136] for appointing counsel in state capital cases. If the state's competency standards do not satisfy these benchmark criteria, they "will be deemed adequate only if they otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases."[137]

As detailed in various comments objecting to the Final Rule,[138] as discussed in greater detail herein, and as found by a federal district court in the Ninth Circuit,[139] the Final Rule is arbitrary and capricious in violation of the APA. Among the reasons the Final Rule is in violation of the APA is that it contains a catchall competency provision,[140] provides no substantive criteria as to how a state

[132] 28 U.S.C. § 2265(a)(1)(A), (C) (emphasis added).
[133] 28 C.F.R. § 26.22(b) (emphasis added).
[134] Final Rule, 78 Fed. Reg. at 58,161.
[135] 28 C.F.R. § 26.22(b)(1).
[136] 28 C.F.R. § 26.22(b)(1) references 42 U.S.C. § 14163(e), but that statute has been reclassified as 34 U.S.C. § 60301. The statute authorizes the United States Attorney General to award grants to states for the purpose of improving the quality of legal representation provided to indigent defendants in state capital cases.
[137] 28 C.F.R. § 26.22(b)(2).
[138] Ex. M (Previously Submitted Comments Regarding Proposed and Final Rules).
[139] *Habeas Corpus Res. Ctr. v. DOJ* ("*HCRC I*"), No. C 13-4517 CW, 2014 WL 3908220, at *11– 13 (N.D. Cal. Aug. 7, 2014), *vacated on other grounds and remanded sub nom. Habeas Corpus Res. Ctr. v. DOJ* ("*HCRC II*"), 816 F.3d 1241 (9th Cir. 2016).
[140] 28 C.F.R. § 26.22(b)(2).

may satisfy the competency requirements of Chapter 154, and thus fails to give effect to Congress's intent that a state provide for appointment of competent counsel in order to obtain opt-in certification.

Notwithstanding the inadequacies of the Final Rule, and without waiving the right to challenge such inadequacies under the APA in the event the Attorney General certifies Tennessee's appointment scheme, the Federal Defenders maintain that Tennessee has failed to adopt competency standards for either private capital habeas attorneys or staff attorneys at the OPCD that satisfy the Final Rule's benchmark requirements or "reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases."[141]

As the Powell Committee Report observed, "[c]entral to efficacy of this scheme is the development of standards governing the competency of counsel chosen to serve in this specialized and demanding area of litigation."[142] Courts considering the applicability of Chapter 154 have uniformly concluded that states lacking sufficient minimum standards to ensure that appointed counsel are competent to handle complex capital litigation do not qualify for certification.[143]

### A. Tennessee's Experience and Competency Standards Fail the Final Rule's Benchmark.

Tennessee requires that the post-conviction defender be an attorney "in good standing with the Tennessee Supreme Court," and "possess a demonstrated experience in the litigation of capital crimes."[144] Unlike the appointment of trial and appellate counsel in capital cases, Tennessee law does not require that two attorneys be appointed to represent prisoners in state post-conviction proceedings.[145] The Tennessee Supreme Court Rule 13 further mandates that counsel appointed in capital post-conviction cases must either:

1) have three years of litigation experience in criminal trials and appeals, and either experience as counsel of record in the appeal of a capital case or experience as counsel

[141] 28 C.F.R. § 26.22(b)(2).
[142] Powell Comm. Rep., 135 Cong. Rec. 24,696 (1989).
[143] *See, e.g.*, *Colvin-El v. Nuth*, No. Civ. A. 97-2520, 1998 WL 386403, *6 (D. Md. 1998) (holding that standards that required experience participating in at least two capital cases or ten other "serious" cases would be insufficient because, "[g]iven the extraordinarily complex body of law and procedure unique to post-conviction review, an attorney must, at a minimum, have some experience in that area before he or she may be deemed 'competent'"); *Wright v. Angelone*, 944 F. Supp. 460, 467 (E.D. Va. 1996) (holding that Virginia did not qualify for the benefits of Chapter 154 in part because its 1995 standards of competency would permit an attorney with no experience with capital cases to serve as counsel in state habeas proceedings); *Austin v. Bell*, 927 F. Supp. 1058, 1062 (D. Tenn. 1996) (finding Tennessee's standards of competency insufficient because, "[t]hat an attorney has passed the Tennessee bar examination does not mean that the attorney is competent to handle a habeas petition in a capital case").
[144] Tenn. Code Ann. § 40-30-205(c). It is arguable whether the qualification requirements laid out in this statute apply to all assistant post-conviction defenders or only the post-conviction defender appointed by the post-conviction defender oversight commission.
[145] *Compare* Tenn. Sup. Ct. R. 13, § 3(b)(1), *with* Tenn. Sup. Ct. R. 13, § 3(h).

of record in the appeal of at least three felony convictions within the past three years and a minimum of six hours of specialized training in the trial and appeal of capital cases; or

2) have trial and appellate experience in state post-conviction proceedings in three felony cases, two homicide cases, or one capital case.[146]

In addition to the above, counsel must now complete six hours of specialized training on federal habeas corpus practice or otherwise demonstrate possession of sufficient knowledge of federal habeas corpus practice.[147] Prior to 1997, there was no requirement that counsel have any specialized training or skills in federal habeas corpus practice.[148]

As Tennessee acknowledges in its application, "Tennessee's competency standards for appointed counsel in capital post-conviction cases do not require the term-of-years stated in 28 C.F.R. Section 26.22(b)(1),"[149] as Tennessee does not require post-conviction counsel to be "admitted to the bar for at least five years and have at least three years of post-conviction litigation experience."[150] Counsel in Tennessee meet the state's criteria for appointment even if they have only been practicing law for three years and even if they have never represented anyone in any type of post-conviction hearing before, capital or otherwise.[151]

Importantly, the first competency benchmark under § 26.22(b)(1)(i) requires three years' experience in postconviction litigation. This benchmark is not met by Tennessee's appointment mechanism, which allows an attorney to be appointed to capital post-conviction proceedings with no post-conviction experience at all.[152] During the federal rulemaking process the Attorney General was persuaded to set a standard that required post-conviction litigation experience rather than mere felony experience, recognizing " the difficult and unique demands that postconviction law and procedure place on attorneys who litigate those cases."[153]

Furthermore, six hours of specialized habeas training is plainly inadequate to prepare an attorney to represent a client in a state capital post-conviction case, especially if the attorney has—as Tennessee's qualification requirements allow—never before represented a defendant in such a proceeding. State post-conviction practice is one of the most difficult and complex areas of criminal law. In order to competently represent a death-sentenced individual in a state post-conviction proceeding with an eye toward a potential later federal habeas corpus proceeding, an attorney must be knowledgeable in multiple areas of substantive law and practice, including: general criminal law;

---

[146] Ex. KKKK (Amendment to Tenn. Sup. Ct. R. 13, April 3, 1997).
[147] *Id.*
[148] *Compare* Tenn. Sup. Ct. R. 13, 2006 amendment; *with* Tenn. Sup. Ct. R. 13, 2001 amendment.
[149] Tenn. Appl. at 8.
[150] 28 C.F.R. § 26.22(b)(1)(i) provides a benchmark that appointed attorneys be "admitted to the bar for at least five years and have at least three years of post-conviction litigation experience."
[151] Tenn. Sup. Ct. R. 13, § 3(g-h).
[152] Tenn. Sup. Ct. R. 13, § 3(g-h).
[153] Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58,160, 58,169 (Sept. 23, 2013) (codified at 28 C.F.R. § 26).

specialized rules for capital cases (for example, rules related to jury selection); unique aspects of capital trials such as limitations on the classes of persons and crimes eligible for a death sentence); state, federal, and international rules of criminal procedure, including those specific to the death penalty; the law and rules regulating the conduct of lawyers; and state, federal, and international public records and privacy laws. The attorney must also be acutely familiar with the many state and federal procedural requirements that apply to state capital post-conviction proceedings, such as: the due diligence requirements for post-conviction lawyers; state rules regarding the timely and proper preservation of claims and the exceptions to those rules; and the respective statutes of limitation that apply to the filing of a petitioner's state and federal habeas petitions (and when those limitation periods begin to run). State capital post-conviction counsel should also have extensive evidentiary hearing and trial experience because post-conviction hearings are intensive and can take a week or more.[154]

For this reason, comprehensive training programs are standard for new capital habeas defense attorneys in state and federal defender offices around the country. For example, attorneys in the Capital Habeas Unit for the Community Federal Defender Office for the Eastern District of Pennsylvania "attend at least one multi-day capital habeas conference per year and are encouraged to attend numerous internal trainings throughout the year. The CHU conducts at least 15 in-house training programs a year with wide-spread attendance by its attorneys."[155] In the experience of the CHU's Chief, Shawn Nolan, "attendance of these types of internal and external trainings has become standard practice throughout the federal defender community."[156]

Attorneys at the Habeas Corpus Resource Center ("HCRC"), a California judicial branch agency responsible for providing direct representation to indigent death-sentenced prisoners in state and federal habeas corpus proceedings, undergo similarly rigorous training. According to Michael Laurence, who served as the Executive Director of HCRC for seventeen years (1998-2015), during his tenure:

> Newly hired attorneys underwent approximately a two-week training, which included an overview of the capital legal process in California, habeas corpus procedure, and case team and office protocols. Within several months of being hired, the attorneys underwent additional in-house training focusing on substantive legal, mental health, and forensic issues. These trainings included sessions on the habeas corpus practices – for example, habeas corpus issue identification; record and trial file review; coordination and effective use of resources, development of an investigation plan, and drafting of various documents. They also included substantive training on such topics as the law governing guilt and penalty proceedings; mental health and mental illnesses and impairments; mitigation and investigation strategies; forensic issues; relevant court rulings and updates to the law; and ethical issues. . . .

---

[154] 2009 AOC Cap. Post-Conviction Rep., Judge James C. Beasley Jr. noted that post-conviction hearings generally take a week, which he notes is as long as a trial.[154]
[155] Ex. LLLL (Nolan Decl.).
[156] *Id.*

> In addition to the mandatory in-house trainings, attorneys were expected to attend statewide or nationwide trainings on relevant topics. These conferences included the annual California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar; the annual NAACP Legal Defense and Educational Fund, Inc., capital punishment training conference; the annual National Association of Criminal Defense Lawyers Making the Case for Life conference; the annual National Legal Aid and Defender Organization Life in the Balance conference; and programs sponsored by the Administrative Office of the United States Courts Habeas Assistance and Training Counsel. Many of these conferences provided 12-25 hours of training in a few days.[157]

On the basis of his experience serving as the Executive Director of HCRC, as well as his more than thirty-five years practicing and lecturing on capital post-conviction law, Mr. Laurence concludes: that six hours is a mere fraction of what should be required to prepare to represent prisoners in substantively and procedurally complex capital post-conviction proceedings.[158]

**B. Tennessee's Inadequate Experience and Competency Standards are Not Met in Practice.**

While Tennessee's statutory experience and competency standards fall short of the requirements for Chapter 154 certification on their face, even the state's inadequate standards are frequently not met in practice by both staff attorneys at the OPCD and private appointed counsel. Unsurprisingly, in its application, Tennessee provided no information or materials to show that competent counsel is provided in practice.[159] Nor could they, given the reality of state post-conviction representation in Tennessee.[160]

*1. Persistent incompetent representation by the OPCD*

From its inception, OPCD, which presumptively represents all individuals sentenced to death in their capital post-conviction proceedings in Tennessee, has struggled to maintain adequate staffing levels and to meet the needs of the clients it was appointed to represent. In part, these problems result from OPCD frequently hiring attorneys right out of law school,[161] thereby violating the requirement that appointed counsel have some minimum years of experience as practicing attorneys or experience practicing in complex criminal matters. But the systemic failure of the OPCD to provide competent representation stems from incompetence, excessive workloads, chronic staff turnover, mismanagement, and underfunding.

Recognizing OPCD's incompetence and dysfunction, courts have repeatedly criticized the competence of OPCD and have demonstrated persistent reticence to appoint OPCD to represent

[157] Ex. MMMM (Laurence Decl., ¶¶ 11-12).
[158] *Id.* ¶ 13.
[159] 26 C.F.R. § 26.23(b).
[160] *See* Ex. NNNN (Henry Decl. ¶ 4).
[161] Ex. JJJJ (Drew Decl. ¶¶ 39, 43, 77).

prisoners in capital post-conviction proceedings. In 2006, the judge in Kennath Henderson's post-conviction case removed OPCD from representing him, finding that "counsel has not been diligent in preparing this case for trial and [the court] has no expectation that counsel will be ready for a hearing at the next schedule date."[162] In their contributions to an influential 2009 Capital Post-Conviction Report assembled by the Administrative Office of the Courts, several Tennessee judges observed that OPCD attorneys appointed to represent prisoners in capital post-conviction proceedings sometimes lack adequate qualifications. One judge noted that on at least two occasions, the attorney assigned to a capital post-conviction case before her was not licensed to practice law in the state of Tennessee.[163] Another advocated for the dismantling of OPCD due to a "history of inadequate representation" and "questionable staffing decisions."[164] Another bemoaned OPCD's "severe personnel problems and turnover with post-conviction counsel."[165] More recently, a judge stated in a 2015 decision that "[t]he post-conviction defender continually resists all attempts by judges to appoint other local attorneys to these capital cases, so that they can be handled timely, while at the same time, continually complaining of their caseload and lack of staffing to obtain continuances."[166] The judge went on to find that OPCD engaged in "purposeful neglect" as a result of its inability to timely litigate the case at bar.[167] Another judge initially refused to appoint OPCD in 2016 to Richard Odom's case due to the office's inability to promptly litigate cases.[168]

Below, we have provided examples of the rampant and pervasive issues plaguing the OPCD, which repudiate Tennessee's unsupported assertion that "Tennessee's appointment system—and particularly its 30-year utilization of a specialized post-conviction defender office working exclusively on state-court capital collateral review cases—'reasonably assure[s] a level of proficiency appropriate for State postconviction litigation in capital cases.'"[169] At the very least, Tennessee should be required to provide *some* support for its claim. Due to the inadequate time the Federal Defenders have been provided to prepare this comment,[170] these examples should be considered illustrative but not exhaustive.

---

[162] *Henderson v. Bell*, 2:06-cv-2050 (W.D. Tenn. Oct. 20, 2006) (R. 22-1, PageID 1545–46). After OPCD moved to be reinstated, Judge Blackwood reversed course 38 days later and reappointed the office. R. 22-1, PageID 1547–55 (OPCD motion to be reinstated); R. 22-6, PageID 1605 (Reinstatement Order).
[163] 2009 AOC Cap. Post-Conviction Rep., 21.
[164] 2009 AOC Cap. Post-Conviction Rep., 13.
[165] *Id.* at 20.
[166] *Sims v. Colson*, 2:11-cv-02956 (W.D. Tenn. July 13, 2015) (R. 47-1, PageID 2920).
[167] *Id.* at 2922.
[168] *See Odom v. Mays*, 2:18-cv-02355 (W.D. Tenn. Nov. 5, 2018) (R. 21-6, PageID 8917–34).
[169] Tenn. Appl. at 8 (citing 28 C.F.R. § 26.22(b)(2).
[170] *Supra* pp. 19-20, n. 79, n. 84. The Federal Defenders have been constrained by factors including, but not limited to, the fact that some cases have not been scanned into any electronic database, the time consuming process to access federal court archives for cases that are not imaged in PACER, time constraints related to visiting individual county courthouses in person to obtain post-conviction trial court records, and the fact that some materials in some cases persist under seal by court order and there was insufficient time to petition the courts to unseal that information. As a result, the client records attached to this Comment and cited throughout are incomplete and do not contain all of the information known to the Federal Defenders and critical for understanding the inaccuracies and misrepresentations contained in Tennessee's Application.

**<u>Leroy (Lee) Hall:</u>** [171] Lee Hall's counsel was ill-equipped to litigate a complex state post-conviction matter, and as a result procedurally defaulted several critical claims, including ineffective assistance of counsel at trial because Mr. Hall's trial attorneys failed to retain an expert medical examiner, present evidence of Mr. Hall's diminished capacity during the penalty face, challenge a "heat of passion" jury instruction, and challenge a reasonable doubt jury instruction. Mr. Hall's counsels also failed to raise constitutional challenges to Tennessee's death penalty statute.

**<u>Kennath Henderson:</u>** [172] Neither of Kennath Henderson's post-conviction counsel were able to focus on his case because they were both experiencing overwhelming physical and mental health crises, the office was in the midst of an overwhelming influx of new cases, and OPCD was experiencing a staffing crisis was ongoing during the pendency of their representation. Because he was physically unwell, lead counsel abdicated responsibility to oversee the case to an inexperienced lawyer who was seriously mentally ill. Mr. Henderson's attorney's "lack of concentration, absenteeism, and general obvious inability to work on her cases" resulted in repeated official reprimands. The trial court removed OPCD from the case because it found OPCD had "not been diligent in preparing this case for trial," and the OPCD ultimately terminated the employment of his assigned counsel because of her poor performance in his case. The trial court's removal of counsel interrupted counsel's work with an expert psychiatrist and ultimately the psychiatrist did not complete necessary assessment and testing. Though ultimately re-appointed, OPCD continued to undermine Mr. Henderson's case through their incompetence, prompting the trial court to state in a declaration submitted in federal court, "I have concluded that [OPCD] were not candid with the Court and failed to adequately represent Mr. Henderson in this proceeding." Because of Mr. Henderson's incompetent representation, evidence of his significant brain damage was not presented during state post-conviction proceedings.

**<u>David Keen:</u>**[173] David Keen's post-conviction counsel were unable to function effectively: one counsel was inexperienced and seriously mentally ill, while the other was too overloaded to supervise her work. They hired a completely untrained and inexperienced mitigation specialist whose sole experience in any vaguely relevant field was working at a day care center. Because of OPCD's ineffectiveness, they "never thought to explore whether Mr. Keen is mentally retarded." While Mr. Keen is intellectually disabled and exempt from the death penalty, his constitutional claim of ineligibility was procedurally defaulted by post-conviction counsel's ineffectiveness, as were his claims relating to his diagnosis of fetal alcohol syndrome.

**<u>Vincent Sims:</u>** In a scathing evaluation of Vincent Sim's counsel, Judge Christ Craft of the 30th Judicial District in Memphis said the OPCD "continually resists all attempts by judges to appoint other local attorneys" to capital cases, "so that they can be handled timely, while at the same time, continually complaining of their caseload and lack of staffing to obtain continuances."[174] Judge Craft characterized an OPCD attorney's behavior as "clear, obvious and

[171] *See* Ex. KK (L. Hall Files).
[172] *See* Ex. NN (Henderson File).
[173] *See* Ex. AAA (Keen File).
[174] *Sims v. Colson*, 2:11-cv-02946 (W.D. Tenn. July 13, 2015) (R. 47-1, PaigeID#2920).

open neglect," which was "inexcusable."[175] He further referred to their OPCD's actions as "exhibit[ing] a callous indifference" to the court and the citizens it serves.[176]

**Michael Bane:** Judge John Dailey—a judge of the 30th Judicial District—found in Michael Bane's capital post-conviction case that the OPCD was carrying a "hefty case load," and he refused to appoint the office to represent Mr. Bane.[177] Judge Dailey dismissed the quality of representation provided by the organization, referring to OPCD lawyers as "two 23-year olds fresh out law school" and expressed his preference for appointing local attorneys he considered "highly capable, experienced, qualified attorneys."[178] Judge Dailey's comments followed an appeal to the Tennessee Court of Criminal Appeals by OPCD challenging Judge Dailey's refusal to appoint the organization.[179] Despite judicial findings that the organization lacked capacity to perform its job effectively, the organization pressed to continue representing clients. Indeed, in instances where judges have refused to appoint OPCD, the organization has sought judicial review to ensure they are appointed.

**Charles Rice:** [180] Mr. Rice's appointed private counsel chose not to continue to represent him once his petition was denied by the trial court. OPCD was then appointed to represent Mr. Rice in his appeal of the trial court's decision, but OPCD Attorney Morrow failed to file by the deadline, stating in a motion for extension of time that "counsel inexplicably missed the notice filing of the record in this matter." OPCD only filed a motion for an extension of time to submit Mr. Rice's brief after being prompted to do so by the Tennessee Court of Criminal Appeals.

**William (Bill) Stevens:**[181] Paul Morrow, who was the Deputy Defender of OPCD at the time, and Jon Tucci, a junior attorney, were assigned to represent Bill Stevens.[182] As the deadline for submitting an amended petition approached, it became evident that Attorney Tucci was delinquent in his preparation of the petition.[183] To make matters worse, when Mr. Tucci's dereliction became apparent, he abruptly quit in May 2004, only a few months prior to Mr. Stevens's scheduled evidentiary hearing.[184] In July 2004, a state information technology employee was performing routine maintenance on Attorney Morrow's state-issued computer and discovered a large number of pornographic images, including images of rape, torture, and bondage.[185] Attorney Morrow was suspended from duty, and his computer was seized by state authorities.[186]

---

[175] *Id.* at 2921.
[176] *Id.* at 2921.
[177] *Bane v. Westbrooks*, 2:12-cv-02217 (W.D. Tenn. Jan. 28, 2013) (R. 18-2, PageID#2916).
[178] *Id.* at 2905.
[179] *See id.* at 2895–2919.
[180] *See* Ex. QQQ (Rice file).
[181] *See* Ex. ZZZ (Stevens file).
[182] *Stevens v. Bell,* 3:07-cv-0748 (M.D. Tenn. Sept. 10, 2012) (R. 126-1, PageID 1758-59).
[183] *Stevens v. Bell,* 3:07-cv-0748 (M.D. Tenn. Sept. 10, 2012) (R. 126-2, PageID 1798).
[184] *Id.* at 1798–99.
[185] *Id.* at R. 126-1, Page ID 1764, 1773–74.
[186] *Stevens v. Bell,* 3:07-cv-0748 (M.D. Tenn. Sept. 10, 2012) at 1764–68; *See* Ex. NNNN (Henry Decl. ¶ 16).

Due in part to a severe shortage of experienced attorneys willing to work at OPCD, Attorney Morrow was not terminated.[187] Mr. Stevens's case continued to be neglected.[188] When a motion to continue was eventually filed and a hearing on that motions was held, Attorney Morrow and the head of the OPCD refused to reveal to the court the reasons Attorney Morrow was unprepared for the evidentiary hearing[189] and, instead insinuated that it was Mr. Stevens's fault.

OPCD counsel were unprepared for the evidentiary hearing, and as a result failed to litigate Mr. Stevens' claims that his trial counsel were ineffective for sleeping during trial and failed to present compelling proof that Mr. Stevens was innocent and that—even if had been convicted—a presentation of his biopsychosocial history that comported with prevailing professional norms would have convinced at least one juror to sentence him to a sentence less than death. Mr. Stevens died in custody before the federal courts could reach the merits of his claims.

**James Dellinger:**[190] During a hearing in federal court, it was proved that James Dellinger's counsel from the OPCD suffered from bipolar disorder, was unable to care for herself, resisted psychiatric treatment, and was unable to perform the basic job duties required. Her treating therapist declared under oath that at the time OPCD counsel represented Mr. Dellinger, his attorney was "not competent to flip hamburgers, much less function as an attorney." The failures by counsel were exacerbated by an extraordinary, completely unmanageable caseload. As a result of counsel's mental illness and debilitating caseload as well as the utter failure of the OPCD to supervise her performance, counsel abandoned the meritorious issue that Mr. Dellinger was ineligible for the death penalty due to intellectual disability despite having a reported IQ score proving his ineligibility. Prior to Mr. Dellinger's death, the federal district court found that OPCD "abandoned [Mr. Dellinger] unilaterally and without notice, but with concealment," and thereby "severed the principal-agent relationship," because "counsel acted in a manner completely adverse to Petitioner's interest."

**Darryl Holton:**[191] Despite having reason to believe that Darryl Holton was not competent to file a *pro se* petition on his own behalf, OPCD attorneys did not file a post-conviction petition for him before the one-year statute of limitations had run because the attorney tasked with doing so "had an extremely heavy workload." Furthermore, attorneys at the OPCD belatedly realized after the statute of limitations had run that no one from the office had informed Mr. Holton that there was a one-year statute of limitations.

---

[187] *Stevens v. Bell,* 3:07-cv-0748 (M.D. Tenn. Sept. 10, 2012) at 1767–79.
[188] *Stevens v. Bell,* 3:07-cv-0748 (M.D. Tenn. Sept. 10, 2012) at 1779–80.
[189] *See Stevens v. Bell*, 3:07-cv-0748 (M.D. Tenn. Jan. 26, 2016) (R. 183-2, PageID 10379–425); *see also Stevens v. Bell*, 3:07-cv-0748 (M.D. Tenn. Sept. 10, 2012) (R. 126-1, PageID 1780–82 (Mr. Dawson discussing the situation).
[190] *See* Ex. FF (Dellinger file).
[191] *See* Ex. SS (Holton file); *See* Ex. OOOO (OPCD Annual Report to the Post-Conviction Defender Commission, 2005, at 1-2) ("[O]ur experience [missing the deadline to file Mr. Holton's petition] has brought us to the realization that we must reevaluate our present organizational framework to ensure that death sentenced inmates in Tennessee continue to receive high quality representation in state post-conviction . . .").

**Richard Odom:**[192] The OPCD was plagued by dysfunction, high turnover, poor leadership, and judicial distrust at the time that it was appointed to represent Richard Odom. Investigation in Mr. Odom's federal habeas proceedings reveals that between June 2013 and May 2018, at least 5 OPCD attorneys, 2 investigators, and 1 administrative staff member assigned to his case left the organization. Several of these individuals were involuntarily terminated or forced out with "resign or be fired" ultimatums. Judge John Fowlkes—then of the 30th Judicial District—initially refused to appoint OPCD in 2016 to Mr. Odom's case due to its inability to promptly litigate cases.[193] Mr. Odom's case was scheduled at a time when the office resources were stretched thin, and several other post-conviction clients had evidentiary hearings in close proximity to Mr. Odom.

**Henry Jones:** The OPCD assisted Henry Jones in preparing and filing his *pro se* petition.[194] Upon review of that petition, "[t]he post-conviction court determined that the *pro se* petition 'just barely' presented a colorable claim, in part because the petition 'contain[ed] almost no specific factual allegations.'"[195]

**Devin Banks:**[196] After representing Devin Banks for longer than 14 months, OPCD counsel filed a motion for an extension, stating that there was considerable work left to do in the case and attributed the delay in their preparation for Mr. Banks' hearing to their overwhelming caseloads and the upcoming birth of one attorney's child. In denying the motion, Judge Kurtz stated that "[i]f petitioner's counsel cannot identify the colorable claims in 15 months, then they are not to be found," thereby demonstrating counsel's inability to prepare in a timely manner had a material impact on the court's view of Mr. Banks' case. In a motion to continue the post-conviction evidentiary hearing, attorneys assigned to Mr. Banks' case acknowledged they were inexperienced and needed more support from a supervising attorney, thought their supervising attorney's caseload made such supervision untenable.

**Christa Pike:**[197] During Ms. Pike's post-conviction hearing, an OPCD attorney attempted to bring her mother along on a client visit with Ms. Pike, but the detention facility refused to admit the attorney's mother. However, the OPCD attorney was admitted and according to the post-conviction judge who viewed a surveillance video from the detention facility, the attorney behaved inappropriately with Ms. Pike.

2. *Persistent incompetent representation by private appointed counsel*

Private counsel appointed to represent indigent prisoners sentenced to death during the relevant period of time have lacked the skills and experience necessary to provide minimally

[192] *See* Ex. KKK (Odom file).
[193] *See Odom v. Mays*, 2:18-cv-02355 (W.D. Tenn. Nov. 5, 2018) (R. 21-6, PageID#8917–34).
[194] While indigent prisoners are not eligible to have counsel appointed prior to the filing of their initial *pro se* petition, attorneys may assist prisoners in preparing those initial petitions. See Rule 13 § 5 (E)(6).
[195] *Jones v. State*, No. W202001347CCAR10PD, 2022 WL 601074, at *2 (Tenn. Crim. App. Mar. 1, 2022).
[196] *See* Ex. Q (Banks file).
[197] *See* Ex. LLL (Pike file).

sufficient representation have had significant and alarming disciplinary records at the time of their appointment, or were later found to have violated professional standards of conduct in relation to their representation of prisoners in capital post-conviction proceedings.

The following examples demonstrate that private appointed counsel provided to indigent prisoners in Tennessee during state post-conviction proceedings have often fallen far short of the minimum competence required for Chapter 154 certification. As noted above, these examples are not exhaustive, as the Federal Defenders have not had the opportunity to fully develop the record in the inadequate time allowed.[198]

**Marlon Kiser:**[199] Mr. Kiser was appointed private counsel after OPCD moved to withdraw due to a conflict and to seek the appointment of pro bono counsel. The proposed pro bono counsel did not meet the minimum training and experience standards required by Tenn. S. Ct. Rule 13 § 3(h). Despite the fact that Mr. Kiser was severely brain damaged and not competent to do so, the court permitted Mr. Kiser to waive the appointment of qualified counsel and accept the unqualified pro bono counsel.

**Derrick Quintero:**[200] Mr. Quintero was initially appointed counsel from the OPCD. OPCD did not work to progress Mr. Quintero's case for seven months, at which point the judge found the OPCD was conflicted and appointed a private attorney named Clifford McGown. Months later, Attorney McGown also sought to withdraw from the matter, but the judge denied his motion. In September 2000, 16 months after he filed his *pro se* petition and with no assistance from counsel in developing his case, Mr. Quintero filed a *pro se* motion to dismiss Attorney McGown. Mr. Quintero noted that Attorney McGown had failed to interview Mr. Quintero's brother, and that Mr. Quintero's brother—a critical mitigation witness—had since passed away. The judge then re-appointed OPCD. Another private attorney, Paul Buchanan, was also appointed on December 4, 2000, and when Mr. Quintero's amended petition was filed on August 15, 2001, Attorney Buchanan was the only signatory. Attorney Buchanan's law license was suspended from June 1998 until June 1999, and his suspension was followed by a probated suspension through January 2000. On January 8, 2001, Attorney Buchanan's Texas law license was placed on probated suspension for four years because the Texas board found he suffered a disability of depression and required an attorney monitor. Attorney Buchanan did not report the suspensions to the Tennessee Board of Professional Responsibility.

**Charles Rice:**[201] Two attorneys who worked on Charles Rice's post-conviction were not qualified under Tennessee Supreme Court Rule 13 when they were appointed to his case.

**David Ivy:** [202] After the OPCD was removed from David Ivy's case, private counsel was appointed. The appointed private attorney suffered from a substance abuse problem and

[198] *Supra* pp. 19-20, n. 79, n. 84.
[199] *See* Ex. CCC (Kiser file).
[200] *See* Ex. OOO (Quintero file).
[201] *See* Ex QQQ (Rice file).
[202] *See* Ex. VV (Ivy file).

depression, which significantly disrupted his work. Because of private counsel's inadequate representation, significant mitigating evidence in Mr. Ivy's case was not uncovered, nor was compelling evidence of innocence and a *Brady* violation which points to the true perpetrator of the crime.

**Donald (Donnie) Middlebrooks:**[203] In response to a motion to dismiss for failure to file an amended petition, the OPCD stated that Donnie Middlebrooks was represented by counsel with an apparent conflict of interest. OPCD explained in the response to the motion to dismiss that it had been having difficulty locating "qualified, conflict free counsel" to represent Mr. Middlebrooks.

After OPCD shared that it was having difficulty locating "qualified, conflict free counsel," Hershal Koger was appointed to represent Mr. Middlebrooks. During his representation of Mr. Middlebrooks, Attorney Koger was briefly suspended from the practice of law for non-compliance with CLE requirements.

**Patrick Stout:**[204] Patrick Stout was initially appointed a private attorney as post-conviction counsel. On the court date of what was supposed to be the evidentiary hearing, Mr. Stout's attorney admitted to the court that he had not yet reviewed trial counsel files despite trial counsel's offer to assist and discuss potential issues that could be raised in post-conviction.

## VI. TENNESSEE'S APPOINTMENT SCHEME DOES NOT GUARANTEE ADEQUATE COMPENSATION AND PAYMENT OF REASONABLE LITIGATION EXPENSES

To qualify for certification under Chapter 154, Tennessee's mechanism must provide for the "compensation[] . . . of competent counsel."[205] The Final Rule requires that the compensation paid to appointed counsel be "adequate,"[206] and the lynchpin of that analysis is whether a state's compensation provision provides "sufficient financial incentives to secure the appointment of competent counsel in sufficient numbers to timely provide representation to capital petitioners in State collateral proceedings."[207] The Final Rule describes two ways that a state may make that showing. First, the state may establish that its mechanism meets presumptive benchmarks described in the Final Rule, and that the presumption should apply.[208] Second, where a state does

[203] Ex. GGG (Middlebrooks file).
[204] *See* Ex. AAAA (Stout file).
[205] Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58,160 (Sept. 23, 2013) (to be codified at 28 C.F.R. § 26).
[206] Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58,160, 58,162 (Sept. 23, 2013) (to be codified at 28 C.F.R. § 26).
[207] Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58,160, 58,173 (Sept. 23, 2013) (to be codified at 28 C.F.R. § 26).
[208] 28 C.F.R § 26.22(c)(1).

not meet those benchmarks, the state may show that its compensation system nonetheless assures compensation that is sufficient to consistently attract and retain competent counsel.[209]

The Final Rule also provides that a state's appointment mechanism "must provide for payment of reasonable litigation expenses of appointed counsel."[210] "Such expenses may include, but are not limited to, payment for investigators, mitigation specialists, mental health and forensic science experts, and support personnel."[211] The Final Rule only allows for "presumptive limits" on payments of litigation expenses "only if means are authorized for payment of necessary expenses above such limits."[212]

Since its inception, Tennessee's mechanism has fallen short of these requirements by failing to provide adequate compensation and payment of reasonable litigation expenses to both private attorneys appointed to represent indigent capital habeas defendants in post-conviction proceedings and to OPCD attorneys.

**A. Tennessee's Appointment System Does Not Guarantee Adequate Reimbursement of Reasonable Litigation Expenses.**

Tennessee's appointment system fails and has always failed to guarantee the payment of reasonable litigation expenses for the attorneys appointed to represent indigent capital defendants in state post-conviction proceedings.

*1. Tennessee Imposes Unreasonable Caps on Litigation Expenses Reimbursed Under Rule 13.*

For litigation expenses, Tennessee sets maximum hourly rates for particular expert services and caps expenses related to investigative services at $20,000 and expert services at $25,000 unless the trial court determines extraordinary circumstances proven by clear and convincing evidence justify exceeding those caps.[213] The imposition of a cap at the outset of a case, before counsel and the court know what expenses will be necessary, is arbitrary and improper. Such strict caps violate the Final Rule, which allows for limitations on reimbursement "only if means are authorized for payment of necessary expenses above such limits." Although there exists an entitlement to exceed the $20,000 and $25,000 limits, such entitlement is an empty promise when, in practice, judges routinely deny requests for funds in excess of those caps.

Litigation expenses include necessary costs expressly contemplated by the Final Rule, including mitigation specialists, mental health experts, investigators.[214] Costs only increase in more complex cases. These necessary litigation expenses frequently exceed Tennessee's

[209] 28 C.F.R. § 26.22(c)(2).
[210] 28 C.F.R. § 26.22(d).
[211] *Id.*
[212] *Id.*
[213] Tenn. Sup. Ct. R. 13, § 5(d)(5) and (d)(1).
[214] 28 C.F.R. § 26.22(d).

statutory limits. Tennessee thus cannot claim that it provides for the payment of reasonable litigation expenses, as expressly required by the Final Rule.

Tennessee's mechanism also establishes fixed hourly "rates paid individuals or entities for services provided to indigent parties."[215] Rates are set by the Director of the Tennessee Administrative Office of the Courts and the Chief Justice of the Tennessee Supreme Court, and they are published on the website of the Tennessee Administrative Office of the Courts.[216] Rates approved for state post-conviction proceedings are far lower than those approved in the capital federal habeas corpus context.[217] Tennessee authorizes investigators to be paid a flat rate of $50 an hour, whereas the federal courts in Tennessee authorize investigators to be paid between $75 and $125 an hour, with investigators working on capital cases being authorized to receive more than the minimum rate. In Tennessee capital post-conviction proceedings, mitigation specialists are limited to $65 an hour, whereas the federal district courts in Tennessee authorize mitigation specialists working on capital cases to be paid between $85 and $120 an hour. Experts with specialized knowledge may be paid up to $400 an hour an hour for services they provide to indigent prisoners in federal capital habeas corpus proceedings, but the Tennessee fee schedule does not permit any expert in any field to be paid more than $250 an hour. Counsel often finds it difficult to find qualified experts who are willing to work for Tennessee's below-market rates.[218]

2. *District Judges Frequently Refuse to Approve Reasonable Litigation Expenses as Defined by the Final Rule*

In addition to impermissibly enforcing a limit on litigation expenses, Tennessee's appointment scheme also fails to provide funding for the kinds of litigation expenses expressly envisioned by the Final Rule. The following examples demonstrate that indigent death-row prisoners in Tennessee have often been denied requests for reasonable expenses necessary for the litigation of their post-conviction cases.[219] For the reasons discussed above regarding time constraints, these examples are not exhaustive.[220]

**John Freeland:**[221] Limitations on funding also limit the experts available to appointed counsel, as they must find an expert who is willing to work at significantly reduced rates, and as a result these experts have often been less qualified than they otherwise would be. For example, John Freeland's post-conviction counsel struggled to find experienced and qualified mental health experts who were willing to work for the hourly rates permitted by the court. Counsel spent months searching for a willing and able expert.

---

[215] Tenn. Sup. Ct. R. 13, Section 5(d)(1).

[216] Ex. PPPP (Fee Schedule for Experts and Investigators published by the Administrative Office of the Courts).

[217] Ex. QQQQ (CJA Sixth Circuit Service Provider Hourly Rates).

[218] *See* Ex. RRRR; Annual Report to the Post-Conviction Defender Oversight Commission, 2019, at 2-3.

[219] *See also* Ex. JJJJ (Drew Decl. ¶ 34-36).

[220] *Supra* pp. 19-20, n. 79, n. 84.

[221] *See* Ex. II (Freeland file).

**<u>LeMaricus Davidson:</u>**[222] LeMaricus Davidson's case was rushed through to a hearing, and his counsel was given inadequate time and financial resources to properly litigate his case. Despite the complexities of Mr. Davidson's underlying case, the state court forced the case to an evidentiary hearing in less than one year after appointment. The state court also denied requests for necessary experts, including jury selection and venue experts, a forensic ballistics expert, experts who could demonstrate that Mr. Davidson's brain is damaged, and an expert who would testify that the trial judge presiding over Mr. Davidson's case was impaired during trial. The state court overseeing Mr. Davidson's post-conviction proceedings was so determined to hasten his case through post-conviction that the judge denied Mr. Davidson's counsels' requests for subpoenas of records.

**<u>Tony Carruther:</u>**[223] Since its inception, Tony Carruther's case has involved issues of mental health and mental competency. In preparing for the post-conviction hearing, Mr. Carruther's counsel requested authorization for funds to employ an attorney expert qualified in the areas of mental competency of defendants in death penalty cases in order to show that Mr. Carruther's trial counsel performed deficiently for their client. The post-conviction court made short work of Mr. Carruther's request. In one sentence, the court denied the motion because it "appeared" that an expert witness of that nature was not needed.

**<u>Henry Hodges:</u>**[224] Henry Hodges pled guilty on advice of trial counsel who failed to tell him that he was also pleading guilty to an aggravating circumstance which made him death eligible. Trial counsel admitted that he was rushed to trial and the case was a financial burden, and Mr. Hodges was sentenced to death after a hearing at which scant mitigation evidence was presented. Despite Mr. Hodges' undeveloped trial record, during post-conviction proceedings, the court denied funding for a mental health expert and a mitigation specialist stating that they were not necessary, because "we judges and lawyers are sufficiently knowledgeable to take that information and process it." No mitigation evidence was presented in post-conviction in support of Mr. Hodges' ineffective assistance of counsel at sentencing claim as a result of the court's denial of resources.

**<u>Stephen Hugueley:</u>**[225] Stephen Hugueley's post-conviction counsel were denied expert funding for a psychological expert to assist counsel in challenging Mr. Hugueley's competency to waive post-conviction proceedings. Because counsel lacked the resources necessary to prove Mr. Hugueley's incompetence, the trial court allowed Mr. Hugueley to waive his post-conviction review process thereby abandoning virtually all his claims for relief in federal court. Mr. Hugueley, who was seriously brain damaged and mentally ill, later attempted to rescind his waiver and proceeded with litigation in federal court until his death.

---

[222] *See* Ex. DD (L. Davidson file).
[223] *See* Ex. W (Carruther file).
[224] *See* Ex. RR (Hodges file).
[225] *See* Ex. UU (Hugueley file).

**<u>Donald (Donnie) Middlebrooks:</u>**[226] Donnie Middlebrooks suffers from severe brain damage. During his post-conviction proceedings, Mr. Middlebrooks' counsel requested funds to hire an expert in the field of neuropsychological radiology to test for brain damage resulting from an injury sustained prior to his crime of conviction. The post-conviction court denied that request.

Finally, even when judges have found requests for investigation and experts reasonably necessary to develop and present potentially meritorious claims, the decision to fund those requests rests with the AOC and the Chief Justice. As the Deputy Director of the OPCD explained:

> In all cases, the trial court decides whether or not to grant funding and what amount is reasonable following an ex parte hearing on a motion for funding. However, from there, the funding process becomes opaque. In 2004, the Tennessee Supreme Court amended Rule 13, adding sections (5)(e)(4) and (e)(5) to create a funding review by the AOC. The AOC review requires an indigent, death-sentenced petitioner to provide the AOC Director with the post-conviction court's order finding that the requested services are necessary to protect a constitutional right, and that such order receive "prior approval" from the Director of the AOC before funds could be dispersed. Should the Director deny the funds, the rule provides for an "appeal" to the Chief Justice of the Tennessee Supreme Court. As discussed below, the "appeal" has none of the due process protections associated with appellate procedure. The Chief Justice is the final arbiter and may deny funding without any explanation.[227]

3. *The mechanism by which the OPCD funds litigation expenses has radically changed twice in the last two years*

From 1995 until 2023, the OPCD was permitted to hire staff investigators using the budget for staff salaries appropriated by the General Assembly, but any requests for funding for additional investigators and requests for experts were made using the procedures outlined in Tennessee Supreme Court Rule 13. Starting in 2023, and as Tennessee notes in its application,[228] the General Assembly decided that the OPCD would be appropriated additional funds in its operations budget that the office could use to hire investigators, mitigation specialists, and experts,[229] but at that time the office was also permitted to seek additional funding using the Rule 13 reimbursement mechanism.[230] In 2024, the Tennessee Supreme Court amended Rule 13 such that "[i]n a post-conviction capital case where the Office of the Post-Conviction Defender represents a petitioner, funding for investigative services and expert services and tests shall not be paid pursuant to [Rule

[226] *See* Ex. GGG (Middlebrooks file).
[227] Ex. JJJJ (Drew Decl. ¶ 30).
[228] Tenn. Appl. at 9-10.
[229] 2023 Tenn. Pub. Acts, ch. 418, § 54, Item 1, Line 124; 2024 Tenn. Pub. Acts, ch. 966, § 36, Item 207; 2025 Tenn. Pub. Acts, ch. 530, § 36, Item 23.
[230] Ex. JJJJ (Drew Decl. ¶ 38).

13],[231] meaning the OPCD would be entirely limited to the funds available in its operations budget to cover any and all costs associated with litigating the cases on the office's docket.

While Tennessee acknowledges this significant change in the way that Tennessee's mechanism covers the costs associated with post-conviction proceedings in a footnote, it fails to grapple with how this significant change demonstrates that there is no coherent system for the compensation and appointment of state post-conviction counsel that has existed from 1995 until the present day. Rather, the mechanism by which Tennessee provides for litigation expenses for indigent prisoners sentenced to death in state post-conviction proceedings has been in a persistent state of flux over the last 30 years, and it is continues to undergo substantial changes. The radically new ways in which the OPCD is funded, and post-conviction litigation-related expenses are covered is barely two years old. There is virtually no evidence that the majority of indigent prisoners—as most are represented by the OPCD—will receive adequate "payment of reasonable litigation expenses of appointed counsel" as is required by the Final Rule.[232]

**B. Tennessee Underfunds the OPCD, which Cannot Attract and Retain Competent Counsel.**

Tennessee has failed to demonstrate that OPCD attorneys are adequately compensated under 28 C.F.R. § 26.22(c). Tennessee claims that OPCD attorney salaries range from $69,960 to $180,960 a year.[233] However, this pay range is somewhat misleading, as many OPCD staff attorneys are inexperienced and earn a salary toward the low end of the pay range.[234] Tennessee fails to mention that OPCD salaries were significantly lower only two years ago. Prior to 2023, salaries were between $55,524 and $145,500 a year.[235]

Tennessee has failed to demonstrate that its rates of compensation are adequate under the Final Rule. Under 28 C.F.R. § 26.22(c)(1), the compensation provided by a state's mechanism is "presumptively adequate" if it is "comparable to or exceeds" certain benchmarks: (1) the compensation of counsel appointed in capital federal habeas proceedings; (2) the compensation of competent "retained counsel"; (3) the compensation of appointed counsel in state "appellate or trial proceedings in capital cases"; or (4) the compensation of attorneys "representing the State in State postconviction proceedings in capital cases." If a state's mechanism does not meet any of these four criteria, the state must show that its provisions for compensation are "reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency."[236]

---

[231] Order, In re: Proposed Amendment to Tennessee Rules of Appellate Procedure, No. ADM2024-01134 (Tenn. July 1, 2025).
[232] 28 U.S.C. § 2261.
[233] Tenn. Appl. at 9 n.7.
[234] Ex. JJJJ (Drew Decl. ¶ 44).
[235] Ex. JJJJ (Drew Decl. ¶ 43).
[236] 28 C.F.R. § 26.22(c)(2).

OPCD staff salaries are far below those paid to federal habeas counsel—thus, the mechanism for compensation fails the first of the four benchmarks identified in the Final Rule.[237] Tennessee does not attempt to argue that OPCD salaries are comparable to the compensation of appointed counsel in federal capital habeas proceedings, but it also does not acknowledge this shortcoming. The assistant federal defenders who are appointed in federal habeas corpus proceedings to review capital cases from the state earn much higher salaries than OPCD attorneys who work in the same city. The majority of the federal defenders for the Middle District of Tennessee came to the organization as experienced attorneys and therefore qualified for a starting salary much higher than their OPCD counterparts.[238] As those attorneys have been with the CHU for many years, their compensation is, now, substantially higher. As a result of the significantly higher salaries at federal defender offices, OPCD is vulnerable to losing its most competent staff attorneys to the Capital Habeas Units of the federal defender offices, which occurs with some frequency.[239]

OPCD staff attorneys are also not paid salaries that are comparable to the fees paid to retained counsel in capital post-conviction proceedings, the second benchmark criteria provided in the Final Rule.[240] Again, Tennessee's application does not argue that OPCD salaries are comparable to the compensation of retained counsel, and again, Tennessee ignores this compensation disparity. Private criminal defense attorneys in Tennessee earn more than $150 an hour,[241] and many of those attorneys are engaged in practices that are far less complex and demanding than state post-conviction proceedings. Assuming OPCD attorneys work an average of 40 hours per week and assuming seven weeks of paid time off each year, 40 hours of work per week for 45 weeks amounts to 1,800 hours of work per year. With OPCD salaries ranging from $70,872 to $185,724,[242] that amounts to an effective hourly rate of $39.37 for the lowest paid OPCD attorney and $103.18 for the highest paid OPCD attorney. This is nowhere near comparable to the $150+ hourly fees paid to retained counsel for the same work, even when taking into account the overhead costs that must be borne by private counsel.[243]

In order for OPCD salaries to be presumptively adequate under 28 C.F.R. § 26.22(c)(1)(iii), they must be commensurate with the salaries of public defenders who are appointed in *capital* cases, not just any criminal cases.[244] In its application, Tennessee does not even attempt to argue that salaries for attorneys who handle trial or direct appeal proceedings for *capital* cases at any public defender's office are commensurate with OPCD salaries. Instead, Tennessee makes a

---

[237] 28 C.F.R. § 26.22(c)(1)(i).
[238] Ex. NNNN (Henry Decl. ¶ 13).
[239] Ex. NNNN (Henry Decl. ¶ 12); Ex. JJJJ (Drew Decl. ¶ 44).
[240] 28 C.F.R. § 26.22(c)(1)(ii).
[241] *See* Clio, *Lawyer Rate Compensation Per State*, https://www.clio.com/resources/legal-trends/compare-lawyer-rates/ Clio (last visited October 10, 2025) (stating criminal defense attorneys in Tennessee charge an average of $196 an hour); Knoxville Bar Association, Economic Survey 2023, https://www.knoxbar.org/?pg=EconomicSurvey2023 (last visited October 10, 2025) (stating hourly rates for attorneys in Knoxville were at least $150 an hour and 86% of attorneys charged at least $200 an hour).
[242] Ex. SSSS (OPCD Government Att'y Pay Comparisons).
[243] *See* Ex. NNNN (Henry Decl. ¶ 6).
[244] 28 C.F.R. § 26.22(c)(1)(iii).

different comparison, contending that OPCD salaries are generally commensurate with salaries at public defender offices. That comparison is legally irrelevant, because the Final Rule requires the comparison to be made to other lawyers who handle challenging and important capital cases, not other types of lawyers in public defender cases, who may handle routine misdemeanor cases and the like. The legally relevant comparison is to public defenders throughout the state who are assigned to units or teams that handle capital-eligible cases. Public defenders assigned to such units and teams tend to be very experienced, and are thus, on average, compensated more considerably than public defenders who handle other kinds of cases.[245] It is Tennessee's burden to show that OPCD salaries are commiserate with the salaries paid to the experienced attorneys who handle capital trials, which they have not done.

Finally, salaries for staff attorneys at the OPCD are not comparable to the salaries of staff in the office of the state's attorney general, Tennessee's post-conviction counsel as of 2023.[246] The average minimum salary available for staff attorneys at the Office of the Attorney General and Reporter is 45% more than the minimum salary available to staff attorneys at the OPCD.[247] The disparity at the bottom the pay scales for these two offices is especially important, because many OPCD staff attorneys lack experience and so relieve salaries at the low end of the scale.[248] Tennessee acknowledges that "staff within the office of the attorney general and reporter are not paid under the same systems" as staff attorneys at the OPCD, but inaccurately and without any support claims that "the compensation is sufficiently comparable so as to render Tennessee's appointment system for capital post-conviction review presumptively adequate."[249]

Rates of compensation for staff attorneys at the OPCD are equal to the salaries of assistant district attorneys in Tennessee,[250] which represented Tennessee in capital post-conviction proceedings until 2023.[251] Tennessee relies heavily on this fact in its application, minimizing the pay discrepancy between the OPCD and Office of the Attorney General and Reporter.[252] But Tennessee is seeking certification for current and future matters, and so the current system of representation and compensation cannot be minimized and ignored.

Because OPCD salaries are not presumptively adequate based on any of the four enumerated grounds, compensation of OPCD attorneys must meet the requirements of 28 C.F.R. § 26.22(c)(2), discussed infra § VI, in order to be adequate. Tennessee has failed to demonstrate that OPCD attorneys are sufficiently compensated to ensure that attorneys who work there meet minimum standards of competency for state capital post-conviction counsel.

---

[245] 28 C.F.R. § 26.22(c)(1)(iii).
[246] 28 C.F.R. § 26.22(c)(1)(iv).
[247] Ex. JJJJ (Drew Decl. ¶ 44).
[248] *Id*.
[249] Tenn. Appl. at 10.
[250] Tenn. Code Ann. § 8-14-107.
[251] Tenn. Appl. at 9.
[252] *Id*., 9-10.

OPCD attorneys frequently do not meet the minimum standards for competent counsel established by law and frequently do not provide minimally competent representation in practice. This has been true throughout OPCD's existence, and it is in part because salaries have consistently been too low to attract experienced, competent counsel.[253] Bemoaning delays in capital post-conviction proceedings, one judge suggested that delays could be reduced if there was "a fully staffed Post-Conviction Defender's Office who are paid decent money so that they will hopefully stay in their jobs."[254] Once competent attorneys gain experience working at OPCD, they frequently leave and seek higher paying jobs, like those available in federal capital habeas office, demonstrating that the rate at which the state compensates OPCD attorneys is not adequate.[255]

Salaries paid to OPCD staff attorneys fail all four grounds set forth in 28 C.F.R. § 26.22(c)(1) that provide guidance for determining when post-conviction counsels' compensation is sufficient to be considered presumptively adequate. In addition, OPCD compensation is not adequate under the requirements of 28 C.F.R. § 26.22(c)(2). Thus, the OPCD salaries are inadequate under the Final Rule. Because the OPCD is appointed to represent almost all indigent prisoners in Tennessee who are sentenced to death and who are seeking relief in state post-conviction proceedings and staff within the office are inadequately compensated, Tennessee's application must be denied.

### C. Tennessee's Private Appointments System Fails to Adequately Compensate Appointed Post-Conviction Counsel in Capital Cases.

Tennessee states that its mechanism for compensating private attorneys who are appointed to represent capital defendants in post-conviction proceedings is adequate, as the rate of compensation is $90 an hour—the same as is available to co-counsel during capital trial proceedings.[256] In truth, the mechanism of compensation for privately appointed counsel in state post-conviction cases is unpredictable and ad hoc. Appointed counsel must submit requests for fees, which are subject to approval by the judge presiding over the case and then are reviewed by the Administrative Office of the Courts, which may contest the billing.[257] Tennessee's private appointment mechanism fails to meet the presumptive benchmarks specified by the Final Rule, as qualified counsel have little incentive to accept capital habeas appointments and provide the competent representation to which defendants are legally entitled.

Of note, Arizona's application for certification was ultimately denied because the DOJ found that capital post-conviction counsel in that state was not adequately compensated at a rate

[253] Ex. NNNN (Henry Decl. ¶ 11).
[254] 2009 AOC Cap. Post-Conviction Rep., 21.
[255] Ex. NNNN (Henry Decl. ¶ 12).
[256] Tennessee Application, at 9.
[257] Tenn. Sup. Ct. R. 13 Section 6(b)(1), (2), (5).

of $100 an hour [258]—$10 an hour more than appointed post-conviction counsel receives in Tennessee.[259]

Tennessee has failed to demonstrate that its rates of compensation are adequate under the Final Rule. As explained above, 28 C.F.R. § 26.22(c)(1) sets four grounds for determining whether compensation is presumptively adequate. Salaries paid to appointed attorneys fail all four grounds to be considered presumptively adequate. In addition, appointed attorney compensation is not adequate under the requirements of 28 C.F.R. § 26.22(c)(2).

Tennessee's Application does not attempt to argue that its private post-conviction compensation scheme in capital cases is "comparable to or exceeds . . . [t]he compensation of counsel appointed . . . in Federal habeas corpus proceedings reviewing capital cases from the State,"[260] but it also fails to recognize the chasm between the hourly rate for state post-conviction counsel and federal counsel. In the U.S. Court of Appeals for the Sixth Circuit, practitioners appointed to represent capital defendants in federal habeas cases are compensated under the Criminal Justice Act at an hourly rate of $223.[261] That is nearly 250% the rate paid to private appointed state post-conviction counsel in Tennessee.

Tennessee's Application also does not argue or demonstrate that Tennessee's appointment scheme provides for compensation that is "comparable to or exceeds . . . retained counsel in State postconviction proceedings in capital cases who meet State standards of competency."[262] This benchmark is not a useful comparator, as there are few examples of paid counsel being privately retained for capital state post-conviction proceedings in Tennessee (in light of widespread indigence among death row inmates). Notably, the rate of retained counsel in criminal cases generally is substantially higher than $90, with most attorneys charging more than $150 an hour.[263]

Turning to the third benchmark criteria, it may superficially appear that private appointed state post-conviction counsel in Tennessee is paid at a rate comparable to that of "appointed counsel in State appellate or trial proceedings in capital cases."[264] Tennessee Supreme Court Rule 13 establishes a rate of $90 an hour for co-counsel in capital trial[265] and counsel in capital post-conviction proceedings,[266] and these rates have historically been governed by and

---

[258] Office of Att'y Gen., Dep't of Justice, Denial of Arizona Chapter 154 Certification, OLP Docket No. 177, at 5-7 (Jan. 17, 2025).
[259] See Rule 13 § 3(k)(3).
[260] 28 C.F.R. § 26.22(c)(1)(i).
[261] 18 U.S.C. § 630.10.10(a).
[262] 28 C.F.R. § 26.22(c)(1)(ii).
[263] *See* Clio, *Lawyer Rate Compensation Per State*, https://www.clio.com/resources/legal-trends/compare-lawyer-rates/ Clio (last visited October 10, 2025) (stating criminal defense attorneys in Tennessee charge an average of $196 an hour); Knoxville Bar Association, Economic Survey 2023, https://www.knoxbar.org/?pg=EconomicSurvey2023 (last visited October 10, 2025) (stating hourly rates for attorneys in Knoxville were at least $150 an hour and 86% of attorneys charged at least $200 an hour).
[264] 28 C.F.R. § 26.22(C)(1)(iii).
[265] Rule 13 § 3(k).
[266] *Id.*

comparable under Rule 13. And it is this that Tennessee asserts in its application for certification under Chapter 154.[267]

However, Tennessee must do more than demonstrate that state post-conviction counsel's hourly rate is comparable to that of counsel appointed in capital trials and appeals *in principle*. It must also show that capital post-conviction counsel receives comparable compensation *in practice*. Tennessee has provided no evidence to prove that post-conviction counsel actually receives pay comparable to their counterparts at trial and on direct appeal.[268] Upon information and belief, private appointed counsel highly qualified attorneys will not accept appointments for state court capital work because to do so will result in a net loss to their practice, and because of the low rates paid by the court, there is a chronic shortage of investigators available to accept state court work.[269] Upon information and belief, private counsel often does not bill for all of the hours that they worked on the case because they knew that they would not be reimbursed for all of their time.[270]

Because of the limited time available to prepare this Comment, and because the Attorney General has denied the Federal Defenders' justified requests for additional time, the Federal Defenders have not had an opportunity to fully develop this record of how private appointed counsel in Tennessee capital post-conviction proceedings are actually compensated. Per the Final Rule, it is not possible to file exhibits associated with this Comment under seal.[271] There may be attorneys who have had experiences as appointed counsel in Tennessee capital post-conviction proceedings who would be willing to submit declarations attesting to the inadequacy of their pay in practice, the de facto caps imposed by courts, and other compensation related challenges were they able to do so under seal.

Finally, in considering the third criterion, it is important to emphasize that state post-conviction work is exceptionally demanding—significantly more so than appellate work—because it requires extensive factual investigation and, at times, active litigation, whereas appellate work is confined to legal analysis and argument based on an existing factual record.

In its application, Tennessee does not argue that rates paid to private appointed counsel in state post-conviction proceedings are comparable to those paid to prosecutors in capital state post-conviction cases.[272] Importantly, Tennessee District Attorneys, unlike appointed post-

---

[267] Tenn. Appl. at 9 ("This compensation comparability among appointed defense counsel at the various stages throughout the duration of a capital case fully satisfies the presumption of adequacy in 28 C.F.R. § 26.22(c)(1).").
[268] 26 C.F.R. § 26.23(b).
[269] Ex. NNNN (Henry Decl. ¶ 9).
[270] Ex. NNNN (Henry Decl. ¶ 7).
[271] *See* Ex. M (Previously Submitted Comments Regarding Proposed and Final Rules), at 559; Office of the Attorney General, *Certification Process for State Capital Counsel Systems*, 76 Fed. Reg. 11,705, 11,706 (Mar. 3, 2011) (explaining that material redacted for online publication because of confidentiality issues is placed in the public docket where it can be inspected).
[272] *See* 28 C.F.R. § 26.22(c)(1)(iv).

conviction counsel, are not subject to presumptive caps on fees and expenses. Nor are these District Attorneys asked to cover shortfalls in funding out of their own pockets.

Because it has failed to demonstrate that its mechanism meets any of the presumptive adequacy standards set forth in 28 C.F.R. 26.22(c)(1), Tennessee must show that its mechanism is "otherwise reasonably designed to ensure the availability for appointment of counsel who meet [sufficient] State standards of competency."[273] Tennessee does not and cannot do so. As previously described, Tennessee's low compensation rates for appointed capital post-conviction counsel, combined with caps on expenses, disincentivize competent counsel from taking state post-conviction cases.

## VII. TENNESSEE'S APPOINTMENT OF COUNSEL SCHEME DOES NOT GUARANTEE APPOINTMENT OF COUNSEL AT ALL CRITICAL POST CONVICTION PROCEEDINGS

To qualify for certification, Chapter 154 requires a determination of "whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death."[274] The Final Rule defines "[s]tate postconviction proceedings" as "collateral proceedings in State court, regardless of whether the State conducts such proceedings after or concurrently with direct State review."[275]

Tennessee, however, does not provide for counsel in all collateral proceedings. Current law limits indigent prisoners to an unqualified right to representation in a post-conviction proceeding only after an initial *pro se* petition is filed. Tennessee law does not provide representation or an unqualified right to representation to an indigent, death-sentenced prisoner for his or her (1) initial *pro se* petition; (2) successive post-conviction petitions; or (3) post-conviction applications for DNA forensic testing of biological materials or fingerprint analysis.

These gaps in Tennessee's statute are conspicuous when compared to the scope of representation afforded by the analogous federal statute providing for habeas corpus representation in capital cases in federal courts. Once counsel is appointed in federal court, the lawyer's duties continue throughout "all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures," including "competency proceedings and proceedings for executive or other clemency as may be available to the defendant."[276] Tennessee's failure to provide counsel during analogous state post-conviction proceedings violates the plain language of the Final Rule and disqualifies the state for certification under Chapter 154.

---

[273] 28 C.F.R. 26.22(c)(2).
[274] 28 U.S.C. § 2265(a)(A).
[275] 28 C.F.R. § 26.21.
[276] 18 U.S.C. § 3599(e).

### A. Tennessee Does Not Appoint Counsel for the Initial Petition.

As discussed at length above, an indigent prisoner sentenced to death in Tennessee is not appointed post-conviction counsel immediately following the denial of his or her direct appeal.[277] Rather, counsel is appointed only after the prisoner files an adequate *pro se* petition, requests counsel, and the presiding judge finds him or her to be indigent.[278] Preparation of an initial post-conviction petition is a critical stage of post-conviction proceedings, and Tennessee's failure to appoint counsel during this stage alone precludes applicability of Chapter 154.[279]

Tennessee suggests that it is of no consequence if a prisoner's initial *pro se* petition is underdeveloped and states that petitioners have ample opportunity to file amended petitions once counsel is appointed.[280] This is a flagrant mischaracterization of the law in Tennessee and the unsupported contention disregards the statutory requirements that initial petitions must meet, minimizes the risk that *pro se* prisoners face should they file an inadequate petition, and does not acknowledge the implications for timely appointment of counsel.

A petition that makes conclusory or bare allegations is not sufficient for a petitioner to proceed in post-conviction proceedings; the *pro se* petition must be detailed and present complex factual and legal allegations and claims.[281] If a petition is not pled correctly, the court may summarily dispose of it without an evidentiary hearing.[282] While the court *may* grant a *pro se* petitioner leave to file a corrected petition within 15 days if he or she initially fails to state a factual basis for the claims alleged, it is not required to do so.[283] Only after one or more of these failed attempts may the court consider a prisoner's indigency, that the petition was filed *pro se*, and appoint counsel to assist in drafting an amendment.[284] The fact that an indigent prisoner may be required to file not only an initial, but also an amended petition prior to the appointment of counsel introduces significant delay and cannot be described as timely. Furthermore, state court judges may dismiss claims brought in a *pro se* petition prior to the appointment of counsel.[285]

While Tennessee correctly states that *pro se* petitioners may have some access to counsel prior to the filing of their *pro se* petitions, Chapter 154 requires the *State* to establish a mechanism for providing counsel to all prisoners, which must be appointed by the court by an entry or an

---

[277] Tenn. Sup. Ct. R. 28 § 6(B)(3)(a).
[278] *Id.*
[279] *See Mills* v. *Anderson,* 961 F. Supp. 198, 201 n.4 (S.D. Ohio 1997) (questioning whether State mechanism that provides for appointment of counsel only after filing of *pro se* petition is inadequate under chapter 154) (citing *McFarland v. Scott*, 512 U.S. 849, 854-58 (1994) (holding that 'post-conviction proceedings,' as used in 21 U.S.C. § 848(q) encompasses the stage of initial preparation of a habeas corpus petition in federal court).
[280] Tenn. Appl. at 5.
[281] Tenn. Sup. Ct. R., § 5(E)(1)-(6), app. A.
[282] Tenn. Code Ann. § 40-30-106 (2006); Tenn. Sup. Ct. R. 28, § 5(F).
[283] Tenn. Code Ann. § 40-30-106(d) (2006).
[284] Tenn. Code Ann. § 40-30-106(e).
[285] *Supra* p. 28.

order.[286] Informal efforts by the OPCD to connect with petitioners who may otherwise unknowingly miss their opportunity to bring claims in state post-conviction proceedings, successful or not, do not satisfy this requirement imposed on the State. OPCD cannot be appointed to represent an indigent prisoner before the filing of the *pro se* petition. OPCD must obtain permission from a prisoner's direct appellate counsel before making contact with the prisoner, and OPCD cannot conduct any investigations or expend any financial resources before being formally appointed.[287] Thus, any efforts to assist a prisoner prior to the filing of a *pro se* petition are extremely limited.

An indigent prisoner must initiate his or her own state post-conviction proceedings. If he or she is incompetent to do so, a "next friend" may file a petition for the prisoner. Without the benefit of counsel, the next friend must demonstrate the prisoner is incompetent and in need of a next friend.[288] Tennessee has no mechanism for identifying prisoners who may not be competent to file a *pro se* petition or track the relevant statute of limitations, nor is there any mechanism in place to inform prisoners of the post-conviction process and requirements. Thus, there is no provision of counsel in state post-conviction proceedings for indigent prisoners who are incompetent to file their own *pro se* petitions—a glaring violation of Chapter 154, which requires a qualifying mechanism to "offer counsel to *all* State prisoners under capital sentence."[289]

### B. Tennessee Does Not Guarantee Appointment of Counsel for Successive Post-Conviction Proceedings.

Tennessee law does not guarantee the appointment of an attorney for the preparation of a Motion to Reopen post-conviction proceedings, in clear violation of the Final Rule.

Tennessee law allows a prisoner to file a motion to reopen his or her first post-conviction case if: (1) the claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required; or (2) the claim in the motion is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or (3) the claim asserted in the motion seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid; and (4) it appears that the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced.[290]

By design and in operation, subsequent applications in Tennessee reach claims that could not have been presented on an initial application, through no fault of the prisoner. For example,

---

[286] 28 U.S.C. 2261(b)(1), (c).
[287] Ex. JJJJ (Drew Decl. ¶ 10).
[288] *Holton and Reid v. State*, 201 S.W.3d 626, 634-635 (Tenn. 2006).
[289] 28 U.S.C. § 2261(c) (emphasis added).
[290] Tenn. Code Ann. § 40-30-117.

subsequent post-conviction petitions are used to raise claims when the prisoner can show that the factual basis of the claim was unavailable to the prisoner through the exercise of due diligence when the prior application was filed. They are also filed to present retroactive constitutional rights that are announced after the initial application was filed. The Supreme Court's decision in *Atkins v. Virginia* is an example of a decision that established a retroactive rule of constitutional law by holding that the Eighth Amendment prohibited execution of intellectually disabled persons.[291] Applicants who filed a post-conviction petition prior to the *Atkins* decision could not have included an *Atkins* claim in their initial post-conviction petition, and thus many prisoners raised these claims for the first time in a successive post-conviction petition. [292]

Because post-conviction applications require detailed factual allegations, preparing a successive post-conviction petition is a time consuming and expensive process, potentially requiring hundreds of hours of investigative and legal work, and thousands of dollars in expenses.[293] This intense amount of work is especially required when there is a pending execution date, or when a potential successive post-conviction claim requires substantial investigation in advance of filing. Accordingly, much of the legal work in preparing a subsequent post-conviction petition occurs during the process of preparing the application to be filed.[294]

Despite the importance of subsequent post-conviction petitions in capital cases and the hours of preparatory work necessary to draft such petitions, Tennessee has never guaranteed indigent prisoners any right to representation for the preparation of a subsequent post-conviction application. If the grounds of a successive state post-conviction petition arise while the prisoner has not yet initiated proceedings in federal court, and if the prisoner has been represented by the OPCD, then, in practice, the OPCD typically continues to represent that individual.[295] If the grounds for the successive state post-conviction petition arise after the prisoner has initiated federal habeas corpus proceedings, often their Federal Defender will represent them in state court, will recruit pro bono counsel, or will request that the OPCD take the case.[296] While these various defender organizations advocate vigorously to find capable representation for their clients, this makeshift, ad hoc system for the provision of counsel falls far short of what is required by Chapter 154. Tennessee thus provides no mechanism of appointment and compensation of counsel—or payment of reasonable litigation expenses—for the preparation of a subsequent post-conviction application. This failure alone should preclude Tennessee from obtaining certification under Chapter 154.

---

[291] *Atkins v. Virginia*, 536 U.S. 304 (2002) (establishing a new rule of constitutional law prohibiting the execution of the intellectually disabled).
[292] *See*, Tenn. Code Ann. § 39-13-203(g)(1) (2021 amendment) (allowing all defendants sentenced prior the effective date of the amendment and whose conviction is final on direct review to petition for a determination of whether they are intellectually disabled); *see also, Keen v. State, 398 S.W.3d 594* (Tenn. 2012) (raising Atkins claim in motion to reopen) ; *Coleman v. State,* 341 S.W.3d 221 (Tenn. 2011). (same); *Howell v. State,* 151 S.W.3d 450 (Tenn. 2004) (same).
[293] Ex. JJJJ (Drew Decl. ¶ 12).
[294] *Id.*
[295] Ex. JJJJ (Drew Decl. ¶ 11).
[296] Ex. NNNN (Henry Decl. ¶ 3).

### C. Tennessee Does Not Guarantee Appointment of Counsel for Post-Conviction Forensic DNA Testing of Biological Evidence or Forensic Fingerprint Analysis.

Tennessee law permits any person convicted of a criminal offense to move the trial court after conviction for forensic DNA testing of biological evidence or forensic fingerprint analysis,[297] and specifically provides that any individual convicted of and sentenced for first-degree murder may file a petition for DNA and/or fingerprint analysis.[298] Thus, it is a post-conviction discovery device that affords access to evidence and information that may serve as the factual basis for claims raised in either state court or in a federal habeas corpus application.

However, Tennessee law does not provide an unqualified right to appointment of competent counsel and funding for attorney compensation and reasonable litigation expenses to prepare and litigate a motion for DNA or fingerprint analysis in capital cases. Rather, "the court may, at any time during proceedings instituted under this part, appoint counsel for an indigent petitioner."[299]

Tennessee provides no mechanism for the appointment of counsel to advocate for such a motion in a capital case, leaving the burden on the defendant to prove that that there is a "reasonable probability [ ] that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA [or fingerprint] analysis," the requested evidence still exists, that the evidence was never previously subjected to the requested analysis, and that the application for analysis will not unreasonably delay the petitioner's sentence and is made for the purpose of demonstrating justice.[300] The court is not required to hold a hearing to determine the necessity of this post-conviction relief even if a petitioner successfully complies with stringent pleading standards.[301] And the court may summarily deny motions when those requirements are not met, regardless of the strength of the merits of the petitioner's claim.[302] If a petitioner is told that the requested evidence does not exist but the petitioner disagrees, the court is not required to hold an evidentiary hearing to resolve that dispute of fact.[303] Without counsel to advocate on their behalf, many petitioners could be denied a meaningful opportunity to have potentially exculpating DNA tested or fingerprints analyzed. Tennessee's failure in this respect means that the state mechanism does not provide a guarantee of counsel during critical post-conviction proceedings and does not qualify for certification under Chapter 154.

---

[297] Tenn. Code. Ann. §§ 40-30-301 to-313 (DNA); Tenn. Code Ann. §§ 40-30-401 to -413 (fingerprint).
[298] Tenn. Code Ann. § 40-30-303 (DNA); Tenn. Code Ann. § 40-30-403 (fingerprint).
[299] Tenn. Code Ann. § 40-30-307 (DNA); Tenn. Code Ann. § 40-30-407 (fingerprint).
[300] Tenn. Code Ann. § 40-30-304 (DNA); Tenn. Code Ann. § 40-30-405 (fingerprint).
[301] Tenn. Code Ann. §, Provision of 40-30-304.
[302] Tenn. Code Ann. §, Provision of 40-30-304.
[303] *Buford v. State*, 2003 WL 1937110, at *6 (TN Ct. App. April 24, 2003).

## VIII. TENNESSEE'S APPLICATION DOES NOT ACCURATELY REFLECT THE REALITIES OF TENNESSEE'S POST-CONVICTION MECHANISM

Tennessee's Application does not accurately describe Tennessee's appointment scheme, and as a result it precludes full and meaningful participation on the part of the public in this administrative proceeding. The Attorney General should reject Tennessee's Application for certification on this basis.

A bedrock premise of any administrative process involving public comment is that the process will accurately and completely disclose the subject matter at issue to allow for meaningful comment. A member of the public is "entitled, of course, to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it. rebut it." [304] "Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation."[305]

As discussed in detail throughout this Comment, Tennessee's Application is rife with misrepresentations, inaccuracies, and material omissions, which include but are not limited to the following examples:

- Tennessee's application fails to recognize that indigent prisoners sentenced to death are not provided counsel during critical post-conviction proceedings,[306] stating simply and inaccurately that the state authorizes the appointment of counsel "upon request" by indigent capital defendants.[307] Tennessee ignores the rigorous pleading requirements for the initial, *pro se* petition that indigent prisoners must file without the benefit of appointed counsel.[308]
- Tennessee inaccurately states that the appointment of post-conviction counsel is timely "in view of time limitations on . . . federal collateral review," given the "one-year statute of limitations for filing a subsequent federal habeas corpus petition under 28 U.S.C. § 224(d)(2)," completely disregarding the fact that—should Tennessee's application for certification be granted—the statute of limitations for filing a subsequent federal habeas corpus petition would be reduced to 180 days,[309] and as a

[304] *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 289 n.4 (1974) (citing *Ohio Bell Telephone Co. v. Public Utilities Comm'n*, 301 U.S. 292 (1937), and *United States v. Abilene & S.R. Co.*, 265 U.S. 274, (1924)).
[305] *Bowman Transp., Inc.*, 419 U.S. at 289 n.4; *see also Williston Basin Interstate Pipeline Co. v. F.E.R.C.*, 165 F.3d 54 (D.C. Cir. 1999); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999) ("[T]he most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation"); *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1162 (9th Cir. 1980) (vacating and remanding an EPA order because of a failure to provide a meaningful opportunity to respond to findings).
[306] *Supra* § VII.
[307] Tenn. Appl. at 1.
[308] Tenn. Appl. at 4.
[309] 28 U.S.C. § 2263(a).

result, many prisoners who have sought post-conviction relief over the last 30 years would have been and will potentially be entirely precluded from seeking federal habeas relief under Chapter 154.[310]

Tennessee's application is devoid of any factual support to demonstrate how the state's post-conviction counsel appointment mechanism works in practice. Examples of the dearth of factual support include but are not limited to the following:

- While the state acknowledges the presumptive caps on expense payments during capital post-conviction proceedings, it provides no evidence that those presumptive caps are in any way sufficient to cover standard post-conviction litigation costs in less than extraordinary circumstances, nor do they demonstrate that courts do, in fact, approve costs that exceed those caps when appropriate.[311]
- Tennessee also attempts to skirt by unnoticed by simply stating that the provision of counsel is "reasonably timely" under 28 C.F.R. § 26.21. But the Application provides no empirical support for this assertion,[312] in direct contradiction of the empirical analyses attested to here.[313]
- While the application recites Tennessee Code Annotated § 40-30-205(c), which outlines the training and experience that counsel should have before being eligible to accept appointed capital post-conviction cases,[314] the state provides no evidence to show that these requirements are enforced in practice or comport with nationally recognized standards. As discussed above, they are not.[315]
- Tennessee ignores what it may consider inconvenient cases that demonstrate that in the last 30 years, many prisoners have, in fact, been appointed counsel who were not qualified to represent them in such complex, specialized proceedings[316] or who were being actively disciplined by the Tennessee Bar.[317]
- Even Tennessee's analysis of the compensation of OPCD attorneys and appointed private attorneys is incorrect and misleading.[318] In reality, OPCD attorneys make roughly $40,000 to $50,000 of what is earned by their counterparts in the Tennessee Attorney General's Office.[319]
- The state has provided no evidence to demonstrate that private appointed counsel is actually compensated at the rates established by Tennessee law,[320] or that private

[310] *Supra* pp. 24-25, 27.
[311] Tenn App. 10-11.
[312] Tenn. Appl. at 5.
[313] FDO Decl.; *Supra* § IV(A).
[314] Tenn. Appl. at 8.
[315] *Supra* § V(B).
[316] *Id.*
[317] *Id.*
[318] Tenn. Appl. at 10.
[319] Ex. SSSS (OPCD Government Att'y Pay Comparisons).
[320] Tenn. Appl. at 10; Tenn. Sup. Ct. R. 13, §(k).

> counsel is able to bill and receive payment for the full scope of their representation.[321]

By presenting plainly inaccurate, incomplete, and unexamined information, Tennessee's Application denies the public the ability to meaningfully comment on Tennessee's appointment scheme since 1995 and whether it should be certified. The Federal Defenders have also been required to go to great lengths to correct the inaccurate and incomplete record created by Tennessee, and even despite their best efforts over the last several weeks, the record remains underdeveloped due to breadth of information and the difficulty of locating and effectively summarizing relevant information from a 30-year period. The denial of reasonable requests for extension are the direct cause for the incomplete record presented herein.[322] Even so, this comment on behalf of the Federal Defenders is supported by real world evidence and thorough examination of Tennessee's assertions. The Attorney General should deny certification on the basis of Tennessee's failure to accurately describe its purported mechanism. Tennessee has failed to supply sufficient information for the public to comment on whether Tennessee's mechanism meets Chapter 154's requirements. The APA and the Due Process Clause require at least that much.

In the alternative, Tennessee should be required to supplement its initial application. Chapter 158 is intended to permit the development of a complete and accurate factual record on which the deciding agency can rely when reaching a conclusion.[323] Tennessee should be required to bear its burden of presenting sufficient evidence of Tennessee's alleged qualification of Chapter 154 certification, and commenters, including the Federal Defenders, should be permitted an opportunity to provide additional comments in response to Tennessee's supplement because insufficient time was permitted during this comment period.

## IX. THE ATTORNEY GENERAL CANNOT CERTIFY TENNESSEE'S MECHANISM BECAUSE CHAPTER 154 IS UNCONSTITUTIONAL

Even beyond the problems with Tennessee's appointment scheme, the Attorney General must deny Tennessee's application because Chapter 154 has three constitutional defects: (1) it impermissibly transfers to the Attorney General the authority to create the statutory standards and content; (2) it violates separation of powers by impinging on the judicial power; and (3) it violates due process by vesting the certification decision in the Attorney General.

---

[321] Should we have an opportunity to further develop the record, we would seek to introduce testimony from private counsel regarding their hours, pay, and whether they face implied or explicit pressure to write down their time.

[322] *Supra* pp. 19-20, n. 79, n. 84.

[323] *See* Court of Appeals Review of Certain Administrative Orders, H. Rep. No. 81-2122 (1950), as reprinted in 1950 U.S.C.C.A.N. 4303, 4306 (Congress anticipated that Chapter 158's review procedures would be sufficient because the record before the agencies "will be made in such a way that all questions for the determination of the courts on review, and the facts bearing upon them, will be presented and the rights of the parties will be fully protected.").

### A. Chapter 154 Violates the Nondelegation Doctrine.

Chapter 154 unconstitutionally delegates to the Attorney General the authority to certify that jurisdictions qualify for opt-in review. Article I of the U.S. Constitution vests the legislative powers in Congress. Because defining what constitutes competent counsel, reasonable expenses, and adequate compensation for state post-conviction representation is a legislative power—and not an executive one—Article I precludes Congress from transferring to the Attorney General the authority to create the statutory standards and content.

#### *1. The Constitution Prohibits Congress from Delegating Its Legislative Powers.*

The Constitution establishes a tripartite system of government that separates power among the three federal branches. Article I dictates that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." [324] It prescribes that laws be made according to "a single, finely wrought and exhaustively considered, procedure," including bicameralism and presentment.[325] Intrinsic to the separation of powers is the recognition that no branch may delegate its own power to another branch. Without this principle, the Constitution would be incapable of preventing tyranny, the very evil it was designed to vanquish.[326]

The nondelegation doctrine protects the constitutional separation of powers in part by prohibiting Congress from delegating its legislative powers and thereby circumventing this carefully crafted scheme.[327] Critically, the doctrine protects individual liberty,[328] promotes democratic accountability,[329] and preserves federalism.[330] These interests underscore the need for judicial enforcement of nondelegation principles.

---

[324] U.S. Const. Art. I, § 1.

[325] *INS v. Chadha*, 462 U.S. 919, 951 (1983); *see also Clinton v. City of New York*, 524 U.S. 417, 445 (1998) (invalidating Line-Item Veto Act because President cannot change or "effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7").

[326] *See* The Federalist No. 47 (Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many . . . may justly be pronounced the very definition of tyranny.").

[327] *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989); J.*W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 405–06 (1928).

[328] *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 722 (1986) ("Even a cursory examination of the Constitution reveals the influence of Montesquieu's thesis that checks and balances were the foundation of a structure of government that would protect liberty.").

[329] *See, e.g.*, *Loving v. United States*, 517 U.S. 748, 757–58 (1996) ("Article I's precise rules of representation, member qualifications, bicameralism, and voting procedure make Congress the branch most capable of responsive and deliberate lawmaking."); *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 57 (2015) (Alito, J., concurring) (noting that nondelegation ensures that citizens can readily identify the source of laws, thereby preventing government actors from "wield[ing] power without owning up to the consequences").

[330] States maintain their sovereign interests, in part, through their representatives' participation in the federal legislature, particularly the Senate. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550-51(1985).

The nondelegation doctrine bars Congress from abdicating its legislative function and transferring lawmaking power to another branch. Despite this well-established doctrine, Chapter 154 grants the Attorney General undirected discretion to create the standards and define key statutory provisions relevant to whether a jurisdiction qualifies for opt-in review, potentially changing the rules of the game for every death row inmate in a certified jurisdiction. By permitting the Attorney General to define the most critical terms in the statute, Chapter 154 grants the Attorney General what are best characterized as "legislative" powers.

*2. Chapter 154 Impermissibly Delegates "Legislative" Powers.*

Chapter 154 grants the Attorney General quintessentially legislative powers. It allows the Attorney General to determine "whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings," and requires him or her to "promulgate regulations to implement the certification procedure."[331] Chapter 154 provides no definition of the essential terms—like "reasonable" and "competent"—and provides no further guidance on what Congress intended the statute to accomplish.

The legislative powers to which Congress is exclusively entitled include those it delegated to the Attorney General in Chapter 154. "The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct. . . ."[332] Although the Constitution permits Congress to condition legislation on the administrative determinations of facts and even empower agencies to decide "the inferences to be drawn from [those facts]" in light of the legislature's "standards and declaration of policy,"[333] it must "sufficiently define[]" the "framework of the policy" to avoid a nondelegation problem.[334] Courts examine "the statute to see whether Congress . . . has itself established the standards of legal obligation, thus performing its essential legislative function, or . . . has attempted to transfer that function to others."[335]

Here, the delegation grants the Attorney General authority to make his or her own assessment of whether the State created a mechanism to appoint post-conviction counsel in capital cases and whether the State has standards of competency applicable to the appointment of those lawyers. *See* 28 U.S.C. § 2265(a)(1). Nowhere does Chapter 154 define any of the statute's central terms like "reasonable" and "competent." Nowhere does Chapter 154 make clear what standards the Attorney General should employ in making its determinations. Instead, Congress left not simply the implementation but the very creation of legislative policy to the Attorney General. In

---

[331] 28 U.S.C. § 2265(a)(1)(A), (b).
[332] *Yakus v. United States*, 321 U.S. 414, 424 (1944).
[333] *Id*. at 425.
[334] *Panama Refining Co. v. Ryan*, 293 U.S. 388, 429 (1935).
[335] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 530 (1935); *see also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 686 (1980) (Rehnquist, J., concurring) ("[T]he [nondelegation] doctrine ensures that courts charged with reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards").

this way, the legislature unconstitutionally circumvented "the hard choices, . . . which must be made by the elected representatives of the people."[336] Chapter 154 thus violates the nondelegation doctrine.

### 3. *Congress's Delegation to the Attorney General Fails the Intelligible Principle Test.*

As the Supreme Court has recently explained, "a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."[337] There is no "intelligible principle" which can save Chapter 154.[338] Although such a principle would inform the judicial analysis of the Article I challenge, Congress did not hand one down in passing the relevant legislation. As a result, the nondelegation violation remains, even under the Supreme Court's jurisprudence favoring inter-branch coordination over a more formalistic or textual reading of the Constitution's allocation of legislative, executive, and judicial powers.

Although affirming that Congress cannot delegate its legislative powers, the Court has recognized that "separation-of-powers principle[s] . . . do not prevent Congress from obtaining the assistance of its coordinate Branches."[339] The Court's modern "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad directives."[340] The Court developed the "intelligible principle" test to evaluate such congressional delegations of power. Under this test, if "Congress shall lay down by legislative act an intelligible principle to which the person or body [to whom the power is delegated] is directed to conform, such legislative action is not a forbidden delegation of legislative power."[341] When Congress lays down a sufficiently clear guiding principle, the Court has construed the powers delegated not to be "legislative," even if they involve some degree of discretion, because Congress itself has made all of the fundamental policy decisions.[342]

The amount of constitutionally required guidance depends on the "extent and character" of the power conferred.[343] Thus, while Congress "must provide substantial guidance on setting air standards that affect the entire national economy," far less guidance is necessary when the Executive determines relatively minor matters, like the definition of "country elevators."[344]

---

336 *Indus. Union Dep't, AFL-CIO*, 448 U.S. at 687 (Rehnquist, J., concurring).
337 *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion).
338 *See J.W. Hampton, Jr.*, 276 U.S. at 409.
339 *Mistretta*, 488 U.S. at 372.
340 *Id.*
341 *J.W. Hampton, Jr.*, 276 U.S. at 409.
342 *See id*. at 407; *see also United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 85 (1932) (noting that it is "clear" that "the legislative power of Congress cannot be delegated . . . . But Congress may declare its will, and, after fixing a primary standard, devolve upon administrative officers the 'power to fill up the details' . . . .").
343 *J.W. Hampton Jr. & Co.*, 276 U.S. at 406.
344 *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 475 (2001).

Congress must speak with particular clarity when it confers powers that "touch[] constitutionally sensitive areas."[345] "[A]ction . . . in areas of doubtful constitutionality[] requires careful and purposeful consideration by those responsible for enacting and implementing our laws."[346] In addition to being clear enough to guide the executive, the legislature's intelligible principle must enable courts to determine whether the delegate has acted within the bounds of the delegated authority and in accordance with Congress's expressed will.[347]

Chapter 154 is unconstitutional because it transfers what is best characterized as lawmaking authority and does so without setting forth any intelligible principle. An intelligible principle must include, at a minimum, standards or criteria to guide and restrain the exercise of delegated power. Chapter 154 contains no such thing. Aside from ensuring that indigent capital defendants are offered postconviction counsel in state court proceedings who are different from trial counsel,[348] Chapter 154 "establishes no criterion to govern the [Attorney General's] course."[349] Under the law, the Attorney General has total freedom to interpret "mechanism for appointment," "reasonable litigation expenses," "competent counsel," and "standards of competency," in any way it chooses.[350] Where the legislature has not "clearly delineate[d] the general policy,"[351] and it "supplies no standards," it cannot be said that there is an intelligible principle.[352] This is especially true when Congress legislates on a matter as sensitive, critical, and historically significant as the Great Writ.[353] Given the character and significance of the power that Chapter 154 confers, and the guidance it fails to provide, it violates the nondelegation doctrine.

---

[345] Laurence H. Tribe, American Constitutional Law 987 (3d ed. 2000).

[346] *Greene v. McElroy*, 360 U.S. 474, 507 (1959); *see also Kent v. Dulles*, 357 U.S. 116, 129 (1958) ("If . . . 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress."); Cass R. Sunstein, Nondelegation Canons, 67 U. Chi. L. Rev. 315, 317 (2000) (noting that the nondelegation doctrine's "most convincing claim" is "that certainly highly sensitive decisions should be made by Congress").

[347] *See, e.g.*, *Yakus*, 321 U.S. at 423, 425 (courts must be able to see "in an appropriate proceeding" that there is a "substantial basis" for the executive action and that the "will of Congress has been obeyed"); *Indus. Union Dep't, AFL-CIO*, 448 U.S. at 686 (Rehnquist, J., concurring).

[348] *See* 28 U.S.C. § 2261.

[349] *Panama*, 293 U.S. at 415.

[350] 28 U.S.C. § 2265(a)(1).

[351] *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946).

[352] *A.L.A. Schechter*, 295 U.S. at 541.

[353] Legal and other sources show that "[t]he right . . . to claim the benefit of the writ of habeas corpus," *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823), is among the "rights of the citizen guaranteed by the Federal Constitution." *Slaughter-House Cases*, 83 U.S. 36, 79 (1872). Congress passed the Habeas Corpus Act of 1867 with the understanding that such legislation would define the habeas privilege protected by the Suspension Clause. *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 101–02 (1868); *Ex parte Royall*, 117 U.S. 241, 247–48 (1886); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807); *see, e.g.*, Jordan Steiker, *Incorporating the Suspension Clause: Is There A Constitutional Right to Federal Habeas Corpus for State Prisoners?*, 92 Mich. L. Rev. 862, 888 (1994) (explaining how "the [Supreme] Court cast habeas as an affirmative individual right of constitutional dimension").

"[T]he doctrine of separation of powers . . . is at the heart of our Constitution. . . ."[354] The doctrine protects the constitutional structure by requiring that each branch retain its essential powers and independence. Nondelegation precludes Congress from ceding its Article I legislative powers. In passing Chapter 154, Congress contravened nondelegation principles, giving legislative power to the Attorney General and failing to limit that transfer of power with any intelligible principle. Because "the basic policy decisions governing society are to be made by the Legislature,"[355] Chapter 154 is unconstitutional. "To leave this aspect of the constitutional structure alone undefended would serve only to accelerate the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was constitutionally reserved for the people's representatives in order to protect their liberties."[356]

### B. Chapter 154 Unconstitutionally Delegates Judicial Functions to the Attorney General.

Article III of the U.S. Constitution vests the judicial power in the federal courts. Because the federal courts decide cases in which an individual files a writ of habeas corpus, Article III precludes Congress from transferring the certification authority to the Attorney General rather than leaving it with the judiciary. Although Chapter 154 provides an appellate court with jurisdiction to review the Attorney General's certification determination, the Constitution's commitment of the judicial power requires federal courts to make all habeas-related determinations in the first instance. By subjecting the affected parties to a constitutionally illegitimate proceeding presided over by a constitutionally illegitimate decisionmaker, the certification regime violates their rights and runs afoul of the Constitution's requirement of a separation of powers.

#### 1. *The Judicial Power to Decide Federal Habeas Cases Belongs Exclusively to an Independent Federal Judiciary.*

As described above, the U.S. Constitution creates a separation of powers between the three branches of the federal government. It vests the "judicial power" in the U.S. Supreme Court and the inferior federal courts that Congress has created.[357] To protect that power and maintain the judiciary's independence, the Constitution provides that federal judges have no term limits and cannot have their compensation reduced.[358] Through these protections, "the Framers sought to ensure that each judicial decision would be rendered, not with an eye toward currying favor with Congress or the Executive, but rather with the '[c]lear heads . . . and honest hearts' deemed 'essential to good judges.'"[359] Although "the three branches are not hermetically sealed from one another,"[360] Article III is nevertheless "an inseparable element of the constitutional system of

---

[354] *Buckley v. Valeo*, 424 U.S. 1, 119 (1976).
[355] *Mistretta*, 488 U.S. at 415 (Scalia, J., dissenting).
[356] *Gundy*, 588 U.S. at 169 (Gorsuch, J., dissenting).
[357] U.S. Const. Art. III, § 1.
[358] *See id*.
[359] *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting 1 Works of James Wilson 363 (J. Andrews ed. 1896)).
[360] *Id*. at 483.

checks and balances" that "both defines the power and protects the independence of the Judicial Branch."[361]

The federal courts' Article III judicial power cannot be divided and shared with the other branches of government. According to the rudimentary concept of separation of powers the judicial power "'can no more be shared' with another branch than 'the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.'"[362] The "judicial power" consists of the powers to independently, finally, and effectually decide federal law questions arising under the court's jurisdiction.[363] Article III thus prohibits Congress from encroaching on the power of federal courts by delegating its authority to legislative or executive entities.[364]

While Congress may lawfully confer quasi-judicial authority to administrative agencies and non-Article III courts in some circumstances, those instances demonstrate why a similar assignment of power is inappropriate in the federal habeas context. The U.S. Supreme Court has analyzed various factors to determine whether a congressional action runs afoul of Article III: "the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, . . . the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III."[365] These cases underscore the difference between statutorily-created rights and constitutional rights. When Congress funnels constitutionally-based claims—like those made in accordance with the Great Writ[366]—to executive or legislative bodies, these "substantial inroads into functions that have traditionally been performed by the Judiciary cannot be characterized merely as incidental extensions of Congress' power to define rights that it has created."[367] Instead, "such inroads suggest unwarranted encroachments upon the judicial power of the United States, which our Constitution reserves for Art. III courts."[368]

---

[361] *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (plurality opinion).

[362] *Stern*, 564 U.S. at 483 (quoting *United States v. Nixon*, 418 U.S. 683, 704 (1974)).

[363] *See, e.g.*, *Crowell v. Benson*, 285 U.S. 22, 60 (1932) ("In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function."); *see generally* James S. Liebman & William F. Ryan, "Some Effectual Power": The Quantity and Quality of Decisionmaking Required of Article III Courts, 98 Colum. L. Rev. 696 (1998).

[364] *See Stern*, 564 U.S. at 484 ("Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III.").

[365] *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986) (holding that the Commission's jurisdiction over common law counterclaims did not violate Article III); *see also Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 594 (1985) (holding Congress's binding arbitration scheme under the Federal Insecticide, Fungicide, and Rodenticide Act was valid use of its Article I powers).

[366] The writ of habeas corpus—though codified by statute—is "antecedent to statute, throwing its root deep into the genius of our common law." *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (internal quotations omitted). It is "an integral part of our common-law heritage . . . ." *Id.* (internal quotations omitted).

[367] *N. Pipeline*, 458 U.S. at 84 (plurality opinion).

[368] *Id.*

Federal habeas resides at the heart of the power reserved to Article III courts. In the Founding era, Chief Justice John Marshall—author of *Marbury v. Madison*—declared that habeas is a "great constitutional privilege."[369] Its special status was apparent in the beginning; the Constitution provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."[370] Indeed, habeas made the list of national rights protected under the Fourteenth Amendment's Privileges and Immunities Clause.[371] Congress, during the Reconstruction, gave state prisoners the constitutional privilege of plenary federal habeas review of allegedly unconstitutional detention.[372] Legal and other sources show that "[t]he right . . . to claim the benefit of the writ of habeas corpus,"[373] is among the "rights of the citizen guaranteed by the Federal Constitution."[374] Congress passed the Habeas Corpus Act of 1867 with the understanding that such legislation would define the habeas privilege protected by the Suspension Clause.[375] The individual right to habeas corpus thus possesses the "origins and importance" undeniably subject to the core, indivisible judicial power.

Article III ultimately requires that the federal courts retain exclusive jurisdiction over cases in federal habeas. The Constitution permits Congress to grant or withdraw Article III jurisdiction.[376] Once Congress grants the federal courts jurisdiction, however—as it has in the federal habeas context—it cannot encroach on the judiciary's power to interpret the law and decide the cases and controversies.[377] Chapter 154 contravenes the constitutional requirement of

---

[369] *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807).
[370] U.S. Const. Art. I, § 9.
[371] *See Slaughter-House*, 83 U.S at 79.
[372] *See* Act of Feb. 5, 1867, 2nd Sess., ch. 28, §1, 14 Stat. 385, 385-86; *Slaughter-House*, 83 U.S. at 69 (citing *In re Turner*, 24 F. Cas. 337 (C.C.D. Md. 1867)); *see also Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 101–02 (1868); *Ex parte Royall*, 117 U.S. 241, 247–48 (1886); *DHS v. Thuraissigiam*, 591 U.S. 103, 128–29 (2020); *Lehman v. Lycoming Cnty. Child.'s Servs. Agency*, 458 U.S. 502, 518 n.3 (1982) (Blackmun, J., dissenting); *Griffin's Case*, 11 F. Cas. 7, 23–24 (C.C.D. Va. 1869) (Chase, C.J.); Anthony G. Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial, 113 U. Pa. L. Rev. 793, 886 (1965) (federal courts "viewed the 1867 statute as imperatively demanding federal discharge of state prisoners held for trial or after state trial-court conviction, notwithstanding the availability of still unexhausted state remedies") (cited in *State of Ga. v. Rachel*, 384 U.S. 780, 786 n.4 (1966), as "a remarkably original and comprehensive discussion of the issues").
[373] *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823).
[374] *Slaughter-House*, 83 U.S. at 79.
[375] *See, e.g.*, *Yerger*, 75 U.S. at 101–02; *Royall*, 117 U.S. at 247–48; *Ex parte Bollman*, 8 U.S at 95.
[376] *See, e.g., City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 291 (2013) ("Congress has the power to tell the courts what classes of cases they may decide—that is, to define their jurisdiction—but not to prescribe how they decide those cases.").
[377] *See City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (declaring that "[w]hen the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is" and any contrary expectations from the legislative branch "must be disappointed"); *Lindh v. Murphy*, 96 F.3d 856, 872 (7th Cir. 1996 (en banc), *rev'd on other grounds*, 521 U.S. 320 (1997) ("Once the judicial power is brought to bear by the presentation of a justiciable case or controversy within a

separation of powers by granting the Attorney General the power to make certification determinations in the first instance. The question is ultimately whether Congress's action represents an "encroachment or aggrandizement of one branch at the expense of the other."[378] Based on the manner in which the scheme operates, the answer is yes.

*2. Chapter 154 Transfers Judicial Power from the Federal Judiciary to the Attorney General.*

When Congress originally adopted AEDPA, Chapter 154 did not assign any authority to the Attorney General. Instead, the statute made expedited procedures available to state respondents if *a court* found that "the State establishe[d] by rule of its court of last resort or by statute a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in the unitary review proceedings . . . ."[379] Under this initial scheme, the Court of Appeals for the Sixth Circuit conclude that "[t]here is no indication that Tennessee has complied with 28 U.S.C. § 2261(b) and (c)," thus, Chapter 154 did not apply to the proceedings. [380]

In 2006, Congress—frustrated by several judicial determinations that states did not meet the opt-in requirements[381]—amended Chapter 154 through the USA PATRIOT Improvement and Reauthorization Act of 2005.[382] The amendments removed the power from the courts to determine whether a state could invoke the expedited review procedures and transferred that authority to the Attorney General, who now possesses the power to certify that jurisdictions qualify. The Attorney General's certification is a precondition to the application of Chapter 154.[383] Under the amended scheme, the Attorney General determines "whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent [capital] prisoners," and that the State "provides standards of competency for the appointment of counsel in [these] proceedings."[384] As

statutory grant of jurisdiction, the federal courts' independent interpretive authority cannot be constitutionally impaired.").

[378] *United States v. Johnston*, 258 F.3d 361, 367 (5th Cir. 2001) (quoting *Schor*, 478 U.S. at 850 (citations and internal quotation marks omitted)).

[379] Pub. L. No. 104-132, § 107(a), 110 Stat. 1214 (1996).

[380] *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997).

[381] *See, e.g.*, *Ashmus v. Woodford*, 202 F.3d 1160, 1168 (9th Cir. 2000) (California); *Ortiz v. Stewart*, 149 F.3d 923 (9th Cir. 1998) (Arizona); *Neelley v. Nagle*, 138 F.3d 917 (11th Cir. 1998) (Alabama); *Moore v. Reynolds*, 153 F.3d 1086 (10th Cir. 1998) (Oklahoma); *Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998) (Oklahoma); *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) (Oklahoma); *Mata v. Johnson*, 99 F.3d 1261 (5th Cir. 1996) (Texas); *Ward v. French*, 989 F. Supp. 752 (E.D.N.C. 1997); *Lockett v. Puckett*, 980 F. Supp. 201 (S.D. Miss. 1997); *Mills v. Anderson*, 961 F. Supp. 198 (S.D. Ohio 1997); *Scott v. Anderson*, 958 F. Supp. 330 (N.D. Ohio 1997); *Williams v. Cain*, 942 F. Supp. 1088 (W.D. La. 1996); *Zuern v. Tate*, 938 F. Supp. 468 (S.D. Ohio 1996); *Austin v. Bell*, 927 F. Supp. 1058 (M.D. Tenn. 1996); *Ryan v. Hopkins*, No. 4:CV95-3391, 1996 WL 539220 (D. Neb. 1996).

[382] Pub. L. No. 109-177, § 507(c)(1), 120 Stat. 192 (2006).

[383] *See* 28 U.S.C. § 2261(b)(1).

[384] 28 U.S.C. § 2265(a)(1)(A), (C).

amended, Chapter 154 also authorizes the Attorney General to "promulgate regulations to implement the certification procedure."[385]

The Attorney General's role in certification compromises the structural guarantee that federal courts will hold judicial power. Under Chapter 154, the Attorney General's determination that a state is certified has a compulsory effect. *See* 28 U.S.C. § 2261(b)(1). The statute purports to prohibit courts reviewing habeas petitions from reconsidering or nullifying the Attorney General's certification decision; instead they merely determine whether "counsel was appointed pursuant to that [state post-conviction] mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent."[386] In other words, the Attorney General's determination ties the federal habeas court's hands.[387] The scheme Congress adopted here thus represents an unconstitutional departure from Article III. The judicial power is diminished and divided by the statute's empowerment of the Attorney General, and Chapter 154 thus improperly aggrandizes the executive branch at the expense of the judicial branch.[388]

Further evidence of how the certification regime infringes upon the judicial power comes from the ways in which a certification determination undermines the courts' ability to manage their own affairs. Courts have, in exercising judicial power, identified "[c]ertain implied [judicial] powers [that] must necessarily result to our Courts of justice, from the nature of their institution."[389] These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs. . . ."[390] Fundamentally, the judicial power requires that courts retain the "power to control [their] own docket."[391]

Chapter 154, however, imposes internal deadlines upon district courts and courts of appeals to decide and enter a final judgment on any federal habeas corpus application to which the opt-in provisions apply.[392] Critically, 28 U.S.C. § 2266 mandates that such adjudication "shall be given priority . . . over all noncapital matters."[393] Similarly, § 2266 imposes internal deadlines upon the

---

[385] 28 U.S.C. § 2265(b). The Attorney General promulgated regulations that became effective in 2013. *See* 28 C.F.R. §§ 26.20–26.23.
[386] 28 U.S.C. § 2261(b)(2).
[387] *See* The Attorney Gen.'s Auth. in Certifying Whether A State Has Satisfied the Requirements for Appointment of Competent Counsel for Purposes of Capital Conviction Review Proceedings, 2009 WL 7513855, at *6 (O.L.C. Dec. 16, 2009) ("Similarly, the amended law unambiguously requires the federal habeas courts to give effect to the Attorney General's certification determinations. . . . [S]ection 2261(b)(1) [] expressly requires courts to accept the Attorney General's certification under section 2265(a)(1)(A) in determining whether the expedited procedures apply.").
[388] *See Johnston*, 258 F.3d at 367.
[389] *United States v. Hudson*, 11 U.S. 32, 34 (1812).
[390] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630 (1962)).
[391] *Clinton v. Jones*, 520 U.S. 681, 706 (1997).
[392] *See* 28 U.S.C. § 2266. Specifically, section 2266(b)(1)(A) directs district courts to enter a final judgment "not later than 450 days after the date on which the application is filed, or 60 days after the date on which the case is submitted for decision, whichever is earlier." 28 U.S.C. § 2266(b)(1)(A).
[393] 28 U.S.C. § 2266(a). Although section 2266 contemplates that district courts may "delay" deciding an application, this delay may not exceed 30 days, and must be supported by "a written order making a finding,

courts of appeals.[394]As to both the district courts and courts of appeals, the State may "enforce a time limitation" by petitioning for a writ of mandamus to a higher court.[395]

These provisions, which flow from the Attorney General's certification determination, are inconsistent with the duty of Article III courts to "exercise their best judgment," and to "conscientiously" decide capital cases.[396] Although Congress has the authority to regulate the practice and procedure of federal courts, "temporal strictures upon *actual judicial decisionmaking* are scarce."[397] Chapter 154 ultimately controls substantive judicial decision-making and "by itself 'tell[s] judges when, how, or what to do.'"[398] It creates judicial timelines and priorities, and provides the State with a means to seek enforcement of these provisions.[399] In total, certification triggers the application of a statute that deprives the judiciary of its ability to manage its own affairs.

The separation of powers violation is underscored by the legislative history of the USA PATRIOT Improvement and Reauthorization Act. According to the test the Supreme Court articulated in *Schor*, "the concerns that drove Congress to depart from the requirements of Article III" help determine whether an Article III violation occurred.[400] Remarkably, the premise of the amendment that granted the Attorney General the authority to certify jurisdictions for opt-in was that the judiciary was partial and operated under a "conflict of interest."[401] On this theory, the expedited procedures' imposition of strict time limits upon the judiciary rendered the judiciary unable to fairly decide whether a jurisdiction should be certified.[402] For this reason, elected representatives who were transparently frustrated with judicial determinations that their states did

---

and stating the reasons for the finding, that the ends of justice that would be served by allowing the delay outweigh the best interests of the public and the applicant in a speedy disposition of the application." *id.* § 2266(b)(1)(C)(i). Section 2266 identifies three factors, among others, that "a court shall consider" in determining whether a delay is warranted, *id.* § 2266(b)(1)(C)(ii) and instructs that no delay "shall be permissible because of general congestion of the court's calendar." *id.* § 2266(b)(1)(C)(iii).

394 *See* 28 U.S.C. §§ 2266(c)(1)(A), 2266(c)(1)(B)(i), 2266(c)(1)(B)(ii).

395 28 U.S.C. § 2266(b)(4)(B), (c)(4)(B). Finally, section 2266 requires the Administrative Office of the United States Courts to submit to Congress an annual report on the compliance by the courts with the time limitations. *Id.* §§ 2266(b)(5)(A), 2266(c)(5).

396 *Cohens v. Virginia*, 19 U.S. 264, 404 (1821).

397 *Hadix v. Johnson*, 144 F.3d 925, 943 n.15 (6th Cir. 1998) (emphasis added), ab*rogated on other grounds by Miller v. French*, 530 U.S. 327 (2000).

398 *Miller*, 530 U.S. at 346 (quoting *French v. Duckworth*, 178 F.3d 437, 449 (7th Cir. 1999) (Easterbrook, J., dissenting from denial of rehearing en banc)).

399 Although the Supreme Court in *Miller v. French* ultimately rejected an argument that section 3626(e)(2) of the Prison Litigation Reform Act violated the separation of powers by imposing an internal deadline upon the judiciary, the Court only reached this conclusion after first finding that the section did not implicate judicial decision-making. *See* 530 U.S. at 346, 349. The Court in *Miller* cautioned that it was not deciding "whether there could be a time constraint on judicial action that was so severe that it implicated these structural separation of powers concerns." *Id.* at 350.

400 478 U.S. at 851.

401 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extended remarks of Rep. Flake).

402*See id*.; *see also* 152 Cong. Rec. S1620 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl).

not meet Chapter 154 requirements decided that a "neutral party"— the Attorney General—should decide.[403] If ever the concerns that drove Congress to diminish the judiciary's power would implicate separation-of-powers issues, this is the scenario.[404] The legislative branch infringed upon the judicial branch's authority because it disagreed with the courts' conclusions and questioned their ability to exercise power impartially.

The Constitution seeks to protect individuals (and our government) from the types of structural incursions that prevent the judiciary from independently resolving cases and controversies. The Supreme Court has explained that "our Constitution unambiguously enunciates a fundamental principle—that the 'judicial Power of the United States' must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence."[405] The power is sacrosanct in the context of private rights to liberty, including habeas corpus.[406] In diminishing the judicial power in the habeas context and transferring the certification authority to the Attorney General, Congress disregarded the constitutional command.

3. *Judicial Review Before the D.C. Circuit Does Not Cure Chapter 154's Constitutional Defects.*

The 2006 amendment's provision of judicial review of the Attorney General's determination does not alleviate the Article III separation-of-powers violation. Unlike laws that created positions for magistrates to assist federal judges, the certification scheme provides no judicial control over the Attorney General's decision-making process. Moreover, the Chapter 154 scheme still interferes with the traditional allocation of judicial power, truncating the role that federal district courts play in resolving federal habeas petitions. For these reasons, the prospect of judicial review does not save the statute.[407]

[403] *See* 152 Cong. Rec. S1620 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl).
[404] *See United States v. Will*, 449 U.S. 200, 217–18 (1980) ("A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government.").
[405] *N. Pipeline*, 458 U.S. at 60 (plurality opinion).
[406] *SEC v. Jarkesy*, 603 U.S. 109, 127–28 (2024) ("we have repeatedly explained that matters concerning private rights may not be removed from Article III courts"). Habeas corpus protects the private right to liberty – freedom from unlawful restraint – which is a classic example of a private right in Article III terms. *See, e.g.*, *I.N.S. v. St. Cyr*, 533 U.S. 289, 305 (2001) ("The writ of habeas corpus has always been available to review the legality of Executive detention."); *Boumediene v. Bush*, 553 U.S. 723, 743, (2008) (observing "the Framers considered the writ a vital instrument for the protection of individual liberty," which was made "evident from the care taken to specify the limited grounds for its suspension"). For a further discussion, see John M. Golden & Thomas H. Lee, Article III, the Bill of Rights, and Administrative Adjudication, 92 Fordham L. Rev. 397, 411 (2023) (discussing the likelihood that habeas corpus review must be considered a core Article III judicial function).
[407] *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (finding "[j]udicial review of [plaintiffs'] structural constitutional claims would come too late to be meaningful.").

Chapter 154 created a path for the judicial review of an Attorney General's decision to certify a state. It grants the Court of Appeal for the District of Columbia Circuit "exclusive jurisdiction" to review the determination.[408] Review is governed by Chapter 158 of Title 28.[409] The applicable standard of review is *de novo*.[410] That court's judgment is appealable to the U.S. Supreme Court.[411]

The nature of the judicial review provided does not alleviate the Article III concerns that Chapter 154 creates. "The claim . . . is about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker."[412] The provision of review in the Circuit Court of Appeals after-the-fact does not dispense with the constitutional harm. Even if "[t]hat harm may sound a bit abstract" the Supreme Court "has made clear that it is 'a here-and-now injury.'"[413] It is the proceedings in front of the Attorney General that constitute the violation.[414]

Important features differentiate the facially unconstitutional certification regime from other statutes that have been deemed legitimate. First, the scheme has none of the hallmarks of judicial control that have justified previous reallocations of judicial power. Several cases arising under the Federal Magistrates Act establish the principle that magistrates can perform some judicial functions because "the magistrate acts subsidiary to and only in aid of the district court" and "the entire process takes place under the district court's total control and jurisdiction."[415] By contrast, in the Chapter 154 certification process, however, the Attorney General possesses the sole authority to determine in the first instance whether a state is certified,[416] and, the Attorney General creates its own regulations to govern the certification process.[417] Unlike a magistrate, the Attorney General is not "subsidiary to" or "only in aid of" the judiciary. Instead, the Attorney General is fully independent of the courts, like an administrative agency.

One additional feature of the judicial review process further demonstrates the Article III violation. Whereas magistrates' recommendations are passed along to federal district court judges for consideration, the Chapter 154 procedure altogether bypasses the district courts. In vesting "exclusive jurisdiction" of certification determinations in the Court of Appeals for the District of

---

[408] 28 U.S.C. § 2265(c)(2).
[409] 28 U.S.C. § 2265(c)(1).
[410] 28 U.S.C. § 2265(c)(3).
[411] 28 U.S.C. § 2265(c)(2); 28 U.S.C. § 2350(a).
[412] *Axon*, 598 U.S. at 191.
[413] *Id.* at 191 (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212 (2020)).
[414] *See id.* ("[A]s to that grievance, the court of appeals can do nothing: A proceeding that has already happened cannot be undone. Judicial review of [plaintiffs'] structural constitutional claims would come too late to be meaningful.").
[415] *United States v. Raddatz*, 447 U.S. 667, 681 (1980); *see also Peretz v. United States*, 501 U.S. 923, 937 (1991) (finding that "there is no danger that use of the magistrate involves a congressional attempt to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating constitutional courts" (internal quotations omitted)).
[416] *See* 28 U.S.C. § 2265(a)(1).
[417] *See* 28 U.S.C. § 2265(b) ("The Attorney General shall promulgate regulations to implement the certification procedure under subsection (a)."); 28 C.F.R. §§ 26.20-26.23 (relevant regulations).

Columbia Circuit, the statute thwarts the normal structure and operation of judicial review. Rather than respecting the role that federal district courts play in reviewing habeas petitions, Chapter 154 transfers basic judicial power to the Attorney General and the Court of Appeal for the District of Columbia Circuit by requiring them to answer the general question of whether a state's mechanism for postconviction representation qualifies the jurisdiction for opt-in. The district court bypass is another method the statute adopts to diminish judicial authority in habeas litigation.

Although the U.S. Supreme Court has found that magistrates can perform many functions typically performed by Article III judges, it has insisted that Article III judges must preside over all dispositive matters adjudicated within a federal case or controversy.[418] The prohibitions on the authority of a magistrate to make dispositive rulings in a proceeding are instructive; the constitutional concerns they address are even less pressing than those raised by the Attorney General's certification power because the judiciary controls its magistrates and the certification regime produces immediate harms that can only be repaired by restoring judicial power in the Article III courts. The judicial review provided does not address the way in which Chapter 154 violates the structural guarantees made by Article III.

The separation of powers doctrine protects the constitutional structure by requiring that each branch retain its essential powers and independence. Chapter 154 impermissibly altered the allocation of essential powers, transferring judicial power from the federal courts to the Attorney General. The Supreme Court's opinion in *Stern* explains why this unconstitutional transfer must be identified and stopped:

> A statute may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely. Slight encroachments create new boundaries from which legions of power can seek new territory to capture. . . . [W]e cannot overlook the intrusion: illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure. We cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system . . . .[419]

For these reasons, Chapter 154 is unconstitutional.

### C. Chapter 154 Violates Due Process by Giving the Attorney General Authority Over Certification Decisions.

The Attorney General's certification authority under Chapter 154 is unconstitutional because it runs afoul of Article III and due process. These two constitutional components work in tandem to protect the rights of individual litigants by ensuring that the independent judiciary makes certain legal judgments. The Constitution's commitment to structural due process—a separation of powers and guarantee of adjudicatory independence assured by Article III and the Bill of

[418] *See Raddatz*, 447 U.S. at 673 (explaining that the non-Article III magistrate "has no authority to make a final and binding disposition" on dispositive motions).
[419] 564 U.S. at 502–03 (internal quotations and citations omitted).

Rights—precludes the Attorney General from certifying jurisdictions for opt-in because the Attorney General operates under a conflict of interest and is biased in the cause.

1. *Due Process Requires a Structurally Independent Judiciary to Decide Whether a Jurisdiction is Entitled to Chapter 154's Opt-In Provisions.*

As noted above, Article III vests the judicial power in the U.S. Supreme Court and the inferior federal courts that Congress has created.[420] To protect that power and maintain the judiciary's independence, the Constitution provides that federal judges have no term limits and cannot have their compensation reduced.[421] Through these protections, "the Framers sought to ensure that each judicial decision would be rendered, not with an eye toward currying favor with Congress or the Executive, but rather with the '[c]lear heads . . . and honest hearts' deemed 'essential to good judges.'"[422]

The right to due process, enshrined in the Bill of Rights and deeply embedded in our constitutional tradition, protects individuals against the arbitrary deprivation of life, liberty, or property.[423] Due process guards individual liberty by ensuring that the government provides certain procedural protections when making decisions that will affect a person's rights. While the concept is "flexible" and turns on what a "particular situation demands," it embodies key values including accuracy, fairness, the appearance of fairness, equality, predictability, transparency, and rationality.[424] It also requires the neutrality of key government decision-makers.[425]

Article III and due process work in tandem. The separation of powers and adjudicatory independence they promise have roots as deep as the idea of due process itself, though that understanding has been obscured over time. Two scholars have explained the connection between due process and the separation of powers:

> The individual-rights implications of Magna Charta are well appreciated, but not enough attention has been paid to their connection to the separation of powers. Indeed, those rights may be best understood not as a guarantee of a certain definition of liberty or property, or of abstract principles of "fairness" . . . but as a guarantee of judgment by an independent institution according to procedures designed to take the case out of the hands of the King.[426]

---

[420] *See* U.S. Const. Art. III, § 1.
[421] *See id.*
[422] *Stern*, 564 U.S. at 484 (quoting 1 Works of James Wilson 363 (J. Andrews ed. 1896)).
[423] *See* U.S Const. Amends. V, XIV.
[424] *Schweiker v. McClure*, 456 U.S. 188, 200 (1982) (internal quotation omitted).
[425] *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal . . . .").
[426] Nathan S. Chapman & Michael W. McConnell, Due Process as Separation of Powers, 121 Yale L.J. 1672, 1683 (2012).

Indeed, the separation of powers across the branches of government is not merely about the allocation of power, it is also about protecting individual liberty.[427]

The liberty-protecting function of Article III converges with due process to require, in some instances, that the judiciary itself make the contested determination. The Constitution effectively channels certain decisions to specific branches as a means of protecting individual rights.[428] Decisions about the Great Writ of habeas corpus implicate structural due process considerations.[429] Because the rights of individual habeas petitioners are at stake, the Constitution requires the decision-maker in the first instance be an independent adjudicator.[430] The structurally independent judiciary—equipped for the task by Article III—is the branch the Constitution requires to make the opt-in decision. The Attorney General is unable to act with sufficient independence to fulfill the constitutional guarantee of structural due process.[431]

2. *Chapter 154 Circumvents the Independent Judiciary, Empowering the Attorney General Who is Biased in Favor of the State and Against Petitioners.*

With the amendments to Chapter 154, Congress circumvented structural due process protections by transferring the authority to certify jurisdictions under Chapter 154 to the Attorney General. The Attorney General does not possess any of the hallmarks of an independent adjudicator. Indeed, the overwhelming potential for the Attorney General's bias to play a role in the certification process leaves no doubt that this arrangement runs afoul of the constitutional protections provided by Article III and the Due Process clause. That problem is exacerbated by the authority Congress gave the Attorney General to create regulations and determine what standards

---

[427] *See Boumediene v. Bush*, 553 U.S. 723, 742 (2008) ("The Framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers among three independent branches. This design serves not only to make Government accountable but also to secure individual liberty."); *Stern*, 564 U.S. at 483 ("The structural principles secured by the separation of powers protect the individual as well" (internal citations omitted)); *see also Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring) ("Even more importantly, the founders considered the separation of powers a vital guard against governmental encroachment on the people's liberties, including all those later enumerated in the Bill of Rights.").

[428] *See, e.g.*, Nicholas Quinn Rosenkranz, The Objects of the Constitution, 63 Stan. L. Rev. 1005, 1043 (2011) ("[T]he Due Process Clause . . . is essentially a separation of powers provision. Individual rights are indeed the beginning and the end of the clause. But separation of powers is the means and the meaning. The clause protects individual rights by assigning and channeling federal power.").

[429] *See Boumediene*, 553 U.S. at 746 (finding that the separation-of-powers doctrine "inform[s] the reach and purpose" of the Suspension Clause and the habeas rights of the detained).

[430] *See* Martin H. Redish & Lawrence C. Marshall, Adjudicatory Independence and the Values of Procedural Due Process, 95 Yale L.J. 455, 475–76 (1986) ("[P]articipation of an independent adjudicator is . . . an essential safeguard . . . . None of the core values of due process . . . can be fulfilled without the participation of an independent adjudicator.").

[431] *See id*. at 479 (contending that evidence supports the statement that "there can never be due process without a sufficiently independent adjudicator"); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995) (noting that "the doctrine of separation of powers is a structural safeguard").

will be used to assess the adequacy of a state's mechanism for providing post-conviction representation.

In some circumstances, "the nature of one's position or the relationship between that position and the outcome of adjudications disqualifies a person from serving with the impartiality mandated by the Due Process Clause."[432] Due process is violated when an adjudicator has "substantial" interest in the outcome of a case.[433] Where an official's executive responsibilities create partisan pressure on his or her adjudicatory responsibilities, there exists "a 'situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) necessarily involves a lack of due process of law . . . .'"[434] The risk of institutional bias is greater when governing statutes do not impose limits on the agency's decision-making.[435]

The Attorney General is the chief prosecutor of the United States.[436] The Attorney General oversees a massive operation involving many law enforcement and prosecutorial entities, including: the FBI; the DEA; Bureau of Alcohol, Tobacco, and Firearms; the Solicitor General; the Criminal Division; and the office of United States Attorneys. No entity of this sprawling apparatus involves the protection of a criminal defendant's right to effective legal representation. The position's primary interests align in stark opposition to the interests of the capital prisoners and organizations now challenging Chapter 154. The sub-sections below substantiate the Attorney General's partisan interests, making clear that "because of his institutional responsibilities," he has "so strong a motive to rule in a way" that would advance those interests at the expense of adjudicatory neutrality and independence.[437]

a. <u>The Attorney General has a Substantial Interest in Minimizing the Standards for Determining Whether Counsel is Competent.</u>

The Chapter 154 certification process asks the Attorney General to evaluate whether a state provides timely appointed, competent, and adequately resourced defense counsel, but the Department of Justice regularly opposes attempts to standardize or improve criminal defense performance. The Attorney General's institutional interests are advanced by narrowly defining competency of counsel and determining that state competency standards—no matter how undemanding—are sufficient. The office's core interests can be seen in the Attorney General's role as *amicus curiae* and advocate in the criminal and habeas corpus contexts. Those interests present

---

[432] *Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976).
[433] *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).
[434] *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 60 (1972) (quoting *Tumey*, 273 U.S. at 534); *see also Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*, 114 F.3d 840, 844 (9th Cir. 1997) (noting that due process is violated "where the decisionmaker, because of his institutional responsibilities, would have 'so strong a motive' to rule in a way that would aid the institution" (internal citation omitted)).
[435] *See Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C.*, 53 F.3d 1395, 1407 (4th Cir. 1995) (observing institutional bias may occur when agency interest is not limited by statutory restrictions).
[436] *See Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985).
[437] *Alpha Epsilon Phi Tau Chapter Hous. Ass'n*, 114 F.3d at 844 (internal citation omitted).

a conflict for the Attorney General in the role assigned to him or her under Chapter 154 as an independent arbiter of the adequacy of state post-conviction representation schemes.

As the Attorney General has stated, the law governing the 28 U.S.C. § 2255 cases which the Attorney General defends is substantively similar to and informed by law governing federal habeas corpus proceedings challenging state convictions.[438] The Attorney General has repeatedly asserted these institutional interests as an *amicus curiae* and advocate in the capital and habeas corpus context, including in cases involving constitutional challenges to the effectiveness of trial counsel.[439] Moreover, the Supreme Court has recognized the Attorney General's substantial

---

[438] *See* Brief for the United States as Amicus Curiae Supporting Petitioner (Warden), *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343, at *1 (arguing in state ineffective assistance of counsel case that "similar collateral attacks on federal criminal judgments will generally be adjudicated under the same standards.").

[439] See, for example, Briefs of United States as Amicus Curiae in *Day v. Crosby*, 2006 WL 139213 ("[T]he Court's decision in this case will influence, if not control, the resolution of cases presenting similar questions under 28 U.S.C. § 2255. *See, e.g.*, *United States v. Bendolph*, 409 F.3d 155 (3d Cir. 2005) (en banc). The United States therefore has a significant interest in this case.") (opinion at *Day v. McDonough*, 547 U.S. 198 (2006)); *Mayle v. Felix*, 2005 WL 435884 ("Because the Court's ruling will apply to collateral attacks on federal criminal judgments, the United States has a substantial interest in the outcome of this case.") (opinion at *Mayle v. Felix*, 545 U.S. 644 (2005)); *Rompilla v. Beard*, 2004 WL 2945403 ("Although this case involves a claim by a state prisoner under 28 U.S.C. § 2254, the Court's analysis will likely affect federal prisoners' ineffectiveness claims under 28 U.S.C. § 2255. The United States therefore has a substantial interest in the resolution of the question presented. The government has previously participated in numerous cases raising similar ineffective assistance of counsel questions.") (opinion at *Rompilla v. Beard*, 545 U.S. 374 (2005)); *Medellin v. Dretke*, 2005 WL 504490 ("The President, through subordinate Executive Branch officials, represents the United States in ICJ proceedings and in the United Nations (U.N.), and he has the lead role in determining whether, and if so, how, to comply with the determinations of such international bodies. The United States also has a substantial interest in the interpretation and effect given to international instruments to which it is a party.") (opinion at *Medellin v. Dretke,* 544 U.S. 660 (2005)); *Dretke v. Hayle*, 2003 WL 22970602 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the actual innocence exception applies in the same manner to collateral attacks by both federal and state prisoners. The United States has a substantial interest in the outcome of this case . . . .") (opinion at *Dretke v. Haley*, 541 U.S. 386 (2004)); *Wiggins v. Smith*, 2003 WL 470211 ("The United States has a substantial interest in the resolution of the question on which the Court granted certiorari, because claims of ineffective assistance of counsel are frequently asserted on collateral review in federal criminal cases. Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision will likely affect ineffectiveness claims brought by federal prisoners under 28 U.S.C. § 2255 as well.") (opinion at W*iggins v. Smith*, 539 U.S. 510 (2003)); *Bell v. Cone*, 2002 WL 122621 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision is also likely to affect ineffective-assistance-of-counsel claims brought by federal prisoners under 28 U.S.C. § 2255.") (opinion at *Bell v. Cone*, 535 U.S. 685 (2002)); *Mickens v. Taylor*, 2001 WL 1056945 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision likely will affect ineffective-assistance claims brought by federal prisoners under 28 U.S.C. § 2255 as well.") (opinion at *Mickens v. Taylor*, 535 U.S. 162 (2002)); *Roe v. Flores-Ortega*, 1999 WL 33611343 ("This case involves the proper standards for evaluating a claim that respondent's constitutional right to counsel was violated when his lawyer failed to perfect an appeal from the state court judgment entered on his plea of guilty.

interest in § 2254 cases by inviting the Solicitor General to submit *amicus curiae* briefs in cases involving the interpretation of § 2254.[440]

Since 2000, the Attorney General, through the Solicitor General's Office, has inserted itself into state prisoner habeas cases over twenty times.[441] It has done so overwhelmingly on the side of the States, arguing against the challenges to state convictions and sentences and never in support of the petitioners. In cases in which the Attorney General moved to file a brief as *amicus curiae*, it stated an interest in the outcome because "similar collateral attacks on federal criminal judgements will generally be adjudicated under the same standards."[442]

Relatedly, in every case in which the Attorney General has filed in support of a party, the Attorney General has advocated for the state and against the habeas corpus petitioner. The Attorney General does not file in support of the petitioner; in a few cases, it has filed briefs in support of

---

Because similar collateral attacks on federal criminal judgments will generally be adjudicated under the same standards, the United States has a substantial interest in the outcome of this case.") (opinion at *Roe v. Flores-Ortega*, 528 U.S. 470 (2000)); *Hopkins v. Reeves*, 1997 WL 720441 ("The Court's resolution of that question could affect the jury instructions given in federal capital proceedings.") (opinion at *Hopkins v. Reeves*, 524 U.S. 88 (1998)). The holding of the court of appeals in these cases-that the assumed futility of objection constitutes sufficient cause to excuse a failure to make timely objection-would, if sustained by this Court, substantially increase the susceptibility of otherwise final judgments in federal criminal cases to collateral attack.") (opinion at *Engle v. Isaac*, 456 U.S. 107 (1982)).

[440] *See, e.g.*, *Slack v. McDaniel*, 1999 WL 1223771 ("The Court has invited the Solicitor General to express the views of the United States on the following questions.") (opinion at *Slack v. McDaniel*, 529 U.S. 473 (2000)); *Felker v. Turpin*, 1996 WL 284697 ("The United States has an important interest in the resolution of those issues. In the Court's order granting certiorari and specifying the questions to be briefed, the Court invited the Solicitor General to file a brief expressing the views of the United States.") (opinion at *Felker v. Turpin*, 518 U.S. 651 (1996)).

[441] *See Kahler v. Kansas*, 589 U.S. 271, 296 (2020) (constitutional requirements of insanity test); *Kansas v. Carr*, 577 U.S. 108 (2016) (joint penalty phrase trials); *Ryan v. Gonzales*, 568 U.S. 57 (2013) (competency during federal habeas corpus proceedings); *Whorton v. Bockting*, 549 U.S. 406 (2007) (retroactivity of *Crawford v. Washington*); *Burton v. Stewart*, 549 U.S. 147 (2007) (non-retroactivity of *Blakely v. Washington*); *Day v. McDonough*, 547 U.S. 198 (2006) (timeliness of petition); *Hill v. McDonough*, 547 U.S. 573 (2006) (timeliness of petition); *Mayle v. Felix*, 545 U.S. 644 (2005) (timeliness of petition); *Gonzalez v. Crosby*, 545 U.S. 524 (2005) (timeliness of petition); *Rompilla v. Beard*, 545 U.S. 374 (2005) (ineffective assistance of counsel); *Medellin v. Dretke*, 544 U.S. 660 (2005) (Vienna Convention); *Florida v. Nixon*, 543 U.S. 175 (2004) (ineffective assistance of counsel); *Dretke v. Haley*, 541 U.S. 386 (2004) (actual innocence in sentencing of non-capital petitioner); *Yarborough v. Alvarado*, 541 U.S. 652 (2004) (voluntariness of confession); *Schriro v. Summerlin*, 542 U.S. 348 (2004) (non-retroactivity of *Ring v. Arizona*); *Price v. Vincent*, 538 U.S. 364 (2003) (double jeopardy); *Wiggins v. Smith*, 539 U.S. 510 (2003) (ineffective assistance of counsel); *Bell v. Cone*, 535 U.S. 685 (2002) (ineffective assistance of counsel); *Mickens v. Taylor*, 535 U.S. 162 (2002) (trial attorney conflict of interest); *Tyler v. Cain*, 533 U.S. 656 (2001) (successive petitions); *Slack v. McDaniel*, 529 U.S. 473 (2000) (AEDPA's applicability to appeals of non-AEDPA petitions); *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (ineffective assistance of counsel); and *Portuondo v. Agard*, 529 U.S. 61 (2000) (prosecutorial misconduct).

[442] *See, e.g.*, Brief for the United Sates as Amicus Curiae Supporting Petitioner (Warden), *Roe v Flores-Ortega*, 528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343, at *1.

neither party.[443] The Attorney General has argued for lower quality counsel for state defendants, and for tighter procedural restrictions on federal habeas to state prisoners. The Attorney General has never argued that a state petitioner received ineffective assistance of trial counsel. Not once has the Attorney General argued that a particular petitioner's case fits within the procedural guidelines of § 2254 and ought to be heard, instead persistently urging the Court to dismiss or deny petitions on procedural grounds.

The Attorney General has also advocated against robust postconviction review. For example, in one case, the Attorney General argued that "ordinary and reasonable principles of finality" should foreclose a prisoner's ability to make a claim of actual innocence on a second federal habeas petition.[444] In another, it argued against extending the actual innocence exception to the cause-and-prejudice requirement to non-capital cases.[445]

The Attorney General's consistent, one-sided interests implicate its role as the certifying authority under Chapter 154. Even though standards for competency promulgated by the states or other organizations do not fix the Sixth Amendment standard for effective assistance, "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable."[446] Thus, the Attorney General is influenced by a desire to approve less demanding standards for competency because courts may draw upon those standards in future cases when facing claims of ineffective assistance.

In furtherance of this interest, the Attorney General has submitted a number of amicus briefs in the United States Supreme Court in cases specifically involving ineffective assistance of counsel arising from habeas corpus petitions challenging state convictions.[447] In every such case the Attorney General has opposed the petitioner's claim of ineffective assistance of counsel and urged a less rigorous standard of performance or denial of relief.[448]

Two cases in which the Supreme Court ruled that trial counsel was constitutionally ineffective illustrate that the Attorney General has argued forcefully for both the denial of habeas

[443] *See Ramirez v Collier*, 596 U.S. 411 (2022); *Shoop v. Twyford*, 596 U.S. 811 (2022); *Nance v. Ward*, 597 U.S. 159 (2022).
[444] Brief for the United States as Amicus Curiae, *Felker v. Turpin*, 1996 WL 277112, at *47–48 (opinion at *Felker v. Turpin*, 518 U.S. 651 (1996)).
[445] Brief for the United States as Amicus Curiae Supporting Petitioner (Warden), *Dretke v. Haley*, 2003 WL 22970602, at *19 (arguing that an "extension of the actual innocence exception to noncapital sentencing would impose unacceptable burdens on finality, comity, and scarce federal judicial resources") (opinion at *Dretke v. Haley*, 541 U.S. 386 (2004)).
[446] *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *see also Wiggins*, 539 U.S. at 524.
[447] *See, e.g., Gonzales*, 568 U.S. 57; *Rompilla*, 545 U.S. 374; *Wiggins,* 539 U.S. 510; *Bell*, 535 U.S. 685; *Mickens*, 535 U.S. 162; *Flores-Ortega*, 528 U.S. 470; *Strickland*, 466 U.S. 668.
[448] *See* Briefs for the United States as Amicus Curiae: *Rompilla*, 2004 WL 2945403; *Wiggins*, 2003 WL 470211; *Bell*, 2002 WL 122621; *Mickens*, 2001 WL 1056945; *Flores-Ortega*, 1999 WL 33611343; and *Strickland*, 466 U.S. 668 (1984).

relief and for what the Court determined to be unconstitutionally low standards for defense representation.[449] In both cases, the Supreme Court rejected the Attorney General's position.

In *Rompilla*, the Court held that defense counsel's failure to examine the file in the defendant's prior conviction for rape and assault at the sentencing phase of capital murder trial fell below the level of reasonable performance, and that this failure was prejudicial to defendant, warranting habeas relief. The Attorney General asserted that defense counsel acted reasonably in concluding that further investigation into the defendant's background was unwarranted. The Attorney General incorrectly asserted that:

> [T]he professional norm, as recognized in *Wiggins* and the ABA standards the Court cited, is for counsel *to make efforts to discover* all reasonably available evidence by, first, conducting an interview with the defendant and then, based on that interview, acquiring all *relevant* records - which is precisely what counsel did in this case. Reading *Wiggins* more broadly, to impose an inflexible rule that counsel must always procure all reasonably available records, would render *Wiggins* inconsistent with this Court's decisions in *Strickland* and *Burger v. Kemp*, both of which recognized that courts may not impose rigid checklists on counsel but must evaluate an attorney's performance in view of the totality of circumstances, and both of which upheld investigations where counsel failed to seek the defendant's records after conducting interviews of the defendant and family members.[450]

The Court rejected the Attorney General's view of what qualifies as constitutionally adequate representation, specifically rejecting the position the government took at oral argument with regard to counsel's duty to investigate the defendant's prior criminal record:

> At oral argument, the United States, arguing as an *amicus* in support of Pennsylvania, maintained that counsel had fulfilled their obligations to investigate the prior conviction by obtaining the rap sheet. Tr. of Oral Arg. 44-45. But this cannot be so. The rap sheet would reveal only the charges and dispositions, being no reasonable substitute for the prior conviction file.[451]

---

[449] Brief for the United States as Amicus Curiae Supporting Respondent (Secretary, Pennsylvania Department of Corrections), *Rompilla*, 2004 WL 2945403, at *30 (arguing, unsuccessfully, that counsel was not deficient for failing to obtain and review records regarding prior convictions that were used in aggravation during the penalty phase because such records "were simply not relevant") (opinion at *Rompilla*, 545 U.S. 374 (2005)); Brief for the United States as Amicus Curiae Supporting Respondent (Warden), *Wiggins*, 2003 WL 470211, at *17 (arguing, unsuccessfully, that there was no applicable "standard for counsel's duty to investigate a capital defendant's background[, n]or should any such quasi-mandatory duty be created") (opinion at *Wiggins*, 539 U.S. 510 (2003)).

[450] Brief for United States as Amicus Curiae, *Rompilla*, 2004 WL 2945403 at *11 (emphasis in the original, citations omitted).

[451] *Rompilla*, 545 U.S. at 385, n.3.

The Attorney General also opposed relief in *Wiggins v. Smith* where the Court again found that defense counsel was ineffective. Mr. Wiggins's counsel failed to investigate petitioner's life history beyond obtaining a presentence investigation report and department of social services records, thus falling far short of prevailing professional standards. The Attorney General, however, argued that defense counsel was not ineffective, citing in part the psychologist retained by defense counsel. The Court specifically addressed this point:

> For its part, the United States emphasized counsel's retention of the psychologist. But again, counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background. Though Stejskal based his conclusions on clinical interviews with Wiggins, as well as meetings with Wiggins' family members, Lodging of Petitioner, his final report discussed only petitioner's mental capacities and attributed nothing of what he learned to Wiggins' social history.[452]

In *Wiggins*, as in *Rompilla*, the Attorney General took on the role of an adversary to capital defendants and sought to lower the bar for what constitutes competent defense representation.

That the standards relevant to Chapter 154 apply specifically to the competency of state *post-conviction* representation does not dilute the Attorney General's substantial litigation interest. After all, the U.S. Supreme Court has held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."[453] Given that the adequacy of initial-review counsel is determined under *Strickland*, which refers to the "guid[ing]" role that prevailing standards of practice play in the analysis, the Attorney General's interest in those standards remains substantial in this particular context. It is simply not enough to assert that the Attorney General is disinterested in state criminal convictions and state habeas proceedings. That is not true and has never been true.

b. <u>The Attorney General has a Substantial Interest in the Certification Outcome Due to Its Role as an Advocate for and Partner with State Prosecutors and Law Enforcement.</u>

The Attorney General regularly serves as an advocate for law enforcement who partner with the states and for state prosecutors who are parties to the certification process. Allowing the Attorney General to decide whether to certify a jurisdiction with which it has partnered raises due process concerns.[454] The Attorney General's consistent work with state prosecutors, particularly

---

[452] *Wiggins*, 539 U.S. at 532 (internal citations omitted).
[453] *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).
[454] *See In re Oliver*, 333 U.S. 257, 278 (1948) (Rutledge, J., concurring) (finding a due process violation where a state's grand-jury scheme "combines in a single official . . . historically separate powers"); *Trans World Airlines, Inc. v. Civ. Aeronautics Bd.*, 254 F.2d 90, 91 (D.C. Cir. 1958) ("The fundamental requirements of fairness in the performance of [quasi-judicial] functions require at least that one who participates in a case on behalf of any party . . . take no part in the decision of that case by any tribunal on which he may thereafter sit."); *Walker v. City of Berkeley*, 951 F.2d 182, 185 (9th Cir. 1991) (ruling that due process is violated by "allowing the same person to serve both as decisionmaker and as advocate for

on capital cases, demonstrates that it cannot also serve as a neutral decision maker in the certification context.

Further evidence of the Attorney General's long-standing partnership and alliance with state prosecutors and law enforcement is the extent of its training programs and joint projects with those state actors. For example, Department of Justice officials are members of the Association of Government Attorneys in Capital Litigation ("AGACL"), an association of state and federal prosecutors.[455] In additional to an annual conference and other training projects, the AGACL is involved in developing a brief bank, in conjunction with the National District Attorneys Association, National Association of Prosecutor Coordinators, and the National Association of Attorneys General, to be shared among state and federal prosecutors.

The Bureau of Justice Assistance ("BJA"), a division in the Office of Justice Programs under the supervision of the Attorney General, has long provided local and state law enforcement training on a wide variety of topics.[456] The Department of Justice formalized this association by joining with the National District Attorneys Association to create the National Advocacy Center, located on the University of South Carolina campus in Columbia, South Carolina, where training facilities for American prosecutors at all levels—federal, state and local—are concentrated in one facility. Indeed, the Department of Justice transferred its central training facility for federal prosecutors from Washington, D.C. to the National Advocacy Center.

The Department of Justice also offers funding to support state prosecutors in a variety of ways.[457] And, as explained in more detail below, the Attorney General has now been tasked by the President with encouraging states to seek capital charges, ensuring states have drugs to perform executions, and attempting to overrule Supreme Court precedents that limit the government's authority to impose the death penalty. The Attorney General has also commanded "the relevant U.S. Attorney's Offices . . . to assist local prosecutors in pursuing death sentences under state law against the 37 commuted inmates" to whom President Biden granted clemency.[458] Given that certification would further advance the interests of its law enforcement partners—and interests tied to those the Attorney General herself has identified as a priority—there is no doubt the certifying authority is biased.

---

the party that benefited from the decision"); *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) (noting that due process requires administrative decision makers "to function as neutral and impartial arbiters" and "assiduously refrain from becoming advocates for either party") (internal quotations omitted); *Harrison v. McBride*, 428 F.3d. 652, 669 (7th Cir. 2005) (decision makers show bias in violation of due process when they "forsake the role of impartial arbiter and instead assume the role of advocate").

[455] *See* Association of Government Attorneys in Capital Litigation, History, http://agacl.com/history/ (last visited Oct. 5, 2025).

[456] *See* U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Assistance, National Training and Technical Assistance Center, at https://bjatta.bja.ojp.gov/about (last visited Oct. 5, 2025).

[457] *See, e.g.*, U.S. Dep't of Justice, Grants https://www.justice.gov/grants (last visited Oct. 5, 2025).

[458] Memorandum from Pam Bondi, Att'y Gen., U.S. Dep't of Justice, to All Department Employees (Feb. 5, 2025) https://www.justice.gov/ag/media/1388526/dl?inline (last visited Oct. 5, 2025).

c. <u>There Exists a Risk of Actual Bias or Prejudgment Because the Attorney General's Process Combined the Adjudicative Function with the Law Enforcement Function.</u>

When a decision-maker with dual roles (adjudicative and law enforcement) mixes those roles together, there is a heightened risk that the process has compromised structural due process guarantees. Here, the manner in which the Attorney General promulgated regulations about the certification process demonstrates that it conflated its role as an advocate with its role as the adjudicator. The Attorney General's August 22, 2017 Memorandum indicated that the office would consult the Capital Case Section of the Criminal Division—a group that assists in the prosecution of federal capital cases and defends against federal capital habeas petitions.[459] The consultation is particularly troubling because a federal district court had previously found that the Attorney General's consultation with the chief of the Capital Case Unit when promulgating an earlier rule on certification "raise[d] serious questions" about whether the "rule was so tainted by bias that it was not a valid exercise of rulemaking authority."[460] This earlier consultation suggests that the Attorney General will continue to sacrifice neutrality as the adjudicator and privilege his responsibilities as a prosecutor.[461] Under these circumstances, the Attorney General's bias is clear.

d. <u>The Attorney General has a Substantial Financial Interest in Employing Certification Standards that Fall Below Well-Established Norms.</u>

Allowing the Attorney General to determine whether a jurisdiction complies with the requirements of Chapter 154 violates due process because the Attorney General has a financial interest in ensuring that determinations regarding counsel competence, compensation, or expenses made under section 2265 do not increase federal financial obligations for representation in federal proceedings.[462] The existence of economic benefits flowing to an institutional body through its adjudicatory functions, though not a direct benefit to individual adjudicators, may be sufficient to state a claim of due process bias owing to a financial conflict of interest.[463]

---

[459] *See* Memorandum from Jeff Sessions, Att'y Gen., U.S. Dep't of Justice, to the Acting Ass't. Att'y Gen., Office of Legal Policy (Aug. 22, 2017), https://www.justice.gov/olp/page/file/1003426/download (last visited Oct. 5, 2025).

[460] *Habeas Corpus Res. Ctr. v. DOJ*, No. C 08-2649 CW, 2009 WL 185423, at *9 (N.D. Cal. Jan. 20, 2009).

[461] *See Ford v. Wainwright*, 477 U.S. 399, 416 (1986) (Marshall, J., writing) ("Perhaps the most striking defect in the procedures . . . is the State's placement of the decision wholly within the executive branch. . . . The commander of the State's corps of prosecutors cannot be said to have the neutrality that is necessary for reliability in the factfinding proceeding.").

[462] *See, e.g.*, *Gutierrez de Martinez v. Lamango*, 515 U.S. 417, 429 (1995) (noting that the Attorney General's conflict of interest included "sparing the purse" of the federal government).

[463] *See Tumey*, 273 U.S. at 523 ("[I]t certainly . . . deprives a defendant in a criminal case of due process of law[] to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case"); *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (upholding claim of bias based on pecuniary interest); *Jerrico*, 446 U.S. at 243 n.2 (characterizing the Gibson financial interest as professionals "competing" in the same field); *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 219 (1st Cir. 2004) (noting that "a pecuniary interest need not be personal to compromise an adjudicator's neutrality" where fine imposed would flow directly to the adjudicative

The range of issues the Attorney General has felt compelled to address through *amicus* arguments in the federal habeas proceedings of state prisoners demonstrates an institutional belief in the need to protect government resources in criminal appeals and collateral proceedings.[464] Several federal courts have deemed that reasonable standards for protecting indigent capital habeas petitioners in the Chapter 154 scheme would exceed those currently in place for competence, compensation, and expenses funded in federal representation.[465] Because the Attorney General is also committed to preventing resource-intensive changes to the provision of federal habeas counsel, these opinions underscore how Chapter 154 certification further implicates the Attorney General's interest in limiting government expenditures. One cannot expect the Attorney General – which already fears that decisions in state cases will skew federal competency standards – to require more of the states than the federal government requires of itself. Financial concerns, among others, undermine the Attorney General's ability to enforce meaningful standards in the Chapter 154 certification process.

---

body's budget); *see also Yamaha Motor Corp., U.S.A. v. Riney*, 21 F.3d 793, 798 (8th Cir. 1994) ("An indirect financial interest in the claim raises a question of impartiality.").

[464] *See, e.g.,* Brief for the United States as Amicus Curiae Supporting Petitioner (Director, Texas Department of Criminal Justice, Correctional Institutions Divisions), *Dretke*, 2003 WL 22970602, *1 (citing "substantial interest" in not extending the actual innocence exception to noncapital sentencing a section 2254 cases) (opinion at *Dretke*, 541 U.S. 386 (2004)); Brief for the United States as Amicus Curiae Supporting Petitioner (Director of Corrections), *Schriro v.*, 2004 WL 96767, *1 (noting that the rule at issue "has little direct effect on federal capital practice" but nonetheless expressing "a substantial interest in this case" and arguing against the retroactive application of the rule) (opinion at *Schriro*, 542 U.S. 348 (2004)); Brief for the United States as Amicus Curiae Supporting Respondent (Warden), *Fry v. Pliler*, 2007 WL 697886, *2 (citing "substantial interest" in harmless error standard applied to a section 2254 case because of limited circumstances where the standard could apply in federal habeas proceedings under section 2255) (opinion at *Pliler*, 551 U.S. 112 (2007)); Brief for the United States as Amicus Curiae Supporting Affirmance (State), *Padilla v. Kentucky*, 2009 WL 2509223, at *1 (noting Government's interest in maintaining guilty pleas because they resolve a "majority of federal criminal prosecutions") (opinion at *Padilla*, 559 U.S. 356 (2010)); Brief for the United States as Amicus Curiae Supporting Respondent (Warden), *Martinez*, 2011 WL 4071911, at *2 (citing a "substantial interest" given that federal law treats appointment of postconviction counsel as discretionary rather than mandatory) (opinion at *Martinez*, 566 U.S. 1 (2012)).

[465] *Compare Wright v. Angelone*, 944 F. Supp. 460, 466-67 (E.D. Va. 1996) (holding that Virginia did not qualify for the benefits of Chapter 154 because its 1995 standards of competency would permit an attorney with no experience with capital cases to serve as counsel in state habeas proceedings), and *Spears v. Stewart*, 283 F.3d 992, 1015 (9th Cir. 2002) (determining that a mechanism for the appointment of competent counsel that in part required counsel to have "demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases," met the Chapter 154 opt-in requirements on its face, although not in its application), *with* 18 U.S.C. § 3599 (requiring only experience handling felony appeals). *Compare also Colvin-El v. Nuth*, No. Civ. A. AQ 972520, 1998 WL 386403, *6 (D. Md. 1998) (holding that standards that required experience participating in at least two capital cases at the trial level would be insufficient given complexity of post-conviction review), and *Wright*, 944 F. Supp. at 467 (holding that Virginia's standards were inadequate because they did not require state habeas corpus experience), *with* 18 U.S.C. § 3599(c) (requiring at least one attorney appointed in federal capital post-conviction proceedings to have no less than three years' experience in appellate litigation in the jurisdiction of appointment).

In addition to the Attorney General's concrete interests in narrowly defined and weaker standards for determining whether state post-conviction counsel are competent, the Attorney General also has an institutional financial interest in ensuring that the determinations regarding counsel competence, compensation, and expenses made under § 2265 do not increase federal financial obligations for representation in federal proceedings.[466]

### 3. *Judicial Review After-the-Fact is Insufficient to Cure the Structural Due Process Violation*

The certification process set forth in Chapter 154 includes judicial review in the Court of Appeals for the District of Columbia, but this after-the-fact assessment does not suffice to cure the structural due process violation. Capital prisoners subject to Chapter 154 have a right to a neutral and independent determination in the first instance.[467] The availability of judicial review of a final agency decision is here "insufficient to avoid the irreparable harm that inheres in the biased administrative proceeding itself."[468]

Chapter 154 creates a path for the eventual judicial review of an Attorney General's decision to certify a state by granting the Court of Appeals for the District of Columbia "exclusive jurisdiction" to review the determination.[469] As explained above, Chapter 154's provision of judicial review, however, does not resolve the structural due process violation that the law engenders. The constitutional harm produced here simply cannot be cured by subsequent judicial review. "Submission to a fatally biased decision making process is in itself a constitutional injury."[470] The constitutional error is a structural one, requiring "automatic reversal."[471]

### 4. *The Legislative History Confirms that the Attorney General was Granted the Certification Authority Precisely Because He or She is Biased.*

The legislative history leaves no doubt that Congress transferred Chapter 154 certification authority from the courts to the Attorney General precisely because the Attorney General is biased. The premise of the transfer was that the judiciary was partial and operated under a "conflict of interest."[472] On this contrived rationale, Chapter 154's imposition of strict time limits upon the

---

[466] *See, e.g.*, *Gutierrez de Martinez*, 515 U.S. 417, 429 (1995) (noting that the Attorney General's conflict of interest included "sparing the purse" of the federal government); *see also Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 219 (1st Cir. 2004) (noting that "a pecuniary interest need not be personal to compromise an adjudicator's neutrality" where fine imposed would flow directly to the adjudicative body's budget).

[467] *See Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972) (rejecting argument that de novo trial is cure and explaining that litigant is "entitled to neutral and detached judge in the first instance").

[468] *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 221 (1st Cir. 2004); *see also AxonTC*, 598 U.S. at 191 (2023) (validating the legitimacy of a claim about being subjected to "an illegitimate proceeding, led by an illegitimate decisionmaker").

[469] 28 U.S.C. § 2265(c)(2).

[470] *United Church of the Med. Ctr. v. Med. Ctr. Com'n*, 689 F.2d 693, 701 (7th Cir. 1982); *see also Axon*, 598 U.S. at 191 (finding "[j]udicial review of [plaintiffs'] structural constitutional claims would come too late to be meaningful").

[471] *Neder v. United States*, 527 U.S. 1, 8 (1999).

[472] 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extended remarks of Rep. Flake).

judiciary rendered the judiciary unable to fairly decide whether a jurisdiction was certified.[473] For this reason, elected representatives who were transparently frustrated with judicial determinations that their states did not meet Chapter 154 requirements decided that the Attorney General was better equipped to ensure that Chapter 154 was implemented.[474] If ever the desires that drove Congress to diminish the judiciary's authority would implicate structural due process and separation-of-powers concerns, this is the scenario.[475] At bottom, the legislative branch infringed upon the judicial branch's authority because it disagreed with the courts' prior conclusions and wanted to empower a biased decision-maker who would reach the results those in power in Congress wished it to reach.[476]

Due process and Article III together require the judiciary to make contested determinations in the habeas corpus context. Rather than respect the constitutional command of structural due process, Congress contravened it, taking the authority from the judiciary to certify jurisdictions under Chapter 154 and giving it to the Attorney General. Because the Attorney General is biased and conflicted, he is incapable of providing any semblance of the neutrality and independence that is constitutionally required. For these reasons, Chapter 154 is unconstitutional on its face.

## X. THE ATTORNEY GENERAL SHOULD WITHDRAW THE FINAL RULE

The Department may not certify Tennessee because the Department of Justice has not lawfully promulgated regulations implementing the Chapter 154 certification process. There are several problems with the Final Rule, including that it is substantively inconsistent with Chapter 154, is arbitrary and capricious, and was promulgated in violation of the Administrative Procedure Act (APA).[477] The Habeas Corpus Resource Center and the Office of the Federal Public Defender for the District of Arizona previously sued the Department under the APA, alleging numerous procedural and substantive problems with the Final Rule.[478] As these and other legal issues are meritorious and have not been resolved, the Department should withdraw the Final Rule, undertake notice-and-comment rulemaking that complies with the APA, develop an appropriate Final Rule that comports with Congressional intent in enacting and judicial interpretations of Chapter 154,

---

[473] *See id.*; *see also* 152 Cong. Rec. S1620 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl).
[474] *See* 152 Cong. Rec. S1620 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl).
[475] *See United States v. Will*, 449 U.S. 200, 217–18 (1980) ("A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government.").
[476] In enacting the Innocence Protection Act, Congress apparently recognized that the Attorney General is actually the one with a conflict of interest. 34 U.S.C. § 60305 provides grants for the improvement of capital representation and gives the Inspector General authority to oversee compliance with the terms of the grant. Congress believed that the Attorney General, "itself a prosecutorial agency," could not "be the sole oversight mechanism for a program designed to strengthen the defense function." *See* S. Rep. No. 107-315, at 30 (2002). Congress should have recognized that same institutional bias when amending Chapter 154; indeed, it appears more accurate to say that it did, and at that time decided in favor of a biased decisionmaker.
[477] 5 U.S.C. §§ 551–59 (2025).
[478] Complaint, *HCRC I* , No. C 13-4517 CW, 2014 WL 3908220 (N.D. Cal. Sept. 30, 2013), ECF No. 1.

and thereafter require Tennessee to submit a new application directed to properly issued opt-in regulations.[479]

APA challenges to the Final Rule are appropriate in this proceeding, and the Attorney General is estopped from arguing otherwise given its unequivocal positions in several lawsuits. Judicial estoppel applies when "a party assumes a certain position in a legal proceeding, succeeds in maintaining that position, and then, simply because his interests have changed, assumes a contrary position."[480] In the Northern District of California and the Ninth Circuit and in other cases, the Department repeatedly argued that challenges to the Final Rule should be brought as part of the certification process, rather than an independent lawsuit brought pursuant to the APA, because Section 2265(c)'s "direct-review provision affords a full and fair opportunity for judicial review of any cognizable claims arising from the certification process, *including challenges to the underlying regulations*."[481] The Ninth Circuit relied on that representation as a basis for finding the APA claims were not ripe, stating that "[d]elayed judicial review of the Final Regulations is unlikely to cause hardship to capital prisoners."[482] Accordingly, as part of its review of Tennessee's Application, the Department must consider and address the Federal Public Defenders' objections to the Final Rule itself.

### A. The Final Rule Is Arbitrary and Capricious

As explained in the Complaint jointly filed by the HCRC and the Office of the Federal Public Defender for the District of Arizona, and recognized by the district court in HCRC I, the Final Rule is arbitrary and capricious and should be set aside under 5 U.S.C. § 706(2)(A). A regulation is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[483]

First, the Final Rule erroneously characterizes certification decisions as orders rather than rules and as a result the Department of Justice will not permit the public to participate in the notice-and-comment rulemaking procedures.[484] In the Final Rule, the Attorney General asserted that certification determinations constitute orders, not rules, and therefore are not subject to the APA requirements governing rulemaking or those governing "adjudication required to be made or

---

[479] *See HCRC I*, No. C 13-4517 CW, 2014 WL 3908220 (N.D. Cal. Aug. 7, 2014), *vacated by HCRC II*, 816 F.3d 1241 (9th Cir. 2016).

[480] *Moses v. Howard Univ. Hosp*., 606 F.3d 789, 792 (D.C. Cir. 2010) (citation & alterations omitted); *see also Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 474 (6th Cir. 1988) (applying judicial estoppel against federal government).

[481] *See, e.g.*, Ex. TTTT (Opening Brief, *Habeas Corpus Res. Ctr. v. DOJ*, No. CR14-16928 (9th Cir. Feb. 11, 2015), at 23–26 (emphasis added)).

[482] *HCRC II*, 816 F.3d at 1253–54.

[483] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

[484] *HCRC I*, 2014 WL 3908220, at *9 ("[T]he Court finds that [certification decisions] are more properly characterized as rules rather than orders").

determined on the record after opportunity for an agency hearing."[485] In other words, the Attorney General believes that certification decisions are not subject to the APA's public notice-and-comment procedures. This is incorrect. The Attorney General's role in the certification process is to certify states, not to decide whether opt-in applies to a particular defendant, which would constitute and adjudication. Adjudication "resolve[s] disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals" and, in contrast with rulemaking, which has a prospective effect on individuals, adjudication "involve(s) concrete disputes, [that] have an immediate effect on specific individuals (those involved in the dispute)."[486] A certification decision does not affect a single individual but rather a broad class of people—current as well as future death row litigants throughout the particular applicant state.[487]

Certification decisions are properly characterized as rulemakings, so the Final Rule must provide for notice-and-comment procedures under 5 U.S.C. § 553(b). The bare requirement in 28 C.F.R. § 26.23 that the Attorney General publish the application and consider comments is not sufficient.[488] The Department must also provide notice of its proposed decision and offer an opportunity to comment on the decision. The Attorney General's August 22, 2017, memo provides that the public will be denied this opportunity.[489]

Moreover, current Department policy requires that "[a]ll final decisions, whether granting or denying certification, will be publicly available on the Department's website."[490] The Department complied with this policy when former Attorney General Merrick Garland denied the State of Arizona's application on January 17, 2025, by posting it on the Pending Requests & Final Decisions website. [491] Administrations, however, on January 20, 2025, the denial was removed, preventing the public from viewing and understanding the basis for that decision.

Second, the Final Rule improperly shifts the burden of proof from states seeking certification to interested parties. Under the Final Rule, a state seeking certification need only submit a "request in writing that the Attorney General determine whether the State meets the requirements for Chapter 154 certification."[492] A state is not required to submit any data in support of its application, such as proof that the purported mechanism actually is implemented in the state;

---

[485] 78 Fed. Reg. 58,174.
[486] *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994).
[487] *HCRC I*, 2014 WL 3908220, at *9.
[488] *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 445 (D.C. Cir. 2004) (notice must "provide sufficient factual detail and rationale" such that interested parties have an opportunity to "comment meaningfully") (citation omitted).
[489] *See* Mem. from Jeff Sessions, Att'y Gen., U.S. Dep't of Just., to the Acting Ass't. Att'y Gen., Office of Legal Policy (Aug. 22, 2017), at 2 ("After consideration of the recommendation [of the Office of Legal Policy] and all relevant materials, the Attorney General will issue a final decision on each application.").
[490] *Id*.
[491] DOJ, *Pending Requests & Final Decisions*, https://www.justice.gov/olp/pending-requests-final-decisions (visited on January 19, 2025).
[492] 78 Fed. Reg. 58,180, 58,184.

nor is it required to take any affirmative steps to prove eligibility for certification, such as comparing its mechanism to the benchmarks provided in the regulations.[493]

This is contrary to the requirements of Chapter 154.[494] The legislative history, purpose, and judicial construction of Chapter 154 require that a state applying for the benefits of Chapter 154 must bear the burden of strictly demonstrating the state's actual compliance with the statute's requirements. Congress unquestionably intended that states would have the burden of showing they meet the requirements of Chapter 154.[495] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[496] Further, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."[497] The Powell Committee Report, upon which Congress based Chapter 154, explicitly recognized that "[u]nless a State takes the affirmative steps required" by Chapter 154, it cannot implement the expedited procedures contemplated by the statute; that is, the Powell Committee explicitly placed the burden of proving compliance on the state seeking certification.[498] The certification process contemplated by the Final Rule does not put the burden on the state and

---

[493] *Id*. at 58,174 (stating that certification decisions "need not be supported by a data-intensive examination of the State's record of compliance with the established mechanism in all or some significant subset of postconviction cases").

[494] *See HCRC I*, 2014 WL 3908220, at *9–10. Title 28 of the United States Code § 2261(b)(1) requires that the "State [have] established a mechanism for providing counsel in postconviction proceedings." *See also* 28 U.S.C. § 2265(a)(1)(A) (Attorney General determines "whether the *State has established* a mechanism…") (emphasis added).

[495] As a general matter, there is a "normal assumption that an applicant is not entitled to benefits unless and until he proves his eligibility." *Lavine v. Milne*, 424 U.S. 577, 584 (1976*); see also Concrete Pipe & Prods. of Ca., Inc. v. Constr. Laborers Pension Trust for S. Ca.,* 508 U.S. 602, 626 (1993) ("[w]here the burden of proof lies on a given issue is, of course, rarely without consequence and frequently may be dispositive to the outcome of the litigation or application") (quotation omitted). Congress further made clear in Chapter 154 that "it is entirely the states' decision whether to opt-in – by so choosing the states are properly allocated the burden of proving compliance." *Ashmus*, 31 F. Supp. 2d 1183 (referencing the Powell Committee Report); *see also* Zuern, 938 F. Supp. at 472 ("Congress did not write § 2261 in terms of substantial compliance. Rather the section is replete with mandatory language."); Satcher *v. Netherland*, 944 F. Supp. 1222, 1245 (E.D. Va. 1996) ("Strict interpretation of the stringent opt-in requirements of the Act is not mere formality. Rather, strict interpretation is necessary to meaningfully effectuate the quid pro quo arrangement which lies at the core of Chapter 154."). Indeed, the United States Supreme Court explicitly has held that invoking the procedures of Chapter 154 constitutes an affirmative defense employed by the state in habeas corpus proceedings, *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998), and that government officials bear the burden of establishing their affirmative defenses, *see, e.g., Hunter v. Bryant*, 502 U.S. 224, 233 (1991).

[496] *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984), *overruled on other grounds, Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

[497] *Id*. at 843 n.9.

[498] 135 Cong. Rec. S13471-04, S13483.

is consequently arbitrary and capricious because it is inconsistent with the requirements of Chapter 154.[499]

Third, the Final Rule improperly permits certification of a state that does not actually comply with its mechanism. The idea that the Attorney General would certify a state that is not actually in compliance with its mechanism is wholly irrational.[500] A mechanism has not actually been "established" unless it is whole and actually followed in practice.[501] Without such a requirement, states can write whatever statutes or standards they want, but none of it matters if, in practice, they do not adhere to those standards. In turn, the quid pro quo by which states agreed to provide competent representation becomes nothing more than a false promise. As the Fourth Circuit noted in interpreting the pre-PATRIOT Act version of Chapter 154, "[i]t would be an astounding proposition if a state could benefit from the capital-specific provisions of AEDPA by enacting, but not following, procedures promulgated [to meet Chapter 154 requirements]."[502] The amendments to Chapter 154 did nothing to change this requirement.[503] The Department's only concession on this issue is to acknowledge that a state's "wholesale failure to implement one or more material elements of a mechanism described in a state's certification submission" might be a basis to deny certification.[504] But Congress did not intend that a state with something less than a "wholesale failure" could be certified, creating havoc for state and federal post-conviction lawyers. The Final Rule violates the APA and is invalid because, as discussed above, it is "contrary to clear congressional intent."[505]

Fourth, the Final Rule does not require sufficient information in the state's application to permit effective public comment. The Attorney General's use of an undefined "request in writing" as the basis of the certification process does not require a state seeking certification to provide the Attorney General with any information about the state mechanism or the basis of the state's eligibility for certification – much less specific, relevant facts about the timely appointment of counsel, state competency standards, compensation, payment of litigation expenses, and the functioning of those required features in practice – that the Attorney General must consider in making a certification decision.[506] The certification process provides for public comment on the

[499] 5 U.S.C. § 706(2)(A).
[500] *HCRC I*, 2014 WL 3908220, at *10 ("Common sense requires that a state must actually comply with its own mechanism, and the history, purpose and exhaustive judicial interpretation of chapter 154 also support this view.").
[501] 28 U.S.C. § 2265(a)(1).
[502] *Tucker v. Catoe*, 221 F.3d 600, 604–05 (4th Cir. 2000); *see also Lindh v. Murphy*, 521 U.S. 320, 327–31 (1997) (benefits of Chapter 154 are available "only if the State meets certain conditions" and it has "done its part to promote sound resolution of prisoners' petitions").
[503] *See Hall v. United States*, 566 U.S. 506, 516 (2012) ("We assume that Congress is aware of existing law when it passes legislation . . . .") (citation omitted).
[504] 78 Fed. Reg. 58,162-63.
[505] *Chevron*, 467 U.S. at 843 n.9.
[506] *HCRC I*, 2014 WL 3908220, at *9 (finding "the rule as written requires only a bare-bones request" and does not require a state "submit data demonstrating its record of compliance with its mechanism" nor "demonstrate that its procedures are adequate").

state's request,[507] but this is an impossible exercise because the state's request need not contain any relevant substance to which the public can respond. The Department has not offered any rational explanation for why it failed to require states to demonstrate the alleged bases for certification. By permitting applications without adequate content, the Final Rule is arbitrary and capricious because it "entirely fail[s] to consider an important aspect of the problem," *i.e.*, how to provide for effective public comment.[508]

Fifth, the Final Rule lacks sufficient definitional content on what constitutes competent counsel, particularly as to the catchall provision in § 26.22(b). Final regulations are arbitrary and capricious when they fail to provide "definitional content" for terms guiding agency action implementing a statute.[509] An agency is "obliged under the APA" to give content to statutory standards it is tasked with implementing,[510] and must not leave a prospective applicant "utterly without guidance as to what he must prove, and how."[511] "[I]t must be possible for the regulated class to perceive the principles which are guiding agency action."[512] 28 C.F.R. § 26.22(b)(2) permits certification if a state's competency benchmarks "otherwise reasonably assure a level of proficiency appropriate for State post-conviction litigation in capital cases." The Department has never disputed that "the Attorney General can base his certification decision on section 26.22(b) alone."[513] This broad catchall provides no clear guidelines as to what constitutes competent counsel for capital post-conviction review. Where, as here, the "agency's failure to state its reasoning or to adopt an intelligible standard is so glaring," courts "can declare with confidence that the agency action was arbitrary and capricious."[514] The "catch-all" in § 26.22(b)(2) provides no discernible standards and, if allowed to stand, would permit entirely subjective certification decisions.[515]

Sixth, the Final Rule lacks any definitional content for the vague and indeterminate terms contained in 28 C.F.R. § 26.22(a), including (1) when a prisoner is "unable competently to decide" whether to accept or reject an offer of counsel; (2) how detailed the findings must be under either § 2261(c)(1) or (c)(2), so that a summary statement could potentially qualify even though a

---

507 78 Fed. Reg. 58,162.
508 *State Farm*, 463 U.S. at 43; *see also Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993) (an agency must make public "everything that was before the agency pertaining to the merits of its decision"); *Exportal Ltda. v. United States*, 902 F.2d 45, 50 (D.C. Cir. 1990) ("In order to infuse a measure of public accountability into administrative practices, the APA mandates that agencies provide interested parties notice and an opportunity for comment before promulgating rules of general applicability."); *Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1023–24 (2d Cir. 1986) (holding agency action arbitrary and capricious for failure to provide public with information relied upon for its conclusions).
509 *Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999).
510 *Id*. at 661.
511 *S. Terminal Corp. v. EPA*, 504 F.2d 646, 670 (1st Cir. 1974).
512 *Pearson*, 164 F.3d at 661.
513 *HCRC I*, 2014 WL 3908220, at *11.
514 *See Checkosky v. SEC*, 139 F.3d 221, 226 (D.C. Cir. 1998), *recognized as superseded on other grounds*, *Marrie v. S.E.C.*, 374 F.3d 1196, 1198 (D.C. Cir. 2004).
515 *See Defs. of Wildlife v. Salazar*, 842 F. Supp. 2d 181, 187 (D.D.C. 2012) (agency's regulations violated the APA because definition "is so overbroad as to be absolutely meaningless").

summary statement would impair the federal court's ability to make its determination under § 2261(b)(2); (3) when a hearing on a decision to decline the offer of counsel is "necessary" under § 2261(c)(2); (4) what is necessary for a state court to validly say a prisoner had an "understanding" under § 2261(c)(2) such as whether a factual or rational understanding would suffice; and (5) what "legal consequences" the state court order must account for under § 2261(c)(2). For the reasons stated in the preceding paragraph the Final Rule's failure to define any of these highly contentious and context-variable terms violates the APA and will lead to arbitrary and capricious decision-making.

Seventh, the Final Rule completely fails to account for § 2261(e)'s requirement that an affected prisoner be able to seek the appointment of different counsel at any stage of the state post-conviction proceedings if that counsel is ineffective or incompetent in those proceedings. Consequently, the Final Rule undermines Congress's statutory scheme by allowing for the certification of a state's mechanism although no prisoner in that state was on notice of his or her right to counsel under § 2261(e). In the absence of that critical safeguard, the application of Chapter 154 would be inconsistent with Congress's design and would violate prisoners' due process rights by subjecting them to substantial risks of default or inadequate claim development after the time for protecting themselves has passed and without any prior notice that the safeguard was available.

Eighth, the Final Rule fails to address the effect of prior Chapter 154 jurisprudence and provides no guidance as to whether and how prior judicial interpretations of Chapter 154 will be considered during the certification process.[516] The Department's vague statements that prior jurisprudence "remains generally informative" and "supports many features" of the Final Rule only highlights the Final Rule's lack of guidance as to precisely how such case law will be considered in a certification determination.[517] The district court in *HCRC I* agreed, concluding the Final Rule "does not in any way address how prior judicial decisions will inform individual certification decisions."[518] Prior judicial decisions, a traditional tool of statutory construction, are relevant to whether a state meets the requirements of Chapter 154.[519] And many prior judicial decisions are exactly on point. For example, the Tennessee Attorney General submitted an application for certification, seeking certification based on a mechanism established in 1995. However, the Court of Appeals for the Sixth Circuit concluded in 1997 that "[t]here is no indication that Tennessee has complied with 28 U.S.C. § 2261(b) and (c)" and that Chapter 154 did not apply to pending proceedings.[520] The Final Rule says nothing about how the Department will apply the Sixth Circuit's case law. The Final Rule's silence on the effect of Chapter 154 jurisprudence is arbitrary and capricious and fails to consider an important aspect of the problem at hand.[521]

Ninth, the Final Rule is arbitrary and capricious for its failure to address *ex parte* communications between the United States Attorney General and state officials. *Ex parte*

---

[516] *See* 78 Fed. Reg. 58,183-84.
[517] *Id*. at 58,164.
[518] *HCRC I*, 2014 WL 3908220, at *11.
[519] *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987).
[520] *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997).
[521] *See State Farm*, 463 U.S. at 43.

communications have already infected Arizona's application, as described in the separate challenge to the Arizona mechanism. The Final Rule has nothing to say about this. The Final Rule merely states that the Attorney General will make any state's certification request publicly available. Because the public must be fairly apprised of issues before an agency, the Department's adherence to a policy of *ex parte* communications runs afoul of the APA.[522] In the HCRC litigation, the Department's primary defense to these ex *parte* communications was based on its erroneous belief that certifications are adjudications and not rulemakings.[523] That is incorrect. Regardless, *ex parte* communications are particularly egregious given the Attorney General's inherent bias and that the certification procedure in the Final Rule does not provide for notice and comment on the Attorney General's certification decision in any form and instead only includes publication and comment on the state application.[524]

Tenth, the Final Rule creates unavoidable conflicts of interest and the appearance of bias. Due process requires the Attorney General's certification decision making to be "impartial and disinterested,"[525] and protects against "even the probability of unfairness."[526] As the chief law enforcement officer for the United States Government, the Attorney General enforces the law of the United States, defends against challenges to federal criminal prosecutions, regularly cooperates with, and provides training, funding, and support for, local law enforcement, and participates directly in joint law-enforcement operations with the states. Given these roles, the Attorney General's decision making on opt-in inherently involves the risk of bias.[527] Congress has recognized that, given the Attorney General's role as a prosecutor, the Attorney General is not equipped to objectively assess state compliance with a mechanism for supplying competent defense representation.[528] The Final Rule fails to account for the Attorney General's inherent bias in evaluating whether a state provides competent defense representation and must be withdrawn.

Eleventh, the Final Rule does not provide actual notice to those most directly affected by the certification decision – death-sentenced prisoners. "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified."[529] The Final Rule requires the Department to publish notice of the state's application in the Federal

---

[522] *Portland Audubon Soc'y*, 984 F.2d at 1548.
[523] Ex. TTTT (Opening Brief, *Habeas Corpus Res. Ctr. v. DOJ*, No. CR14-16928 (9th Cir. Feb. 11, 2015), at 48).
[524] *HCRC I*, 2014 WL 3908220, at *13.
[525] *Marshall v. Jerrico*, 446 U.S. 238, 242 (1980).
[526] *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).
[527] *See, e.g., Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 428 (1995) (stating that under a statute that required the Attorney General to certify plaintiff was injured in the scope of employment—where the result was to shield the government from liability—the U.S. Attorney to whom the Attorney General delegated that authority "[i]nevitably . . . will feel a strong tug to certify, even when the merits are cloudy" and "his interest would certainly bias his judgment").
[528] Sen. Comm. on the Judiciary, Innocence Protection Act of 2002, S. Rep. 107-315 at 30 (2002); *see also* 34 U.S.C. § 60305 (shielding the Attorney General from direct and sole authority for evaluating state compliance with grant program designed to provide competent defense counsel).
[529] *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).

Register and to publish the state's application and (completely optional) supporting materials on the internet.[530] The Final Rule's failure to provide notice to death-sentenced prisoners is unlawful, arbitrary and capricious.

Twelfth, the Final Rule is arbitrary and capricious because it does not include procedures for decertification. There is no process for the public to request that the Attorney General revoke a state's certification. Just the opposite: Only a "State may request a new certification by the Attorney General to ensure the continued applicability of chapter 154 to cases in which State post-conviction proceedings occur after a change or alleged change in the State's certified capital counsel mechanism."[531] The Final Rule also provides that certification is valid for five years, at which time a state can request recertification.[532] But in the meantime, the state may change or abandon its mechanism in whole or in part, forcing district courts to decide on a case-by-case basis that Chapter 154 does not apply to a particular defendant. Because prisoners will have to alter their conduct during state appellate and post-conviction proceedings to preserve the statute of limitations under Chapter 154, and cannot risk missing their filing deadline on the chance that they will manage to convince a district court not to apply the 180-day statute of limitations under Chapter 154, the Final Rule fails to afford prisoners due process. The Department should withdraw the Final Rule and include a procedure for the public to request decertification of a state and suspension of a certification pending review.

**B. The Department of Justice Violated the Administrative Procedure Act in Promulgating the Final Rule**

In addition to being arbitrary and capricious, the Final Rule is invalid due to numerous procedural violations during the rulemaking process, including the Attorney General's failure to provide adequate notice that he would treat a certification decision as an order rather than a rulemaking.

The APA "requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'"[533] When an agency fails to notify interested parties of its position, its notice of proposed rulemaking has not "provide[d] sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully,"[534] or "an opportunity to present their objections."[535]

The Attorney General first informed the public that the certification decisions were adjudications rather than orders when the Final Rule was published.[536] There is a significant

---

[530] 28 C.F.R. § 26.23(b).
[531] 28 C.F.R. § 26.23(d).
[532] 28 C.F.R. § 26.23(e).
[533] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2001) (quoting 5 U.S.C. § 553(b)(3)).
[534] *Honeywell Int'l. Inc. v. EPA*, 372 F.3d 441, 445 (D.C. Cir. 2004) (citation omitted).
[535] *Jones v. Flowers*, 547 U.S. 220, 226 (2006).
[536] 78 Fed. Reg. 58,174.

difference between agency rulemaking and informal agency adjudications.[537] The Attorney General's belated disclosure of this substantial change in decision deprived the public of the ability to comment on whether a certification decision should be governed by the APA's more robust notice-and-comment rulemaking procedures or the requirements for informal adjudications.

The history of the Final Rule confirms that the public was not on notice that the Attorney General would treat certification decisions as adjudications and not rulemakings. In a version of the regulations proposed in 2008, the Attorney General indicated that certifications would be considered orders and not rules.[538] That version was withdrawn, and the newer version eliminated the characterization of certification decisions as orders.[539] Interested parties reasonably presumed that the Attorney General intentionally removed this provision from the new proposed rule. Indeed, this reasonable interpretation is supported by the fact that the 2011 Proposed Rule and 2012 Supplemental Notice included indicia of rulemaking for the certification decision, namely publication of the application followed by a notice-and-comment period. In light of the clearly differing interpretations of the certification process in the past, the Department was obligated to provide notice of their controversial view that rulemaking procedures would not apply to the certification decision.[540]

The district court in *HCRC I* found this error was harmless, because HCRC and FDO AZ commented on "the lack of full rule-making procedures" in the proposed regulations.[541] But there are more than procedural differences between rulemakings and adjudications. Rulemakings are forward-looking and set out standards that can be applied to more than one case, while adjudications are limited to the facts of a particular case and may not project forward to predetermine future scenarios.[542] Rulemakings are more likely to ensure uniform treatment across similarly situated states.[543] Treating certification as a rulemaking, rather than as an adjudication, gives the public notice of how the Attorney General will rule on particular applications. The failure to provide such notice was not harmless.

[537] *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 653–56 (1990) (explaining requirements for informal adjudications under 5 U.S.C. § 555).

[538] Certification Process for State Capital Counsel Systems, Final Rule, 73 Fed. Reg. at 75,327, 75,333 (Dec. 11, 2008).

[539] Removal of Final Rule, 75 Fed. Reg. 71,353 (Nov. 23, 2010); Notice of Proposed Rulemaking for State Capital Counsel Systems, 76 Fed. Reg. 11,705 (Mar. 3, 2011).

[540] *See Louis v. U.S. Dep't of Labor*, 419 F.3d 970, 976 (9th Cir. 2005) (notice that omitted "potentially controversial subject matter" was insufficient); *Habeas Corpus Res. Ctr. v. DOJ*, No. 08-cv-2649, 2009 WL 185423, at *8 (N.D. Cal. Jan. 20, 2009) (finding in a challenge to the 2008 version of the regulations that notice was inadequate when public commenters did not reflect any understanding of DOJ's controversial interpretation and likely would have disputed it had they been provided notice).

[541] *HCRC I*, 2014 WL 3908220, at *7.

[542] *See, e.g.*, Arthur Earl Bonfield, *State Administrative Policy Formulation and the Choice of Lawmaking Methodology*, 42 Admin. L. Rev. 121, 126 (1990).

[543] *Id*. at 129–30 ("[A]djudication is not an especially appropriate means for the formulation of legal principles that are in fact applicable to a broad class of persons because it permits low visibility, differential agency decisionmaking of an arbitrary or capricious nature").

The Attorney General should therefore withdraw the Final Rule.

## XI. IF THE ATTORNEY GENERAL CERTIFIES TENNESSEE, SHE SHOULD STAY HER CERTIFICATION DECISION PENDING REVIEW BY THE D.C. CIRCUIT AND SUPREME COURT

Under the Chapter 154 amendments, the Court of Appeals for the District of Columbia Circuit has exclusive jurisdiction to review the Attorney General's certification decision, subject to further review by the U.S. Supreme Court.[544] If the Attorney General were to certify the mechanism proposed by Tennessee, the Attorney General should stay the implementation of the certification decision pending de novo judicial review by the Court of Appeals and the Supreme Court. The preliminary injunction test is not directly applicable here as a procedural matter, but it is instructive as to why the Attorney General should stay the implementation of the certification decision here. Generally speaking, a party seeking a preliminary injunction must establish a likelihood of success on the merits; a likelihood of irreparable harm absent preliminary relief; that the balance of equities favors the party; and that an injunction would be in the public interest.[545] These are the factors the Court of Appeal will consider in determining whether a stay is warranted.[546] All of these factors are satisfied here. The factors are not considered in isolation but are weighed together, such that a particularly strong showing on one factor can justify a slight deficiency in another.[547] In this case, the balance of interests clearly justifies a stay.

In this case, the preceding sections demonstrate why the Federal Public Defenders are likely to succeed on the merits: Tennessee's mechanism is inadequate and should not be certified. Furthermore, the individual death-sentenced inmates, some of whom are clients of the Federal Public Defenders, and whose right to habeas relief hangs in the balance, are clearly likely to suffer irreparable harm if Tennessee's inadequate mechanism is certified. As described above, depending on the date of certification and how habeas corpus courts decide the retroactive applicability of Chapter 154's various provisions in individual cases, prisoners could be precluded or drastically limited from pursuing habeas relief, e.g., where a prisoner lacked access to counsel under § 2261(e) at the time his state post-conviction lawyer was providing ineffective representation, and a claim or evidence was lost.

The balance of equities clearly favors the capital petitioners whose habeas corpus claims are currently pending or who are between state and federal court. The public interest broadly favors granting death-sentenced an adequate opportunity to challenge the fairness of their conviction and sentence.[548] If Tennessee's mechanism is certified, the federal courts will be inundated with

---

[544] 28 U.S.C. § 2265(c)(2).
[545] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).
[546] Circuit Rule 18(a)(1); *see Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841, 844 (D.C. Cir. 1977).
[547] *See Washington Metro*., 559 F.2d at 843; Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958).
[548] *See, e.g.*, *Arizona v. Washington*, 434 U.S. 497, 516 (1978) (remarking on "the public's interest in fair trials designed to end in just judgments").

litigation over whether Chapter 154's deadlines and curtailed procedures apply to numerous pending cases in Tennessee federal courts. Even prisoners still on direct review in state court could be harmed by rushed petitions for certiorari or initial post-conviction petitions. Filings that attorneys had budgeted time for could have to be expedited. Absent a stay, post-conviction counsel will have to curtail their investigation of prisoners' cases. Federal habeas petitions could be filed without raising potentially meritorious claims. Prisoners could be executed without having had a full and fair review of their conviction and sentence.

The effects of certification are profound and wide-ranging.[549] Requiring Tennessee to wait for appellate review of the Department's decision imposes no material injury, and any such injury pales in comparison to the harm a prisoner and his counsel experience by hampering their already limited opportunities for habeas relief. Although many individuals would suffer irreparable harm if a certification decision went into effect, there is no countervailing concern of unfairness to the State.[550] Overall, a stay would preserve the status quo, whereas failure to stay the certification decision would result in major changes to an important aspect of the habeas process and result in significant harm to a number of individuals and the public interest in the fair and orderly administration of justice.

## XII. CONCLUSION

For the foregoing reasons, the Attorney General should deny Tennessee's Application for certification under Chapter 154 and withdraw the Final Rule. However, if the Attorney General certifies Tennessee's mechanism, implementation of the certification decision should be stayed pending review by the D.C. Circuit Court of Appeals and the Supreme Court, in order to maintain the status quo and prevent irreparable harm.

Dated: October 10, 2025

*/s/ Kelley J. Henry*_______
Kelley J. Henry
Chief, Capital Habeas Unit
**Federal Public Defender of**
**Middle District of Tennessee**
810 Broadway, Suite 200
Nashville, TN 37203
(615) 736-5047
kelley_henry@fd.org

OF COUNSEL:

*/s/ Jennifer Ware-Phillips*___
Jennifer Ware-Phillips
Kevin Adam
**WHITE & CASE LLP**
75 State Street
Boston, MA 02109-1814
(617) 979-9300
jennifer.ware@whitecase.com
kevin.adam@whitecase.com

[549] *HCRC I*, 2014 WL 2908220, at *9 (recognizing that "certification decisions will affect the rights of broad classes of individuals").
[550] *Washington Metro*., 559 F.2d at 843–44.

*/s/ Stephen Ferrell*________
Stephen Ferrell
Supervisor, Capital Habeas Unit
**Federal Defender Services of**
**Eastern Tennessee, Inc.**
800 South Gay Street, Suite 2400
Knoxville, TN 37929-9714
(865) 637-7979
stephen_ferrell@fd.org

written comments on the proposal to the FAA. No comments were received.

Class E airspace designations are published in paragraph 6006, of FAA Order 7400.9X dated August 7, 2013, and effective September 15, 2013, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designations listed in this document will be published subsequently in that Order.

## The Rule

This action amends Title 14 Code of Federal Regulations (14 CFR) part 71 by establishing Class E en route domestic airspace extending upward from 1,200 feet above the surface, at the Battle Mountain VORTAC navigation aid, Battle Mountain, NV, to accommodate IFR aircraft under control of Salt Lake City, Oakland and Los Angeles ARTCCs by vectoring aircraft from en route airspace to terminal areas. This action is necessary for the safety and management of IFR operations.

The FAA has determined this regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. Therefore, this regulation: (1) Is not a ''significant regulatory action'' under Executive Order 12866; (2) is not a ''significant rule'' under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that only affects air traffic procedures and air navigation, it is certified this rule, when promulgated, does not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act. The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the U.S. Code. Subtitle 1, Section 106 discusses the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it establishes controlled airspace at the Battle Mountain VORTAC, Battle Mountain, NV.

## Environmental Review

The FAA has determined that this action qualifies for categorical exclusion under the National Environmental Policy Act in accordance with FAA Order 1050.1E, ''Environmental Impacts: Policies and Procedures,'' paragraph 311a. This airspace action is not expected to cause any potentially significant environmental impacts, and no extraordinary circumstances exist that warrant preparation of an environmental assessment.

## List of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

## Adoption of the Amendment

In consideration of the foregoing, the Federal Aviation Administration amends 14 CFR Part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### § 71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of the Federal Aviation Administration Order 7400.9X, Airspace Designations and Reporting Points, dated August 7, 2013, and effective September 15, 2013 is amended as follows:

*Paragraph 6006 En Route Domestic Airspace Areas.*

* * * * *

**ANM NV E6 Battle Mountain, NV [New]**

Battle Mountain VORTAC, NV
(Lat. 40°34′09″ N., long. 116°55′20″ W.)

That airspace extending upward from 1,200 feet above the surface within an area bounded by Lat. 41°08′22″ N., long. 114°57′44″ W.; to Lat. 40°40′40″ N., long. 114°28′45″ W.; to Lat. 40°06′57″ N., long. 114°37′44″ W.; to Lat. 39°38′25″ N., long. 114°42′19″ W.; to Lat. 38°28′04″ N., long. 114°21′28″ W.; to Lat. 38°19′56″ N., long. 114°09′07″ W.; to Lat. 38°23′43″ N., long. 113°12′48″ W.; to Lat. 37°48′00″ N., long. 113°30′00″ W.; to Lat. 37°49′25″ N., long. 113°42′01″ W.; to Lat. 37°53′44″ N., long. 113°42′03″ W.; to Lat. 38°01′00″ N., long. 114°12′03″ W.; to Lat. 38°01′00″ N., long. 114°30′03″ W.; to Lat. 37°59′59″ N., long. 114°42′06″ W.; to Lat. 37°53′00″ N., long. 116°11′03″ W.; to Lat. 37°53′00″ N., long. 116°26′03″ W.; to Lat. 37°53′00″ N., long. 116°50′00″ W.; to Lat. 38°13′30″ N., long. 117°00′00″ W.; to Lat. 38°13′30″ N., long. 117°16′30″ W.; to Lat. 37°55′11″ N., long. 117°53′37″ W.; to Lat. 39°39′28″ N., long. 117°59′55″ W.; to Lat. 40°04′38″ N., long. 118°49′42″ W., thence to the point of beginning.

Issued in Seattle, Washington, on September 11, 2013.

**Christopher Ramirez,**

*Acting Manager, Operations Support Group, Western Service Center.*

[FR Doc. 2013–22846 Filed 9–20–13; 8:45 am]

BILLING CODE 4910–13–P

---

## DEPARTMENT OF JUSTICE

## 28 CFR Part 26

**[Docket No. 1540; AG Order No. 3399–2013]**

**RIN 1121–AA77**

## Certification Process for State Capital Counsel System

**AGENCY:** Office of the Attorney General, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** Chapter 154 of title 28, United States Code, provides special procedures for Federal habeas corpus review of cases brought by indigent prisoners in State custody who are subject to a capital sentence. These special procedures are available to States that the Attorney General has certified as having established mechanisms for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by such prisoners, and as providing standards of competency for the appointment of counsel in these proceedings. This rule sets forth the regulations for the certification procedure.

**DATES:** *Effective Date:* This rule is effective October 23, 2013.

**FOR FURTHER INFORMATION CONTACT:** Robert Hinchman, U.S. Department of Justice, Office of Legal Policy, 950 Pennsylvania Avenue NW., Washington, DC 20530, at (202) 514–8059 or *Robert.Hinchman@usdoj.gov*.

**SUPPLEMENTARY INFORMATION:** Chapter 154 of title 28, United States Code, makes special procedures applicable in Federal habeas corpus review of State capital judgments if the Attorney General has certified ''that [the] State has established a mechanism for providing counsel in postconviction proceedings as provided in section 2265'' and ''counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent.'' 28 U.S.C. 2261(b). Section 2265(a)(1) provides that, if requested by an appropriate State official, the Attorney General must

determine ''whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State [capital] postconviction proceedings brought by indigent prisoners'' and ''whether the State provides standards of competency for the appointment of counsel in [such] proceedings.''

Chapter 154 was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Public Law 104–132, section 107, 110 Stat. 1214, 1221–26 (1996), and was amended by the USA PATRIOT Improvement and Reauthorization Act of 2005, Public Law 109–177, section 507, 120 Stat. 192, 250–51 (2006). Before the 2006 amendments, the regional Federal courts in their review of State capital cases determined States' eligibility for the chapter 154 habeas corpus review procedures. The 2006 amendments re-assigned responsibility for chapter 154 certifications to the Attorney General of the United States, subject to de novo review by the Court of Appeals for the District of Columbia Circuit, and added a provision stating that there are no requirements for certification or for application of chapter 154 other than those expressly stated in the chapter, 28 U.S.C. 2265(a)(3). The effects of the 2006 amendments are explained in an opinion of the Department's Office of Legal Counsel and, where relevant to a specific provision in the rule, elsewhere in this preamble. *See The Attorney General's Authority in Certifying Whether a State Has Satisfied the Requirements for Appointment of Competent Counsel for Purposes of Capital Conviction Review Proceedings,* 33 Op. O.L.C. ____, at *12 (Dec. 16, 2009) (''OLC Opinion''), *available at http://www.justice.gov/olc/opinions.htm*.

Section 2265(b) directs the Attorney General to promulgate regulations to implement the certification procedure under chapter 154. The Attorney General accordingly published a proposed rule in the **Federal Register** on June 6, 2007, to add a new subpart entitled ''Certification Process for State Capital Counsel Systems'' to 28 CFR part 26. 72 FR 31217. The comment period ended on August 6, 2007. The Department published a notice on August 9, 2007, reopening the comment period, 72 FR 44816, and the reopened comment period ended on September 24, 2007. A final rule establishing the chapter 154 certification procedure was published on December 11, 2008, 73 FR 75327 (the ''2008 regulations''), with an effective date of January 12, 2009.

In January 2009, the United States District Court for the Northern District of California enjoined the Department ''from putting into effect the rule . . . without first providing an additional comment period of at least thirty days and publishing a response to any comments received during such period.'' *Habeas Corpus Resource Ctr.* v. *U.S. Dep't of Justice,* No. 08–2649, 2009 WL 185423, at *10 (N.D. Cal. Jan. 20, 2009) (preliminary injunction); *Habeas Corpus Resource Ctr.* v. *U.S. Dep't of Justice,* No. 08–2649, slip op. at 1 (Jan. 8, 2009) (temporary restraining order). On February 5, 2009, the Department solicited further public comment, with the comment period closing on April 6, 2009. 74 FR 6131.

As the Department reviewed the submitted comments, it considered further the statutory requirements governing the regulatory implementation of the chapter 154 certification procedures. The Attorney General determined that chapter 154 gave him greater discretion in making certification determinations than the 2008 regulations would have allowed. Therefore, the Department published a notice in the **Federal Register** on May 25, 2010, proposing to remove the 2008 regulations pending the completion of a new rulemaking process, during which the Department would further consider what procedures were appropriate. 75 FR 29217. The comment period closed on June 24, 2010. On November 23, 2010, the Department published a final rule removing the 2008 regulations. 75 FR 71353.

The Department published a new proposed rule on March 3, 2011. 76 FR 11705. The comment period closed on June 1, 2011. The Department published a supplemental notice of proposed rulemaking on February 13, 2012, which identified a number of possible changes the Department was considering based on comments received in response to the publication of the proposed rule. 77 FR 7559. The comment period closed on March 14, 2012.

**Summary of Comments**

About 60 comments were received on the proposed rule, including both comments received on the initial notice of proposed rulemaking and comments received on the supplemental notice of proposed rulemaking.

Some commenters urged the Department to publish, in effect, a third notice of proposed rulemaking so as to disclose the exact text of the final rule—particularly the language regarding the effect of compliance with benchmarks on certification—before its publication. However, the Department published the full text of the proposed rule in the original notice of proposed rulemaking. 76 FR 11705. It also published a supplemental notice of proposed rulemaking to provide a further opportunity for public input on changes to the rule under consideration following initial comment. 77 FR 7559. The text of this final rule is the same as that published in the original notice of proposed rulemaking, except for five changes to that text that were precisely described in the supplemental notice, further clarifying amendments (affecting §§ 26.20, 26. 21, 26.22(b), (c), and (d), and 26.23(c)), and minor technical changes. All of the changes made to the text directly pertain to subjects and issues identified as under consideration by the terms of the original notice and supplemental notice and are responsive to the public comments received on those notices. The extensive comments received in response to the two publications confirm that interested members of the public were able to comment intelligently on the issues affecting the formulation of the final rule and in fact did so.

In the ensuing summary, comments that concern the general approach of the rule or that affect a number of provisions in the rule are discussed initially, followed by discussion of comments that pertain more specifically to particular provisions in the rule.

**General Comments**

*The Basic Approach of the Rule*

Two commenters argued that the Attorney General lacks authority to articulate substantive standards for chapter 154 certification, contending instead that chapter 154 limits the Attorney General to performing ministerial tasks when exercising his or her certification responsibilities. These comments are not well-founded. Chapter 154 is reasonably construed to allow the Attorney General to define within reasonable bounds the chapter's requirements for certification, and to evaluate whether a State's mechanism is adequate for purposes of ensuring that it will result in the appointment of competent counsel. The reasons for this conclusion are summarized in the OLC Opinion and elsewhere in this preamble.

Many commenters agreed that the Attorney General may appropriately specify and apply a substantive Federal standard that State mechanisms must meet to satisfy chapter 154's requirements for certification, and this rule specifies that standard, within the limits of the statutory scheme it implements: (i) *Appointment*—Chapter

154 requires the Attorney General to certify ''whether the State has established a mechanism for the appointment . . . of . . . counsel'' in State capital collateral proceedings. This rule provides further specification regarding the statutory appointment procedures and discusses the express statutory provisions that require such appointments to occur in a reasonably timely fashion. (ii) *Competent Counsel*—Chapter 154 provides that the Attorney General must determine whether the State has established a mechanism for the appointment of ''competent counsel'' in State capital collateral proceedings, and ''whether the State provides standards of competency for the appointment of counsel'' in such proceedings. This rule provides two ''benchmark'' competency standards that are presumptively sufficient to warrant certification while still leaving States some leeway to adopt other standards so long as they reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases. (iii) *Compensation and payment of reasonable litigation expenses*—Chapter 154 additionally requires the Attorney General to determine whether the State has established a mechanism for the ''compensation'' and ''payment of reasonable litigation expenses'' of competent counsel in State capital collateral proceedings. This rule provides four benchmark compensation standards that are presumptively adequate while again leaving States some significant discretion to formulate alternative compensation schemes, if reasonably designed to ensure the availability and timely appointment of competent counsel. And as to all of these matters, this rule provides that the Attorney General will consider a State's submission requesting certification and any input from interested parties received through a public comment procedure before determining whether certification is warranted.

Several commenters, however, argued that the certification standards and procedures promulgated in this rule (and described in the prior notice and supplemental notice of proposed rulemaking) do not go far enough in dictating the standards States must meet, or in providing for sufficient review and oversight by the Attorney General of State compliance with mechanisms for which certification is sought. For the reasons discussed generally below, and elsewhere in this preamble in the context of specific provisions of the rule, the Department has not adopted the changes proposed by these commenters.

Some of these commenters urged that the rule incorporate counsel competency provisions that would have the effect of eliminating or largely displacing State discretion to develop, within appropriate bounds, mechanisms for ensuring that competent counsel are appointed. One commenter, for instance, proposed that the rule should prescribe uniform national competency standards that must be adopted by any and all States seeking certification. Other commenters contended that the rule should incorporate measures as to prior experience in capital and postconviction capital proceedings, specialized training, demonstrated competence according to performance standards, and removal of attorneys who fail to provide effective representation—and find deficient, without exception, any State system that does not incorporate *all* of these features. The Department did not accept these comments, believing that they risk conflict with the statutory scheme, which leaves room for States to formulate their own standards so long as they reasonably assure the availability and appointment of competent counsel. *See* OLC Opinion at *12–13; *see also* 135 Cong. Rec. 24696 (1989) (report of the Judicial Conference's Ad Hoc Committee on Federal Habeas Corpus in Capital Cases (''the Powell Committee report'') from which many of the relevant features of Chapter 154 derive, explaining that giving States ''wide latitude to establish a mechanism that complies with [the statutory requirements]'' is ''more consistent with the federal-state balance'').

Raising another issue, several comments proposed that the rule require a showing of State compliance with its own established mechanism as a condition of certification. As envisioned by these comments, the Attorney General, when presented with a request for certification, would review a State's record of appointments in individual cases to verify that the appointments were made in conformity with the State's established mechanism. These comments were not adopted because the statutory scheme does not call for such case-specific oversight by the Attorney General of State compliance with a mechanism it has established.

Chapter 154 in its current formulation states two preconditions for the chapter's applicability in a particular case: (1) As provided in section 2261(b)(1), ''the Attorney General of the United States certifies that a State has established a mechanism for providing counsel in postconviction proceedings as provided in section 2265''; and (2) as provided in section 2261(b)(2), ''counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent.'' Of these two functions, only the general certification function is assigned to ''the Attorney General of the United States.'' The case-specific function of ascertaining whether counsel was appointed pursuant to the certified mechanism is reserved to Federal habeas courts, which can address individual irregularities and decide whether the Federal habeas corpus review procedures of chapter 154 will apply in particular cases. If the commenters were correct in asserting that the Attorney General should withhold certification unless he or she finds that the State has complied with its established mechanism in every case, there would have been little need for Congress to have included section 2261(b)(2). *Cf. Ashmus* v. *Woodford,* 202 F.3d 1160, 1168 & n.13 (9th Cir. 2000) (chapter 154 designed to avoid case-by-case analysis of counsel's competence by requiring binding appointment standards). Moreover, if a State establishes a new mechanism for appointment of competent counsel (in response to this rule and its articulation of benchmark standards) and requests at the outset that the Attorney General determine its adequacy, chapter 154 should not be read to foreclose certification simply because the Attorney General would not yet have a basis to examine the State's compliance with the newly established system.

Though the Department rejects the suggestion that the Attorney General's certification determination should depend on whether a State complies with its own mechanism in isolated cases, the question of whether a State has ''established'' a mechanism is a conceptually distinct matter that the statutory framework *does* charge the Attorney General with determining, *see* 28 U.S.C. 2265(a)(1)(A)–(B). The requirement of having ''established'' a mechanism consistent with chapter 154 presupposes that the State has adopted and implemented standards consistent with the chapter's requirements concerning counsel appointment, competency, compensation, and expenses. Thus, the rule allows for the possibility that the Attorney General will need to address situations in which there has been a wholesale failure to implement one or more material elements of a mechanism described in a State's certification submission, such as

when a State's submission relying on § 26.22(b)(1)(ii) in the rule points to a statute that authorizes a State agency to create and fund a statewide attorney monitoring program, but the agency never actually expends any funds, or expends funds to provide for monitoring of attorneys in only a few of its cities. Addressing any such situations would require careful consideration of the specific features of a mechanism presented for certification, and is therefore best left to individual certification decisions. Other than in these situations, should they arise, questions of compliance by a State with the standards of its capital counsel mechanism will be a matter for the Federal habeas courts.

Finally, a few of the comments could be read to suggest that chapter 154 requires the Attorney General to certify a State mechanism only if he or she examines and is satisfied by the actual performance of postconviction counsel following appointment. On such an understanding, an assessment by the Attorney General of the performance of attorneys in State habeas proceedings (e.g., what investigation was done or not done, or what arguments were made or not made in a habeas petition) would inform a decision as to whether the State's mechanism adequately provides for appointment of competent postconviction counsel and, accordingly, whether chapter 154 certification is warranted. To the extent that the comments urged such an interpretation, it was rejected in formulating the rule.

The actual requirements under chapter 154 relating to counsel competency are establishment by a State of ''a mechanism for the appointment . . . of competent counsel'' in State capital collateral proceedings, and provision by the State of ''standards of competency for the appointment of counsel'' in such proceedings. Neither of these provisions suggests that the Attorney General is required to inquire into the facts of how counsel performed following appointment in all or some subset of cases. Rather, both frame their requirements regarding counsel competency as matters relating to appointment, and are naturally understood as contemplating an inquiry into whether a State has put in place adequate qualification standards that counsel must meet to be eligible for appointment. This understanding is supported by the Powell Committee report. The report explained that Federal review would examine whether a State's mechanism for appointing capital postconviction counsel comports with the statutory requirements ''as opposed to the competency of particular counsel.'' 135 Cong. Rec. 24696 (1989). It further explained that, in contrast to the focus on ''the performance of a capital defendant's trial and appellate counsel,'' ''[t]he effectiveness of state and federal postconviction counsel is a matter that can and must be dealt with in the appointment process.'' *Id.*

*The Role of the Attorney General*

Some commenters asserted that the Attorney General has an inherent conflict of interest that should disqualify him from making certification determinations under chapter 154. These commenters claimed that the Attorney General's prosecutorial functions and responsibilities would render him unable to objectively evaluate State capital counsel systems. The remediation proposed by these commenters included the suggestion that the Attorney General delegate his functions under chapter 154 to some other official or division within the Department of Justice that the commenters believed would be free of the supposed conflict of interest. Commenters also proposed that the Attorney General only exercise his certification responsibilities on the basis of very specific, inflexible criteria that would leave no room for judgment or discretion by the Attorney General in evaluating a given State system under chapter 154.

As an initial matter, the Attorney General cannot refrain from carrying out the functions assigned to him by chapter 154: The law requires him to discharge those functions. Congress assigned the certification function to the Attorney General after having heard arguments concerning a purported conflict of interest similar to those now advanced by the commenters. *See* 28 U.S.C. 2265(a)(1); *Habeas Reform: The Streamlined Procedures Act: Hearing Before the S. Comm. on the Judiciary,* 109th Cong. 26–27 (2005); *see also id.* at 54 (written statement of Professor Eric M. Freedman on behalf of the American Bar Association) (''The Attorney General is the nation's chief *prosecutor* and thus is hardly an appropriate officer to decide whether a state has kept its part of the 'opt in' bargain.''). Moreover, the enactment of chapter 154 is not the first time that Congress has assigned to the Attorney General the task of evaluating State efforts to provide attorney representation to petitioners convicted of a capital crime. For example, the Innocence Protection Act of 2004, Public Law 108–405, Title IV, Subtitle B, 118 Stat. 2260, 2286–92 (2004) (''IPA''), contemplates the administration by the Attorney General of a program to improve the quality of legal representation provided to indigent petitioners in State capital cases, including the making of grants to States willing to implement federally prescribed capital counsel standards, continuing oversight of the capital defense systems of States that accept funding, and negotiation or direction by the Attorney General of corrective actions needed to secure compliance by those States with the federally prescribed capital counsel requirements. *See* 42 U.S.C. 14163, 14163c–14163d; 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake) (noting as precedent for chapter 154 responsibilities of the Attorney General that ''[j]ust last year . . . Congress assigned the Attorney General to evaluate State . . . capital counsel systems'' under the IPA).

More fundamentally, there is no sound basis for the claim that the Attorney General has a conflict of interest that would preclude him from fairly carrying out the functions assigned to him by Congress. The criteria the Attorney General will apply in deciding whether a State has satisfied the chapter 154 requirements do not control what will be deemed constitutionally effective or ineffective assistance of counsel in the criminal cases for which the Attorney General is responsible. Addressing questions concerning what constitutes constitutionally effective assistance calls for an assessment of an attorney's performance in a given case, and as already noted, the Attorney General will not make such independent assessments in the context of making certification decisions under chapter 154, which call instead for an evaluation of general competency standards put in place by a State mechanism. Hence, there is no basis to conclude that the determinations that the Attorney General must make when presented with a request for certification of a State mechanism would conflict with the conduct of the Attorney General's prosecutorial functions.

Moreover, the functions performed by the Attorney General in his criminal law enforcement and prosecutorial oversight capacities are only part of the broader, diverse range of duties he regularly performs. The Department, under the Attorney General's supervision, administers and carries out programs for the improvement of indigent criminal defense systems, both generally and with respect to capital cases in particular. *See, e.g.,* Bureau of Justice Assistance, U.S. Dep't of Justice, *Answering* Gideon*'s Call: Improving Indigent Defense Delivery Systems, FY*

*2012 Competitive Grant Announcement* (April 4, 2012); Bureau of Justice Assistance, U.S. Dep't of Justice, *Capital Case Litigation Initiative, FY 2011 Competitive Grant Announcement* (Jan. 11, 2011); Bureau of Justice Assistance, U.S. Dep't of Justice, *Capital Case Litigation Initiative, http://www.bja.gov/ProgramDetails.aspx?Program_ID=52* (last visited July 23, 2013) (further information on capital case litigation initiative); U.S. Dep't of Justice, *The Access to Justice Initiative, http://www.justice.gov/atj* (last visited July 23, 2013) (home page for the Department's Access to Justice Initiative, which seeks to ''increase access to counsel and legal assistance,'' including by advancing ''new statutory, policy, and practice changes that support development of quality indigent defense''). The Attorney General leads and convenes the Federal Interagency Reentry Council, a government-wide effort to improve employment, housing, treatment, and educational opportunities for individuals who were previously incarcerated. The Department of Justice also handles much of the Federal government's civil litigation under the Attorney General's authority, in some cases serving as or representing the plaintiff and in others serving as or representing the defendant. In addition, the Attorney General oversees the Department's Community Relations Service, which provides violence prevention and conflict resolution services to State and local governments, private organizations, and community groups. These examples demonstrate that the Attorney General is accustomed to appropriately balancing varied and occasionally competing interests in the exercise of his duties. Thus, even if carrying out the certification function assigned to him by law did affect the Department's criminal enforcement efforts (though it does not), the commenters have made no persuasive showing that the Attorney General would be unable to fairly evaluate a State's certification request.

In addition, discharge of the required chapter 154 functions by the Attorney General is consistent with Rule 1.7(a)(2) of the American Bar Association (''ABA'') Model Rules of Professional Conduct (and comparable rules adopted by most State supreme courts), which provides in relevant part that ''a lawyer shall not represent a client if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.'' The Attorney General has no responsibilities to a client that would materially limit the discharge of the chapter 154 certification function, because the Attorney General's only relevant client is the United States, which through Congress has expressly directed the discharge of that function by law. There is also no reason to believe that the Attorney General has any responsibility to a ''former client'' or ''third person,'' or any ''personal interest,'' that would materially impair his representation of the United States in the discharge of that function. The Attorney General has a professional obligation to abide by the ''client's decisions concerning the objectives of representation,'' ABA Model Rule 1.2(a), making it difficult to conceive how the Attorney General could have such a disqualifying conflict in representing the United States when it is the United States that has mandated through its laws that the Attorney General carry out the chapter 154 certification function.

Against this background, there is no force to the claim of some commenters that the Attorney General has an inherent conflict of interest in carrying out his legal duties under chapter 154—which potentially affects defense and judicial review functions in criminal cases for which the Attorney General is not responsible—because the Attorney General oversees the conduct of prosecutions in Federal criminal cases, among other duties. Modification of the rule to incorporate the remedial measures proposed by these commenters is accordingly not necessary because the underlying assumption of a conflict of interest is not well-founded. Indeed, the specific remedy suggested by many of these commenters, that the Attorney General address the purported conflict of interest by delegating the certification function to the Department's Inspector General, would itself pose problems. Among others, the task of certifying State capital counsel mechanisms falls outside the current duties, responsibilities, and expertise of the Inspector General and his staff, which focus on fraud, waste, and abuse in the Department of Justice, *see* 5 U.S.C. App. 3 sections 4, 8E.

*Relationship to Prior Judicial Interpretation*

Some commenters criticized the rule as inconsistent with the judicial construction of chapter 154. However, prior judicial interpretation of chapter 154, much of which remains generally informative, supports many features of this rule, as this preamble documents. To the extent the rule approaches certain matters differently from some past judicial decisions, there are reasons for the differences.

One reason judicial decisions could not consistently be followed on some matters in this rule is that the decisions were not in accord with each other on these matters. For example, as discussed below in connection with § 26.22(b) of the rule, some district court decisions regarded prior capital litigation experience as necessary to qualify for appointment under chapter 154, but appellate precedent and other authority permit a more flexible approach that would understand capital litigation experience to be relevant and often helpful, but not indispensable.

Textual changes that Congress has made in chapter 154 are another reason for differences from prior judicial decisions under chapter 154. For example, as explained below in the analysis statement accompanying § 26.21 in this rule, chapter 154 originally had separate provisions for State systems bifurcating direct and collateral review (28 U.S.C. 2261 (2000) (amended 2006)) and State ''unitary review'' systems in which collateral claims may be raised in the course of direct review (28 U.S.C. 2265 (2000) (amended 2006)). Both sets of provisions included language specifying the form that State standards establishing the required capital counsel mechanism must take. The general provisions in former section 2261(b) required that a State establish the mechanism ''by statute, rule of its court of last resort, or by another agency authorized by State law.'' The provisions in section 2265(a) for unitary review procedures required that a State establish the mechanism ''by rule of its court of last resort or by statute.'' Both sections said that ''[t]he rule of court or statute must provide standards of competency for the appointment of . . . counsel.''

In *Ashmus* v. *Calderon,* the court concluded that the State unitary review procedure under review in that case did not satisfy chapter 154, in part because the State's qualification standards for appointment of capital counsel were not set out in a ''rule of court'' in the relevant sense. 123 F.3d 1199, 1207–08 (9th Cir. 1997). This particular ground for denying chapter 154 certification no longer exists under the current formulation of chapter 154. The amendments to chapter 154 enacted in 2006 replaced the separate provisions for bifurcated and unitary review procedures with uniform requirements that apply to all State systems and eliminated the former language specifying that the relevant standards

were to be provided by rule of court or statute.

This rule accordingly does not include a requirement that relevant State standards must be adopted by any particular means, notwithstanding the judicial application of such a requirement when the statutory language was different. While States still must establish capital counsel mechanisms that satisfy the chapter 154 requirements to be certified, there is no requirement that they do so in any particular form, such as only through standards set out in rules of court. So long as there has been an authoritative adoption or articulation by a State of binding standards, and those standards are not otherwise negated or overridden by State policy, the standards are ''established'' for the purposes of chapter 154.

Other differences reflect the change in responsibility for chapter 154 certification under the 2006 amendments. Prior to those amendments, requests to invoke the chapter 154 procedures were presented to Federal habeas courts in the context of particular State capital cases they were reviewing. Courts in that posture considered both whether the State had established a mechanism satisfying chapter 154, and if so, whether counsel for the petitioner in the particular case before them had been provided in full compliance with that mechanism. Hence, if counsel had not been appointed on collateral review in a particular case, or if the attorney provided did not satisfy the State's competency standards for such appointments, for example, the courts could find chapter 154 inapplicable on that basis, regardless of whether the State had established a capital counsel mechanism that otherwise satisfied the requirements of chapter 154. *See, e.g., Tucker* v. *Catoe,* 221 F.3d 600, 604–05 (4th Cir. 2000) (''We accordingly conclude that a state must not only enact a 'mechanism' and standards for postconviction review counsel, but those mechanisms and standards must in fact be complied with before the state may invoke the time limitations of 28 U.S.C. 2263.'').

The result in such a case is not necessarily different under the current formulation of chapter 154, but the route to that result is not the same. In entertaining a State's request for chapter 154 certification, the Attorney General has no individual case before him and is not responsible for determining whether a State has complied with its mechanism in any particular case. Rather, as discussed above, 28 U.S.C. 2261(b)(1) assigns to the Attorney General the general certification function under chapter 154, which makes him responsible for determining whether a mechanism has been established by the State and whether the State provides standards of competency. If the State mechanism is certified, appointment of counsel pursuant to the certified mechanism (absent waiver or retention of counsel or a finding of non-indigence) continues to be a further condition for the applicability of chapter 154. But whether that has occurred in any individual case is, under 28 U.S.C. 2261(b)(2), a matter within the province of the Federal habeas court to which the case is presented, not the Attorney General.

### Section 26.20—Purpose

A comment on this section as drafted in the proposed rule objected that it did not mention the condition for chapter 154's applicability appearing in 28 U.S.C. 2261(b)(2). While the section 2261(b)(2) requirement was noted in the preamble to the proposed rule, *see* 76 FR at 11706, 11710–11, the objection is well-taken. The final text of § 26.20 reflects explicitly that the applicability of the Federal habeas corpus review procedures of 28 U.S.C. 2262, 2263, 2264, and 2266 in a capital case depends on both certification of the State's postconviction capital counsel mechanism, as provided in 28 U.S.C. 2261(b)(1), and appointment of counsel pursuant to the certified mechanism (absent waiver or retention of counsel or a finding of non-indigency), as provided in 28 U.S.C. 2261(b)(2).

### Section 26.21—Definitions

*Appointment*

Many comments raised the concern that the proposed rule did not address the timing of counsel appointment. The concern reflected the general importance of the timely availability of counsel in the context of a complex and difficult type of litigation and specific issues arising from chapter 154's special time limit for Federal habeas filing. *Compare* 28 U.S.C. 2263 (general 180-day time limit under chapter 154) *with* 28 U.S.C. 2244(d) (one-year time limit otherwise applicable).

The Department believes that the concern reflected in these comments is well-founded. Chapter 154 involves a *quid pro quo* arrangement under which appointment of counsel for indigents is extended to postconviction proceedings in capital cases, and in return, subsequent Federal habeas review is carried out with generally more limited time frames and scope. *See, e.g.,* H.R. Rep. No. 104–23, at 10 (1995) (noting the chapter's ''quid pro quo arrangement under which states are accorded stronger finality rules on Federal habeas review in return for strengthening the right to counsel for indigent capital defendants''). The Powell Committee report, from which this essential feature of chapter 154 derives, explained that ''[c]apital cases should be subject to one complete and fair course of collateral review in the state and federal system . . . with the assistance of competent counsel for the defendant'' and that ''[t]he belated entry of a lawyer, under severe time pressure, does not do enough to ensure fairness.'' 135 Cong. Rec. 24695 (1989).

The quid pro quo arrangement of chapter 154 requires provision of counsel to capital petitioners in State postconviction proceedings in return for Federal habeas review carried out with generally more limited time frames and scope. Against this background, not every conceivable provision for making postconviction counsel available, however belatedly—e.g., only after the deadline for pursuing State postconviction proceedings had passed; or only after the expiration of section 2263's time limit for Federal habeas filing; or only after such delay that the time available for preparing for and pursuing either State or Federal postconviction review had been seriously eroded—can logically be regarded as providing for appointment of counsel within the meaning of chapter 154. Consistent with such considerations, judicial decisions under chapter 154 that addressed the matter concluded that the State mechanism must provide for timely appointment of counsel. *See, e.g., Brown* v. *Puckett,* No. 3:01CV197–D, 2003 WL 21018627, at *3 (N.D. Miss. Mar. 12, 2003) (''The timely appointment of counsel at the conclusion of direct review is an essential requirement in the opt-in structure. Because the abbreviated 180-day statute of limitations begins to run immediately upon the conclusion of direct review, time is of the essence. Without a requirement for the timely appointment of counsel, the system is not in compliance.''); *Ashmus* v. *Calderon,* 31 F. Supp. 2d 1175, 1187 (N.D. Cal. 1998) (''The quid pro quo would be hollow indeed if compliance by the state was satisfied by merely offering and promising to appoint competent counsel with no element of timeliness.''); *Hill* v. *Butterworth,* 941 F. Supp. 1129, 1147 (N.D. Fla. 1996) (''[T]he Court holds that any offer of counsel pursuant to Section 2261 must be a *meaningful offer.* That is, counsel must be immediately appointed after a

capital defendant accepts the state's offer of postconviction counsel.''), *rev'd on other grounds,* 147 F.3d 1333 (11th Cir. 1998).

The supplemental notice of proposed rulemaking accordingly proposed specifying more clearly that an adequately functioning mechanism, as described in chapter 154, will necessarily incorporate a policy for the timely appointment of competent counsel. *See* 77 FR at 7560–61. Section 26.21 of the final rule does so by adding a definition of appointment that clarifies that it entails ''provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.'' *See* American Bar Association, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* at 127 (rev. ed. Feb. 2003), *available at http://www.americanbar.org/content/dam/aba/migrated/legalservices/downloads/sclaid/deathpenaltyguidelines2003.authcheckdam.pdf* (''ABA Guidelines'') (increasingly intertwined nature of State and Federal habeas proceedings means that ''although the AEDPA deals strictly with cases being litigated in federal court, its statute of limitations provision creates a de facto statute of limitations for filing a collateral review petition in state court'').

Nevertheless, two comments responding to the supplemental notice objected to this change from the proposed rule as inconsistent with the current version of chapter 154, which provides that ''[t]here are no requirements for certification or for application of this chapter other than those expressly stated in this chapter.'' 28 U.S.C. 2265(a)(3). However, the definition of appointment in § 26.21 does not add to the express requirements for certification. Rather, as explained above, it reflects a contextual understanding of chapter 154's express requirement of a mechanism for appointment of competent postconviction capital counsel, *see* 28 U.S.C. 2265(a)(1), to encompass some standard for affording postconviction representation in a manner that is reasonably timely in light of the relevant postconviction review time limitations and the time required for developing and presenting claims. *See* OLC Opinion at *8 (''In reasonably construing an ambiguous term in a statute that he is charged with administering, the Attorney General would not be adding to the requirements for certification . . . [but] merely would be implementing an express statutory provision . . . just as agency officials regularly do in other contexts'' under *Chevron, U.S.A., Inc.* v. *Natural Res. Defense Council, Inc.,* 467 U.S. 837, 844 (1984).).

Other features of chapter 154 provide additional textual support for the final rule's definition of ''appointment'' and confirm it is consistent with the express statutory scheme, including section 2265(a)(3). Section 2262(a), for instance, provides for an automatic stay of execution, by application to a Federal habeas court, upon entry of an order appointing counsel. If chapter 154 permitted a State to delay appointment of counsel, an execution that is scheduled for a date shortly after the denial of a prisoner's direct appeal could occur before the prisoner receives the State postconviction counsel and the automatic stay that chapter 154 promises. Likewise, chapter 154 expressly contemplates that States will establish, and the Attorney General will review, standards expected to produce *competent* representation by appointed counsel. 28 U.S.C. 2265(a)(1)(A), (C). Judgments concerning what competency standards are needed may well vary based on expectations about the amount of time an attorney will have to perform requisite tasks. The need for counsel to be appointed in a reasonably timely fashion, especially in light of the relevant statutory deadlines for seeking habeas relief, sets such expectations and enables the judgments that the statutory framework requires.

The two concerned commenters also cite legislative history evidence, specifically two floor statements criticizing the Ninth Circuit's decision in *Spears* v. *Stewart,* 283 F.3d 992 (9th Cir. 2001), in support of their objection to the articulation in this rule of chapter 154's requirement that appointments be made in a reasonably timely fashion. *See, e.g.,* 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl, the sponsor of the amendment, including that it ''forbids creation of additional requirements not expressly stated in the chapter, as was done in the Spears case''); 151 Cong. Rec. E2639 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake). However, the legislators' criticism of the *Spears* decision does not support the commenters' objection to the rule's articulation of chapter 154's timeliness requirement. *Spears* addressed an issue concerning the timing of appointment of capital collateral counsel in two contexts, finding first that a rule adopted by the Arizona Supreme Court did adequately provide for timely appointment of counsel, but then declining to apply the chapter 154 Federal habeas review procedures in that particular case on the ground that counsel was not appointed within the time frame called for by the mechanism. *Compare Spears,* 283 F.3d at 1017 (''We conclude that the Arizona statutory mechanism for the appointment of postconviction counsel [requiring appointment within 15 days of notice that the conviction had become final] . . . offered counsel to all indigent capital defendants . . . in a timely fashion.''), *with id.* at 1018–19 (holding that chapter 154 did not apply ''in Petitioner's case'' because his attorney was appointed over a year after the mechanism's deadline). The object of the dissatisfaction expressed in the floor statements upon which the two commenters rely was neither the positive determination in *Spears* regarding the need for a timing component in a State's mechanism nor the adequacy of Arizona's timing provision for purposes of chapter 154, but rather the denial to the State of the benefits of chapter 154 in that individual case. *See* 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl); 151 Cong. Rec. E2639–40 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake).

The Attorney General's current role under chapter 154 parallels that of the *Spears* court in making the first of these two determinations—whether the mechanism in force in the State adequately provides for the reasonably timely appointment of counsel. Nothing in the present rule would bar the Attorney General from approving, as the *Spears* court did, a State mechanism that provides for timely provision of counsel. Whether and in what circumstances a delay in appointment of counsel would affect chapter 154's applicability in an *individual* case may be considered by Federal habeas courts in the exercise of their function under 28 U.S.C. 2261(b)(2), and is not a question that the statute assigns to the Attorney General.

In any event, courts ordinarily give floor statements, even statements made by the sponsor of a bill or amendment, relatively limited weight in analyzing Congress's intent. *See, e.g., Garcia* v. *United States,* 469 U.S. 70, 76 (1984). This is appropriate in the case of the legislation that added section 2265(a)(3) to chapter 154 because the commenters principally rely on views expressed by a Senator that were not included in the bill's conference report, *compare* H.R. Rep. No. 109–333, at 109–10 (2005) (Conf. Rep.) (making no reference to the timing of appointments, and identifying not *Spears,* but a different case that

involved a different issue as being ''overruled'' by the bill's provisions), *with* 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl). *See Ctr. for Sci. in the Pub. Interest* v. *Regan,* 802 F.2d 518, 523 (D.C. Cir. 1986) (noting that ''the contemporaneous remarks of a single legislator, even a sponsor, are not controlling in legislative history analysis; rather, those remarks must be considered along with other statements and published committee reports''). Thus, even if the commenters' reading of the floor statements' criticism of *Spears* were correct, the statements should not be treated as controlling or as indicative of congressional intent contrary to the rule's clarification of a requirement for reasonably timely appointment of counsel.

With respect to a separate but related issue, one commenter suggested that § 26.21's definition of ''appointment'' to encompass a timeliness element is unnecessary because courts may alternatively address problems under chapter 154 resulting from delay in providing postconviction counsel by adjusting the operation of the relevant time limits for filing. The commenter cited *Rhines* v. *Weber,* 544 U.S. 269 (2005), and *In re Morgan,* 50 Cal. 4th 932, 237 P.3d 993 (2010), for support.

As an initial matter, it is unclear to what extent these cited cases apply to the issue at hand. *Rhines,* for example, involved stay-and-abey procedures that may not be available to petitioners under chapter 154, *see* 28 U.S.C. 2264(b), and *Morgan* focused on the viability of pro se ''shell'' State habeas petitions—a practice that, even if it were firmly established and accepted by both State and Federal courts, raises significant concerns in the chapter 154 context. As a practical matter, for example, not every State petitioner will be in a position to understand the necessity for filing such a petition and able to file a petition successfully. Moreover, chapter 154 contemplates that in exchange for substantial benefits on Federal habeas review, States will provide not the opportunity for petitioners to file *pro se* State habeas petitions, but the opportunity for petitioners to file *counseled* State habeas petitions. *See Mills* v. *Anderson,* 961 F. Supp. 198, 201 n.4 (S.D. Ohio 1997) (questioning whether State mechanism that provides for appointment of counsel only after filing of *pro se* petition is inadequate under chapter 154). Thus, the relevance of the procedures discussed in *Rhines* and *Morgan* is uncertain. Even if available in this context, they would at most affect what might be thought necessary to reasonably assure the timely appointment of counsel. The possible existence of such procedures would not undermine the conclusion that the ''appointment'' required under chapter 154 must be made in a reasonably timely manner, as reflected in the definition in § 26.21.

Some commenters approved of the rule's specification of the requirement for timely appointment but stated that it should provide a more definite period of time (e.g., a specific number of days or weeks) within which State mechanisms must appoint counsel. The Department believes, however, that States must have significant latitude in designing mechanisms for ensuring that competent counsel are appointed, *see* OLC Opinion at *12–13, and this rule therefore does not define timeliness in terms of a specific number of days or weeks within which counsel is to be provided. Instead, a State need only demonstrate that it has established a mechanism for affording counsel in a manner that is reasonably timely, in light of the time limits for seeking State and Federal collateral review and the effort involved in the investigation, research, and filing of effective habeas petitions, which protect a petitioner's right to meaningful habeas review.

Additionally, some commenters urged that the rule should require that appointment of postconviction capital counsel be timely in relation to the petitioner's conviction, not just in relation to the time limits for seeking State and Federal postconviction review and the time required for preparing postconviction claims. The rationale offered for this proposal was that direct review of the judgment in capital cases, occurring between the end of the trial proceedings and the commencement of postconviction proceedings, may take a long time, and that evidence and records that would be useful to the defense in postconviction proceedings may be lost in the meantime. While the Department does not question the value of efforts to avoid spoliation of evidence, consideration can be given only within the statutory framework; to the extent these commenters contemplated requiring that postconviction counsel be appointed even before the conclusion of direct review, such a mandate would appear to go beyond chapter 154's requirements for appointment of counsel ''in State postconviction proceedings.'' 28 U.S.C. 2265(a)(1); *see id.* 2261(b)(1).

*Appropriate State Official*

Section 26.21 of the rule, in part, defines an ''appropriate State official'' who may request chapter 154 certification under 28 U.S.C. 2265(a)(1) to mean the State attorney general or the State chief executive if the State attorney general does not have responsibility for Federal habeas corpus litigation. Some commenters objected to the rule's designation of the State attorney general as the appropriate official to request chapter 154 certification on grounds of conflict of interest, lack of relevant knowledge, interference with State discretion, and exceeding statutory authority.

The comments received provided no persuasive reasons for changing the definition of ''appropriate State official'' in § 26.21. First, the objection that the State attorney general's litigation interests may lead him to make unsound judgments whether his State has satisfied chapter 154's requirements conflates the role of applicant and that of decision-maker. Under this rule, the State attorney general is authorized to request certification, but it will be the U.S. Attorney General who makes a wholly independent determination of whether certification is warranted. In making this determination, the U.S. Attorney General will consider any supporting or contrary information or views that any interested entity may choose to submit through the public comment procedure set out in § 26.23 of the rule, in addition to whatever the State attorney general may offer on the question.

Second, designation of the State attorney general as the ''appropriate State official'' is consistent with both the original language of chapter 154 and the 2006 amendments. Prior to the 2006 amendments, Federal habeas courts determined whether chapter 154's requirements were satisfied, so State attorneys general responsible for Federal habeas corpus litigation in capital cases were able to seek determinations that the State capital counsel mechanism satisfied the chapter 154 requirements as part of their litigation functions. The court, not the State attorney general, was the decision-maker on that question, and the court's decision was informed by hearing the views of others with opposed interests, in addition to those of the State attorney general. The transfer of the chapter 154 certification function from the Federal courts to the U.S. Attorney General does not materially change this framework. The State attorney general is authorized to seek certification; the U.S. Attorney General, not the State attorney general, is the decision-maker; and the U.S. Attorney General will consider any views proffered by others as discussed above.

Third, the Attorney General's decisions regarding chapter 154 certification are subject to de novo review by the D.C. Circuit Court of Appeals, as provided in 28 U.S.C. 2265(c), and seeking such review would commonly be within the litigation authority of the State attorney general, regardless of which official had sought the initial determination from the U.S. Attorney General. It would be odd to deem the State attorney general an inappropriate official to seek chapter 154 certification from the U.S. Attorney General in the first instance, where the statutes interpose no obstacle to State attorneys general seeking the same determination from the D.C. Circuit at a later stage.

Fourth, the objection regarding lack of relevant knowledge by the State attorney general is also unpersuasive. This objection in the comments appears to be premised largely on the belief that States seeking certification will normally submit with their request a set of comprehensive data that demonstrate the operation of the State's collateral review system in capital cases, including such matters as the amount of awards to defense counsel for litigation expenses in particular cases, of which the State attorney general might in some cases be unaware. The proposition that the Attorney General must conduct such a case-by-case review under chapter 154 is not well-founded, for reasons discussed earlier in this preamble. Additionally, the Department finds it significant that none of the commenters identified a person in a State likely to have better knowledge than the State attorney general or chief executive concerning matters relevant to certification. Thus, even if it is accepted that a State attorney general may not have perfectly complete information in every instance, there is no basis to believe that there is an alternative official or individual better suited to the task. Moreover, if at times there is information relevant to the U.S. Attorney General's determination that the State attorney general may not have, any interested person is free to provide such information through the public comment procedure for certification requests set out in § 26.23(b)–(c) in this rule.

Finally, the objection in the present comments regarding potential conflict with State law reflects a misunderstanding of the rule, which does not preempt State law. If State law were to prohibit a State attorney general from requesting chapter 154 certification, then the State attorney general would be barred by State law from making such a request. That has no bearing on the formulation of § 26.21, which only defines the class of State officials whose request for chapter 154 certification triggers the requirement under 28 U.S.C. 2265(a)(1) that the U.S. Attorney General make a chapter 154 certification decision. Moreover, any concern about potential conflict with State law is purely speculative. No State submitted comments on this rule stating that it has prohibited, wishes to prohibit, or may prohibit the State attorney general from requesting chapter 154 certification on behalf of the State.

**Section 26.22(a)—Statutory Requirements Concerning Appointments**

Section 26.22(a) tracks chapter 154's provisions concerning the procedures for appointment of counsel, appearing in 28 U.S.C. 2261(c)–(d). Some commenters stated that the rule should be modified to provide additional definition concerning these procedures, such as specifying in greater detail what constitutes a sufficient offer of counsel, or what exactly will or will not be deemed a valid waiver of counsel, under these provisions.

The comments received did not provide persuasive reasons for addressing additional interpretive issues in this rule. Chapter 154's legal directive to the Attorney General regarding rulemaking is that the Attorney General ''shall promulgate regulations to implement the certification procedure under [section 2265(a)],'' 28 U.S.C. 2265(b). Some of the specific matters raised in the comments have been addressed by courts in prior decisions relating to chapter 154, but there is no requirement that the present rule attempt to provide a comprehensive restatement or synthesis of all past judicial decisions under the chapter. Though the Attorney General has provided further definition of the chapter 154 requirements in § 26.22 of this rule, in the interest of affording additional guidance regarding what must be done to qualify for certification under chapter 154 and what criteria will be applied in making certification decisions, that does not oblige the Attorney General to go further and attempt to resolve in this rule (even if it were possible) all possible questions that might arise in the interpretation and application of chapter 154's requirements.

It is uncertain whether particular interpretive questions raised by the commenters will prove to be significant issues in the context of the capital counsel systems of States that actually apply for certification hereafter. If they do not, then little will have been gained by the Attorney General's attempt to resolve them in advance. If they do prove to be significant issues, considering them in the concrete setting of State systems whose certification is requested is likely to be more conducive to sound resolutions than trying to address them in the abstract.

**Section 26.22(b)–(c)—General Issues**

Paragraphs (b) and (c) in § 26.22 articulate the requirements relating to counsel competency and compensation. Each paragraph consists of ''benchmark'' provisions identifying standards that presumptively will be considered adequate (§ 26.22(b)(1) for competency and § 26.22(c)(1) for compensation), followed by general provisions for assessing State standards that take other approaches (§ 26.22(b)(2) for competency and § 26.22(c)(2) for compensation).

The text of the rule published in the notice of proposed rulemaking stated without qualification that the Attorney General *will* approve State standards satisfying the benchmark provisions. Many commenters expressed the concern that, under the proposed rule, the Attorney General could have been required to certify a State's mechanism meeting the competence and compensation benchmarks, even if it could be shown that the mechanism is not adequate in the context of the State system in which it operates.

The Department continues to believe that State mechanisms that incorporate the benchmark standards for competency and compensation should be adequate. However, the comments were persuasive that it is not possible to predict with certainty that these benchmarks will be adequate in the context of every possible State system. For example, it is conceivable that a State standard authorizing what normally should be sufficient compensation may not in fact make competent lawyers available for appointment in postconviction proceedings, considering the context of a particular State system and its distinctive market conditions for legal services. *Cf. Baker* v. *Corcoran,* 220 F.3d 276, 285–86 (4th Cir. 2000) (considering per-attorney overhead costs and effective compensation rates among other factors in finding compensation scheme inadequate under chapter 154). The final rule has accordingly been modified, as discussed in the supplemental notice of proposed rulemaking, to provide that State standards satisfying the benchmarks for competency and compensation are *presumptively* adequate, thereby affording latitude to consider State-

specific circumstances that may establish the contrary—i.e., that standards generally expected to be sufficient in most instances are for some reason not reasonably likely to lead to the timely provision and adequate compensation of competent counsel to habeas petitioners in a particular State. 77 FR at 7561.

Importantly, however, the Department found unpersuasive commenters' separate criticism that the proposed rule fails to provide for oversight of a State's compliance with a chapter 154 mechanism that it has established. As explained earlier in this preamble, the Department remains of the view that chapter 154 is correctly read to assign to the Federal habeas courts—not to the Attorney General—questions concerning whether a State has fully complied in a given case with the requirements of its own established mechanism.

**Section 26.22(b)(1)(i)—Counsel Competency Standards Based on 18 U.S.C. 3599**

Section 26.22(b)(1)(i) in the final rule sets forth competency standards requiring at least five years of bar admission and three years of postconviction litigation experience, or if a State mechanism so provides, allowing appointment for good cause in a given case of other counsel whose background, knowledge, or experience would otherwise enable him or her to properly represent the petitioner. Section 26.22(b)(1)(i) is based on the qualification standards Congress has adopted in 18 U.S.C. 3599 for appointment of counsel in Federal court proceedings in capital cases. The formulation of this provision in the final rule to require three years of postconviction litigation experience differs from the corresponding provision in the proposed rule, which required three years of felony litigation experience, without specification of the stage or stages of litigation at which the experience was obtained. The reasons for this change are explained below.

In response to the proposed rule, many commenters suggested that postconviction litigation experience would be a better measure of competency for State postconviction proceedings than general felony litigation experience because of the difficult and unique demands that postconviction law and procedure place on attorneys who litigate those cases. These comments were persuasive.

In construing chapter 154, some courts have concluded that, given the complexity of postconviction law and procedure, a qualifying mechanism for the appointment of competent counsel should provide for counsel with specialized postconviction litigation experience. *See, e.g., Colvin-El* v. *Nuth,* No. Civ.A. AW 97–2520, 1998 WL 386403, at *6 (D. Md. July 6, 1998) (''Given the extraordinarily complex body of law and procedure unique to postconviction review, an attorney must, at minimum, have some experience in that area before he or she is deemed 'competent.' ''); *see also* Jon B. Gould & Lisa Greenman, *Report to the Committee on Defender Services, Judicial Conference of the United States: Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases* 88 (Sep. 2010) (noting the view of postconviction specialists that there is ''little time available for inexperienced counsel to 'learn the ropes,' and no safety net if they fail''). Several States have also incorporated this guidance into their appointment standards. *See, e.g.,* La. Admin. Code tit. 22, 915(D)(1)(e)(i) (requiring that qualified postconviction lead counsel shall ''have at least five years of criminal postconviction litigation experience.''); Miss. R. App. P. 22(d)(5) (generally requiring prior experience in at least one postconviction proceeding for appointment); Mo. Ann. Stat. § 547.370(2)(3) (requiring at least one of two appointed counsel to have ''participated as counsel or co-counsel to final judgment in at least five postconviction motions involving class A felonies in either state or federal trial courts''). The adaptation of the section 3599 standard in the final rule accordingly specifies three years of postconviction litigation experience, rather than three years of any sort of felony litigation experience as in the proposed rule.

The formulation of this benchmark in the final rule to require postconviction experience does not take issue, as some commenters claimed, with Congress's judgments regarding counsel competency standards that are likely to be adequate. Rather, both the proposed and final versions reflect necessary adaptation of the standards of 18 U.S.C. 3599 for use in chapter 154 certification decisions. In defining relevant prior litigation experience, 18 U.S.C. 3599(b) and (c) deem prior trial experience relevant for trial appointments, and prior appellate experience relevant for appointments ''after judgment.'' The statute does not provide an experience requirement tailored specifically to postconviction proceedings, having no separate specification about the experience required for appointments to provide representation ''after judgment'' in postconviction proceedings as opposed to representation ''after judgment'' on appeal. If section 3599's standards were transcribed as literally as possible in § 26.22(b)(1)(i), the rule would state that a State competency standard is presumptively adequate if it normally requires three years of appellate experience as a precondition for appointment in postconviction proceedings. But chapter 154 differs from section 3599 in that chapter 154 deals exclusively with postconviction proceedings. Prior postconviction litigation experience (as opposed to prior appellate experience) is more similar in character to the postconviction litigation for which an attorney would be appointed pursuant to chapter 154, and more likely on the whole to enable the attorney to provide effective representation in postconviction proceedings. The rule accordingly follows the sensible approach of referring to prior postconviction litigation experience in defining an experience standard that will presumptively be considered adequate for appointments in the postconviction proceedings addressed by chapter 154.

The Criminal Justice Act (CJA) guidelines promulgated by the Judicial Conference of the United States counsel courts to consider postconviction experience when making appointments under 18 U.S.C. 3599. *See* 7A Guide to [Federal] Judiciary Policy 620.50 (last rev. 2011) (''CJA Guidelines''), *available at http://www.uscourts.gov.FederalCourts/AppointmentOfCounsel/CJAGuidelinesForms/GuideToJudiciaryPolicyVolume7.aspx.* To be sure, the CJA Guidelines are not absolute requirements even in Federal habeas matters; the guidelines are phrased in permissive terms and elaborate in part on 18 U.S.C. 3005, *see* CJA Guidelines 620.10.10(a), 620.30, which concern appointment of counsel for trial representation in Federal capital cases and does not apply to appointments for collateral proceedings in State capital cases. *Compare* 18 U.S.C. 3005 *with* 18 U.S.C. 3599. However, the Department does agree that the CJA Guidelines may at times help to inform determinations as to appropriate standards for appointment of counsel, and so understood, the Department is ultimately convinced that the guidelines' advice to consider postconviction experience is sound. The final rule therefore avoids the anomaly that would result from an overly formalistic adaptation of 18 U.S.C. 3599 and instead carries out the adaptation in a manner in which the prior litigation

experience requirement is more finely attuned to the nature of the proceedings—i.e., postconviction proceedings—in which appointments are to be made.

The Department was not convinced, however, by commenters who asserted that this benchmark is deficient (or the other counsel competency provisions of the rule are deficient) because it does not require appointed counsel to have prior experience in *capital* postconviction proceedings, or at a minimum, some prior capital litigation experience generally. While prior capital litigation experience is frequently a relevant and valuable asset for an attorney assigned to handle postconviction matters, *see Wright* v. *Angelone,* 944 F. Supp. 460, 467 (E.D. Va. 1996), and is also a factor that the CJA Guidelines say courts should consider in Federal capital cases, the Department was ultimately unpersuaded that prior capital litigation experience must be required categorically as a precondition of competence under chapter 154. When setting competency requirements for appointed counsel in the IPA, see *infra,* Congress has not mandated that appointed attorneys invariably have such experience. 42 U.S.C. 14163(e). Similarly, courts and others have recognized that prior capital case experience should not be regarded as a sine qua non of an appropriate competency standard for postconviction counsel. *See, e.g., Spears,* 283 F.3d at 1013 (''Nothing in [chapter 154] or in logic requires that a lawyer must have capital experience to be competent.''); ABA Guidelines, at 37 & n. 109 (noting that ''[s]uperior postconviction death penalty defense representation has often been provided by members of the private bar who did not have prior experience in the field'' and stating that such counsel should be appointed if the client will receive high quality legal representation).

Next, and more broadly, some commenters contended that any competency measure based solely on prior experience will necessarily be insufficient under chapter 154 and criticized the Section 26.22(b)(1)(i) benchmark (and § 26.22(b)(2)) on that basis. Many of these comments urged the view that a State system that relies on prior experience must also incorporate procedures for monitoring counsel performance following appointment and for removal of poorly performing attorneys. The rule remains unchanged in response to these comments. 18 U.S.C. 3599 reflects a Congressional judgment that sufficiently robust experience requirements alone can be sufficient. Further, when Congress amended chapter 154 in 2006, it could have required all State mechanisms to adopt monitoring and removal provisions similar to those it required in the IPA in 2004, *see* 42 U.S.C. 14163(e)(2)(E), if it viewed such provisions as indispensable, but Congress did not do so. Thus, monitoring or removal requirements are not included in the rule's benchmark based on 18 U.S.C. 3599. *But see* § 26.22(b)(1)(ii) and discussion *infra.* However, their omission should not displace or affect the existence and operation of more generally applicable monitoring or removal procedures (e.g., disbarment) that a State may have in place, nor should it in any way discourage States from choosing to adopt monitoring and removal provisions as a discretionary matter.

One of the comments argued that the standards applicable under section 3599 to Federal habeas counsel should be considered inadequate for appointment of counsel in State collateral proceedings, on the ground that Federal habeas counsel has the benefit of the antecedent work of State collateral counsel in developing and presenting claims, and accordingly need lesser skills. However, the standards of section 3599 apply to Federal habeas counsel regardless of what prior representation or process has or has not been provided in State proceedings. Also, the same standards apply under section 3599 to counsel in Federal court collateral proceedings in Federal capital cases which, like State court collateral proceedings in State capital cases, are normally preceded only by trial and appeal.

Some commenters also objected to the exception language in the section 3599-based benchmark that allows appointment of counsel not meeting its specific litigation experience requirement in some circumstances. This exception appropriates the standard of 18 U.S.C. 3599(d), which allows courts, for good cause, to appoint other counsel whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty (i.e., capital punishment) and the nature of the litigation. We expect that allowing this type of departure will not unduly negate or undermine the specific experience requirement of this aspect of the rule, since its formulation limits its applicability to exceptional cases. It requires good cause for the court to appoint counsel other than those satisfying the specific experience requirement, and requires the court to verify that such counsel have other characteristics qualifying them to meet the demands of postconviction capital punishment litigation. In the rule, as in section 3599, the exception recognizes that insisting on a rigid application of a defined experience requirement could debar attorneys who are well-qualified on other grounds to represent capital petitioners. The comments provided no persuasive reason to deny this latitude in State court collateral proceedings in capital cases, which Congress has deemed appropriate for Federal court collateral proceedings (and other Federal court proceedings) in capital cases. *See* 18 U.S.C. 3599(d); *cf. Ashmus,* 123 F.3d at 1208 (recognizing that ''habeas corpus law is complex and has many procedural pitfalls'' but concluding that it is not necessary under chapter 154 that every lawyer have postconviction experience), *rev'd on other grounds,* 523 U.S. 740 (1998).

Though the Department therefore believes there is good reason to retain the availability of the exception to § 26.22(b)(1)(i)'s years of experience requirement that is drawn from 18 U.S.C. 3599(d), the rule is permissive, not mandatory, on this point. If a State decides to omit the exception in its mechanism, such that appointed attorneys will invariably need to have been admitted to the bar for five years and have three years of postconviction litigation experience, that omission will not result in a determination that it has failed to satisfy the § 26.22(b)(1)(i) benchmark.

Finally, some commenters objected to this revision of the benchmark as unduly limiting State discretion regarding the formulation of their counsel competency standards. However, use of this particular standard as a benchmark does not convey or depend on a judgment that other approaches States may choose to adopt are necessarily illegitimate or inadequate for purposes of chapter 154. Rather, other standards may be presented for the Attorney General's consideration under § 26.22(b)(2), and they will be approved if they otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases.

**Section 26.22(b)(1)(ii)—Counsel Competency Standards Based on the Innocence Protection Act**

Section 26.22(b)(1)(ii) identifies the establishment of qualification standards for appointment in conformity with the procedures of the IPA as another potential means of satisfying chapter 154.

The text of the rule published in the notice of proposed rulemaking framed the benchmark in terms of ''meeting qualification standards established in conformity with 42 U.S.C. 14163(e)(1) [and] (2)(A).'' These provisions concern the nature and composition of capital counsel appointment or selection entities, 42 U.S.C. 14163(e)(1), and provide that the appointing authority or an appropriate designated entity must ''establish qualifications for attorneys who may be appointed to represent indigents in capital cases,'' 42 U.S.C. 14163(e)(2)(A).

Numerous comments on the proposed rule related to how many of the IPA provisions should be imported into the rule's benchmark. Commenters noted that the benchmark as formulated in the proposed rule did not capture the full range of IPA provisions bearing on the qualifications counsel must meet to be eligible for appointment. In particular, subparagraphs (e)(2)(B), (D), and (E) in 42 U.S.C. 14163 require maintenance of a roster of qualified attorneys, specialized training programs for attorneys providing capital case representation, monitoring the performance of attorneys who are appointed and their attendance at training programs, and removal from the roster of attorneys who fail to deliver effective representation, engage in unethical conduct, or do not participate in required training. These provisions are integral elements of the IPA qualification standards for appointments, because counsel who fail to measure up under these requirements become ineligible for subsequent appointments.

These comments were persuasive that the IPA-based provision in the proposed rule did not fully reflect the IPA system relating to qualifications for appointment because of the omission of reference to subparagraphs (e)(2)(B), (D), and (E) in the statute. The omission has been corrected in § 26.22(b)(1)(ii) in the final rule.

The supplemental notice of proposed rulemaking included this change in the IPA-based benchmark. *See* 77 FR at 7560. Some of the commenters responding to the supplemental notice questioned the continued omission of certain other IPA provisions, particularly the IPA requirements relating to appointment of two counsel, and the IPA requirements concerning compensation of counsel. *See* 42 U.S.C. 14163(e)(2)(C), (F). Counsel compensation is addressed in a different part of this rule, which includes benchmarks similar to the IPA provisions. See § 26.22(c)(1)(ii) and (iv) in the final rule and the related discussion below.

Regarding the number of counsel, chapter 154 does not require States to appoint more than one attorney (as part of a defense team) for postconviction representation. Rather, the applicable statute frames the potential appointment of multiple postconviction counsel as a discretionary matter. *See* 28 U.S.C. 2261(c)(1) (State capital counsel mechanism must provide for court order ''appointing one or more counsels to represent the prisoner''). The Department believes there is no sound basis to eliminate the discretion chapter 154 contemplates by its own terms through a rule that forecloses certification of State mechanisms that provide for the appointment of only one attorney.

Furthermore, the IPA itself requires appointment of two counsel, with some exception, in the context of counsel standards that do not differentiate between different stages in the litigation of capital cases and that are principally concerned with the trial stage. *See* 42 U.S.C. 14163(c)–(d) (providing that IPA funding is to be used for effective systems for providing competent legal representation at all stages, with general requirement that at least 75% be used in relation to trial representation and at most 25% in relation to appellate and postconviction representation). In adapting the IPA standards to the context of chapter 154, which concerns only representation in postconviction proceedings, some flexibility on the question whether multiple counsel should be required is appropriate and accords with relevant congressional judgments in related contexts. As noted, chapter 154 itself frames the appointment of multiple postconviction counsel as a discretionary matter. 28 U.S.C. 2261(c)(1). Likewise, in relation to Federal capital cases and Federal habeas corpus review of State capital cases, Congress has required appointment of two counsel at trial but has made appointment of more than one counsel at later stages a discretionary matter. *Compare* 18 U.S.C. 3005 (court to ''assign 2 . . . counsel'' for trial representation) *with* 18 U.S.C. 3599(a) (requiring in provisions applicable at later stages ''appointment of one or more attorneys''). The rule takes a similar approach when adapting the IPA standards in the chapter 154 context by permitting, but not requiring, State mechanisms to provide for appointment of two attorneys to represent a capital petitioner on collateral review.

Additionally, § 26.22(b) in the rule articulates the statutory requirement that a State provide for the appointment of competent counsel in State postconviction proceedings and provide standards of competency for the appointment of such counsel. 28 U.S.C. 2265(a)(1)(A), (C). As discussed above, this means that States must have qualification standards that counsel must meet to be eligible for appointment and that the Attorney General finds adequate. The IPA provisions included in § 26.22(b)(1)(ii) in the final rule fit within this framework because they are integral to the IPA's specification of qualifications that counsel must meet to be eligible for initial or subsequent appointments. The same would not be true of specifications concerning the number of counsel to be appointed.

As to a separate issue, another comment criticized this benchmark on the ground that it does not prescribe definite qualification standards for appointment of counsel, but rather endorses any standards adopted in conformity with the IPA procedures. However, chapter 154 directs the Attorney General to determine whether the State provides standards of competency for appointment of competent counsel in State capital collateral proceedings, and whether the State's mechanism incorporating such standards will reasonably assure the appointment of competent counsel. It does not require the Attorney General to specify directly the required content of such standards. The corresponding provisions of the IPA reflect a judgment by Congress that qualification standards adopted in conformity with the IPA procedures will be adequate. This judgment is appropriately adopted in defining one of the means by which States may seek to satisfy the requirements of chapter 154.

**Section 26.22(b)(2)—Other Counsel Competency Standards**

Section 26.22(b)(2) in the rule provides that the Attorney General may find other competency standards for the appointment of counsel adequate if they reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases. Some commenters criticized this provision as overly indefinite and urged that the rule should provide for assessment of State capital counsel competency standards only under clearly defined criteria.

Many of these critical comments are premised at least partly on the view that the Attorney General has a conflict of interest under chapter 154. The commenters viewed this alleged conflict as exacerbated by § 26.22(b)(2) and urged that the rule eliminate or drastically limit any opportunity for the Attorney General to exercise judgment

or discretion in evaluating the adequacy of a State capital counsel mechanism. The Department rejects the premise that the Attorney General has a conflict, for reasons discussed above, and therefore finds the comments predicated on that view unpersuasive.

Also, as explained earlier, the Department believes States should retain some significant discretion to formulate and apply counsel competency standards, and § 26.22(b)(2) as drafted appropriately preserves that discretion. There are any number of ways in which a State might adopt measures of experience, knowledge, skills, training, education, or combinations of those considerations in devising a standard that would reasonably assure the appointment of counsel who are competent to conduct postconviction litigation in capital proceedings. Revising § 26.22(b)(2) to provide only very specific, one-size-fits-all criteria is accordingly impractical and would risk foreclosing innovative efforts by States to devise robust standards, even standards that would unquestionably result in the timely appointment of competent counsel.

Furthermore, before Congress reassigned the certification function from the Federal courts to the Attorney General by the 2006 amendments to chapter 154, courts did not assess the adequacy of State counsel competency standards constrained by rigid, pre-announced criteria; they were guided instead by the terms of chapter 154 itself and the facts in a particular case. *See, e.g., Spears,* 283 F.3d at 1012–15; *Ashmus,* 123 F.3d at 1208; *Hill,* 941 F. Supp. at 1142–43. The 2006 amendments changed the decision-maker for purposes of making judgments about the overall adequacy of State systems under chapter 154, but the amendments do not suggest that the Attorney General's discretion to evaluate the adequacy of State competency standards must be constrained by a one-size-fits-all approach. Had Congress questioned the Attorney General's ability to exercise discretion soundly or believed that more specific guidance was necessary, it could have amended the statutory scheme to specify more detailed requirements that State mechanisms must meet when it transferred the certification function to the Attorney General—but Congress did not do so.

This is not to say, as some comments contend, that § 26.22(b)(2) affords a State unbounded discretion to establish any sort of competency standards and still obtain certification of its mechanism under chapter 154. The notice and supplemental notice of proposed rulemaking described the two approaches now reflected in paragraph (b)(1) of the rule as benchmarks, and they function precisely in that manner. That is, the criteria in paragraph (b)(1) do not simply identify two competency standards that will entitle a State that adopts them to a presumption of adequacy; they also serve as a point of reference in judging the adequacy of other counsel qualification standards that States may establish and offer for certification by the Attorney General. A State mechanism that does not incorporate the benchmark standards will naturally require closer examination by the Attorney General to ensure that it satisfies the statutory standards, and while it is possible to conceive of a variety of alternative competency measures that would satisfy chapter 154's requirements, State competency standards that appear likely to result in significantly lower levels of proficiency compared to the benchmark levels risk being found inadequate under chapter 154. For clarity, the text of the proposed rule has been revised to reflect this understanding, namely, that the paragraph (b)(1) standards function as benchmarks and are relevant to the Attorney General's assessment of alternative competency standards for which certification would be predicated on § 26.22(b)(2).

This explanation also responds to another comment, which complains that the provision appearing in the final rule as § 26.22(b)(2) is overly restrictive, on the ground that it limits the possibility of approval of State competency standards to situations in which they are ''functionally identical to or more stringent than'' the particular benchmark standards described in § 26.22(b)(1). This comment reflects a misunderstanding of the rule. The analysis statement in the proposed rule noted in relation to the benchmarks that States' adoption of competency requirements that are similar or that are likely to result in even higher levels of proficiency will weigh in favor of a finding of adequacy for purposes of chapter 154, *see* 76 FR at 11709, and a statement to the same effect appears in the section-by-section analysis for this final rule. However, it is not similarity in form to the presumptively adequate standards that section (b)(2) contemplates, and the standards need not function in an identical matter. Rather, § 26.22(b)(2) contemplates a close equivalence in terms of the expectation that a proffered mechanism will reasonably assure an appropriate level of proficiency in appointed counsel. As the analysis statement explained and this preamble repeats, Congress intended the States to have significant discretion regarding competency standards, within reasonable bounds, and the particular benchmarks identified in the rule do not exhaust the means by which States may satisfy chapter 154's requirements.

**Section 26.22(c)—Compensation of Counsel**

Section 26.22(c)(1)(i) refers to the compensation of counsel pursuant to 18 U.S.C. 3599 in Federal habeas corpus proceedings reviewing State capital cases. The Department received no comments that were specifically critical of this standard, which remains unchanged in the final rule.

The compensation standards for appointed capital counsel in State collateral proceedings described in § 26.22(c)(1)(ii) and (iv) in the rule involve compensation comparable to that of retained counsel meeting sufficient competency standards or attorneys representing the State in such collateral proceedings. Some comments were critical of these benchmarks as setting an inadequate level of compensation. However, as explained in the accompanying analysis statement for the rule, these parts of the rule are similar to legislative judgments in the IPA endorsing compensation of capital defense counsel at market rates or at a level commensurate with that of prosecutors. 42 U.S.C. 14163(e)(2)(F)(ii)(I); *see also* ABA Guidelines § 9.1(B)(2), at 49 (same). The comments provided no persuasive reason to reject this legislative judgment in the context of chapter 154, or to believe that compensating appointed capital defense counsel at higher levels than competent retained counsel or counsel representing the State in the same proceedings will generally be necessary to induce a sufficient number of competent attorneys to provide representation.

Section 26.22(c)(1)(iii) in the rule refers to compensation comparable to the compensation of appointed counsel in State appellate or trial proceedings in capital cases. The accompanying explanation in the analysis statement for this rule explains that the compensation afforded for trial and appellate representation is likely to be sufficient to secure the availability of an adequate pool of competent attorneys to provide postconviction representation, because that level of compensation is necessarily sufficient to ensure an adequate number of attorneys are available to provide representation in trials and appeals, where representation by counsel is constitutionally required.

Some commenters criticized this provision as overly permissive on the ground that trial and appellate counsel may be underpaid and that such counsel are sometimes found to have provided constitutionally ineffective assistance. However, that is not an occurrence that can be infallibly guarded against by any level of compensation at any stage of criminal proceedings. Moreover, the proposed rule has been modified to afford the Attorney General latitude to consider any unusual circumstances presented by a particular State system that indicate that the level of compensation called for in this benchmark is unlikely to function as expected. It is conceivable in the context of a particular State and its distinctive market conditions for legal services, for example, that what normally should be sufficient compensation may not in fact be reasonably likely to make competent lawyers available for timely provision to capital petitioners in State postconviction proceedings. *Cf. Baker,* 220 F.3d at 285–86 (considering per-attorney overhead costs and effective compensation rates among other factors in finding compensation scheme inadequate under chapter 154).

Nevertheless, the Attorney General does not exercise limitless discretion to pass judgment on whether State compensation authorizations are sufficiently generous under chapter 154, which provides in relevant part simply that the Attorney General is to determine ''whether the State has established a mechanism for the appointment [and] compensation . . . of competent counsel.'' 28 U.S.C. 2265(a)(1)(A). The formulation of the rule on this point reads the statutory scheme to allow the Attorney General to review the adequacy of State compensation provisions in the interest of promoting sufficient financial incentives to secure the appointment of competent counsel in sufficient numbers to timely provide representation to capital petitioners in State collateral proceedings. The Attorney General will consider any available relevant information, including the effective hourly rate for appointed attorneys, in evaluating a mechanism's compensation standards. But the comments critical of the § 26.22(c)(1)(iii) benchmark, which raised concerns with funding for appointment of counsel in particular cases or in particular States, were not sufficiently persuasive that compensation that adequately motivates counsel to accept appointments for the trial and appeal of capital cases (in which they are held to provision of constitutionally effective assistance) will generally be unlikely to provide sufficient incentives for competent counsel to provide representation in State collateral proceedings satisfying the standards of chapter 154.

Section 26.22(c)(2) in the rule allows approval of other approaches to compensation, but ''only if the State mechanism is otherwise reasonably designed to ensure the availability for appointment of [competent] counsel.'' Some commenters criticized this provision as vague and urged that the rule be modified so that chapter 154 certification could be granted only if a State's counsel compensation provisions satisfy definite criteria stated in the rule.

As with the corresponding comments on § 26.22(b)(2), these comments in part reflected an assumption that the Attorney General has a conflict of interest in carrying out his legal duties under chapter 154, and the response is much the same. The underlying assumption of a conflict of interest is not well-founded, for reasons discussed above. Additionally, § 26.22(c)(2) is consistent with the Department's recognition that a State should have significant latitude in designing a capital counsel mechanism that (among other things) are tailored to the State's unique characteristics and market conditions. As already noted, the provision affords States appropriate discretion to set alternative levels of compensation that will reasonably assure the timely appointment of competent counsel but that might otherwise be foreclosed by an overly specific ex ante requirement. At the same time, as explained above in connection with § 26.22(b)(2), a State's latitude to consider alternative compensation standards, and the Attorney General's assessment of any such standards, is not unbounded. The rule identifies four benchmarks that will continue to guide the Attorney General's evaluation of other proposed standards—as the text of the proposed rule has similarly been revised to clarify.

**Section 26.22(d)—Reasonable Litigation Expenses**

Section 26.22(d) in the rule reflects the requirement to provide for payment of reasonable litigation expenses. Some commenters criticized this provision as not sufficiently specific regarding the types of expenses that must be defrayed and the means of evaluating what expenditures are reasonable. They accordingly urged more definite specification concerning these matters in the rule, such as explicitly requiring payment for investigators, mitigation specialists, mental health and forensic science experts, and support personnel, and providing standards for evaluating the reasonableness of compensation for persons in each category.

The comments raise an important issue for consideration. The Department recognizes that investigators, mental health and forensic experts, and other support personnel often contribute critical services in capital postconviction cases. The Department agrees that payment of such individuals, among other expenses that may arise in the context of a particular case, are litigation expenses that should merit reimbursement if reasonable, and the text of § 26.22(d) has been modified in the final rule to clarify this point. *See* ABA Guidelines, at 128 (''[C]ollateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation in accordance with Guideline 10.7 . . . [including] discover[ing] mitigation that was not presented previously, [and] identify[ing] mental-health claims which potentially reach beyond sentencing issues to fundamental questions of competency and mental-state defenses.''); *Rompilla* v. *Beard,* 545 U.S. 374, 387 (2005) ('''[W]e long have referred [to ABA Standards] as guides to determining what is reasonable.''' (quoting *Wiggins* v. *Smith,* 539 U.S. 510, 524 (2003) (internal quotation marks omitted)).

However, the language of section 2265 does not suggest that the Attorney General must enumerate the universe of litigation expenses that merit reimbursement. Rather, the relevant statutory directive to the Attorney General is to determine whether the State has established a mechanism for the ''payment of reasonable litigation expenses.'' 28 U.S.C. 2265(a)(1)(A). The comments on this issue did not persuasively establish that a State should be denied chapter 154 certification if its mechanism requires the payment of reasonable litigation expenses in terms similar to chapter 154 itself, or at some other level of generality less specific than that urged by the commenters. *See Spears,* 283 F.3d at 1016 (''[Chapter 154] requires only that the state mechanism provide for the payment of reasonable litigation expenses. The federal statute thus assumes that a state can assess reasonableness as part of its process.''); *see also* Gould & Greenman, *supra,* at 31–32, 78, 122 (2010) (provision for Federal court proceedings in capital cases, which refers generally to fees and expenses for investigative, expert, and other reasonably necessary services,

states that payment for these purposes shall not exceed $7,500 unless approved for a higher amount by the circuit chief judge or delegee—but the median reimbursable cost that Federal courts approved in capital cases between 1998 and 2004 was $83,000).

Importantly, though, as with other requirements under chapter 154, satisfaction of the requirement regarding payment of reasonable litigation expenses requires that States have standards in force that so provide. The Attorney General will consider all relevant aspects of State standards in ascertaining whether the statutory requirements have been satisfied. Thus, as § 26.22(d) states, a general provision requiring payment of reasonable litigation expenses would not be sufficient if negated by rigid payment caps with no authorized means for payment of necessary expenses above such limits, and the Attorney General would similarly consider whether such a provision is negated by State policy that precludes payment for certain categories of expenses that may be reasonably necessary. Moreover, as with other requirements, the Attorney General is not dependent on the State's representations, and any interested person or entity believing that State standards overall do not provide for payment of reasonable litigation expenses is free to bring relevant information to the Attorney General's attention through the comment procedure set out in § 26.23 in the rule.

Comments responding to the supplemental notice of proposed rulemaking suggested that satisfaction of § 26.22(d) should only be considered presumptively adequate for purposes of chapter 154, paralleling the ''presumptively'' qualifier applicable to the benchmark provisions relating to counsel competency and compensation, which appear in § 26.22(b)(1) and (c)(1) in the final rule. The ''presumptively'' qualifier is neither necessary nor appropriate here because § 26.22(d) incorporates no benchmark provisions. It articulates the requirement relating to payment of litigation expenses under chapter 154, and States that have established mechanisms that meet this requirement have done what chapter 154 requires in this connection. Its proper counterpart is not the benchmark provisions in § 26.22(b)(1) and (c)(1), but the general articulations of the chapter's requirements relating to counsel competency and compensation in § 26.22(b)(2) and (c)(2), which similarly do not need or have a ''presumptively'' qualifier.

**Section 26.23(a)–(c)—Certification Procedure**

These provisions in the rule specify the procedure for the Attorney General to receive requests for chapter 154 certification, obtain public comment on the requests through Internet posting and **Federal Register** publication, and make and announce the certification decision.

Some commenters objected that the public notice and comment procedure of the rule is inadequate and that the Attorney General must engage in additional fact-finding processes. These objections are premised on an incorrect understanding of the nature and scope of the Attorney General's certification determination, as explained earlier in this preamble. The Attorney General's decision to certify an established State mechanism under chapter 154 need not be supported by a data-intensive examination of the State's record of compliance with the established mechanism in all or some significant subset of postconviction cases; for instance, certification should not be foreclosed for a State that cannot submit the information the commenters identify because it has established new standards that satisfy the statutory requirements but for which there is no pre-existing record of compliance. The comments provided no persuasive reason to believe that the rule's procedure, under which the Attorney General will publish a State's request for certification and invite interested parties and the State seeking certification to be heard via written submissions during one or more public comment periods, will be inadequate to provide the information needed for the determinations that the Attorney General actually must make under chapter 154. Moreover, the Attorney General's certifications under chapter 154 are orders rather than rules for purposes of the Administrative Procedure Act (APA). They are accordingly not subject to the APA's rulemaking provisions, *see* 5 U.S.C. 553, much less to the APA's requirements for rulemaking or adjudication required to be made or determined on the record after opportunity for an agency hearing, *see* 5 U.S.C. 553(c), 554, 556, 557.

The Department does not believe, as some commenters urged, that it is necessary to specify detailed information concerning State capital collateral review systems that States must include in their requests for chapter 154 certification. For the reasons already given, these comments were similarly based on an incorrect understanding of the nature and scope of the Attorney General's certification determination. Chapter 154 itself and this rule explain what States must do to qualify for chapter 154 certification. Under the procedures of § 26.23, States will be free to present any and all information they consider relevant or useful to explain how the mechanism for which they seek certification satisfies these requirements. Likewise, through the public comment procedure of the rule, any other interested person or entity will be free to submit any information it may wish in support of, or in opposition to, the State's request—including information that the mechanism submitted for certification has not been established because its standards are actually negated or overridden by contrary State policy. Further, the proposed rule has been revised to make clear that the Attorney General may permit more than one period for comment to allow the requesting State or any interested parties further opportunity for submission of views or information. The comments provided no persuasive reason for an across-the-board imposition of more definite informational requirements beyond that.

Comments also proposed that the rule require the Attorney General to give personal notice to certain entities concerning a State's submission of a request for chapter 154 certification, such as capital defense entities in the requesting State. In any particular State, there may be a large number of organizations and individuals who are involved in capital defense work or who would be interested in a State's request for chapter 154 certification for other reasons. It is not feasible for the Attorney General to attempt to identify and personally notify all of them. Nor should the Attorney General be in the position of having to pick and choose, identifying certain persons or organizations as sufficiently interested or important to receive personal notice, when others will not receive such notice. Such personal notice requirements, in any event, are unnecessary, because the State's request will be made publicly available on the Internet and in the **Federal Register** as provided in § 26.23(b).

Section 26.23(c) states that if certification is granted, the certification will be published in the **Federal Register**. Some commenters urged that denials of certification also be published in the **Federal Register**. However, the granting of chapter 154 certification by the Attorney General changes the Federal habeas corpus review procedures applicable in relation to capital cases in the State, so there is a

clear interest in making it indisputable and publicly known that certification has been granted, for which **Federal Register** publication is a convenient and sufficient means. The reasons for publicizing a denial of certification through official publication are less compelling because its legal effect is just to perpetuate the status quo. Publication of a denial of certification might alternatively serve the purpose of providing the predicate for an appeal of the Attorney General's decision to the D.C. Circuit Court of Appeals. However, review by the D.C. Circuit would be pursuant to chapter 158 of title 28, *see* 28 U.S.C. 2265(c), which provides that ''[o]n the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules.'' 28 U.S.C. 2344. So the Attorney General has the option of giving notice by service to the State official who requested certification regarding the denial of the certification, and is not legally required to publish the denial. Considering the foregoing, the comments do not persuasively establish that the rule should be changed to require uniformly that the Attorney General publish denials of certification in the **Federal Register**.

### Section 26.23(d)—Post-Certification Occurrences

Section 26.23(d) in the rule addresses the effect of changes or alleged changes in a State capital counsel mechanism following certification by the Attorney General.

One commenter urged that more of the accompanying explanation regarding this provision in the analysis statement for the proposed rule be contained in the rule itself. The relevant portion of the analysis statement, 76 FR at 11710–11, in part noted that if a State abolishes its capital counsel mechanism following certification by the Attorney General, then 28 U.S.C. 2261(b)(2)'s requirement of appointment of counsel pursuant to the certified mechanism as a condition of chapter 154's applicability cannot thereafter be satisfied, reflecting the obvious point that counsel cannot be appointed pursuant to something that no longer exists. The analysis statement further noted that capital habeas petitioners may present claims to Federal habeas courts that subsequent changes or alleged changes in the certified mechanism effectively converted it into a new and uncertified mechanism, and hence section 2261(b)(2)'s requirement of appointment of counsel pursuant to the certified mechanism was not satisfied in their cases. This observation reflects no judgment by the Attorney General as to whether certain changes in a certified mechanism would affect the applicability of chapter 154, and, if so, under what circumstances or to what extent. That is a matter that Federal habeas courts may consider if capital petitioners raise claims of this nature under section 2262(b)(2). The rule says no more on this question because resolving it is not any part of the Attorney General's certification functions under chapter 154.

The analysis went on to note that in such circumstances, or in other circumstances in which there has been some change or alleged change in the State mechanism, the State could request a new certification by the Attorney General of its present capital counsel mechanism. That could avoid litigation in Federal habeas courts under 28 U.S.C. 2261(b)(2) over the present status of the State mechanism and ensure that determinations regarding satisfaction of chapter 154's requirements are made by the Attorney General, subject to review by the D.C. Circuit Court of Appeals, as contemplated by 28 U.S.C. 2261(b)(1) and 2265(c)(2). The rule does not need to be changed to make this point because § 26.23(d) in the rule already says that ''[a] State may request a new certification by the Attorney General to ensure the continued applicability of chapter 154 to cases in which State postconviction proceedings occur after a change or alleged change in the State's certified capital counsel mechanism.''

Some comments urged that the rule should be changed to provide a means for decertification of State capital counsel mechanisms that the Attorney General has previously approved. One of the comments pointed in this connection to 5 U.S.C. 553(e), which in part requires agencies to give interested persons the right to petition for the repeal of a rule. However, that provision is inapplicable to chapter 154 certifications, which are orders rather than rules, as noted above.

Decertification could conceivably be effected in one of two ways: (i) through some procedure for examination or oversight of State capital counsel mechanisms following their certification to ascertain whether they continue to measure up under chapter 154's standards, or (ii) through modification of the rule to provide that a certification automatically lapses based on subsequent changes in the capital counsel mechanism or other changed circumstances.

The argument for incorporating some provision for continual oversight and potential decertification of State capital counsel mechanisms is not persuasive for a number of reasons. First, the proposal conflates the functions assigned to the Attorney General and those reserved to Federal habeas courts under the current formulation of chapter 154, which limits the Attorney General's function to making general certification determinations upon request of an appropriate State official, *see* 28 U.S.C. 2261(b)(1), 2265(a)(1), and reserves case-specific inquiries affecting chapter 154's applicability to Federal habeas courts under 28 U.S.C. 2261(b)(2). Second, the chapter includes provisions that establish when a certification takes effect and direct the Attorney General to promulgate regulations to implement a certification procedure, *see* 28 U.S.C. 2265(a)(2), 2265(b), but no direction to the Attorney General to implement a decertification procedure. These considerations lead to the conclusion that day-to-day oversight and potential decertification of State capital counsel mechanisms are not among the Attorney General's authorized functions under chapter 154.

Regarding the idea that a certification would automatically lapse based on subsequent events, such an approach would pose difficulties in operation, most prominently that certification should not cease to apply merely because the change *might* affect satisfaction of the chapter 154 requirements, and that it is unclear *who* would determine whether a change in the capital counsel system might affect satisfaction of the chapter 154 requirements.

This rule accordingly responds to these difficulties by not including any provision for decertification, but providing in § 26.23(d) that a State may seek a new certification from the Attorney General to resolve uncertainties concerning chapter 154's continued applicability in light of subsequent changes or alleged changes in the State's certified capital counsel mechanism. This approach (i) avoids any question of legal consistency with chapter 154's definition of the Attorney General's authority and functions, and (ii) avoids the difficulties inherent in attempting to define ex ante and in the absence of any factual context the conditions and procedures for assessing whether and what changes to a State system should prompt a decertification review, but (iii) affords a means for resolution by the responsible authority under chapter 154 of questions that may arise in practice regarding the continued effectiveness of chapter 154 certifications.

Just as importantly, § 26.23(e), discussed below, provides that

certifications are effective for a period of five years, thereby ensuring that a State capital counsel mechanism's current satisfaction of the chapter 154 requirements will be revisited at reasonable intervals. This addresses concerns about the possibility of subsequent changes in a State's system that could put it out of compliance with chapter 154, further reducing the force of any argument that a decertification procedure is needed.

**Section 26.23(e)—Renewal of Certifications**

Section 26.23(e) provides that certifications remain effective for a period of five years. The addition of this provision, which was not in the proposed rule but was described in the supplemental notice of proposed rulemaking, *see* 77 FR at 7562, is responsive to many comments that pointed out that changed circumstances may affect whether a once-certified mechanism continues to be adequate for purposes of chapter 154. For example, inflation or changed economic circumstances may mean that provisions authorizing compensation of counsel at a specified hourly rate, which were sufficient at the time of an initial certification decision, are no longer adequate after the passage of years. Or changes may occur in the standards constituting a State's postconviction capital counsel mechanism that affect their consistency with chapter 154.

Some commenters on the supplemental notice approved of this change but urged that the rule include more detail concerning the operation of the recertification process and the standards that would be applied in making recertification decisions. This is unnecessary because the process and standards for subsequent certification decisions are the same as those for initial certification decisions under the rule. The standards of § 26.22 will be applied in deciding whether a State's capital counsel mechanism for which recertification is requested satisfies the chapter 154 requirements, and the procedure set forth in § 26.23 will apply in entertaining, obtaining public input concerning, and deciding recertification requests.

Two commenters objected to limiting the duration of certifications on the grounds that chapter 154 does not provide for the termination of certifications and that the sponsor of the 2006 amendments to chapter 154 explained that they were intended to create a system of ''one-time certification.'' *See* 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl). Regarding the statutory question, the statutory framework is unquestionably premised on the continuing sufficiency of a mechanism once certified by the Attorney General. The quid pro quo that is the core and the animating purpose of chapter 154, procedural ''benefits'' for States if and only if they meet the statutory criteria, would cease to make sense if a certification were indefinitely and irrevocably effective even if—by virtue of changed circumstances, *see infra* (analysis statement)—the standards first put in place by a State no longer satisfied the statutory requirements. Providing for periodic review of certifications is fully consistent with the statutory text and avoids such an absurd result. If a statute requires an assessment of mutable conditions against legal standards, a reasonable time limit may be imposed on the effectiveness of a certification to ensure its continuing validity, even if the authorizing statute does not explicitly provide for a time limit. *See Durable Mfg. Co.* v. *U.S. Dep't of Labor,* 578 F.3d 497, 501–02 (7th Cir. 2009) (upholding time limitation of validity of labor certificates in light of possible subsequent changes in economic circumstances affecting consistency with statutory requirements and objectives).

Regarding the statement by the sponsor of the amendment, it reflects a rejection of the idea of a continuing ''compliance review'' process or ''decertification'' procedure under chapter 154 in light of (i) ''the substantial litigation burdens'' that would likely result for States that have been certified, including ''the cost of creating opportunities to force the State to continually litigate its chapter 154 eligibility,'' (ii) the concern that ''if such a means of post-opt-in review were created, it inevitably would be overused and abused,'' and (iii) the judgment that States ''are entitled to a presumption that once they have been certified as chapter-154 compliant, they will substantially maintain their counsel mechanisms.'' 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl). The statement further viewed a decertification procedure as enabling adverse parties to embroil States in challenges to the continued validity of their capital counsel mechanisms under chapter 154 based on case-specific deficits in their operation, such as delay in the appointment of counsel in particular cases for reasons beyond the State's control. *See id.*

Considered as a whole, the sponsor's statement reflects concerns that would be implicated by the creation of a continuing oversight or decertification procedure for chapter 154. The Department, as discussed above, has not attempted to create such a procedure in the present rule.

The provision adopted in § 26.22(e) in the final rule does not implicate these concerns. It authorizes no person or entity to initiate challenges to the continuing validity of a certification, much less to involve a State in the uncertainty of perpetual litigation about the validity of a certification. Moreover, § 26.22(e) provides that certifications remain effective for an uninterrupted period of five years after the completion of the certification process by the Attorney General and any related judicial review. If recertification is requested at or before the end of that period, the rule provides that the prior certification will remain in effect until the completion of the recertification process by the Attorney General and any related judicial review.

Section 26.22(e) also does not implicate the concern about challenges based on case-specific non-compliance with State capital counsel mechanisms. Recertification decisions by the Attorney General will involve the same standards and procedures as initial certification decisions.

Finally, the inclusion of § 26.22(e) in the rule does not reflect an assumption that States are likely to abolish or materially weaken their chapter 154-compliant capital counsel mechanisms once they have been established. If no changes have occurred that take a State capital counsel mechanism out of compliance with chapter 154, then it will be recertified, and the recertification process will provide a definitive means of establishing continued satisfaction of the chapter's requirements.

**Section-by-Section Analysis**

*Section 26.20*

Section 26.20 explains the rule's purpose of implementing the certification procedure for chapter 154. It is modified from the corresponding provision in the 2008 regulations to describe more fully the conditions for the applicability of chapter 154 under 28 U.S.C. 2261(b).

*Section 26.21*

Section 26.21 defines the terms ''appropriate state official'' and ''state postconviction proceedings'' in the same manner as the 2008 regulations, and adds a definition of ''appointment'' and ''indigent prisoners.''

Chapter 154 involves a quid pro quo arrangement under which States provide for the appointment of counsel

for indigent petitioners in State postconviction proceedings in capital cases, and in return Federal habeas review is carried out with generally more limited time frames and scope following the State postconviction proceedings in which counsel has been made available. *See* 28 U.S.C. 2261–2266. In this context, not every provision for making counsel available in State postconviction proceedings, however belatedly, can logically be regarded as providing for the appointment of counsel in the sense relevant under the chapter. In particular, that would not be the case if the State capital counsel mechanism provided for the availability of counsel to represent indigent capital petitioners only after the deadline for pursuing State postconviction proceedings had passed; or only after the expiration of the time limit in 28 U.S.C. 2263 for Federal habeas filing; or only after such delay that the time available to prepare for and pursue State or Federal postconviction review had been seriously eroded. Section 26.21 accordingly defines ''appointment'' to mean ''provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.''

Under 28 U.S.C. 2265(a), a certification request must be made by ''an appropriate State official.'' Prior to the 2006 amendments to chapter 154, Federal courts entertaining habeas corpus applications by State prisoners under sentence of death would decide which set of habeas corpus procedures applied—chapter 153 or chapter 154 of title 28—and State attorneys general responsible for such litigation could request determinations that their States had satisfied the requirements for the applicability of chapter 154. The 2006 amendments to chapter 154 were not intended to disable the State attorneys general from their pre-existing role in this area, and State attorneys general continue in most instances to be the officials with the capacity and motivation to seek chapter 154 certification for their States. *See* 73 FR at 75329–30. Section 26.21 of the rule accordingly provides that the appropriate official to seek chapter 154 certification is normally the State attorney general. In those few States, however, where the State attorney general does not have responsibilities relating to Federal habeas corpus litigation, the chief executive of the State will be considered the appropriate State official to make a submission on behalf of the State.

Section 26.21 defines ''State postconviction proceedings'' as ''collateral proceedings in State court, regardless of whether the State conducts such proceedings after or concurrently with direct State review.'' Collateral review normally takes place following the completion of direct review of the judgment, but some States have special procedures for capital cases in which collateral proceedings and direct review may take place concurrently. Provisions that separately addressed the application of chapter 154 to these systems were replaced by the 2006 amendments with provisions that permit chapter 154 certification for all States under uniform standards, regardless of their timing of collateral review vis-à-vis direct review. *Compare* 28 U.S.C. 2261(b), 2265 (2006) (as amended by the USA PATRIOT Improvement and Reauthorization Act of 2005), *with* 28 U.S.C. 2261(b), 2265 (2000) (as enacted by AEDPA). *See generally* 152 Cong. Rec. S1620 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl) (explaining that the current provisions simplify the chapter 154 qualification standards, ''which obviates the need for separate standards for those States that make direct and collateral review into separate vehicles and those States with unitary procedures'').

The definition of ''State postconviction proceedings'' in the rule reflects the underlying objective of chapter 154 to provide expedited Federal habeas corpus review in capital cases arising in States that have gone beyond the constitutional requirement of providing counsel for indigents at trial and on appeal by extending the provision of counsel to indigent capital petitioners in State collateral proceedings. *See* 73 FR at 75332–33, 75337 (reviewing relevant legislative and regulatory history). The provisions of chapter 154, as well as its legislative history, reflect the understanding of ''postconviction proceedings'' as specifically referring to collateral proceedings rather than to all proceedings that occur after conviction (e.g., sentencing proceedings, direct review). *See* 28 U.S.C. 2261(e) (providing that ineffectiveness or incompetence of counsel during postconviction proceedings in a capital case cannot be a ground for relief in a Federal habeas corpus proceeding); 28 U.S.C. 2263(a), (b)(2) (180-day time limit for Federal habeas filing under chapter 154 starts to run ''after final State court affirmance of the conviction and sentence on direct review or the expiration of the time for seeking such review'' subject to tolling ''from the date on which the first petition for postconviction review or other collateral relief is filed until the final State court disposition of such petition''); 152 Cong. Rec. S1620, 1624–25 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl) (explaining that chapter 154 provides incentives for States to provide counsel in State postconviction proceedings, referring to collateral proceedings); 151 Cong. Rec. E2639–40 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake) (displaying the same understanding); *see also, e.g., Murray* v. *Giarratano,* 492 U.S. 1 (1989) (using the terms postconviction and collateral proceedings interchangeably).

*Section 26.22*

Section 26.22 sets out the requirements for certification that a State must meet to qualify for the application of chapter 154. These are the requirements in 28 U.S.C. 2261(c)–(d) and 2265(a)(1).

Paragraph (a) of § 26.22—Appointment of Counsel

Paragraph (a) of § 26.22 sets out the requirements of chapter 154 concerning appointment of counsel that appear in 28 U.S.C. 2261(c)–(d).

Paragraph (b) of § 26.22—Competent Counsel

Paragraph (b) of § 26.22 explains how States may satisfy the requirement to provide for appointment of ''competent counsel'' and to provide ''standards of competency'' for such appointments. 28 U.S.C. 2265(a)(1)(A), (C).

The corresponding portion of the 2008 regulations construed the reference to appointment of ''competent counsel'' in section 2265(a)(1)(A) as a cross-reference to counsel meeting the competency standards provided by the State pursuant to section 2265(a)(1)(C). It accordingly treated the definition of such standards as a matter of State discretion, not subject to further review by the Attorney General. *See* 73 FR at 75331. However, these provisions may also reasonably be construed as permitting the Attorney General to require a threshold of minimum counsel competency, while recognizing substantial State discretion in setting counsel competency standards. *See generally* OLC Opinion. The latter understanding is supported by cases interpreting chapter 154, *see, e.g., Spears,* 283 F.3d at 1013 (recognizing that ''Congress . . . intended the states to have substantial discretion to determine the substance of the competency standards'' under chapter 154 while still reviewing the adequacy

of such standards), and by the original Powell Committee proposal from which many features of chapter 154 ultimately derive, *see* 135 Cong. Rec. 24696 (1989). This understanding is adopted in § 26.22(b) of the final rule.

The specific standards set forth in paragraph (b) are based on judgments by Congress in Federal laws concerning adequate capital counsel competency standards and on judicial interpretation of the counsel competency requirements of chapter 154. Section 26.22(b)(1) sets out two approaches that will presumptively be considered adequate to satisfy chapter 154—an option involving an experience requirement derived from the standard for appointment of counsel in Federal court proceedings in capital cases (paragraph (b)(1)(i)), and an option involving qualification standards set in a manner consistent with relevant portions of the IPA (paragraph (b)(1)(ii)). Section 26.22(b)(2) provides that States can satisfy chapter 154's requirements by reasonably assuring an appropriate level of proficiency in other ways, such as by requiring some combination of experience and training.

As indicated in the introductory language in subsection (b)(1) of § 26.22, State capital counsel mechanisms will be regarded as presumptively adequate in relation to counsel competency if they meet or exceed the benchmark standards identified in the subsection. States will not be penalized for going beyond the minimum required by the rule. Thus, for example, in relation to paragraph (b)(1)(i), State competency standards will be considered presumptively sufficient if they require five years of postconviction experience, rather than three; uniform satisfaction of the five-year/three-year experience requirement rather than allowing some exception as in 18 U.S.C. 3599(d); or training requirements for appointment in addition to the specified experience requirement.

The rule does not require that all counsel in a State qualify under the same standard. Alternative standards may be used so long as the State mechanism requires that all counsel satisfy some standard qualifying under paragraph (b). *Cf.* 18 U.S.C. 3599(d) (allowing exceptions to categorical experience requirement); *Spears,* 283 F.3d at 1013 (finding that alternative standards are allowed under chapter 154). Hence, for example, a State system may pass muster by requiring that appointed counsel either satisfy an experience standard sufficient under paragraph (b)(1)(i) or satisfy an alternative standard sufficient under paragraph (b)(2) involving more limited experience but an additional training requirement.

Option 1: § 26.22(b)(1)(i)—The Competency Standards for Federal Court Proceedings

As provided in paragraph (b)(1)(i) of § 26.22, a State may satisfy chapter 154's requirement relating to counsel competency by requiring appointment of counsel ''who have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience.'' This is based on the standard for appointed counsel in capital case proceedings in Federal court. *See* 18 U.S.C. 3599(a)–(e). Because Congress has determined that a counsel competency standard of this nature is adequate for capital cases in Federal court proceedings, including postconviction proceedings, *see* 18 U.S.C. 3599(a)(2), it will also presumptively be considered adequate for chapter 154 purposes when such cases are at the stage of State postconviction review.

The counsel competency standards for Federal court proceedings in capital cases under 18 U.S.C. 3599 do not require adherence to a five-year/three-year experience requirement in all cases, but provide that the court, ''for good cause, may appoint another attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant,'' with due consideration of the seriousness of the penalty (i.e., capital punishment) and the nature of the litigation. 18 U.S.C. 3599(d). For example, a court might consider it appropriate to appoint an attorney who is a law professor with expertise in capital punishment law and training in capital postconviction litigation to represent a prisoner under sentence of death, even if the attorney has less than three years of relevant litigation experience. The rule in paragraph (b)(1)(i) accordingly does not require the imposition of a five-year/three-year minimum experience requirement in all cases, but allows States that generally impose such a requirement to permit the appointment of other counsel who would qualify for appointment under the exception allowed in 18 U.S.C. 3599, i.e., appointment by a court, for good cause, of attorneys whose background, knowledge, or experience would otherwise enable them to properly represent prisoners under sentence of death considering the seriousness of the penalty and the nature of the litigation. This recognizes, as in section 3599, that courts may properly be allowed, for good cause, to depart from the specified experience requirement, which the Department expects would occur only in exceptional cases.

Option 2: § 26.22(b)(1)(ii)—The Innocence Protection Act Standards

Paragraph (b)(1)(ii) in § 26.22 sets forth a second approach that presumptively satisfies the counsel competency requirements of chapter 154, specifically, by setting qualification standards for appointment of postconviction capital counsel in a manner consistent with the IPA. The IPA directs the Attorney General to provide grants to States to create or improve ''effective system[s] for providing competent legal representation'' in capital cases, 42 U.S.C. 14163(c)(1), and provides a definition of ''effective system'' in 42 U.S.C. 14163(e) that is largely based on elements of the ABA Guidelines. *Compare* 42 U.S.C. 14163(e), *with* ABA Guidelines § 3.1, at 22–23. The IPA specifies that such effective systems are to include appointment of capital counsel (i) by a public defender program, (ii) by an entity composed of individuals with demonstrated knowledge and expertise in capital cases (other than current prosecutors) that is established by statute or by the highest State court with criminal case jurisdiction, or (iii) by the court appointing qualified attorneys from a roster maintained by a State or regional selection committee or similar entity pursuant to a pre-existing statutory procedure. 42 U.S.C. 14163(e)(1).

Under the IPA requirements, the appointing authority or an appropriate designated entity must ''establish qualifications for attorneys who may be appointed to represent indigents in capital cases,'' ''maintain a roster of qualified attorneys,'' ''conduct, sponsor, or approve specialized training programs,'' and monitor and disqualify from subsequent appointment attorneys whose performance is ineffective or unethical or who fail to participate in required training. 42 U.S.C. 14163(e)(2)(A), (B), (D), (E). The IPA does not prescribe the content of the required counsel qualification standards, but assumes that the specifications regarding the nature of the appointment or selection authority—and the associated requirements for post-appointment monitoring and potential disqualification—can be relied on to provide appropriate competency standards.

Paragraph (b)(1)(ii) in § 26.22 follows this legislative judgment in relation to a State's satisfaction of the counsel competency requirements of chapter

154. Thus, a State's capital counsel mechanism will presumptively be deemed adequate for purposes of chapter 154's counsel competency requirements if it provides for the appointment and qualification (or disqualification) of counsel in State postconviction proceedings in capital cases in a manner consistent with 42 U.S.C. 14163(e)(1) and 14163(e)(2)(A), (B), (D), (E).

Option 3: § 26.22(b)(2)—Other Standards Reasonably Assuring Proficiency

In enacting chapter 154, ''Congress did not envision any specific competency standards but, rather, intended the states to have substantial discretion to determine the substance of the competency standards.'' *Spears,* 283 F.3d at 1013. The options described in paragraphs (b)(1)(i) and (ii) in § 26.22 accordingly do not exhaust the means by which States may satisfy chapter 154's requirements concerning counsel competency. Indeed, Congress in formulating chapter 154 rejected a recommendation that States uniformly be required to satisfy standards similar to those for Federal court proceedings in capital cases that currently appear in 18 U.S.C. 3599, *see* 73 FR at 75331, and in amending chapter 154 in 2006 Congress did not modify chapter 154 to require adherence by States to the IPA standards that had been enacted in 2004 but rather continued to use the more general language of chapter 154 relating to counsel competency.

Consequently, as provided in paragraph (b)(2) in § 26.22, the Attorney General will consider whether a State's counsel competency standards reasonably assure appointment of counsel with a level of proficiency appropriate for State postconviction litigation in capital cases, even if they do not meet the particular criteria set forth in paragraph (b)(1)(i) or (b)(1)(ii). As in the courts' consideration of the adequacy of State competency standards prior to the 2006 amendments to chapter 154, no definite formula can be prescribed for this review, and the Attorney General will assess such State mechanisms individually. Measures that will be deemed relevant include standards of experience, knowledge, skills, training, education, or combinations of these considerations that a State requires attorneys to meet in order to be eligible for appointment in State capital postconviction proceedings. *Cf.* 18 U.S.C. 3599(d) (allowing appointment of counsel whose background, knowledge, or experience would otherwise enable such counsel to properly represent the petitioner); *Spears,* 283 F.3d at 1012–13 (finding that competency standards involving combination of experience, proficiency, and education were adequate under chapter 154); ABA Guidelines § 5.1(B)(2), at 35, § 8.1(B), at 46 (recommending skill and training requirements for capital counsel).

Also, the rule in subparagraphs (b)(1)(i) and (ii) of § 26.22 identifies particular approaches that will be considered presumptively adequate, namely, those of the Federal capital counsel statute, 18 U.S.C. 3599, or the IPA, 42 U.S.C. 14163(e)(1), (2)(A) (B), (D), (E). These approaches accordingly serve as benchmarks, and a State's adoption of competency requirements that are likely to result in similar or even higher levels of proficiency will weigh in favor of a finding of adequacy for purposes of chapter 154. Conversely, State competency standards that appear likely to result in significantly lower levels of proficiency compared to the benchmark levels risk being found inadequate under chapter 154.

Paragraph (c) of § 26.22—Compensation of Counsel

Paragraph (c) of § 26.22 explains how a State may satisfy the requirement that it have established a mechanism for the compensation of appointed counsel. 28 U.S.C. 2265(a)(1)(A). The corresponding portion of the 2008 regulations assumed that levels of compensation for purposes of chapter 154 were a matter of State discretion, not subject to review by the Attorney General, because the statute refers simply to ''compensation'' and imposes no further requirement that the authorized compensation be ''adequate'' or ''reasonable.'' *See* 73 FR at 75331–32. However, the broader statutory context is the requirement that the State establish a mechanism ''for the appointment [and] compensation . . . of competent counsel.'' 28 U.S.C. 2265(a)(1)(A). This requirement reflects a determination by Congress that reliance on unpaid volunteers to represent indigent prisoners under sentence of death is insufficient, and a State mechanism affording inadequate compensation could similarly fall short in ensuring the availability of competent counsel for appointment. Hence, when a State relies on a compensation incentive to secure competent counsel, chapter 154 is reasonably construed to permit the Attorney General to review the adequacy of authorized compensation. This understanding is adopted in § 26.22(c) of the proposed rule.

Paragraph (c)(1) in § 26.22 describes a number of possible compensation standards that will presumptively be considered adequate for purposes of chapter 154, generally using as benchmarks the authorizations for compensation of capital counsel that have been deemed adequate in other acts of Congress.

The first option, appearing in paragraph (c)(1)(i), is compensation comparable to that authorized by Congress for representation in Federal habeas corpus proceedings reviewing State capital cases in 18 U.S.C. 3599(g)(1). This level of compensation should similarly be adequate to ensure the availability of competent counsel for appointment in such cases at the stage of State postconviction review.

The second option, appearing in paragraph (c)(1)(ii), is compensation comparable to that of retained counsel who meet competency standards sufficient under paragraph (b). The IPA and the ABA Guidelines similarly endorse reliance on market rates for legal representation to provide adequate compensation for appointed capital counsel. *See* 42 U.S.C. 14163(e)(2)(F)(ii)(II); ABA Guidelines § 9.1(B)(3), at 49. Compensation sufficient to induce competent attorneys to carry out such representation for hire should likewise be sufficient to attract competent attorneys to accept appointments for such representation.

The third option, appearing in paragraph (c)(1)(iii), is compensation comparable to that of appointed counsel in State appellate or trial proceedings in capital cases. *Cf.* 18 U.S.C. 3599(g)(1) (authorization for compensation of capital counsel not differentiating between compensation at different stages of representation). The compensation afforded at the stages of trial and appeal must be sufficient to secure competent attorneys to provide representation because effective legal representation is constitutionally required at those stages. Comparable compensation should accordingly be sufficient for that purpose at the postconviction stage.

The fourth option, appearing in paragraph (c)(1)(iv), is compensation comparable to that of attorneys representing the State in State postconviction proceedings in capital cases. This option also follows the IPA and the ABA Guidelines, which provide that capital counsel employed by defender organizations should be compensated on a salary scale commensurate with the salary scale of prosecutors in the jurisdiction. 42 U.S.C. 14163(e)(2)(F)(ii)(I); ABA Guidelines § 9.1(B)(2), at 49. The rule allows this approach for compensation of both public defenders and private counsel, but recognizes that private

defense counsel may have to pay from their own pockets overhead expenses that publicly employed prosecutors do not bear. The rule accordingly specifies that, if paragraph (c)(1)(iv) is relied on to justify the level of compensation authorized for private counsel, the compensation standard should take account of overhead costs (if any) that are not otherwise payable as reasonable litigation expenses. *Cf. Baker,* 220 F.3d at 285–86 (finding that compensation resulting in substantial losses to appointed counsel was inadequate under chapter 154).

In comparing a State's compensation standards to the benchmarks identified in paragraph (c)(1), both hourly rates and overall limits on compensation will be taken into account. For example, under paragraph (c)(1)(iii), suppose that State law authorizes the same hourly rate for compensation of appointed capital counsel at the appellate stage and in postconviction proceedings, but it specially imposes a low overall limit on compensable hours at the postconviction stage. The compensation authorized at the respective stages may then not be comparable in any realistic sense, and the objective of ensuring the availability of competent counsel for postconviction representation may not be realized, because counsel who accepted such representation would effectively be required to function as uncompensated volunteers to the extent they needed to work beyond the maximum number of compensable hours. This does not mean that State compensation provisions will be deemed inadequate if they specially prescribe presumptive limits on overall compensation at the postconviction stage, but comparability to the paragraph (c)(1) benchmarks may then depend on whether the State provides means for authorizing compensation beyond the presumptive maximum where necessary. *Cf. Spears,* 283 F.3d at 1015 (approving a presumptive 200-hour limit under chapter 154 where compensation was available for work beyond that limit if reasonable); *Mata* v. *Johnson,* 99 F.3d 1261, 1266 (5th Cir. 1996) (overall $7500 limit on compensation was not facially inadequate under chapter 154 and was not shown inadequate in the particular case), *vacated in part on other grounds,* 105 F.3d 209 (5th Cir. 1997).

As with the counsel competency benchmarks of paragraph (b)(1), the counsel compensation standards of paragraph (c)(1) provide only a floor that States are free to exceed, and not all counsel must be compensated in conformity with a single standard. A State may adopt alternative standards, each comparable to or exceeding some benchmark identified in paragraph (c)(1), and provide for compensation of different counsel or classes of counsel in conformity with different standards. For example, a State might provide for representation of some indigent capital petitioners in postconviction proceedings by appointed private counsel and some by public defender personnel, compensate the private counsel in conformity with paragraph (c)(1)(iii), and compensate the public defender counsel in conformity with paragraph (c)(1)(iv).

The rule recognizes that the options set out in paragraph (c)(1) of § 26.22 are not necessarily the only means by which a State may provide compensation for competent counsel. State compensation provisions for capital counsel have been deemed adequate for purposes of chapter 154 and other Federal laws independent of any comparison to the benchmarks in paragraph (c)(1). *See* 42 U.S.C. 14163(e)(2)(F)(i) (under the IPA, State may compensate under qualifying statutory procedure predating that Act); *Spears,* 283 F.3d at 1015 (State could compensate at ''a rate of up to $100 an hour, a rate that neither Petitioner nor amici argue was unreasonable''). Also, a State may secure representation for indigent capital petitioners in postconviction proceedings by means not dependent on any special financial incentive for accepting appointments, such as by providing sufficient salaried public defender personnel to competently carry out such assignments as part of their duties. Accordingly, under paragraph (c)(2) in § 26.22, capital counsel mechanisms involving compensation provisions that do not satisfy paragraph (c)(1) may be found to satisfy the statutory requirement if they are otherwise reasonably designed to ensure the availability of competent counsel. As with § 26.22(b)(2) of the rule, mechanisms seeking to qualify under paragraph (c)(2) that appear likely to provide for significantly lesser compensation compared to the benchmark levels risk being found inadequate under chapter 154.

Paragraph (d) of § 26.22—Payment of Reasonable Litigation Expenses

Paragraph (d) of § 26.22 incorporates the requirement in 28 U.S.C. 2265(a)(1)(A) to provide for the payment of reasonable litigation expenses. An inflexible cap on reimbursable litigation expenses in capital postconviction proceedings could contravene this requirement by foreclosing the payment of costs incurred by counsel, even if determined by the court to be reasonably necessary. However, the requirement does not foreclose a presumptive limit if the State provides means for authorizing payment of litigation expenses beyond the limit where necessary. *Cf.* 18 U.S.C. 3599(f), (g)(2) (establishing presumptive $7500 limit on payment for litigation expenses in Federal court proceedings in capital cases, with authority for chief judge or delegee to approve higher amounts); *Mata,* 99 F.3d at 1266 (concluding that overall $2500 limit on payment of litigation expenses was not facially inadequate under chapter 154 and was not shown to be inadequate in the particular case).

*Section 26.23*

Section 26.23 in the rule sets out the mechanics of the certification process for States seeking to opt in to chapter 154.

Paragraph (a) provides that an appropriate State official may request in writing that the Attorney General determine whether the State meets the requirements for chapter 154 certification. Paragraph (b) provides that the Attorney General will make the request available on the Internet and solicit public comment on the request by publishing a notice in the **Federal Register**. It requires Internet availability because State requests for certification may include supporting materials not readily reproducible or viewable in the **Federal Register**, such as copies of State statutes, rules, and judicial decisions bearing on the State's satisfaction of chapter 154's requirements for certification.

As provided in paragraph (c), the Attorney General will review the State's request, including consideration of timely public comments received in response to a **Federal Register** notice. The Attorney General will decide whether the State has satisfied the requirements for chapter 154 certification and will publish the certification in the **Federal Register** if certification is granted. The certification will include a determination of the date the capital counsel mechanism qualifying the State for certification was established, as that date is the effective date of the certification. 28 U.S.C. 2265(a)(2).

Paragraph (d) addresses the effect of changes or alleged changes in a State's capital counsel mechanism after that mechanism has been certified by the Attorney General. The paragraph first addresses situations involving changes or alleged changes in a State's capital counsel mechanism prior to State postconviction proceedings in a capital case. Chapter 154's special Federal

habeas corpus review procedures apply in cases in which two conditions are met: (i) the State's capital counsel mechanism has been certified by the Attorney General, 28 U.S.C. 2261(b)(1), and (ii) ''counsel was appointed pursuant to that mechanism''—i.e., the mechanism certified by the Attorney General—unless the petitioner ''validly waived counsel . . . [or] retained counsel . . . or . . . was found not to be indigent,'' 28 U.S.C. 2261(b)(2). The first sentence of paragraph (d) therefore notes that certification by the Attorney General under chapter 154 reflects the Attorney General's determination that the State capital counsel mechanism examined in the Attorney General's review satisfies chapter 154's requirements. If a State later discontinues that mechanism before counsel is appointed in a given State postconviction proceeding, then counsel in that case will not have been ''appointed pursuant to'' the mechanism that was approved by the Attorney General and chapter 154 would accordingly be inapplicable in that case. Similarly, if a State later changes or is alleged to have changed the certified mechanism, litigation before Federal habeas courts may result under 28 U.S.C. 2261(b)(2) as to whether the State has in fact materially changed its mechanism and, if so, whether the change means that counsel (even if appointed) was appointed pursuant to what is effectively a new and uncertified mechanism, rather than the mechanism certified by the Attorney General.

The second sentence of paragraph (d) accordingly provides that a State may seek a new certification by the Attorney General if there is a change or alleged change in a previously certified capital counsel mechanism. If a State wishes to improve on a certified capital counsel mechanism, then certification by the Attorney General of the new or revised mechanism will allow the State to avoid Federal habeas court litigation over whether chapter 154 is applicable to cases involving appointments made pursuant to that mechanism. Similarly, if legal questions are raised about the continued applicability of chapter 154 based on changes or alleged changes in a certified capital counsel mechanism, a State may seek a new certification by the Attorney General that its current mechanism satisfies chapter 154's requirements, ensuring the continued applicability of chapter 154's special Federal habeas corpus procedures. By seeking a new certification of a new or revised capital counsel mechanism, a State may ensure that it is the Attorney General, subject to review by the DC Circuit Court of Appeals, who determines whether its capital counsel mechanism is in present compliance with chapter 154's requirements, *see* 28 U.S.C. 2261(b)(1), 2265(c)(2), and avoid litigation over that matter in the Federal habeas courts.

The final sentence in paragraph (d) states that subsequent changes in a State's capital counsel mechanism do not affect the applicability of chapter 154 in cases in which a mechanism certified by the Attorney General existed throughout State postconviction proceedings in the case. For example, suppose that the Attorney General certifies a State's capital counsel mechanism in 2013, the State postconviction proceedings in a capital case are carried out in 2014 and 2015 with counsel in those proceedings appointed pursuant to the certified mechanism, and Federal habeas corpus proceedings in the case commence in 2016. Suppose further that the State makes some change in 2016 to its counsel competency or compensation standards. Because a certified capital counsel mechanism would have been in place throughout State postconviction review, the prerequisites for expedited Federal habeas corpus review under chapter 154 would be satisfied. *See* 28 U.S.C. 2261(b). That result would not be affected by later changes in the State's postconviction capital counsel mechanism.

Section 26.23(e) provides in part that a chapter 154 certification remains effective for a period of five years. This takes account of the possibility of changes over time in a State's standards constituting its postconviction capital counsel mechanism, and the possibility of other changes in a State that may affect the continuing sufficiency over time of standards initially adopted by a State and certified under chapter 154. For example, a State provision authorizing compensation of counsel at a specified hourly rate may initially be reasonably designed to ensure the availability for appointment of competent counsel, but that may no longer be the case after the passage of years in light of inflation or other changed economic circumstances. *Cf. Durable Mfg. Co.,* 578 F.3d at 501–02 (upholding time limitation of validity of labor certificates in light of possible subsequent changes in economic circumstances affecting consistency with statutory requirements and objectives). Providing for some limitation on the lifespan of certifications and requiring renewal allows questions concerning the continued adequacy of the mechanism's standards, including whether they continue to apply, to be reexamined at regular intervals, each time with increased information about a State's actual experience with its mechanism, rather than assuming that a once-compliant State system is compliant indefinitely. At the same time, overly stringent limits on the duration of certifications could unduly burden States and undermine the incentive States have under chapter 154 to undertake the effort to establish compliant mechanisms and seek their certification.

Balancing these considerations, § 26.23(e) in the rule provides a basic period of five years during which a certification remains valid, with further provisions regarding the beginning and end of the period to promote the uninterrupted availability of the benefits of chapter 154 to a certified State when seeking recertification. As provided in 28 U.S.C. 2265(a)(2), the effectiveness of a certification is backdated to the date the certified capital counsel mechanism was established, but under the rule the five-year limit on its duration does not begin to run until the completion of the certification process by the Attorney General and any related judicial review. Moreover, the rule provides that a certification remains effective for an additional period extending until the conclusion of the Attorney General's disposition of the State's recertification request and any judicial review thereof, if the State requests recertification at or before the end of the five-year period.

**Regulatory Certifications**

*Executive Order 13563 and 12866*

As described in Executive Order 13563, Improving Regulation and Regulatory Review (Jan. 18, 2011), agencies must, to the extent permitted by law, propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; tailor the regulation to impose the least burden on society, consistent with obtaining the regulatory objectives; and, in choosing among alternative regulatory approaches, select those approaches that maximize net benefits. Executive Order 13563 recognizes that some benefits and costs are difficult to quantify and provides that, where appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.

The Department of Justice has determined that this rule is a ''significant regulatory action'' under

Executive Order 12866, section 3(f), and, accordingly, this rule has been reviewed by the Office of Management and Budget. The determination that this is a significant regulatory action, however, does not reflect a conclusion that it is ''likely to result in a rule that may . . . [h]ave an annual effect on the economy of $100 million or more'' or other effects as described in section 3(f)(1) of the Executive Order.

This rule has no effect on States unless they decide that they wish to qualify for chapter 154 certification. If States do decide to apply for chapter 154 certification, the resulting costs will mainly depend on (i) the number of capital cases these States litigate in State postconviction proceedings, and (ii) the incremental difference (if any) between their current per-case capital litigation costs and the corresponding costs under a system that complies with this rule.

These costs cannot be exactly quantified because (i) we do not know how many States will try to seek certification based on their own analysis of whether it is beneficial on balance to do so; (ii) the rule provides States wide latitude to design their own appointment mechanism; (iii) the rule affords the Attorney General discretion in making certification decisions; and (iv) there are non-quantifiable benefits to providing an opt-in system that may outweigh the costs such as improved fairness and equity in capital counsel systems. Absent a State's application and public comment, the Department cannot determine whether the Attorney General would decide, in his discretion, to certify that the State's capital counsel mechanism satisfies this rule.

Moreover, even if the Department could determine at this time that a State's mechanism fails to meet this rule's standards, the Department does not have the data necessary to calculate the costs of making the State mechanism compliant and the rule gives States substantial discretion to correct any perceived shortfall in a myriad of ways. Thus, any cost projections would need to be specific to each State and would depend on unknown variables such as how a State will design compensation and competency standards and whether and how the Attorney General will exercise discretion. Against this background, the Department cannot quantify the costs and benefits of this rule.

Despite the impracticability of exact quantification, the Department can confidently project that the annual cost will not exceed $100 million. At the end of 2010, 36 States held 3,100 prisoners under sentence of death. *See* Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice, *Capital Punishment, 2010—Statistical Tables* at 8, table 4 (Dec. 2011), *available at http://www.bjs.gov/content/pub/pdf/cp10st.pdf.* Regarding the costs of satisfying the requirements of this rule, 35 of the 36 States accounting for capital cases in the United States already provide for appointment of counsel in State postconviction proceedings. These States may still fall short of satisfying this rule's standards, in relation to such matters as payment of litigation expenses or compensation of counsel, but this rule affords States a variety of options that may minimize any resulting increase in costs.

Assuming that all 36 States that currently have the death penalty will upgrade their postconviction capital counsel mechanisms to the extent necessary to satisfy this rule, and that the number of capital cases pending in State postconviction proceedings in a year is 2,000, the total cost for the States to comply with this rule could not reach $100 million unless the average increase in litigation costs were $50,000 for each case. While for the reasons explained above we have not estimated the costs for States to satisfy this rule, we have no reason to believe that costs would increase to that degree.

States that obtain certification by the Attorney General under this rule could realize costs savings resulting from chapter 154's expedited procedures in subsequent Federal habeas corpus review. *See* 28 U.S.C. 2262, 2264, 2266. Chapter 154's expedited procedures offer States the benefits of: (i) Definite rules regarding the commencement and expiration of stays of execution, *see* 28 U.S.C. 2262; (ii) clearer and more circumscribed rules regarding the claims cognizable on federal habeas corpus review, *see* 28 U.S.C. 2264; (iii) general times frames of 450 days and 120 days respectively for decision of capital habeas petitions by federal district courts and courts of appeals, *see* 28 U.S.C. 2266(b)(1); and (iv) limited allowances for the amendment of such petitions, *see* 28 U.S.C. 2266(b)(3). In addition, because the States would more fully defray the costs of representing indigent capital petitioners in State postconviction proceedings, there would be less need for representation by private counsel on a pro bono basis, often arranged through postconviction capital defense projects. Thus, State costs also would be offset by reduced costs for private entities and individuals who otherwise would provide representation, reducing the overall economic effect.

Along with the cost savings States could obtain, this rule also affords indigent capital petitioners non-quantifiable benefits. If a State chooses to ''opt-in'' to Chapter 154, an indigent capital petitioner is more likely to be represented by competent counsel in state postconviction proceedings—proceedings in which there is no constitutional right to counsel. The timely appointment of qualified counsel also provides indigent capital petitioners the opportunity to properly and promptly present their challenges in postconviction proceedings without the severe time pressure created by the belated entry of a lawyer. Above all, the rule's requirement of timely appointment of competent counsel seeks to provide an indigent capital petitioner the benefit of a collateral review that will be fair, thorough, and the product of capable and committed advocacy.

*Executive Order 13132—Federalism*

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. It provides only a framework for those States that wish to qualify for the benefits of the expedited habeas procedures of chapter 154 of title 28 of the United States Code. Therefore, in accordance with Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism assessment.

*Executive Order 12988—Civil Justice Reform*

This regulation meets the applicable standards set forth in section 3(a) and (b)(2) of Executive Order 12988.

*Regulatory Flexibility Act*

The Attorney General, in accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), has reviewed this regulation and by approving it certifies that this regulation will not have a significant economic impact on a substantial number of small entities. This rule provides only a framework for those States that wish to qualify for the benefits of the expedited habeas procedures of chapter 154 of title 28 of the United States Code.

*Unfunded Mandates Reform Act of 1995*

This rule will not result in aggregate expenditures by State, local and tribal governments or by the private sector of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under

the provisions of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1532.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

**List of Subjects in 28 CFR Part 26**

Law enforcement officers, Prisoners.

Accordingly, for the reasons set forth in the preamble, part 26 of chapter I of title 28 of the Code of Federal Regulations is amended as follows:

## PART 26—DEATH SENTENCES PROCEDURES

■ 1. The authority citation for part 26 continues to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 4001(b), 4002; 28 U.S.C. 509, 510, 2261, 2265.

■ 2. A new Subpart B is added to part 26 to read as follows:

**Subpart B—Certification Process for State Capital Counsel Systems**

Sec.

26.20 Purpose.
26.21 Definitions.
26.22 Requirements.
26.23 Certification process.

## Subpart B—Certification Process for State Capital Counsel Systems

**§ 26.20 Purpose.**

Sections 2261(b)(1) and 2265(a) of title 28 of the United States Code require the Attorney General to certify whether a State has a mechanism for providing legal representation to indigent prisoners in State postconviction proceedings in capital cases that satisfies the requirements of chapter 154 of title 28. If the Attorney General certifies that a State has established such a mechanism, sections 2262, 2263, 2264, and 2266 of chapter 154 of title 28 apply in relation to Federal habeas corpus review of State capital cases in which counsel was appointed pursuant to that mechanism. These sections will also apply in Federal habeas corpus review of capital cases from a State with a mechanism certified by the Attorney General in which petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent, as provided in section 2261(b) of title 28. Subsection (b) of 28 U.S.C. 2265 directs the Attorney General to promulgate regulations to implement the certification procedure under subsection (a) of that section.

**§ 26.21 Definitions.**

For purposes of this part, the term—

*Appointment* means provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.

*Appropriate State official* means the State attorney general, except that, in a State in which the State attorney general does not have responsibility for Federal habeas corpus litigation, it means the chief executive of the State.

*Indigent prisoners* means persons whose net financial resources and income are insufficient to obtain qualified counsel.

*State postconviction proceedings* means collateral proceedings in State court, regardless of whether the State conducts such proceedings after or concurrently with direct State review.

**§ 26.22 Requirements.**

The Attorney General will certify that a State meets the requirements for certification under 28 U.S.C. 2261 and 2265 if the Attorney General determines that the State has established a mechanism for the appointment of counsel for indigent prisoners under sentence of death in State postconviction proceedings that satisfies the following standards:

(a) As provided in 28 U.S.C. 2261(c) and (d), the mechanism must offer to all such prisoners postconviction counsel, who may not be counsel who previously represented the prisoner at trial unless the prisoner and counsel expressly requested continued representation, and the mechanism must provide for the entry of an order by a court of record—

(1) Appointing one or more attorneys as counsel to represent the prisoner upon a finding that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer;

(2) Finding, after a hearing if necessary, that the prisoner rejected the offer of counsel and made the decision with an understanding of its legal consequences; or

(3) Denying the appointment of counsel, upon a finding that the prisoner is not indigent.

(b) The mechanism must provide for appointment of competent counsel as defined in State standards of competency for such appointments.

(1) A State's standards of competency are presumptively adequate if they meet or exceed either of the following criteria:

(i) Appointment of counsel who have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience. But a court, for good cause, may appoint other counsel whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty and the unique and complex nature of the litigation; or

(ii) Appointment of counsel meeting qualification standards established in conformity with 42 U.S.C. 14163(e)(1) and (2)(A), if the requirements of 42 U.S.C. 14163(e)(2)(B), (D), and (E) are also satisfied.

(2) Competency standards not satisfying the benchmark criteria in paragraph (b)(1) of this section will be deemed adequate only if they otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases.

(c) The mechanism must provide for compensation of appointed counsel.

(1) A State's provision for compensation is presumptively adequate if the authorized compensation is comparable to or exceeds—

(i) The compensation of counsel appointed pursuant to 18 U.S.C. 3599 in Federal habeas corpus proceedings reviewing capital cases from the State;

(ii) The compensation of retained counsel in State postconviction proceedings in capital cases who meet State standards of competency sufficient under paragraph (b);

(iii) The compensation of appointed counsel in State appellate or trial proceedings in capital cases; or

(iv) The compensation of attorneys representing the State in State postconviction proceedings in capital cases, subject to adjustment for private counsel to take account of overhead costs not otherwise payable as reasonable litigation expenses.

(2) Provisions for compensation not satisfying the benchmark criteria in paragraph (c)(1) of this section will be deemed adequate only if the State mechanism is otherwise reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency sufficient under paragraph (b) of this section.

(d) The mechanism must provide for payment of reasonable litigation expenses of appointed counsel. Such expenses may include, but are not limited to, payment for investigators, mitigation specialists, mental health and forensic science experts, and support personnel. Provision for reasonable litigation expenses may incorporate presumptive limits on payment only if means are authorized for payment of necessary expenses above such limits.

**§ 26.23 Certification process.**

(a) An appropriate State official may request in writing that the Attorney General determine whether the State meets the requirements for certification under § 26.22 of this subpart.

(b) Upon receipt of a State's request for certification, the Attorney General will make the request publicly available on the Internet (including any supporting materials included in the request) and publish a notice in the **Federal Register**—

(1) Indicating that the State has requested certification;

(2) Identifying the Internet address at which the public may view the State's request for certification; and

(3) Soliciting public comment on the request.

(c) The State's request will be reviewed by the Attorney General. The review will include consideration of timely public comments received in response to the **Federal Register** notice under paragraph (b) of this section, or any subsequent notice the Attorney General may publish providing a further opportunity for comment. The certification will be published in the **Federal Register** if certification is granted. The certification will include a determination of the date the capital counsel mechanism qualifying the State for certification was established.

(d) A certification by the Attorney General reflects the Attorney General's determination that the State capital counsel mechanism reviewed under paragraph (c) of this section satisfies chapter 154's requirements. A State may request a new certification by the Attorney General to ensure the continued applicability of chapter 154 to cases in which State postconviction proceedings occur after a change or alleged change in the State's certified capital counsel mechanism. Changes in a State's capital counsel mechanism do not affect the applicability of chapter 154 in any case in which a mechanism certified by the Attorney General existed throughout State postconviction proceedings in the case.

(e) A certification remains effective for a period of five years after the completion of the certification process by the Attorney General and any related judicial review. If a State requests re-certification at or before the end of that five-year period, the certification remains effective for an additional period extending until the completion of the re-certification process by the Attorney General and any related judicial review.

Dated: September 11, 2013.

**Eric H. Holder, Jr.,**

*Attorney General.*

[FR Doc. 2013–22766 Filed 9–20–13; 8:45 am]

BILLING CODE P

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R04–OAR–2009–0140; FRL–9901–10-Region 4]**

### Approval and Promulgation of Implementation Plans; North Carolina; Removal of Stage II Gasoline Vapor Recovery Program

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is taking final action to approve changes to the North Carolina State Implementation Plan (SIP) submitted by the State of North Carolina Department of Environment and Natural Resources (NC DENR), Division of Air Quality on September 18, 2009, for the purpose of removing Stage II vapor control requirement contingency measures for new and upgraded gasoline dispensing facilities in the State. The September 18, 2009, SIP revision also addresses several non-Stage II related rule changes. However, action on the other portions for the September 18, 2009, SIP revision is being addressed in a separate rulemaking action. EPA has determined that North Carolina's September 18, 2009, SIP revision regarding the Stage II vapor control requirements is approvable because it is consistent with the Clean Air Act (CAA or Act).

**DATES:** *Effective Date:* This rule will be effective October 23, 2013.

**ADDRESSES:** EPA has established a docket for this action under Docket Identification No. EPA–R04–OAR–2009–0140. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, i.e., Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Regulatory Development Section, Air Planning Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303–8960. EPA requests that if at all possible, you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection. The Regional Office's official hours of business are Monday through Friday, 8:30 to 4:30 excluding Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** For information regarding this action, contact Ms. Kelly Sheckler, Regulatory Development Section, Air Planning Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303–8960. Ms. Sheckler's telephone number is (404) 562–9222; email address: *sheckler.kelly@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background
II. Final Action
III. Statutory and Executive Order Reviews

**I. Background**

EPA, under the CAA Amendments of 1990, designated (pursuant to section 107(d)(1)) and classified certain counties in North Carolina, either in their entirety or portions thereof, as ''moderate'' ozone nonattainment areas for the 1-hour ozone national ambient air quality standards (NAAQS). Specifically, the Charlotte-Gastonia Area (comprised of Gaston and Mecklenburg Counties); the Greensboro-Winston-Salem-High Point Area (comprised of Davidson, Davis (partial), Forsyth and Guilford Counties); and the Raleigh-Durham Area (comprised of Durham, Granville (partial), and Wake Counties) were all designated as ''moderate'' ozone nonattainment areas for the 1-hour ozone NAAQS. The designations were based on the Areas' 1-hour ozone design values for the 1987–1989 three-year period. The ''moderate'' classification triggered various statutory requirements for these Areas including the Stage II vapor recovery requirements pursuant to section 182(b)(3) of the CAA.

tanning facilities to only allow adults to use a sunlamp product if the prospective user had signed a risk acknowledgement certification in the past six months, and proposed the form of this certification. Third, the Proposed Rule contained two proposed user-manual related provisions. In proposed § 878.4635(c)(2), the Proposed Rule proposed requiring tanning facility operators to provide a sunlamp product's user manual to users or prospective users of sunlamp products upon request, and in proposed § 878.4635(c)(3), the Proposed Rule proposed requiring 510(k) holders to provide a sunlamp product's user manual to tanning facility operators and sunlamp product users or prospective users upon request.

FDA received more than 8,100 comments on the Proposed Rule from entities including industry associations, medical and healthcare professional associations, law firms, cancer advocacy groups, and other interested parties, including individuals. In general, the comments discussed the dangers of UV radiation from sunlamp products; scientific aspects of the Proposed Rule; vulnerability of young people to the risks of sunlamp products; support for personal choice and parental decision-making; availability and relative safety of sunlamp product alternatives; and compliance burdens on small businesses.

In light of the scientific and technical concerns raised in the comments on the Proposed Rule, concerns regarding possible unintended consequences of certain proposals in the Proposed Rule, and potential alternatives proposed in comments received on the Proposed Rule, FDA is withdrawing the Proposed Rule in order to reconsider the best means for addressing the issues covered by the Proposed Rule and related issues regarding access to sunlamp products. Therefore, effective on the date of publication of this document, the Proposed Rule is withdrawn.

FDA continues to consider regulatory initiatives related to sunlamp products. The withdrawal of the Proposed Rule does not preclude the Agency from reinstituting rulemaking concerning the issues addressed in the proposal. Should we decide to undertake such rulemaking in the future, we will issue a proposed rule and provide a new opportunity for comment. Furthermore, this withdrawal is only intended to address the Proposed Rule ''General and Plastic Surgery Devices: Restricted Sale, Distribution, and Use of Sunlamp Products'' published in the **Federal Register** of December 22, 2015, and not any other pending proposals that the Agency has issued or is considering. If you need additional information about the subject matter of the withdrawn Proposed Rule, you may review the Agency's website (*www.fda.gov*) for any current information on the matter.

**Robert F. Kennedy, Jr.,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2026–05103 Filed 3–13–26; 8:45 am]

**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF JUSTICE

### Office of the Attorney General

### 28 CFR Part 26

**[Docket No. OAG198; AG Order No. 6678–2026]**

**RIN 1105–AB80**

### Certification Process for State Capital Counsel Systems

**AGENCY:** Department of Justice.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** Chapter 154 of title 28, United States Code, provides special procedures for federal habeas corpus review of cases brought by prisoners in state custody who are under a sentence of death. The special procedures are available to States that the Attorney General has certified as having established mechanisms for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in state postconviction proceedings brought by indigent prisoners, and as providing standards of competency for the appointment of counsel in these proceedings. This rule would remove impediments to certification that chapter 154 does not authorize and would enable more prompt decisions on States' requests for certification.

**DATES:** Written and electronic comments must be sent or submitted on or before May 15, 2026. Comments received by mail will be considered timely if they are postmarked on or before the last day of the comment period. The electronic Federal Docket Management System will accept electronic comments until midnight Eastern Time at the end of that day.

**ADDRESSES:** Comments may be mailed to Regulations Docket Clerk, Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Room 4234, Washington, DC 20530. To ensure proper handling, please reference RIN 1105–AB80 on your correspondence. You may submit comments electronically or view an electronic version of this proposed rule at *http://www.regulations.gov.* In accordance with 5 U.S.C. 553(b)(4), a summary of this rule may be found at *https://www.regulations.gov.* Commenters must submit comments by using one of the methods described above, not by emailing the address set forth in the following paragraph.

**FOR FURTHER INFORMATION CONTACT:** Levi Lall, Counsel, Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530; telephone 202–598–0771.

**SUPPLEMENTARY INFORMATION:**

### I. Public Participation

Posting of Public Comments. Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule via one of the methods and by the deadline stated above. The Department of Justice (''the Department'') also invites comments that relate to the economic, environmental, or federalism effects that might result from this rule. Comments that will provide the most assistance to the Department in developing these procedures will reference a specific portion of the rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change.

Please note that all comments received are considered part of the public record and made available for public inspection at *http://www.regulations.gov.* Such information includes personally identifying information (''PII'') (such as your name, address, etc.).

Interested persons are not required to submit their PII in order to comment on this rule. However, any PII that is submitted is subject to being posted to the publicly accessible website at *http://www.regulations.gov* without redaction.

If you want to submit confidential business information as part of your comment but do not want it to be posted online, you must include the phrase ''CONFIDENTIAL BUSINESS INFORMATION'' in the first paragraph of your comment. You must also prominently identify confidential business information to be redacted within the comment. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *http://www.regulations.gov.*

Confidential business information identified and located as set forth above will not be placed in the public docket

file. The Department may withhold from public viewing information provided in comments that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.* To inspect the agency's public docket file in person, you must make an appointment with the agency. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for agency contact information.

### II. Legal Authority

The Department of Justice is issuing this rule pursuant to 28 U.S.C. 2265(b).

### III. Overview

Executing final judgments in state capital cases, and thus achieving finality for crime victims and their families, is substantially delayed because of an interminable process of state and federal postconviction review. Following conviction, sentencing, affirmance of the convictions and capital sentences on direct state court review, affirmance of the convictions and capital sentences in state collateral proceedings, and denial of certiorari by the U.S. Supreme Court, inmates under sentence of death imposed pursuant to state law may continue to litigate and relitigate their claims in the lower federal courts. The process starts by applying for habeas corpus in a federal district court and ordinarily takes years to move through the federal court system. Even when a capital sentence survives the multiple stages of repetitive state and federal review, it is typically decades before it can be carried out. Data collected by the Department reveals that, as of December 31, 2022, the average time on death row was 21 years. *See* Tracy L. Snell, Bureau of Just. Stat., *Capital Punishment, 2022—Statistical Tables* at 10 (2024), *https://perma.cc/UM7U-HXKL.* That constitutes a dramatic increase from 1984, at which time the average time between sentencing and execution was just over six years. *See id.* at 12.

While the States have a degree of control over the extent and duration of capital punishment litigation in their own court systems, they are powerless to curb the delays resulting from federal habeas review. Congress initially sought to address this problem in 1996 by enacting chapter 154 of title 28 as part of the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, sec. 107, 110 Stat. 1214, 1221–26. Among other reforms, chapter 154 provides definite time limits for concluding the adjudication of federal habeas petitions in capital cases, which otherwise can languish for years at the various stages of federal court adjudication and review. *See, e.g.,* 28 U.S.C. 2266. Application of chapter 154 is conditioned on States adopting mechanisms to appoint, compensate, and pay reasonable litigation expenses for competent counsel to represent indigent prisoners under sentence of death in state postconviction proceedings in capital cases, and setting counsel competency standards. *See id.* 2265(a)(1)(A), (C).

Originally, federal courts determined whether States satisfied chapter 154's statutory preconditions. Congress eventually concluded, however, that the courts were not implementing chapter 154 as Congress intended, but rather were creating their own preconditions for applying chapter 154 that had no basis in the statute. *See* 152 Cong. Rec. 2440–41, 2445–46 (2006) (remarks of Sen. Jon Kyl); 151 Cong. Rec. E2639–40 (2005) (remarks of Rep. Jeff Flake). Congress accordingly amended chapter 154 in 2006 to assign the certification determination to the Attorney General, believing that the Attorney General would be free of the conflicts of interest that were leading to adverse judicial decisions from the regional courts of appeals. *Id.* Congress further amended chapter 154 by adding section 2265(a)(3), which states that ''[t]here are no requirements for certification or for application of this chapter other than those expressly stated in this chapter.'' USA PATRIOT Improvement and Reauthorization Act of 2005, Public Law 109–177, sec. 507(c), 120 Stat. 192, 250 (2006) (codified at 28 U.S.C. 2265(a)(3)).

Following the direction of 28 U.S.C. 2265(b) to promulgate implementing regulations for the certification procedure, Attorney General Mukasey issued regulations in 2008 to carry out the chapter in conformity with the legislative text, imposing no significant preconditions on State qualification beyond those appearing expressly in the statutes. *See* Certification Process for State Capital Counsel Systems, 73 FR 75327 (Dec. 11, 2008) (''2008 Regulations''). However, the regulations were quickly challenged in litigation, and following a change of administration, Attorney General Holder rescinded the original regulations and later issued regulations imposing many additional requirements and restrictions on chapter 154 certification. *See* Certification Process for State Capital Counsel System, 78 FR 58160, 58160–61 (Sept. 23, 2013) (''2013 Regulations'').

Following another change of administration, and after clearing additional litigative challenges, the Department began reviewing state applications for chapter 154 certification. It ultimately concluded in 2020 that Arizona satisfied chapter 154's requirements. *See* Certification of Arizona Capital Counsel Mechanism, 85 FR 20705 (Apr. 14, 2020). The 2020 certification was promptly challenged in the D.C. Circuit and, following the transition to the Biden Administration, the Department effectively nullified the 2020 certification by seeking and securing a voluntary remand from the D.C. Circuit for further development of the administrative record and reconsideration. *See* Arizona Chapter 154 Certification Review; Notice Regarding Arizona's June 2022 Response, 87 FR 52416 (Aug. 25, 2022). On January 17, 2025, Attorney General Garland signed an order determining that the record did not support a conclusion that Arizona's postconviction capital counsel mechanisms meet the requirements under chapter 154 and denying certification to Arizona, notwithstanding the favorable determination by Attorney General Barr in 2020. *Denial of Arizona Chapter 154 Certification,* A.G. Order No. 6157–2025 (2021).

Hence, nearly 30 years after the original enactment of chapter 154, its expedited federal habeas corpus procedures have not been applied in federal habeas review of a single state capital case, effectively rendering chapter 154 a dead letter and thwarting Congress's objectives. To ensure that Congress's statutory scheme is given effect, the Department is re-committing to implementing chapter 154 in conformity with its terms. *Cf.* Memorandum from Attorney General Pam Bondi to All Department Employees, *Re: Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions* (Feb. 5, 2025), *https://perma.cc/U3AG-ELUD.* Effectuating the statute's terms requires rescinding aspects of the 2013 Regulations that add non-statutory requirements for certification and adopting other changes that will expedite and strengthen the certification process. The affected areas are counsel competency, compensation of counsel, timeliness of appointment, the definition of indigent prisoners, the Department's internal review process for state applications, and the finality of certifications. Because each of the proposed changes to these affected areas is independently valid and justified, the proposed rule clarifies that each proposed change is severable.

*Attorney General's Regulatory Responsibilities*

Section 2265(b) requires the Attorney General to ''promulgate regulations to implement the certification procedure'' under section 2265(a). 28 U.S.C. 2265(b). By its terms, the grant of regulatory authority to the Attorney General is limited to procedure, not substance. The statute further restrains the Attorney General's regulatory authority by providing that ''[t]here are no requirements for certification or for application of this chapter other than those expressly stated in this chapter.'' *Id.* 2265(a)(3).

Notably, chapter 154 leaves undisturbed the States' authority to set substantive standards for counsel competency, appointment, compensation, and payment of reasonable litigation expenses. Section 2265(a)(1)(C) directs the Attorney General merely to determine whether ''the State provides standards of competency for the appointment of counsel in proceedings described in subparagraph (A).'' *Id.* 2265(a)(1)(C). Similarly, section 2265(a)(1)(A) directs the Attorney General to determine only ''whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses for competent counsel.'' *Id.* 2265(a)(1)(A). In light of these narrow authorizations to the Attorney General and section 2265(a)(3)'s prohibition against adding to chapter 154's express requirements, the 2013 Regulations exceeded the Attorney General's statutory authority by promulgating federal standards on counsel competency, appointment, and compensation, in addition to other atextual requirements. This rule thus does not prescribe alternative federal standards on these issues, which would suffer from the same legal infirmity.

Statutory prohibition aside, adding atextual requirements to chapter 154 through federal regulation would thwart Congress's goal of expediting federal habeas review of state capital convictions; delay finality for victims and their families; increase burdens on States, the Department, and affected parties; and unnecessarily complicate review of state applications. For these reasons, even if the Attorney General had statutory discretion to promulgate certification requirements in addition to those in section 2265—which she does not—she would not exercise such discretion.

*Counsel Competency*

Section 2265(a)(1) directs the Attorney General to determine ''whether the State has established a mechanism for the appointment . . . of competent counsel'' and ''whether the State provides standards of competency for the appointment of counsel.'' 28 U.S.C. 2265(a)(1). The 2008 Regulations naturally understood this to mean that the state capital counsel mechanism must provide for the appointment of counsel who meet competency standards that the State has adopted. The 2008 Regulations rejected the view that the Attorney General could adopt a nationwide, federal counsel competency standard, which chapter 154 nowhere authorizes

> Some commenters urged that the rule be revised to provide further specification concerning the ''standards of competency[ ]'' [and] ''competent counsel'' . . . that a state's postconviction capital counsel system must provide to qualify for chapter 154 certification. For example, . . . the Judicial Conference of the United States in its comments urged . . . that ''[s]pecific mandatory standards similar to those set forth in [18 U.S.C. 3599] should be required with respect to the appointment and compensation of counsel for capital defendants . . . . The commenters are correct that the text of chapter 154 needs to be supplemented in defining competency standards for postconviction capital counsel, but mistaken as to who must effect that supplementation. Responsibility to set competency standards for postconviction capital counsel is assigned to the states that seek certification. 28 U.S.C. 2265(a)(1)(C) . . . . [While] the Judicial Conference . . . urg[ed] that states be required to satisfy federally prescribed standards of counsel competency . . . , Congress did not accept the Conference's recommendation on this point . . . . The Attorney General has no authority to overrule Congress and prescribe standards that others unsuccessfully urged Congress to impose.

73 FR at 75330–31.

In contrast, the 2013 Regulations required States to comply with competency standards sufficient in the Attorney General's judgment, relying on an opinion issued in 2009 by the Department's Office of Legal Counsel (''OLC''). *See* 78 FR at 58161–62, 58169–72, 58177–79 (citing *State Procedures for Appointment of Competent Counsel in Post-Conviction Review of Capital Sentences,* 33 Op. O.L.C. 402 (2009) (''2009 OLC Opinion'')). The 2009 OLC Opinion opined that chapter 154 did not ''compel'' the Attorney General to interpret chapter 154 in the same manner as the original 2008 Regulations, and that chapter 154 could ''reasonably'' be interpreted to allow greater discretion to prescribe federal counsel competency requirements ''under the now familiar *Chevron* framework.'' 2009 OLC Opinion, 33 Op. O.L.C. at 409, 411 (citing *Chevron U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984)).

The Supreme Court has since overruled *Chevron* in *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369 (2024). Following *Chevron's* abrogation, agencies must adhere to the single best reading of the statutes they administer, and not alternative, less plausible interpretations that are merely within the bounds of what could be considered reasonable. In view of this intervening precedent, OLC recently withdrew its 2009 Opinion after determining that it did not provide even a permissible reading of section 2265. *Reconsidering State Procedures for Appointment of Competent Counsel in Postconviction Review of Capital Sentences,* 50 Op. O.L.C. ____, at *3–4 (Feb. 18, 2025) (''2025 OLC Opinion''). Having fully considered the matter, the Attorney General has concluded that the 2013 Regulations' counsel-competency provisions do not reflect the best reading of the statute. The best reading of chapter 154 is that it does not authorize the Attorney General to establish federal competency standards for state capital counsel, and does not permit the Attorney General to impose more stringent requirements relating to counsel competency than those expressly stated in chapter 154 itself. *See* 28 U.S.C. 2265(a)(3). Hence, this proposed rule limits the regulations only to what is required by the statute and rescinds the additional counsel-competency requirements appearing in § 26.22(b) in the 2013 Regulations. *See* 78 FR at 58183–84.

*Compensation of Counsel*

Section 2265(a)(1) directs the Attorney General to determine ''whether the State has established a mechanism for the . . . compensation . . . of . . . counsel.'' 28 U.S.C. 2265(a)(1). The 2008 Regulations rejected public comments that urged that the regulations should adopt more stringent compensation requirements:

> With respect to compensation of counsel, various commenters urged that the rule be more prescriptive regarding the amount of required compensation, to ensure that state postconviction capital counsel are ''reasonably'' or ''adequately'' compensated or receive ''fair'' compensation. Again, such comments urge the regulatory adoption of measures that Congress declined to include in chapter 154. In contrast to the immediately succeeding phrase concerning litigation expenses in section 2265(a)(1)(A), which requires a mechanism for payment of ''reasonable'' litigation expenses, the language relating to ''compensation'' in the same provision comes with no qualifier. The statute requires only that the state have a mechanism for the ''compensation'' of

postconviction capital counsel, leaving determination of the level of compensation to the states.

73 FR at 75331.

Drawing on the 2009 OLC Opinion, the 2013 Regulations maintained that the Department could ignore Congress's statutory language and impose extra-statutory counsel-compensation requirements as necessary to ensure the availability for appointment of competent counsel. *See* 78 FR at 58161–62, 58179. As with its approach to counsel competency, the 2009 OLC Opinion again relied on *Chevron'*s deference to ''reasonable,'' but not necessarily best, interpretations of statutes, *see* 2009 OLC Opinion, 33 Op. O.L.C. at 419—deference that no longer exists following the Supreme Court's decision in *Loper Bright. See also* 2025 OLC Opinion, 50 Op. O.L.C. ____, at *1 (withdrawing 2009 OLC Opinion).

Having fully considered the matter, the Attorney General has concluded that the 2013 Regulations' understanding of chapter 154's language relating to compensation of counsel is not the best reading of the statute. Section 2265(a)(3) unequivocally prohibits imposing requirements not expressly stated in chapter 154 itself. The 2013 Regulations' atextual federal compensation requirements, *see* 78 FR at 58183, contravene Congress's express prohibition. Moreover, chapter 154 recognizes States' authority to set the mechanism for counsel compensation and simply authorizes the Attorney General to ''determine'' that a State has done so. 28 U.S.C. 2265(a)(1)(A). Because chapter 154 does not authorize the Attorney General to set a federal compensation standard for state capital counsel, the Attorney General is statutorily prohibited from regulating on this issue.

Even if chapter 154 did give the Attorney General discretion to prescribe by regulation counsel-compensation requirements not stated in chapter 154, the Attorney General would not exercise that discretion. If States are unable to provide counsel—due to insufficient compensation or any other reason—then the expedited federal habeas review procedures of chapter 154 are not available to them. 28 U.S.C. 2261(b)(2) generally conditions the application of chapter 154 on actual representation by or waiver of counsel. Thus, the States are incentivized to provide compensation that will attract willing counsel. The statutory requirement that States ''establish[ ] a mechanism for the appointment . . . of competent counsel'' ensures that States must offer sufficient compensation to attract counsel meeting this qualification. *Id.* 2265(a)(1)(A).

Because the imposition of a federal compensation standard contravenes Congress's prohibition of extra-statutory requirements, *see* 28 U.S.C. 2265(a)(3), the proposed rule rescinds the atextual counsel-compensation requirements of section 26.22(c) appearing in the 2013 Regulations. *See* 78 FR at 58183.

*Timeliness of Appointment*

The 2013 Regulations added a requirement that appointment of state postconviction capital counsel must be ''in a manner that is reasonably timely in light of the time limitations for seeking state and federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.'' 78 FR at 58177. The 2008 Regulations had no similar requirement because nothing of this nature appears in chapter 154, and ''[t]here are no requirements for certification or for application of this chapter other than those expressly stated in this chapter.'' 28 U.S.C. 2265(a)(3). Indeed, the judicial imposition of a timely appointment requirement motivated Congress's decision in 2006 to transfer the chapter 154 certification determination to the Attorney General and to add a provision prohibiting any addition to chapter 154's express requirements. 152 Cong. Rec. 2446 (remarks of Sen. Jon Kyl) (''In *Spears* v. *Stewart,* the Ninth Circuit . . . den[ied] the State the benefit of [chapter 154] qualification because of a delay in appointing counsel. . . . Paragraph (a)(3) of new section 2265 forbids creation of additional requirements not expressly stated in the chapter, as was done in the Spears case.'' (citation omitted)); *see* 73 FR at 75332.

The 2013 Regulations sought to justify this addition to the express statutory requirements on the ground that in some situations delay in appointing postconviction counsel could deprive a defendant of meaningful assistance of counsel. *See* 78 FR at 58165–67, 58176–77. Chapter 154, however, directs the Attorney General to determine whether States have capital counsel mechanisms that satisfy the requirements Congress has prescribed in chapter 154—not to insert requirements that others believe Congress ought to have included. Timing rules for appointment of state postconviction capital counsel are not among the express statutory requirements. Nor does inserting ''reasonably timely'' into a ''definition'' of ''appointment''—a term that requires no definition—circumvent the statute's unequivocal prohibition of atextual certification requirements.

This proposed rule accordingly rescinds the ''reasonably timely'' requirement graphed onto the definition of appointment by the 2013 Regulations.

*Definition of Indigent Prisoners*

The 2008 Regulations did not include any special definition of the term indigent prisoners. *See* 73 FR at 75338. The 2013 Regulations added a special definition of ''[i]ndigent prisoners'' to mean ''persons whose net financial resources and income are insufficient to obtain qualified counsel.'' *See* 78 FR at 58183. No explanation was provided for the addition of this special definition. *See id.* 58165–68.

This proposed rule rescinds the definition of ''indigent prisoners.'' Indigency requires no special definition because all jurisdictions will have a definition of this term that they can use, given that States are required to appoint counsel for indigent defendants in trial and appellate proceedings. The definition in the 2013 Regulations clouds what is otherwise a clear and familiar concept because it refers to persons whose financial resources and income are insufficient to obtain ''qualified'' counsel, with no explanation of what ''qualified'' is supposed to mean.

*Application Review Process*

Both the 2008 Regulations and the 2013 Regulations included a categorical requirement that the Attorney General publish a notice in the **Federal Register** of every State's request for chapter 154 certification and receive and consider public comments thereon. *See* 73 FR at 75339; 78 FR at 58184. This proposed rule rescinds this requirement for two reasons:

First, notice and comment is not required under either chapter 154 or the Administrative Procedure Act (''APA''). Nothing in chapter 154 contemplates a categorical requirement for public notice and comment with respect to all States' applications, regardless of actual need, with resulting delay in deciding whether the State is entitled to the application of chapter 154. Evaluating States' requests for chapter 154 certification consistent with Congress's statutory framework should be simpler and quicker without the legally and practically unnecessary requirement that processing States' requests must start by posting them for public comment.

The APA likewise does not require notice and comment for chapter 154 certification requests. Under the APA, the chapter 154 certification process is an adjudication, not a rulemaking, and the resulting certification decisions are

orders, not rules. Hence, the notice-and—comment requirements of 5 U.S.C. 553 for rulemaking do not apply. *See* 73 FR at 75333–34; 78 FR at 58174.

Second, public notice and comment will not always be necessary for determining whether a State has established a capital counsel mechanism that satisfies chapter 154. Stripped of the extra-statutory conditions of the 2013 Regulations, certification decisions present fairly straightforward questions regarding whether a State has a mechanism for appointing, compensating, and paying reasonable litigation expenses of counsel, and has standards of competency for such appointments. These are matters that may be readily ascertainable from a State's statutes and policies and from the information in its request for certification, without need for public input through **Federal Register** publication. Nevertheless, the Attorney General will retain the discretion to seek public input on individual state certification requests when judged necessary or helpful, as may be done with respect to any other matter the Attorney General needs to decide.

*Finality of Certifications*

Chapter 154 provides no authorization for the Attorney General to temporally limit State certifications and require periodic recertification, or to terminate or revoke a certification once granted. The plain statutory text reflects Congress's decision to adopt a system of one-time, permanent certification, as was explicitly stated by one of its key drafters during the course of its ratification:

> When section 507 [*i.e.,* the 2006 chapter 154 amendments] was being finalized, I and others were presented with arguments that some mechanism should be created for ''decertifying'' a State that has opted in to chapter 154 but that allegedly has fallen out of compliance with its standards. I ultimately concluded that such a mechanism was unnecessary, and that it would likely impose substantial litigation burdens on the opt-in States that would outweigh any justification for the further review. . . . [I]f such a means of post-opt-in review were created, it inevitably would be overused and abused. . . . I thought it best to create a system of one-time certification, with no avenues to challenge or attempt to repeal the State's continuing chapter-154 eligibility. The consequences of opting in to chapter 154 should not be perpetual litigation over the State's continuing eligibility. . . . Therefore . . . , once a State is certified for chapter 154, that certification is final. There is no provision for ''decertification'' or ''compliance review'' after the State has been made subject to chapter 154.

152 Cong. Rec. 2446 (remarks of Sen. Jon Kyl).

The 2008 Regulations recognized and respected the terms of chapter 154 in this regard, as well as the intent clearly stated in the legislative history. *See* 73 FR at 75335.

The 2013 Regulations do not. They acknowledge that chapter 154 contains ''no direction to the Attorney General to implement a decertification procedure'' and that ''day-to-day oversight and potential decertification of state capital counsel mechanisms are not among the Attorney General's authorized functions under chapter 154.'' 78 FR at 58175. Nevertheless, the 2013 Regulations provide categorically that a certification remains good only for a period of five years, a condition that likewise does not appear in chapter 154. *See id.* at 58184. The 2013 Regulations sought to justify this requirement based on a policy concern that a State's capital-counsel mechanism should be periodically revisited to ensure continued compliance with chapter 154. *See id.* at 58175–76, 58180–81.

However, speculative concerns about possible future changes in certified States' capital-counsel mechanisms, which may not occur in any State, cannot justify the addition of a regulatory certification requirement not required by the statute and contrary to the legislative intent. The 2013 Regulations' five-year rule makes chapter 154 inapplicable unless a State reapplies for certification after five years and persuades the Attorney General again that it has established a capital counsel mechanism satisfying chapter 154's requirements—a condition on chapter 154's application that appears nowhere in chapter 154 itself. Since there are ''no requirements for certification or for application of'' chapter 154 ''other than those expressly stated in th[e] chapter,'' 28 U.S.C. 2265(a)(3), the requirement to recertify after five years, *see* 78 FR at 58184, is *ultra vires* and this proposed rule rescinds it.

*Severability*

Each of the reforms proposed in this rulemaking is independently justified and valid. For example, rescission of the 2013 Regulations' federal compensation standard for state capital counsel is necessary and justified, regardless of the validity of this rule's rescission of the federal counsel-competency standard, timeliness requirement for appointments, or limitation on the finality of certifications, and vice versa. Likewise, affording the Attorney General discretion on whether public notice and comment is needed or useful in deciding any particular State's application for chapter 154 certification is justified and valid, regardless of the validity of the rule's other reforms. The provisions of this rule accordingly are severable and each is valid regardless of the validity or invalidity of any other provision.

## IV. Section-by-Section Analysis

By section and subsection, the provisions of the proposed rule are as follows:

*Section 26.20*

Section 26.20 explains the rule's purpose of implementing the certification procedure for chapter 154, as directed by 28 U.S.C. 2265(b). It briefly describes the effect of chapter 154 certification. This explanation has been shortened from the 2013 Regulations for clarity.

*Section 26.21*

Section 26.21 defines the terms ''appropriate state official'' and ''State postconviction proceedings.'' These definitions are unchanged from the previous regulations and reflect the same purposes. *See* 78 FR at 58177, 58183.

Section 26.21 no longer includes the 2013 Regulations' definition of ''[a]ppointment'' to mean ''provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking state and federal postconviction review and the time required for developing and presenting claims.'' *See id.* at 58183. This was not a definition of ''appointment'' at all—a term that requires no definition in this context—but rather an effort to add a timeliness-of-appointment precondition for chapter 154 certification, contrary to section 2265(a)(3)'s prohibition of conditions for certification not expressly stated in the chapter.

Section 26.21 no longer includes the 2013 Regulations' definition of ''[i]ndigent prisoners'' to mean ''persons whose net financial resources and income are insufficient to obtain qualified counsel.'' *See id.* Indigency requires no special definition here because all jurisdictions will have a definition of this term that they can use, given that States are required to appoint counsel for indigent defendants in trial and appellate proceedings. The definition in the 2013 Regulations clouds what is otherwise a clear and familiar concept because it refers to persons whose financial resources and income are insufficient to obtain ''qualified'' counsel, with no explanation of what ''qualified'' is supposed to mean.

Section 26.21 adds a definition of ''competent counsel'' to mean ''counsel meeting state standards of competency.'' This confirms that chapter 154's requirement relating to competent counsel means appointment of counsel meeting state standards of competency, not the additional federal standard of competency appearing in § 26.22(b) in the 2013 Regulations, *see id.,* which is *ultra vires* because chapter 154 does not authorize a federal competency standard.

*Section 26.22*

Subsections (a) and (b) of § 26.22 reproduce (i) 28 U.S.C. 2265(a)(3)'s provision that there are no requirements for certification or application of chapter 154 other than those expressly stated in the chapter and (ii) chapter 154's express requirements for certification, relating to appointment, compensation, payment of reasonable litigation expenses, and competency. Section 26.22 as amended does not include the extra-statutory federal competency and compensation standards appearing in § 26.22(b)–(c) in the 2013 Regulations, *see* 78 FR at 58183, which are *ultra vires* because they do not appear expressly in chapter 154.

Subsections (a) and (b) of § 26.22 also do not include language from § 26.22(a) in the 2013 Regulations requiring that postconviction counsel ''may not be counsel who previously represented the prisoner at trial unless the prisoner and counsel expressly requested continued representation.'' 78 FR at 58183. This language mirrors a statutory requirement in 28 U.S.C. 2261, which imposes conditions on the application of expedited habeas proceedings. But section 2261's text and structure reflect that this requirement is not a precondition for state certification under section 2265. Start with section 2261(b), which provides that chapter 154 applies if, among other requirements, ''the Attorney General certifies [ ] a State . . . as provided in section 2265.'' Neighboring section 2261(d) then provides that ''[n]o counsel appointed pursuant to subsections (b) and (c) to represent a State prisoner under capital sentence shall have previously represented the prisoner at trial in the case for which the appointment is made unless the prisoner and counsel expressly request continued representation.'' 28 U.S.C. 2261(d). This is most naturally read as an additional, independent qualification on subsections (b) and (c) for applying expedited habeas procedures, distinct from the section 2265 certification requirements separately cross referenced in section 2261(b).

Section 2265 reinforces this reading. That section provides that ''certification'' is limited to only three determinations: (A) whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death; (B) the date on which the mechanism described in subparagraph (A) was established; and (C) whether the State provides standards of competency for the appointment of counsel in proceedings described in subparagraph (A). *Id.* 2265(a)(1). These determinations do not include whether post-conviction counsel is separate from trial counsel—a requirement found in section 2261. Whether postconviction counsel is separate from trial counsel (absent an express request for continued representation) is a question for a federal court to determine on a case-by-case basis and would be ill-suited to a categorical state certification decision. The 2013 Regulations improperly conflated it with the separate requirements for certification by the Attorney General.

Subsection (c) of § 26.22 rescinds the unnecessary requirement that all chapter 154 certification requests be subject to public notice and comment. *See* 78 FR at 58174, 58183. It instead promotes the prompt resolution of certification applications by directing the Attorney General to make a determination within 90 days of receipt of the request. For certification applications that are pending when this rule is finalized, § 26.22(c)'s 90-day decision period begins to run from the finalization of the rule. Section 26.22(c) further provides that these time rules do not affect the validity of a later certification decision by the Attorney General if the Attorney General is unable to decide within the relevant time frame. This ensures that the Attorney General will not be divested of authority to make a certification determination, and that the State will not have to restart the application and certification process if, for example, the Attorney General is temporarily barred from proceeding with a certification because of a district court's injunction.

Subsection (d) of § 26.22 provides that the certification is final and that there is no authorization or procedure for suspending, reconsidering, revoking, or denying a certification once granted. This rescinds the 2013 Regulations' provision in § 26.23(d)–(e) that certifications lapse after five years.

*Section 26.23*

Section 26.23 no longer discusses the certification process because that issue is now addressed in § 26.22. Instead, § 26.23 adds a severability provision for the rule.

**V. Regulatory Requirements**

*A. Regulatory Flexibility Act*

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and by approving it certifies that this regulation will not have a significant economic impact on a substantial number of small entities for the purposes of that Act because the regulation only implements the certification procedure for chapter 154 of title 28. No small entities (small businesses, small organizations, or small governmental jurisdictions) are regulated by this rulemaking.

*B. Executive Orders 12866 and 13563—Regulatory Review*

The Office of Management and Budget (''OMB'') has determined that this rulemaking is a ''significant regulatory action'' under section 3(f) of Executive Order 12866, 58 FR 51735, 51738 (Sept. 30, 1993), but that it is not a section 3(f)(1) significant action. Accordingly, this proposed rule has been submitted to OMB for review. This proposed rule has been drafted and reviewed in accordance with section 1(b) of Executive Order 12866 and Executive Order 13563, 76 FR 3821 (Jan. 18, 2011). The changes made by this rulemaking involve no additional costs. If anything, this rulemaking will diminish the financial burden on States related to their applications for certification. The benefits include increased ease and expedition in determining whether States have satisfied the requirements of chapter 154.

*C. Executive Order 14192—Unleashing Prosperity Through Deregulation*

Executive Order 14192, 90 FR 9065 (Jan. 31, 2025), requires an agency, unless prohibited by law, to identify at least 10 existing regulations to be repealed or revised when the agency publicly proposes for notice and comment, or otherwise promulgates a new regulation, that qualifies as an Executive Order 14192 regulatory action (defined in OMB Memorandum M–25–20 as a final significant regulatory action as defined in section 3(f) of Executive Order 12866 that imposes total costs greater than zero). In furtherance of this requirement, section 3(c) of Executive Order 14192 requires that the incremental costs associated with such

new regulations must, to the extent permitted by law, also be offset by eliminating existing costs associated with at least 10 prior regulations. *Id.* at 9065. This proposed rule proposes to rescind impediments to certification that chapter 154 does not authorize, and to enable more prompt decision of States' requests for certification. Accordingly, this rule, if finalized, will be considered a deregulatory action.

*D. Executive Order 14294—Overcriminalization of Federal Regulations*

Executive Order 14294, 90 FR 20363 (May 9, 2025), requires agencies promulgating regulations with criminal regulatory offenses potentially subject to criminal enforcement to explicitly describe the conduct subject to criminal enforcement, the authorizing statutes, and the mens rea standard applicable to each element of those offenses. *Id.* at 20363. This proposed rule does not create a criminal regulatory offense and is thus exempt from Executive Order 14924 requirements.

*E. Executive Order 13132—Federalism*

This proposed rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as outlined by Executive Order 13132, 64 FR 43255 (Aug. 4, 1999). The proposed rule implements only a procedure for States that request certification of their postconviction capital-counsel mechanisms under chapter 154 of title 28.

*F. Executive Order 12988—Civil Justice Reform*

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988, 61 FR 4729, 4730–32 (Feb. 5, 1996), to specify provisions in clear language. Pursuant to section 3(b)(1)(I) of the Executive Order, nothing in this proposed rule is intended to create any legal or procedural rights enforceable against the United States. *See id.* at 4731.

*G. Unfunded Mandates Reform Act of 1995*

This rule when finalized will not result in the expenditure by state, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more (as adjusted for inflation) in any one year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. The rule only concerns the procedure for certification of state postconviction capital counsel mechanisms under chapter 154 of title 28.

**List of Subjects in 28 CFR Part 26**

Law enforcement officers, Prisoners.

**Authority and Issuance**

Accordingly, for the reasons stated in the preamble, the Attorney General proposes to amend 28 CFR part 26 as follows:

## PART 26—DEATH SENTENCES PROCEDURES

■ 1. The authority citation for part 26 continues to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 4001(b), 4002; 28 U.S.C. 509, 510, 2261, 2265.

■ 2. Subpart B of part 26 is revised to read as follows:

**Subpart B—Certification Process for State Capital Counsel Systems**

Sec.

26.20 Purpose.
26.21 Definitions.
26.22 Certification.
26.23 Severability.

### Subpart B—Certification Process for State Capital Counsel Systems

**§ 26.20 Purpose.**

Sections 2261(b)(1) and 2265(a) of title 28 of the United States Code require the Attorney General to certify whether a State has established a mechanism for providing legal representation to indigent prisoners in State postconviction proceedings in capital cases that satisfies the requirements of chapter 154 of title 28. Certification qualifies the State for the application, in its capital cases, of special federal habeas corpus review procedures set forth in sections 2262, 2263, 2264, and 2266 of title 28. Subsection (b) of 28 U.S.C. 2265 directs the Attorney General to promulgate regulations to implement the certification procedure under subsection (a) of that section.

**§ 26.21 Definitions.**

For purposes of this part, the term—

*Appropriate State official* means the state attorney general, except that, in a State in which the state attorney general does not have responsibility for federal habeas corpus litigation, it means the chief executive of the State.

*Competent counsel* means counsel meeting state standards of competency for the appointment of counsel in state postconviction proceedings brought by indigent prisoners who have been sentenced to death.

*State postconviction proceedings* means collateral proceedings in state court, regardless of whether the State conducts such proceedings after or concurrently with direct state review.

**§ 26.22 Certification.**

(a) There are no requirements for certification or for application of chapter 154 other than those expressly stated in the chapter. An appropriate state official may request in writing that the Attorney General determine whether the State meets the requirements for certification expressly stated in chapter 154. If so requested, the Attorney General shall determine—

(1) Whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in state postconviction proceedings brought by indigent prisoners who have been sentenced to death;

(2) The date on which the mechanism was established; and

(3) Whether the State provides standards of competency for the appointment of counsel in proceedings described in paragraph (1) of this section.

(b) As provided in 28 U.S.C. 2261(c), the mechanism must offer postconviction counsel to all indigent prisoners with capital sentences and must provide for the entry of an order by a court of record—

(1) Appointing one or more attorneys as counsel to represent the prisoner upon a finding that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer;

(2) Finding, after a hearing if necessary, that the prisoner rejected the offer of counsel and made the decision with an understanding of its legal consequences; or

(3) Denying the appointment of counsel, upon a finding that the prisoner is not indigent.

(c) The Attorney General shall determine whether to certify a State's capital counsel mechanism within the later of—

(1) 90 days after the Attorney General's receipt of the request for certification by the appropriate state official; or

(2) 90 days after the Attorney General publishes in the **Federal Register** a final rule, if the request for certification is received before the final rule is published in the **Federal Register**.

(d) The failure to make a determination within the applicable

time frame because of judicial interference or other circumstances beyond the Attorney General's control does not affect the validity of a later determination.

(e) If certification is granted, the certification will be published in the **Federal Register** and will identify the date on which the State established its qualifying capital counsel mechanism. Certification is a final determination by the Attorney General that the State meets the statutory requirements for certification. There is no authorization or procedure for suspending, reconsidering, revoking, or denying certification with respect to a State for which certification has been granted.

**§ 26.23 Severability.**

If any provision of this subchapter, or the application of such provision to any person or circumstance, is found to be invalid, that shall not affect the validity of any other provision or application.

Dated: March 12, 2026.

**Pamela Bondi,**

*Attorney General.*

[FR Doc. 2026–05134 Filed 3–13–26; 8:45 am]

**BILLING CODE 4410–BB–P**

---

## DEPARTMENT OF TRANSPORTATION

### National Highway Traffic Safety Administration

### 49 CFR Part 571

**[Docket No. NHTSA–2026–0628]**

**RIN 2127–AM72**

### Federal Motor Vehicle Safety Standards; Modernization of FMVSS No. 102 To Accommodate ADS-Equipped Vehicles

**AGENCY:** National Highway Traffic Safety Administration (NHTSA), Department of Transportation (DOT).

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** NHTSA is proposing to amend Federal Motor Vehicle Safety Standard (FMVSS) No. 102, ''Transmission shift position sequence, starter interlock, and transmission braking effect.'' The proposed modification would except vehicles equipped with Automated Driving Systems (ADS) that do not have manually operated driving controls from the requirement for a transmission shift position display. This rulemaking would remove unnecessary regulatory burdens and costs associated with a display designed to aid a person driving the vehicle. As the transmission shift position display does not fulfill the same safety need in an ADS-equipped vehicle without manually operated driving controls, the amendment will not impact vehicle safety. This action is part of a larger NHTSA effort to address vehicle automation in the agency's regulations.

**DATES:** Comments should be submitted no later than April 15, 2026.

**ADDRESSES:** You may submit comments identified by the docket number in the heading of this document or by any of the following methods:

- *Federal eRulemaking Portal:* Go to *www.regulations.gov*. Follow the instructions for submitting comments on the electronic docket site by clicking on ''Help'' or ''FAQ.''
- *Mail or Hand Delivery:* Docket Management Facility. U.S. Department of Transportation, 1200 New Jersey Avenue SE, West Building, Suite W58–213, Washington, DC 20590 between 9 a.m. and 5 p.m. Eastern Time, Monday through Friday, except Federal Holidays. To be sure someone is there to help you, please call (202) 366–9826 or (202) 366–9317 before coming.
- *Fax:* 202–493–2251.

*Instructions:* All submissions must include the agency name and docket number or Regulatory Information Number (RIN) for this rulemaking. Note that all comments received will be posted without change to *www.regulations.gov,* including any personal information provided. Please see the Privacy Act discussion below. We will consider all comments received before the close of business on the comment closing date indicated above. To the extent possible, we will also consider comments filed after the closing date.

*Docket:* For access to the docket to read background documents or comments received, go to *www.regulations.gov* at any time or to 1200 New Jersey Avenue SE, West Building Ground Floor, Room W12–140, Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal Holidays. Telephone: 202–366–9826.

*Confidential Business Information:* If you claim that any of the information in your comment (including any additional documents or attachments) constitutes confidential business information within the meaning of 5 U.S.C. 552(b)(4) or is protected from disclosure pursuant to 18 U.S.C. 1905, please see the detailed instructions given under the Public Participation heading of the **SUPPLEMENTARY INFORMATION** section of this document.

*Privacy Act:* In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to inform its decision-making process. DOT posts these comments, without edit, including any personal information the commenter provides, to *www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *www.transportation.gov/privacy*. To facilitate comment tracking and response, we encourage commenters to provide their name, or the name of their organization; however, submission of names is completely optional. Regardless of whether commenters identify themselves, all timely comments will be considered fully.

**FOR FURTHER INFORMATION CONTACT:** For technical issues, you may contact Ms. Lina Valivullah, Office of Automation Safety; Telephone: 202–366–1810; Email: *Lina.Valivullah@dot.gov;* Facsimile: 202–493–2739. For legal issues, you may contact Mr. David Jasinski, NHTSA Office of the Chief Counsel, Email: *David.Jasinski@dot.gov*. The mailing address of these officials is: National Highway Traffic Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Executive Summary
II. Background
III. Proposed Change
IV. Request for Comment
V. Rulemaking Analyses and Notices
VI. Public Participation

## I. Executive Summary

This rulemaking focuses on vehicles equipped with Automated Driving Systems (ADS) that do not have manually operated driving controls. These vehicles currently are not available for consumer purchase; however, there is considerable investment into the safe testing, development, and validation of these vehicles, as well as localized deployment by manufacturers and rideshare operators. Vehicle automation technology has the potential to reduce roadway crashes and fatalities while increasing mobility. As the technology is still maturing, and many of the potential benefits are yet to be realized, NHTSA is engaging in a process to remove unnecessary barriers to technological innovation while ensuring motor vehicle safety is not compromised.

NHTSA seeks to address the application of certain existing crash avoidance standards to ADS-equipped vehicles without manually operated driving controls. In this document, NHTSA proposes to amend Federal

E-FILED
7/17/2026 5:54 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

**IN THE CHANCERY COURT FOR DAVIDSON COUNTY**
**TWENTIETH JUDICIAL DISTRICT**
**THE STATE OF TENNESSEE**

| | | |
|---|---|---|
| FEDERAL DEFENDER SERVICES OF<br>EASTERN TENNESSEE, INC.<br>800 South Gay Street, Suite 2400<br>Knoxville, Tennessee 37929<br><br>FEDERAL PUBLIC DEFENDER FOR THE<br>MIDDLE DISTRICT OF TENNESSEE<br>810 Broadway, Suite 200<br>Nashville, Tennessee 37203<br><br>ANDRE BLAND, No. 232838<br>Riverbend Maximum Security Institution<br>7475 Cockrill Bend Boulevard<br>Nashville, TN 37209<br><br>JOHN MICHAEL BANE, No. 98568<br>Riverbend Maximum Security Institution<br>7475 Cockrill Bend Boulevard<br>Nashville, TN 37209<br><br>STEPHEN FERRELL<br>621 Sedgley Drive<br>Knoxville, TN 37922<br><br>*Plaintiffs*,<br><br>v.<br><br>JONATHAN SKRMETTI, in his official capacity<br>as Attorney General and Reporter<br>State of Tennessee<br>P.O. Box 20207<br>Nashville, TN 37202<br><br>*Defendant*. | ) | Case No. 26-0660-II |

**<u>AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

## NATURE OF THE ACTION

1. Plaintiffs challenge the extra-statutory and unconstitutional exercise of authority by Defendant, the Tennessee Attorney General and Reporter ("TN-AGR"), to seek, and to defend in the U.S. Court of Appeals for the D.C. Circuit, the certification under Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (relevant portions codified as amended at 28 U.S.C. §§ 2241–55(1996)), and apply the certification in federal habeas corpus proceedings.

2. The TN-AGR holds a unique place in Tennessee's constitutional structure. Unlike every other state, which has placed the attorney general in one of its policymaking branches, the framers of Tennessee's Constitution placed the TN-AGR in Tennessee's Judicial Department. As such, courts have long recognized the TN-AGR as an impartial, quasi-judicial officer, prohibited from legislating. The TN-AGR's powers are further limited by statute as the Tennessee Constitution does not prescribe his duties. Thus, the TN-AGR may only exercise statutory, and in some cases, common law authority.

3. Chapter 154 of AEDPA establishes a *quid pro quo* arrangement: a state provides indigent death-sentenced prisoners with a mechanism for the timely appointment of competent postconviction counsel and adequate litigation expenses, and in exchange, the state may benefit from special expedited and narrowed federal habeas review by Article III courts. To take advantage of Chapter 154, a state must seek certification from the U.S. Attorney General ("US-AG") that its mechanism for appointing postconviction counsel satisfies Chapter 154's requirements. The US-AG must then undertake an administrative process governed by the Administrative Procedure Act ("APA") to certify whether "the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State

postconviction proceedings." 28 U.S.C. § 2265(a)(1)(A). Historically, and as is the case here, the administrative process has involved a public comment period in which stakeholders, including federal defender organizations, are allowed to comment on whether certification is authorized by federal law. In some cases, the US-AG has also requested that the applicant state provide additional information in support of its request.

4. Certification under Chapter 154 carries severe consequences for death-sentenced prisoners and their counsel. Among other things, Chapter 154 cuts in half the statute of limitations to file a federal habeas petition—to only 180 days, instead of a year—and limits the circumstances in which tolling is permitted. Chapter 154 also limits the ability to raise procedurally defaulted claims, amend habeas petitions, and obtain stays of execution from a federal court. Chapter 154 places strict limits on the time that district courts and courts of appeals have to rule on petitions, thus quickening the pace of litigation. Chapter 154's limitations are so severe that they are effectively substantive—curbing habeas petitioners' entitlement to relief.

5. On June 6, 2025, after being invited to by the US-AG, the TN-AGR applied for Chapter 154 certification. The TN-AGR, however, lacked the authority to do so. The TN-AGR's general statutory and common law powers do not permit him to initiate federal administrative proceedings including the Chapter 154 certification process. Indeed, the General Assembly has explicitly empowered the TN-AGR to initiate civil and administrative proceedings in other discrete, statutorily defined contexts, but has not granted the TN-AGR the general authority to initiate federal administrative proceedings. Further, given the far-reaching consequences of certification for death-sentenced prisoners, seeking certification constituted a legislative act, and thus encroached upon the General Assembly's legislative powers. The General Assembly has

refused to delegate this policymaking authority to the TN-AGR and thus the TN-AGR's application for certification was extra-statutory and unconstitutional.

6. On July 10, 2026, the US-AG published a notice—Certification of Tennessee Capital Counsel Mechanism—in which he certified, premised on the TN-AGR's application, that Tennessee "has established a postconviction capital counsel mechanism satisfying the requirements of" Chapter 154. 91 Fed. Reg. 42761, 42761–42762 (July 10, 2026).

7. Certification has already unleashed, and will continue to result in, chaos upon Plaintiffs. For Plaintiff John Michael Bane, Chapter 154, if applied, will immediately erect a new, aggressive, substantive bar to amending his federal habeas petition to reflect the results of DNA testing to which the State of Tennessee has agreed. And for Plaintiff Andre Bland, certification threatens to truncate the time available to pursue newly exhausted intellectual-disability and related claims upon return from state court and to litigate amendments in his stayed federal habeas petition.

8. The TN-AGR will likely seek to enforce Chapter 154's shortened statute of limitations and other restrictions against the Federal Defender Plaintiffs' other clients, including those who are mentally incompetent and unable to understand Tennessee's certification or its implications for their cases, forcing the Federal Defenders to immediately litigate these issues before federal courts. And for clients who have yet to file habeas petitions, the Federal Defenders may be forced to rush and protectively file petitions to ensure those petitions are timely under Chapter 154. Complying with the TN-AGR's enforcement of Chapter 154 certification will require significant time, effort, and resources that the Federal Defenders simply do not have. The TN-AGR would be inflicting all these harms, all unlawfully, at the taxpayers' expense.

9. Given these substantial harms, Plaintiffs bring this suit seeking an order permanently enjoining the TN-AGR from (1) seeking to defend the certification decision in the U.S. Court of Appeals for the D.C. Circuit and the U.S. Supreme Court, (2) invoking or enforcing Chapter 154 in any federal habeas corpus proceeding, and (3) reapplying for certification. In addition, Plaintiffs seek a declaration that the TN-AGR's certification application was extra-statutory and unconstitutional and thus void and of no effect.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to Tenn. Code Ann. §§ 16-11-101, *et seq.*, and 29-14-101, *et seq.*.

11. This Court has personal jurisdiction over Defendant pursuant to Tenn. Code Ann. §§ 20-2-222 and 20-2-223 on grounds that his principal place of business is in Tennessee and that the wrongful conduct and resulting injuries alleged herein have and are occurring in Tennessee.

12. Venue is proper in this judicial district pursuant to Tenn. Code Ann. § 20-4-101(a) because the cause of action arose in Davidson County.

## PARTIES

### Plaintiffs

13. **Plaintiff Federal Defender Services of Eastern Tennessee, Inc. ("FDSET")** operates as the federal public defender in the Eastern District of Tennessee pursuant to 18 U.S.C. § 3006(A)(g). FDSET's mission statement undertakes to "zealously advocate[] in federal courts for those who have been accused or convicted of federal or capital crimes," "provide client centered, vigorous, and compassionate representation to all" and "believe in the worth, dignity and humanity of every client." FDSET includes a Capital Habeas Unit (CHU), which is appointed to serve in all non-conflicted capital habeas cases arising from the Eastern District of Tennessee and

to represent capital habeas corpus petitioners in nine other federal districts across the country. The CHU's legal mandate is set forth in 18 U.S.C. § 3599(e):

> [E]ach attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

14. Currently, FDSET represents six inmates on Tennessee's death row whose cases could be substantially and negatively affected by Chapter 154's application. All six have federal habeas petitions pending in district court. At least some of FDSET's clients are mentally incompetent and unable to understand Tennessee's certification or its implications for their cases. These clients relied on their appointed counsel to engage in the Chapter 154 administrative proceedings before the US-AG and to defend their interests in this challenge to Tennessee's application. FDSET is a significant stakeholder in capital representation in Tennessee and has an established interest on behalf of itself and its clients in Tennessee's certification.

15. **Plaintiff Federal Public Defender for the Middle District of Tennessee ("TNM")** operates as the federal public defender in the Middle District of Tennessee pursuant to 18 U.S.C. § 3006(A)(g). TNM includes a CHU with the same legal mandate as FDSET. TNM is dedicated to protecting the constitutional rights and inherent dignity of indigent persons sentenced to death. It provides the highest quality of legal representation in federal postconviction proceedings through exhaustive investigation, collaborative case development, and zealous advocacy in the pursuit of justice and the preservation of life. TNM's mission is to ensure that persons sentenced to death in their jurisdiction "receive full and fair review of their conviction and sentence" and to "strive to examine the processes that resulted in their convictions and sentences,

including revealing the human stories often overlooked by the legal system, challenge systemic injustices through rigorous litigation, and ensure that our clients receive the full benefit of their rights under the United States Constitution."

16. TNM is appointed counsel for nineteen of the forty-one individuals currently on death row in Tennessee. Nine of those clients have pending federal habeas petitions; these clients' cases could be substantially and negatively affected by the application of Chapter 154. At least some of TNM's clients are mentally incompetent and unable to understand Tennessee's certification or its implications for their cases. These clients relied on their appointed counsel to engage in the Chapter 154 administrative proceedings before the US-AG and to defend their interests in this challenge to Tennessee's application. TNM is a significant stakeholder in capital representation in Tennessee and has an established interest on behalf of itself and its clients in Tennessee's certification.[1]

17. **Plaintiff Andre Bland**, age 52, was sentenced to death on February 12, 1994, at the Shelby County Criminal Court in Memphis, Tennessee. His direct appeal concluded before the Tennessee Supreme Court on December 1, 1997. His petition for a writ of certiorari was filed on April 20, 2017, and the U.S. Supreme Court denied it on June 26, 2017. His pro se petition for state postconviction relief was filed on July 16, 1998. Private counsel Bret Stein and Wayne Chastain were originally appointed to represent him in his initial state postconviction proceedings. The Office of the Post Conviction Defender for Tennessee ("OPCD") was subsequently appointed and private counsel were removed. Finally, OPCD was removed and private counsel Michael Scholl and Marty McAfee were appointed. The trial court denied the postconviction petition on

[1] FDSET and TNM will hereinafter be collectively referred to as the "Federal Defenders."

November 28, 2006, and the Court of Criminal Appeals of Tennessee affirmed the denial on April 8, 2009. On August 17, 2009, the Tennessee Supreme Court denied Mr. Bland's application for permission to appeal.

18. Mr. Bland filed his pro se federal habeas petition on August 28, 2009. Currently, Mr. Bland's federal habeas petition is stayed while he pursues relief on his intellectual disability claim, along with his challenge to Tennessee's amended statute, Tenn. Code Ann. § 39-13-203. Mr. Bland is represented by TNM in his federal habeas/state-exhaustion proceedings.

19. **Plaintiff John Michael Bane**, age 61, was first sentenced to death in 1990 in Shelby County, Tennessee. His sentence was appealed to and remanded by the Tennessee Supreme Court, and he was resentenced to death in 1997. Subsequently, he was found indigent and appointed private counsel in 2002. Mr. Bane is now represented by TNM. Mr. Bane is the petitioner in a petition for writ of habeas corpus in the U.S. District Court for the Western District of Tennessee. During the pendency of Mr. Bane's application, he initiated state court proceedings to obtain DNA testing intended to establish his innocence. Tennessee agreed to that testing, and Mr. Bane's counsel is currently working with the State and an appropriate laboratory for the testing to be completed. Mr. Bane expects that those results will necessitate an amendment of the federal petition for the writ of habeas corpus.

20. **Plaintiff Stephen Ferrell** is an Assistant Federal Defender in the CHU for FDSET. He is an attorney licensed to practice in Tennessee and Ohio and was the supervisor of the CHU from 2022 until June 2026. He has been employed as an attorney at FDSET since 2004 and has served as FDSET's primary point of contact for counsel in this case.

21. Mr. Ferrell is also a Tennessee taxpayer. Mr. Ferrell has and continues to pay the Tennessee Professional Privilege Tax as an attorney, *id.* at § 68-4-1702(3), as well as state property

taxes, *id.* at §§ 67-5-101–67-5-2803, gasoline taxes, *id.* at § 67-3-201, and motor vehicle taxes. *Id.* at §§ 55-4-101 and 55-4-111.

22. The tax payments made by Mr. Ferrell to the State of Tennessee flow into the State's general fund. The General Assembly annually appropriates funds from the State's general fund to the TN-AGR's office for payroll, operational expenses (*i.e.*, travel, printing and duplicating, communications, equipment, training, technology), the publication of Tennessee reports, and special litigation.

23. For example, in fiscal year 2024–2025, the General Assembly appropriated $57,457,800 to the TN-AGR's office, including for operating expenses and special litigation amounting to $19,559,500. In fiscal year 2025–2026, the General Assembly appropriated $65,382,600 to the TN-AGR's office including for operating expenses and special litigation amounting to $16,820,100. Finally, for fiscal year 2026–2027, the General Assembly has appropriated $64,875,200 to the TN-AGR's office including for up to $16,833,700 in operating expenses and special litigation.

24. Plaintiffs are informed and believe that the funds the TN-AGR's office used to participate in the Chapter 154 certification process and will use to seek enforcement of Chapter 154 against federal habeas petitioners and to intervene in any judicial review of the certification decision will derive from annual appropriations from the State's general fund.

**Defendant**

25. **Defendant Jonathan Skrmetti** is a member of Tennessee's Judicial Department, Tenn. Const. art. VI, § 5, and serves as the TN-AGR. On June 6, 2025, he requested that the US-AG certify that Tennessee qualifies for expedited federal habeas proceedings pursuant to Chapter 154. Letter from Jonathan Skrmetti, Att'y Gen., State of Tenn., to Alida Kass, Senior Couns.,

Office of Legal Pol'y, U.S. Dep't of Just. (June 6, 2025) (hereinafter "Certification Request"), https://www.justice.gov/olp/media/1410091/dl?inline.

## LEGAL AND FACTUAL BACKGROUND

### I. The Tennessee Attorney General Is An Independent, Quasi-Judicial Officer Whose Powers Are Limited by Statute

26. Tennessee's current Constitution is an amended form of the State's Constitution of 1870. That Constitution "was a political expedient to correct" what many of the framers considered to be "the tyrannical abuses of" the Reconstruction government. *See* Brief of William E. Hardy, Ph.D. as Amicus Curiae, *McKay v. State*, 706 S.W.3d 338 (Tenn. 2025) at 9. The framers "intended to break [the] Radical centralized political-legal authority" by, among other things, "impos[ing] certain checks and balances on the legislature and various state governmental departments to prevent the arbitrary exercise of power." *Id.*

27. Consistent with that purpose, the Tennessee Constitution divides "[t]he powers of the Government . . . into three distinct departments: the Legislative, Executive, and Judicial." Tenn. Const. art. II, § 1. The Legislative Department, consisting of the General Assembly, is vested with the "[t]he Legislative authority of [the] State." *Id.* at art. II, § 3. It carries with it all the "powers necessary for a branch of the Legislature of a free State." *Id.* at art. II, § 12. The Executive Department consists of the Governor and the Secretary of State. *Id.* at art. III, § 1, 17. The Governor is vested with the "Executive power," *id.* at art. III, § 1, which includes the authority to "take care that the laws [are] faithfully executed." *Id.* at art. III, § 10. The Secretary of State, who is appointed by the General Assembly, must "keep a fair register of all the official acts and proceedings of the Governor" and "perform such other duties as shall be enjoined by law." *Id.* at art. III, § 17.

28. The Judicial Department of Tennessee is unique among the states. In addition to including the Tennessee Supreme Court and inferior courts, *id.* at art. VI, §§ 1–4, it also includes non-judicial legal officers—namely, the TN-AGR and "[a]n Attorney for the State for any circuit or district." *Id.* at art. VI, § 5. Both roles carry a term of eight years. *Id.* While local Attorneys for the State—*i.e.*, district attorneys—must be "elected by the qualified voters of such circuit or district," the TN-AGR is "appointed by the Judges of the Supreme Court." *Id.* No other state has placed its attorney general outside its policymaking branches. *See State v. Thomas*, 687 S.W.3d 223, 259 (Tenn. 2024) (Gee, J., concurring).

29. Recognizing this unique placement of the TN-AGR and local district attorneys, courts have long regarded constitutionally created State attorneys as "quasi-judicial officer[s], . . . presumed to act impartially in the interest of justice." *Manning v. State*, 257 S.W.2d 6, 9 (1953); *see also Ledgerwood v. Pitts*, 125 S.W. 1036, 1045 (1910) ("Attorneys General . . . have always been recognized, and are, in fact, a part of the judiciary"). Further, given that the Tennessee Constitution prohibits members of one department from "exercis[ing] any of the powers properly belonging to" another, Tenn. Const. art. II, § 2, district attorneys and the TN-AGR ordinarily may not encroach upon the General Assembly's powers unless they are so "directed or permitted." *Id.*

## II. Chapter 154 Limits Important Rights Otherwise Guaranteed To Death-Sentenced Prisoners

30. AEDPA governs federal habeas review of state criminal judgments. AEDPA's Chapter 153, 28 U.S.C. §§ 2241–2255, establishes general requirements and conditions for such habeas petitions, including a one-year statute of limitations for filing a petition, 28 U.S.C. § 2244(d).

31. This case involves AEDPA's Chapter 154, 28 U.S.C. §§ 2261–2266. Compared to Chapter 153, Chapter 154 places additional restrictions on federal habeas review of state capital convictions and sentences. But those restrictions apply only to prisoners who were sentenced to death in states that reasonably guarantee that death-sentenced indigent prisoners will be appointed timely, competent, and adequately resourced counsel for state postconviction review. *See* 28 C.F.R. pt. 26.21–26.22 (2013).

32. Chapter 154 requires that an "appropriate State official" must first apply to the US-AG to take advantage of Chapter 154. 28 U.S.C. § 2265(a)(1). Upon receiving a request, the US-AG must undertake an administrative process governed by the APA to certify whether "the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings." *Id.* at § 2265(a)(1)(A). Historically, and as is the case here, the administrative process has involved a public comment period in which stakeholders, including federal defender organizations, have commented on whether certification would be appropriate. Notice of Request for Certification of Tenn. Cap. Couns. Mechanism, 90 Fed. Reg. 38182, 38183 (Aug. 7, 2025) (hereinafter "Notice of Request"); *see* DOJ Docket ID DOJ-OLP-2017-0009, https://www.regulations.gov/docket/DOJ-OLP-2017-0009; DOJ Docket ID DOJ-OLP-2017-0010, https://www.regulations.gov/docket/DOJ-OLP-2017-0010. And in some cases, the US-AG has also requested that the applicant state provide additional information in support of its request. *See* Letter from Jessica E. Hart, Intergovernmental Affs. & Pub. Liaison, U.S. Dep't of Just. to Ken Paxton, Att'y Gen., State of Tex. (June 19, 2018), https://www.justice.gov/olp/page/file/1073361/dl?inline (seeking further information from Texas

regarding its mechanism's effective date, counsel fees and expenses, and its standards of competency).

33. Once a state is certified, Chapter 154 may apply to all capital habeas cases in which the petitioner's postconviction counsel was "appointed pursuant to [the approved] mechanism, [the] petitioner validly waived counsel, [the] petitioner retained counsel, or [the] petitioner was found not to be indigent." 28 U.S.C. § 2261(b)(2). Among other things, Chapter 154 cuts in half the statute of limitations to file a federal habeas petition—to just 180 days, instead of a year—and limits the circumstances in which tolling is permitted. *Id.* at § 2263. Chapter 154 also severely limits a petitioner's ability to raise procedurally defaulted claims, *id.* at § 2264(a), amend their habeas petition, *id.* at § 2266(b)(3)(B), and obtain a stay of execution from federal court, *id.* at § 2262(c). It also places specific limits on the time that district courts and courts of appeals have to rule on petitions. *Id.* at § 2266. For example, district courts must generally enter final judgment within 450 days of filing or within 60 days after the petition is submitted for decision, whichever is earlier. *Id.* at § 2266(b)(1)(A). Under Chapter 153, there are no such time constraints.

## III. The U.S. Attorney General Invites States To Seek Chapter 154 Certification

34. On January 20, 2025, the first day of his second term, President Donald Trump issued Executive Order ("EO") 14164, Restoring the Death Penalty and Protecting Public Safety. Exec. Order No. 14164, 90 Fed. Reg. 8463 (Jan. 20, 2025). The EO provides in part:

> [E]fforts to subvert and undermine capital punishment defy the laws of our nation, make a mockery of justice, and insult the victims of these horrible crimes. The Government's most solemn responsibility is to protect its citizens from abhorrent acts, and my Administration will not tolerate efforts to stymie and eviscerate the laws that authorize capital punishment against those who commit horrible acts of violence against American citizens.

*Id.* at 8463. Establishing that "[i]t is the policy of the United States to ensure that the laws that authorize capital punishment are respected and faithfully implemented," the EO directs the US-AG to "take all appropriate action [on] any pending request for certification" under Chapter 154. *Id.*

35. The US-AG promptly complied. On February 5, 2025, then-Attorney General Pamela Bondi directed the Department of Justice (the "Department"), Office of Legal Policy ("OLP") to "promptly address states' pending requests for certification" under Chapter 154. Office of the Att'y Gen., *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388561/dl?inline. On May 15, 2025, OLP sent a letter to state attorneys general inviting their applications and offering the Department's assistance. Letter from Aaron Reitz, Assistant Att'y Gen., U.S. Dep't of Just. to State Att'ys Gen. (May 15, 2025) (attached as Ex. 1). The letter provides general instructions on how states may "get certified" and reassures attorneys general that OLP "is ready to assist should your state choose to navigate this process." *Id.* The letter also reminds attorneys general that "[o]n his first day in office, President Trump issued Executive Order 14164, Restoring the Death Penalty and Protecting Public Safety, directing the US-AG 'to take all appropriate action [on] any pending request for certification'" under Chapter 154. *Id.* (citation omitted).

## IV. The Tennessee Attorney General Seeks Certification

36. Less than a month later, on June 6, 2025, the TN-AGR accepted OLP's offer to "get certified." Certification Request. He requested that the US-AG approve Tennessee's mechanism effective October 23, 1995, such that Chapter 154 would apply to all petitioners whose postconviction counsel were appointed "pursuant to [the] mechanism" since that date. *Id.* at 11 (citing 28 U.S.C. § 2265(a)(2)).

37. Two months later, on August 7, 2025, the Department provided notice that public comments on Tennessee's application would be accepted until October 6, 2025. Notice of Request at 38183. The deadline was later extended to October 10, 2025, for Plaintiffs as part of a separate federal court proceeding in *Bland v. Bondi*, No. 25-cv-3499 (D.D.C. 2025). Joint Status Rep., (Oct. 2, 2025), D.E. 13.

## V. Tennessee's Application Subjected The Federal Defenders To A Burdensome Federal Administrative Proceeding

### A. The Certification Request Coerced the Federal Defenders into Participating in an Invalid Federal Administrative Proceeding

38. The Federal Defenders were forced to participate in this administrative process as (1) certification would have severe consequences for the Federal Defenders and their clients, and (2) to preserve all their constitutional, administrative, and substantive challenges to certification—or risk forgoing their ability to seek judicial review of these claims.

39. With respect to the consequences of certification under Chapter 154, once the US-AG "certifies that a State has established a mechanism for providing counsel," 28 U.S.C. § 2261(b)(1), Chapter 154's shortened 180-day statute of limitations and accompanying tolling restrictions, *id.* at § 2263, restrictions on amendments, *id.* at § 2266(b)(3)(B), procedural default limitations, *id.* at § 2264(a), and tightened deadlines for the judiciary, *id.* at § 2266, may take effect if state postconviction "counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent." *Id.* at § 2261(b)(2). The US-AG has adopted this position, stating that "certifications under chapter 154 are orders rather than rules for purposes of the [APA]," Certification Process for State Cap. Couns. Sys., 78 Fed. Reg. 58160, 58174 (Sept. 23, 2013) (hereinafter "Current Rule"), and are thus immediately binding on federal courts.

40. On information and belief arising out of a lengthy history of litigating federal habeas petitions involving the State of Tennessee, the Federal Defenders believe it is likely that Tennessee will imminently seek to invoke Chapter 154 in federal habeas corpus proceedings, including asserting its entitlement to the dismissal of already-filed habeas petitions as untimely and individual claims as procedurally defaulted, to preventing prisoners from otherwise permissibly amending their petitions, and to expedite proceedings. This may be especially true for some death-sentenced prisoners represented by the Federal Defenders, including those unable to represent themselves here. Their petitions were timely under Chapter 153's one-year statute of limitations. But, depending on how a court interprets Chapter 154's tolling restrictions or other challenges, including whether these clients are entitled to equitable tolling, their petitions may be untimely under Chapter 154.

41. Mr. Bane's case is illustrative. When his DNA testing is returned, it will very likely be necessary to amend his habeas petition. If Chapter 154 is applied in Mr. Bane's case, his request to amend will be subject to the heightened amendment standard imposed by 28 U.S.C. § 2266(b)(3)(B), which will require him to establish that "the factual predicate for [his] claim could not have been discovered previously through the exercise of due diligence" and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id*. at § 2254(b)(2)(B). Under Chapter 153, in contrast, his petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions," which require courts to "freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2).

42. Similarly, the Attorney General's certification decision threatens to truncate the time available to Mr. Bland to present his newly exhausted intellectual-disability and related claims upon return from state court and litigate amendments in his stayed federal habeas petition.

43. What this means for the Federal Defenders and their fifteen Tennessee death-sentenced clients with pending habeas petitions is that they will immediately be forced to expend resources, including hundreds of attorney and staff hours, investigating and litigating the legal ramifications of certification. They will have to determine and litigate whether (1) each client's postconviction counsel was appointed according to the approved mechanism, validly waived counsel, or was properly found not to be indigent, *id.* at § 2261(b)(1), (2) received the benefit of such appointment; and (3) it is proper for Chapter 154 to apply retroactively given that their clients previously lacked notice that Chapter 154's provisions would apply. This will inevitably require the Federal Defenders, whose resources are scarce, to divert staff hours away from other cases that do not implicate Chapter 154 and from otherwise fulfilling their institutional missions. These other cases include four scheduled executions and numerous pending matters before federal and state appellate and trial courts.

44. As for the Federal Defenders' clients who have yet to file a habeas petition, the Federal Defenders will have to spend significant resources conducting a similar investigation to determine whether Chapter 154 will apply to their cases. And to the extent they determine that Chapter 154's provisions may apply, they will have to act protectively and hastily file petitions, curtailing further investigation of other potentially meritorious claims. Upon doing so, they will also likely be required to litigate the issue of whether Chapter 154 applies and to protect claims vulnerable to Chapter 154's stricter procedural default rules. They will also be severely restricted

in their ability to amend petitions and potentially add claims they were unable to fully develop given the haste with which they were forced to file. *Id.* at § 2266(b)(3)(B).

45. State postconviction proceedings for individuals sentenced to death in Tennessee will also be impacted. The statutes of limitations for state postconviction proceedings and federal habeas petitions both begin to run when a defendant's direct appeal is denied. Tenn. Code Ann. § 40-30-102(a); 28 U.S.C. §§ 2244, 2263. A petitioner's time to file a federal habeas petition is tolled by state postconviction proceedings only after their state postconviction petition is filed. 28 U.S.C. §§ 2244, 2263. In Tennessee, a capital prisoner must initiate postconviction proceedings themself by filing a pro se postconviction petition. Tenn. Code Ann. § 40-30-102(a). It is only after a pro se petition is filed that the court can appoint counsel for indigent capital defendants. *Id.* at § 40-30-106(e). As a result of Tennessee's certification under Chapter 154, pro se petitioners will be forced to rush to file hurried and potentially underdeveloped state postconviction petitions long before their time to file those petitions is exhausted under Tennessee law. Otherwise, they will run out of time to bring a federal habeas petition if they do not succeed during state postconviction proceedings. Effectively, this means that the one-year statute of limitations for filing a state postconviction petition is also halved by Chapter 154 certification.

46. The injuries the Federal Defenders will incur due to certification will continue even beyond their strict-litigation work. For instance, Federal Defender staff will need to significantly increase their consultations with Tennessee death row clients to explain what the certification means, explain the ramifications of the state's filings in the clients' cases, discuss how they will defend against the state's position, and answer client questions. It is up to a six-hour round trip for FDSET attorneys to visit Tennessee clients, so even a single client-visit results in a full day out of

the office and associated mileage costs, per diem costs, and hotel costs. Because staff are often working longer than eight hours on those days, it also causes compensatory time or overtime costs.

47. Federal Defender staff will also need to train existing attorneys and staff, and incoming attorneys and staff, as to the implications of Chapter 154 and respond to media inquiries about Chapter 154.

48. The Federal Defenders, in furtherance of their core missions, have always engaged with external community stakeholders to provide trainings and presentations on capital representation. *See* Guide to Judiciary Policy, Vol. 7 Def. Servs., Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6 § 655(a) ("Circuit courts should encourage the establishment of capital habeas units in federal defender organizations where they do not already exist and make resource counsel and other resources, as well as training opportunities, more widely available to attorneys appointed in capital habeas cases."); id., Vol. 2 Ethics and Judicial Conduct, Part. A Codes of Conduct. Chapter 4 § 420, Canon 4 (A defender employee may speak, write, lecture, teach, and participate in other activities concerning defender services, the legal system, and the administration of justice," and "may promote the development of professional organizations and foster the interchange of information and experience with others in the profession."). These outreach efforts will need to be expanded in light of certification. Indeed, the stringent timeliness framework applied by Chapter 154 typically requires not only timely action by capital habeas attorneys, but also appropriate case management by other attorneys representing convicted individuals.

49. Given these increased responsibilities, the Federal Defenders are budgetarily constrained and thus cannot independently increase staff size in response to Tennessee's certification, including the expanded operational demands that far exceed their current staffing and

budgetary resources. Such a workload and stress burden will also undoubtedly produce practical consequences that would further undermine the Federal Defenders' missions, including the departure of trained and experienced staff, resulting in loss of institutional knowledge and disruption to clients' ongoing cases.

50. Given both the immediate and long-term consequences of certification, the Federal Defenders were required to participate in the administrative proceedings before the US-AG.

**B. The Administrative Proceeding Was Burdensome**

51. Due to their coerced participation in the certification process, the Federal Defenders were required and will be required to expend substantial resources to respond to Tennessee's application and certification.

52. When the Department announced that the public would only have sixty days to submit comments, the Federal Defenders sought a ninety-day extension. They explained that because Tennessee's application sought retroactive certification for a thirty-year period stretching back to 1995, Certification Request at 11, submitting a comment would require "research into decades of historic development" of the capital counsel mechanism, involving access to off-site storage units, gathering county court records, potential public records requests, and interviews of persons with knowledge of Tennessee's postconviction proceedings. The TN-AGR's failure to provide any supporting documentation to the Department in his request, *see generally id.*, increased the burden on the Federal Defenders to ensure that the Department considered all relevant information, as required by regulation. Furthermore, the many unsupported statements and misrepresentations in Tennessee's application required the Federal Defenders to compile extensive rebuttal information. *See id.*

53. The US-AG denied the request for an extension, and the Federal Defenders were forced to investigate and develop a response within the truncated timeframe. During the compressed public comment period, FDSET's CHU, a small capital habeas unit, was required to divert resources from time sensitive legal matters in their habeas representation. Three out of the five total attorneys on staff and one paralegal were assigned to work on the public comment, diverting a total of 381 staffing hours in an approximately two-month period.

54. Similarly, TNM's CHU was required to divert approximately 1,170 hours for preparing the public comment. Due to Tennessee's application and the Department's refusal to extend the time for submitting comments, all TNM CHU staff were designated as essential workers and were required to work during the shutdown of the federal government. The TNM staff regularly worked late into the evenings and weekends on this project, with several staff members working late into the night for several days during critical stages. The certification process has substantially diverted their work capacity away from other pending legal matters on behalf of their clients. The need to devote substantial time to respond to the state's request significantly interfered with TNM's ability to attend to those tasks.

55. The Federal Defenders ultimately submitted a comprehensive public comment on October 10, 2025, detailing the many significant ways in which Tennessee's system has facially never met Chapter 154's requirements. Fed. Pub. Def. for the Middle Dist. of Tenn. and Fed. Def. Servs. of E. Tenn., Inc., Comment on Notice of Request for Certification of Tenn. Cap. Couns. Mechanism (Oct. 10, 2025) (hereinafter "Public Comment") (attached as Ex. 2). They also demonstrated that in practice, Tennessee has failed to comply with its own rules for appointing postconviction counsel. *Id.* at 25, 36–41, 43–45.

56. Rather than responding to public comments, requesting additional information, or deciding Tennessee's application, the US-AG initiated rulemaking proceedings to set forth a new rule to govern certification. On November 20, 2025, OLP submitted an EO 12866 Regulatory Review to the Office of Information and Regulatory Affairs ("OIRA") of the Office of Management and Budget ("OMB") for a new Proposed Rule for the Certification Process for State Capital Counsel Systems. *See* RIN 1105-AB80. Then, on February 6, 2026, OIRA published notice of its Conclusion of EO 12866 Regulatory Review of the Department's proposed new rule. *See id.* at Certification Process for State Cap. Couns. Sys, OIRA, OMB. This permitted the Department conduct a rulemaking proceeding to promulgate a revised rule.

57. The Department published a new Proposed Rule governing certification on March 16, 2026, and opened a sixty-day public comment period, which ended May 15, 2026. Certification Process for State Cap. Couns. Sys, 91 Fed. Reg. 12525, 12525 (proposed Mar. 16, 2026) (to be codified at 28 C.F.R. pt. 26). In undertaking this rulemaking proceeding, the US-AG has made clear that he does not view the existing rule as a lawful interpretation of Chapter 154. Citing *Loper Bright*, the US-AG noted that "agencies must adhere to the single best reading of the statutes they administer," and because the current rule purportedly contains "non-statutory requirements," it does not "reflect the best reading of" Chapter 154. *Id.* at 12572 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)).

58. On May 15, 2026, to protect their ability to challenge the new rule and potential certification thereunder upon judicial review, the Federal Defenders once again expended significant resources in submitting a public comment.

## VI. The Tennessee Attorney General's Request Is Extra-Statutory and Unconstitutional

### A. The Tennessee Attorney General's Powers Have Long Been Limited by Statute

59. While the Tennessee Constitution provides "for the appointment of the attorney general," Tenn. Const. art. VI, § 5, the TN-AGR has not always been a constitutional officer. The office was first created by the General Assembly in 1835, and its "powers and duties" were "fixed" by statute. *State v. Spurgeon*, 47 S.W. 235, 236 (Tenn. 1897). These powers were subsequently "supplemented by other acts" and integrated, with "slight changes of phraseology, into the Code of 1858." *Id.* When the Constitution was amended in 1853, and again in 1870, to explicitly create the office of the TN-AGR, *McKay v. State*, 2024 WL 4404318, at *5–6 (Tenn. Crim. App. Oct. 4, 2024), the framers notably did not "prescribe [his] duties.'" *Spurgeon*, 47 S.W. at 236. Accordingly, courts have consistently held that the TN-AGR's powers as a constitutional officer continue to be limited by statute. *See, e.g.*, *id.*; *McKay*, 2024 WL 4404318, at *6, *vacated in part on other grounds*, 706 S.W.3d at 341 (leaving "undisturbed" all other aspects of the lower court "opinion and judgment" except with respect to justiciability).

### B. No Statute Permits the Tennessee Attorney General to Initiate Chapter 154 Proceedings

60. The statutory powers of the TN-AGR are generally set out in Tenn. Code Ann. § 8-6-109(b). Most of these powers involve or are related to the TN-AGR's authority to represent the State and its officials, *see also id.* at § 8-6-301, in pending matters. *See id.* at § 8-6-109(b)(1)–(3), (8)–(11), (13)–(14). Other enumerated powers involve the provision of legal advice or opinions to officials in other branches of government, *id.* at § 8-6-109(b)(4)–(6), (12), and the duty to report appellate decisions from state courts, *id.* at § 8-6-109(b)(7).

61. In addition, the General Assembly has authorized the TN-AGR to "prosecute or defend, as the case may be, any and all suits, civil or criminal, in the supreme court of the United States, in the United States court of appeals for the judicial circuit of the United States comprising the state of Tennessee, or in any of the district courts of the United States held in the state of Tennessee, in which suit or suits the state may be a party, or in which the state has or may have interests of a pecuniary nature." *Id.* at § 8-6-110.

62. The various "offices, departments, agencies, boards, commissions [and] instrumentalities of the state" are empowered to initiate civil proceedings "through the attorney general and reporter." *Id.* at § 8-6-301(b). There is, however, no corresponding provision generally permitting the TN-AGR to initiate such proceedings on behalf of the State on his own authority, absent the participation of an Executive Department official.

63. Here, the provisions closest to being applicable to the TN-AGR's certification request are Tenn. Code Ann. §§ 8-6-109(b)(1), (b)(15), and 8-6-110. The TN-AGR lacks authority to seek certification under all three provisions. Under Section 109(b)(1), the TN-AGR does not have the power to ***initiate*** federal administrative proceedings, which as explained above, Chapter 154 certification requires. Section 109(b)(15) also does not apply as no law, including Chapter 154, "devolve[s] upon, or "imposes" a "duty" on the TN-AGR to seek certification. *Id.* at § 8-6-109(b)(15). And under Section 110, the TN-AGR may only initiate ***suits*** in ***federal court***. *Id.* at § 8-6-110. The Chapter 154 administrative process is not a suit, nor does it take place in federal court.

i. Section 109(b)(1) does not authorize the TN-AGR to initiate Chapter 154 proceedings.

64. Beginning with Section 109(b)(1), the TN-AGR has a duty to attend to the "trial and direction of all civil litigated matters and administrative proceedings in which the state or any officer, department, agency, board, commission or instrumentality of the state may be interested." *Id.* at § 8-6-109(b)(1).

65. Notably, the provision omits any explicit grant of authority to ***initiate*** civil or administrative proceedings. This omission is especially revealing because the General Assembly very well "knows" how to grant the TN-AGR such power. *Whitfield v. U.S.*, 543 U.S. 209, 216 (2005).

66. For instance, in the same section as Section 109(b)(1), in Section 109(b)(14), the General Assembly authorized the TN-AGR "[t]o ***bring suit***" on behalf "of the state, local government units or local education agencies to recover public funds." *Id.* at § 8-6-109(b)(14) (emphasis added). By permitting the TN-AGR to bring suit, the General Assembly clearly empowered the TN-AGR to initiate civil actions under certain circumstances. Similarly, in the provision immediately following Section 109, in Section 110, the General Assembly authorized the TN-AGR to "***prosecute*** or defend . . . any and all suits, civil or criminal, in the supreme court of the United States, in the United States court of appeals for the judicial circuit of the United States comprising the state of Tennessee, or in any of the district courts of the United States held in the state of Tennessee." *Id.* at § 8-6-110 (emphasis added). To prosecute a suit includes the power to initiate it. And finally, three provisions after Section 109, in Section 112, the General Assembly empowered the TN-AGR to "***initiate*** the criminal prosecution of any judge, chancellor, or judicial elected official, or district attorney general." *Id.* at § 8-6-112(a) (emphasis added). Thus, if the General Assembly intended to give the TN-AGR the power to initiate civil or administrative

proceedings, it could have simply used the same language it has used elsewhere to authorize such conduct.

67. Instead, the General Assembly authorized the TN-AGR to attend to the "***direction*** of . . . civil litigated matters and administrative proceedings." *Id.* at § 8-6-109(b)(1) (emphasis added). The "ordinary meaning" of "direction," in the context of Tennessee's statutory scheme delineating the TN-AGR's powers, does not encompass the power to initiate Chapter 154 proceedings. *Falls v. Goins*, 673 S.W.3d 173, 180 (Tenn. 2023) (statutes should be interpreted in light of their "plain and ordinary meaning" and in the context of other statutes relating to the "same subject matter" (citations omitted)).

68. As a preliminary matter, unlike the phrases "prosecute," "bring suit," or "initiate prosecution," to direct a proceeding does not necessarily include the power to initiate it. Indeed, courts applying Tennessee law have recognized that such authority is distinct from the TN-AGR's power to exercise "supervision and control" during already-instituted proceedings. *State v. Flanigan*, 2026 WL 228063, at *4 (Tenn. Crim. App. Jan. 28, 2026); *see State ex rel. Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 516 (6th Cir. 2019) ("This statute is not applicable because the Attorney General chose ***not to file suit*** against the federal government, rather than choosing ***not to defend*** the constitutionality of some law that the General Assembly enacted." (emphases added)); *cf. State ex. rel. Inman v. Brock*, 622 S.W.2d 36, 42 (Tenn. 1981) ("The legislature has undoubtedly vested the attorney general with broad discretion to decide when he may lend the assistance of his office *to* ***defend*** public officers." (emphasis added)). Thus, while under Section 109(b), the TN-AGR may "supervis[e] and control" the State's litigation conduct during postconviction proceedings, *Flanigan*, 2026 WL 228063, at *4, and defend public officials and state agencies in civil suits, *see, e.g.*, *Inman*, 622 S.W.2d at 36; *State ex. Rel. Comm'r of*

*Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 772 (Tenn. Ct. App. 2001), the TN-AGR may not, solely by virtue of having the power of "direction," institute these proceedings in the first place.

69. That the General Assembly has empowered the TN-AGR to initiate proceedings in other discrete, statutorily defined contexts confirms that the term "direction" was not intended to include the power to initiate. Indeed, a holding to the contrary would render each of these statutes wholly superfluous as the duties they impose would be encompassed by that of Section 109(b)(1). *See Tenn. Dep't of Corr. v. Pressley*, 528 S.W.3d 506, 518 (Tenn. 2017) (explaining that courts have a "duty to construe a statute so that no part will be inoperative, superfluous, void or insignificant." (*quoting Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 228 (Tenn. 2010)). Consider for example, Section 110, under which the TN-AGR may "prosecute or defend . . . any and all suits, civil or criminal, in the supreme court of the United States, in the United States court of appeals for the judicial circuit of the United States comprising the state of Tennessee, or in any of the district courts of the United States held in the state of Tennessee." Tenn. Code Ann. § 8-6-110. If Section 109(b)(1) included the power to institute civil proceedings, then there would be no need for Section 110 to permit the prosecution of civil suits. Similarly, other statutes empower the TN-AGR to initiate certain specific types of proceedings outside federal court. These provisions too would be rendered superfluous if "direction" were construed to encompass the power to initiate. The statutes include the:

(a) Tennessee False Claims Act, *id.* at § 4-18-104(a) ("If the attorney general and reporter finds that a person has violated or is violating § 4-18-103, the attorney general and reporter may bring a civil action under this section against that person.");

(b) Tennessee Human Rights Act, *id.* at § 4-21-302(a)(1) ("If the attorney general has reason to believe that a person has engaged in, is engaging in, or is about to engage in an act or practice in violation of this chapter, then the attorney general may bring an action in the name of the state or on behalf of the complainant against such person to restrain, by temporary restraining order, temporary injunction, or permanent injunction, the use of such act or practice.");

(c) Tennessee Charitable Beneficiaries Act, *id.* at § 35-13-110(a) ("The attorney general and reporter may sue and be sued, and, insofar as the suit against the attorney general and reporter is against the state, the state expressly consents to be sued.");

(d) Tennessee Consumer Protection Act, *id.* at § 47-18-108(a) ("[T]he attorney general may bring an action in the name of the state against such person to restrain by temporary restraining order, temporary injunction, or permanent injunction the use of such act or practice.");

(e) Tennessee Medicaid False Claims Act, *id.* at § 71-5-183(a) ("If the attorney general and reporter finds that a person has violated or is violating § 71-5-182, the attorney general and reporter may bring a civil action under this section against the person."); and

(f) Tennessee's civil investigative demand statute, *id.* at § 8-6-404 ("If a witness fails to comply with a civil investigative demand issued under this part by its return date and has not secured a protective order from the court,

> then the attorney general and reporter, upon notice to the witness, may apply to a court of competent jurisdiction for an order compelling compliance.").

70. Other statutes also empower the TN-AGR to initiate discrete proceedings only if that power is exercised in conjunction with some other official. These include the Tennessee Water Quality Control Act, *id.* at § 69-3-115(a)(2)(D), under which the TN-AGR may "institute proceedings" on behalf of the Commissioner of the Tennessee Department of Environment and Conservation, and Tennessee's statute governing usurpation of office, *id.* at § 29-35-109, which permits the TN-AGR to bring "suit" when "directed so to do by the general assembly, or by the governor and attorney general of the state concurring."

71. The General Assembly's numerous statutes granting specific authority to initiate proceedings on behalf of the state confirms that the TN-AGR possesses no general authority to do so; otherwise, every such provision would be surplusage.

ii. Section 109(b)(15) does not authorize the TN-AGR to initiate Chapter 154 proceedings.

72. Section 109(b)(15) also does not permit the TN-AGR to seek Chapter 154 certification. This is because Chapter 154 does not authorize, let alone "devolve upon" or "impose" a "duty" on state officials to seek certification. *Id.* at § 8-6-109(b)(15).

73. To the contrary, Chapter 154 simply provides that should an "appropriate State official" request certification, the US-AG "shall determine" whether the state's mechanism for appointing postconviction counsel qualifies. 28 U.S.C. § 2265(1). That is, Chapter 154 defines the "class of State officials"—*i.e.*, those who are considered "appropriate" under the implementing regulations, *see* 28 C.F.R. pt. 26.21—whose request for certification "triggers the requirement . . .

that the U.S. Attorney General make a chapter 154 certification decision." Current Rule at 58168. It does not permit or require state officials to actually seek certifications.

74. The commentary to the current rule governing certification confirms this understanding. In addressing comments that raised concerns about potential conflicts between the administrative rule and state law, then-Attorney General Holder, Jr. stated explicitly that "the rule . . . does not preempt State law." *Id.* The commentary goes on to provide that "if State law were to prohibit a State attorney general from requesting chapter 154 certification, then the State attorney general would be barred by State law from making such a request." *Id.* In other words, Chapter 154 does not override state-level restrictions on state attorneys general's power.

iii. Section 110 does not authorize the TN-AGR to initiate Chapter 154 proceedings.

75. Finally, Section 110 does not permit the TN-AGR to initiate Chapter 154 proceedings. This is so for two reasons.

76. First, Section 110 only permits the prosecution of "suits." A "suit" is a "proceeding in a court of justice." *Weston v. City Council of Charleston*, 27 U.S. (2 Pet.) 449, 464 (1829) (Marshall, C.J.). Accordingly, Chapter 154 proceedings, which are initiated before the US-AG, are not suits nor "in the nature" of suits. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937). Rather, they are "statutory proceeding[s]" subject to the requirements of the APA. *Id.*

77. Second, Section 110 has a forum limitation, reaching only federal courts. Tenn. Code Ann. § 8-6-110; *see also Harris v. Barnes*, 2022 WL 244967, at *1 (W.D. Tenn. Jan. 25, 2022) ("Tenn. Code Ann. § 8-6-110 . . . merely requires the Attorney General to represent the state in federal court."). Again, Chapter 154 proceedings take place before the US-AG, not a federal court.

78. And to the extent the TN-AGR may argue that he has implied power to seek certification pursuant to his authority to defend against federal habeas petitions, this implied authority only extends as far as "necessary . . . to enable [him] to fulfill [his] statutory mandate." *Bird Black Bear*, 63 S.W.3d at 769. While Chapter 154 certification would undoubtedly affect the TN-AGR's duties in federal habeas defense, seeking certification is in no way necessary to performing those duties.

### C. The Tennessee Attorney General's Common Law Powers Do Not Permit Him to Seek Certification

79. Although the Tennessee Supreme Court has recognized that the TN-AGR, as a constitutional officer, also possesses some "common law powers," those powers may be "restricted by statute." *State v. Chastain*, 871 S.W.2d 661, 664 (Tenn. 1994) (citation omitted).

80. Here, the General Assembly has limited the TN-AGR's ability to "utilize and refer to" his common law powers to "***cases*** in which the state is a party." Tenn. Code Ann. § 8-6-109(b)(1) (emphasis added). Federal administrative proceedings before the US-AG are not cases.

81. That the TN-AGR lacks broad common law power to initiate proceedings is further confirmed by the numerous statutes through which the General Assembly has sought to affirmatively confer this authority. For if the TN-AGR possesses common law power to initiate proceedings, why has the General Assembly considered it necessary to so frequently grant this ability? Insofar as the TN-AGR may have possessed some general authority to initiate proceedings under the common law, the General Assembly's provisions limiting that power to specific circumstances evinces an intent to replace that broad power with a series of more limited ones—consistent with the rule that the TN-AGR's common law duties may be "restricted by statute." *Chastain*, 871 S.W.2d at 664.

### D. The Tennessee Attorney General's Application Encroached Upon The General Assembly's Legislative Power

82. Tenn. Const. art. II, § 1 divides "the powers of the Government into three distinct departments: the Legislative, Executive, and Judicial." "No person . . . belonging to one of these departments [may] exercise any of the powers properly belonging to either of the others," unless they are so "directed or permitted." *Id.* at art. II, § 2. In general, "the 'legislative power' is the authority to make, order, and repeal law; the 'executive power' is the authority to administer and enforce the law; and the 'judicial power' is the authority to interpret and apply law." *McLay v. Airport Mgmt. Servs. LLC*, 596 S.W.3d 686, 694 (Tenn. 2020) (citation omitted).

83. Courts have opined on but not fully defined the scope of the General Assembly's legislative power. For instance, in delineating the General Assembly's authority to set rules of evidence, the Tennessee Supreme Court distinguished between "substantive law," which is "within the province of the legislature" and the "rules of practice and procedure," which fall "under the authority of the judiciary." *Willeford v. Klepper*, 597 S.W.3d 454, 465–66, 468 (Tenn. 2020). Substantive law "'creates, defines, and regulates the rights, duties, and powers of parties' whereas procedural law concerns '[t]he rules that prescribe the steps for having a right or duty judicially enforced.'" *Whitley v. Metro. Nashville Bd. of Educ.*, 2023 WL 4131459, at *5 (Tenn. Ct. App. June 22, 2023) (quoting *Black's Law Dictionary* (11th ed. 2019)).

84. In another context, involving the General Assembly's ability to delegate legislative power to "executive branch agenc[ies]," courts have defined "'[p]urely legislative' power"—*i.e.*, that which the General Assembly may not delegate—as the "legislature's discretion as to what the law shall be.'" *Boyce v. Tenn. Peace Officer Standards & Training Comm'n*, 354 S.W.3d 737, 741 (Tenn. Ct. App. 2011) (citation omitted). Indeed, the General Assembly may only "delegate to an

administrative agency the authority to implement the expressed policy of particular statutes." *Id.* (citation omitted).

85. Courts have also distinguished between legislative and quasi-judicial power for purposes of the writ of certiorari, Tenn. Code Ann. § 27-8-101 (applying only to the exercise of "judicial functions"). *See, e.g.*, *Fallin v. Knox Cnty. Bd. of Comm'rs*, 656 S.W.2d 338, 342 (Tenn. 1983). Whereas legislative action "makes new law," judicial or quasi-judicial action "executes one already in existence." *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990). That is, "to qualify as an administrative, judicial, or quasi-judicial act, the discretionary authority of the government body must be exercised within existing standards and guidelines." *Id.* at 639.

86. And finally, courts have refrained from construing statutes broadly or recognizing previously unrecognized causes of action when doing so would have "far-reaching social and legal consequences," and thus risk encroaching upon the legislature's authority. *Taylor v. Beard*, 104 S.W.3d 507, 511 (Tenn. 2003); *In re C.K.G.*, 173 S.W.3d 714, 731 (Tenn. 2005) (construing a statute narrowly to avoid "declar[ing] a policy of sweepingly general and administratively grave effect" that would "intrude upon the legislative function"); *Pike v. State*, 164 S.W.3d 257, 264–65 (Tenn. 2005) (holding that whether a death row inmate is entitled to postconviction review is a "policy consideration[] that [is] more appropriately directed to the legislature").

87. Under any formulation of the General Assembly's scope of authority, seeking Chapter 154 certification constitutes a quintessential exercise of legislative power. Certification has far-reaching legal consequences for current and future death row inmates as it may result in severely curtailing the availability of federal habeas relief, including by shortening the statute of limitations, foreclosing certain claims, and limiting the ability to amend claims and habeas petitions. *See, e.g., Harrison v. Schrader*, 569 S.W.2d 822, 827 (Tenn. 1978) ("Statutes providing

for the limitation of actions are . . . 'exclusively the creatures of the legislative branch of government.'" (quoting *Carney v. Smith*, 437 S.W.2d 246, 248 (1969)); *Tenn. Cable Television Ass'n v. Tenn. Pub. Serv. Comm'n*, 844 S.W.2d 151, 161 (Tenn. Ct. App. 1992) (describing rulemaking, a "legislative function," as to "lay[] down new prescriptions to govern . . . future conduct"). Applying for certification is also purely discretionary, as Chapter 154 does not impose a duty on state officials. And finally, by requesting certification, the TN-AGR sought to make new law as Chapter 154 mandates that the US-AG certify qualifying states. Accordingly, the decision on whether to apply under Chapter 154 rests with the General Assembly, not the TN-AGR.

88. The General Assembly has not empowered the TN-AGR to seek certification. And for good reason. The TN-AGR is ill-suited to vouch for Tennessee's eligibility under Chapter 154. The General Assembly has long empowered local district attorneys general, not the TN-AGR, to represent the state at the trial court level in most types of postconviction proceedings. *See* Tenn. Code Ann. § 40-30-108(a). For most cases—and, historically, all such cases—the TN-AGR is empowered to take the case only at the appellate level. *See id.* at § 8-6-109(b)(2). Only in 2023 did the General Assembly grant the TN-AGR "exclusive control over the state's defense of the request for collateral review" in any "case[] where a defendant has been sentenced to death and is seeking collateral review of a conviction or sentence." *Id.* at § 40-30-114(c), *as enacted in* 2023 Tenn. Laws Pub. Ch. 182 (H.B. 1002) § 1. But even then, the TN-AGR continues to exercise ***no authority*** over the provision of postconviction representation in capital cases.

89. The duty to represent indigent death-sentenced individuals is vested in OPCD, a statutorily created office. *See id.* at § 40-30-206. OPCD is appointed by the Postconviction Defender Oversight Commission ("PCDOC"), *id.* at § 40-30-204(c), which is composed of: (1) three members appointed by the Governor, (2) three members appointed by the Speaker of the

Senate, and (3) three members appointed by the Speaker of the House of Representatives. *Id.* at § 40-30-203. Neither the TN-AGR nor any other judicial branch official has the authority to appoint or remove any member of the PCDOC.

90. The resultant role of the TN-AGR on the issue of postconviction representation is, therefore, strikingly limited, particularly prior to 2023. Until the effective date of the 2023 legislation, the TN-AGR's involvement in postconviction review was limited to the discrete task of overseeing appeals. Since 2023, that involvement has expanded to the trial court level, but only for capital cases. The TN-AGR has no trial level responsibility regarding ordinary postconviction review and therefore no responsibilities in terms of resource-balancing between capital and non-capital cases. Even post-2023, the TN-AGR plays no official role in the administration or oversight of the state's mechanism for providing postconviction defense, which the General Assembly has made the policy decision to make accountable to both the Executive and Legislative Departments through the PCDOC.

91. The TN-AGR's lack of familiarity with postconviction representation generally, and entire disconnect with the capital postconviction counsel appointment mechanism, underscores why the legislature has not granted the TN-AGR authority to seek certification.

## VII. Tennessee is Now Certified, Creating Havoc for Plaintiffs

92. Despite deeming the current rule unlawful, and as such, indicating that Tennessee's application would be decided under the Proposed Rule once it became final, the US-AG surprised Plaintiffs when, on April 30, 2026, OLP published a March 27, 2026 letter from the US-AG to the TN-AGR requesting an election if Tennessee still wishes to be considered for certification under the current rule. Letter from Daniel E. Burrows, Assistant Att'y Gen. U.S. Dep't of Just., to Jonathan Skrmetti, Att'y Gen., State of Tenn. (Mar. 27, 2026),

https://www.justice.gov/olp/media/1438826/dl?inline. The Department stated that if so, it intended to decide Tennessee's request by May 26, 2026. *Id.* at 1.

93. Given that the Department failed to promptly disclose its letter to the TN-AGR to the public and has not disclosed the TN-AGR's response, Plaintiffs suspect that the US-AG and TN-AGR engaged in prohibited *ex parte* communication regarding Tennessee's application, including whether the TN-AGR elected for Tennessee to be certified under the Proposed Rule. Indeed, the letter itself was an *ex parte* communication. To uncover such communication so as to be able to meaningfully comment on all aspects of the US-AG's decision-making process, Plaintiffs sent a letter to the Department seeking such information, as well as requesting that the public comment period on Tennessee's application be reopened for thirty days. Letter from Jennifer Ware-Philipps, Assoc., White & Case LLP, to Levi Lall, Couns., OLP, U.S. Dep't of Just. (May 8, 2026) (attached as Ex. 3). The Department has not responded to that request.

94. In addition, attorneys at TNM expended additional resources submitting Tennessee Public Records Act requests to the TN-AGR requesting records of such communication. Letter from Elijah Swiney, Legal Rsch & Writing Specialist, TNM, to Jonathan Skrmetti, Att'y Gen., State of Tenn. (May 6, 2026) (attached as Ex. 4); Letter from Elijah Swiney, Legal Rsch & Writing Specialist, TNM, to Jonathan Skrmetti, Att'y Gen., State of Tenn. (May 12, 2026) (attached as Ex. 5). The TN-AGR did not disclose whether Tennessee elected to be certified under the current or Proposed Rule.

95. Plaintiffs also requested via letter that the TN-AGR withdraw its unlawful request by 5:00 p.m. ET on May 19, 2026, or alternatively to meet and confer. Letter from Ammar Inayatali, Assoc., White & Case LLP, to Jonathan Skrmetti, Att'y Gen., State of Tenn. (May 13, 2026) (attached as Ex. 6).

96. On May 18, 2026, Plaintiffs' counsel conferred with members of the TN-AGR's office. The TN-AGR's office did not disclose whether it sought to proceed under the current rule or Proposed Rule and did not express an intention to withdraw the application.

97. On July 10, 2026, the US-AG published a notice in which he certified that Tennessee "has established a postconviction capital counsel mechanism satisfying the requirements of" Chapter 154. Certification at 42761–42762. The effective date of certification is July 1, 1997. *Id.*

98. In addition to putting Mr. Bane's ability to seek federal habeas relief through an appropriately amended petition imminently at risk, and similarly threatening Mr. Bland's petition, certification has already caused havoc for the Federal Defenders.

99. Federal Defender staff have had to rearrange schedules and postpone other habeas work to discuss the certification with clients. At least two of four attorneys at FDSET's CHU are losing entire days in the office week to make the long roundtrip, which includes associated mileage costs, per diem costs, and sometimes hotel costs. Because attorneys are often working longer than eight hours on those days, it has caused compensatory time to be owed by FDSET.

100. Federal Defender attorneys have had to postpone other habeas work to accommodate travel and meetings in Washington, DC related to the implications of Chapter 154 and to create litigation strategies, incurring per diem and hotel costs and compensatory time owed by the Federal Defenders.

101. TNM is sending two attorneys to a statewide criminal defense conference on July 30, 2026, to ensure that attorneys from outside the office are aware of the issues created by certification, including the new timeliness framework. TNM has also been required to, and will continue to be required to, expend additional resources to educate the state- and nationwide legal

communities regarding the nature of certification. TNM CHU's Deputy Chief has traveled to Virginia to present on the topic and will, with an additional attorney, present on that topic at another seminar in August 2026.

102. The TN-AGR will also likely begin using state funds appropriated to his office to seek enforcement of Chapter 154's provisions against habeas petitioners and to intervene with respect to any petition for review of the certification decision. Several Plaintiffs intend to seek such review.

103. Given these harms, on July 14, 2026, Plaintiffs' counsel submitted another letter informing the TN-AGR of the illegality of using public funds to seek enforcement of Chapter 154's provisions against any federal habeas petitioner and to intervene in any judicial review proceeding. Plaintiffs' counsel demanded corrective action. Letter from Ammar Inayatali, Assoc., White & Case LLP, to Jonathan Skrmetti, Att'y Gen., State of Tenn. (July 14, 2026) (attached as Ex. 7).

104. In that letter, Plaintiffs' counsel requested that the TN-AGR respond to their demands by 5:00 p.m. ET on July 16, 2026. The TN-AGR did not respond by that deadline, and has yet to respond as of the time of this filing.

## CAUSES OF ACTION

### COUNT I
### Extra-Statutory and Unconstitutional State Official Conduct
*Against Defendant Jonathan Skrmetti*

105. Plaintiffs incorporate all allegations set forth above or below as though set forth herein.

106. As set forth above, Defendant's *ultra vires* request for certification went beyond the scope of his statutory and constitutional powers under Tenn. Const. art. VI, § 5.

107. Defendant's extra-statutory and unconstitutional conduct has harmed, continues to harm, and will imminently harm Plaintiffs as set forth above.

108. Plaintiffs are entitled to equitable relief pursuant to this Court's authority under Tenn. Code Ann. §§ 16-11-101, *et seq.* and Tenn. R. Civ. P. 65.

109. Further, under Tenn. Code Ann. § 29-14-102(a), this Court may "declare rights, status, and other legal relations whether or not further relief is or could be claimed."

110. Defendant has unlawfully sought Chapter 154 certification.

111. This request has harmed, continues to harm, and will imminently harm Plaintiffs as set forth above.

112. Plaintiffs are entitled to a judgment declaring that Defendant's conduct is extra-statutory and unconstitutional and thus void and without effect.

**COUNT II**
**Violation of Separation of Powers**
*Against Defendant Jonathan Skrmetti*

113. Plaintiffs incorporate all allegations set forth above or below as though set forth herein.

114. As set forth above, Defendant's request for certification encroached upon the General Assembly's legislative authority in violation of Tenn. Const. art. II, §§ 1, 2.

115. Defendant's unconstitutional conduct has harmed, continues to harm, and will imminently harm Plaintiffs as set forth above.

116. Plaintiffs are entitled to equitable relief pursuant to this Court's authority under Tenn. Code Ann. §§ 16-11-101, *et seq.* and Tenn. R. Civ. P. 65.

117. Further, under Tenn. Code Ann. § 29-14-102(a), this Court may "declare rights, status, and other legal relations whether or not further relief is or could be claimed."

118. Defendant has unlawfully sought Chapter 154 certification.

119. This request has harmed, continues to harm, and will imminently harm Plaintiffs as set forth above.

120. Plaintiffs are entitled to a judgment declaring that Defendant's conduct is unconstitutional and thus void and without effect.

## PRAYERS FOR RELIEF

121. Plaintiffs incorporate all allegations set forth above or below as though set forth herein.

122. Plaintiffs seek a permanent injunction enjoining the TN-AGR from (1) seeking to defend the certification decision in the U.S. Court of Appeals for the D.C. Circuit and the U.S. Supreme Court, (2) invoking or enforcing Chapter 154 in any federal habeas corpus proceeding, and (3) reapplying for certification.

123. Plaintiffs also seek a judgment declaring that the TN-AGR's request for certification was extra-statutory and unconstitutional and thus Tennessee's application is void and of no effect.

124. An award of Plaintiffs' costs and reasonable attorneys' fees.

125. Finally, Plaintiffs ask that this Court grant such further relief as it may deem just and proper.

Dated: July 17, 2026

Respectfully submitted,

By: */s/ John Spragens*

John Spragens (TN Bar No. 31445)
SPRAGENS LAW PLC
915 Rep. John Lewis Way S., Suite 100
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

WHITE & CASE LLP

Ammar Inayatali (admitted *pro hac vice*)
701 Thirteenth Street NW
Washington, D.C. 20005
(202) 626-6485
ammar.inayatali@whitecase.com

Kevin Adam (admitted *pro hac vice*)
Jennifer Ware-Phillips (admitted *pro hac vice*)
75 State Street
Boston, MA 02109
(617) 979-9300
kevin.adam@whitecase.com
jennifer.ware@whitecase.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 17, 2026, a true and correct copy of the foregoing was filed along with all exhibits, attachments, and accompanying documents, and served by operation of the Court's eFileTN filing system and via email on July 17, 2026, upon:

Reed N. Smith
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
615-741-9593
Reed.Smith@ag.tn.gov

Zachary R. Clark
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
615-741-7403
Zachary.Clark@ag.tn.gov

Caleb J. Walker
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
615-253-0684
Caleb.Walker@ag.tn.gov

Dated: July 17, 2026

By: */s/ John Spragens*

John Spragens

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ANDRE BLAND, TOMIS No. 232838
Riverbend Maximum Security Institution
7475 Cockrill Bend Blvd.
Nashville, TN 37209-1048

URSHAWN MILLER, TOMIS No. 455407
Riverbend Maximum Security Institution
7475 Cockrill Bend Blvd.
Nashville, TN 37209-1048

HOWARD HAWK WILLIS, TOMIS No. 473273
Riverbend Maximum Security Institution
7575 Cockrill Bend Blvd.
Nashville, Tennessee 37209-1048

FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE
800 South Gay Street
Suite 2400
Knoxville, Tennessee 37929-9714

FEDRAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE
810 Broadway, Suite 200
Nashville, Tennessee 37203

*Plaintiffs*,

v.

PAMELA J. BONDI, in her official government capacity as Attorney General
United States
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Case No: 1:25-cv-3499-AMP

UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

*Defendants*.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(*Chapter 154 of Title 28 and unconstitutional transfer of judicial authority to a biased decision maker to certify a state postconviction counsel mechanism*)

## INTRODUCTION

1. Mr. Andre Bland, Mr. Urshawn Miller, Mr. Howard Hank Willis, the Federal Defender Services of Eastern Tennessee ("FDSET"), and the Federal Defender for the Middle District of Tennessee ("TNM-CHU"), state prisoners sentenced to death or their counsel (collectively "Plaintiffs"), challenge the unconstitutional exercise of authority of the Defendants, the United States Attorney General ("Attorney General") and United States Department of Justice ("DOJ"), under Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2265(a)(1).

2. Chapter 154 of the AEDPA establishes a *quid pro quo* arrangement: a State provides indigent defendants sentenced to death with a mechanism for competent post-conviction counsel and adequate litigation expenses in exchange for imposing special expedited and narrowed federal habeas review by Article III courts. To apply and qualify for the fast-track procedures for federal habeas review in Chapter 154, a State must meet the requirements for an adequate post-conviction counsel mechanism in capital cases. 28 U.S.C. § 2265. Originally, under AEDPA, federal courts conducting habeas review decided whether a State was eligible for the expedited procedures by having met Chapter 154's requirements. Pub. L. No. 104-132, § 107(a), 110 Stat. 1214 (1996). In 2006, Congress expressed frustration over judicial determinations that States did not meet Chapter 154's requirements.[1] It thus transferred decision-making authority from Article III courts to the

[1] As DOJ explained, "The 2006 amendments reflected a legislative judgment that the Attorney General and the D.C. Circuit would best be able to make disinterested determinations regarding state counsel systems' satisfaction of chapter 154 . . . [and] reflect[ed] congressional concern that some courts had declined to apply chapter 154 on grounds going beyond those Congress had deemed to be warranted in its formulation of chapter 154, *see* 152 Cong. Rec. 2441, 2445-46 (2006) (remarks of Sen. Kyl); 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake)." Certification of Arizona Capital Counsel Mechanism, 85 Fed. Reg. 20,705, 20,706-07 (Apr. 14, 2020).

Attorney General and authorized the Attorney General to "certify" that a State satisfies Chapter 154. *See* USA PATRIOT Improvement and Reauthorization Act of 2005 ("Reauthorization Act"), Pub. L. No. 109-177, § 507(c)(1). It further sought to make the Attorney General's certification decision for a given state binding on Article III courts considering the federal habeas petitions of individual death-sentenced prisoners of the same state.

3. On August 7, 2025, the DOJ, Office of Legal Policy ("OLP"), published the State of Tennessee's request, which had been filed on June 6, 2025, for certification of its capital counsel mechanism. The state asserts that its assigned counsel mechanism~~s~~ satisfied Chapter 154's requirements as of October 23, 1995. Tennessee did not provide any additional information or materials to document how its mechanism actually operated in practice. 26 C.F.R. § 26.23(b) (requiring publication of "supporting materials"). OLP gave notice that public comments regarding this request must be submitted by October 6, 2025.

4. The transfer of decision-making authority from Article III courts to the Attorney General, an Article II executive branch official, under 28 U.S.C. § 2265, violates the constitutional mandates of due process and separation of powers. The Supreme Court has long established that the Due Process Clause of the Fifth Amendment requires an impartial, disinterested, and independent decision maker when individual rights are at issue, and that the separation of powers doctrine protects the tripartite system of government in the Constitution, including safeguarding the powers and duties of Article III courts.

5. Neither Chapter 154 nor any other federal law affords any individual status to those most affected by a grant of certification and those most knowledgeable of unfilled promises in the state's paper application—the condemned prisoners seeking federal habeas review and their attorneys. Despite their life-and-death interests, and their superior knowledge, their only option is

to submit public comment, along with any other interested members of the public. Any failure to do so would deprive the Attorney General, and later the D.C. Circuit Court of Appeals, of the administrative records required to decide the application, beyond Tennessee's barebones assurances that it has provided an adequate system of defense.

6. These circumstances have forced Plaintiffs to make a Hobson's Choice: invest in participating in the unconstitutional certification process or risk losing their ability to pursue their claims on judicial review of the certification decision. Specifically, the individual Plaintiffs could choose to have their counsel invest extraordinary time and resources to submit public comments that create the administrative record in support of their substantive challenges to the certification application, then exhaust the administrative process, and finally seek judicial review of their claims in the U.S. Court of Appeals for the D.C. Circuit. This burden has been explained in requests for extensions submitted by the individual Plaintiffs' counsel as well as Plaintiff FDSET. Only after this exercise in futility to exhaust an unconstitutional administrative process before an unconstitutionally biased decision maker, could Plaintiffs then raise their collateral constitutional challenges before an Article III court, along with their substantive challenges to a certification decision. *See* 28 U.S.C. § 2265(c); Ch. 158 of Title 28. Alternatively, Plaintiffs could forgo expending the time and resources to develop and submit public comments but would then face the substantial risk of a biased decision maker creating an inadequate administrative record. Even with *de novo* review in the Court of Appeals, the Plaintiffs cannot be guaranteed the opportunity to develop the record for their substantive challenges to the Attorney General's decision should their constitutional claims be unsuccessful. Nor would *de novo* review alleviate Plaintiffs' frustration with the absurdity of the nation's highest *prosecutor*—an unconstitutionally biased decision maker—determining whether the particulars of a state postconviction counsel mechanism afforded

them an adequate *defense* sufficient to justify restrictions on their right to federal habeas review, a proceeding that itself falls squarely within the federal district court's authority under Article III. Plaintiffs cannot accept the certification regime's biased process, which vests the Attorney General with vast discretion, in violation of both the due process and separation of powers guarantees of the U.S. Constitution.

7. The Due Process Clause of the Fifth Amendment requires the neutrality of an unbiased and disinterested government decision maker, which is violated when an adjudicator has substantial interest in the outcome of a case, including the interest arising from an official's executive responsibilities. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980); *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 60 (1972); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). Fairness issues are also at their apex when a federal court reviews the process requisite to the taking of a human life by the state. *See*, *e.g.*, *Lambright v. Stewart*, 191 F.3d 1181, 1188 (9th Cir. 1999) (Reinhardt, J. dissenting) (due process demands a "higher degree of procedural regularity and reliability in capital cases"). Further, it is well-established that this fairness requirement applies not only to courts, but to administrative agencies. *Withrow v. Larkin*, 421 U.S. 35, 46-7 (1975). While involvement of an actually biased decision maker violates due process rights, "our system of law has always endeavored to prevent even the probability of unfairness." *Id*. at 47 (holding in the context of administrative adjudication that the presumption of probit in favor of adjudicators is overcome when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable" (citing *Tumey* and *Ward*)). Thus, the violation of due process is established "not just on actual bias, but on circumstances that could create a significant risk of actual bias." *Wildberger v. Am. Fed'n of Gov't Employees, AFL-CIO*, 86 F.3d 1188, 1196 (D.C. Cir. 1996); *see also In re Murchison*, 349 U.S. 133, 136 (1955). A due process claim for such

probable unfairness is established when a plaintiff demonstrates that the "risk of unfairness is intolerably high" under the circumstances of the particular case. *Withrow*, 421 U.S. at 58. Accordingly, the determination of a State's certification application—the required step before the truncated procedures under Chapter 154 of Title 28 are applied and the State's taking of a human life is expedited—must be free of institutional bias or a significant risk of it. The Attorney General, as the government's chief prosecutor and law enforcement officer, has demonstrated both an actual institutional bias in favor of expediting capital prosecutions and executions, and a clear, substantial risk of bias. When the decision maker is biased, as the Attorney General is here, the process violates the Due Process Clause.

8. Article III, § 1 of the U.S. Constitution vests the judicial power in the federal courts, and federal habeas review resides at its heart. Legal and other sources show that "the right … to claim the benefit of the writ of habeas corpus," *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823), is among the "rights of the citizen guaranteed by the Federal Constitution." *Slaughter-House*, 83 U.S. 36, 79 (1872) (citing *Corfield*). Congress passed the Habeas Corpus Act of 1867 (HCA) with the understanding that such legislation would define the habeas privilege protected by the Suspension Clause. *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 101-02 (1868); *Ex parte Royall*, 117 U.S. 241, 247-48 (1886); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807); *see also* Jordan Steiker, *Incorporating the Suspension Clause: Is There A Constitutional Right to Federal Habeas Corpus for State Prisoners?*, 92 Mich. L. Rev. 862, 888 (1994) (explaining how "the [Supreme] Court cast habeas as an affirmative individual right of constitutional dimension").

9. Once Congress grants the federal courts jurisdiction—as it has in the federal habeas context—it cannot encroach on the judiciary's power to interpret the law and decide the cases and controversies that arise under it. *See City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). In

transferring to the Attorney General the authority under § 2265 to decide that a State qualifies for expedited procedures, Chapter 154 purports to bind Article III courts conducting federal habeas review to the certification determination. Simply put, § 2265 authorizes the Attorney General to make an aggregate decision on the State's eligibility to employ expedited procedures and a narrowed scope of review in individual habeas cases, encroaching upon the federal court's core role in deciding petitions for habeas review on a case-by-case basis. This contravenes Article III, § 1.

10. Finally, while either of these constitutional violations, standing alone, requires this Court to declare 28 U.S.C. § 2265 unconstitutional, considered together, the constitutional infirmities aggrandize the Attorney General's power in a manner that flouts the protections and structure of the Constitution. *See Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 881 (1990) (recognizing prior decisions where conduct was found to be a constitutional violation when constitutional protections were viewed in connection with one another (citing cases)), *superseded by statute*, 42 U.S.C. § 2000bb *et seq*.

11. In sum, the certification process under § 2265 violates both Article III, § 1 of the U.S. Constitution and the procedural due process clause of the Fifth Amendment.

12. Plaintiffs now face the Attorney General's consideration of the State of Tennessee's pending certification application pursuant to 28 U.S.C. § 2265(a)(1). No matter the outcome of Tennessee's application, the Plaintiffs challenge the constitutionality of the decision making by the Attorney General under 28 U.S.C. § 2265(a)(1). The administrative proceeding itself is an illegitimate process before an illegitimate decision maker. The Plaintiffs seek to put an end to this unconstitutional process and to ensure that authority is restored to independent Article III courts to fully adjudicate their federal habeas petitions. They are challenging the Attorney General's

constitutional power to proceed at all, not any particular actions taken during the ongoing administrative proceeding. Therefore, any potential judicial review in the Court of Appeals for the District of Columbia Circuit after a certification decision by the Attorney General would come, if it came at all, too late for meaningful redress of Plaintiffs' claims.

**JURISDICTION AND VENUE**

13. The Court has jurisdiction over this action under Article III of the Constitution and 28 U.S.C. §1331 (federal question) because Plaintiffs' purely legal claims assert facial constitutional challenges to the exercise of decision-making authority by the Attorney General in any administrative proceedings under 29 U.S.C. § 2265(a)(1). *See Axon Enterprise v. Federal Trade Commission*, 598 U.S. 175 (2023) (holding alternative review scheme does not divest a district court of jurisdiction over a constitutional challenge to an agency's decision-making structure); *Free Enterprise Fund v. Public Company Oversight Bd.*, 561 U.S. 477 (2010) (applying the factors in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to hold that the district court had jurisdiction under § 1331 to hear a constitutional separation of powers challenge to the structure of the Public Company Accounting Oversight Board); *see also Medina v. Nat'l Labor Relations Bd.*, 2025 WL 1988096 (D.D.C. Slip Op. July 17, 2025) (finding subject matter jurisdiction under § 1331 despite the availability of proceedings under the National Labor Relations Board because "[f]airness dictates that if it can be avoided, plaintiff should not have to choose between redressing his injury in an unconstitutional forum and not redressing his injury at all"). Plaintiffs' claims are not an effort to obtain interlocutory relief amidst agency proceedings that Congress has placed within the exclusive jurisdiction of a Court of Appeals but an effort to prevent an unconstitutional process from proceeding, a challenge entirely separate from any challenge to the certification that the Court of Appeals may later review.

14. Venue is appropriate in the District Court for the District of Columbia under 28 U.S.C. §1391(e) because Defendants' acts giving rise to the claims occurred in this District, and the Defendants are headquartered in this District.

**STANDING**

15. The individual Plaintiffs have standing to bring their constitutional claims against the Defendants, and the Plaintiffs FDSET and TNM-CHU have both organizational and third-party standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 146 (D.D.C. 2025) *amended sub nom. Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President,* No. CV 25-917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025) (finding that law firm's attorney-client relationships are "sufficient to confer third-party standing" for "existing client[s].") (citing *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). Plaintiffs will imminently suffer a concrete and particularized injury-in-fact if the Attorney General certifies the Tennessee capital counsel mechanism, effective as of October 23, 1995. Individual Plaintiffs face likely, not merely speculative, injury because they stand at risk of concrete and imminent negative effects from the Attorney General's certification. *See Lujan*, 504 U.S. at 560-61.

16. The organizational Plaintiffs, likewise, have standing because both their clients and the Capital Habeas Units ("CHUs") as organizations will face injuries-in-fact that would be directly caused by the downstream harms from the Attorney General's certification of Tennessee's capital counsel mechanism. Note that this injury is in addition to the here-and-now harm caused by participating in an illegitimate proceeding before an illegitimate decision maker.

17. With respect to their clients, both the FDSET and TNM-CHU represent death-sentenced state prisoners who would suffer direct and devastating impacts from the Attorney

General's certification decision. As organizations, the downstream impact of the Attorney General's certification of Tennessee's capital counsel mechanism would severely undermine the organizations' mission and capacity to fulfill their legal mandate.

18. For the individual and organizational Plaintiffs, their injuries can only be redressed at this time by a favorable decision that preserves the authority of the federal district court in habeas review and finds the Attorney General's authority under Chapter 154 to be unconstitutional. The Plaintiffs accordingly have standing to pursue their claims.

## PARTIES

### Plaintiffs

19. **Plaintiff Andre Bland**, age 52, was sentenced to death on February 12, 1994, at the Shelby County Criminal Court in Memphis, Tennessee. His direct appeal concluded before the Tennessee Supreme Court on December 1, 1997. His petition for a writ of certiorari was filed on April 20, 2017, and the U.S. Supreme Court denied it on June 26, 2017. His *pro se* petition for post-conviction relief was filed on July 16, 1998. Private counsel Bret Stein and Wayne Chastain were originally appointed to represent him in his initial state post-conviction proceedings. Then the Office of the Post-Conviction Defender for Tennessee ("OPCD") was appointed and private counsel were removed. Finally, OPCD was removed and private counsel Michael Scholl and Marty McAfee were appointed. The trial court denied the post-conviction petition on November 28, 2006, and the Court of Criminal Appeals of Tennessee at Jackson affirmed the denial on April 8, 2009. On August 17, 2009, the Tennessee Supreme Court denied his application for permission to appeal.

20. Mr. Bland filed his *pro se* federal habeas petition on August 28, 2009. Currently, Mr. Bland's federal habeas petition is stayed while he pursues relief on his intellectual disability claim, along with his challenge to Tennessee's amended statute, Tennessee Code Annotated 39-13-

203 (2021). Mr. Bland is represented by the Office of the Federal Defender for the Middle District of Tennessee ("MDTN") in his federal habeas/state-exhaustion proceedings.

21. **Plaintiff Urshawn Miller**, age 37, was sentenced to death on May 10, 2018, in the Circuit Court for Madison County, Tennessee. His conviction and death sentence were affirmed on appeal by the Tennessee Supreme Court on December 7, 2021. After receiving an extension on the original March 7, 2022, deadline, his petition for writ of certiorari was filed on May 4, 2022, and the U.S. Supreme Court denied it on October 3, 2022. His *pro se* petition for post-conviction relief was filed on November 9, 2022. Currently, Mr. Miller is represented in his state post-conviction proceedings by the OPCD.

22. **Plaintiff Howard Hawk Willis**, age 74, was sentenced to death on June 21, 2010, in the Circuit Court for Washington County, Tennessee. His conviction and death sentence were affirmed on appeal by the Supreme Court of Tennessee on July 6, 2016. His petition for writ of certiorari was filed on November 21, 2016, and the U.S. Supreme Court denied it on March 6, 2017. His *pro se* petition for post-conviction relief was filed on April 17, 2017. He was represented by Josh Hedrick and Cullen Wojcik in his state post-conviction proceedings. On January 22, 2025, the Court of Criminal Appeals of Tennessee affirmed the post-conviction trial court's denial of post-conviction relief. On October 31, 2025, Mr. Willis's federal habeas petition was filed by the Capital Habeas Unit of FDSET and remains pending.

23. **Plaintiff Federal Defender Services of Eastern Tennessee, Inc.~~,~~ ("FDSET")** operates as the federal public defender in the Eastern District of Tennessee pursuant to 18 U.S.C. § 3006(A)(g). FDSET's Mission Statement undertakes to "zealously advocate[] in federal courts for those who have been accused or convicted of federal or capital crimes," "provide client-centered, vigorous, and compassionate representation to all" and "believe in the worth, dignity,

and humanity of every client." FDSET includes a Capital Habeas Unit ("CHU"), which is appointed to serve in all non-conflicted capital habeas cases arising from the Eastern District of Tennessee and an additional nine other federal districts across the country. The CHU's legal mandate is set forth in 18 U.S.C. § 3599(e):

> [E]ach attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

24. Currently, the FDSET represents five inmates on Tennessee's death row whose cases could be substantially and negatively affected if Tennessee were to receive certification. At least some of FDSET's clients are mentally incompetent and unable to understand Tennessee's application for certification or its implications for their cases. These clients must rely on their appointed counsel to engage in the administrative proceedings for the Attorney General's decision on the application. FDSET is a significant stakeholder in capital representation in Tennessee and has an established interest on behalf of itself and its clients in both the administrative proceedings and the outcome of the Attorney General's certification decision under 28 U.S.C. § 2265(a).

25. **Plaintiff Federal Public Defender for the Middle District of Tennessee ("TNM-CHU")** operates as the federal public defender in the Middle District of Tennessee pursuant to 18 U.S.C. § 3006(A)(g), and includes the Capital Habeas Unit ("CHU") with the same legal mandate as the FDSET. The TNM-CHU is dedicated to protecting the constitutional rights and inherent dignity of indigent persons sentenced to death. They provide the highest quality of legal representation in federal post-conviction proceedings through exhaustive investigation, collaborative case development, and zealous advocacy in the pursuit of justice and the preservation

of life. The TNM-CHU's Mission is to ensure that persons sentenced to death in their jurisdiction "receive full and fair review of their conviction and sentence" and to "strive to examine the processes that resulted in their convictions and sentences, including revealing the human stories often overlooked by the legal system, challenge systemic injustices through rigorous litigation, and ensure that our clients receive the full benefit of their rights under the United States Constitution."

26. The TNM-CHU is appointed as counsel for 20 of the 42 individuals currently on death row in Tennessee; these clients' cases could be substantially and negatively affected if Tennessee were to receive certification. At least some of TNM-CHU's clients are mentally incompetent and unable to understand Tennessee's application for certification or its implications for their cases. These clients must rely on their appointed counsel to engage in the administrative proceedings for the Attorney General's decision on the application. TNM-CHU is also a significant stakeholder in capital representation in Tennessee and has an established interest on behalf of itself and its clients in both the administrative proceedings and the outcome of the Attorney General's certification decision under 28 U.S.C. § 2265(a).

**Defendants**

27. **Defendant Pamela J. Bondi** is the Attorney General of the United States. She oversees the U.S. Department of Justice ("DOJ"), including the Office of Legal Policy ("OLP"), and asserts the purported authority under 28 U.S.C. § 2265 to determine that a state is certified under 28 U.S.C. § 2265(a) and eligible for the expedited and narrowed federal habeas review procedures under 28 U.S.C. § 2261.

28. **Defendant DOJ** promulgated the regulations to implement the Attorney General's certification procedures. 28 C.F.R. §§ 26.20-26.23; Certification Process for State Capital Counsel

System, 78 Fed. Reg. 58,160 *et seq*. Attorney General Bondi directed the OLP to manage the application and review process set forth in the regulation, including managing the notice and public comment period, and preparing a recommendation and draft decision for the Attorney General regarding each State's certification application.

**FACTS**

29. On June 6, 2025, the State of Tennessee filed an application seeking the Attorney General's certification under Chapter 154 of its mechanism for providing post-conviction assigned counsel, effective as of October 23, 1995. Two months later, on August 7, 2025, OLP published Tennessee's request. 90 F.R. 38182. The deadline for submissions of public comments on the application was October 6, 2025. There is no deadline for the Attorney General's certification decision, and the Attorney General may publish "subsequent notice[s]" for further opportunity to comment before deciding the application. 28 C.F.R. § 26.23(c).

**A. Chapter 154 limits important rights otherwise guaranteed to federal habeas petitioners.**

30. Congress enacted Chapter 154 as part of AEDPA to provide a "quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review in return for strengthening the right to counsel for indigent capital defendants." H.R. Rep. No. 104-23, at 10 (1995). To be certified as an "opt-in" State, a State must meet the requirements of Chapter 154 to provide individuals sentenced to death with competent, adequately compensated, and properly resourced state postconviction counsel. Once certified, a State is entitled to assert Chapter 154's restricted procedures for federal habeas review. These include:

a. a shorter statute of limitations of 180 days instead of 1 year, 28 U.S.C. § 2263(a);

b. more limited grounds for tolling of the statute of limitations, *id.* § 2263(b);

c. restrictions on the ability to file an amended habeas petition, *id.* § 2266(b)(3)(B);

d. prioritizing the adjudication of petitions subject to Chapter 154 in the federal district court and court of appeals over all non-capital matters, *id.* § 2266(a);

e. requiring a federal district court to enter final judgment on a habeas petition within 450 days of the filing of the petition, or 60 days after it is submitted for decision, whichever is earlier, *id.* § 2266(b);

f. requiring the court of appeals to render a final determination of any appeal within 120 days of filing of a reply or answering brief, *id.* 2266(c); and

g. allowing the State to "enforce a time limitation" by petitioning for a writ of mandamus to a higher court. *id.* § 2266(b)(4)(B), (c)(4)(B).[2]

31. If certified, a State may assert it is entitled to these provisions retroactively to the date the Attorney General finds the State's assigned counsel mechanism satisfied the requirements of Chapter 154. *See id.* § 2265(a)(2).

32. In States that are not certified under Chapter 154, Chapter 153 of Title 28 is applicable to federal habeas review for individuals with state death sentences. The two chapters create a dual system with the presumption that petitions will be adjudicated under Chapter 153 unless the requirements of Chapter 154 are satisfied.

---

[2] Finally, § 2266 requires the Administrative Office of the United States Courts to submit to Congress an annual report on the compliance by the courts with the time limitations. 28 U.S.C. § 2266(b)(5)(A); *id*. § 2266(c)(5). Annual reports concerning district courts must further include any order allowing for a delay. *Id*. § 2266(b)(1)(C)(iv).

33. Chapter 153 confers important rights, protections, and expectations that are taken away by certification under Chapter 154 and application of its expedited procedures. The Supreme Court has recognized that because the application of Chapter 154 changes "standards of proof and persuasion in a way favorable to a State, the statute goes beyond 'mere' procedure to affect substantive entitlement to relief." *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). As Congress clearly contemplated that such a change would occur only if the predicates for the application of Chapter 154—that is the requirement of the appointment of adequately-compensated, competent counsel who benefited from the payment of reasonable litigation expenses in state post-conviction—were met, due process must accompany that determination. Because the determination of Chapter 154's applicability affects a petitioner's "substantive entitlement to relief," and because that relief would ultimately be predicated on a petitioner's unconstitutional conviction or sentence, the determination implicates important liberty and, in capital cases, life interests that due process safeguards.

**B. The Reauthorization Act transferred certification authority from federal courts to the Attorney General.**

34. When Congress originally adopted AEDPA, Chapter 154 did not assign any authority to the Attorney General. Instead, the statute made expedited procedures available to state respondents if *a federal court* found that "the State establishe[d] by rule of its court of last resort or by statute a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in the unitary review proceedings . . . ." Pub. L. No. 104-132, § 107(a), 110 Stat. 1214 (1996).

35. Following the enactment of AEDPA, the federal courts found or observed in twenty-five[3] states that the governments were not entitled to apply the expedited procedures under Chapter 154 against individuals seeking federal habeas review of their death sentences. The federal courts concluded (or states acknowledged) that the mechanisms did not satisfy the requirements of Chapter 154 to ensure that qualified counsel and sufficient resources were provided to the petitioners to develop and pursue claims in state post-conviction proceedings[4] or found it

---

[3] Alabama, Arizona, Arkansas, California, Florida, Georgia, Idaho, Illinois, Indiana, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington.

[4] *See, e.g., Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000) (Maryland), *cert. denied*, 531 U.S. 1193 (2001); *Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000) (Texas); *Ashmus v. Woodford*, 202 F.3d 1160 (9th Cir. 2000) (California), *cert. denied*, 531 U.S. 916 (2000); *Sexton v. French*, 163 F.3d 874 (4th Cir. 1998*), cert. denied*, 528 U.S. 855 (1999); *Pitsonbarger v. Gramley*, 141 F.3d 728 (7th Cir. 1998); *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997) (Tennessee), *cert. denied*, 523 U.S. 1079 (1998); *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) (Oklahoma); *Langford v. Day*, 110 F.3d 1380 (9th Cir. 1997) (Montana); *Death Row Prisoners of Pa. v. Ridge*, 106 F.3d 35 (3rd Cir. 1997) (Pennsylvania); *Burris v. Parke*, 95 F.3d 465 (7th Cir. 1996), *amended and superceded by* 130 F. 3d 782 (7th Cir. 1997); *Carter v. Friel*, No. 2:02CV326TS, 2005 WL 1683689 (D. Utah July 18, 2005); *Palmer v. Clarke*, 293 F. Supp. 2d 1011 (D. Neb. 2003), *rev'd in part on other grounds by* 408 F.3d 423 (8th Cir. 2005); *Brown v. Puckett*, 2003 WL 21018627 (N.D. Miss. 2003); *Noel v. Norris*, 194 F. Supp. 2d 893, n.47 (E.D. Ark. 2002); Order, *Brown v. Lambert*, No. C01-715C (W.D. Wash. Sept. 6, 2001); *Tillman v. Cook*, 25 F. Supp. 2d 1245 (D. Utah 1998), *aff'd*, 215 F.3d 1116 (10th Cir.), *cert. denied*, 531 U.S. 1055 (2000); *Mills v. Anderson*, 961 F. Supp. 198 (S.D. Ohio 1997); *Scott v. Anderson*, 958 F. Supp. 330 (N.D. Ohio 1997); *Wright v Angelone*, 944 F. Supp. 460 (E.D. Va. 1996); *Hill v. Butterworth*, 941 F. Supp. 1129 (N.D. Fla. 1996) (Florida), *rev'd for lack of a case or controversy*, 147 F.3d 1333 (11th Cir. 1998); *Williams v. Cain*, 942 F. Supp. 1088 (W.D. La. 1996), *rev'd on other grounds*, 125 F.3d 269 (5th Cir. 1997), *cert. denied*, 525 U.S. 859 (1998); *Martinez High v. Turpin*, 14 F. Supp. 2d 1358, 1365 n.6 (S.D. Ga. 1998), *aff'd* 209 F.3d 1257 (11th Cir. 2000), *cert. denied*, 532 U.S. 909 (2001); *see also Bell v. Haley*, 437 F. Supp. 2d 1278, 1280 (M.D. Ala. 2005) (noting the state's response to the court that "no court has ruled that Alabama has satisfied the opt-in provisions"); *Leavitt v. Arave*, 927 F. Supp. 394, 396 (D. Idaho 1996) ("[T]he court does not understand either party to argue that at the time of the petitioner's state proceedings the State of Idaho had in place procedures sufficient to meet the requirements of the new chapter 154.").

unnecessary to evaluate the mechanism at all because it would not have been applicable in the petitioner's case.[5]

36. Subsequently, members of Congress expressed their dissatisfaction with the judicial determinations that states did not qualify for the expedited procedures for federal habeas review of capital sentences, and Congress amended Chapter 154.[6] Some members of Congress asserted that federal courts were unable to be "disinterested" because applying the expedited procedures under Chapter 154 would affect their deadlines and workload, and these members asserted that the Attorney General could be a disinterested decision maker.[7] Despite courts' reasoned rulings about whether states were entitled to the opt-in provisions, Congress removed from the federal courts the power to determine whether a state could invoke the expedited review

[5] *See, e.g., Tucker v. Catoe*, 221 F.3d 600 (4th Cir.), *cert. denied*, 531 U.S. 1054 (2000); *Kreutzer v. Bowersox*, 231 F.3d 460 (8th Cir. 2000), *cert. denied*, 534 U.S. 863 (2001). In *Spears v. Stewart*, 283 F.3d 992 (9th Cir. 2002), the Court found that Arizona's *prior* postconviction capital counsel mechanism satisfied the requirements of Chapter 154 but that expedited procedures would not apply in petitioner's case because Arizona did not appoint postconviction counsel for him in conformity with its mechanism. Arizona's mechanism has since been revised.

[6] *See*, *e.g.*, 152 Cong. Rec. S1598, 1620-28, 1621, 1625 (Mar. 2, 2006) (statement of Sen. Kyl) (criticizing the "Federal habeas system" and declaring that what victims and their families "have experienced at the hands of the Federal courts should offend every American" and explaining that "ADEPA left the decision of whether a State qualified for the incentive to the same courts that were impacted by the time limits. This has proven to be a mistake"); 151 Cong. Rec. E2639-40, E2639 (Dec. 22, 2005) (statement of Rep. Flake), 2025 WL 3501657 (stating that the Reauthorization Act § 507(c)(1) "gives States a real chance to qualify for chapter 154 treatment" and, with respect to why the Arizona had not qualified for chapter 154 procedures, stated that "The problem is simple: under current law, the local Federal court of appeals decides whether a State has opted in to chapter 154").

[7] *See, e.g.*, 151 Cong. Rec. E2639-40, E2640 (Dec. 22, 2005) (statement of Rep. Flake), 2025 WL 3501657 ("The trouble with chapter 154 is that the courts assigned to decide when it applies are the same courts that would be bound by the chapter's strict deadlines if a State is found to qualify. Simply put, the regional courts of appeals have a conflict of interest. They decide whether the States are entitled to a benefit which places a burden on the courts themselves.").

procedures, transferring that authority to the Attorney General, who now possesses the power to certify that jurisdictions qualify. *See* Reauthorization Act, § 507(c)(1).

37. The Attorney General's certification is a necessary prerequisite decision to a habeas court's determination in an individual case that the state's mechanism proposed applied in that case. *See* 28 U.S.C. § 2261(b)(1). Under the amended scheme, the Attorney General determines "whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent [capital] prisoners," "the date on which the mechanism" was established, and whether the State "provides standards of competency for the appointment of counsel in [these] proceedings." *id.* § 2265(a)(1).

38. Chapter 154 also authorizes the Attorney General to "promulgate regulations to implement the certification procedure," which included defining key provisions such as "competent counsel," "reasonable resources," and "adequate" litigation resources. 28 U.S.C. § 2265(b). Chapter 154 purports to bind federal courts by preventing a federal court in an individual case from reviewing any of those determinations respecting the state's mechanism.

39. Chapter 154 created a path for the judicial review of an Attorney General's decision to certify a state. It grants the Court of Appeals for the D.C. Circuit "exclusive jurisdiction" to review the determination. 28 U.S.C. § 2265(c)(2). Review is governed by the Hobbs Administrative Orders Review Act, Chapter 158 of Title 28. *See id.* § 2265(c)(1). The applicable standard of review is *de novo*. *See id.* § 2265(c)(3). That Court's judgment is appealable to the U.S. Supreme Court. *See id.* § 2265(c)(2); *id.* § 2350(a).

40. On June 6, 2007, DOJ published its initial Notice of Proposed Rulemaking for the Certification Process for State Capital Counsel Systems and set a 60-day public comment period.

72 F.R. 312217 (proposed June 6, 2007) (to be codified at 28 C.F.R. Part 26). Following the receipt of comments, DOJ reopened the public comment period on September 24, 2007. 72 F.R. 44816. The Attorney General received more than 32,000 comments in response to the Notice.

41. On December 11, 2008, DOJ published the 2008 Final Rule for the Certification Process for State Capital Counsel Systems ("2008 Final Rule"), with a scheduled effective date of January 12, 2009. 7 F.R. 75327 (Dec. 11, 2008) (to be codified at 28 C.F.R. Part 26). The District Court for the Northern District of California enjoined the 2008 Final Rule in *Habeas Corpus Resource Center v. DOJ, et al.,* Case No. 08-2649 (Jan. 20, 2009) (ECF 81), finding the rule violated the requirements of the Administrative Procedure Act, 5 U.S.C. §§ 553.

42. On February 5, 2009, DOJ published new Notice of Request for Public Comment on the 2008 Final Rule, which closed on April 6, 2009. 74 F.R. 6131 (Feb. 2, 2009). On Nov. 23, 2010, DOJ published Notice of the Removal of the 2008 Final Rule, pending completion of a new rulemaking process. 75 F.R. 71353 (Nov. 23, 2010).

43. On March 3, 2011, DOJ published Notice of the new Proposed Rule for the Certification Process for State Capital Counsel Systems, with a comment period open until June 2, 2011. 76 F.R. 11705 (March 3, 2011) (to be codified at 28 C.F.R. Part 26). DOJ received 30 comments.

44. On March 3, 2011, the State of Texas submitted to the Attorney General the first application for certification under 28 U.S.C. § 2265(a). The application was not published until four years later. 82 F.R. 61327 (Dec. 27, 2017).

45. On February 13, 2012, DOJ published a Supplemental Notice of Proposed Rulemaking for the Certification Process for State Capital Counsel Systems, 77 F.R. 7559 (Feb. 13, 2012) (to be codified at 28 C.F.R. Part 26), seeking comments on five specific modifications

proposed in response to the public comments received for the March 3, 2011 Notice. The deadline for public comments was March 14, 2012, and 60 public comments were received.

46. On April 18, 2013, the State of Arizona submitted to the Attorney General its first application for certification under 28 U.S.C. § 2265(a). The application was not published until over four years later.

47. On September 23, 2013, the DOJ published the Notice of Final Rule for Certification Process for State Capital Counsel Systems ("2013 Final Rule") that is currently in effect. 78 F.R. 58160 (Sept. 23, 2013) (to be codified at 28 C.R.F. Part 26).

48. On October 18, 2013, the District Court for the Northern District of California temporarily enjoined the 2013 Final Rule in *Habeas Corpus Resource Center v. DOJ*, No. 13-cv-4517, 2104 WL 5962031 (N.D. Cal. Oct 18, 2013).

49. On August 7, 2014, in the same case, the court granted summary judgment and permanently enjoyed the 2013 Final Rule in *HCRC v. DOJ*, 2014 WL 3908220 (N.D. Cal., Aug. 7, 2014) (*"HCRC I"*). The district court decision was vacated and remanded on standing and ripeness grounds in *HCRC v. DOJ*, 816 F.3d 1241 (9th Cir. 2016) ("*HCRC II*").

50. On March 20, 2019, the U.S. Supreme Court denied the petition for writ of certiorari in *HCRC v. DOJ II*, 580 U.S. 1199 (March 20, 2017), allowing DOJ to implement the 2013 Final Rule, without a final adjudication on the merits of any substantive or procedural challenges either to the rulemaking procedures or the substance of the rule.

51. As noted above, prior to 2025 (and prior to the effective date of the 2013 Final Rule), only two states, Texas and Arizona, had submitted applications for certification to the Attorney General. Neither state is certified.

52. On November 16, 2017, the DOJ published in the Federal Register a notice that Arizona had submitted an application for certification under Chapter 154. 82 Fed. Reg. 53,529 (Nov. 16, 2017). During the public comment period for Arizona's application, DOJ received 140 comments opposing certification. *See* DOJ Docket ID DOJ-OLP-2017-0009, at https://www.regulations.gov/docket/DOJ-OLP-2017-0009 (last visited Sept. 23, 2025). The Federal Public Defender for the District of Arizona supported its opposition with twenty exhibits demonstrating the deficiencies in the Arizona mechanism. The Attorney General briefly certified Arizona's capital counsel mechanism, *see* 85 Fed. Reg. 20705 (April 4, 2020). While a Petition for Review was pending in the Court of Appeals, the Court granted DOJ's request for a voluntary remand to obtain additional information about the operation of the state's mechanism. Arizona did not provide some of the additional information requested by the Attorney General. The Attorney General rescinded its prior approval and denied Arizona's application after not receiving the requested information. *See* Letter from the Acting Assistant Attorney Geneal to Attorney General of Arizona, January 17, 2025, *available at* https://www.justice.gov/olp/media/1385496/dl (last visited Sept. 25, 2025).

53. On November 16, 2017, the DOJ published a notice in the Federal Register advising the public of Texas's certification request and initiating a sixty-day public comment period. Notice of Request for Certification of Texas Capital Counsel Mechanism, 82 Fed. Reg. 53,530 (Nov. 16, 2017). In response to the initial application and a subsequent update, DOJ received 46 public comments, the most extensive of which was a 247-page comment submitted by the Texas Defender Offices and supported by 134 exhibits. *See* DOJ Docket ID DOJ-OLP-2017-0010, *available at* https://www.regulations.gov/docket/DOJ-OLP-2017-0010 (last visited Sept. 25, 2025). After review, on June 19, 2018, DOJ sought further information from Texas regarding its effective date;

counsel fees and expenses; and its standards of competency. *See* Letter from Office of the Assistant Attorney General to the Attorney General of Texas, June 19, 2025, *available at* *https://www.justice.gov/olp/page/file/1073361/dl?inline* (last visited Sept. 25, 2025). Texas has not responded, and the Attorney General has allowed the application to remain pending for over seven years.

**C. Executive Order 14164 and Attorney General directions on Chapter 154 certifications invite a renewed certification process.**

54. On January 20, 2025, President Trump issued Executive Order 14164 to promote use of the death penalty. Section 4(b) of the Executive Order encourages the US Attorney General to decide pending applications for certification made by States under 28 U.S.C. § 2265.

55. Consistent with this Executive Order, on February 5, 2025, Defendant Attorney General Bondi issued a memo directing the OLP "to promptly address states' pending requests for certification pursuant to [28 U.S.C.] § 2265." *See* Memorandum *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions*, *available at* https://www.justice.gov/ag/media/1388561/dl?inline (last visited Sept. 25, 2025).

56. On May 15, 2025, the OLP sent a letter to state attorneys general inviting their applications and offering assistance from DOJ.

**D. Tennessee seeks Chapter 154 certification.**

57. As noted above, an application by Tennessee under Chapter 154 was filed on June 6, 2025, seeking certification by the Attorney General that Tennessee's assigned counsel mechanism satisfies Chapter 154's requirements as of October 23, 1995. Two months after Tennessee applied, on August 7, 2025, the United States Department of Justice issued a Notice of Request for Certification of Tennessee Capital Counsel Mechanism, advising the public that public comments would be accepted until October 6, 2025.

58. Plaintiffs must engage in this public comment period and ongoing pre-certification administrative process before the Attorney General to preserve all their constitutional, administrative, and substantive challenges to the procedures for certification and the State's application—or risk forgoing their ability to seek judicial review of their claims by the Court of Appeals for the D.C. Circuit pursuant to 28 U.S.C. § 2265(c) and Chapter 158 of Title 28.

59. As result of their coerced participation in an administrative process that itself violates constitutional mandates, Petitioners have been placed under a heavy burden. As the requests for an extension of time by the individual Petitioners' counsel and the FDSET explain, providing substantive public comments to enable Plaintiffs to challenge a certification determination requires substantial work.

60. For example, when the DOJ issued its Notice of Request for Certification for Tennessee on August 7, 2025, it invited interested parties to submit comments on or before October 6, 2025. Tennessee sought retroactive certification for a 30-year period stretching back to 1995. FDSET, TNM-CHU, and OPCD sought a 90-day extension to submit comments, explaining that responding to this request would require "research into decades of historic development" of the capital counsel mechanism, involving access to off-site storage units, gathering county court records, potential public records requests, and interviews of persons with knowledge of Tennessee's post-conviction proceedings. Tennessee's failure to provide any supporting documentation to DOJ with its application increased the burden on the commentors to ensure that DOJ considered all relevant information, as required by regulation. As the TNM-CHU explained:

> To provide the DOJ with this important, relevant information will require commentors to invest significant time and resources to identify relevant cases from these time periods, review their case files, interview relevant actors where possible, attempt to obtain fee vouchers for attorneys, attempt to obtain expert requests and expert vouchers, and synthesize that data into a coherent comment for DOJ's review.

TNM-CHU estimated that this process would require hundreds of hours of staff time. Furthermore, the many unsupported statements and misrepresentations in Tennessee's application required commentors to compile extensive rebuttal information.

61. The Attorney General denied the request for an extension on September 29, 2025, allowing only sixty days from the August 6 notice to the October 6 deadline for public comment. As part of the agreed schedule for the briefing and hearing on the Plaintiffs' TRO Motion (ECF 4), the Defendants agreed to accept public comments from the Plaintiffs until October 10, 2025, only four days after the original deadline for the public comment.

62. This short period increases the burden on the already burdened commenting organizations that had sought it. These organizations jointly represent a majority of those on Tennessee's death row. The organizations' clients, during this foreshortened comment period, have continued to live under a cloud of uncertainty about the continued viability of their litigation, as the opt-in provisions threaten to upend the decades-old timelines of many of their cases. And the additional workload created for their lawyers by the certification process has decreased the time available to litigate their ongoing cases.

63. During the compressed public comment period, TNM-CHU and FDSET and counsel for Mr. Miller diverted substantial resources from their normal organizational operations and resources to prepare public comment. Counsel for Mr. Miller, a 20-person state agency, sought to safeguard his interests and rights by providing relevant information on his behalf for the preparation of public comments. To that end, the director, the deputy director, paralegal and investigator supervisor, and administrative assistant spent vast amounts of their time amassing the necessary information in support of the public comment. In addition, the remainder of the attorney

and paralegal staff, including members of Mr. Miller's post-conviction legal team, spent dozens of hours in support of this effort.

64. FDSET's CHU, a small capital habeas unit, was required to divert resources from time sensitive legal matters in their habeas representation. Three attorneys out of the five total attorneys on staff and one paralegal were assigned to work on the public comment, diverting a total of 381 staffing hours in an approximately two-month period.

65. Similarly, the TNM-CHU was required to divert approximately 1170 hours for preparing public comment for the administrative proceeding for Tennessee's certification application. As a result of the Tennessee application and the DOJ's refusal to extend the time for submitting comments, all the TNM-CHU staff were designated as essential workers and were required to work during the shutdown of the federal government. The TNM-CHU staff regularly worked late into the evenings and weekends on this project, with several staff members working late into the night for several days prior during critical stages. The administrative process substantially diverted their work capacity away from other pending legal matters on behalf of their clients. The need to devote substantial time to respond to the state's application for Chapter 154 certification significantly interfered with the TNM-CHU's ability to attend to those tasks. The TNM-CHU estimates that an additional 2500 hours of staff time will be required to continue participation in the administrative process and subsequent judicial review, if any.

66. In addition to the likelihood of numerous public comment periods, DOJ submitted for an Executive Order 12866 Regulatory Review a proposed new Rule for the Certification Process for State Capital Counsel Systems, described below.

**E. DOJ's proposed new Rule for the Certification Process for State Capital Counsel Systems.**

67. On November 20, 2025, OLP submitted an Executive Order 12866 Regulatory Review to the Office of Information and Regulatory Affairs ("OIRA") of the Office of Management and Budget ("OMB") for a new proposed rule for the Certification Process for State Capital Counsel Systems. *See* RIN 1105-AB80. The proposed rule is not yet published in OIRA's Unified Agenda. Individuals with state death sentences and their counsel have raised numerous challenges under the Due Process Clause of the Fifth Amendment of the Constitution and the Administrative Procedures Act both to the rulemaking process for, and the substance of, the original 2008 Final Rule as well as the current 2013 Final Rule for the Certification Process for State Capital Counsel Systems. While most of these early cases were ultimately dismissed on justiciability grounds, DOJ successfully sought a voluntary remand in *Office of the Federal Public Defenders for the District of Arizona, et al., v. Barr*, No. 20-1144 (D.C. Cir.), the only judicial review proceeding in the Court of Appeals for the District of Columbia that would have ruled on the legality of the Attorney General's rulemaking process and 2013 Final Rule. Now it appears that the Attorney General seeks to propose new rules yet again during its consideration of Tennessee's application. The administrative proceedings for Tennessee's certification application will likely include additional periods of public comment on, and consideration of, the impact of and standards set out in the proposed new rule currently in a pending EO 12866 Regulatory Review.

68. Accordingly, Plaintiffs are in an untenable position of being coerced into participating in a biased, unconstitutional administrative process that grants the Attorney General the power to legislate, prosecute, and adjudicate the scope of federal habeas review of their death sentences. The unconstitutional proceeding is time-consuming, resource-intensive, and diverts limited resources away from Plaintiffs' defense against their sentences of death.

**F. The Attorney General is the nation's chief prosecutor.**

69. The Attorney General is the nation's chief prosecutor whose institutional interests have consistently aligned with the interests of law enforcement and state prosecutors, and against those of capital defendants. Section 35 of the Judiciary Act of 1789 established the Office of the Attorney General. Ch. 20, 1 Stat. 73 ("And there shall also be appointed a meet person, learned in the law, to act as attorney-general for the United States, who shall be sworn or affirmed to a faithful execution of his office; whose duty it shall be to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned . . ."); *see Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985) ("As the Nation's chief law enforcement officer, the Attorney General provides vital assistance to the President in the performance of the latter's constitutional duty to 'preserve, protect, and defend the Constitution of the United States.' U.S. Const., Art. II, § 1, cl. 8."). In 1870, the current Department of Justice was established as an executive department of the federal government, led by the Attorney General as the chief law enforcement officer and legal advisor for the nation. An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162, 162-165 (1870). Today, the Attorney General leads a department comprised of 40 separate component organizations, including the Office of Legal Policy and the Capital Case Section within the Criminal Division, which overseas DOJ's capital prosecutions.[8]

70. As the nation's chief prosecutor, the Attorney General directs the Department of Justice regularly to oppose attempts to standardize or improve criminal defense performance. In this role, the Attorney General has been a forceful legal advocate for states and law enforcement in litigation challenging state convictions in federal habeas proceedings, has repeatedly asserted a

[8] *See* U.S. Dep't of Justice, Organizational Chart, https://www.justice.gov/agencies/chart/map (last visited Sept. 18, 2025).

legal interest in the standards for competent counsel and interpretations of procedural rules that restrict federal habeas review, and is a consistent and close partner with state and local law enforcement.

### G. The Attorney General's substantial legal interests in federal habeas challenges to state convictions is aligned with the interests of States and against habeas petitioners.

71. As the Attorney General has stated, the law governing the § 2255 petitions which the Attorney General opposes is substantively similar to and informed by law governing proceedings challenging state convictions in federal habeas corpus proceedings. *See* Brief for the United States as Amicus Curiae Supporting Petitioner (Warden), *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343, at *1 (arguing in state ineffective assistance of counsel case that "similar collateral attacks on federal criminal judgments will generally be adjudicated under the same standards."). The Attorney General has repeatedly asserted these institutional interests as an *amicus curiae* and advocate in the capital and habeas corpus context, including in cases involving constitutional challenges to the effectiveness of trial counsel.[9]

[9] See, for example, Briefs of United States as *Amicus Curiae* in *Ryan v. Gonzales*, 568 U.S. 57 (2013) (arguing that "[s]ection 3599 does not expressly create a right to be competent to assist counsel" and "[w]hen a capital prisoner's claims can be fairly litigated without his assistance, a competency-related stay would be difficult to justify. That will usually be the case in Section 2254 proceedings . . . ."); *Day v. Crosby*, 2006 WL 139213 ("the Court's decision in this case will influence, if not control, the resolution of cases presenting similar questions under 28 U.S.C. § 2255. *See*, *e.g., United States v. Bendolph,* 409 F.3d 155 (3d Cir. 2005) (en banc). The United States therefore has a significant interest in this case.") (opinion at *Day v. McDonough*, 547 U.S. 198 (2006)); *Mayle v. Felix*, 2005 WL 435884 ("Because the Court's ruling will apply to collateral attacks on federal criminal judgments, the United States has a substantial interest in the outcome of this case.") (opinion at *Mayle v. Felix*, 545 U.S. 644 (2005)); *Rompilla v. Beard*, 2004 WL 2945403 ("Although this case involves a claim by a state prisoner under 28 U.S.C. § 2254, the Court's analysis will likely affect federal prisoners' ineffectiveness claims under 28 U.S.C. § 2255. The United States therefore has a substantial interest in the resolution of the question presented. The government has previously participated in numerous cases raising similar ineffective assistance of counsel questions.") (opinion at *Rompilla v. Beard*, 545 U.S. 374 (2005)); *Medellin v. Dretke*, 2005 WL 504490 ("The President, through subordinate Executive Branch officials, represents the United States in ICJ proceedings and in the United Nations (U.N.), and he has the

Moreover, the Supreme Court has recognized the Attorney General's substantial interest in § 2254 cases by inviting the Solicitor General to submit *amicus curiae* briefs in cases involving the interpretation of § 2254. *See, e.g.*, *Slack v. McDaniel*, 1999 WL 1223771 ("The Court has invited

---

lead role in determining whether, and if so, how, to comply with the determinations of such international bodies. The United States also has a substantial interest in the interpretation and effect given to international instruments to which it is a party.") (opinion at *Medellin v. Dretke*, 544 U.S. 660 (2005)); *Dretke v. Hayle*, 2003 WL 22970602 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the actual innocence exception applies in the same manner to collateral attacks by both federal and state prisoners. The United States has a substantial interest in the outcome of this case…") (opinion at *Dretke v. Haley*, 541 U.S. 386 (2004)); *Wiggins v. Smith*, 2003 WL 470211 ("The United States has a substantial interest in the resolution of the question on which the Court granted *certiorari*, because claims of ineffective assistance of counsel are frequently asserted on collateral review in federal criminal cases. Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision will likely affect ineffectiveness claims brought by federal prisoners under 28 U.S.C. § 2255 as well.") (opinion at *Wiggins v. Smith*, 539 U.S. 510 (2003)); *Bell v. Cone*, 2002 WL 122621 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision is also likely to affect ineffective-assistance-of-counsel claims brought by federal prisoners under 28 U.S.C. § 2255.") (opinion at *Bell v. Cone*, 535 U.S. 685 (2002)); *Mickens v. Taylor*, 2001 WL 1056945 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision likely will affect ineffective-assistance claims brought by federal prisoners under 28 U.S.C. § 2255 as well.") (opinion at *Mickens v. Taylor*, 535 U.S. 162 (2002)); *Roe v. Flores-Ortega*, 1999 WL 33611343 ("This case involves the proper standards for evaluating a claim that respondent's constitutional right to counsel was violated when his lawyer failed to perfect an appeal from the state court judgment entered on his plea of guilty. Because similar collateral attacks on federal criminal judgments will generally be adjudicated under the same standards, the United States has a substantial interest in the outcome of this case.") (opinion at *Roe v. Flores-Ortega*, 528 U.S. 470 (2000)); *Hopkins v. Reeves*, 1997 WL 720441 ("The Court's resolution of that question could affect the jury instructions given in federal capital proceedings.") (opinion at *Hopkins v. Reeves*, 524 U.S. 88 (1998)); *Strickland v. Washington*, http://www.usdoj.gov/osg/briefs/1983/sg830192.txt ("Claims of ineffective assistance of counsel are raised with increasing frequency in federal criminal cases, and the principles laid down in this case are likely to govern the disposition of such claims.") (opinion at *Strickland v. Washington,* 466 U.S. 668 (1984)); and *Engle v. Isaac*, 1981 WL 389902 ("The standard for determining when an error that was not duly objected to at trial or raised on direct appeal can nevertheless support collateral relief is of substantial importance to the administration of justice in the federal system. The holding of the court of appeals in these cases-that the assumed futility of objection constitutes sufficient cause to excuse a failure to make timely objection-would, if sustained by this Court, substantially increase the susceptibility of otherwise final judgments in federal criminal cases to collateral attack.") (opinion at *Engle v. Isaac*, 456 U.S. 107 (1982)).

the Solicitor General to express the views of the United States on the following questions.") (opinion at *Slack v. McDaniel*, 529 U.S. 473 (2000)); *Felker v. Turpin*, 1996 WL 284697 ("The United States has an important interest in the resolution of those issues. In the Court's order granting *certiorari* and specifying the questions to be briefed, the Court invited the Solicitor General to file a brief expressing the views of the United States.") (opinion at *Felker v. Turpin*, 518 U.S. 651 (1996)). Accordingly, the Attorney General has a substantial interest in the outcome and relevant legal standards in federal habeas corpus proceedings challenging state convictions, and has sided with the States' interpretations.

**a. The Attorney General's amicus advocacy overwhelmingly supports the States because of their common legal interests.**

72. Since 2000, the Attorney General, through the Solicitor General's Office, has inserted itself into state prisoner habeas cases over twenty times.[10] It has done so overwhelmingly on the side of the States, arguing against the challenges to state convictions and sentences and never in support of the petitioners. In cases in which the Attorney General moved to file a brief as *amicus curiae*, it stated an interest in the outcome because "similar collateral attacks on federal

[10] *See Kahler v. Kansas*, 589 U.S. 271 (2020) (constitutional requirements of insanity test); *Kansas v. Carr*, 577 U.S. 108 (2016) (joint penalty phrase trials); *Ryan v. Gonzales*, 568 U.S. 57 (2013); *Whorton v. Bockting*, 549 U.S. 406 (2007) (retroactivity of *Crawford v. Washington*); *Burton v. Stewart*, 549 U.S. 147 (2007) (non-retroactivity of *Blakely v. Washington*); *Day v. McDonough*, 547 U.S. 198 (2006) (timeliness of petition); *Hill v. McDonough*, 547 U.S. 573 (2006) (timeliness of petition); *Mayle v. Felix*, 545 U.S. 644 (2005) (timeliness of petition *Gonzalez v. Crosby*, 545 U.S. 524 (2005) (timeliness of petition); *Rompilla v. Beard*, 545 U.S. 374 (2005) (IAC); *Medellin v. Dretke*, 544 U.S. 660 (2005) (Vienna Convention); *Florida v. Nixon*, 543 U.S. 175 (2004) (IAC); *Dretke v. Haley*, 541 U.S. 386 (2004) (actual innocence in sentencing of non-capital petitioner); *Yarborough v. Alvarado*, 541 U.S. 652 (2004) (voluntariness of confession); *Schriro v. Summerlin*, 542 U.S. 348 (2004) (non-retroactivity of *Ring v. Arizona*); *Price v. Vincent*, 538 U.S. 364 (2003) (double jeopardy); *Wiggins v. Smith*, 539 U.S. 510 (2003) (IAC); *Bell v. Cone*, 535 U.S. 685 (2002) (IAC); *Mickens v. Taylor*, 535 U.S. 162 (2002) (trial attorney conflict of interest); *Tyler v. Cain*, 533 U.S. 656 (2001) (successive petitions); *Slack v. McDaniel*, 529 U.S. 473 (2000) (AEDPA's applicability to appeals of non-AEDPA petitions); *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (IAC); and *Portuondo v. Agard*, 529 U.S. 61 (2000) (prosecutorial misconduct).

criminal judgements will generally be adjudicated under the same standards." *See*, *e.g.*, Brief for the United States as Amicus Curiae Supporting Petitioners (Director, Arizona Department of Corrections), *Ryan v. Gonzales*, 568 U.S. 57 (2013) (arguing that "[s]ection 3599 does not expressly create a right to be competent to assist counsel" and "[w]hen a capital prisoner's claims can be fairly litigated without his assistance, a competency-related stay would be difficult to justify. That will usually be the case in § 2254 proceedings . . . ."); Brief for the United Sates as Amicus Curiae Supporting Petitioner (Warden), *Roe v Flores-Ortega*, 528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343, at *1.

73. Relatedly, in all the cases where the Attorney General has filed in support of a party, the Attorney General has advocated for the state and against the habeas petitioner. The Attorney General does not file in support of the petitioner; in a few cases, it has filed in support of neither party.[11] The Attorney General has argued for lower quality counsel for state defendants, and for tighter procedural restrictions on federal habeas to state prisoners. The Attorney General has never argued that a state petitioner received ineffective assistance of trial counsel. Not once has the Attorney General argued that a particular petitioner's case fits within the procedural guidelines of § 2254 and ought to be heard, instead persistently urging the Court to dismiss or deny petitions on procedural grounds.

74. Considering the number of times the Attorney General has chosen to express interests that are oppositional to the interest of state prisoners who are seeking habeas relief, the Attorney General cannot be regarded as a disinterested decision maker in habeas matters.

---

[11] *See Ramirez v Collier*, 596 U.S. 411 (2022)*; Shoop v. Twyford*, 596 U.S. 811 (2022)*; Nance v. Ward*; 597 U.S. 159 (2022).

**b. The Attorney General has consistently argued for lower standards of effective assistance of defense counsel.**

75. The Attorney General has submitted a number of amicus briefs in the United States Supreme Court in cases specifically involving ineffective assistance of counsel arising from habeas corpus petitions challenging state convictions. *See, e.g., Ryan v. Gonzales*, 568 U.S. 57 (2013); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Bell v. Cone*, 535 U.S. 685 (2002); *Mickens v. Taylor*, 535 U.S. 162 (2002); *Roe v. Flores-Ortega*, 528 U.S. 470 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984). In every such case the Attorney General has opposed the petitioner's claim of ineffective assistance of counsel and urged a less rigorous standard of performance or denial of relief. *See* Briefs for the United States as Amicus Curiae*:* *Ryan v. Gonzales*, 568 U.S. 57 (2013); *Rompilla v. Beard*, 2004 WL 2945403; *Wiggins v. Smith*, 2003 WL 470211; *Bell v. Cone*, 2002 WL 122621; *Mickens v. Taylor*, 2001 WL 1056945; *Roe v. Flores-Ortega*, 1999 WL 33611343; and *Strickland v. Washington*, 466 U.S. 668 (1984).

76. Two cases in which the Supreme Court ruled that trial counsel were constitutionally ineffective illustrate that the Attorney General has argued forcefully for both the denial of habeas relief and for what the Court determined to be unconstitutionally low standards for defense representation. *See, e.g.*, Brief for the United States as Amicus Curiae Supporting Respondent (Secretary, Pennsylvania Department of Corrections), *Rompilla v. Beard*, 545 U.S. 374 (2005) (No. 04-5462), 2004 WL 2945403, at *30 (arguing, unsuccessfully, that counsel was not deficient for failing to obtain and review records regarding prior convictions that were used in aggravation during the penalty phase because such records "were simply not relevant"); Brief for the United States as Amicus Curiae Supporting Respondent (Warden), *Wiggins v. Smith*, 539 U.S. 510 (2003) (No. 02-311), 2003 WL 470211, at *17 (arguing, unsuccessfully, that there was no applicable

"standard for counsel's duty to investigate a capital defendant's background[, n]or should any such quasi-mandatory duty be created").

77. In both *Rompilla* and *Wiggins*, the Supreme Court rejected the Attorney General's position.

78. In *Rompilla*, the Court held that defense counsel's failure to examine the file in the defendant's prior conviction for rape and assault at the sentencing phase of capital murder trial fell below the level of reasonable performance, and that this failure was prejudicial to defendant, warranting habeas relief. The Attorney General asserted that defense counsel acted reasonably in concluding that further investigation into the defendant's background was unwarranted. The Attorney General incorrectly asserted that:

> [T]he professional norm, as recognized in *Wiggins* and the ABA standards the Court cited, is for counsel *to make efforts to discover* all reasonably available evidence by, first, conducting an interview with the defendant and then, based on that interview, acquiring all *relevant* records - which is precisely what counsel did in this case. Reading *Wiggins* more broadly, to impose an inflexible rule that counsel must always procure all reasonably available records, would render *Wiggins* inconsistent with this Court's decisions in *Strickland* and *Burger v. Kemp*, both of which recognized that courts may not impose rigid checklists on counsel but must evaluate an attorney's performance in view of the totality of circumstances, and both of which upheld investigations where counsel failed to seek the defendant's records after conducting interviews of the defendant and family members.

Brief for United States as Amicus Curiae, 2004 WL 2945403 at *11 (emphasis in the original, citations omitted). The Court rejected the Attorney General's view of what qualifies as constitutionally adequate representation, specifically rejecting the position the government took at oral argument with regard to duty to investigate the defendant's prior criminal record:

> At oral argument, the United States, arguing as an *amicus* in support of Pennsylvania, maintained that counsel had fulfilled their obligations to investigate the prior conviction by obtaining the rap sheet. Tr. of Oral Arg. 44-45. But this cannot be so. The rap sheet would reveal only the charges and dispositions, being no reasonable substitute for the prior conviction file.

*Rompilla*, 545 U.S. at 385, n.3.

79. The Attorney General also opposed relief in *Wiggins v. Smith*, 539 U.S. 510 (2003), where the Court again found that defense counsel was ineffective. Mr. Wiggins's counsel failed to investigate petitioner's life history beyond obtaining a presentence investigation report and department of social services records, thus falling far short of prevailing professional standards. The Attorney General, however, argued that defense counsel was not ineffective, citing in part the psychologist retained by defense counsel. The Court specifically addressed this point:

> For its part, the United States emphasized counsel's retention of the psychologist. *Id*., at 51; Brief for United States as *Amicus Curiae* 27. But again, counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background. Though Stejskal based his conclusions on clinical interviews with Wiggins, as well as meetings with Wiggins' family members, Lodging of Petitioner, his final report discussed only petitioner's mental capacities and attributed nothing of what he learned to Wiggins' social history.

*Wiggins*, 539 U.S. at 532. In *Wiggins*, as in *Rompilla*, the Attorney General opposed the positions of state capital defendants and sought to lower the bar for what constitutes competent defense representation.

**c. The Attorney General has consistently argued for interpretation of procedural rules that would restrict habeas review.**

80. On several occasions in federal habeas cases challenging state convictions, the Attorney General has argued for interpretations of habeas law that impose greater procedural restrictions on federal habeas petitioners.

81. In *Day v. McDonough*, 547 U.S. 198 (2006), the Supreme Court decided that federal district courts are permitted, although not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition, but only if the court accords the parties fair notice and an opportunity to present their positions. *Day*, 547 U.S. at 209. The Attorney General moved to file a brief as

*amicus curiae*, inserting itself into the case to argue that the rules of habeas procedure do not divest district courts of an "independent authority to abide by the limitations on habeas review." Brief for United States as *Amicus Curiae*, 2006 WL 139213, *6. The Attorney General encouraged the Court to place a higher value on the "disposition" of petitions than on the essence of a petitioner's claim, arguing that "the State's act of filing a response in this case, even one that erroneously conceded that the petition was timely, did not deprive the district court of its authority to enforce the limitations period that Congress has adopted to promote the prompt filing and disposition of habeas corpus petitions." Brief for United States as *Amicus Curiae*, 2006 WL 139213, *6.

82. In *Mayle v. Felix*, 545 U.S. 644 (2005), the Court held that petitioner's amended petition, filed after the one-year federal habeas limitations period and targeting his statements in a pretrial interrogation, did not (as the petitioner maintained) relate back to the date of the original petition, which challenged the admission of a prosecution witness's videotaped testimony. The Attorney General filed an *amicus* brief arguing that a state prisoner "cannot rely on the doctrine of relation back, under Federal Rule of Civil Procedure 15(c)(2), to render timely under the AEDPA's limitation period an otherwise untimely amendment to an original habeas petition, when the amendment articulates new grounds for relief and supporting facts that differ from those alleged in the original petition." Brief for United States as *Amicus Curiae*, 2006 WL 435884, *7. The Attorney General here again argued for limiting review of a state prisoner's federal habeas petition.

83. In *Dretke v. Haley*, 541 U.S. 386 (2004), the Attorney General entered as *amicus curiae* to oppose an exception to a procedural bar based on actual innocence. The Attorney General encouraged the Court to hold that an actually innocent non-capital offender should not be granted the "actual innocence" exception to procedural default of a constitutional claim of sentencing error. The Court declined to make such a holding. *Id*. at 393-94 ("We decline to answer the question in

the posture of this case and instead hold that a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default.").

84. The Court noted that both Mr. Dretke and the State of Texas conceded that petitioner had a viable and significant ineffective assistance of counsel claim. The Court decided to remand the case to the District Court to consider non-defaulted, alternative grounds for relief, in spite of the Attorney General having urged the court to consider judicial economy over actual innocence. *Id.*; Brief of the United States as *Amicus Curiae*, 2003 WL 22970602, *16-19.

85. In *Engle v. Isaac*, 456 U.S. 107 (1982), the Attorney General, as *amicus curiae*, urged the Court to deny federal habeas corpus review and relief on a substantively valid claim that involved a procedural default. The Attorney General argued that unless there was a finding of constitutionally ineffective assistance of trial counsel, "there is certainly no justification for refusing to permit the state to enforce its procedural default rule." Brief for the United States as Amicus Curiae, 1981 WL 389902, *21. The case repeats the consistent pattern of the Attorney General's efforts to limit habeas review.

86. As the Attorney General's advocacy as an *amicus* in federal habeas cases challenging state convictions demonstrates, the Attorney General has—perhaps understandably—been an interested advocate: the chief prosecutor, not an impartial decision maker. Moreover, the Attorney General has exclusively advocated in support of the state and in opposition to the petitioner, or on behalf of no party. Not only is the Attorney General a consistent advocate for one side, but unlike agencies delegated administrative power, there is also no adjudicatory aspect to the office's activities. The Attorney General, in the context of federal habeas review, is an advocate and only an advocate, and that advocacy is entirely for one side. When required to make a decision,

as under the Reauthorization Act amendment, in the very same context in which the office has so consistently played the role of an advocate, it is impossible to imagine that the Attorney General will not continue to favor the side that the office has always favored in the past and, at a minimum, the great risk of the appearance of bias. Moreover, the impact of the Attorney General's unconstitutional bias is compounded by the broad delegation of discretion to define the standards under which the office will assess a state's application.

**d. The Attorney General is a consistent partner with state law enforcement and cannot neutrally judge a state's compliance with Chapter 154.**

87. In addition to asserting aligned legal positions in litigation, the Attorney General also works in partnership with state prosecutors to further their common litigation interests, consistent with the office's responsibilities as the chief law enforcement officer for the nation. *See Mitchell*, 472 U.S. at 520. For example, under the leadership of the Attorney General, Department of Justice officials are members of the Association of Government Attorneys in Capital Litigation ("AGACL"), an association of state and federal prosecutors. *See History*, Association of Government Attorneys in Capital Litigation, http://agacl.com/history/ (last visited Aug. 12, 2025). In addition to an annual conference and other training projects, the AGACL is involved in developing a brief bank, in conjunction with the National District Attorneys Association, National Association of Prosecutor Coordinators, and the National Association of Attorneys General, to be shared among state and federal prosecutors.

88. The partnership with state and local law enforcement, in training,[12] funding,[13] and actual prosecutorial functions is far too close to allow the Attorney General to escape the reality of the office's bias in favor of state prosecutions. Given the consistency of the Attorney General's cooperation with and assistance of state and local law enforcement, and the lack of any similar role with regard to defense counsel, it is again clear that the Attorney General's position is that of a partisan advocate, not a neutral decision maker.

89. Finally, as detailed above, the President has charged the Attorney General with encouraging states to seek capital charges, ensuring that states have drugs to perform executions, and attempting to overrule Supreme Court precedents that limit the government's authority to impose the death penalty. The Attorney General has also commanded "the relevant U.S. Attorney's Offices . . . to assist local prosecutors in pursuing death sentences under state law against the 37 commuted inmates" to whom President Biden granted clemency.[14]

---

[12] For example, the Bureau of Justice Assistance ("BJA"), a division in the Office of Justice Programs under the supervision of the Attorney General, long has provided local and state law enforcement training on a wide variety of topics. *See* U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Assistance, National Training and Technical Assistance Center, at https://bjatta.bja.ojp.gov/about (last visited Sept. 25, 2025). The Department of Justice formalized this association by joining with the National District Attorneys Association to create the National Advocacy Center, located on the University of South Carolina campus in Columbia, South Carolina, where training facilities for American prosecutors at all levels—federal, state and local—are concentrated in one facility. *See* https://www.ndaa-apri.org/education/nac_index.html (last visited Sept. 25, 2025). Indeed, the Department of Justice transferred its central training facility for federal prosecutors from Washington, D.C. to the National Advocacy Center.

[13] *See, e.g.*, Grants at https://www.justice.gov/grants (last visited Sept. 25, 2025).

[14] *See* Gutierrez Decl. Ex. 2; Attorney General, Restoring a Measure of Justice to the Families of Victims of Commuted Murderers, Feb. 5, 2025, https://www.justice.gov/ag/media/1388526/dl?inline (last visited Sept. 24, 2025).

90. While allowing the Attorney General to make the certification determination under Chapter 154 may not constitute being "a judge in his own case," *In re Murchison*, 349 U.S. 133, 136 (1955), it essentially equates with allowing the office to act as judge in its brother's case and thus violates the principle that "no man is permitted to try cases where he has an interest in the outcome." *Id.*

## CLAIMS FOR RELIEF

**COUNT 1**
**Challenge to the constitutionality of 28 U.S.C. § 2265 (authority of Attorney General to make certification determinations)**
**Fifth Amendment of the U.S. Constitution – Procedural Due Process (biased process)**
**All Plaintiffs**
**Against All Defendants in Their Official Capacity**

91. Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

92. The Attorney General's decision-making authority to decide certification applications under § 2265, on its face, violates the Due Process Clause of the Fifth Amendment and is unconstitutional. Specifically, the Attorney General is a biased decision maker that cannot fairly decide Tennessee's application for certification under Chapter 154 in a disinterested and neutral manner.

93. For these reasons, § 2265 violates the Fifth Amendment to the U.S. Constitution.

**COUNT 2**
**Challenge to the constitutionality of 28 U.S.C. § 2265 (authority of Attorney General to make certification determinations)**
**Article III, § 1 of the U.S. Constitution – Separation of Powers (encroachment of judicial authority)**
**All Plaintiffs**
**Against All Defendants in Their Official Capacity**

94. Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

95. The transfer of decision-making authority under § 2265 from the federal habeas court to the Attorney General impermissibly encroaches upon core judicial functions under Article III to decide habeas corpus petitions.

96. For these reasons, § 2265 violates Article III to the U.S. Constitution.

**COUNT 3**
**Challenge to the constitutionality of 28 U.S.C. § 2265 (authority of Attorney General to make certification determinations)**
**Article III of, and the Fifth Amendment to, the U.S. Constitution – Separation of Powers and Due Process in Combination**
**All Plaintiffs**
**Against All Defendants in Their Official Capacity**

97. Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

98. The transfer of authority to an unconstitutionally biased decision maker and the encroachment upon the judicial authority of the federal counts under Article III concerning habeas review, considered together, create an aggrandizement of constitutional power in the Attorney General under § 2265 that flouts the protections and structure of the Constitution.

99. For these reasons, the certification process under § 2265 violates Article III, § 1 of the U.S. Constitution and the procedural due process clause of the Fifth Amendment to the U.S. Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

(A) Declare that 28 U.S.C. § 2265 violates Article III and the Due Process Clause of Fifth Amendment of the Constitution;

(B) Permanently enjoin the Defendants from conducting an unconstitutional certification proceeding pending final resolution of this action; and

(C) Grant any other and further relief this Court deems just, proper, and appropriate.

Respectfully submitted,

Dated: January 16, 2026

*/s/ Gitanjali S. Gutierrez*

Maria V. Morris, D.C. 1697904
**ACLU FOUNDATION**
915 15th Street, N.W.
Washington, D.C. 20005
Tel: 202-393-4930
mmorris@aclu.org

Gitanjali S. Gutierrez, N.Y. 4183935*
Claudia Van Wyk, N.Y. - 1706514 **
**ACLU FOUNDATION**
201 W. Main St., Ste. 402
Durham, N.C. 27701
Tel: 919-682-5659
ggutierrez@aclu.org
cvanwyk@aclu.org

* *Admiited pro hac vice*
** *Pro hac vice admission forthcoming.*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANDRE BLAND, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 25-cv-03499 (APM)** |
| **TODD BLANCHE, et al.,** | |
| **Defendants.**[1] | |

**MEMORANDUM OPINION**

**I.**

Under Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a state may request the Attorney General of the United States certify that it "has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death." 28 U.S.C. § 2265(a). Certification changes certain procedures applicable to federal habeas review of the state's capital cases. Such changes include a shorter statute of limitations, more limited grounds for tolling the statute of limitations, and restrictions on petitioners' ability to amend their petitions. *Id.* § 2263; First Am. Compl. for Declaratory and Injunctive Relief, ECF No. 29 [hereinafter Am. Compl.], ¶ 30.

In June 2025, the state of Tennessee applied for such certification. Am. Compl. ¶ 57. As part of its review, the Attorney General solicited public comments. *Id.* The two Plaintiff federal public defender organizations have expended substantial resources to write and submit

[1] The court substitutes the current Acting Attorney General, Todd Blanche, for former Attorney General Pamela J. Bondi. *See* Fed. R. Civ. P. 25(d).

comments opposing certification. Pls.' Opp'n to Mot. to Dismiss [hereinafter Pls.' Opp'n], ECF No. 35, Ex. B, ECF No. 35-2, ¶¶ 3–7; Pls.' Opp'n, Ex. C, ECF No. 35-3, ¶¶ 3–7. The Attorney General's review remains ongoing. *See* Status Report, ECF No. 43, ¶ 3 (citing Letter from Daniel E. Burrows, U.S. Assistant Att'y Gen., to Jonathan Skrmetti, Tennessee Att'y Gen. & Rep. (Mar. 27, 2026), https://perma.cc/SW3B-U7A8 [hereinafter Letter]). On March 27, 2026, the Department of Justice sent a letter to Tennessee's Attorney General stating that the Department "hope[s] to have a decision within the next 60 days." Letter at 1. As far as the court is aware, no such decision has been made.

Plaintiffs—the two aforementioned organizations and three individuals who have been sentenced to death in Tennessee—challenge the validity of the review process. They allege that vesting certification authority in the Attorney General is unconstitutional for two reasons: (1) it violates the Fifth Amendment's Due Process Clause because the Attorney General is an inherently biased decisionmaker, and (2) it violates the separation of powers because granting the Attorney General such authority "encroaches upon core judicial functions under Article III to decide habeas corpus petitions." Am. Compl. ¶¶ 91–99.

Plaintiffs initially moved for a temporary restraining order, which the court denied. Order, ECF No. 20 [hereinafter Order]. Plaintiffs did not establish a substantial likelihood that this court had statutory jurisdiction over their claims; rather, such jurisdiction rested exclusively with the D.C. Circuit. *Id.* at 2–4. Plaintiffs also did not demonstrate they would suffer irreparable harm absent emergency relief. *Id.* at 4–5. Afterward, Plaintiffs filed an amended complaint. *See* Am. Compl. Defendants now move to dismiss. *See* Defs.' Mot. to Dismiss for Lack of Jurisdiction and Standing, ECF No. 31 [hereinafter Defs.' Mot.].

For the same reasons as in its prior order, the court concludes that it lacks statutory jurisdiction to hear Plaintiffs' claims. *See* Order at 2–4.[2]

**II.**

**A.**

Congress granted the D.C. Circuit "exclusive jurisdiction" over "[t]he determination by the Attorney General regarding whether to certify a State under this section." 28 U.S.C. § 2265(c). Under Circuit precedent, that "exclusive jurisdiction" extends beyond review of the Attorney General's determination itself. "[W]here a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals." *Telecomms. Rsch. & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 78–79 (D.C. Cir. 1984). So, under § 2265(c), the D.C. Circuit has exclusive jurisdiction to review not only a final certification decision by the Attorney General, but also any claim that "might affect" its future power to review such a decision. Plaintiffs' claims—which challenge the validity of ongoing review of a state's certification request—are of that type.

Start with their bias claim. The D.C. Circuit has spoken clearly on the subject. It has held that claims of decisionmaker bias "might affect the Court of Appeals' future statutory power of review" and are therefore subject to its "exclusive jurisdiction." *Air Line Pilots Ass'n, Int'l v. Civ. Aeronautics Bd.*, 750 F.2d 81, 88 (D.C. Cir. 1984). And while the D.C. Circuit has not explicitly held as such with respect to separation-of-powers claims, they have the power to affect its future jurisdiction just the same. In fact, Plaintiffs acknowledge that a decision in their favor would deprive the D.C. Circuit of any ability to review an eventual certification determination. *See* Pls.' [Corrected] Opp'n to Defs.' Mot., ECF No. 36-1 [hereinafter Pls.' Corrected Opp'n], at

---

[2] In light of this conclusion, the court does not reach Defendants' standing and ripeness arguments. Defs.' Mot., Defs.' Mem. in Supp. of Defs.' Mot., ECF No. 31-1, at 14–20.

19. Plaintiffs nevertheless submit that, if the court so holds, the D.C. Circuit "would not have jurisdiction to protect" (because the Attorney General would be foreclosed from making a certification "determination") and thus there is no "interfere[nce] with the Court of Appeals' subsequent jurisdiction over the merits of a final agency decision." *Id.* But regardless of how it is framed, such an outcome necessarily entails this court rendering a decision "affect[ing]" that very jurisdiction. *TRAC*, 750 F.2d at 78–79. This the court cannot do.

**B.**

Plaintiffs raise several counterarguments. None are persuasive. Plaintiffs start with the statutory text, emphasizing that the statute grants the D.C. Circuit the exclusive power to review only the Attorney General's "determination" whether to certify a state. Pls.' Corrected Opp'n at 4–5. Plaintiffs' constitutional challenges to the structure of the review process, they reason, are distinct from that ultimate certification decision. *See id.* That may be. But as already explained, the D.C. Circuit interprets jurisdictional provisions like these to grant it exclusive review over claims that might affect its future jurisdiction to review the agency's final decision. *TRAC*, 750 F.2d at 78–79. Plaintiffs' claims fit that bill.

Plaintiffs' citation to *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), does not move the needle. Pls.' Corrected Opp'n at 4. In *McNary*, the Court interpreted § 210(e)(1) of the Immigration and Nationality Act, which provides that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status," except as to an order of exclusion or deportation in the courts of appeals. 8 U.S.C. § 1160(e)(1), (3). Notwithstanding that provision, the plaintiffs filed a class action in district court challenging on statutory and constitutional grounds the process by which the agency made status eligibility decisions. *McNary*, 498 U.S. at 487–88. The Court held that the INA did not jurisdictionally bar

their suit. *Id.* at 494. It reasoned that § 210(e)(1) "describ[ed] the process of direct review of individual denials of . . . status, rather than as referring to general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.* at 492. The plaintiffs' suit therefore was properly before the district court. *Id.* at 494. Plaintiffs in this case would have the court read § 2265(c) the same way—as applying only to reviews of "[certification] determination[s] by the Attorney General" and not to constitutional challenges to the certification process.

There are indeed some parallels between the statutory language at issue in *McNary* and that contained in § 2265(c). But several additional considerations supported the Court's conclusion in *McNary* that are absent here. Those included that the statute confined the scope of review to the administrative record, the agency's determinations were subject to abuse-of-discretion review, and the plaintiffs would have no opportunity for meaningful judicial review otherwise. *See id.* at 492–96. Such considerations—particularly the final one—make *McNary* inapposite. *See Miriyeva v. U.S. Citizenship & Immigr. Servs.*, 9 F.4th 935, 943–44 (D.C. Cir. 2021). The D.C. Circuit has long emphasized that access to meaningful review is the "focus" of *McNary* and its progeny. *Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1082, 1086 (D.C. Cir. 1992); *see also Daniels v. Union Pac. R.R. Co.*, 530 F.3d 936, 943–44 (D.C. Cir. 2008) ("[T]he availability of effective judicial review is the touchstone of the *McNary* exception."). Plaintiffs can raise and receive meaningful review of their constitutional claims before the D.C. Circuit. *See Jarkesy v. SEC*, 803 F.3d 9, 21 (D.C. Cir. 2015) (describing the "high price of accessing review" as "the key factor supporting district-court jurisdiction" (cleaned up)). Moreover, Plaintiffs' purely legal claim does not depend on any factual development in the administrative record. "Unlike in *McNary*, the court [of appeals] is thus not handcuffed to the administrative record at all or otherwise constrained by the agency's

resolution." *Miriyeva*, 9 F.4th at 944; *see also Jarkesy*, 803 F.3d at 21. Finally, § 2265(c) provides for "de novo review," 28 U.S.C. § 2265(c)(3), which "'lends substantial credence to the conclusion' that the review scheme applies to [Plaintiffs'] challenges." *Miriyeva*, 9 F.4th at 944 (quoting *McNary*, 498 U.S. at 493). *McNary* therefore does not control this case's outcome.

Plaintiffs also attempt to circumscribe *TRAC*'s reach. They describe its "limited holding" as decided in the "particular context of unreasonable agency delay." Pls.' Corrected Opp'n at 17. They then characterize it as applying only to a "narrow band" of claims, emphasizing that "cases transferred to appellate courts under *TRAC* have only presented claims challenging final agency action, the manner in which agency process was implemented, or the agency's jurisdiction on statutory grounds." *Id.* (internal quotation marks omitted) (citing cases). While that may be the trend, *TRAC* itself contains no such limitation. Quite the opposite: it observed that "[t]here may be a small category of cases in which the underlying claim is *not* subject to the jurisdiction of the Court of Appeals (and thus adjudication of the claim in the District Court will not affect any future statutory review authority of the Circuit Court)." *TRAC*, 750 F.2d at 78 (emphasis added). These are "very limited circumstance[s]" where "a denial of review in the District Court will truly foreclose all judicial review." *Id.* Thus, contrary Plaintiffs' description, it is the "exception" to the exclusive-jurisdiction rule that is "narrow," not the rule itself. *Id.* And Plaintiffs' claims do not fall within this narrow exception because, as already described, they can raise their challenges in the D.C. Circuit. *See Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 550 (D.C. Cir. 1992).

Plaintiffs' attempt to distinguish *Air Line Pilots* fares no better. As they did at the emergency relief stage, Plaintiffs note that, unlike here, "the alleged bias at issue in *Air Line Pilots* was not a structural constitutional claim," but rather a "claim that particular actors involved in a specific administrative proceeding were biased." Pls.' Corrected Opp'n at 19. Plaintiffs still have

not explained why this distinction matters. *See* Order at 3. They point out that the *Air Line Pilots* court declined to address the bias claim on interlocutory review in part because of the possibility that the decisionmaker may change over the course of the administrative proceedings. Pls.' Corrected Opp'n at 19. Their alleged bias claim is different, they argue, because it inheres in the office of the decisionmaker, regardless of who actually occupies it, and thus is "not amenable to any potentially ameliorating change in circumstances." *Id.* at 20. But the D.C. Circuit's decision not to exercise its *interlocutory* jurisdiction is entirely separate from the exclusivity of that jurisdiction. *See Air Line Pilots*, 750 F.2d at 88 ("[A]lthough we recognize our jurisdiction over interlocutory claims of bias, we will take no action on the merits of the bias claim at this time."). Its reasons for declining to exercise its jurisdiction there thus do not affect this court's lack of jurisdiction here.

Lastly, Plaintiffs invoke *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), and like cases as standing for the proposition that "statutory review schemes do not silently strip district courts of jurisdiction over structural constitutional claims to enabling legislation." Pls.' Corrected Opp'n at 16; *see also id.* at 5–6, 10, 20. *Axon* emphasized the "'here-and-now injury' of subjection to an unconstitutionally structured decisionmaking process," which "cannot be undone" after the fact. *Axon*, 598 U.S. at 191–92 (citation omitted). "[N]owhere in its post-*Axon* decisions," Plaintiffs continue, "does the D.C. Circuit suggest that district courts lack jurisdiction under *Axon* because of *TRAC* and its progeny." Pls.' Corrected Opp'n at 16.

Plaintiffs overread *Axon*. "In *Axon*, the question before the Supreme Court was whether parties to an ongoing proceeding before a governmental agency had to first go through the agency's administrative process before suing in federal court to challenge the administrative proceeding's structural constitutionality." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1335 (D.C. Cir. 2024).

The Court held that the challenge "can begin before the agency acts." *Id.* at 1336. *Axon* thus primarily answered the question of *when* such a suit can be brought. This case presents not a question of when, but of where. As *Air Line Pilots* illustrates, Plaintiffs can, consistent with *Axon*, bring their constitutional challenges before the Attorney General reaches a final decision on Tennessee's application—they just must do so before the D.C. Circuit. *See Air Line Pilots*, 750 F.2d at 88. Nothing in this opinion prevents them from following that course. Once again, *Axon* "did not overrule the D.C. Circuit's clear holdings in *TRAC* and *Air Line Pilots*." Order at 3–4; *see also id.* at 4 ("Plaintiffs, however, admitted at oral argument that the two lines of cases can be reconciled."). The court is therefore bound to conclude that it lacks jurisdiction over Plaintiffs' claims.

**C.**

One final point bears addressing. To support their reading of *TRAC*, Plaintiffs cite Judge Green's separate opinion in *Ticor Title Insurance Co. v. FTC*, 814 F.2d 731 (D.C. Cir. 1987). Pls.' Corrected Opp'n at 16. Judge Green wrote that "*TRAC* is inapplicable to cases involving challenges to the constitutionality of an agency's enabling statute. Such cases present questions of constitutional law, which require no special administrative expertise to resolve, and do not fall within the 'class of claims' covered by the typical statutory grant of appellate review power." *Ticor*, 814 F.2d at 757–58. Judge Green's view did not garner a majority of the court. Later, in *Time Warner Entertainment Co. v. FCC*, 93 F.3d 957 (D.C. Cir. 1996)—a case neither party cites—the Circuit cited to Judge Green's opinion in acknowledging that "*TRAC*'s applicability to constitutional challenges" remained an open question. *Id.* at 965.

In *Time Warner*, the court held that "*TRAC* does not deprive [the district] court of its general federal question jurisdiction to consider a facial challenge to a statute's constitutionality

*so long as* that challenge is not raised in a suit challenging the validity of agency action taken pursuant to the challenged statute or in a suit that is collateral to one challenging the validity of such agency action." *Id.* (emphasis added). So, rather than holding that district courts have jurisdiction over every such challenge, the Circuit instructed that the posture of the case is key. In *Time Warner*, the agency had only initiated rulemaking. *Id.* at 963. The Circuit thus concluded that the district court had jurisdiction over the plaintiffs' challenge because "the case [was] entirely independent of any agency proceedings, whether actual or prospective." *Id.* at 965.

The court contrasted the case before it with *Ukiah Adventist Hospital v. FTC*, in which it concluded that the district court lacked jurisdiction. Although the challenge in *Ukiah* was "based on the 'purely legal question[]' of [the agency's] jurisdiction," the plaintiff had "brought the jurisdictional challenge *after* the [the agency] had issued an administrative complaint against it." *Time Warner*, 93 F.3d at 965. (first alteration in original) (emphasis added) (quoting *Ukiah*, 981 F.2d at 549). Therefore, if the district court were to enjoin the agency's proceedings as requested, "the statutory obligation of a Court of Appeals to review [the agency's order] on the merits may be defeated." *Id.* (quoting *Ukiah*, 981 F.3d at 549). *TRAC* and *Air Line Pilots* were in an analogous posture, in that individualized agency proceedings had already commenced and were ongoing. *See TRAC*, 750 F.2d at 73–74 (describing specific refund disputes); *Air Line Pilots*, 750 F.2d at 83 (describing specific applications for agency determinations).

This case is more like *Ukiah*, *TRAC*, and *Air Line Pilots* than *Time Warner*. Plaintiffs raised their challenge in response to Tennessee's application for Chapter 154 certification. *See, e.g.*, Am. Compl. ¶ 12. And the Attorney General's review of Tennessee's request is ongoing. Plaintiffs' challenges thus are not "entirely independent of any agency proceedings," *Time Warner*, 93 F.3d at 965, but rather arise directly from them. The court therefore lacks

jurisdiction over Plaintiffs' claims because they might affect the D.C. Circuit's future jurisdiction over the eventual final determination on Tennessee's application.

### III.

For the foregoing reasons, the court grants Defendants' Motion to Dismiss for Lack of Jurisdiction and Standing, ECF No. 31. A final, appealable order accompanies this Memorandum Opinion.

Dated: July 10, 2026

Amit P. Mehta
United States District Judge

(f), 1301.46. RFAA, at 1; *see also* 21 CFR 1316.67.

**Findings of Fact**

The Agency finds that, in light of Registrant's default, the factual allegations in the OSC are deemed admitted. According to the OSC, effective September 25, 2025, the California Board of Registered Nursing revoked Registrant's California registered nurse license and Registrant's California nurse practitioner license. RFAAX 1, at 2. According to California online records, of which the Agency takes official notice,[2] both Registrant's California registered nurse license and Registrant's California nurse practitioner license are revoked. California DCA License Search, *https://search.dca.ca.gov* (last visited date of signature of this Order). Accordingly, the Agency finds that Registrant is not licensed to practice as a nurse practitioner in California, the state in which she is registered with DEA.[3]

**Discussion**

Pursuant to 21 U.S.C. 824(a)(3), the Attorney General is authorized to suspend or revoke a registration issued under 21 U.S.C. 823 ''upon a finding that the registrant . . . has had his State license or registration suspended . . . [or] revoked . . . by competent State authority and is no longer authorized by State law to engage in the . . . dispensing of controlled substances.''

With respect to a practitioner, DEA has also long held that the possession of authority to dispense controlled substances under the laws of the state in which a practitioner engages in professional practice is a fundamental condition for obtaining and maintaining a practitioner's registration. *Gonzales* v. *Oregon,* 546 U.S. 243, 270 (2006) (''The Attorney General can register a physician to dispense controlled substances 'if the applicant is authorized to dispense . . . controlled substances under the laws of the State in which he practices.' . . . The very definition of a 'practitioner' eligible to prescribe includes physicians 'licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices' to dispense controlled substances. 802(21).''). The Agency has applied these principles consistently. *See, e.g., James L. Hooper, M.D.,* 76 FR 71371, 71372 (2011), *pet. for rev. denied,* 481 F. App'x 826 (4th Cir. 2012); *Frederick Marsh Blanton, M.D.,* 43 FR 27616, 27617 (1978).[4]

According to California statute, ''dispense'' means ''to deliver a controlled substance to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, furnishing, packaging, labeling, or compounding necessary to prepare the substance for that delivery.'' Cal. Health & Safety Code § 11010 (West 2026). Further, a ''practitioner'' means a person ''licensed, registered, or otherwise permitted, to distribute, dispense, conduct research with respect to, or administer, a controlled substance in the course of professional practice or research in [the] state.'' *Id.* at § 11026(c).

Here, the undisputed evidence in the record is that Registrant currently lacks authority to practice as a nurse practitioner in California. As discussed above, an individual must be a licensed practitioner to dispense a controlled substance in California. Thus, because Registrant currently lacks authority to practice as a nurse practitioner in California and, therefore, is not authorized to handle controlled substances in California, Registrant is not eligible to maintain a DEA registration. Accordingly, the Agency will order that Registrant's DEA registration be revoked.

**Order**

Pursuant to 28 CFR 0.100(b) and the authority vested in me by 21 U.S.C. 824(a), I hereby revoke DEA Certificate of Registration No. MM5261982 issued to Mariana Moualem, F.N.P. Further, pursuant to 28 CFR 0.100(b) and the authority vested in me by 21 U.S.C. 823(g)(1), I hereby deny any pending applications of Mariana Moualem, F.N.P., to renew or modify this registration, as well as any other pending application of Mariana Moualem, F.N.P., for additional registration in California. This Order is effective August 10, 2026.

**Signing Authority**

This document of the Drug Enforcement Administration was signed on June 22, 2026, by Administrator Terrance Cole. That document with the original signature and date is maintained by DEA. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DEA Federal Register Liaison Officer has been authorized to sign and submit the document in electronic format for publication, as an official document of DEA. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Leslie Mayer,**

*Federal Register Liaison Officer, Drug Enforcement Administration.*

[FR Doc. 2026–13990 Filed 7–9–26; 8:45 am]

BILLING CODE 4410–09–P

[2] Under the Administrative Procedure Act, an agency ''may take official notice of facts at any stage in a proceeding—even in the final decision.'' United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act 80 (1947) (Wm. W. Gaunt & Sons, Inc., Reprint 1979).

[3] Pursuant to 5 U.S.C. 556(e), ''[w]hen an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.'' The material fact here is that Registrant, as of the date of this Order, is not licensed to practice as a nurse practitioner in California. Accordingly, Registrant may dispute the Agency's finding by filing a properly supported motion for reconsideration of findings of fact within fifteen calendar days of the date of this Order. Any such motion and response shall be filed and served by email to the other party and to the Office of the Administrator, Drug Enforcement Administration, at *dea.addo.attorneys@dea.gov.*

[4] This rule derives from the text of two provisions of the Controlled Substances Act (CSA). First, Congress defined the term ''practitioner'' to mean ''a physician . . . or other person licensed, registered, or otherwise permitted, by . . . the jurisdiction in which he practices . . . , to distribute, dispense, . . . [or] administer . . . a controlled substance in the course of professional practice.'' 21 U.S.C. 802(21). Second, in setting the requirements for obtaining a practitioner's registration, Congress directed that ''[t]he Attorney General shall register practitioners . . . if the applicant is authorized to dispense . . . controlled substances under the laws of the State in which he practices.'' 21 U.S.C. 823(g)(1). Because Congress has clearly mandated that a practitioner possess state authority in order to be deemed a practitioner under the CSA, DEA has held repeatedly that revocation of a practitioner's registration is the appropriate sanction whenever he is no longer authorized to dispense controlled substances under the laws of the state in which he practices. *See, e.g., James L. Hooper, M.D.,* 76 FR at 71371–72; *Sheran Arden Yeates, M.D.,* 71 FR 39130, 39131 (2006); *Dominick A. Ricci, M.D.,* 58 FR 51104, 51105 (1993); *Bobby Watts, M.D.,* 53 FR 11919, 11920 (1988); *Frederick Marsh Blanton, M.D.,* 43 FR at 27617.

## DEPARTMENT OF JUSTICE

### Office of the Attorney General

**[Docket No. OLP180; AG Order No. 7011–2026]**

### Certification of Tennessee Capital Counsel Mechanism

**AGENCY:** Office of the Attorney General, Department of Justice.

**ACTION:** Notice.

**SUMMARY:** Federal law makes certain procedural benefits available to States in federal habeas corpus review of capital cases, where the Attorney General certifies that the State has established a postconviction capital counsel mechanism satisfying the requirements of chapter 154 of title 28 of the United States Code. The Attorney General certifies in this notice that Tennessee

has such a mechanism, which was established on July 1, 1997.

**DATES:** Pursuant to 28 U.S.C. 2265(a)(2), the effective date of the certification in this notice is July 1, 1997.

**FOR FURTHER INFORMATION CONTACT:**
Aaron Haviland, Counsel, Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530; telephone (202) 514–4601.

**SUPPLEMENTARY INFORMATION:**

*Certification:* Chapter 154 of title 28, United States Code, provides special federal habeas corpus review procedures for state capital cases where (i) the Attorney General has certified that the State has established a counsel appointment mechanism for indigent capital defendants in state postconviction proceedings that meets the requirements stated in the chapter, and (ii) counsel was appointed pursuant to the certified mechanism, the defendant validly waived or retained counsel, or the defendant was not indigent. 28 U.S.C. 2261(b). Chapter 154 directs the Attorney General to determine, if requested by an appropriate state official, whether the State has established a qualifying mechanism for the appointment of postconviction capital counsel, the date on which the mechanism was established, and whether the State provides standards of competency for such appointments. *Id.* 2265(a)(1).

Having considered the relevant statutes, rules, and policies in Tennessee, the application of the Tennessee Attorney General, and the public comments thereon, and exercising the authority conferred on me by 28 U.S.C. 2265, I determine and certify that Tennessee has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in state postconviction proceedings brought by indigent prisoners who have been sentenced to death, including provision of standards of competency for the appointment of counsel in such proceedings, which satisfies the requirements of chapter 154. I further determine and certify that Tennessee had an established capital counsel mechanism satisfying the requirements of chapter 154 as of July 1, 1997, and that Tennessee has continuously had a capital counsel mechanism satisfying the requirements of chapter 154 since that date. This certification reflects no judgment or opinion whether Tennessee had a postconviction capital counsel mechanism satisfying the requirements of chapter 154 before that date.

## I. Procedural History

Chapter 154 applies to cases arising under 28 U.S.C. 2254 brought by prisoners in state custody who are subject to a capital sentence if ''(1) the Attorney General of the United States certifies that a State has established a mechanism for providing counsel in postconviction proceedings as provided in section 2265,'' and ''(2) counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent.'' 28 U.S.C. 2261(b).

Where the chapter applies, federal habeas review is conducted in conformity with special provisions relating to stays of execution, the time available for federal habeas filing, the scope of federal habeas review, and the time for completing the adjudication of federal habeas petitions.

Congress enacted chapter 154 as part of the Antiterrorism and Effective Death Penalty Act of 1996. *See* Public Law 104–132, sec. 107(a), 110 Stat. 1214, 1221–26. It was derived from a proposal developed in 1989, under the leadership of Justice Lewis F. Powell, to address the problem of protracted and repetitive litigation in capital cases and to fill a gap in representation for capital defendants at the stage of state postconviction review. Under chapter 154 in its original form, federal habeas courts determined the applicability of chapter 154's expedited federal habeas review procedures in the context of adjudicating federal habeas petitions filed by state capital defendants. Litigation relating to States' satisfaction of chapter 154's requirements ensued in various States, resulting in a substantial body of district court and court of appeals precedent interpreting chapter 154, as well as a related decision by the Supreme Court in *Calderon* v. *Ashmus,* 523 U.S. 740 (1998).

In 2006, Congress enacted amendments that brought chapter 154 into its current form. *See* Public Law 109–177, sec. 507, 120 Stat. 250, 250–51 (codified in part at 28 U.S.C. 2265). The amendments transferred responsibility for determining a State's satisfaction of chapter 154's requirements from the courts to the Attorney General, subject to de novo review by the D.C. Circuit Court of Appeals. *See* 28 U.S.C. 2265. Under the revised scheme, the Attorney General, if requested by an appropriate state official, certifies whether the State has established a postconviction capital counsel mechanism satisfying the chapter's requirements, with exclusive review of the certification by the D.C. Circuit. *See id.* 2265(a), (c).

The 2006 amendments also added a provision stating that ''[t]here are no requirements for certification or for application of'' chapter 154 ''other than those expressly stated in this chapter.'' *Id.* 2265(a)(3). The addition of this provision reflected Congress's concern that some courts had declined to apply chapter 154 for reasons other than a failure to satisfy the requirements of the statute. *See* 152 Cong. Rec. 2441, 2445–46 (2006) (remarks of Sen. Kyl); 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake).

Chapter 154 directs the Attorney General to promulgate regulations to implement the certification procedure. *See* 28 U.S.C. 2265(b). Attorney General Mukasey in 2008 issued an initial implementing rule for chapter 154. *See* 73 FR 75327 (Dec. 11, 2008). The rule generally tracked the statutory requirements, recognizing that 28 U.S.C. 2265(a)(3) precludes certification requirements other than those expressly stated in the chapter. *See id.* at 75327–39. Attorney General Holder in 2013 replaced the original rule with the current regulations (''2013 Regulations''), which prescribe additional requirements for certification. *See* 28 CFR 26.20–26.23; 78 FR 58160, 58160–84 (Sept. 23, 2013). On March 16, 2026, Attorney General Bondi published a notice of proposed rulemaking to rescind the requirements of the 2013 Regulations that are not expressly required by chapter 154 itself. *See* 91 FR 12525 (Mar. 16, 2026); *see also Reconsidering State Procedures for Appointment of Competent Counsel in Postconviction Review of Capital Sentences,* 50 Op. O.L.C. __ (Feb. 18, 2026). Notwithstanding this proposed rulemaking, the 2013 Regulations remain in effect and continue to guide the Attorney General's adjudication of States' requests for certification.

Tennessee has requested that the Attorney General certify its capital counsel mechanism under chapter 154. The materials relating to Tennessee's request are available at *www.justice.gov/olp/pending-requests-final-decisions.*

Tennessee initially requested chapter 154 certification by letter from its Attorney General, dated June 6, 2025. On August 7, 2025, the Department of Justice published a notice in the **Federal Register** inviting public comment on Tennessee's request for certification and providing a 60-day comment period. *See* 90 FR 38182 (Aug. 7, 2025). Three capital public defender offices in Tennessee submitted requests for extension of the comment period, which

the Department denied. Two of these offices also sought a temporary restraining order to enjoin the Attorney General from deciding whether to certify Tennessee's capital counsel mechanism, but a district court denied their motion. *See* Order, *Bland* v. *Bondi,* No. 25–cv–3499 (D.D.C. Oct. 10, 2025), ECF No. 20. As an accommodation, the Department permitted the capital public defender offices to submit a late comment on Tennessee's certification request. The Department also received one other comment, submitted by the American Bar Association.

## II. Assessment of Tennessee's Mechanism Under Chapter 154

Chapter 154 directs the Attorney General, if requested by an appropriate state official, to determine (i) whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in state postconviction proceedings brought by indigent prisoners who have been sentenced to death, and (ii) whether the State provides standards of competency for the appointment of such counsel. 28 U.S.C. 2265(a).

Before turning to specific issues, I will discuss the significance of previous judicial interpretations of chapter 154. I will then examine whether Tennessee's mechanism for the appointment of counsel, its standards of competency, its mechanism for compensation, and its mechanism for the payment of reasonable litigation expenses comply with chapter 154 and the 2013 Regulations.

### *A. Judicial Opinions Interpreting Chapter 154*

In addressing Tennessee's request for certification, I do not write on a clean slate. Prior to 2006, the Attorney General was not involved in chapter 154 determinations, which were instead made by the federal courts in adjudicating individual habeas petitions filed by state prisoners. In 2002, for example, the Ninth Circuit concluded that Arizona had established a capital counsel mechanism satisfying chapter 154's requirements. *See Spears* v. *Stewart,* 283 F.3d 992, 1007–19 (9th Cir. 2002). The analysis in *Spears* may still be relevant to the extent that elements of an adequate state capital counsel mechanism now required by chapter 154 overlap with those required by chapter 154 at the time of that decision.

For example, the Ninth Circuit clarified in *Spears* that capital-case litigation experience is not a prerequisite for appointment under chapter 154. *See id.* at 1013; *see also Ashmus* v. *Calderon,* 123 F.3d 1199, 1208 (9th Cir. 1997) (holding that postconviction litigation experience is not required under chapter 154). Other holdings in *Spears*—including with respect to counsel competency, compensation, and payment of reasonable litigation expenses—may also remain relevant as persuasive authority in assessing the capital counsel mechanisms of Tennessee and other States under the 2013 Regulations. *See* 85 FR 20705, 20708 (Apr. 14, 2020).

In other respects, however, the pre-2006 case law may no longer be relevant because of changes in chapter 154. For example, in *Ashmus* v. *Calderon,* the Ninth Circuit held that California's capital counsel mechanism did not satisfy chapter 154 because its standards of counsel competency were not articulated in a statute or by a rule of the State's court of last resort. 123 F.3d at 1207–08. The 2006 amendments, however, rejected this ''hypertechnical'' reading of the statute and removed the language relied upon by the *Ashmus* court, thereby affording the States ''flexibility on how to establish the mechanism.'' 152 Cong. Rec. 2446 (remarks of Sen. Kyl). As another example, the Ninth Circuit concluded in *Spears* that Arizona's capital counsel mechanism satisfied chapter 154 but nevertheless declined to apply the expedited federal habeas procedures because of a delay in appointing counsel. *See* 283 F.3d at 1018–19. The 2006 amendments likewise repudiated this aspect of *Spears,* providing instead that there are no requirements for certification or for application of chapter 154 other than those expressly stated in the statute. *See* 28 U.S.C. 2265(a)(3); 152 Cong. Rec. 2446 (remarks of Sen. Kyl).

Another important change in chapter 154 concerns whether I must undertake a case-specific review of the operation of a State's capital counsel mechanism. Public comments have supposed that I must deny certification if a State's mechanism is deficient in practice—*e.g.,* if counsel are not appointed quickly after the conclusion of direct review or do not consistently provide high-quality representation after appointment. These comments claim support in pre-2006 decisions that held that the procedural benefits of chapter 154 are not available in a particular case if the State did not comply with the requirements of its capital counsel mechanism in that case. *See, e.g., Spears,* 283 F.3d at 1018–19 (failure to appoint counsel within the time required by state mechanism); *Tucker* v. *Catoe,* 221 F.3d 600, 604–05 (4th Cir. 2000) (failure to appoint counsel meeting state competency standards).

Judicial decisions of this nature reflected the pre-2006 version of chapter 154, under which requests to apply chapter 154's procedures were presented to federal habeas courts in particular cases. In that posture, courts could consider both the general question of whether the State has established a mechanism satisfying chapter 154—an issue that was typically determined by examination of state laws and policies—and the specific question of whether counsel for the petitioner in a particular case had been appointed in compliance with that mechanism. Following the 2006 amendments to chapter 154, however, only the general question is assigned to the Attorney General. *See* 28 U.S.C. 2265. The case-specific question of whether counsel was appointed pursuant to the certified mechanism is reserved to the courts that adjudicate prisoners' habeas petitions. *See* 28 U.S.C. 2261(b)(2); 78 FR at 58162–63, 58165. Consequently, comments supposing that I must undertake a case-specific review of the operation of a State's capital counsel mechanism misapprehend the current division of labor under chapter 154 between the Attorney General and federal courts. *See* 85 FR at 20708, 20711–12; 78 FR at 58162–63; 73 FR at 75334–35.

### *B. Appointment of Counsel*

#### 1. Appointment of Counsel and Chapter 154

Section 2265(a)(1) of title 28 directs the Attorney General to determine whether the State has established a mechanism for the appointment of counsel in state postconviction proceedings brought by indigent prisoners who have been sentenced to death.

Tennessee's capital counsel mechanism satisfies this requirement. Tennessee Supreme Court Rule 13 provides for court-ordered appointment of postconviction counsel for indigent prisoners under sentence of death. The Tennessee Supreme Court adopted Rule 13 on April 3, 1997, and the rule took effect on July 1, 1997. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997), *https://perma.cc/CYQ8-VXRH;* Tenn. Sup. Ct. Order (Apr. 10, 1997), *https://perma.cc/7ZJ9-FEC6* (setting effective date of amendment to July 1, 1997). The substantive requirements of the relevant provisions have not changed in the years since Rule 13 was adopted. *See* Tenn. Sup. Ct. Order (June 1, 2004), *https://perma.cc/YP6K-DTYS;* Tenn. Sup. Ct. Order (June 1, 2004), App'x A,

*https://perma.cc/XTM3-JJM6;* Tenn. Sup. Ct. Order (Oct. 4, 2024), *https://perma.cc/6BX3-6KWN.* Accordingly, Tennessee has continually satisfied the requirements of chapter 154 with respect to the appointment of counsel since July 1, 1997.

2. Appointment of Counsel and the 2013 Regulations

The 2013 Regulations augment chapter 154's express requirements relating to appointment of counsel. Under the regulations, counsel must be provided in a manner that is ''reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.'' 28 CFR 26.21. Tennessee satisfies the timeliness requirement. Upon the filing of an initial petition for postconviction relief, the trial court must complete a preliminary consideration of the petition within 30 days. *See* Tenn. Code Ann. sec. 40–30–106(a). At this stage, the trial court may dismiss the petition only if it is not in the court of conviction, is untimely, is successive, fails to show that the petitioner is entitled to any relief, or fails to show that the claims for relief were not waived or previously determined. *See id.* sec. 40–30–106(b), (f). If the petition is not dismissed, the trial court must enter a preliminary order directing further proceedings. *See id.* sec. 40–30–107(a). If the petitioner is not already represented by counsel, the trial court determines the petitioner is indigent, and the petitioner requests counsel, the trial court's preliminary order must also appoint counsel to represent the petitioner. *See id.* sec. 40–30–107(b)(1).

In addition, the 2013 Regulations provide that the attorney appointed as postconviction counsel ''may not be counsel who previously represented the prisoner at trial unless the prisoner and counsel expressly requested continued representation.'' 28 CFR 26.22(a). Tennessee also satisfies this requirement. Tennessee Supreme Court Rule 13 provides that postconviction counsel ''must not have previously represented the defendant at trial or on direct appeal in the case for which the appointment is made, unless the defendant and counsel expressly consent to continued representation.'' Tenn. Sup. Ct. R. 13, sec. 3(h).

3. Specific Criticisms

One public comment faulted Tennessee for requiring the appointment of two attorneys at the trial and appellate stages of capital cases but only one attorney at the postconviction stage. On this requirement, Tennessee law parallels federal law. *See* 18 U.S.C. 3005, 3599. Neither chapter 154 nor the 2013 Regulations subject Tennessee to a higher requirement than the requirement Congress has adopted for federal capital cases.

Other comments objected that Tennessee does not require the appointment of counsel in successive postconviction proceedings or in proceedings for the testing or analysis of biometric identifiers—*i.e.,* DNA and fingerprints. These objections are without merit because chapter 154 requires a mechanism for the appointment of counsel only in the initial collateral proceedings. It imposes no requirements in either successive collateral proceedings or proceedings related to the testing or analysis of biometric identifiers. *See* 28 U.S.C. 2261–66; 135 Cong. Rec. 24659 (Powell Committee Report: ''Capital cases should be subject to one complete and fair course of collateral review in the state and federal system, free from the time pressure of impending execution, and with the assistance of competent counsel for the defendant. When this review has concluded, litigation should end.''); *see also* 73 FR at 75337; 78 FR at 58177.

The text of section 2263 confirms that chapter 154 does not apply to successive collateral proceedings. Section 2263 imposes a 180-day time limit for seeking federal habeas relief that runs from the conclusion of state direct review. The limitation period is tolled upon the filing of ''the first petition for post-conviction review or other collateral relief.'' 28 U.S.C. 2263(b)(2). There is no provision for tolling the time limit for successive petitions for post-conviction relief. The scope of chapter 154 is limited to the initial round of state and federal postconviction review, and the statute does not create any right to appointed counsel for successive petitions.

Chapter 154 likewise does not apply to motions related to postconviction biometric testing procedures. The chapter applies only to proceedings for collateral relief; it has no application to other proceedings occurring after conviction aside from collateral relief, such as biometric testing. *See* 73 FR at 75337; 78 FR at 58177. In addition, federal law leaves the appointment of counsel to represent an indigent defendant with a federal conviction in a motion for post-conviction DNA testing in the discretion of the court, *see* 18 U.S.C. 3600(b)(3), but extending chapter 154 to postconviction biometric proceedings would make the appointment of counsel in such proceedings mandatory for the States. Again, nothing in chapter 154 suggests that Congress intended to hold the States to a higher standard than the federal government. Finally, applying chapter 154 to postconviction biometric proceedings raises the same timing problem as applying the statute to successive collateral proceedings because the statute does not provide for tolling the 180-day time limit upon the filing of a motion for biometric testing. *See* 28 U.S.C. 2263.

Another comment faulted Tennessee for not requiring that prisoners be notified of their right to replacement counsel under section 2261(e). Section 2261(e) provides that ''[t]he ineffectiveness or incompetence of counsel during State or Federal post-conviction proceedings in a capital case shall not be a ground for relief in a'' federal habeas proceeding, but this limitation does ''not preclude the appointment of different counsel, on the court's own motion or at the request of the prisoner, at any phase of State or Federal post-conviction proceedings on the basis of the ineffectiveness or incompetence of counsel in such proceedings.'' 28 U.S.C. 2261(e). This provision safeguards against the invalidation of capital judgments based on counsel incompetence in postconviction proceedings. It does not require the replacement of counsel if counsel does not perform competently, nor does it require the State to inform prisoners of any such right. Accordingly, section 2261(e) has no bearing on my certification decision.

One comment asserted that Tennessee should be denied certification because its application to the Attorney General contains misrepresentations, inaccuracies, and material omissions. The substance of this complaint is that, in the commenters' view, Tennessee's application does not rebut the commenter's many objections to certification. This comment is not germane to my certification determination because chapter 154 does not condition certification on the State's submission of an application that is free of errors and that convincingly rebuts all objections. Furthermore, I have determined that Tennessee satisfies the requirements of chapter 154 based on a review of the relevant law and for the reasons stated in this certification. Insofar as either Tennessee's request or the public comments contain any inaccuracies or omissions, they were immaterial to my decision.

Another comment argued that Tennessee does not satisfy chapter 154 because it does not require that

postconviction counsel be formally appointed until a prisoner files an initial petition for postconviction relief. The comment noted that some prisoners under sentence of death may not be competent to file *pro se* petitions on their own and may need a ''next friend'' to file on their behalf, but the State has no mechanism for identifying such prisoners. Furthermore, the comment objected that Tennessee has no mechanism in place to inform prisoners under sentence of death of the postconviction process and requirements. In support of this objection, the comment quoted language from Attorney General Holder's response to public comments on the 2013 Regulations asserting that chapter 154 contemplates that States will provide ''the opportunity for petitioners to file *counseled* State habeas petitions.'' 78 FR at 58167.

This comment misunderstands the requirements of chapter 154. The statute requires a mechanism for the appointment of counsel ''in''—not before—''State postconviction proceedings brought by indigent prisoners who have been sentenced to death.'' 28 U.S.C. 2265(a)(1). The state postconviction review proceedings begin on ''the date on which the first petition for post-conviction review or other collateral relief is filed.'' *Id.* 2263(b)(2). Before the petition is filed, chapter 154's requirement that counsel must be appointed does not apply. I am aware that one federal district court has suggested in dicta that chapter 154 might apply before the filing of a state postconviction petition, *see Mills* v. *Anderson,* 961 F. Supp. 198, 201 n. 4 (S.D. Ohio 1997), but that conclusion is inconsistent with the text of chapter 154. The 2013 Regulations likewise do not require a State to identify and to provide counsel to prisoners under sentence of death who might want to file a postconviction petition but have not yet done so. To the extent that remarks in the preamble to the 2013 Regulations suggest otherwise, those remarks are inconsistent with both the statutory and the regulatory text.

The same comment cited 28 U.S.C. 2261(c), which requires that ''[a]ny mechanism for the appointment, compensation, and reimbursement of counsel as provided in subsection (b) must offer counsel to all State prisoners under capital sentence.'' 28 U.S.C. 2261(c). But the comment takes that language out of context. Section 2261(c) refers to a mechanism ''provided in subsection (b).'' 28 U.S.C. 2261(c). Subsection (b), in turn, refers to ''a mechanism for providing counsel in postconviction proceedings as provided in section 2265.'' *Id.* 2261(b)(1). And section 2265 refers to ''a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death.'' *Id.* 2265(a)(1)(A). Neither section 2261(c) nor any other provision of chapter 154 requires a State to seek out prisoners under sentence of death who might have collateral claims but have not filed petitions for postconviction relief. The ''offer'' language in section 2261(c) applies only when a prisoner under sentence of death has filed ''the first petition for post-conviction review or other collateral relief,'' *id.* 2263(b)(2), which begins the ''State postconviction proceedings,'' *id.* 2265(a)(1)(A).

Several features of Tennessee's system ameliorate any potential concerns about the requirement to file an initial petition for postconviction relief. In Tennessee, counsel from the Office of the Post-Conviction Defender (''OPCD'') may help prisoners prepare and file their petitions prior to any formal appointment of counsel. A court may appoint counsel if necessary to secure the filing of a complete petition. *See* Tenn. Code Ann. sec. 40–30–106(e). It cannot dismiss a *pro se* petition for failure to follow the prescribed form until the court has given the petitioner a reasonable opportunity to amend the petition with the assistance of counsel. *See* Tenn. Sup. Ct. R. 28 sec. 6(B)(4)(b). After the filing of the initial petition and the appointment of counsel, a prisoner has the opportunity to amend the petition to raise additional issues. *See* Tenn. Code Ann. sec. 40–30–107(b)(2); Tenn. Sup. Ct. R. 28 sec. 6(B)(3)(b); *id.* R. 28 sec. 8(D)(5).

The comment asserted that if an initial *pro se* petition is not sufficiently detailed and does not present complex factual allegations and legal claims, then a court will summarily dismiss the petition for failure to show that the petitioner is entitled to any relief. That characterization of Tennessee law is incorrect. A court will dismiss an initial *pro se* petition if it contains ''[a] bare allegation that a constitutional right has been violated'' or ''mere conclusions of law.'' Tenn. Code Ann. sec. 40–30–106(d). But a court will not dismiss a petition that states a ''colorable claim,'' which is defined as a claim ''that, if taken as true, in the light most favorable to petitioner, would entitle petitioner to relief under the Post-Conviction Procedure Act.'' Tenn. Sup. Ct. R. 28 sec. 2(H); *see also id.* R. 28 sec. 6(B). The presence of even minimal facts in an initial *pro se* petition is sufficient for the purpose of a court's preliminary consideration. *See, e.g., Arnold* v. *State,* 143 SW3d 784, 785–87 (Tenn. 2004) (reversing the summary dismissal of the initial *pro se* petition of a convicted child rapist alleging ineffective assistance of counsel with minimal factual support).

Nevertheless, the comment suggested that Tennessee should be denied certification based on the bare possibility that postconviction counsel will not be appointed for an indigent prisoner in some capital case, where the petition is dismissed based on failure to state a colorable claim or other deficiency. As discussed above, Tennessee's system incorporates extensive assistance, procedures, and rights for petitioners which may foreclose the occurrence of such cases. If such a case were to occur despite these protections, counsel would not be ''appointed pursuant to [the certified] mechanism'' in the case, because not appointed at all, potentially bringing into play the inapplicability of chapter 154's expedited federal habeas review procedures in the individual case. 28 U.S.C. 2261(b)(2). But the actual occurrence or theoretical possibility of such a case would not contradict my conclusion, for the reasons explained above, that Tennessee ''has established a mechanism for the appointment . . . of . . . counsel'' for indigent prisoners in capital postconviction proceedings, which suffices for certification of Tennessee's mechanism. 28 U.S.C. 2261(b)(1), 2265(a)(1)(A).

Another comment argued that Tennessee does not guarantee that counsel will be appointed in a timely manner. Although chapter 154 does not contain a timeliness requirement, the 2013 Regulations define ''Appointment'' to mean the ''provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.'' 28 CFR 26.21; *see also* 73 FR at 75332; 91 FR at 12528. The commenter's objection is without merit because, as noted above, Tennessee provides a process for the prompt appointment of postconviction counsel.

Furthermore, even if there were instances where postconviction counsel for an indigent defendant had not been appointed in a timely manner, that would not be a basis to deny certification. As discussed above, chapter 154 requires that a State have a mechanism for the appointment of postconviction counsel, *see* 28 U.S.C. 2265(a). If ''appointment'' of counsel is understood to mean appointment in a

reasonably timely manner, as provided in 28 CFR 26.21, the section 2265 certification determination looks to whether the State has a mechanism for appointing counsel in a reasonably timely manner, not the timeliness of appointment in any individual case. Section 2265 certification is not a case-specific assessment.

Relatedly, one comment asserted that, as a factual matter, many initial *pro se* habeas petitions in Tennessee have not been filed until after the expiration of the 180-day time limit of 28 U.S.C. 2263 that would be established by certification under chapter 154. The comment argued that Tennessee does not satisfy chapter 154 and the 2013 Regulations because postconviction counsel may be appointed weeks or months after a final judgment. That argument lacks merit. Cases are litigated, petitions are prepared and filed, and counsel are provided to assist in such petitions in conformity with the applicable time limits when the litigation occurs. The fact that litigants use more time when it is available to them says nothing about whether they could comply with a shorter deadline if the available time were reduced. And, in any event, the applicable time limit reflects a judgment by Congress about what amount of time is needed, assuming the State has established a postconviction capital counsel mechanism that meets the requirements of chapter 154.

The comment also expressed concern that certification of Tennessee's mechanism would apply retroactively to pending federal habeas petitions seeking postconviction relief and would result in many of those petitions—those that were already, when filed, past the 180-day time limit for federal habeas filing under 28 U.S.C. 2263—being dismissed as untimely. *Cf.* 85 FR at 20719 (same concern noted and addressed in certification of Arizona's mechanism in 2020). But section 2265 dictates the effective date of a certification, *see* 28 U.S.C. 2265(a)(2), and gives the Attorney General no discretion to adjust that date. To the extent any individual habeas cases present retroactivity questions, those issues may be raised to the federal courts adjudicating those petitions. Regardless of how the courts may address this issue, it is not a matter under the control of the Attorney General or the State of Tennessee, and it does not bear on whether Tennessee has established a capital counsel mechanism satisfying the requirements of chapter 154.

One comment asserted that significant time and resources are required to prepare and present claims in capital collateral litigation and that the time and conditions for adding claims after a federal habeas petition has been filed would be limited by 28 U.S.C. 2266 if chapter 154 applies. The comment interpreted the statute as requiring that a State requesting certification must guarantee that postconviction counsel will be appointed quickly so that all claims can be developed and presented consistent with the time limit in section 2263 and the limit on amending petitions in section 2266. However, neither chapter 154 nor the 2013 Regulations prescribe, as a condition of certification, a specific timeframe for appointing counsel after a judgment becomes final. Federal law similarly provides no specific timeframe for appointing counsel in federal habeas litigation or litigation arising under 28 U.S.C. 2255, yet such litigation is still subject to statutory time limits. *See* 18 U.S.C. 3599; *see also* 28 U.S.C. 2244(d), 2255(f), 2263. Nothing in the text of chapter 154 suggests that Congress intended to hold the States to a higher standard than the federal government in this regard as a condition of certification.

The comment also overlooks statutory provisions that narrow the difference between the 180-day time limit for filing a federal habeas petition under chapter 154, *see* 28 U.S.C. 2263, and the one-year time limit under normal habeas procedures, *see id.* 2244(d). Chapter 154 provides a 180-day period for the filing of a federal habeas petition, extendable to 210 days for good cause and subject to tolling during the pendency of a petition for certiorari to the Supreme Court and during the pendency of state collateral proceedings. *See id.* 2263. Amendments to a petition are permitted until the filing of an answer, after which subsequent amendments are conditioned on satisfaction of the requirements for successive petitions under 28 U.S.C. 2244(b). *See id.* 2266(b)(3)(B). Both the time limit of section 2244(d) and the time limit of section 2263, as well as the limitation on amendments in section 2266, were enacted by Congress in 1996 in the Antiterrorism and Effective Death Penalty Act. In defining the limitations under chapter 154 somewhat more narrowly, Congress was attempting to solve the acute problems of delay and obstruction that thwart the execution of capital sentences. *See* 152 Cong. Rec. 2240–50 (remarks of Sen. Kyl).

The comment also fails to acknowledge that a chapter 154 certification could, in a number of ways, lighten the load of defense counsel and enable them to meet shorter deadlines. Where chapter 154 applies, the automatic stay provisions of section 2262 are available, reducing the need to engage in litigation over stays of execution. Section 2264 also provides clearer and tighter rules concerning the range of cognizable claims in federal habeas corpus review under chapter 154, in comparison with the general federal habeas review standards, which relieves counsel of the need to prepare and to present claims precluded under section 2264. *See* 152 Cong. Rec. 2448–49 (remarks of Sen. Kyl) (explaining differences). Furthermore, chapter 154 relieves federal habeas counsel of the need to litigate questions concerning the exhaustion of state remedies, as well as other litigation burdens incident to the movement of cases between state and federal court, because the exhaustion requirement does not apply under chapter 154. *See* 28 U.S.C. 2264(b) (''Following review subject to subsections (a), (d), and (e) of section 2254, the court shall rule on the claims properly before it.''); 152 Cong Rec. 2447–48 (remarks of Sen. Kyl); 135 Cong. Rec. 24695, 24698 (Powell Committee Report); 73 FR at 75336; 85 FR at 20720.

In light of these considerations, Congress concluded that the time limits and the limitation on amending petitions in chapter 154 strike the right balance between removing obstructions to the execution of capital sentences and affording prisoners under sentence of death the opportunity to seek postconviction relief. To the extent the commenters do not believe that chapter 154 provides adequate time for preparing and presenting claims, the place to raise that argument is before Congress.

### *C. Counsel Competency*

#### 1. Counsel Competency Standards and Chapter 154

Chapter 154 also requires, as a condition of certification, that the State establish standards of competency for appointment of counsel in capital postconviction proceedings. 28 U.S.C. 2265(a)(1).

Tennessee satisfies this requirement. Tennessee Supreme Court Rule 13, section 3(h), establishes competency standards for attorneys to be appointed as postconviction counsel in capital cases. There are two alternative paths to qualify as appointed postconviction counsel. Under the first path, an attorney qualifies to serve as appointed postconviction counsel if he also qualifies to serve as appointed appellate counsel. *See* Tenn. Sup. Ct. R. 13 sec. 3(h). The criteria for appointed appellate counsel are ''three years of

litigation experience in criminal trials and appeals'' and experience as counsel of record in the appeal of either one capital case or three felony convictions. *Id.* R. 13 sec. 3(g). If the attorney's experience is based on the appeal of three felony convictions, that experience must have been ''within the past three years,'' and the attorney must also complete ''a minimum of six hours of specialized training in the trial and appeal of capital cases.'' *Id.*

Under the second path, if an attorney does not meet the qualifications of appointed appellate counsel, he may still qualify to serve as appointed postconviction counsel if he has ''experience as counsel of record in state post-conviction proceedings in three felony cases, two murder cases, or one capital case.'' *Id.* R. 13 sec. 3(h). Regardless of whether he qualifies under the first or the second path, an attorney must also ''have a working knowledge of federal *habeas corpus* practice, which may be satisfied by six hours of specialized training in the representation in federal courts of defendants under the sentence of death.'' *Id.* These competency standards have not materially changed since Rule 13 went into effect on July 1, 1997. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 3(g)–(h).

In addition, Tennessee law provides that indigent capital defendants are generally represented in postconviction proceedings by qualified attorneys from the OPCD, unless those attorneys have a conflict of interest. *See* Tenn. Sup. Ct. R. 13 sec. 1(e)(4)(A); *see also* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 1(h); Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 1(e)(4)(A). In the event of a conflict, the court will assign replacement counsel from a roster of qualified private attorneys maintained by the court. *See* Tenn. Sup. Ct. R. 13 sec. 1(e)(4)(B). The OPCD has existed in Tennessee since 1995 and has been primarily responsible for capital postconviction representation throughout the period of this certification. *See* Tenn. Code Ann. secs. 40–30–205(g), 40–30–206(a), (c); *see also* 1995 Tenn. Pub. Acts ch. 510 sec. 1. The required use of OPCD counsel in most cases provides an additional standard of competency because the attorneys appointed as postconviction counsel have been found fit for employment by a dedicated capital postconviction defender office whose regular work is postconviction capital representation. Moreover, by virtue of their employment in the OPCD, those attorneys are embedded in a community of coworkers who work on similar matters and can provide oversight and assistance.

2. Counsel Competency Standards and the 2013 Regulations

The 2013 Regulations provide that a State's ''mechanism must provide for appointment of competent counsel as defined in State standards of competency for such appointments.'' 28 CFR 26.22(b). To aid in the determination regarding this requirement, paragraph (b)(1) provides two benchmark criteria. *See id.* 26.22(b)(1). A State's standards of competency are presumptively adequate if they meet or exceed either of the benchmarks. *See id.* Paragraph (b)(2) further states that competency standards will also ''be deemed adequate'' if they ''reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases.'' 28 CFR 26.22(b)(2).

Tennessee's counsel competency standards satisfy paragraph (b)(2) because they compare favorably to the federal standards for attorneys appointed to serve as postconviction counsel in capital cases. *See* 18 U.S.C. 3599(c)–(d). The federal statutory competency standards are appropriate reference points in assessing corresponding state standards because Congress likely would not have deemed inadequate state competency standards that are similar to those it deemed adequate for federal postconviction proceedings in capital cases. *See* 78 FR at 58169–70. The federal competency standard requires at least five years of admission to the applicable court of appeals and at least three years of experience in handling felony appeals. *See* 18 U.S.C. 3599(c). The federal standard does not require postconviction or capital litigation experience or training. By contrast, both of Tennessee's alternative paths to qualify as appointed postconviction counsel require some degree of training or experience in postconviction proceedings or capital cases. *See* Tenn. Sup. Ct. R. 13 sec. 3(g)–(h). Moreover, Tennessee's standards require three years of litigation experience in criminal trial and appeals and experience in the appeal of a capital case or three felony convictions *or* experience in state postconviction proceedings in three felony cases, two murder cases, or one capital case. An attorney who satisfies Tennessee's competency standards is therefore likely at least as prepared to serve as appointed postconviction capital counsel as an attorney who satisfies the federal standard.

With respect to public defenders from the OPCD, I find that the creation and use of a dedicated capital post-conviction defender office, with the structure, functions, and responsibilities described in Tenn. Code Ann. sec. 40–30–205 *et seq.,* likewise satisfies paragraph (b)(2) because it ''reasonably assure[s] a level of proficiency appropriate for State postconviction litigation in capital cases.'' 28 CFR 26.22(b)(2). In addition to providing counsel whose day-to-day work is representing prisoners in capital postconviction proceedings, Tennessee's approach promotes proficient representation by using attorneys embedded in a community of similarly employed coworkers, who can provide oversight and assistance, and who can potentially be substituted if the individual counsel becomes unable to provide representation or to do so effectively.

The conclusion that Tennessee's competency standards satisfy paragraph (b)(2) is reinforced by comparing Tennessee's standards to the benchmarks in paragraph (b)(1). Even if a State's capital counsel standards do not satisfy the benchmarks under paragraph (b)(1), those benchmarks continue to function as reference points in the evaluation of adequacy under paragraph (b)(2). State competency standards that are likely to result in significantly lower levels of proficiency than the benchmarks risk being found inadequate under chapter 154, whereas state competency standards that are likely to result in similar or even higher levels of proficiency than the benchmarks weigh in favor of a finding of adequacy under chapter 154. *See* 78 FR at 58172, 58179.

The first benchmark, appearing in paragraph (b)(1)(i), is appointment of counsel ''who have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience.'' *Id.* 26.22(b)(1)(i). This standard is an adaptation of the federal competency standard under 18 U.S.C. 3599, with postconviction litigation experience substituted for appellate litigation experience. *See* 78 FR at 58178. The basic standard is subject to the proviso that ''a court, for good cause, may appoint other counsel whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty and the unique and complex nature of the litigation.'' 28 CFR 26.22(b)(1)(i).

Tennessee's standards compare favorably to the first benchmark for much the same reason that they compare favorably to the federal competency standards under 18 U.S.C.

3599. The benchmark could be satisfied by handling one or two postconviction proceedings over a period of three years in any type of case. In comparison, Tennessee's standards, as discussed above, include more robust criminal litigation experience and training requirements that can help in providing effective representation in capital postconviction proceedings. Therefore, an attorney who satisfies the Tennessee competency standards is likely at least as prepared to serve as appointed postconviction capital counsel as an attorney who satisfies the first benchmark in paragraph (b)(1)(i).

The second benchmark, appearing in paragraph (b)(1)(ii), is appointment of counsel ''meeting qualification standards established in conformity with'' provisions of the federal Innocence Protection Act. *Id.* 26.22(b)(1)(ii). This benchmark requires that a State must ''invest[ ] the responsibility for appointing qualified attorneys to represent indigent defendants in capital cases . . . in a public defender program that relies on staff attorneys, members of the private bar, or both, to provide representation in capital cases.'' 34 U.S.C. 60301(e)(1)(A). The public defender program must ''establish qualifications for attorneys who may be appointed to represent indigents in capital cases,'' ''establish and maintain a roster of qualified attorneys,'' ''conduct, sponsor, or approve specialized training programs for attorneys representing defendants in capital cases,'' ''monitor the performance of attorneys who are appointed and their attendance at training programs,'' and ''remove from the roster attorneys who'' provide inadequate representation, have been sanctioned, or fail to comply with training requirements. *Id.* 60301(e)(2)(A)–(B), (D)–(E).

Tennessee's use of the OPCD compares favorably to the second benchmark. The OPCD employs, trains, and supervises staff attorneys who represent indigent capital defendants in postconviction proceedings. *See* Tenn. Code Ann. secs. 40–30–206, –208. In addition, the OPCD is directed to provide training, consulting services, and sample materials and briefs to public defenders and private counsel representing indigent capital defendants. *See id.* sec. 40–30–206(d). The use of the OPCD creates ''an effective system for providing competent legal representation,'' which is the goal of the federal Innocence Protection Act and the second benchmark. 34 U.S.C. 60301(e).

3. Specific Criticisms

The comments suggested that certification should be denied because it is possible to satisfy Tennessee's competency standards without any postconviction litigation experience or capital experience—for example, by serving as counsel of record in the appeal of three felony convictions within the past three years. *See* Tenn. Sup. Ct. R. 13 sec. 3(g)–(h). These comments lack merit because chapter 154 does not require either postconviction litigation experience or capital litigation experience as a prerequisite for appointment as counsel in capital postconviction proceedings. In *Spears* v. *Stewart,* the Ninth Circuit rejected the argument that Arizona's competency standards were insufficient because they permitted the appointment of attorneys who did not have capital litigation experience. *See* 283 F.3d at 1013. The court reasoned that ''[n]othing in 28 U.S.C. 2261(b) or in logic requires that a lawyer must have capital experience to be competent.'' *Id.* Likewise, in *Ashmus* v. *Calderon,* the Ninth Circuit rejected the argument that California's competency standards were insufficient because they did not require any familiarity with or experience in postconviction litigation. *See* 123 F.3d at 1208. The court concluded that ''[m]any lawyers who could competently represent a condemned prisoner would not qualify under such a standard.'' *Id.*

The benchmark criteria in the 2013 Regulations likewise do not mandate postconviction or capital litigation experience in all cases. The second benchmark requires that state qualification standards must conform to certain provisions of the federal Innocence Protection Act, *see* 28 CFR 26.22(b)(1)(ii), and none of those provisions expressly requires either postconviction or capital litigation experience, *see* 34 U.S.C. 60301(e)(1), (e)(2)(A)–(B), (e)(2)(D)–(E). The first benchmark mandates three years of postconviction litigation experience as the default standard, but it provides that this standard may be waived ''for good cause,'' and it does not require any capital litigation experience. 28 CFR 26.22(b)(1)(i).

Some comments asserted that certification should also be denied because the six hours of specialized training required by Tennessee are inadequate and fail to cover numerous topics that an attorney in a capital postconviction proceeding should know. But neither chapter 154 nor the 2013 Regulations require any specialized training and, for that matter, neither do the competency requirements for appointed counsel in federal proceedings in capital cases. *See* 18 U.S.C. 3599; 28 CFR 26.22(b). Any policy disagreement about the adequacy of Tennessee's specialized training requirement provides no legal ground for me to deny certification.

The comments also argued that the Attorney General should not certify Tennessee's capital counsel mechanism because there have been cases in which capital postconviction counsel have not performed competently in practice. This argument misconceives the requirements for certification and the Attorney General's role in the certification process. *See* 85 FR at 20712 (discussing the role of the Attorney General in the Arizona certification). Chapter 154 provides that the Attorney General ''shall determine'' whether a State ''has established a mechanism for the appointment . . . of competent counsel'' in state capital postconviction proceedings, and whether the State ''provides standards of competency for the appointment of counsel'' in such proceedings. 28 U.S.C. 2265(a). The statute does not authorize or require the Attorney General to inquire into counsel's performance following appointment. Instead, it frames its requirements regarding counsel competency as matters relating to appointment, contemplating an inquiry into whether a State has standards determining eligibility for appointment. *See* 78 FR at 58162–63, 58165. This understanding is supported by the Powell Committee Report, from which chapter 154 derives. The report explained that federal review would examine whether a State's mechanism for appointing capital postconviction counsel comports with the statutory requirements ''as opposed to [examining] the competency of particular counsel.'' 135 Cong. Rec. 24696. It further explained that, in contrast to the focus on ''the performance of a capital defendant's trial and appellate counsel,'' ''[t]he effectiveness of State and Federal postconviction counsel is a matter that can and must be dealt with in the appointment process.'' *Id.; see also* 78 FR at 58162–63, 58165. The 2013 Regulations accordingly rejected public comments suggesting that ''chapter 154 requires the Attorney General to certify a state mechanism only if he or she examines and is satisfied by the actual performance of postconviction counsel following appointment.'' 78 FR at 58163.

As discussed above, the 2006 amendments to chapter 154 bifurcated responsibility for determinations

affecting chapter 154's applicability. The Attorney General's function is to determine whether a State has established a capital counsel mechanism satisfying chapter 154's requirements, a determination that turns on an examination of the State's laws and policies and does not involve reviewing how counsel performs after appointment. *See* 28 U.S.C. 2261(b)(1), 2265. The federal district court reviewing a habeas petition is responsible for determining whether counsel was appointed pursuant to the State's mechanism. *See id.* 2261(b)(2). Counsel performance in particular cases does not have any bearing on my determination whether Tennessee's competency standards satisfy the requirements of chapter 154 or the 2013 Regulations.

Some comments asserted that it is unclear whether the Tennessee Supreme Court Rule 13 standards of competency are enforced against OPCD counsel. As discussed above, employment by the OPCD is itself a sufficient standard of competency under the 2013 Regulations because, among other reasons, the day-to-day work of the office is representing prisoners under sentence of death in postconviction proceedings. *See* Tenn. Code Ann. sec. 40–30–205 *et seq.* Moreover, even if a new attorney hired by the OPCD lacks the requisite experience, it does not follow that the competency standards have been violated in a particular case because the junior attorney may be serving as co-counsel alongside a more experienced OPCD attorney. And experience gained in working for OPCD may qualify an attorney, even if inexperienced when hired, for subsequent appointments under the standards of Rule 13 sec. 3(h), which treat as sufficient experience in state postconviction proceedings in a capital case—OPCD's regular work—plus a training requirement.

Regardless, any failure to satisfy the Rule 13 competency standards in some instances does not mean that Tennessee fails to satisfy the requirements for certification under chapter 154 or the 2013 Regulations. Prisoners who believe that counsel appointed in their cases do not meet the State's counsel competency standards for appointment could raise the matter before the federal district courts reviewing their habeas petitions. Those courts are responsible for determining whether counsel was appointed pursuant to a State's capital counsel mechanism. *See* 28 U.S.C. 2261(b)(2). Whatever federal courts may determine in such cases, it is not relevant to my determination whether Tennessee's capital counsel mechanism satisfies the requirements for certification.

Finally, one comment argued that certification should be denied because Tennessee's competency standards do not comply with the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* which were issued in 2003. As an example of this failure, the comment observed that Tennessee does not have an agency responsible for ensuring that appointed counsel meet competency standards and monitoring the post-appointment performance of counsel. The comment also objected that Tennessee law allows courts to rely on attorneys' representations regarding their qualifications.

None of these objections is grounded in the text of chapter 154 or the 2013 Regulations. Moreover, the statute providing for the appointment of counsel in federal postconviction proceedings does not create any requirements for an agency to oversee and enforce attorney competency standards or for courts to require evidence of competency beyond an attorney's representations. *See* 18 U.S.C. 3599. Nothing in chapter 154 suggests that Congress intended to hold the States to a higher standard than the federal government in this regard.

More broadly, my responsibility is to determine whether Tennessee has established a capital counsel mechanism that satisfies the requirements of chapter 154, not the requirements of any guidelines issued by the American Bar Association. Congress adopted standards modeled on the American Bar Association's *Guidelines* in the context of a grant program when it enacted the Innocence Protection Act in 2004. *See* 34 U.S.C. 60301. Had Congress intended to make those standards a requirement of chapter 154 certification, it could have done so when it amended chapter 154 in 2006. But Congress chose not to do so, and it instead decided to afford the States broad latitude in developing mechanisms for the appointment of competent counsel.

### *D. Compensation of Counsel*

#### 1. Compensation of Counsel and Chapter 154

Chapter 154 requires the Attorney General to determine whether a state has established a mechanism for the compensation of appointed postconviction capital counsel. 28 U.S.C. 2265(a)(1). I find that Tennessee has established such a mechanism.

In Tennessee, the representation of indigent capital defendants is normally provided by salaried post-conviction defenders who have no conflict of interest. *See* Tenn. Sup. Ct. R. 13 sec. 1(e)(4)(A); Tenn. Code Ann. secs. 40–30–206, –207, –208; *see also* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 1(h); Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 1(e)(4)(A). The salary of the Post-Conviction Defender—*i.e.,* the head of the OPCD—is equal to that of the district public defenders and in 2025 was $218,256 per year. *See* Tenn. Code Ann. sec. 40–30–209(a); Tennessee Office of the Post-Conviction Defender Salaries, *GovSalaries, https://bit.ly/4u4fhRN* (last visited Apr. 30, 2026). The salaries of the Assistant Post-Conviction Defenders are based on experience level and are determined in accordance with the assistant public defender's pay schedule. *See* Tenn. Code Ann. sec. 40–30–209(b). In 2025, these salaries ranged from $75,336 per year to $190,824 per year. *See* Tennessee Office of the Post-Conviction Defender Salaries, *GovSalaries, https://bit.ly/4u4fhRN* (last visited Apr. 30, 2026).

If the OPCD counsel have conflicts of interest, Tennessee courts are then required to designate private attorneys to represent indigent capital defendants. *See* Tenn. Sup. Ct. R. 13 sec. 1(e)(4)(B); Tenn. Code Ann. sec. 40–30–207; *see also* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 1(h); Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 1(e)(4)(B). Between July 1, 1997, and November 30, 2024, private attorneys appointed to serve as postconviction counsel for indigent capital defendants were compensated at a rate of $60 per hour for out-of-court work and $80 per hour for in-court work. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 3(j)(5)–(6); *see also* Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 3(k)(5)–(6). Beginning on December 1, 2024, private attorneys appointed to serve as postconviction counsel for indigent capital defendants are compensated at a rate of $90 per hour, which would equate to $180,000 per year on a 2000-hours-per-year basis. Tenn. Sup. Ct. R. 13 sec. 3(k)(3).

#### 2. Compensation of Counsel and the 2013 Regulations

The Department's rule addressing compensation of counsel is 28 CFR 26.22(c), which provides that a State's ''mechanism must provide for compensation of appointed counsel.'' 28 CFR 26.22(c). The rule lists four benchmark criteria in paragraph (c)(1) and provides that a State's provision for compensation is presumptively

adequate if it is comparable to or exceeds any of the benchmarks. *See id.* 26.22(c)(1). The benchmarks are: (i) compensation of appointed capital federal habeas counsel; (ii) compensation of retained state postconviction capital counsel meeting state standards of competency; (iii) compensation of appointed state capital trial or appellate counsel; and (iv) compensation of state attorneys in state capital postconviction proceedings, taking account of private counsel overhead costs. *See id.* The rule further states in paragraph (c)(2) that provisions for compensation not satisfying the benchmarks will be deemed adequate only if the state mechanism is otherwise reasonably designed to ensure the availability for appointment of counsel who meet state standards of competency sufficient under paragraph (b). *See id.* 26.22(c); 78 FR at 58172–73, 58179–80 (further explaining the regulatory provisions). The preamble of the 2013 Regulations explains that paragraph (c)(2) recognizes that compensation provisions ''have been deemed adequate for purposes of chapter 154 . . . independent of any comparison to the benchmarks in paragraph (c)(1).'' 78 FR at 58180.

I find that Tennessee's compensation mechanism for both OPCD counsel and appointed private attorneys satisfies paragraph (c). *See* 28 CFR 26.22(c). With respect to public defenders, the fact that Tennessee has created the OPCD and compensates the attorneys in that office by salary is sufficient. The Department explained when it promulgated the 2013 Regulations that ''a State may secure representation for indigent capital petitioners in postconviction proceedings by means not dependent on any special financial incentive for accepting appointments, such as by providing sufficient salaried public defender personnel to competently carry out such assignments as part of their duties.'' 78 FR at 58180; *see also* 85 FR at 20714 (concluding that use of salaried public defenders in Arizona satisfies 28 CFR 26.22(c)(2)).

With respect to private attorneys, the compensation rates are ''presumptively adequate'' because they are ''comparable'' to ''[t]he compensation of appointed counsel in State appellate or trial proceedings in capital cases.'' 28 CFR 26.22(c)(1)(iii). Between July 1, 1997, and June 30, 2018, Tennessee's compensation rates for appointed lead counsel in a capital case were $75 per hour for out-of-court work and $100 per hour for in-court work. Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 3(j)(1)–(2). For appointed co-counsel in a capital case, the compensation rates were $60 per hour for out-of-court work and $80 per hour for in-court work. *See id.* R. 13 sec. 3(j)(3)–(4). The compensation rates for appointed post-conviction counsel during this period—$60 per hour for out-of-court work and $80 for in-court work—were identical to the rates for appointed co-counsel in the trial and appellate stages. *See id.* R. 13 sec. 3(j)(5)–(6).

Tennessee amended its compensation rates on June 29, 2018, and those rates took effect on July 1, 2018. *See* Tenn. Sup. Ct. Order (June 29, 2018), *https://perma.cc/6HRJ-D55B;* Tenn. Sup. Ct. Order (July 2, 2018), *https://perma.cc/H474-6XUB.* Beginning on July 1, 2018, and until the rates were amended again on July 1, 2024, the compensation rate for appointed lead counsel in a capital case was $100 per hour. *See* Tenn. Sup. Ct. Order (July 2, 2018), R. 13 sec. 3(k)(1) (July 2, 2018). For appointed co-counsel in a capital case, the rate was $80 per hour. *See id.* R. 13 sec. 3(k)(2). The compensation rate for appointed postconviction counsel during this period—$80 per hour—was identical to the rate for appointed co-counsel in the trial and appellate stages. *See id.* R. 13 sec. 3(j)(3).

Tennessee increased its compensation rates to their current levels on July 2, 2024, with an effective date for those rates of July 1, 2024. *See* Tenn. Sup. Ct. Order (July 2, 2024), *https://perma.cc/XML5-VCEL.* The current rate for appointed lead counsel in a capital case is $110 per hour. *See* Tenn. Sup. Ct. R. 13 sec. 3(k)(1). The current rate for appointed co-counsel in a capital case is $90 per hour. *See id.* R. 13 sec. 3(k)(2). The compensation rate for appointed postconviction counsel—$90 per hour—is identical to the rate for appointed co-counsel in the trial and appellate stages. *See id.* R. 13 sec. 3(k)(3).

Tennessee satisfies paragraph (c)(1)(iii). *See* 28 CFR 26.22(c)(1)(iii). Since July 1, 1997, Tennessee's compensation rate for appointed postconviction counsel in capital cases has been identical to the compensation rate for co-counsel in capital trials and appeals. *See* Tenn. Sup. Ct. R. 13 sec. 3(k); Tenn. Sup. Ct. Order (June 29, 2018), R. 13 sec. 3(k); Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 3(j). Although the compensation rate for postconviction counsel is less than the compensation rate for lead counsel at the trial and appellate stages, paragraph (c)(1)(iii) does not distinguish between lead counsel and co-counsel. The benchmark is satisfied when the compensation rate of postconviction counsel ''is comparable to or exceeds'' the compensation rate of ''appointed counsel'' in the trial or appellate stages. 28 CFR 26.22(c)(1)(iii). Tennessee law, like federal law, requires the initial appointment of two attorneys in the trial stage of capital litigation but only one attorney in the postconviction stage. *See* 18 U.S.C. 3005, 3599; Tenn. Sup. Ct. R. 13 sec. 3(b)(1). Nothing in chapter 154 or the 2013 Regulations prohibits Tennessee from relying on the same distinction and compensating lead counsel in the trial stage at a higher rate than co-counsel or postconviction counsel. Although solo postconviction counsel would lack the assistance provided by lead counsel to co-counsel at earlier stages, postconviction counsel would be rewarded for any resulting additional work by being compensated for however many additional hours he works.

Tennessee's compensation mechanism also satisfies paragraph (c)(2) because it compares favorably to the fourth benchmark in paragraph (c)(1)(iv) and is therefore ''reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency.'' 28 CFR 26.22(c)(2); *see also* 78 FR at 58172, 58179. Paragraph (c)(1)(iv) provides that a State's provision for compensation is ''presumptively adequate'' if it ''is comparable to or exceeds . . . [t]he compensation of attorneys representing the State in State postconviction proceedings in capital cases, subject to adjustment for private counsel to take account of overhead costs not otherwise payable as reasonable litigation expenses.'' 28 CFR 26.22(c)(1)(iv). Before 2023, the offices of the Tennessee district attorneys general represented the State in all capital postconviction litigation. *See* Tenn. Code Ann. sec. 40–30–108(a). Since 2023, the offices of the district attorneys general have continued to represent the State in capital postconviction litigation for death sentences imposed after March 1, 2023. *See id.* secs. 40–30–108(a); 40–30–114(c). The Office of the Tennessee Attorney General now represents the State in capital postconviction litigation for death sentences imposed on or before March 1, 2023. *See id.* sec. 40–30–114(c)(1), (c)(4)(B).

The salaries of the assistant district attorneys general are determined by a pay scale set by statute, subject to annual adjustment reflecting the average percentage pay increase for state employees set by general appropriations bills. *See* Tenn. Code Ann. sec. 8–7–226. For example, on July 1, 2023, the entry-level salary for an assistant district attorney general was $63,853 per year, and the salary after 25 years of experience was $167,325 per year. *See id.* The compensation rates for assistant

postconviction defenders exceed these compensation rates. *See* Tennessee Office of the Post-Conviction Defender Salaries, *GovSalaries, https://bit.ly/4u4fhRN* (last visited Apr. 30, 2026); *see also* Tenn. Code Ann. secs. 8–14–107(b)(1) (pay scale for assistant district public defenders); 40–30–209(b) (compensation for assistant postconviction defenders set ''in compliance with the assistant public defender's pay schedule'').

Thus, throughout most of the period of this certification, the authorized compensation for OPCD counsel, who represent indigent defendants in most capital postconviction proceedings, has been comparable to the compensation of the assistant district attorneys general representing the State in such proceedings. The information provided in Tennessee's application is not sufficient to make comparisons to the compensation of private attorneys appointed as postconviction counsel or to the compensation of attorneys from the Office of the Tennessee Attorney General. As a result, there is not enough information to determine conclusively whether Tennessee's compensation mechanism satisfies paragraph (c)(1)(iv). However, Tennessee's compensation mechanism compares favorably overall to this benchmark and, therefore, satisfies paragraph (c)(2).

3. Specific Criticisms

The public comments argued that Tennessee's compensation rates are too low to attract and retain competent counsel to provide postconviction representation in capital cases. But the comments did not identify any cases in which the State was unable to secure postconviction representation for an indigent defendant under sentence of death because of inadequate compensation. If the compensation mechanisms for OPCD attorneys and private attorneys were not ''reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency,'' surely there would be some evidence of this. 28 CFR 26.22(c)(2). To the extent the comments suggest that the compensation Tennessee affords is insufficient to ensure the availability of counsel who perform adequately following appointment, that argument misconceives the applicable standard under the 2013 Regulations. A State's compensation mechanism must be ''reasonably designed to ensure the availability for appointment of counsel who meet'' only the State's ''standards of competency'' for appointment, not any other standard of competency or performance. *Id.*

Regardless, even if there were some exceptional case where the State was unable to secure counsel meeting the State's standards of competency because of inadequate compensation, the failure to do so in that particular case would not be a basis to deny certification. The 2013 Regulations require a compensation mechanism that is ''reasonably designed to ensure'' the availability for appointment of such counsel, not one that will infallibly ensure the appointment of such counsel in every case. 28 CFR 26.22(c)(2). And as a case-specific matter, a failure to appoint counsel pursuant to the certified mechanism, because of inadequate compensation or other reasons, could be raised under 28 U.S.C. 2261(b)(2).

Another comment argued that the salaries paid by Tennessee to OPCD counsel are inadequate because OPCD counsel are generally less experienced and, therefore, compensated at lower rates than both the public defenders who handle capital cases at the trial and appellate phases and the attorneys who represent the State in capital postconviction proceedings. This comment misapprehends the 2013 Regulations and the benchmarks. The 2013 Regulations ''recognize[ ] that the options set out in paragraph (c)(1) of 26.22 are not necessarily the only means by which a State may provide compensation for competent counsel.'' 78 FR at 58180. Tennessee's salary-based compensation mechanism need not satisfy the (c)(1) benchmarks because its use of salaried postconviction defenders—compensated comparably to district attorneys general and public defenders—to serve as postconviction counsel for indigent capital defendants satisfies the 2013 Regulations under paragraph (c)(2). *See* 78 FR at 58180; 85 FR at 20714. Regardless, Tennessee authorizes identical compensation scales for OPCD counsel, district public defenders who represent capital defendants at the trial and appellate stages, and district attorney generals and their assistants who represent capital defendants in postconviction proceedings. *See* Tenn. Code Ann. sec. 8–14–107(a); *id.* sec. 40–30–209(a)–(b). The 2013 Regulations do not require that a postconviction defender's salary must meet or exceed the salary of the trial and appellate counsel or the attorneys representing the State in every particular capital case.

With respect to private attorneys appointed as postconviction counsel, one comment objected that the compensation rate of $90 per hour is less than the corresponding rate for federally appointed counsel under 18 U.S.C. 3599. But chapter 154 does not require that the compensation rate for appointed counsel in state postconviction proceedings must be commensurate with the compensation for appointed counsel in federal postconviction proceedings. Moreover, in the 2013 Regulations, the federal compensation rate is only one of four benchmarks, each of which independently establishes presumptive adequacy. *See* 28 CFR 26.22(c)(1). I have concluded that Tennessee's compensation rate for private attorneys is presumptively valid under paragraph (c)(1)(iii) because it is comparable to the compensation rates for appointed co-counsel in state trial or appellate proceedings in capital cases. I have also concluded in the alternative that Tennessee's compensation rate satisfies paragraph (c)(2) because it is comparable to the compensation rates for attorneys representing the State in state postconviction proceedings and therefore compares favorably to the benchmark in paragraph (c)(1)(iv). Any failure of Tennessee's compensation rate to satisfy other benchmarks in paragraph (c)(1) does not undermine my conclusion.

Another comment suggested that Tennessee's request for certification should be denied because Attorney General Garland purportedly denied Arizona's request for certification on January 17, 2025, on the ground of inadequate compensation. The Ninth Circuit held in *Spears* v. *Stewart* that Arizona's compensation rate of $100 per hour was adequate under chapter 154. 283 F.3d at 1015. Attorney General Barr made the same finding when he certified that Arizona had established a capital counsel mechanism satisfying the requirements of chapter 154 on April 14, 2020. *See* 85 FR at 20713–15. In 2025, however, Attorney General Garland concluded that the value of $100 had been eroded by inflation and that, as a result, Arizona's compensation rate no longer satisfied chapter 154. The comment on Tennessee's request for certification argues that, based on Attorney General Garland's reasoning, Tennessee's compensation rate of $90 per hour cannot satisfy chapter 154 because it is less than Arizona's compensation rate.

Attorney General Garland's determination regarding Arizona's request for certification was intrinsically flawed. Its factual premise was that $100 per hour was worth less in 2025 than when Attorney General Barr certified Arizona in 2020. But the relevant standard under the 2013 Regulations asks only whether the State's compensation mechanism is

reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency. 28 CFR 26.22(c)(2). Arizona had advised the Department as late as June 4, 2022, that its compensation rate of $100 per hour continued to attract attorneys meeting the State's competency standards to serve as postconviction counsel for indigent capital defendants. *See* Letter from the Arizona Deputy Solicitor General to the Department of Justice at 6 (June 24, 2022), *www.justice.gov/olp/pending-requests-final-decisions.* Attorney General Garland's determination pointed to no evidence that this was no longer the case.

Moreover, regardless of its flaws, Attorney General Garland's purported denial of Arizona's certification request does not affect my determination that Tennessee's capital counsel mechanism satisfies chapter 154 and the 2013 Regulations. Neither the statute nor the regulations require that a State's compensation rate must exceed or be comparable to a compensation rate that would be adequate in another State or to a nationwide compensation rate. Tennessee's compensation mechanism stands on its own and is adequate under chapter 154 and the 2013 Regulations for the reasons explained above.

Finally, one comment argued that Tennessee's compensation mechanism is inadequate under the 2013 Regulations based on findings in two state reports: a 2017 report by the Tennessee Supreme Court's Indigent Representation Task Force and a 2024 report by the Tennessee Comptroller. According to the comment, these reports concluded that Tennessee's compensation rate for appointed attorneys does not measure up to current market rates for attorneys in the State and that, as a result, many attorneys cannot afford to take on indigent clients. But claims about current market rates and what many attorneys can afford do not mean that a State is unable to provide counsel who meet the State's standards of competency—*i.e.,* the fact that some subset of attorneys might choose not to take on indigent clients hardly establishes more broadly that Tennessee cannot attract counsel to take on such clients. The comment does not alter my conclusion that Tennessee's compensation mechanism for capital counsel satisfies chapter 154 and the 2013 Regulations.

*E. Payment of Reasonable Litigation Expenses*

1. Payment of Reasonable Litigation Expenses and Chapter 154

Chapter 154 requires the Attorney General to determine whether a State has established a mechanism for the payment of reasonable litigation expenses of appointed postconviction counsel in capital cases. 28 U.S.C. 2265(a).

Tennessee's capital counsel mechanism satisfies this requirement. By rule, Tennessee provides for the reimbursement of ''certain necessary expenses directly related to the representation of indigent parties,'' Tenn. Sup. Ct. R. 13 sec. 4(a)(1), and has done so since 1997, *see* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 4(a)(1). By statute and rule, Tennessee also authorizes the reimbursement of investigative services, expert services, and other similar services. *See* Tenn. Code Ann. sec. 40–14–207(b); Tenn. Sup. Ct. R. 13 sec. 5(a)(1); *see also* *Owens* v. *State,* 908 SW2d 923, 924 (Tenn. 1995) (holding that Tenn. Code Ann. sec. 40–14–207(b) ''applies in post-conviction capital cases''). A court ''may grant prior authorization for . . . necessary services in a reasonable amount'' and ''shall provide for the payment or reimbursement of reasonable and necessary expenses.'' Tenn. Sup. Ct. R. 13 sec. 5(a)(2); *see also* Tenn. Code Ann. sec. 40–14–207(b) (same).

Tennessee law also provides standards and procedures for effectuating the payment of reasonable litigation expenses. To obtain reimbursement for expert and investigative services, the appointed counsel must demonstrate a ''particularized need for the requested services'' in a hearing before the court. Tenn. Sup. Ct. R. 13 sec. 5(c)(1); *see also* Tenn. Sup. Ct. Order, R. 13 sec. 5(b) (Apr. 3, 1997) (''the trial court must . . . determine if the requested services are necessary to ensure the protection of the defendant's constitutional rights''). Since July 1, 2004, all requests for reimbursement of investigative, expert, and other services have required final approval by either the Director of the Administrative Office of the Courts or, if denied, the Chief Justice. *See* Tenn. Sup. Ct. R. 13 sec. 5(e)(4)–(5); Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 5(e)(4)–(5); *see also* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 sec. 5(c) (prior rule requiring approval by the Chief Justice for requests exceeding $150 per hour or $5,000 in total expected costs). Although these provisions establish certain conditions for reimbursement, there is no conflict with chapter 154 because they do not prohibit the payment of reasonable litigation expenses.

2. Payment of Reasonable Litigation Expenses and the 2013 Regulations

The 2013 Regulations reiterate the statutory requirement that a state capital counsel mechanism must provide for payment of reasonable litigation expenses of appointed counsel. *See* 28 CFR 26.22(d). Paragraph (d) provides a nonexhaustive list of types of litigation expenses that includes expenses for ''investigators, mitigation specialists, mental health and forensic science experts, and support personnel.'' *Id.* It further states that presumptive limits on payment are allowed, but only if means are authorized for payment of necessary expenses above such limits. *See id.*

Tennessee's capital counsel mechanism satisfies the 2013 Regulations with respect to the payment of reasonable litigation expenses through the same provisions that satisfy chapter 154 itself, which are described above. With respect to ''presumptive limits on payment'' for services, Tennessee's mechanism satisfies the 2013 Regulations because ''means are authorized for payment of necessary expenses above [these] limits.'' 28 CFR 26.22(d). Tennessee initially established presumptive caps on payments for expert and investigative services in 2004, and those caps became effective on July 1, 2004. *See* Tenn. Sup. Ct. Order (June 1, 2004), App'x A, R. 13 sec. 5(d)(4)–(5). From July 1, 2004, to November 30, 2024, courts in post-conviction capital cases were not permitted to authorize more than $25,000 for expert services or more than $20,000 for investigative services unless the court, ''in its sound discretion,'' determined that ''extraordinary circumstances,'' ''proven by clear and convincing evidence,'' justified exceeding these limits. *Id.* Beginning December 1, 2024, these presumptive limits and the means for exceeding them apply only when the capital defendant in a post-conviction proceeding is represented by a private attorney appointed as postconviction counsel. *See* Tenn. Sup. Ct. R. 13 sec. 5(d)(4)–(5); Tenn. Sup. Ct. Order (Oct. 4, 2024), App'x, R. 13 sec. 5(d)(4)–(5). The OPCD is authorized to secure investigative and expert services through other funds appropriated by statute. *See* Tenn. Code Ann. sec. 40–30–208.

Since July 1, 2004, Tennessee has also maintained maximum hourly rates for particular types of expert services, which are currently set by the Director of the Administrative Office of Courts

and the Chief Justice. *See* Tenn. Sup. Ct. R. 13 sec. 5(d)(1); *see also* Tenn. Sup. Ct. Order, App'x A, R. 13 sec. 5(d)(1) (June 1, 2004). Appointed counsel are expected to ''make every effort to obtain individuals or entities who are willing to provide services at an hourly rate less than the maximum.'' Tenn. Sup. Ct. R. 13 sec. 5(d)(1). Requests for experts ''not listed on the published rate list'' are ''considered on a case by case basis.'' *Id.* Appointed counsel may request ''additional funding for the same investigator or expert,'' and such requests are ''subject to additional review by the [Director of the Administrative Office of the Courts].'' *Id.*

3. Specific Criticisms

Some comments argued that Tennessee's capital counsel mechanism is inadequate because, in some cases, judges do not allow the reimbursement of requested litigation expenses. But the federal statute assumes that a State can assess the reasonableness of litigation expenses as part of its process; chapter 154 does not require that judges must agree in all instances with appointed defense counsel about what expenses are reasonable. Determinations about whether requested expenses are reasonable can be left to the courts. *See* 78 FR at 58173; *Spears,* 283 F.3d at 1016.

Other comments objected both to the requirement that expenses must be authorized by the Administrative Office of the Courts or the Chief Justice and to the presumptive caps of $25,000 for expert services and $20,000 for investigative services. But Tennessee's mechanism is similar to the federal statute governing the appointment of counsel for indigent capital defendants in federal proceedings, which imposes a presumptive cap of $7,500 on litigation expenses and requires approval of the chief judge of the circuit or his delegee for payments exceeding this limit ''as necessary to provide fair compensation for services of an unusual character or duration.'' *See* 18 U.S.C. 3599(g)(2); 78 FR at 58180. Moreover, as discussed above, the 2013 Regulations permit presumptive limits on payment so long as means are authorized for exceeding these limits. *See* 28 CFR 26.22(d); *cf. Spears,* 283 F.3d at 1015 (finding presumptive ceiling on compensable hours valid where means were provided for allowing more hours); *Mata* v. *Johnson,* 99 F.3d 1261, 1266 (5th Cir. 1996) (finding inflexible caps on compensation and expenses adequate under chapter 154), *vacated in part on reh'g,* 105 F.3d 209 (5th Cir. 1997).

Another comment argued that Tennessee's maximum hourly rates for expert services are lower than the rates permitted for federal expert services, and that these rate limits make it difficult for appointed counsel to find qualified experts. But neither chapter 154 nor the 2013 Regulations require that state experts and investigators must be paid at the same rate as their federal counterparts. Nor do they require that securing expert and investigative services must be expeditious or convenient to any particular degree, so long as the State has a mechanism for payment of reasonable litigation expenses.

Finally, one comment objected to changes that have occurred over time regarding the extent to which litigation expenses must be sought from the courts, paid from OPCD's budget with latitude to seek more from the courts, or paid fully from OPCD's budget. The comment asserted that this shifting system provides no assurance that indigent prisoners will receive adequate payment of their litigation expenses. However, neither chapter 154 nor the 2013 Regulations require that defense litigation expenses must be paid by the courts instead of from the budget of a public defender agency conducting the litigation. To the extent this comment is speculating that the Tennessee legislature might in the future decide not to provide the OPCD with sufficient funds to pay for reasonable litigation expenses, that concern applies just as well to whether the Tennessee legislature will provide sufficient funds to the courts for this purpose. In either case, this speculation has no bearing on whether Tennessee has established and currently maintains a mechanism for the payment of reasonable litigation expenses.

## III. Date the Mechanism Was Established

Tennessee has requested that I determine it established its qualifying capital counsel mechanism as of October 23, 1995, referring to the date the Tennessee Supreme Court held that the statute authorizing the payment of investigative and expert services in capital cases applies to postconviction proceedings. *See Owens,* 908 SW 2d at 924 However, the State's certification request rests partly on features of its capital counsel mechanism that were adopted at later times. In particular (and as discussed in detail above), the Tennessee Supreme Court adopted amendments to its Rule 13 on April 3, 1997, effective July 1, 1997, for the purpose of meeting the standards of chapter 154. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997); Tenn. Sup. Ct. Order (Apr. 10, 1997). Accordingly, the earliest date on which I can certify Tennessee's capital counsel mechanism, based on the information provided by Tennessee, is July 1, 1997.

Although there have been some changes in the relevant Tennessee statutes and rules since that time, I find that those differences are not material to Tennessee's satisfaction of chapter 154's requirements. I accordingly determine and certify that Tennessee has continuously had a capital counsel mechanism satisfying chapter 154's requirements since July 1, 1997.

Some of the comments argued that two federal cases that considered Tennessee's capital counsel mechanism prevent me from certifying the mechanism. The first case is *Austin* v. *Bell,* in which a federal district court concluded that chapter 154 did not apply in Tennessee because the State ''imposes insufficient standards to ensure that only qualified competent counsel will be appointed to represent habeas petitioners in capital cases.'' 927 F. Supp. 1058, 1061–62 (M.D. Tenn. 1996). Following this decision, the Tennessee Supreme Court amended its Rule 13 to meet the standards of chapter 154, which included the adoption of minimum experience requirements for postconviction counsel. *See* Tenn. Sup. Ct. Order (Apr. 3, 1997), R. 13 secs. 1(a), 3(h); Tenn. Sup. Ct. Order (Apr. 10, 1997). In light of that amendment, I have certified Tennessee's capital counsel mechanism as complying with chapter 154 since July 1, 1997, and have expressed no opinion as to whether it complied with chapter 154 prior to that date. The district court decision in *Austin* v. *Bell,* issued on May 9, 1996, preceded the effective date of my current certification of Tennessee and related to Tennessee's capital counsel mechanism as it was before that date. A federal court of appeals subsequently affirmed the district court decision and concluded that ''[t]here is no indication that Tennessee has complied with'' chapter 154. *Austin* v. *Bell,* 126 F.3d 843, 846 n.3 (6th Cir. 1997). But that decision concerned Tennessee's capital counsel mechanism as it existed before the establishment of key elements of the current system, including the adoption of Tennessee Supreme Court Rule 13. Accordingly, the district court and court of appeals opinions in *Austin* v. *Bell* are neither controlling nor informative with respect to Tennessee's present satisfaction of chapter 154's requirements.

The second case cited by the commenters is *King* v. *Bell,* in which a prisoner under sentence of death argued

in his federal habeas petition that his claims were not procedurally defaulted because ''Congress eliminated the doctrine of procedural default in all habeas cases except those falling under Chapter 154.'' 392 F. Supp. 2d 964, 1014 (M.D. Tenn. 2005). The district court concluded that this argument was ''without merit.'' *Id.* at 1015. In rejecting the argument, the court undertook no assessment of whether Tennessee's capital counsel mechanism satisfies the requirements of chapter 154, merely observing that the petitioner ''concede[d] Tennessee is not an 'opt in' state'' and that the chapter 154 procedures did not apply to the case. *Id.* A meritless legal argument and a concession made in litigation by a prisoner under sentence of death have no relevance to whether Tennessee satisfies the requirements of chapter 154.

## IV. Other Matters

### *A. Constitutionality of Chapter 154*

The comments raised several constitutional objections to chapter 154. My responsibility under chapter 154 is to determine whether a State has established a postconviction capital counsel mechanism that satisfies the statute's requirements. After reviewing the constitutional objections raised in the public comments, I have concluded that they have no bearing on my certification determination and that they are, in any event, not well founded.

### *B. Validity of the Implementing Rule*

Some comments challenged the implementing rule for chapter 154, Subpart B of 28 CFR part 26—*i.e.,* the 2013 Regulations—arguing that the regulations are invalid on procedural and substantive grounds. These criticisms provide no ground for denying certification to Tennessee. *See* Br. for Appellants at 28–49 and Reply Br. for Appellants at 15–28, *Habeas Corpus Res. Ctr.* v. *U.S. Dep't of Just.,* 816 F.3d 1241 (9th Cir. 2016) (No. 14–16928); Br. for Respondents at 52–65, *Off. of the Fed. Pub. Def. for the Dist. of Ariz.* v. *Rosen,* No. 20–1144 (D.C. Cir. 2020).

### *C. Request for Supplemental Process*

Some commenters objected that they had inadequate time to develop a full record for their public comments. They also argued that Tennessee's application for certification does not accurately describe the State's capital counsel mechanism and should be denied for this reason. If the application is not denied, they requested that I order Tennessee to supplement its application in order to correct the alleged misrepresentations and to provide additional information on how the capital counsel mechanism has operated in practice. They also requested that I authorize an additional public comment period for responses to Tennessee's supplemental submission.

I deny these requests because the information available is sufficient to determine that Tennessee has established a capital counsel mechanism that satisfies the requirements of chapter 154 and the 2013 Regulations. The organizations that provided public comments had sufficient time to prepare and to file lengthy comments with numerous attachments. The commenters have not explained how the additional information they seek to provide would change my determination. Chapter 154 directs me to certify only whether a State ''has established a mechanism for the appointment . . . of competent counsel'' in state capital postconviction proceedings, the date on which this mechanism was established, and whether the State ''provides standards of competency for the appointment of counsel'' in such proceedings. 28 U.S.C. 2265(a)(1). It does not direct or authorize me to carry out a case-specific review of the operation of a State's capital counsel mechanism.

### *D. Request for a Stay*

One comment requested that I stay my certification of Tennessee's mechanism pending review of my determination. The comment argued the matter on the terms a court would consider in deciding whether to order a stay—*i.e.,* likelihood that the determination will be overturned on judicial review, alleged irreparable harm to the commenters and their clients, the balance of the equities, and the public interest. Chapter 154 creates no requirement that I grant a stay, and I decline to do so.

Chapter 154 conditions its applicability on the Attorney General's determination that a State has established a capital counsel mechanism satisfying its requirements, not on the completion of judicial review of my determination. *See* 28 U.S.C. 2261(b), 2265. The statute directs me to determine the date on which the state capital counsel mechanism was established and makes that date the effective date of the certification. 28 U.S.C. 2265(a)(1)(B), (a)(2). Thus, chapter 154 applies to cases in which postconviction counsel was appointed pursuant to the mechanism, though the appointment occurred prior to the publication of this notice. *See* 152 Cong. Rec. at 2449 (remarks of Sen. Kyl) (explaining effect of section 2265(a)(2)); 151 Cong. Rec. at E2640 (extension of remarks of Rep. Flake) (same); *Habeas Corpus Resource Ctr.,* 816 F.3d at 1245 (''The certification is effective as of the date the Attorney General finds the state established its adequate mechanism; as this date can be in the past, a certification decision may apply retroactively.''). A stay would mean, however, that the certification would not yet be effective in relation to cases in which state postconviction counsel was appointed on or after July 1, 1997—notwithstanding my determination that Tennessee established a capital counsel mechanism satisfying chapter 154 on that date—but would take effect only at some unpredictable future time when litigation relating to the certification has run its course.

Additionally, the comment's arguments for a stay are unpersuasive. It is not likely that a challenge to the certification will prevail on the merits because Tennessee has in fact established a mechanism satisfying the requirements of chapter 154, as explained in this notice. Even if there were a likelihood of a challenge succeeding on the merits, there is no public interest or prospect of irreparable injury that justifies a stay. The comment contended that the time available to seek federal habeas review will be severely curtailed or eliminated if the time limit of 28 U.S.C. 2263 becomes applicable. This concern is not well founded and does not bear on the validity of the certification, as explained above. The comment also suggested that declining to grant a stay will result in additional burdens on the federal courts in the form of litigation challenging whether the chapter 154 procedures and deadlines apply to pending cases. To the contrary, permitting the chapter 154 review procedures to go into effect will streamline federal habeas review and will relieve federal courts and litigants of unnecessary burdens.

By contrast, Tennessee will be harmed if it is denied the benefits of the chapter 154 review procedures to which it is legally entitled based on its establishment of a capital counsel mechanism satisfying the requirements of chapter 154. As the Supreme Court has recognized, ''[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence.'' *Bucklew* v. *Precythe,* 587 U.S. 119, 149 (2019). The survivors of victims murdered by persons under sentence of death in Tennessee will be harmed by a stay, prolonging their suffering and further denying them the closure of a final disposition of the cases

that concern them. *See* 152 Cong. Rec. at 2441–47 (remarks of Sen. Kyl); 151 Cong. Rec. at E2639 (extension of remarks of Rep. Flake). There will also be harm to any persons under sentence of death in Tennessee who would be granted relief on a final disposition of their federal habeas petitions but whose cases now linger for years or decades because there is no requirement that the cases be accorded priority or concluded within any specific time frame. Staying the implementation of the chapter 154 procedures that Congress enacted, to which Tennessee is entitled, would be harmful to many and not in the public interest.

Consequently, I do not stay my certification of Tennessee's postconviction capital counsel mechanism, and the effective date of the certification is July 1, 1997, in conformity with 28 U.S.C. 2265(a)(2).

Dated: July 6, 2026.

**Todd Blanche,**

*Acting Attorney General.*

[FR Doc. 2026–13970 Filed 7–9–26; 8:45 am]

**BILLING CODE 4410–BB–P**

---

## DEPARTMENT OF LABOR

### Bureau of Labor Statistics

### Proposed Information Collection; ATUS Artificial Intelligence (AI) Questions

**AGENCY:** Bureau of Labor Statistics, Department of Labor.

**ACTION:** Request for comment.

**SUMMARY:** The Department of Labor, as part of its continuing effort to reduce paperwork and respondent burden, conducts a pre-clearance consultation program to provide the general public and Federal agencies with an opportunity to comment on proposed and/or continuing collections of information in accordance with the Paperwork Reduction Act of 1995. This program helps to ensure that requested data can be provided in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the impact of collection requirements on respondents can be properly assessed. The Bureau of Labor Statistics (BLS) is soliciting comments concerning the proposed new collection, the ''American Time Use Survey (ATUS) Artificial Intelligence (AI) Questions.'' A copy of the proposed information collection request can be obtained by contacting the individual listed below in the Addresses section of this notice.

**DATES:** Written comments must be submitted to the office listed in the **ADDRESSES** section of this notice on or before September 8, 2026.

**ADDRESSES:** Send comments to Erin Good, BLS Clearance Officer, Division of Management Systems, Bureau of Labor Statistics, by email to *BLS_PRA_Public@bls.gov.*

**FOR FURTHER INFORMATION CONTACT:** Erin Good, BLS Clearance Officer, at 202–691–7628 (this is not a toll free number). (See **ADDRESSES** section.)

**SUPPLEMENTARY INFORMATION:**

#### I. Background

The increasing availability of Artificial Intelligence (AI) tools has raised important questions about how these technologies are being adopted by individuals and how they affect daily activities across work and non-work domains. Despite the rapid growth of AI applications, there are currently no federal surveys that link individuals' use of AI to a detailed record of their activities.

The American Time Use Survey (ATUS) is uniquely positioned to fill this gap. By pairing new AI questions with the ATUS time diary, the collection will allow researchers and policymakers to understand when, how, and for which tasks people use AI tools. No other national survey provides this level of behavioral insight; existing federal surveys may collect limited information on technology use, but none provide activity-level detail or link AI use to a continuous 24-hour record.

Collecting information on AI use supports the BLS mission under 29 U.S.C. 2 to develop and disseminate data on labor market activity and emerging economic trends. As AI becomes increasingly integrated into work, education, and household management, understanding who uses these tools—and for what purposes is essential for assessing potential implications for productivity, job tasks, skill requirements, and overall time allocation.

#### II. Current Action

Office of Management and Budget clearance is being sought for a new module to the ATUS with a set of questions regarding AI. These questions will provide the first nationally representative data linking AI use to detailed, activity level time use information. The AI items will supplement the ATUS by identifying:

- Whether individuals have used AI tools;
- The tasks for which individuals use AI;
- How AI use varies across demographic and occupational groups; and
- How AI use relates to time spent in work, education, household production, and leisure.

The information collected will allow BLS and external researchers to examine how AI interacts with individuals' daily activities, analyses that cannot be conducted using any existing federal data sources. The data will be used to produce public-use microdata files, tabulations, and technical documentation.

The proposed AI questions will be fielded beginning in January 2027 for a two-year period, allowing BLS to capture early patterns of adoption during a time of rapid technological and behavioral change.

#### III. Desired Focus of Comments

The Bureau of Labor Statistics is particularly interested in comments that:

- Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility.
- Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used.
- Enhance the quality, utility, and clarity of the information to be collected.
- Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submissions of responses.

*Title of Collection:* ATUS Artificial Intelligence (AI) Questions.

*OMB Number:* 1220–NEW.

*Type of Review:* New collection.

*Affected Public:* Individuals or Households.

*Annual Number of Respondents:* 7,672.

*Frequency:* Annually.

*Total Annual Responses:* 7,672.

*Average Time per Response:* 2 minutes.

*Estimated Annual Total Burden Hours:* 256 hours.

Comments submitted in response to this notice will be summarized and/or included in the request for Office of Management and Budget approval of the information collection request; they also will become a matter of public record.

**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **CORINIO PRUITT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-CV-02855-BCL-atc** |
| | ) | |
| **KENNETH NELSEN, Warden** | ) | |
| | ) | **CAPITAL CASE** |
| **Respondent.** | ) | |

**ANSWER TO AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

## I. PRELIMINARY STATEMENT

Pursuant to this Court's order entered on July 26, 2026, (ECF No. 53), and Rules 4 and 5 of the Rules Governing § 2254 Cases in the United States District Courts ("Habeas Rules"), Respondent files this Answer to the Amended Petition for Writ of Habeas Corpus filed under 28 U.S.C. § 2254, (ECF No. 38). Petitioner, Corinio Pruitt, challenges his confinement and death sentence under his conviction from the Shelby County Criminal Court for the first-degree felony murder of the victim, Lawrence Guidroz. This is Petitioner's first petition for writ of habeas corpus under 28 U.S.C. § 2254. For the reasons previously stated by Respondent in his motion to dismiss the petition, (ECF No. 50), Petitioner's habeas corpus petition is time-barred.

Pursuant to Rule 5 of the Habeas Rules and this Court's prior order, (ECF No. 8), Respondent has filed the state-court record, including the appellate records created for the direct appeal and the post-conviction appeal of Petitioner's convictions. (ECF Nos. 11-13.) To Respondent's knowledge, all pertinent state-court proceedings have been transcribed and filed with the Clerk.

## II. STATEMENT OF THE CASE

Petitioner was indicted by a Shelby County grand jury for one count of first-degree felony murder and one count of first-degree premeditated murder, both for the death of the victim, Lawrence Guidroz. (ECF No. 11-1, PageID 212-14.) At arraignment, the State of Tennessee filed a notice of intention to seek the death penalty. (*Id.* at PageID 269-71.) Pursuant to Tenn. Code Ann. § 39-13-204 and Tenn. R. Crim. P. 12.3, the State gave notice of their intent to rely on three aggravating circumstances: (1) that Petitioner had been previously convicted of one or more violent felonies; (2) the murder was committed while Petitioner was engaged in the commission of a felony, namely robbery; and (3) the victim of murder was seventy (70) years of age or older, or was particularly vulnerable due to a significant handicap or disability. (*Id.*); *Ref.* Tenn. Code Ann. § 39-13-204(i)(2), (7), (14) (2008).

On February 29. 2008, Petitioner was convicted at a jury trial in the Shelby County Criminal Court of first-degree felony murder and also second-degree murder, as a lesser-included offense of first-degree premeditated murder. *State v. Pruitt,* 415 S.W.3d 180, 194 (Tenn. 2013), *cert. denied sub nom Pruitt v. Tennessee,* 573 U.S. 949 (2014); (ECF No. 11-15, PageID 1995-96.) The trial court merged the second-degree murder conviction into the first-degree felony murder conviction, and the trial proceeded to the penalty phase on the first-degree felony murder conviction. *Id.*; (ECF No. 11-15, PageID 1998-99.) At the conclusion of the penalty phase, the jury found the three proposed aggravating circumstances beyond a reasonable doubt and concluded that these aggravators outweighed the mitigating circumstances. *Id.* at 198. The jury imposed a sentence of death. A judgment of conviction sentencing Petitioner to death was entered on March 1, 2008. (ECF No. 11-2, PageID 401-02; ECF No. 11-17, PageID 2300-02.)

Following the trial court's denial of Petitioner's motion for new trial, Petitioner appealed his judgment to the Tennessee Court of Criminal Appeals. Upon review, that court affirmed Petitioner's conviction and sentence. *State v. Pruitt,* No. W2009-01255-CCA-R3-DD, 2011 WL 2417856, at *1 (Tenn. Crim. App. Jun. 13, 2011). On automatic review to the Tennessee Supreme Court pursuant to Tenn. Code Ann. § 39-13-206(a)(1), the court reviewed multiple issues raised by Petitioner and conducted two separate oral arguments on a total of six designated issues. *Pruitt,* 415 S.W.3d at 186-87. Ultimately, the Tennessee Supreme Court affirmed the judgment of the intermediate appellate court. *Id.* at 187. Petitioner sought rehearing from the Tennessee Supreme Court, which denied the request. (Attachment 1). Petitioner next filed a petition for writ of certiorari in the United States Supreme Court, which denied certiorari on June 30, 2014. *Pruitt,* 573 U.S. 949.

On October 1, 2014, Petitioner filed a petition for post-conviction relief in the Shelby County Criminal Court with the assistance of proposed counsel, along with a motion for stay of execution and a motion to appoint proposed counsel. (ECF No. 12-20, PageID 4317-23; ECF No. 12-23, PageID 4804-14.) Following an evidentiary hearing, the post-conviction court denied relief, and Petitioner appealed this decision to the Tennessee Court of Criminal Appeals. (ECF No. 12-21, PageID 4588-767.) On appeal, the Tennessee Court of Criminal Appeals reviewed and rejected the issues presented and affirmed the trial court's denial of the petition for post-conviction relief. *Pruitt v. State,* No. W2019-00973-CCA-R3-PD, 2022 WL 1439977, at *1 (Tenn. Crim. App. May 6, 2022). The Tennessee Supreme Court subsequently denied discretionary review on November 18, 2022, and it denied rehearing of that order on December 9, 2022. (ECF Nos. 13-28; 13-31.)

On September 15, 2023, Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 with the assistance of appointed counsel. (ECF No. 6.) In a case management order filed on January 5, 2024, this Court directed Respondent to file the complete state court record and directed Petitioner to file an amended petition thereafter. (ECF No. 8, PageID 189.) Respondent filed the state-court record on February 21, 2024. (ECF Nos. 11-13.) Before Petitioner filed his amended petition, prior appointed counsel motioned this Court to substitute counsel and appoint the Federal Public Defender for the Western District of North Carolina. (ECF No. 24.) This Court granted substitution of counsel and appointed new counsel for Petitioner on July 3, 2024. (ECF No. 27.) On September 10, 2025, Petitioner filed an amended petition. (ECF No. 38.) As contemplated in Habeas Rule 4, Respondent file a motion to dismiss the petition on timeliness grounds. (ECF No. 50.) Respondent contemporaneously filed a motion for excusal, requesting that the Court excuse filing of an answer under Habeas Rule 5 at this time because the resolution of the threshold issue of untimeliness is outcome determinative. (ECF No. 51). On July 26, 2026, this Court denied Respondent's motion for excusal and directed Respondent to file an answer to the amended petition. (ECF No. 53.) Respondent now submits an answer to Petitioner's amended petition for habeas relief.

## III. STATEMENT OF THE FACTS

### A. Trial Testimony

The Tennessee Supreme Court on direct appeal summarized the evidence presented at trial during the guilt phase and the penalty phase, as follows:

***Evidence at Guilt Phase***

On the morning of August 2, 2005, Courtney Johnson encountered Mr. Pruitt by chance as he walked to the Apple Market on Winchester Road in Memphis, Tennessee. Mr. Pruitt talked about stealing a car and asked Mr. Johnson if he would get in the car with him if Mr. Pruitt took one. Although Mr. Johnson told Mr. Pruitt "no," he remained with Mr. Pruitt outside the market and spoke to people who came to the market, including Mr. Pruitt's cousin, Michael Rockett. Later, Mr. Johnson's friend, "Sed," came to the market. Mr. Pruitt remained outside the market as Mr. Johnson and Sed walked to the Family Dollar store at the other end of the shopping center. Mr. Johnson testified that he went with Sed to the Family Dollar store because he did not want to be involved in whatever Mr. Pruitt was going to do.

Taka Pruitt arrived at the Apple Market with her neighbor. They parked directly outside the front door of the market. Ms. Pruitt stayed in the car while her neighbor went inside. As she waited in the car, she observed a "younger gentleman," later identified as Mr. Pruitt, standing to the left of the door. Ms. Pruitt recognized him as someone who lived in her apartment complex. After five or six minutes, Ms. Pruitt saw an older man walk out of the market with groceries in his arms and walk to his car. As he reached the driver's side door, Mr. Pruitt ran up behind the older man and pushed him into the car. Although she could not see clearly into the car, it appeared to Ms. Pruitt that the two men were "tussling." She saw Mr. Pruitt on top of the older man, and she could see the older man's feet dangling out of the car. After about fifteen seconds, she saw Mr. Pruitt throw the older man to the ground, slam the car door, and drive away. When Ms. Pruitt checked on the victim, he was shaking and having trouble breathing and he was bleeding from his nose and both ears.

Ms. Pruitt ran inside the market, told employees that someone had just been carjacked, and asked them to call 911. She then ran back to the victim and called 911 on her cell phone. Ms. Pruitt went to the police station after the carjacking. She identified Mr. Pruitt from a photo lineup as the person who beat the victim and took the victim's car. At trial, Ms. Pruitt was shown a still photo created from the market's security camera video. She circled an image of Mr. Pruitt, identifying him as the younger man she saw push the victim into his car. Ms. Pruitt also confirmed that Mr. Pruitt was alone when he attacked the victim.

Courtney Johnson testified that he saw the victim arrive at the Apple Market in a brown Chevrolet and walk into the market just before he and Sed went to the Family Dollar store. Mr. Johnson said that the victim appeared to be fine when he went into the Apple Market. Mr. Johnson and Sed were in the Family Dollar store for "three to four minutes." When they walked back in the direction of the Apple Market, Mr. Johnson saw "an old man laying down with blood coming out of his head, and his car was gone." Mr. Pruitt was also gone. Mr. Johnson said he ran inside the market and asked someone to call 911. He left the scene before the police

arrived because he did not want to be involved and did not want to "snitch" on Mr. Pruitt.

Memphis Police Officer Charmell Smith was the first officer on the scene and arrived before emergency medical personnel. She found the victim lying on his back on the ground and bleeding from his ears and mouth. She testified that the victim was "semi-conscious" and that she helped load the victim into an ambulance when it arrived. Based on her prior medical training as a certified nursing assistant, she opined that the bleeding from the ears indicated some kind of head trauma.

Thomas J. Leech III identified the victim, Mr. Lawrence Guidroz, from a still photo created from the Apple Market's security camera video. Mr. Leech testified that he had known Mr. Guidroz for more than twenty-five years and that he was very close to Mr. Guidroz. Mr. Leech went to the hospital to see Mr. Guidroz when he heard that Mr. Guidroz had been attacked. Mr. Leech remained in Mr. Guidroz's hospital room throughout the night. At no point was Mr. Guidroz able to communicate with Mr. Leech. Mr. Guidroz died the next day. Mr. Leech testified that Mr. Guidroz was seventy-nine years old at the time of his death. Mr. Guidroz was buried in Louisiana after a service in Memphis. Mr. Leech identified photographs of Mr. Guidroz's car, bearing the license plate number CUX 845.

Following the carjacking, Memphis Police began looking for the victim's car. Officer Jonas Holguin found the car parked at the Somerset Apartments near Tullahoma and Winchester and was instructed to watch it from a distance. At trial, Officer Holguin was shown the photograph of Mr. Guidroz's car, which had been identified by Mr. Leech, and confirmed that the license plate was the same as the car he was instructed to watch. At some point, the car was moved from the apartment complex without the knowledge of the police, and the police began to search the area in an attempt to locate the car. The car was later observed pulling into a residence at 3180 Beauchamp, and a team of police officers converged on that location.

The driver of the car, who was wearing a red shirt, went inside the house. The police made the decision to apprehend the driver. Mr. Johnson came out of the house and the police took him into custody. According to Sergeant Robin Hulley, Mr. Johnson yelled, "the guy you want is in the back yard." Officers went to the back yard and saw a man wearing a red shirt jump over a fence and run. Although dogs were called in to track the man, police had no success in finding him.

Mr. Johnson testified that after the incident at the Apple Market, he did not see Mr. Pruitt again until three days later, when Mr. Pruitt telephoned and asked to come to Mr. Johnson's house to take some liquor from Mr. Johnson's grandmother's bar. Because he knew Mr. Pruitt had stolen the victim's car, Mr. Johnson told Mr. Pruitt not to come to his house.

Nevertheless, Mr. Pruitt drove to Mr. Johnson's house and parked the car in the garage. Shortly thereafter, three to four unmarked police cars arrived on the scene. Mr. Johnson knew that the police were there for Mr. Pruitt. Although Mr. Johnson was not aware that Mr. Guidroz had died, Mr. Pruitt informed Mr. Johnson that he had "body-slammed" the victim before taking his car. At trial, Mr. Johnson identified a photograph of himself with Mr. Pruitt at the Apple Market on the day of the carjacking and identified the victim's car as the one Mr. Pruitt parked in his garage. Mr. Johnson was never charged in the case.

The car was taken to the crime scene investigation office, where Officer Francis Donald Carpenter processed the car for fingerprints. Officer Carpenter testified that he found several latent prints on the car. Two prints were lifted from the outside windshield on the front passenger side. Officer Nathan Gathright, a latent fingerprint examiner for the Memphis Police Department, testified that these prints belonged to Mbenda McCracken. A print found on the left rear fender outside the car belonged to Kendricks Scott. Another print found on the right rear fender above the wheel belonged to Mr. Pruitt. Both Mr. McCracken and Mr. Scott testified at trial.

Mr. McCracken identified Mr. Pruitt in the courtroom. In August 2005, Mr. McCracken had known Mr. Pruitt for approximately eight months. Mr. McCracken identified a photo of the victim's car and stated that he saw Mr. Pruitt driving the car in August 2005. When Mr. McCracken asked Mr. Pruitt where the car came from, Mr. Pruitt told him it was his girlfriend's car. Mr. McCracken got into the car and went with Mr. Pruitt to buy beer and marijuana. Mr. Pruitt, Mr. McCracken, and a friend named "Fred" drove around in the car for three to four hours and got high. Mr. McCracken later saw on the news that the car Mr. Pruitt was driving had been taken in a carjacking. Mr. McCracken denied any involvement in the carjacking.

Before Mr. McCracken testified, he and Mr. Pruitt were accidentally placed in the same holding cell for about forty-five minutes. Mr. McCracken was in custody on an aggravated burglary charge unrelated to the present case. Mr. McCracken testified that while he and Mr. Pruitt were in the holding cell, Mr. Pruitt told Mr. McCracken that there were two persons involved in the carjacking and that the other person had not been charged. Mr. Pruitt said that he and the other person were trying to get into the victim's car. When the victim approached the car, they jumped on him. Mr. Pruitt told Mr. McCracken that he grabbed the victim and threw him down. Mr. Pruitt tried to persuade Mr. McCracken to testify that he did not know Mr. Pruitt and that another man came into the neighborhood to attempt to sell Mr. McCracken parts from the car.

Kendricks Scott, whose fingerprints were found on the left rear fender, testified that he saw Mr. Pruitt driving the victim's car in August 2005. Mr. Pruitt offered Mr. Scott a ride to work and told Mr. Scott that it was "his auntie's car." Mr. Scott opened the rear door of the car and briefly sat in the back seat with the door open,

but did not ride in the car. Another person, whom Mr. Scott did not know, was in the car at the time. The following day, when the police came looking for Mr. Pruitt at the house next door to Mr. Scott's residence, Mr. Scott learned that the car had been taken in a carjacking. Mr. Scott did not volunteer any information to the police at that time.

Alma Rockett is Mr. Pruitt's aunt. Mr. Pruitt was living with Ms. Rockett in the Somerset Apartments in August 2005. On August 2, 2005, Ms. Rockett recognized Mr. Pruitt in video footage shown on a television news broadcast. She also recognized another man in the video who previously had been in her home with Mr. Pruitt. At trial, she was shown still photographs from the Apple Market security video. Ms. Rockett identified Mr. Pruitt as the man wearing the dark-colored shirt, a larger man as her son, Michael, and a smaller man as the man who previously came home with Mr. Pruitt. She also identified Michael's car in the photograph with the three men. After seeing the video footage on the news, Ms. Rockett and her son went downtown "to straighten it out, to let them know that [Michael] was not involved." After that night, Mr. Pruitt never came back to her house. When Mr. Pruitt later called Ms. Rockett, she told him to turn himself in to police.

Mr. Pruitt testified in his own defense. He acknowledged his prior convictions for aggravated burglary, robbery, criminal attempt to commit robbery, and theft over $500. He stated that on the morning of August 2, 2005, he left for work around 6:00 a.m. When he arrived at work, however, he discovered he had left his identification badge at home. Although he called his aunt to confirm the badge was there, he never went home to get it. Instead, Mr. Pruitt went to Courtney Johnson's house and arrived between 8:00 and 8:30 a.m.

Mr. Pruitt stated that he and Mr. Johnson talked for awhile and went to the Apple Market for the express purpose of stealing a car. While they were standing by the drink machine attempting to decide which car to steal, Mr. Pruitt's cousin, Michael, arrived and went into the market. When Michael came out of the market, Michael, Mr. Johnson, and Mr. Pruitt walked to the Family Dollar store. Mr. Pruitt stated that Michael bought something, and the three of them returned to the front of the Apple Market by the drink machine until Michael left. Mr. Pruitt acknowledged seeing Taka Pruitt arrive at the market. He claimed that he and Mr. Johnson knew her because "[they] smoke[d] weed with her."

Mr. Johnson spoke to Mr. Guidroz when he arrived at the market. After Mr. Guidroz went inside, Mr. Johnson walked toward the Family Dollar store because he did not want to be seen on the surveillance camera. According to Mr. Pruitt, Mr. Johnson "popped up on the other side" from where Mr. Pruitt was and "scoped out" Mr. Guidroz's car. Mr. Pruitt testified that he was the lookout while Mr. Johnson got inside the car.

According to Mr. Pruitt, when Mr. Guidroz came out of the store, he saw Mr. Johnson in Mr. Guidroz's car. Mr. Guidroz began struggling with Mr. Johnson. Mr. Pruitt ran up to Mr. Guidroz, grabbed him, and "slung him" into the car. He believed that Mr. Guidroz fell to the ground after he hit the car. Mr. Pruitt admitted pushing Mr. Guidroz hard. Mr. Pruitt testified that he was scared and that he got into the car and drove it to Mr. Johnson's house on Beauchamp. Mr. Johnson did not get into the car with him. When Mr. Johnson came home, Mr. Pruitt left. Mr. Pruitt testified that he did not have a gun at the time he took the victim's car and that his intent was to steal the car and sell its parts.

The next day, Mr. Johnson called Mr. Pruitt and met him at the Somerset Apartments, where Mr. Pruitt was staying. The car was parked at an apartment complex across the street from the Somerset Apartments. Mr. Pruitt believed that Mr. Johnson was the person who moved the car to that location. Mr. Pruitt stated that on August 3, 2005, he and Mr. Johnson went back to Mr. Johnson's house in the victim's car and drove it into the garage. When the police arrived, Mr. Pruitt ran because he was scared. He claimed he did not know at the time that the victim had died. The following day, Mr. Pruitt turned himself in and gave a statement to the police.

When cross-examined about his statement to the police, Mr. Pruitt admitted that he told police he left Mr. Johnson standing outside the Family Dollar store when he took the victim's car. He admitted telling police that he did not leave the victim's car at Mr. Johnson's house. He also admitted telling police that he drove a number of friends around and that he let his friend, Reggie, use the car. Mr. Pruitt stated that he initially lied about Mr. Johnson's involvement because he did not want to "snitch" on him. Mr. Pruitt admitted that his version of the events did not match the security video, which shows Mr. Johnson walking to the Family Dollar store before the carjacking and walking back after the carjacking. He said that most of his statement to police was true. As to any inconsistencies between his version of events and the testimony from Taka Pruitt and Mr. McCracken, he claimed both were lying. He maintained that he did not intend to hurt the victim.

The State presented medical evidence regarding Mr. Guidroz's injuries. Dr. Karen Chancellor, the Chief Medical Examiner in 2005 for Memphis and Shelby County, Tennessee, performed Mr. Guidroz's autopsy. As a result of her internal and external examinations of Mr. Guidroz, Dr. Chancellor concluded that the cause of Mr. Guidroz's death was multiple blunt force injuries sustained to the head and chest and that the manner of Mr. Guidroz's death was homicide.

Dr. Chancellor found an abrasion on the front of Mr. Guidroz's face and a laceration on the left side of his forehead. She also noted that "there [was] ecchymosis or hemorrhag[ing] around both eyes, and that was caused by skull fractures . . . found inside the body." The injuries to Mr. Guidroz's body included bruising on the ear, the right and left side of the chest, the upper left arm, the neck and shoulder, the right ankle, the backs of both hands, both forearms, and the lips. Dr. Chancellor

opined that all the victim's bruises were caused at the same time and at the time of the incident at the Apple Market.

As to her internal examination of Mr. Guidroz, Dr. Chancellor noted that "there was quite a bit of hemorrhage overlying the ribs on the left side" and a complete fracture of the clavicle. Eleven ribs on Mr. Guidroz's left side were fractured, with resulting bruises on the surrounding lung tissue. Dr. Chancellor remarked that Mr. Guidroz had extensive blunt force injuries to his head, which included skull fractures, bruises to brain tissue, and hemorrhaging around the brain. In addition, Mr. Guidroz suffered a subdural hematoma, which required surgery to avoid severe brain injury. She opined that the skull fractures were caused by at least three separate blows or impacts to the left side of the head. Mr. Guidroz also suffered fractures to the orbital plates directly above the eyes, which resulted in blood collecting around his eyes.

Dr. Chancellor was unaware that Mr. Guidroz had coagulopathy, a condition making him prone to bleed, but she was aware that Mr. Guidroz had severe coronary atherosclerosis, a blockage of the blood vessels of the heart. No evidence of surgical intervention for these blockages was present. Dr. Chancellor did not collect any of Mr. Guidroz's fractured bones during the autopsy. Dr. Chancellor stated that, although the practice of removing bones during autopsy was once "in vogue," the practice is no longer common. She also did not conduct a bone density test on Mr. Guidroz because a bone density test is not a routine part of an autopsy. Although she opined that Mr. Guidroz's injuries were consistent with being beaten, she was not able to determine the order of his injuries or whether his injuries resulted from being struck by a hard object, being forcibly thrust against a hard object, or a combination of these two actions. She did not believe, however, that a fall alone would have caused all of his injuries.

The defense introduced testimony from Dr. O.C. Smith, former Chief Medical Examiner for Shelby County, Tennessee. Dr. Smith reviewed the medical examiner's files and Mr. Guidroz's medical records in July 2007. Dr. Smith noted several deficiencies in the autopsy record. He commented on the absence of X-rays taken as part of the autopsy procedure and the absence of bones for review. Dr. Smith testified that bones can be excised, cleaned, and retained in inventory, or can be preserved with photographs or X-rays. Dr. Smith testified that when he was the medical examiner, the lab was able to test for bone density either by X-ray or by excising the bone and examining it. He opined that loss of bone density due to age or osteoporosis could have made Mr. Guidroz's bones more vulnerable to trauma. Dr. Smith's routine practice when he was medical examiner was to excise every fractured bone in a homicide or suspected homicide. He also commented that he was unable to examine Mr. Guidroz's brain specimen because the preserving fluid had been allowed to dry out.

Dr. Smith testified that Mr. Guidroz's medical records indicated he suffered from coagulopathy, which made him prone to bleed. Mr. Guidroz lost 1.5 liters of blood

during his brain surgery, which required a transfusion of blood, fresh frozen plasma, and platelets. Dr. Smith opined that the coagulopathy, together with the blockages in Mr. Guidroz's heart, made him particularly vulnerable to injury. The coagulopathy also would have caused "seepage" of blood during surgical procedures, which would have made Mr. Guidroz's injuries look worse than they actually were. The ecchymosis, or hemorrhaging or bleeding under the skin, on various parts of Mr. Guidroz's body also could have been exacerbated by the coagulopathy. Dr. Smith discussed a condition known as "senile ecchymosis" that occurs as part of the aging process and opined that some of Mr. Guidroz's ecchymosis might be attributable to his age. He explained that with such a condition, even minor trauma can cause bruising with superficial bleeding on the skin's surface. He conceded that the ecchymosis could be from the original injuries but thought that it was probably a combination of surgery and original injury. Dr. Smith agreed that blood beneath the skin on the left side of Mr. Guidroz's neck likely resulted from the fracture and dislocation of the clavicle and fractures of the adjacent ribs, not from surgery.

Dr. Smith found evidence of a "contre-coup" or "decelerating" brain injury and distinguished between accelerative trauma and contre-coup trauma. Accelerative trauma occurs when a moving object strikes a fixed head and leaves a bruise on the skin and causes damage in the area of the brain immediately beneath the blow. A contre-coup injury, however, is decelerative trauma caused when a moving head hits a fixed object. Injury to the skin occurs at the point of impact, but the injury to the brain occurs on the opposite side of the head. Dr. Smith testified that, although the fractures of Mr. Guidroz's skull were on the left side of his head, he suffered a contre-coup injury to the right side of his brain, indicating that his injuries occurred in a fall.

Dr. Smith noted that the fractures to the clavicle, ribs, and head were all on Mr. Guidroz's left side and opined that the cause of death was "a fall to a flat surface or some contact where the body is in motion, and then it's been arrested by a hard, unyielding surface." Dr. Smith opined that the fall could have been from a standing height, from running and falling, from falling from a height, or from being propelled, depending on the strength of Mr. Guidroz's bones and the force that caused the fall. He ruled out the possibility that blows or strikes to Mr. Guidroz's body were the sole cause of his injuries.

Dr. Smith agreed with Dr. Chancellor that the manner of Mr. Guidroz's death was homicide and the cause of Mr. Guidroz's death was blunt force injury to his head and chest. He also agreed that Mr. Guidroz's injuries were consistent with a scenario of

> being pushed in on the left-hand side of his car—something was going [on] in that front seat of the car to the point that an eye witness saw Mr. Guidroz's feet dangling . . . out of the driver's side door with the [d]efendant on top of him, and then the next thing that an

> eye witness sees is this [d]efendant pick up the body of Mr. Guidroz and sling him out of [the] car onto the concrete.

Dr. Bruce Levy, then Chief Medical Examiner for the State of Tennessee and the Medical Examiner for Davidson County, testified for the State in rebuttal. Although Dr. Smith's routine practice during his tenure was to remove bones from the body and store them, Dr. Levy testified that this practice was unique to Memphis and uncommon. In Dr. Levy's opinion, Dr. Chancellor, who actually performed the autopsy, was in the best position to render opinions as to what she saw and to interpret her observations. In his view, she followed the standard practice of documenting the autopsy by photographs, diagrams, and narratives describing what she saw.

Dr. Levy stated that Mr. Guidroz suffered blunt force trauma injuries. He opined that the victim's skull fractures, which were indicative of at least two separate blows, combined with the fractures to the ribs and clavicle, led to a "differential diagnosis." In other words, there could be different causes for the injuries: either a fall from some height, a car collision, or an accelerated fall in which the victim was thrown to the ground with some force. Dr. Levy opined that breaking eight or nine ribs was not consistent with a simple fall to the ground, but might be consistent with an accelerated fall. Likewise, the multiple injuries to the chest, arms, face, and head were inconsistent with a simple fall.

He testified that when faced with a differential diagnosis, a medical examiner will rely on the history of the case. In this case, the anecdotal reports that Mr. Guidroz was assaulted in a carjacking and thrown to the ground were factors in determining the cause of his injuries. Dr. Levy testified that "body-slamming" can cause multiple fractures like the ones observed in Mr. Guidroz. The presence of complex skull fractures was indicative of a significant amount of force, "much greater than you could possibly get from simply falling to the ground and striking your head on a flat surface."

Based on the evidence, the jury convicted Mr. Pruitt of first degree felony murder in the perpetration of a robbery. The jury also convicted Mr. Pruitt of second degree murder as a lesser-included offense of the charged first degree premeditated murder. The trial court merged the two convictions and proceeded to the penalty phase.

### ***Evidence at Penalty Phase***

Marie Leech was a close family friend of Mr. Guidroz. She testified that she met Mr. Guidroz at St. Paul the Apostle Catholic Church and had known him for more than twenty-five years. On Sundays after church, Mr. Guidroz usually had dinner at Ms. Leech's home. Mr. Guidroz was the godfather of Ms. Leech's middle child and particularly close to that child. Ms. Leech explained that Mr. Guidroz had a very active life. He attended Mass daily at different churches throughout Memphis

and went to St. Peter Villa, an assisted living facility, three days a week to visit and care for residents there. Ms. Leech testified that Mr. Guidroz was fondly regarded in the Oakhaven neighborhood where he had lived for more than forty years.

The State introduced Mr. Pruitt's indictments and judgments of conviction from five prior offenses through Shelby County Criminal Court Deputy Clerk, Alice Robinson. Those offenses were robbery and an attempted robbery committed on November 26, 2002, and three aggravated robberies committed on November 4, 1996.

In mitigation, Mr. Pruitt presented the testimony of Dr. Rebecca Rutledge, a clinical psychologist, who assessed him in November 1996 at the request of the Memphis and Shelby County Juvenile Court. Mr. Pruitt was sixteen years old at that time. As part of her assessment, Dr. Rutledge administered to Mr. Pruitt the Slosson Intelligence Test, a Bender Visual Motor Gestalt Test, and a Rorschach Psycho-diagnostic Technique Test. Mr. Pruitt's score on the Slosson test was sixty-six, which is in the upper mildly mentally retarded range. Dr. Rutledge stated that someone who is mildly mentally retarded would tend to be impulsive and would not likely consider the consequences of his actions. She noted that at the time of the assessment, which lasted about forty-five minutes to one hour, Mr. Pruitt did not appear to be taking the process seriously. She stated that Mr. Pruitt's test results may have been slightly lower than his actual level of cognitive functioning. She opined, however, that had he put forth more effort he would have continued to test in the mildly mentally retarded range. She did not have access to Mr. Pruitt's academic records at the time of the evaluation and knew only that he had repeated the first grade. She also commented that mild mental retardation is difficult to recognize because the person may appear "normal" until he is engaged in conversation. The level of functioning of a person who is mildly mentally retarded can improve with training, family support, job support, and various community resources.

Prior to her testimony, Dr. Rutledge reviewed a report from the Middle Tennessee Mental Health Institute ("MTMHI") resulting from a September 2006 evaluation of Mr. Pruitt. She noted that the MTMHI staff's diagnosis of Mr. Pruitt as mildly mentally retarded was consistent with her 1996 diagnosis.

On cross-examination, Dr. Rutledge conceded that she did not have any particular memory of Mr. Pruitt. At the time of the 1996 screening, she did not find that he suffered from any mental illness that would have prevented his transfer to adult court, nor did she find any disorders when she administered the Rorschach and the Bender Gestalt tests. Dr. Rutledge testified that the juvenile court asked her to administer the Slosson test. She explained that the Slosson test was designed to provide an estimate of general verbal cognitive ability in a short time frame. She acknowledged that the Slosson test, unlike other tests, did not have built-in standards for determining malingering. Dr. Rutledge testified that the Wechsler Adult Intelligence Screening ("WAIS") test is the "gold standard" for functional

intelligence quotient ("I.Q.") testing and is better at discerning specific areas of impairment. She opined, however, that Mr. Pruitt "would have fallen pretty close to [his score on the Slosson test]" if he had been given the WAIS test in 1996.

Dr. Rutledge was aware of the staff observations in the MTMHI evaluation that Mr. Pruitt was exaggerating his mental illness symptoms. MTMHI had also noted Mr. Pruitt's self-reported paranoid schizophrenia, although there was no record of his having received treatment for the disorder. Dr. Rutledge conceded that Mr. Pruitt could have deliberately underperformed on the 1996 Slosson test to avoid being transferred to adult court. She also conceded that Mr. Pruitt had many reasons to underperform during his 2006 assessment at MTMHI because of his pending capital murder charges.

Mr. Pruitt's mother, Vivian Pruitt, testified that if Mr. Pruitt were to receive a death sentence, it "would just kill [her] too." She recounted that Mr. Pruitt was the youngest of five children she had by three different men. Mr. Pruitt's father was about sixteen years younger than Ms. Pruitt, and Mr. Pruitt never had a relationship with him. When she was pregnant with Mr. Pruitt, Ms. Pruitt smoked, but she did not recall drinking. When Mr. Pruitt was born, she was married to Walter Lee Pruitt. Although the two have since divorced, Mr. Pruitt thought of Walter Lee Pruitt as his father and was close to him.

Vivian Pruitt detailed a family history of mental health issues. She had previously been hospitalized at Memphis Mental Health Institute three times due to addiction problems, but had been sober for fifteen to twenty-five years at the time of trial. During her period of addiction, she was arrested numerous times, usually for minor offenses like public intoxication, and was frequently in and out of prison. On one occasion she was arrested for aggravated assault when she shot Mr. Pruitt's father. When Ms. Pruitt was in prison, Mr. Pruitt stayed with his grandmother, Frankie Timberlake.

According to Ms. Pruitt, Ms. Timberlake, who helped raise Mr. Pruitt, spent time in and out of mental institutions. Several of Ms. Timberlake's siblings (Vivian Pruitt's aunts and uncles) had mental health problems as well. One of Ms. Timberlake's siblings died from a drug overdose and another committed suicide. One of Mr. Pruitt's sisters, Tapika Pruitt, had attempted suicide several times. Vivian Pruitt considered Mr. Pruitt a normal child with good test scores, and she never sought any type of treatment for him. He did not seem "slow" to her, but she believed he was in resource class in fifth and sixth grade.

Vivian Pruitt testified that Mr. Pruitt's first arrest was at age thirteen or fourteen and that he had experienced "problems" since that time. After Mr. Pruitt was released from juvenile court, he was arrested for several other offenses, including stealing shoes and writing graffiti on the school walls. He was in and out of juvenile court and was sent at various times to different juvenile facilities. He escaped from the Memphis Boys Group Home after he was charged with the three aggravated

robbery offenses in 1996. Ms. Pruitt testified that Mr. Pruitt eventually quit school "because they had him in juvenile."

Ms. Pruitt said that Mr. Pruitt was living with his aunt, Alma Rockett, on the day of the carjacking and was scheduled to work at Patterson Warehouse. She indicated that Mr. Pruitt had moved in with Ms. Rockett after he and his sister, Quiana Pruitt, with whom he had been living, had a dispute about Mr. Pruitt's discipline of Quiana's son. Vivian Pruitt believed Mr. Pruitt was experiencing stress over the fight with his sister and his housing situation at the time of the offense.

Quiana Pruitt testified that if her brother were sentenced to death and executed it would "really hurt [her]." She and Mr. Pruitt have the same father, who was not involved in their lives, and she considered Walter Pruitt her father. She recounted that she and Mr. Pruitt had a difficult upbringing. Their grandmother, Ms. Timberlake, was their primary caretaker because their mother was frequently in prison. Their aunt, Alma Rockett, told them their mother was "on drugs, didn't want [them], [and] neglected [them]." Quiana Pruitt also recounted the family history of mental health problems. Her mother and extended family on her mother's side-including an uncle and two aunts-suffered from paranoid schizophrenia. Their sister, Tapika, had mental health and drug problems. Ms. Timberlake had Alzheimer's disease and was hospitalized in a mental institution in 2000.

Quiana Pruitt did not consider her brother "slow" when he was growing up. She recalled that Mr. Pruitt began getting into trouble at the age of thirteen or fourteen and was in and out of "juvenile." He eventually dropped out of school in the seventh grade. Mr. Pruitt moved in with Quiana Pruitt and their mother following his release from prison after serving his sentence for the 1996 aggravated robbery convictions. Mr. Pruitt left their home after attempting to discipline Quiana Pruitt's son and went to live with his aunt, Alma Rockett.

In rebuttal, the State presented Sandra Atkinson, the records supervisor for Memphis City Schools. Ms. Atkinson reported that Mr. Pruitt was enrolled in the first grade at Carnes Elementary School in September 1987. Although his grades and conduct were average in the first grade, he was retained and repeated the first grade. During April of his second year in the first grade, he transferred to Larose Elementary School, where he remained for the rest of his elementary school years. Mr. Pruitt received mostly As and Bs for grades, and Es and Ss for conduct. His Tennessee Comprehensive Assessment Program ("TCAP") scores varied somewhat from year to year but at times were exceptional. He scored in the ninety-eighth percentile overall during his fifth-grade year and in the ninety-fifth percentile overall during his sixth-grade year.

Mr. Pruitt's academic performance declined dramatically during his seventh-grade year. He enrolled at Vance Middle School in the Fall of 1994 and attended until December, when he transferred to Colonial Middle School for one week, then

returned to Vance Middle School until May 5, 1995, after which he withdrew. Ms. Atkinson testified that Mr. Pruitt was frequently absent in the seventh grade. No grades were available because he did not complete his seventh-grade year. Although Mr. Pruitt took some of the TCAP tests, he apparently missed some of the testing days because he had no scores for reading or spelling. Mr. Pruitt's remaining scores were poor, ranging from a low in the eighth percentile for science to a high in the forty-second percentile for study skills.

Although Mr. Pruitt did not complete the seventh grade, he was nevertheless promoted to the eighth grade. During his eighth-grade year in 1995, however, he did not attend school until November 2, 1995, and he stopped attending after January 30, 1996. His grades were dramatically lower his eighth-grade year, reflecting all Fs for the semester. His records were transferred to an alternative school on April 26, 1996. Ms. Atkinson testified that the transfer to an alternative school could have been for non-attendance or behavior issues, but the records did not reflect the reason. Nothing in Mr. Pruitt's records indicates that he was ever in a resource class.

In surrebuttal, the defense recalled Vivian Pruitt to explain the dramatic decline in Mr. Pruitt's academic performance following elementary school. She testified that Mr. Pruitt fell in the fifth grade and struck his head. She stated that he had persistent headaches following that injury, but that she "didn't think it was that serious." When he was in the seventh grade, four of Mr. Pruitt's friends were killed in a particularly gruesome car wreck. Mr. Pruitt went to the scene and observed their injuries. Mr. Pruitt's behavior declined after witnessing the accident. Mr. Pruitt also had a brother who died from AIDS during this period. Ms. Pruitt testified that she did not believe Mr. Pruitt knew right from wrong or that he meant to kill Mr. Guidroz.

Prior to the jury charge in the penalty phase and before closing arguments, Mr. Pruitt made an oral motion challenging the appropriateness of the death penalty in his case pursuant to Tennessee Code Annotated section 39-13-203 because he had a functional I.Q. "below seventy" and deficits in adaptive behavior. The trial court denied the motion, noting that neither the court nor the State had been provided notice that a motion pursuant to Tennessee Code Annotated section 39-13-203 would be made. The trial court commented that the motion should have been filed prior to trial and stated that the timing of the motion was improper.

The jury found that the State had proven beyond a reasonable doubt the aggravating circumstances that: (1) the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit a robbery; and (3) the victim was seventy years of age or older at the time of the murder. *See* Tenn.Code Ann. § 39-13-

> 204(i)(2), (7), (14) (2010). The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstances outweighed any mitigating circumstances and sentenced Mr. Pruitt to death.

*Pruitt,* 415 S.W.3d at 187-198 (footnotes omitted).

The Tennessee Supreme Court on direct appeal also summarized the evidence presented at the motion for new trial hearing concerning Petitioner's intellectual disability, as follows:

***Evidence at the Hearing on the Motion for New Trial***

> After the jury returned a sentence of death, Mr. Pruitt filed a motion for new trial, in which he challenged, among other things, the trial court's refusal to consider his oral motion to disallow the consideration of the death penalty due to intellectual disability. At a hearing, trial counsel testified that he had given the State a "Notice of Intent to Present Expert Testimony Regarding Mental Condition" on February 5, 2008, but failed to formally file this motion with the trial court clerk until March 10, 2008, after the trial had ended. He argued that this motion, together with the proof at trial of Mr. Pruitt's diagnosis of "mild mental retardation" gave the State sufficient notice that he was challenging the applicability of the death penalty.
>
> The trial court held a hearing on December 12, 2008, and January 16, 2009, on the issue of Mr. Pruitt's eligibility for the death penalty. The defense initially rested on the proof presented at trial by Dr. Rutledge. The State introduced testimony from Dr. Sam Craddock, a clinical psychologist at MTMHI, who testified that he evaluated Mr. Pruitt from August 31 to September 27, 2006, at MTMHI. During this evaluation, MTMHI staff observed Mr. Pruitt "around the clock." Dr. Craddock administered I.Q. tests, aptitude tests, and a personality test. In addition to interviewing Mr. Pruitt's mother, Dr. Craddock also examined law enforcement files in the case, certain court documents filed in the case, and a forensic evaluation conducted by the Midtown Mental Health Center.
>
> Dr. Craddock identified a staff conference report from MTMHI dated September 22, 2006. Noted on the report was an Axis I diagnosis of "schizophrenia, differentiated type," and an Axis II diagnosis of "mild mental retardation." Dr. Craddock testified that the latter diagnosis was recorded in error and should have read "borderline intellectual functioning." Other notes throughout the file, including the discharge summary, recorded the Axis II diagnosis as borderline intellectual functioning, not mental retardation. Dr. Craddock could not explain why he had made the transcription error. After reviewing Mr. Pruitt's records, Dr. Craddock prepared an addendum to the report stating that the "mild mental retardation" note was made in error.
>
> Dr. Craddock testified that there are three requirements for a diagnosis of mental retardation: subaverage intellectual functioning demonstrated by an I.Q. below seventy, impairments in the subject's adaptive functioning, and a diagnosis before

the age of eighteen. Mr. Pruitt's I.Q. score was sixty-eight on the test Dr. Craddock administered at MTMHI. Dr. Craddock acknowledged that his report indicated Mr. Pruitt appeared to be making a good effort on the test "[w]ith the exception of him occasionally giving quick responses with accompanying little thought." Dr. Craddock therefore believed that Mr. Pruitt's I.Q. was actually higher than his scores reflected.

Other factors led Dr. Craddock to conclude that Mr. Pruitt's score was not indicative of mental retardation. For instance, at the age of eighteen, Mr. Pruitt had received a score of eighty-one on a Beta test administered through the Department of Correction. At that time, Mr. Pruitt indicated an interest in earning his Graduate Equivalency Degree and learning about small engine repair. The Beta test score indicated that Mr. Pruitt was reading at an eighth-grade level, spelling at a high school level, and understanding math at a fifth-grade level. Furthermore, Mr. Pruitt's school records indicated he had performed well both academically and on his TCAP tests until the sixth grade. School records did not indicate that Mr. Pruitt was ever in special education classes, which Dr. Craddock would have expected if Mr. Pruitt was mentally retarded.

Dr. Craddock also did not see any deficits in Mr. Pruitt's adaptive behavior. Mr. Pruitt had stated to Dr. Craddock that one of his interests was playing chess, which Dr. Craddock noted is inconsistent with someone who is mentally retarded. Also, Dr. Craddock "question[ed] the scores because mentally retarded individuals . . . typically score high on performance and low on verbal." Mr. Pruitt's scores revealed just the opposite. Dr. Craddock stated that

> [w]hen you score low on performance, there is an implication there that you may not be making your best effort. So, if you look in the textbooks, time after time, mentally retarded people, they have poor[er] verbal, math skills, and so forth than they do manipulation skills, visual skills, but that was not the case with [Mr. Pruitt].

In rebuttal, Mr. Pruitt presented the testimony of Dr. Rutledge. She had compared the results of the test that she administered to Mr. Pruitt with the results of the test administered by Dr. Craddock. She stated that both tests indicated Mr. Pruitt had an I.Q. of approximately sixty-eight. Dr. Rutledge's memory of Mr. Pruitt's adaptive skills was that he had fifth-grade reading skills, third-grade math skills, was unable to live independently, and was unable to remain gainfully employed. She admitted that she last saw Mr. Pruitt twelve years earlier, when he was sixteen years old and spent, at most, an hour with him. She also admitted that at the time she thought his scores might not accurately reflect his actual ability. She did not have his school records and was unaware that at one point he scored in the ninety-eighth percentile on his TCAP tests.

On May 22, 2009, the trial court entered an order denying Mr. Pruitt's motion for new trial and found that Mr. Pruitt had failed to prove by a preponderance of the

> evidence that he was intellectually disabled and thus ineligible for the death penalty under Tennessee Code Annotated section 39-13-203. The trial court found that Mr. Pruitt had failed to prove by a preponderance of the evidence that he had significantly subaverage intellectual functioning as evidenced by an I.Q. of seventy or below. The court found that neither the test score in 1996 nor the test score in 2006 was the product of Mr. Pruitt's best efforts and that his grades in school and TCAP scores indicated that the 1996 and 2006 test scores were unreliable. The trial court also determined that Mr. Pruitt failed to prove by a preponderance of the evidence that he suffered deficits in his adaptive behavior. The trial court based this finding on Mr. Pruitt's excellent performance in school through the sixth grade and testimony from his mother that he seemed like a "normal" child. The trial court also noted Dr. Craddock's testimony that he did not see any deficits in Mr. Pruitt's adaptive behavior. The trial court found that the drop in Mr. Pruitt's grades and test scores after the sixth grade appeared to result from traumatic events in his life, drug use, incarceration, and absence from school.

*Id.* at 198-200 (footnotes omitted).

## B. Post-Conviction Hearing Testimony

The Tennessee Court of Criminal Appeals summarized in the post-conviction appeal the evidence presented at the post-conviction evidentiary hearing conducted over multiple days, as follows:

### *The Prosecutors and General Weirich's Family*

> Assistant District Attorney Carolyn Alanda Dwyer testified that she was the lead prosecutor in the Special Prosecution Unit. Ms. Dwyer explained that Petitioner's case qualified for the Special Prosecution Unit because of his prior record. Ms. Dwyer testified that she was involved in Petitioner's case since it was indicted, although she did not recall handling Petitioner's preliminary hearing. She testified that the usual practice in Shelby County was for the prosecutor handling the case to determine the charges to be presented to the grand jury, so it would have been her decision to charge Petitioner with both felony murder and premeditated murder. Before filing a notice of intent to seek the death penalty, Ms. Dwyer reviewed the facts of the case and the applicable aggravating factors with then-District Attorney General William L. Gibbons and received his approval to file the notice. Ms. Dwyer testified that there was no formal process for the defense to present mitigating evidence at the time the charging decision or the decision to seek the death penalty is made and that she had no information regarding Petitioner's mental health or I.Q. at that time.
>
> Ms. Dwyer did not recall signing an agreed order to have Petitioner evaluated at MTMHI because the doctor at Midtown Mental Health Center had concerns about

his competency, but she explained that such an order was a "form order that we enter on most homicide cases." Ms. Dwyer acknowledged that she received notice of the defense team's intent to present expert testimony regarding Petitioner's mental condition through Dr. Rutledge, but she did not recall when she received such notice. She agreed that there was a note in her file to obtain Petitioner's mental health records in order to rebut such testimony and that she subpoenaed records from TDOC in February of 2008. Ms. Dwyer agreed that her file contained "form responses" to defense motions requesting individual voir dire and jury questionnaires that she printed but never filed because the defense never filed such motions in this case. She explained that individual voir dire was not a common practice in Shelby County at the time, though it was more common at the time of the post-conviction hearing.

Ms. Dwyer testified that then-Assistant District Attorney Amy Weirich became involved in the case just a week or two before trial. Ms. Dwyer testified that another prosecutor had recently left the office so she asked Gen. Weirich to help her pick the jury. Ms. Dwyer testified that "it had been awhile since I had done a death penalty case" and that she relied on Gen. Weirich's experience. Ms. Dwyer denied that she had ever seen a "Voir Dire Manual" that was supposedly used by the District Attorney's Office as a training tool. She disagreed with some of the manual's suggestions that the goal of voir dire is to establish the credibility of the prosecutor and "to get [the jury] on the side of the State," explaining that "the most important thing is the jury understand their duty and they're to follow the law."

Katherine Alfonso Weirich, the mother-in-law of Gen. Weirich, testified that she was employed at St. Paul Catholic Church as an administrative assistant and choir director. Mrs. Weirich knew the victim in this case because he sang in the choir that usually performed at funerals. She testified that the victim was a "very private person. He was in my choir, but I can't say that I knew him other than he was always there to come and sing." She testified that she did not socialize with the victim, though she was friends with Marie and Thomas Leech, who both testified for the State at trial. Because of her employment at the church, Mrs. Weirich received a call that the victim had been "carjacked and beat up," so she went to the hospital. After the victim passed away, Mrs. Weirich assisted with his funeral arrangements, "pretty much [taking] care of . . . the planning, the reading, the songs and all that." She also directed the choir that sang at the victim's funeral, which was not unusual given her role at the church. Mrs. Weirich attended Petitioner's trial as a representative of the church, and she knew that her daughter-in-law was one of the prosecutors. Mrs. Weirich did not have any discussions with the prosecution regarding the potential outcome of the sentencing phase. Mrs. Weirich had attended other trials as an observer, including at least two murder trials prosecuted by Gen. Weirich.

Charles Weirich, Gen. Weirich's husband, testified that he is an attorney in the Memphis area. Mr. Weirich and his family attended St. Paul Catholic Church until they moved to East Memphis. At that point, Mr. Weirich continued to attend St.

Paul as a lector while his family attended a different church. Mr. Weirich would advertise his services as an attorney at St. Paul. In 2002, Mr. Weirich was contacted by the victim, whom he recognized from the church, about drafting a will. At the time, the law required an executor to live in Tennessee, so Mr. Weirich agreed to be co-executor of the victim's will with Thomas Leech, who lived out of state. After the victim's death, Mr. Weirich filed a petition to probate the estate in his role as an attorney. He attempted to renounce his role as a co-executor, but the probate judge wanted either an in-state executor who was subject to the contempt power of the court or for Mr. Leech to post a bond. Mr. Weirich agreed to stay on as co-executor, and he was eventually paid $5,000 "for fees and expenses related to the administration of the estate." The estate was closed in September of 2007, several months before Petitioner's trial. Mr. Weirich testified that the outcome of the criminal prosecution in this case had no bearing on the probate proceedings.

District Attorney General Amy P. Weirich testified that in 2008, she was the head of the Gang and Narcotics Prosecution Unit for the Shelby County District Attorney's Office. She became involved in Petitioner's trial when Ms. Dwyer asked her to assist with the case the week before trial. Because of other cases she was trying, Gen. Weirich did not read through the file until the weekend prior to the start of trial. Gen. Weirich testified that she was aware that the defense team would present evidence that Petitioner was intellectually disabled but that she was not involved in any pretrial discussions of the matter. Gen. Weirich did not specifically recall that she was the "primary attorney handling voir dire" or that voir dire was completed in a single day. Gen. Weirich testified that she had seen the "Voir Dire Manual" as a reference available in the District Attorney's Office but that she had never been instructed by previous supervisors to study it or relied on it in preparing for voir dire. Gen. Weirich testified that she had participated in capital cases where individual voir dire was used but that it was not a common practice.

Gen. Weirich recalled that Thomas Leech testified as a witness during the guilt phase of Petitioner's trial and that his wife, Marie Leech, testified during the sentencing phase. Gen. Weirich testified that she knew the Leeches prior to trial because they were "good friends of my in-laws" as well as through attending St. Paul Catholic Church. Gen. Weirich testified that she was not aware of the probate of the victim's estate at the time of trial. Gen. Weirich testified that she did not have an independent recollection of her mother-in-law attending the trial but that it would not surprise her that Mrs. Weirich would attend as a representative of the church and as support for the Leech family. Gen. Weirich was unaware that Mrs. Weirich was involved in the victim's funeral arrangements but explained "that was one of her main responsibilities for members of the parish who died[.]" Gen. Weirich testified that she did not attend the victim's funeral.

***Petitioner's Defense Team***

Lead counsel testified that when he first began representing Petitioner in 2005, he was employed part-time in the Capital Case Unit of the Shelby County Public

Defender's Office while also maintaining a private practice consisting of both criminal and civil cases. Throughout the three years leading up to Petitioner's trial, lead counsel was also assigned to approximately 38 other cases with the Capital Case Unit for varying lengths of time, although not every case resulted in a capital trial. Lead counsel was originally assigned to Petitioner's case as co-counsel with another attorney in the Public Defender's Office. Former lead counsel was primarily in charge of case development while lead counsel assisted "mostly under her direction." When former lead counsel left the capital case unit prior to Petitioner's trial, lead counsel took over and new co-counsel joined the team. At that point, the primary responsibility for case development shifted to lead counsel because he had more experience handling capital cases. Petitioner's defense team also consisted of Ralph Nally as a fact investigator and Jeanette Stanback as a social investigator.

Lead counsel testified that he attended an initial intake interview of Petitioner on August 26, 2005, along with other members of the defense team. Lead counsel testified that he attended monthly case reviews with the entire Capital Case Unit where pending cases "were discussed and strategized." Lead counsel identified some formal, written requests for Mr. Nally to investigate certain issues, and he testified that he also made casual, verbal requests for investigation. The defense team was able to put together an arrest history for Petitioner's mother, Vivian Pruitt, going back to Petitioner's birth, but lead counsel acknowledged that he did not obtain records for any arrests during Vivian's pregnancy with Petitioner. One of the defense's mitigation theories was "bad family situation," which lead counsel explained included "Vivian Pruitt's history with respect to arrests before and other behavior." However, lead counsel agreed on cross-examination that he made strategic choices based on how the jury may view the evidence and that he did not think that Vivian's arrests would be viewed as mitigating.

Lead counsel recalled that the trial court signed an agreed order in June 2006 for Petitioner to be evaluated at Midtown Mental Health Institute to determine his competency to stand trial and mental status at the time of the offense. In August 2006, clinical psychologist Dr. John Whirley sent a letter to the trial court expressing concerns about Petitioner's competency to stand trial and recommending that Petitioner be transferred to MTMHI for further evaluation. During the evaluation at MTMHI, Dr. Craddock administered the Wechsler Adult Intelligence Scale 3 (WAIS-3) and determined that Petitioner had a full-scale I.Q. score of 68. Lead counsel acknowledged that Dr. Craddock did not administer any tests of adaptive functioning or have any adaptive rating scales from family members. Lead counsel did not recall providing any information to MTMHI to assist with an adaptive behavior assessment. However, Dr. Craddock's psychological evaluation report indicated that Petitioner was diagnosed with mild mental retardation in addition to schizophrenia and substance abuse.

Lead counsel recalled that prior to the time he became lead counsel, the defense team retained the services of clinical psychologist Dr. Fred Steinberg to evaluate

Petitioner. Case review memos from July and September 2007 listed Dr. Steinberg as a potential defense expert and cited the discharge summary from MTMHI diagnosing Petitioner with schizophrenia and "borderline" mental retardation as one of the working mitigation theories. Lead counsel testified that he spoke to Dr. Steinberg many times, although he did not recall meeting with him in person. Lead counsel testified, "my recollection was that [Dr. Steinberg] was not -- his opinion would not help us in this case."

In January 2008, lead counsel retained the services of Dr. Rutledge to testify during the sentencing phase regarding her evaluation of Petitioner for Juvenile Court in 1996 and her diagnosis of mild mental retardation. In preparing for the case, Dr. Rutledge primarily reviewed her report and the records from MTMHI. After the trial court granted the ex parte motion for expert services, lead counsel provided the State with a notice of intent to present expert testimony regarding Petitioner's mental condition at trial. Although the copy of the notice in the Public Defender's file had a handwritten notation that it was filed on February 5, 2008, a copy could not be found in the trial court clerk's file. Lead counsel testified that he intended the notice to be an attempt to communicate the defense's position that Petitioner was exempt from the death penalty due to intellectual disability. Lead counsel did not have an independent recollection of the prosecutor indicating that the State might seek an evaluation from its own expert. Lead counsel recalled moving for a directed verdict on the death penalty on the basis that the State had not presented any evidence to contradict Dr. Rutledge's testimony during the sentencing phase. Lead counsel testified that one of the reasons for this decision was the fact that the defense team could not afford to pay Dr. Rutledge twice for her testimony. Additionally, the statute indicated that the issue could be raised at trial and did not mandate that it be raised pretrial.

Ultimately, the trial court denied the motion for a directed verdict because of the lack of a pretrial motion. However, when ruling on the motion for new trial, the trial court concluded that the timing of the motion was an issue of first impression and reserved ruling on the intellectual disability issue. Lead counsel filed a formal written motion for a hearing on July 17, 2008, and attached the reports from MTMHI and Dr. Rutledge, which were consistent in diagnosing Petitioner with mild mental retardation. However, prior to the hearing, lead counsel learned that Dr. Craddock had sent a letter to the prosecution stating that he had erred in diagnosing Petitioner with mild mental retardation and changing his diagnosis to borderline intellectual functioning. Lead counsel contacted Dr. Rutledge again in August 2008 and requested the raw data from MTMHI for her to review. Dr. Rutledge told lead counsel that she "did not see any reason to justify change of diagnosis."

In an email from November 2008 discussing scheduling Dr. Rutledge's rebuttal testimony in this case, lead counsel asked if Dr. Rutledge would also be willing to be involved in another case. In that email, lead counsel stated that he wanted to "consider some measure of adaptive behavior" for the other defendant because that

was "classically the area in which we lose on [the intellectual disability] issue" and asked Dr. Rutledge if there was "any test or scale which might facilitate our proof of such deficits." Lead counsel testified that adaptive functioning was an important area to explore in any case and that he was aware of the Adaptive Behavior Assessment System ("ABAS") test for adaptive deficits. Additionally, Dr. Rutledge's response to his email referred to the Vineland Adaptive Behavior Scales when she offered to evaluate the other defendant. However, lead counsel never asked Dr. Rutledge to perform any adaptive behavior assessments of Petitioner, nor did she interview Petitioner or any of his family members. However, on cross-examination, lead counsel agreed that a diagnosis of mild mental retardation required a finding of adaptive deficits. Lead counsel agreed that he relied on the opinions of the experts and did not tell them what tests they needed to do.

Lead counsel testified that he did not consider filing a motion challenging the State's dual charging of felony murder and premeditated murder. He testified that Ms. Dwyer was the lead prosecutor throughout the case and that he did not recall the circumstances of Gen. Weirich becoming involved in this case. Lead counsel stated that he "never heard anything to th[e] effect" that Gen. Weirich knew the victim, and he did not recall Gen. Weirich disclosing that her family was close to the victim's family at any point during the trial. Lead counsel testified that if he had known that Mr. Weirich was co-executor of the victim's estate, he would have addressed that issue during his cross-examination of Mr. Leech. Lead counsel was not aware that Mrs. Weirich attended the trial or that she was Gen. Weirich's mother-in-law.

Lead counsel estimated that he met with Petitioner in person approximately 20 to 30 times prior to trial to discuss the facts of the case and Petitioner's social history. Lead counsel's notes from a meeting on February 8, 2008, indicated that Petitioner was depressed and had been prescribed Cogentin and Risperdal, which lead counsel believed were both psychotropic drugs. Lead counsel could not recall what dosages Petitioner was taking but testified that he had the jail medical records available. On cross-examination, lead counsel agreed that the upcoming trial could have been a cause of Petitioner's depression. Lead counsel testified that he did not notice anything about Petitioner's demeanor, behavior, or ability to communicate that would have indicated that Petitioner was impaired by the medication and that he would have addressed the matter with the court if he had. On redirect examination, Lead counsel agreed that he did not consult with a medical doctor regarding Petitioner's medication.

Lead counsel testified that he participated in the ongoing process of investigating mitigation evidence. He believed that he met with Petitioner's family members in their homes, though he admitted he could be confusing this case with another. Lead counsel did not recall meeting with any of Petitioner's teachers or any of his friends and former neighbors from the Fowler Homes neighborhood. When presented with a photograph from the Public Defender's file labeled "Corinio Pruitt family," lead counsel testified that he did not recognize any of the children in the photo but that

he had "no reason to doubt that that is his family." Lead counsel conceded that he requested a mitigation instruction regarding Petitioner's prenatal exposure to drugs and alcohol even though Vivian Pruitt denied drinking while she was pregnant, and no other witnesses testified on the issue. Lead counsel also requested a mitigation instruction that Petitioner experienced "significant ad[a]ptive deficits," even though including the term "significant" when it was not in the statute "was probably a mistake." Lead counsel also testified that he would generally agree with the Tennessee Supreme Court's opinion that "little evidence" of Petitioner's deficits in adaptive behavior was presented. Lead counsel agreed that in investigating adaptive deficits and mitigating circumstances, "all the records that are available should be obtained." Lead counsel also agreed that it was important "to attempt to interview anyone that would know anything about that issue," including family, friends and neighbors "if we were aware of [them]." On cross-examination, lead counsel agreed that it was possible for the jury to determine that Vivian Pruitt was not being truthful when she denied drinking while she was pregnant with Petitioner.

Lead counsel did not recall if there was a strategic decision not to file a motion requesting individual voir dire but testified that such a motion was in the "standard motion packet" created by a former supervisor of the Capital Case Unit, although "it was commonly overruled." Lead counsel testified that he was familiar with juror questionnaires and had used them previously with this particular trial judge and in other capital cases, so he "probably" made "a conscious strategic decision" not to use them in this case. Lead counsel recalled that voir dire was conducted as a group in the courtroom and that more than one juror responded that they had heard of the defense expert, Dr. Smith, and would not credit his testimony. Lead counsel was aware that Dr. Smith had stepped down from his position as Shelby County Medical Examiner after he was charged with possession of explosives and lying to investigators, a case that ultimately ended in a mistrial. Lead counsel had not seen an episode of the television show, 48 Hours, featuring Dr. Smith's story and discussing his "history of lying." On cross-examination, lead counsel agreed that Dr. Smith had been employed by defense attorneys on numerous occasions and that as a former medical examiner, he was in a unique position to review and critique autopsy procedures. Dr. Smith also testified about his practice of preserving bones during an autopsy. On redirect-examination, lead counsel testified that he was not aware of the case of *State v. Jerry Ray Davidson* where a pathologist from Arkansas provided similar testimony for the defense. Lead counsel testified that he would not be surprised if there were other experts but that he had known Dr. Smith for several years, had seen him testify before in other cases, and had a certain rapport with him despite his legal issues.

Lead counsel did not have an independent recollection of delivering the closing argument in this case but recognized a document he created containing notes of topics that he wanted to discuss. He acknowledged that the notes contained the statement, "What happened here to Lawrence Guidroz? No one cared about him." Lead counsel did not recall reading an article in a local newspaper just after the murder describing the high regard in which the victim's neighbors held him. Lead

counsel did not speak to anyone from St. Paul Catholic Church before the trial, although he did meet Mr. Leech and other parishioners outside of the courtroom during the trial. Lead counsel recalled that Mr. Leech told him that "they were not out for blood."

Lead counsel testified that he did not recall a plea offer but that the State would usually approve a plea agreement if the victim's family did not object. Lead counsel testified that he discussed settling the case with Petitioner many times, but Petitioner "would have no part of it." Lead counsel explained to Petitioner the possible defenses and the likelihood of conviction at trial. With regard to whether Petitioner understood the charges against him, lead counsel testified, "I think he understood it but I don't think he accepted it" because "his position all along . . . was that at most he was guilty of carjacking." Lead counsel explained that Petitioner did not believe he was guilty of murder because he did not intend to kill the victim, even though he had several lengthy conversations with the defense team about the elements of felony murder. During one interview with Petitioner in September 2005, which lead counsel recorded and transcribed, Petitioner recited from memory the legal concept of criminal responsibility for felony murder and asked why his "trial partner" was "out on the street." During this interview, Petitioner admitted that he knew Courtney Johnson intended to rob somebody, and Petitioner also admitted that he grabbed the victim and threw him to the ground, causing the victim to hit his head on the concrete. Lead counsel explained that even though Petitioner could recite the elements of felony murder, "I don't believe he ever accepted felony murder" because he "had made his mind up that he wasn't guilty of felony murder and that's what he wanted." Lead counsel testified that his advice to Petitioner was not to testify during the guilt phase but only during the sentencing phase. However, after a Momon hearing, Petitioner decided that he wanted to testify during the guilt phase of the trial, which lead counsel recalled was "definitely unhelpful."

On cross-examination, lead counsel testified that the Public Defender's file contained copies of letters that Petitioner had sent to his mother, which included instructions to call certain people along with phone numbers and directions on how to access messages on an answering machine. Lead counsel agreed that the records from MTMHI indicated that Petitioner began using marijuana at age fourteen, cocaine at age sixteen, and methamphetamine and various pills at age twenty-two. Lead counsel agreed that the Public Defender's file also contained a psychological evaluation of Petitioner from 1998 in which he reported that he began selling drugs at the age of fourteen and that he typically made a $350 weekly profit. A September 2006 discharge summary from MTMHI indicated that Petitioner was diagnosed with schizophrenia, undifferentiated type; history of cocaine and cannabis abuse; and borderline intellectual functioning. On redirect examination, lead counsel read from a staff conference report from MTMHI that indicated Petitioner's "below average cognitive abilities" would limit his ability to assist in his defense, though he did have "sufficient ability" to work with his attorneys, understand the evidence, and weigh the merits of a plea offer.

Lead counsel identified a "social chronology" for Petitioner listing his juvenile and adult arrests, psychological evaluations, periods of incarceration, and suicide attempts prior to his arrest in this case. Lead counsel obtained the presentence reports from Petitioner's prior convictions, which indicated that Petitioner was in a gang. Lead counsel obtained records from Petitioner's employer at the time of the offense as well as Petitioner's school records. Lead counsel testified that he and former lead counsel presented Petitioner's case at a seminar put on by the National Association of Criminal Defense Lawyers where the participants were able to consult with experienced attorneys and mitigation experts in order to brainstorm ways to defend their cases. On redirect examination, lead counsel testified that the seminar probably included presentations on *Atkins v. Virginia* and that he purchased the AAMR manual around that time.

Co-counsel testified that he worked for the Public Defender's Office and that he joined the Capital Case Unit in 2007. He was assigned to Petitioner's case as second chair after former lead counsel left the Capital Case Unit and lead counsel became first chair. Co-counsel agreed that his role was to assist lead counsel, who had the primary responsibility to manage the defense team. Co-counsel testified that he participated in the monthly case reviews with the rest of the capital defense team. On cross-examination, co-counsel testified that this was his first capital trial. Co-counsel acknowledged that capital defense is "constantly evolving" and that attorneys must "do the best we can at the time."

Co-counsel first met with Petitioner in February 2007, and his notes from that meeting indicated that Petitioner was taking Risperdal and Cogentin. Co-counsel believed that Risperdal was "an anti-psychotic or something they prescribe for people with schizophrenia" and that "Cogentin deals with the side effects of Risperdal." Co-counsel was not aware of the dosages Petitioner was receiving or why those drugs had been prescribed. Co-counsel testified that the defense obtained Petitioner's jail medical records and that they discussed it with their experts. Co-counsel testified that he and lead counsel discussed whether to inform the jury regarding Petitioner's medication, but they considered it to be "a double edge sword" because the jury might be more fearful of a defendant who is psychotic. Co-counsel testified that Petitioner "didn't appear crazy to me but I'm not a doctor." Co-counsel did not recall any discussion of retaining a psychiatrist or neuropharmacologist. On cross-examination, co-counsel testified that he never had an indication that Petitioner's medication was interfering with his ability to communicate and that he would have brought it to the attention of the trial court if he had.

When presented with a report from MTMHI that indicated that Petitioner's "below average cognitive abilities will limit the quality of what he contributes to his defense," co-counsel agreed that he experienced communication issues with Petitioner. Specifically, co-counsel explained that he did not "know that we ever got through to him" that felony murder was first degree murder and was death

penalty eligible. On cross-examination, co-counsel testified that Petitioner had the opportunity to plead guilty and receive a sentence of either life or life without parole. Co-counsel agreed that he advised Petitioner with regard to that offer and discussed possible defenses and the likelihood of conviction at trial, but Petitioner chose not to plead guilty. Co-counsel testified he discussed the concept of felony murder and the fact that it was death eligible with Petitioner "[m]any times."

Co-counsel testified that he did not have any contact with Dr. Steinberg, whose work on the case had been conducted prior to co-counsel's joining the team. Co-counsel's notes from a conversation with former lead counsel in January 2007 reflected that Petitioner had been diagnosed as schizophrenic and "borderline" intellectually disabled by MTMHI but that former lead counsel agreed with Dr. Steinberg's opinion that there was "nothing wrong" with Petitioner. The notes also indicated that there was "lots of mitigation," that Petitioner had a bad family situation and a long juvenile record, and that the biggest problem would be the facts of the case. Co-counsel testified that it would not "surprise" him if Dr. Steinberg's report was not located in the Public Defender's Office's files for this case "because if we have a conversation with our doctors and it's not going to be helpful, we'll often tell them to not bother writing a report." Co-counsel did not know whether Dr. Steinberg's testing resulted in an I.Q. score of less than 70, stating, "All I know is I was told that he was not helpful to us." On cross-examination, co-counsel testified that he did not recall if Dr. Steinberg had indicated that Petitioner was malingering.

Co-counsel testified that lead counsel was primarily responsible for contacting and preparing Dr. Rutledge. Co-counsel did not specifically recall discussing with lead counsel the reason for not having a pretrial hearing on the intellectual disability issue but testified that "some of it had to do with Doctor Rutledge's schedule." Co-counsel also explained that "part of it also was we had the report from [ ] MTMHI that was helpful and that we were not going to press the issue because we were afraid that the State was going to fix it if we did." Co-counsel explained that by "fix it," he meant having an expert testify that the report was inaccurate, which is ultimately what happened during the post-trial hearing. Co-counsel's notes from that hearing indicated that the trial court agreed to consider evidence of intellectual disability and deficits in adaptive behavior presented during the mitigation phase. The defense waived the presence of Dr. Rutledge during the initial hearing because of her illness, and the trial court agreed to bifurcate the hearing to allow Dr. Rutledge to testify in rebuttal on a later date. Co-counsel's notes taken during Dr. Craddock's testimony for the State indicated "no work done" with regard to "measures of adaptive behavior," which co-counsel believed meant "there's no scale for adaptive behavior." Co-counsel testified that his understanding of the "clinical standard" for adaptive deficits was "you either have deficits or you don't" and that adaptive strengths did not matter. With regard to whether the defense team made a strategic decision not to investigate Petitioner's adaptive deficits, co-counsel testified that "we did endeavor to develop those things." On cross-examination, co-counsel testified that only an expert could diagnose intellectual

disability and that such a diagnosis required a finding of adaptive deficits and manifestation before the age of eighteen. On redirect examination, co-counsel testified that the "legal standard" for intellectual disability under Tennessee's statute "includes not just I.Q. score but also deficits," which was based on the "current level of medical standards."

With regard to the mitigation investigation, co-counsel testified that he was involved in some of the family meetings but that lead counsel had primary responsibility for mitigation since that had been his job when he was second chair. Co-counsel testified that he did not accompany Ms. Stanback when she met with Petitioner's family members in their homes but that he met with them in the office. Co-counsel did not meet with any of Petitioner's teachers, friends, or former neighbors. Co-counsel's notes from a team meeting two months before trial indicated that "no family members will help" with mitigation, and co-counsel explained that they were relying on Ms. Stanback "to marshal the family" to Petitioner's defense. Co-counsel testified that one of the possible mitigation themes was Petitioner's "horrendous childhood." Co-counsel denied that there was a strategic decision not to seek out or develop mitigating evidence. On cross-examination, co-counsel acknowledged that some of the mitigation evidence could "cut the other way."

Co-counsel's notes also reflected that the defense team was considering the possibility of having someone form the victim's church testify that the Catholic Church is against the death penalty. However, co-counsel explained that he did not know whether such testimony would be admissible and that they were simply "brainstorming" possible mitigation theories. Co-counsel acknowledged that a news report after the trial indicated that Mr. and Mrs. Leech did not necessarily agree with Petitioner's death sentence. On cross-examination, co-counsel testified that he presumed from the outset that the Leeches were against the death penalty because of their religion. Co-counsel testified that he did not recall "how far we got" with calling a Catholic priest to testify about the Church's position but that he would not dispute the record showing that the State's objection to such testimony was sustained.

Co-counsel reviewed his notes from a meeting with Petitioner's family on the Saturday before the start of trial that included Shirley Pruitt, the widow of Petitioner's stepfather, Walter Pruitt. The notes reflected that Petitioner's grades dropped in the sixth grade after his parents split up. Both of Petitioner's parents, as well as his grandmother, were drinking a lot, and "everything was very dysfunctional." Petitioner grew up moving from place to place, and his mother was not always around. Co-counsel's notes reflected that there was always "some fighting going on," including one incident in which Petitioner's mother shot or stabbed her boyfriend, and he ended up in the hospital; Petitioner was twenty-four years old at the time. According to Shirley Pruitt, Petitioner never had a job long enough to get his own apartment or be self-sufficient, and he never had a steady girlfriend.

Co-counsel's notes reflected that there was a second family meeting that same day with Vivian and Antonio Pruitt. At the time of the post-conviction hearing, co-counsel did not recall that Vivian Pruitt was Petitioner's mother. The notes from that meeting reflected that there was some discussion as to whether Alma Rockett or Quiana Pruitt would act as the "family historian" during the mitigation phase. According to the notes, Petitioner's mother agreed that an I.Q. test of Petitioner at sixteen years old indicated that he was "mildly mentally retarded." Petitioner's mother indicated that Petitioner never did anything wrong around her, denied "early drinking," but stated that "all boys smoked marijuana." The notes indicated that whenever Petitioner's mother was arrested, he would stay with his grandmother, who was mentally ill, and that mental illness ran in the family. On cross-examination, co-counsel testified that "probably a lot of kids did smoke marijuana" in the neighborhood where Petitioner grew up. With regard to whether Petitioner's lack of a job and lack of a stable living situation were unusual compared to his other clients, co-counsel testified that "[p]eople who are defendants often have trouble because of their situations, their traumatized childhoods, their adolescent development or lack thereof I think it's typical for the clients that I deal with."

Co-counsel testified that most of the pretrial motions had been filed before he became involved in the case. He did not recall if there was a specific strategic decision for not filing motions requesting individual voir dire or the use of juror questionnaires. Co-counsel testified that lead counsel primarily handled voir dire while co-counsel took notes. During the State's voir dire, co-counsel noted that the prosecutor stated that mitigating circumstances are "something that makes it not so bad," which co-counsel circled because he thought it was a misstatement of the law. Co-counsel denied making a conscious strategic decision not to object to the prosecutor's statement. Co-counsel did not dispute that more than one juror stated that they had heard about Dr. Smith and would not credit his testimony. Dr. Smith had been retained as an expert witness before co-counsel became involved in the case. Co-counsel was aware that Dr. Smith had resigned as the county medical examiner after he was charged with possessing explosives and lying to investigators, though co-counsel was not aware of the specific allegations. Co-counsel denied seeing an episode of 48 Hours discussing Dr. Smith's story, though he was aware that "there was some media exposure there." On cross-examination, co-counsel testified that he had never heard of using juror questionnaires or individual voir dire until he started working on capital cases.

Co-counsel testified that during the trial, lead counsel was able to lean back to confer with Petitioner, who was seated behind counsel table. Co-counsel testified that even though the attorneys had advised Petitioner not to testify during the guilt phase but only during the sentencing phase, "he did exactly the opposite." On cross-examination, co-counsel testified that the defense planned to use remorse as a mitigating circumstance but that "kind of required Mr. Pruitt to take the stand during the Sentencing Phase and he decided not to." With regard to whether

Petitioner expressed remorse during his guilt phase testimony, co-counsel recalled that Petitioner was not "the best witness for himself."

Co-counsel did not recall when Gen. Weirich became involved in this case. Co-counsel testified that Gen. Weirich did not inform the defense that her husband handled the victim's estate and that co-counsel did not learn that information until "much later." Co-counsel testified that he was aware that Gen. Weirich knew the victim through "her church community" but that he did not know if "she had much personal interaction" with the victim. Co-counsel testified that he did not think that Mr. Weirich's prior representation of the victim would have been important to the defense. Co-counsel testified that he was not sure if he would have filed a motion to disqualify Gen. Weirich on that basis but that he "would have considered anything to get either Ms. Dwyer or [Gen.] Weirich off the case because they're both good trial lawyers." Co-counsel testified that he may have addressed the issue during the cross-examination of Mr. Leech but that he did not know "what inference that might have raised for the jury."

During the State's rebuttal closing argument in the guilt phase, co-counsel objected to Gen. Weirich's statement that she "t[ook] offense" to lead counsel's argument that "nobody care[d]" about the victim because he thought it was inflammatory and improperly "put[ ] her opinion in front of the jury." Co-counsel testified that he was not aware that lead counsel was going to argue that the victim had no family and was "a little surprised that he mentioned that at all." Co-counsel testified that he continued to object during Gen. Weirich's rebuttal closing argument because he was "trying to slow her down." In co-counsel's notes, he circled the term "predators" because he "thought maybe it was an improper argument, improper way of describing my client." However, co-counsel testified that he "probably" made a strategic decision not to object to that argument "because I objected a bunch and I think that at a certain point the jury holds it against you when you interfere, and she was about to close, be done anyway so I didn't want to stop her and have her restart and get her going again." Co-counsel explained that whenever Gen. Weirich gave a closing argument, he would "read this chapter on prosecutorial misconduct because she played it very close to the line." Co-counsel testified that he did not consider filing a motion in limine regarding improper argument, explaining that Gen. Weirich "was really good at what she did, you know. We just had to be on our toes to catch her where we could."

On cross-examination, co-counsel testified that the defense team had copies of Petitioner's report cards from elementary school. Co-counsel testified that Petitioner had "done really well" on some tests in the fourth and fifth grades but that "his academic performance had dropped off precipitously around the sixth grade, maybe had a head injury at that point." The report cards reflected that Petitioner made the honor roll and principal's list in second, third, and fourth grade. Some of the handwritten comments from Petitioner's teachers indicated that Petitioner was "smart," "a good learner," "an excellent student," and had "great potential," though some cautioned about his behavior and excessive absences. On

redirect examination, co-counsel testified that he had not been to Larose Elementary and did not recall that Petitioner grew up in the adjacent Fowler Homes neighborhood. With regard to the safety and security of the children living in that area and whether the teachers cared for the children by providing food and clothes, co-counsel testified that he "relied on Ms. Stanback for a lot of that information" since "[s]he knew about the area and the culture a lot better than I ever will."

On cross-examination, co-counsel recalled seeing Petitioner being interviewed on a show called Gangland that aired shortly after the trial. Co-counsel was "a little taken back" when he saw the episode so close after trial because "[i]t appeared that [Petitioner] had done meetings with these people during my representation of him" and not told his attorneys about it. With regard to Petitioner's demeanor, co-counsel testified that "[h]e seemed very well spoken and articulate on this episode." Co-counsel testified that during the interview, Petitioner "went into some detail" about the Lemoyne Gardens gang, or LMG, including "how it was organized and who some of the players were." Co-counsel testified that defendant "knew [Petitioner] had some affiliation" with a gang, so he "wasn't surprised by that." On redirect examination, co-counsel testified that he did not know when or where the interview was filmed and that he did not know how much of the interview was edited out of the episode that eventually aired. Co-counsel agreed that because he saw the episode after Petitioner's trial, it did not affect his trial strategy but that he probably would have advised Petitioner not to participate.

Former lead counsel testified that she had worked for the Public Defender's Office for twenty-three years and was the lead attorney on Petitioner's case until she left the Capital Case Unit in December 2006. She recalled handling Petitioner's preliminary hearing in September 2005. In July 2006, Petitioner was evaluated by Midtown Mental Health, who subsequently referred Petitioner to MTMHI for further evaluation because his competency was "questionable." Former lead counsel testified that in her experience, it was "rare" that Midtown would refer someone to MTMHI. She had Petitioner sign a release so that the defense could have access to the records from MTMHI, including copies of social histories and staff reports. Former lead counsel recalled filing an ex parte motion requesting funds to hire Dr. Fred Steinberg to conduct an independent psychological evaluation of Petitioner. In December 2006, she signed a certification of the time that Dr. Steinberg spent on the case, including the time he spent drafting a forensic report. Former lead counsel testified that even after leaving the Capital Case Unit, she was willing to assist in Petitioner's case and that lead counsel even asked the supervisor if she could be "third chair" at trial, but Petitioner "said no."

On cross-examination, former lead counsel testified that she still worked in the Public Defender's Office after leaving the Capital Case Unit and was available to consult with Petitioner's defense team. She recognized a copy of Dr. Steinberg's report and testified that she did not know why a copy could not be located in the Public Defender's Office's file for Petitioner. She testified that she "wouldn't have signed the certification if the work hadn't been done, so I would have had to have

received it at least at some point in time." Dr. Steinberg's report indicated that Petitioner "was noticeably medicated and somewhat slowed in psychomotor response in the initial sessions" but that "he was more spontaneous and normal in psychomotor response" during a later session. The report stated that Petitioner's I.Q. test "indicates that he is functioning within the Borderline range of intelligence." The report indicated that Petitioner had a "tendency to exaggerate and feign mental illness" and that there was "corroborating data suggestive of symptom exaggeration and malingering of psychiatric symptoms." The report stated that further neuropsychological testing was not necessary in light of these results. Former lead counsel testified that she did not recall following up with Dr. Steinberg about his report but that she would have shared the substance of her conversation with the other members of the defense team.

Former lead counsel recognized her notes from a meeting with Petitioner in September 2005 in which Petitioner relayed his version of the incident, including detailed directions of how he and Courtney Johnson walked to the store. Former lead counsel also recognized a letter she sent to Petitioner in January 2006, which stated that she was providing Petitioner with copies of his discovery and pretrial motions that she had filed on his behalf. Former lead counsel's notes from April 2006 indicated that "Aunt Alma doesn't want us calling or coming to see her anymore." At some point, Petitioner indicated to her that he was not willing to accept any plea offers. Former lead counsel's notes from a meeting with Petitioner in December 2006 indicated that Petitioner wanted the charges reduced to manslaughter and that she explained to him that there was no chance of that happening and that the best offer the State was willing to make was life. The notes also indicated that Petitioner did not want to take the stand. Former lead counsel testified that she attended a conference with Ms. Stanback and lead counsel during which they developed mitigation themes for this case. Former lead counsel acknowledged that Petitioner filed a complaint about her with the Board of Professional Responsibility and that she wrote a response detailing the work she had done on the case.

On redirect examination, former lead counsel testified that she could not recall an occasion where she did not get a report from an expert who had worked on one of her cases. She testified that she would have concerns about discoverability if the report was unhelpful to her client but denied that she would fail to put it in her file or shred it for that reason. She testified that while she would not plan on calling such a witness to testify, she would put the report in the file if for no other reason than to be able to show on post-conviction that the evaluation was performed. Former lead counsel noted that she signed the certification for Dr. Steinberg on December 22, 2006, not long before she left the case, so she "can't say" if the report was received after she left and "somebody else did something with it." However, she testified that she would have put the report in the file had she received it so that "the people who came behind me would be able to look at it and see what's there." She also testified that she was not aware of anyone in the Public Defender's Office removing reports from files and that doing so would be an ethical issue. She

testified that the copy of the report that was entered into evidence had underlining and handwritten notes, but she did not recognize the handwriting. On recross-examination, former lead counsel testified that she recalled being "a little surprised" by the results of Dr. Steinberg's evaluation "because it came back very different from what I had heard from Middle Tennessee, and I was disappointed that it didn't say the same thing."

Jeannette Stanback testified that she worked on Petitioner's case as a mitigation investigator. She was present with former lead counsel and lead counsel during Petitioner's intake interview and took notes. Ms. Stanback gave a lay opinion that Petitioner's behavior was consistent with other defendants she had worked with who were assessed as having a low I.Q. score. Ms. Stanback testified that she regularly met with Petitioner in preparation for trial, meeting with him at the jail at least once a month if not more frequently. Ms. Stanback testified that her initial impression of Petitioner was that he was "stoic" and "unpenetrable" and that it took some time to get through to him. Ms. Stanback agreed that Petitioner was prone to child-like outbursts and was easily influenced by jailhouse lawyers. She could not recall if Petitioner was taking anti-psychotic medication.

Ms. Stanback testified that she gathered records from the jail, MTMHI, and other places. Ms. Stanback also interviewed various witnesses and compiled a report of Petitioner's social history. She testified that everyone on the defense team had access to a shared file and that they would share theories and notes during meetings. Ms. Stanback recalled the defense team meeting with Dr. Steinberg, though she admitted that she may have confused him with someone else.

Ms. Stanback testified that Petitioner grew up in South Memphis. Petitioner lived with his mother and sister in the Clementine Apartments, a poor, high-crime neighborhood. Petitioner sometimes lived with his aunt, Alma Rockett, where the conditions were better. However, at the time of his arrest, Petitioner was "couch surfing" among different residences. Ms. Stanback testified that she was familiar with the Fowler Homes neighborhood, which in the 1980s and 1990s had a reputation as being a very volatile community with high crime and low income and education.

***Lay Witnesses***

Gaynell Talley, a retired teacher, testified that she taught in the Memphis City School system for thirty-five years. Much of that time, she taught third and fifth grade at Larose Elementary School. Ms. Talley also taught a special reading program under Title I, which she explained was a government program for students who had low test scores and were living below the poverty line. Ms. Talley testified that 99% of the students at Larose were on the free lunch program, and a majority lived the nearby Fowler Homes housing project. Ms. Talley testified that the school provided a clothes closet, free school supplies, and basic hygiene products for the children. The teachers encouraged attendance by calling and visiting the children's

homes. The school provided a safe and nurturing environment for the children. Ms. Talley recalled Petitioner's name, but she did not recognize him, and he was never assigned to one of her classes.

Sirderrick Payne testified that he grew up in the Fowler Homes housing project and that he had been best friends with Petitioner since they were about eight or nine years old. Mr. Payne described the neighborhood as being "rough" with a lot of violence, crime, and drug use. On one occasion, when they were about nine or ten years old, Mr. Payne and Petitioner were outside playing curb ball when "Marco the Beast" shot at Petitioner's house while Petitioner's mother and sisters were inside. The boys hit the ground during the shooting, then afterwards ran to the house and saw big holes in the walls and door. Petitioner could not stop crying and "was crazy." Mr. Payne testified that, to his knowledge, the holes in the walls were never fixed.

Mr. Payne also described Petitioner's home life as "rough." Petitioner lived with his mother, his grandmother, his two older sisters, and his two older brothers, as well as one of his sisters' children. Although the house had five bedrooms, Petitioner did not have his own bedroom and often slept on the couch. Mr. Payne testified that Petitioner's mother and siblings were all using drugs, selling drugs, and/or engaging in prostitution. Mr. Payne testified that Petitioner's house was always loud and there was a lot of traffic in and out of the house at all hours. Petitioner's house was considered the place to "hang out, smoke, shoot dice, [and] have sex . . . [I]t was like they don't sleep."

Mr. Payne testified that Petitioner's mother could not control her drug addiction. On one occasion when he was eleven years old, Petitioner's mother offered to have sex with Mr. Payne in exchange for drugs. Petitioner's mother also used her welfare checks and food stamps to buy drugs, so by the end of the month Petitioner would either come over to Mr. Payne's house for food or would have to steal to get food. Mr. Payne testified that although his own mother was also a drug addict, she always made sure to feed and clothe her children, unlike Petitioner's mother who "ran the street to make sure she got high." Additionally, unlike Petitioner's older siblings, Mr. Payne's older siblings looked out for him and helped to provide for him.

Mr. Payne testified that the interactions between Petitioner and his mother were often violent. Petitioner's mother would yell and curse at Petitioner, call him names, and beat him with an extension cord or a belt. On one occasion, Petitioner's mother smacked Petitioner so hard that Mr. Payne thought she had broken his neck. Petitioner's mother was also violent with her boyfriends. She and her boyfriend "Buck" would get drunk or high and start fighting most days of the week. Mr. Payne testified that it happened so often that the Memphis Police Department stopped responding to the domestic disturbance calls.

Both Petitioner and Mr. Payne attended Larose Elementary School, which Mr. Payne described as "fun" and a place "where you can go, really, to feel most safe at" and where "[y]ou can eat and have food." The situation was much different at Vance Middle School, which was located near a different housing project. Mr. Payne testified that if they walked through the other housing project to get to school, they risked getting "jumped." However, if they walked the long way around, they would not get to school on time and either the doors would be locked or they would be written up for tardiness. Petitioner and Mr. Payne stopped attending school, and Mr. Payne eventually transferred to a different school because of the violence.

Mr. Payne described Petitioner as a "follower . . . [m]eaning he can't think for himself." Petitioner was constantly asking Mr. Payne what to do. Petitioner was bullied as a child because he tried to stand up for his older brother who was gay. The other children picked on Petitioner, hit him, and stole his shoes, and Petitioner was afraid to go to school. Mr. Payne testified that he started selling drugs around age nine or ten because he saw the older boys doing it and buying nice things. However, Petitioner did not sell drugs because "he didn't know how" and did not have the "mind set" to do it. Mr. Payne gave an example where someone switched real drugs for "fake" drugs without Petitioner noticing, and Petitioner ended up having to refund money to the people to whom he inadvertently sold the fake drugs. Petitioner would often lose money when trying to sell drugs, and Mr. Payne would have to help him pay for it. Mr. Payne testified that to his knowledge, Petitioner did not use drugs and denied that Petitioner was in a gang. Mr. Payne admitted that he was a member of the Vice Lords and that he was incarcerated on a second-degree murder conviction at the time of Petitioner's trial.

Myron Stewart testified that he grew up in the Fowler Homes housing project about a block away from Petitioner. Mr. Stewart testified that many of the kids who lived in Fowler Homes stopped attending school because of the difficulty involved in walking to Vance Middle School. Mr. Stewart testified that there were frequent gang fights and that "[a] lot of kids was getting jumped on and chased from school, back in the day." However, because he played sports, Mr. Stewart "had like a pass to go through different projects." Mr. Stewart also had the opportunity to spend time with family in Chicago and nicer neighborhoods in Memphis, which motivated him to do better. Mr. Stewart eventually graduated high school and attended community college. In his career, Mr. Stewart worked for the local jail, prison, and police department before leaving the criminal justice field because of too many encounters with people he knew from the old neighborhood.

Mr. Stewart explained that growing up, his house was better than most in terms of cleanliness and discipline. His mother also provided food for many of the kids, including Petitioner. Mr. Stewart testified that Petitioner's family was "dysfunctional" in comparison. Petitioner's mother had a reputation for her drinking and drug use, and there was no one to be a father figure to Petitioner. Mr. Stewart also described the violence in the neighborhood, including shootings and gang fights. Many of the young men who had stopped attending Vance Middle

School were selling marijuana for a man named "Jab-Blue" because he let them smoke as much of the marijuana as they wanted.

Mr. Stewart testified that he worked in the Shelby County Jail at the time Petitioner was incarcerated there before trial. Mr. Stewart testified that Petitioner did not seem like the same person he knew, and he was not sure that Petitioner recognized him. Mr. Stewart testified that Petitioner did not want to get up to eat or shower and that he seemed "[s]low . . . like he was out of it." Mr. Stewart testified that he had worked on the medical floor of the jail where inmates were prescribed psychiatric drugs and that Petitioner exhibited behavior like someone who had been prescribed a high dose of such drugs.

Talon Williams testified that he grew up in the Fowler Homes housing project and that he met Petitioner when they played basketball as kids. Mr. Williams testified that his mother, Doris Barker, tried to make sure that the kids in the neighborhood had clean clothes to wear, enough food to eat, and organized social activities and outings to keep them engaged. Petitioner participated in one of her programs and played on the neighborhood basketball team. Although Petitioner was a good player, he would get frustrated that he could not read the defenses and would quit a lot. Even though Petitioner wanted to be included in things, he was not good in group settings and generally did not fit in.

Petitioner spent a lot of time at Mr. Williams's house because his own house "wasn't the best place to be." Mr. Williams testified that even among others in the housing project, Petitioner's family stood out for their poverty, violence, and drug use. Petitioner's entire family used or sold drugs. Petitioner's mother was always high or drunk. Petitioner's mother and her boyfriends would fight in the front yard "pretty regular[ly]," and "it was kind of like a spectacle where people were drawn to watch them and laugh." Petitioner's house was "dark, smelly, garbage everywhere, a lot of people in and out." Mr. Williams testified that you could not sit on the minimal furniture there was because it was all infested with bed bugs. Petitioner's house was always hot in the summer because the only air conditioning unit was located in one of his brothers' bedroom behind a locked door. On one occasion, the family got evicted for failing to pay rent, and all of their belongings were put out on the curb. The community had to come together to pay their rent so that they could go back inside.

Mr. Williams testified that Petitioner did not have a lot of family support growing up. Petitioner's grandmother would stare at the television all day and mumble to herself, or she would wander off and knock on other people's doors. Mr. Williams testified that he later learned that she was mentally ill. Petitioner's brother, Tony, sold drugs and usually kept to himself and his "crew" without paying attention to Petitioner. Petitioner's sister, Tapika, was "strung out on drugs" and would often leave her children for days at a time. Petitioner's brother, Rico, was gay and was frequently assaulted due to the homophobia in the community. Mr. Williams often

provided Petitioner with clothes off of his own back, made sure that he ate, and would give him a haircut when he had not had one in a while.

Mr. Williams testified that he observed Petitioner using marijuana and cocaine as a teenager. On one occasion, Petitioner was "hanging out with a group of wrong characters" and had been using cocaine for three or four days. When Mr. Williams tried to get Petitioner out of there, Petitioner was "just spaced out, out of his mind on drugs." Mr. Williams testified that Petitioner obtained money to buy drugs by robbing people and gambling. Mr. Williams testified that Petitioner would "try to hustle crap games" but that he was usually not successful at making money because he did not understand the game.

Mr. Williams testified that he spent time in the Shelby County Jail with Petitioner prior to trial in this case. He noticed that Petitioner was "lethargic and incoherent and seemed spaced out." Mr. Williams testified that Petitioner would sit very still and that Petitioner spoke slowly and could not complete a sentence.

Doris Barker, Mr. Williams's mother, testified that she lived in the Fowler Homes housing project in the 1980s and 1990s and that she knew Petitioner as "one of the children that [she] helped to raise in our development." She first met Petitioner when he was eight or nine years old. She described Petitioner as "[a] real nice boy" who came to many of the programs that she organized. Ms. Barker explained that she planned social activities for the children in the neighborhood and tried to make sure that they did not go hungry and that they knew they were loved. Ms. Barker received a grant called Esteem Fifty for three years, which allowed her to provide tutors and organize excursions outside of the housing project. Petitioner successfully completed that program despite lacking the required parental involvement.

Ms. Barker testified that she was familiar with Petitioner's family because they lived just around the corner. Ms. Barker testified that Vivian Pruitt "wasn't one of the best mothers in the world" and that she tended to prioritize her own needs while the rest of her family "just struggle[d] along." Ms. Barker testified that Vivian "wanted to be high. She wanted to drink, or smoke crack and have a good time. She just didn't care." Ms. Barker never saw Vivian go to the grocery store or hug her children. Ms. Barker testified that Vivian only ever called on Petitioner when she needed something. For example, whenever Vivian found out that Petitioner had some money from dancing, she would take it from him.

Although Petitioner "had a roof over his head," Ms. Barker described the house as "an open door, no locks or nothing, people just walking in and there was always some confusion at that house." Ms. Barker testified that there was "[a] lot of fighting and cutting and cussing" and that Petitioner was "a child with nobody to teach him anything." Ms. Barker testified that she worked as a housing inspector for the Memphis Housing Authority. On one occasion, Vivian failed her inspection because "[t]he whole house was just torn up and in chaos. In the kitchen, dishes

piled all up and people running in and out of the house, whatever time of night, it just was bad." A second failed inspection would have meant eviction, but Vivian was able to pass the second inspection.

Ms. Barker testified that although everyone in the neighborhood was "poverty stricken" and "financial prisoners," most families "held together" while Petitioner's family had "no unity" and lacked any sense of caring, nurturing, or love. Petitioner's family also had trouble making the rent, which was usually around $30 or $35 per month. With regard to the violence in the home, Ms. Barker testified that Vivian, her live-in boyfriend "Buck," and Petitioner's siblings would fight all the time both inside and outside of the house. There were frequent occasions where someone would get stabbed or end up with a black eye. Ms. Barker testified that the neighbors eventually got used to the fighting and tried to ignore it, while the children did their best to try to escape it.

Ms. Barker testified that she met Petitioner's grandmother, Frankie Hamilton, one day when she knocked on Ms. Barker's door and asked for "a sandwich and some snuff." Ms. Hamilton told Ms. Barker that she did not have any money because her daughter, Vivian, was taking her monthly checks. Ms. Barker continued to periodically help Ms. Hamilton by feeding her and sending someone to the store to buy her snuff. Ms. Barker testified that Ms. Hamilton was a "sweet person" who "really loved" Petitioner and tried to do what she could for him. Ms. Hamilton often babysat Petitioner and his siblings' children. However, Ms. Hamilton was in bad health and had dementia. She could not go to the grocery store because of the concern that she might wander off.

Ms. Barker was also familiar with Petitioner's oldest sister, Tapika, who lived next door. Ms. Barker testified that Tapika had four children, and Ms. Barker found out that they had never been to school, had never received their immunizations, and did not know how to eat with utensils. Tapika fed the children only "powder eggs and Ramen noodles," while she gave her money and food stamps to "a couple of gigolo guys." Tapika was frequently partying and doing whatever she wanted, and she would leave the children for days at a time. Tapika also smoked crack cocaine and engaged in prostitution. Ms. Barker testified that Tapika failed to provide for her children because she was simply "repeating what she saw" from her own mother.

Ms. Barker testified that she received a letter from Petitioner about a year before the hearing in this case, thanking her for always being there for him. Ms. Barker testified that Petitioner's writing in the letter made sense and was not rambling, but it was very simple, "kind of like a kid wrote it."

Davey Floyd testified that he knew Petitioner since they were around ten or eleven years old and considered him to be his best friend growing up. Although Mr. Floyd lived elsewhere, he spent time in the Fowler Homes housing project with his father, who was known as "Jab-Blue" and was the major distributor of marijuana and cocaine in the neighborhood. Like many of the kids in the neighborhood, Petitioner

started selling drugs for Mr. Floyd's father when he was twelve or thirteen years old. This gave Petitioner unlimited access to marijuana, and he smoked "a hell of a lot" it, "way more" than the other kids. Petitioner also played dice to try to increase the money he made from selling drugs.

Mr. Floyd testified that Petitioner grew up in "a very harsh, violent, uncaring, gruesome environment." Mr. Floyd described Petitioner's house as "[n]asty, un-kept, roaches, rats, trash everywhere, smells, bullet holes in the walls." Petitioner's family was "[c]razy, violent, abusive." Mr. Floyd testified that while other families in the neighborhood were able to "handle their responsibilities" and "provide," he knew of no other family "to be so abusive and so dysfunctional" as Petitioner's family. Mr. Floyd explained that Petitioner's mother caused much of the dysfunction with her extreme drug addiction, alcoholism, violence, and prostitution. Petitioner's mother had no self-control and neglected all of her responsibilities, including her own personal hygiene. She would engage in fights in the courtyard, and people would laugh or look at her with disgust.

Mr. Floyd testified that Petitioner's mother was physically and verbally abusive toward Petitioner and did not provide for him, feed him, care for him, or tell him that she loved him. On one occasion when Petitioner was fourteen years old, he asked her for money to buy something to eat, and she cursed him out, shoved him against the wall by his throat, and then made him leave. Mr. Floyd testified that Petitioner's brother, Rico, was a child molester and that he sexually abused Petitioner and other teenaged boys. Rico also engaged in prostitution in exchange for drugs and eventually died from AIDS.

Mr. Floyd testified that Petitioner was bullied as a child. Petitioner was picked on and pushed around more than other kids because he was "a quiet, inward type person" rather than "outgoing or witty." In contrast, Petitioner's brother, Tony, "had personality and character" and was the "life of the party." People wanted to be around Tony and often provided him with food and money; however, Tony did not look out for Petitioner or feed him when he was hungry. Petitioner's sister, Quiana, also had "everything she needed" because she dated older guys who had money. Often the only food in the house was her personal food that she kept in her room, but she would only give Petitioner "something small" when he was "absolutely hungry" because he had not eaten in a couple of days. Mr. Floyd testified that he would give Petitioner food and money whenever he had any to spare.

Mr. Floyd testified that he was housed in the same pod of the Shelby County Jail as Petitioner before trial. Every time he saw Petitioner, Mr. Floyd noticed that Petitioner was "doped up on so much psych meds that he was out of it." Mr. Floyd described Petitioner as follows: "eyes rolling up in the back of his head, drooling, slobbering, coming out of his mouth . . . slow talking, can't think straight, not . . . responding properly . . . no mind function."

Shirley Jean Pruitt testified that she married Walter Pruitt in 1994. Walter was previously married to Petitioner's mother, Vivian Pruitt. Shirley testified that Vivian was much younger than Walter and "they just didn't get along." When Walter was with Vivian, he drank heavily and "was in and out of trouble and jail." After Walter met Shirley, he eventually stopped drinking and started attending church. Even though Walter was not Petitioner's biological father, he considered Petitioner to be his son, and Walter introduced Petitioner and his siblings to Shirley as his children. Shirley testified that Walter tried to maintain contact with the children after he and Vivian split up. Vivian would not interfere with these visits if Walter brought her some money or something to drink. However, if Walter told her that he did not have anything, Vivian would start cursing and complaining about his relationship with Shirley, asking "why was he bringing this 'B' to her house." Vivian would even grab at Shirley through the window of Walter's truck. Eventually, Shirley stopped accompanying Walter on these visits because "it was just too much of a problem." Shirley testified that Walter only saw Petitioner "off and on." Shirley testified that Walter "loved [Petitioner] and cared about him, but Walter was kind of guilty, he felt guilty about not staying there with them."

Shirley testified that she met with Petitioner's attorneys when they asked her to provide some clothes for him to wear at trial. However, they did not ask her any questions about Petitioner's life and simply told her that they were going to raise an insanity plea because paranoid schizophrenia ran in Petitioner's family. Shirley identified a photograph from trial counsel's file that was marked "Corinio Pruitt's family." Shirley testified that the picture did not depict Petitioner and his siblings but was instead a picture of Walter's daughter from a prior relationship with her half-siblings, who lived in St. Louis and who Petitioner had never met.

Marsha McMillan testified that she knew Petitioner because she was married to Walter Pruitt's brother. Additionally, both Ms. McMillan and Petitioner worked at Patterson Warehouse through a temporary agency called LSI. Ms. McMillan was a supervisor at Patterson Warehouse, and Petitioner worked there for three or four months before his arrest in this case. Ms. McMillan testified that Petitioner would take the bus to get to work and sometimes would arrive late. Ms. McMillan testified that Petitioner had trouble reading instructions on paperwork for loading specific items on a pallet and often had to work with Ms. McMillan to get it right. When putting together a display, most employees were able to correctly follow the model, but Petitioner struggled such that Ms. McMillan had to step in and show him how to do it. Petitioner had an accident with a hand-jack loader where a pallet turned over, and Ms. McMillan testified that other employees did not have similar accidents on a regular basis. Petitioner also had problems putting items into the compactor the correct way so that it would not get jammed. Ms. McMillan testified that to her knowledge, Petitioner was not high while he was at work, but she only found out about Petitioner's drug use after the fact.

***Petitioner's Expert Witnesses***

Dr. Jonathan Joseph Lipman testified as an expert in the field of neuropharmacology, which he explained is the science of how drugs act on the brain and affect behavior. Dr. Lipman testified that in this case, he was asked to "opine on the possible forensic relevance of [Petitioner's] early adolescent cannabis use." Dr. Lipman reviewed records from court files, the reports of psychological evaluations of Petitioner conducted by other experts, medical records, and collateral witness interviews provided by post-conviction counsel. Dr. Lipman did not personally interview Petitioner but relied on interviews conducted by other experts in this case. Dr. Lipman testified that these sources indicated that Petitioner started smoking marijuana at age fourteen, or possibly as early as age twelve, and that Petitioner smoked "frankly an outrageous amount" of 2 to 2.5 ounces of marijuana per day. Dr. Lipman opined that Petitioner's early and heavy marijuana use "likely added to the pre-existing intellectual impairments and the cognitive dysfunction" and that "drug abuse more likely than not interfered detrimentally in his brain's development during this critical period of brain maturation in his teenage years."

Dr. Lipman testified that brain development during childhood "is an extremely dynamic process" and that "[t]here are so many opportunities to interrupt that," including pre-natal development, social and environmental factors, and drug use, which can "produce profound chemical changes in the brain" and "synergize with each other to produce a more than addictive impairment." Dr. Lipman testified that Petitioner likely had pre-existing impairments due to his pre-natal exposure to drugs and alcohol and his "chaotic" upbringing. Petitioner's mother had a "profound arrest history for drug and other offenses during pregnancy," including being arrested for shooting Petitioner's biological father three days before Petitioner's birth. Petitioner's birth records indicated that "he was not normal at birth." Specifically, Petitioner's birth weight was at the "low end of normal," his head circumference was in the third percentile, the sagittal suture in his skull was "gaping open," and his left eye "bugging out and swollen." Petitioner was then "brought up in frankly deprived circumstances" where his "main caregiver was a paranoid schizophrenic lady" and his mother "exchanged drugs for sex and . . . was constantly being arrested." Dr. Lipman explained that the "synergistic impacts" of Petitioner's gestational impairments and social deprivation meant that "[h]e was not a normal child when he started to abuse marijuana at age [twelve] to [fourteen]."

Dr. Lipman described a large epidemiological study that found that early marijuana use "produces measurable intellectual and cognitive deficits later on in life." The study found that certain participants "had neuropsychological impairments that could not be attributed to anything other than early marijuana use" and that were distinct from those who started using marijuana after their brains were more fully developed. Dr. Lipman explained that marijuana's impact on I.Q. scores and neuropsychological testing was "an indication of neurotoxicity." Dr. Lipman explained that the frontal lobe, which controls executive functions such as planning and judgment, is the last part of the brain to develop and is the most sensitive to

damage. Dr. Lipman testified that some people might be able to "resist some of the damage that marijuana can do at that age" if they had a "well nourished brain that had been properly stimulated from birth with nurturing learning experiences," but that Petitioner's "was not such a brain." Dr. Lipman testified that Petitioner's various I.Q. scores were "consistent with a degenerative process as occurring at or after age fourteen," when he achieved his highest score on an intelligence test. Dr. Lipman testified that Petitioner's arrest record was consistent with someone with a damaged frontal lobe, since such "individuals are impulsive and they get into a lot of trouble."

Dr. Lipman testified that a person with frontal lobe damage might be more likely to develop a drug abuse habit because they "cannot apply judgement [as] clearly as a normal person and cannot resist as easily as a normal person." Dr. Lipman testified that one's social environment can also contribute to drug abuse "because modeling is where children get their ideas of what normality is. When everyone is buying, selling and using drugs that may seem normal to a child, not the thing to be resisted." Dr. Lipman testified that post-traumatic stress disorder can also "predispose someone to an appetite for tranquilizing drugs particularly" and that they "might self-medicate with marijuana."

On cross-examination, Dr. Lipman agreed that certain drugs may be associated with violent crime and that neurotoxicity can cause violent behavior as well as other neurological diseases. Dr. Lipman agreed that marijuana can be addictive, can be a gateway drug, and can increase rates of juvenile crime. Dr. Lipman testified that marijuana use can lead to mental health issues "[i]n vulnerable people" and "can provoke psychosis" in those who may be predisposed. Dr. Lipman testified that he was not aware how common Petitioner's experiences were compared to others in Memphis, including the lack of prenatal care, the stressful home environment, parental arrest records, and juvenile use of marijuana. The State presented Dr. Lipman with a longitudinal study of twins that suggested that the decline in I.Q. scores may not be attributable solely to marijuana exposure but to underlying environmental factors that are common to both marijuana use and low intellectual attainment. The State also presented Dr. Lipman with a recent meta-analysis that suggested that "the magnitude and persistence of cognitive deficits" associated with marijuana use may have been "overstated" in previous studies. The meta-analysis suggested that observed deficits may be associated with "acute use or withdrawal" and that abstinence may be associated with "restored cognitive functioning." However, Dr. Lipman testified that the meta-analysis only compared cross-sectional studies and specifically excluded longitudinal studies like the one he described on direct examination, so the results may not necessarily be contradictory.

On redirect examination, Dr. Lipman testified that the twin study suggested that there were "multiple interacting factors" causing intellectual decline; however, "environmental stress" would be consistent between the twins living in the same home. The study found that "the effects of the environment was greater than the

effect of the marijuana use, although marijuana users had lower test scores relative to non-users and showed a significant decline in crystallized intelligence between pre-adolescence and later adolescence." Dr. Lipman described Petitioner's environment as follows:

> His upbringing was -- I don't want to say deprived but emotionally, socially, educationally, intellectually and in terms of adult modeling was impoverished, and stressful. People are being shot around him. He was unwashed, he was not cared for, he smelled of urine according to his school friends, his neighborhood friends. He was afraid to go home. He had a very stressful upbringing. His responsible caregiver, his grandmother who was apparently schizophrenic, his mother was a most unsuitable lady.

Dr. Lipman explained that gestational impairment, environmental stress, and neurotoxicity from substances like marijuana have a "synergistic effect," meaning that while "it might be possible to survive any one of them[,] when they are combined the damage is more than additive." Dr. Lipman testified that he relied on multiple studies showing the effect of marijuana on brain development in writing his report in this case.

Katy Spurlock with the Urban Child Institute testified as an expert in "identifying and communicating information regarding early childhood brain development and trauma." Ms. Spurlock testified that she worked with nonprofit organizations, health care providers, and policymakers to develop training programs and public awareness campaigns designed to translate the scientific research on early childhood development into terms that lay people can understand and use to change their behavior in order to improve public health outcomes.

Ms. Spurlock testified regarding the impact of adverse childhood experiences ("ACEs") on childhood development and public health outcomes. An initial study by Kaiser Permanente in the 1990s identified ten ACEs related to abuse (physical, emotional, and sexual), neglect (physical and emotional), and household dysfunction (mental illness, incarceration, substance abuse, death, and divorce). Subsequent studies have identified additional ACEs, including poverty, racism, community violence, and bullying. These studies have found that 30% of people had experienced at least one ACE, while 12-15% had experienced four or more. Ms. Spurlock testified that the studies showed a "dose response relationship," meaning that the more ACEs a person has had, the worse their health and educational outcomes are over the course of their life. Ms. Spurlock testified that the odds for certain outcomes, such as substance abuse, mental health issues, attempted suicide, and involvement in the criminal justice system, are "pretty astronomical" for people with four or more ACEs.

Ms. Spurlock explained that the brain continues to grow and develop after birth and is not fully developed until around age 25. Ms. Spurlock explained that "those early

years when the brain is not fully formed, an assault to the brain that is related to these adverse childhood experiences and trauma, is particularly damaging when the brain is at its most vulnerable." Ms. Spurlock testified that if the stress and trauma associated with ACEs are not mitigated in any way, such as with the support of a caring adult, they can cause lasting damage to the developing brain. Ms. Spurlock explained the "cascade effect," where a disruption in cognitive development can lead to a "lack of success in school and relationships and health," which leads to risk taking, social and emotional issues, adverse health outcomes, and eventually an early death. Ms. Spurlock explained that a child may be able to overcome the effects of ACEs if they receive adequate family or community support, known as "building resiliency." However, it becomes more difficult to build resilience as the child gets older and experiences more ACEs. Additionally, poverty exacerbates the effects of ACEs because of the increased family stress and lack of access to resources to address psychological needs.

On cross-examination, Ms. Spurlock testified there is a correlation between ACEs and criminal behavior later in life. Ms. Spurlock testified that someone who does well in their elementary school years may have someone in their life, such as a teacher, who is "nurturing them in a way that helps them that mitigates some of those adverse childhood experiences for some success." Ms. Spurlock testified that a 2014 study conducted in Memphis showed while the percentage of people who reported having at least one ACE was similar to the results of studies conducted nationwide, there was an increased rate of emotional abuse and neglect, domestic violence, and sexual abuse.

Dr. Richard G. Dudley, Jr., a physician with a specialty in psychiatry, testified that he was asked to conduct a psychiatric evaluation of Petitioner. Dr. Dudley conducted a clinical interview with Petitioner over the course of four days, gathering background information and evaluating Petitioner's mental status and possible symptoms. Dr. Dudley also reviewed various records related to Petitioner's trial and family history, social history interviews, and the evaluations conducted by the other experts in this case. Dr. Dudley testified that it was his opinion that Petitioner's psychiatric difficulties could have been presented as mitigation evidence and also impacted his competency to stand trial.

Dr. Dudley explained that examining any family history of mental health issues was important because of the increased genetic risk of Petitioner's developing psychiatric issues as well as the impact such issues would have on the environment in which Petitioner was raised. Dr. Dudley testified that Petitioner's family history was replete with a variety of mental health disorders, substance abuse, seizure disorders, intellectual disorders, and lengthy criminal records. Specifically, Petitioner's maternal grandmother, Frankie Hamilton – who was one of Petitioner's primary caretakers – suffered from schizophrenia, did not consistently comply with treatment, and was periodically hospitalized in psychiatric institutions. Petitioner's biological father, Terry McGirt, was assessed as having an I.Q. score of 68 when he was sixteen years old. Petitioner's mother, Vivian Pruitt, had a history of drug

and alcohol abuse, drank during her pregnancy with Petitioner, was incarcerated on multiple occasions, and had a "long history of difficult relationships with considerable domestic violence."

Dr. Dudley gave his opinion that Petitioner "suffered from multiple psychiatric and neuropsychiatric difficulties" related to trauma endured during childhood and adolescence, which occurred in "the absence of the type of parenting that might have helped to mitigate its effect." Petitioner displayed "the classic symptoms of trauma, hypervigilance, over reactivity, and the like, even some dissociation." Additionally, Petitioner had "other developmental difficulties characterized by instability" affecting "important areas of functioning such as attachment, sense of self, mood regulation and decision making," as well as "intellectual and/or other cognitive difficulties." Petitioner's birth records indicated "some gestational difficulties" associated with his mother's use of alcohol during pregnancy and lack of prenatal care, which may have contributed to the development of some of Petitioner's mental health issues and cognitive deficits. Dr. Dudley attributed Petitioner's "significant history of marijuana use and abuse" to his family history of substance abuse, to the fact that it was common in the environment in which Petitioner grew up, and to Petitioner's discovery that "marijuana was helpful in calming some of the symptoms" previously described. As Petitioner grew older, he "struggle[d] with depression often accompanied with suicidal ideations and some attempts, and also then there was the emergence of psychotic symptoms characterized primarily by paranoia delusions and periods of auditory hallucinations."

In describing Petitioner's history of trauma, Dr. Dudley explained that Petitioner experienced various traumas inside the home during his early childhood as well as traumas outside the home and in the community as a teenager. Dr. Dudley explained that Petitioner had more difficulty acknowledging and talking about the traumas he experienced in the home. As a child, Petitioner was exposed to both his mother's and grandmother's "difficulties," including his mother's being stabbed when Petitioner was nine years old. When he was five years old, Petitioner was sexually abused for a period of time by a friend of his mother. Although his grandmother may have known, the abuse was never discussed with Petitioner's family and contributed to his feelings of being unsafe and not protected. The family's money often went toward drugs rather than caring for Petitioner and his siblings, and Petitioner began performing in the streets to try to raise money to take care of some basic needs. As a teenager, Petitioner was assaulted, robbed, had a gun pointed at this head, and was in and out of juvenile detention. Petitioner's home was shot at, and there were frequent shootings in the neighborhood. When he was fifteen years old, Petitioner lost a group of friends to a violent car accident. Dr. Dudley acknowledged that there was some discrepancy as to whether Petitioner actually witnessed the accident or whether he was in juvenile detention at the time. However, Dr. Dudley testified that "clearly [Petitioner] knew about it and knew the details associated with it" such that it "contribut[ed] to the larger picture of the kind of multiple traumas that he endured during his adolescent years."

During the clinical interviews with Dr. Dudley, Petitioner talked a lot about his feelings of hypervigilance and concerns about harm. He described the nightmares and intrusive thoughts he had about the violence he witnessed. He became anxious, nervous, and depressed when describing his past traumas as well as displayed "some spacey dissociative sorts of symptoms." Dr. Dudley explained that Petitioner lacked any kind of nurturing parental support to help him build resiliency and cope with the repeated exposure to violence. Dr. Dudley testified that the situation was further complicated by Petitioner's intellectual and cognitive impairments as well as his marijuana use, explaining that "while each of them have their own individual effect on a person's ability to function, . . . they're also interactive with each other and . . . in many cases they exacerbate the effect of each other and their interaction."

Dr. Dudley testified regarding the stressors in Petitioner's life around the time of the offense in this case. Petitioner was released from prison in 2004 and was "trying to get his life on track in some sort of positive way" by having a job and being able to support himself. However, Petitioner had "difficulty sustaining employment for a variety of reasons," including difficulty learning the tasks required and being able to do them efficiently. Because Petitioner was not able to financially support himself, he moved around living with different family members. For a time, Petitioner was in a relationship that was "quite supportive" and contributed a sense of stability, so it was "pretty devastating" when that relationship ended. Petitioner was struggling with depression and the emergence of psychotic symptoms.

Dr. Dudley reviewed Petitioner's jail medical records. Petitioner was prescribed Risperdal and Cogentin to treat his schizophrenia and depression. Petitioner was prescribed a dosage of 6 milligrams of Risperdal throughout the course of the trial. Dr. Dudley testified that the "normal dosage" was 2-3 milligrams and that a 6 milligram dose was "high enough that it would leave most people sedated." Dr. Dudley believed that Petitioner was taking the Risperdal in the evening, which "would leave him . . . sedated in the morning." People who observed Petitioner described him as acting "doped up, sedated." Petitioner also reported feeling sedated, unable to focus or pay attention, and not understanding what his attorneys were telling him. Petitioner also believed that his attorneys were working against him and trying to harm him. Dr. Dudley had "a serious question about [Petitioner's] competency at the trial" due to the combination of his intellectual cognitive difficulties, psychotic symptoms and paranoia, and the sedation caused by the medication, all of which interfered with his ability to trust and work with his attorneys and to understand the nuances of important decisions, such as whether to testify. Dr. Dudley testified that Petitioner was still "in a lot of physical and emotional distress at the time that I saw him" in 2015 and 2016. Petitioner complained about his health and various bizarre medical issues, such has leaking bodily fluids, and he expressed a belief that the doctors were part of a larger plot to torture him. Dr. Dudley testified that Petitioner's "underlying intellectual cognitive difficulties were evident clinically" and would have caused difficulty in trying to

get Petitioner "to understand and demonstrate a capacity to make some reasonable decisions."

On cross-examination, Dr. Dudley testified that he always considers the possibility of malingering when conducting an evaluation. In his opinion, Petitioner was not malingering. Dr. Dudley acknowledged that he did not administer a standardized test for malingering and that he does not do so as part of his regular practice. Dr. Dudley explained that he instead considered "whether the symptoms . . . [are] presented in the way that we know that they present as opposed to . . . a way that a lay person might think that mental illness looks like[.]" Additionally, Dr. Dudley considered other sources of information to see whether similar symptoms were being reported before the offense. Dr. Dudley believed that "the things that [Petitioner] told me were essentially true." However, with regard to the incident in which several of Petitioner's friends died in a car crash, Dr. Dudley acknowledged that Petitioner told him that the friends had asked him to accompany them joyriding and that he witnessed the scene of the crash even though records indicated that Petitioner may have actually been in juvenile detention at the time. Dr. Dudley acknowledged that he did not interview anyone other than Petitioner and that [ ] all of the documents and interview summaries he reviewed were provided by the post-conviction defense team.

Dr. Dudley testified that it was unlikely that Petitioner's grandmother's schizophrenia was caused by syphilis because she had a long history of psychotic symptoms that predated her other health problems as well as a family history of schizophrenia. Dr. Dudley testified that Petitioner's biological father was a juvenile at the time he fathered Petitioner. Although Dr. Dudley testified that Petitioner's birth records were consistent with gestational difficulties and a lack of prenatal care, he did not know the medical significance of the notation that Petitioner's sagittal suture was open.

Dr. Dudley testified that when Petitioner first began to use marijuana, he discovered that it helped alleviate some of the fear and anxiety associated with his trauma, which rapidly lead to his abuse of marijuana. Additionally, Petitioner grew up in an environment in which substance abuse was common, and he may have also enjoyed the feeling of being high. Dr. Dudley testified that someone who is "psychologically pulled together" may be more successful in addressing a substance abuse problem "compared to individuals who suffer from a combination of substance abuse difficulties and other psychiatric difficulties and intellectual difficulties and a mixture of things like [Petitioner]." Dr. Dudley agreed that it was "fair to say" that a lot of people in Memphis have substance abuse problems, especially in "neighborhoods where there's been considerable violence, drugs, and poverty." Dr. Dudley agreed that Petitioner grew up in such a neighborhood. In addition to using marijuana continuously since the age of fourteen, Petitioner also used cocaine for a period of time when he was sixteen, but he eventually stopped using it because he found it made him more anxious and paranoid. As an adult, Petitioner also used various pills, like Xanax and Lortab, and also tried

methamphetamine. Petitioner did not mention to Dr. Dudley that he was in a gang, but Dr. Dudley testified that it was not uncommon for someone who grew up in a violent neighborhood to join a gang.

Dr. Dudley testified that he would consider depression and suicidal ideation to be unusual, but not unheard of, in jail populations. Dr. Dudley testified that Petitioner experienced depression and suicidal ideation both while in and out of incarceration. In Dr. Dudley's opinion, Petitioner was incompetent at the time of trial due to the combination of his intellectual disability, "other psychiatric difficulties," and the high doses of anti-psychotic medication that he was taking. Dr. Dudley agreed that the Physician's Desk Reference indicated that the recommended dose of Risperdal is between 4 and 8 milligrams per day, which Dr. Dudley testified is usually given in divided doses. Dr. Dudley testified that in his opinion, a single dose of 6 milligrams per day was a high dose and was associated with more adverse effects. Dr. Dudley could not recall who had reported observing Petitioner as seeming "doped up" but stated that "there were a range of people who were observing him around the time of the trial" and that statements from people in the jail would be relevant to whether Petitioner was competent at the time of trial. During redirect examination, Dr. Dudley testified that he did not see Petitioner having much interaction with his post-conviction attorneys from where he was sitting several feet behind counsel table.

Dr. Pamela Mary Auble testified as an expert in the field of neuropsychology, which she explained "is the understanding of brain behavior relationships" and "evaluating people to determine if they have mental or emotional deficits or impairments." Dr. Auble testified that Petitioner had never received a full neuropsychological examination before she was asked to conduct one for this post-conviction proceeding. Dr. Auble testified that she reviewed various records associated with this case, including the pretrial evaluations conducted by Dr. Craddock and Dr. Steinberg, as well as the reports generated by the other experts who testified during the post-conviction hearing. Dr. Auble tested Petitioner across several dates in August 2016. Dr. Auble explained that the testing took multiple sessions because Petitioner would complain of back pain, and she did not want him to become fatigued and not put forth his best effort. Dr. Auble also met with Petitioner in 2018 to administer two additional subtests in response to some results of the testing by the State's expert, Dr. Tucker Johnson. Dr. Auble testified that the battery of tests she administered were designed "to measure in a quantitative standard fashion aspects of human behavior," including "tension and motor skills, memory, speech, language, spatial skills, reasoning, problem solving, judgment, planning, . . . [and] dealing with changing situations." Dr. Auble explained that the tests she administered are standardized and that you can compare a person's performance to "normative data."

Dr. Auble testified that it is important to test a person's level of effort to determine whether they are "doing their best" and not malingering. Dr. Auble administered two stand-alone tests of effort as well as several measures of effort embedded

within the other tests she administered to Petitioner and concluded that Petitioner was not malingering. Dr. Auble testified that both Dr. Craddock and Dr. Steinberg administered the Wechsler Intelligence Scale, which included embedded measures of effort, but neither administered a stand-alone test of effort. Dr. Craddock also administered a personality assessment inventory, the results of which indicated that Petitioner "had some trouble understanding some of the questions" because "he was either not reading it, he was responding randomly or he was confused." Dr. Auble explained that "when you get [results] like that you just can't interpret the rest of the test because he's not answering them in a reliable fashion." Dr. Steinberg also administered a test in which Petitioner gave a "striking" number of "inconsistent" responses regarding various psychological symptoms. Dr. Auble explained that Petitioner's responses on that test were not "reliable" because "maybe he's not always understanding what he's being asked or maybe he's responding without paying attention to what he's being asked." One of the embedded tests of effort on the Wechsler Intelligence Scale is the reliable digit span subtest, and Petitioner's scores on this subtest when administered by Dr. Craddock, Dr. Steinberg, Dr. Johnson, and Dr. Auble indicated that he was "putting forth adequate effort."

Dr. Auble testified that she administered over 20 neuropsychological tests and subtests to Petitioner, which revealed significant impairments in "two main areas": executive functioning and memory. Dr. Auble defined executive functioning as "capacities that enable a person to engage successfully in independent purposes self-directed and self-serving behavior." Dr. Auble explained that impairments in executive functioning can "show up globally because they affect all aspects of behavior," including "approaching or planning or carrying out mental tasks or monitoring your performance." Dr. Auble testified that in the neuropsychological context, memory is defined as "the ability to learn new information." Based on her testing, Dr. Auble found that Petitioner "was particularly impaired on tests which required him to produce information, to engage in reasoning or organization, or to grasp new incoming material."

Dr. Auble testified that Petitioner had difficulty getting set for tasks and understanding what he was supposed to do on a certain test. Dr. Auble had to repeatedly explain the instructions to Petitioner, and she testified that Petitioner's "inability to understand" was "very striking." Another issue that Dr. Auble noticed was that Petitioner's reasoning was "very rigid, very concrete." Dr. Auble testified that Petitioner had difficulty putting together different pieces of information to come up with correct answers. Dr. Auble testified that Petitioner had difficulty shifting from one idea to another, which related to his ability to "change [his] behavior to adapt to what's happening out in the world." If Petitioner received intervening information, it negatively impacted his ability to recall the original information. Dr. Auble testified that Petitioner "had significant trouble remembering new information, and that was especially true when he had to generate that information himself." Both Dr. Craddock and Dr. Steinberg had found similar impairments during their pretrial intelligence testing of Petitioner. Dr. Auble testified that Petitioner scored in the fifth percentile or below on many of the tests

she administered. Dr. Auble testified that Petitioner's memory was "worse than expected" for someone of his level of intelligence, which is generally an indicator of a brain injury. However, Petitioner did well in certain areas, such as paying attention adequately during the tests and performing well on some "speeded tests."

Dr. Auble testified that she diagnosed Petitioner as having mild intellectual disability and mild neuro-cognitive disorder under the current DSM-5. Dr. Auble testified that under the DSM-4TR in use during the pretrial evaluations in 2006, she would have diagnosed Petitioner with mild mental retardation and substance induced persisting dementia, which refers to "impairments in memory and certain other areas of functioning." Dr. Auble explained that neuro-cognitive disorder refers to "impairments in cognition that represented decline from the previous level of functioning," which was consistent with the impairments found by both Dr. Craddock and Dr. Steinberg in 2006. In explaining how neuro-cognitive disorder impacts Petitioner's ability to function, Dr. Auble testified that Petitioner struggled to understand new things, had difficulty remembering things he was told, had "trouble going back and forth between different ideas," had difficulty planning or prioritizing, was unable to retain information needed to think through a problem, was inflexible and impulsive, and had difficulty accurately perceiving social situations. Dr. Auble testified that "these deficits would also impair him in making life decisions or doing complicated real life tasks."

Dr. Auble testified that for a diagnosis of intellectual disability, an individual must have deficits in intellectual functioning, which includes "reasoning, problem solving, planning, abstract thinking, judgement, those kinds of things." Dr. Auble testified that according to the DSM-5, "individual cognitive profiles based on neuropsychological testing . . . can help you understand intellectual abilities better than a single I.Q. score." An individual must also have adaptive deficits, which "are the failure to meet developmental and socio-cultural standards for personal independence and social responsibility." Dr. Auble explained that adaptive deficits "limit your functioning in one or more activities of daily life, and those can include communication, social participation, independent living and they also have to be present across multiple environments like home, at school, at work." Dr. Auble testified that there are three categories of adaptive behavior: the conceptual domain, which includes "academic abilities" as well as "abstract thinking, planning, strategizing, solving problems, setting priorities, mental flexibility, short term memory"; the social domain, which includes conversation and communication, understanding of risk in social situations, social judgement, and gullibility; and the practical domain, which includes personal care, complex daily living tasks, money management, recreation, health care, and vocational skills. Finally, the intellectual disability must have manifested during the developmental period. Dr. Auble testified that Petitioner met the criteria for a diagnosis of intellectual disability.

Dr. Auble testified that there are multiple risk factors for developing intellectual disability. Dr. Auble testified that intellectual disability is not always something a person is born with or caused by genetics, explaining that "someone can be born

with [a] perfectly normal genetic profile but develop intellectual disability due to a lot of other factors like an early injury or child abuse." Based upon the records provided and interviews conducted in this case, Dr. Auble identified many risk factors in Petitioner's life that were either definitely present or potentially present, including the ACEs, trauma, and marijuana use previously discussed. Dr. Auble testified that Petitioner had both maternal and paternal family members with significant mental illness and that Petitioner was diagnosed with schizophrenia by MTMHI in 2006. Dr. Auble testified that mental illness is often a comorbidity with intellectual disability and may be caused by similar factors, such as brain injury, ACEs, or a genetic abnormality. Dr. Auble noted Dr. Lipman's report that heavy marijuana use is correlated with both psychosis and depression as well as deficits in cognition and memory. Dr. Auble testified that Petitioner's "intellectual disability and his mental illness are inter-related. They serve to aggravate each other and they combine together to limit his adaptive functioning."

Dr. Auble testified that Petitioner met the statutory definition for intellectual disability and that this was true at the time of the offense and at trial. Dr. Auble agreed that she did not administer any intelligence tests to Petitioner as part of her evaluation because she was informed by post-conviction counsel that the Tennessee Supreme Court had already concluded that the first prong had been established. However, Dr. Auble reviewed the intelligence tests administered by Dr. Craddock and Dr. Steinberg in 2006 and by Dr. Johnson in 2017. Dr. Auble testified that Petitioner's mean score among the three tests was 70.3, which in her opinion placed Petitioner within the range of the statutory definition of intellectual disability. Dr. Auble also compared Petitioner's scores on the different subtests and noted that Petitioner mostly scored "within a couple of points" each time. Dr. Auble testified that "a lot of stability over time . . . is an indication of validity," explaining that someone who was malingering would have difficulty remembering "what things you did good on and what things you didn't do so good on and to repeat that so that you come up with similar subtest scores." Dr. Auble testified that the one discrepancy she noted was the Matrix Reasoning subtest, in which Petitioner received a "much higher" score on the test administered by Dr. Johnson. Dr. Auble noted that Petitioner's responses were "variable" between correct and incorrect answers. Dr. Auble explained that due to the style of the questions, it was possible to get a higher score just by guessing. Dr. Auble decided to re-administer this subtest to Petitioner along with the Digit Span test, which includes an embedded measure of effort and on which Petitioner's scores had been very stable. Petitioner scored "slightly but not significantly higher than the 2006 evaluation but lower than in 2017" on the Matrix Reasoning test, which indicated to Dr. Auble that Petitioner may have benefitted from some lucky guesses rather than that he had learned how to do the test.

Dr. Auble testified that Petitioner's impaired functioning manifested before the age of eighteen, stating her belief that "it was a gradual onset." Dr. Auble noted the risk factors present around the time of Petitioner's birth, including an incident of domestic violence between Petitioner's mother and biological father just prior to

Petitioner's birth, which could have affected Petitioner and made him more vulnerable to post-traumatic stress disorder. Dr. Auble testified that Petitioner did not start school until he was seven and a half years old and that he repeated the first grade. Petitioner started doing well when he "found that school was a safe place." Dr. Auble testified that Petitioner's good grades and achievement test scores in elementary school could have been due to inflation, "[b]ut the fact that [Petitioner] did as well as he did suggest[ed] that he was working hard and he . . . liked school." However, Petitioner's "home life was beyond awful" with his mother's frequent arrests, substance abuse, and violence; his stepfather's abandonment; his grandmother's serious mental illness; and the family's extreme poverty. By middle school, Petitioner's grades began deteriorating because Petitioner had to walk through a dangerous neighborhood to get to school and because Petitioner began to use "an incredible amount" of marijuana every day. Dr. Auble testified that when Petitioner was fourteen years old, he received a verbal I.Q. score of 81, which was "lower than you'd expect given his achievement testing." Petitioner scored lower than that on the screening test conducted by Dr. Rutledge when he was sixteen years old and lower still when he was evaluated in 2006. Dr. Auble cited a study that found that early marijuana use could contribute to a decline in mental ability and testified that Petitioner's scores on the tests she administered were consistent with that study.

Dr. Auble testified that Petitioner has deficits in adaptive behavior. Dr. Auble testified that her neuropsychological assessment primarily addresses adaptive deficits in the conceptual domain but would also have an impact on the social and practical domains as well. Dr. Auble testified that in the conceptual domain, Petitioner has impairments in "abstract thinking, planning, formulating strategies, setting priorities, mental flexibility and short term memory. He has a concrete approach to problems and solutions." In the social domain, Dr. Auble testified that Petitioner "is likely to have a limited understanding of risk in social situations because he [has] trouble processing changing situations. He is likely to have poor social judgement." In the practical domain, Dr. Auble testified that "while [Petitioner] can engage in personal care, I think complex tasks like organizing child care, managing money, . . . or making complex decisions about things like health care or working in a skilled [v]ocation, all of those would be impaired because of the deficits that I found."

Dr. Auble agreed that Petitioner had disabilities in the areas of reasoning, judgment, and impulse control, thus lessening his culpability. Dr. Auble testified that the transcript of Petitioner's trial testimony indicated that "his understanding of the issues in his case were very limited." Dr. Auble testified that in reviewing the records available at the time of trial, including the testing conducted by Dr. Craddock and Dr. Steinberg, she would have recommended a full neuropsychological assessment of Petitioner. Dr. Auble testified that she was able to review significantly more social history information than was provided to either Dr. Craddock or Dr. Steinberg.

On cross-examination, Dr. Auble testified that it is not unexpected for a person's scores to "vary a little bit" when the same test is administered multiple times. Dr. Auble explained that standardized tests are designed to compare a person to the "normal population." Dr. Auble agreed that failing to follow the manual for administering a particular test could affect the validity of the results and make them harder to interpret.

Dr. Auble explained that a diagnosis of mild neuro-cognitive disorder under the DSM-5 was the same as a diagnosis of substance induced persisting dementia under the DSM-4TR and that the name had simply changed between the two editions. Dr. Auble explained that it was common for a person with intellectual disability to have a "co-occurring diagnosis" of mild neuro-cognitive disorder when "it is caused by an event or something that happens that makes the person's abilities decline or get worse in that developmental period." Dr. Auble testified that she did not believe that Petitioner was born with intellectual disability but that "it was a gradual progression," again noting Petitioner's childhood risk factors, heavy marijuana use, and emotional trauma. Dr. Auble testified that she believed that Petitioner's use of marijuana damaged his brain; however, Dr. Auble acknowledged that she is not an expert on neuroimaging of brains to detect such damage and that no such imaging was conducted on Petitioner.

With regard to her conclusion that Petitioner may have benefitted from some lucky guesses when he scored higher on Dr. Johnson's administration of the Matrix Reasoning subtest, Dr. Auble clarified that she was "not saying [Petitioner was] guessing through the whole test." Dr. Auble explained that "as the test goes on, his choices involve more guessing" as the questions got more difficult.

Dr. Auble testified that she did not interview anyone to evaluate Petitioner's adaptive deficits and that her conclusions were based solely on her neuropsychological testing. Dr. Auble testified that the risk factors she identified on direct examination "are associated with intellectual disability and thought to contribute to the development of intellectual disability." In Petitioner's case, those risk factors included Petitioner's drug use; his family's extreme poverty; a family history of mental illness and cognitive disability; his mother's lack of prenatal care and substance use during pregnancy; domestic violence; child abuse and neglect; a lack of appropriate caregivers and adequate stimulation to foster his development; and a lack of early intervention or special education services when his grades began to decline in middle school. Dr. Auble testified that many of those factors had been present before Petitioner began heavily using marijuana and "would have made him at least vulnerable and maybe had caused some decline already."

Dr. Caroline Everington testified as an expert in intellectual disability and adaptive behavior assessments. Dr. Everington testified that she is a fellow of the American Association on Intellectual and Developmental Disabilities ("AAIDD"), which she described as the organization that developed the official definition of intellectual disability and that works with the American Psychiatric Association to ensure "each

version of the DSM has a congruent definition for intellectual disability." Dr. Everington testified that the current edition of the AAIDD's manual defined intellectual disability as "significant limitations in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills . . . [that] originates before age [eighteen]." Dr. Everington testified that this definition was similar to the definition in the prior edition of the AAIDD manual in use at the time of trial.

Dr. Everington was asked to provide an opinion regarding Petitioner's adaptive behavior. Dr. Everington testified that her "opinion is based upon assessments administered to [Petitioner,] interviews with six individuals who have had contact with [Petitioner] in a variety of settings, and with a review of other records that were available," totaling over two thousand pages. Dr. Everington testified that in her opinion, Petitioner meets the definition of intellectual disability under the criteria established by the AAIDD, the DSM, and the Tennessee statute. All three definitions required a showing of limitations in intellectual functioning, deficits in adaptive behavior, and manifestation during the developmental period. Dr. Everington agreed that an assessment of adaptive behavior was a necessary component of an intellectual disability diagnosis at the time of Petitioner's trial in 2008.

Dr. Everington testified that the majority of people with intellectual disability fall into the mild range, and she described some of characteristics of mild intellectual disability in contrast with some of the stereotypes. "It is an invisible disability," in that most people in this category do not have obvious physical traits indicating that they have a disability. Mild intellectual disability is "multi factored," in that there may not be one specific cause that can be identified, like a genetic disorder. Mild intellectual disability is "[n]ot necessarily comprehensive," in that a person "can function quite well in some settings" and may only need "intermittent" or "less intrusive" support. However, while "the differences are much more subtle than in more severe disabilities," mild intellectual disability "actually affects many thing[s] that the person does across many roles" and "does affect functioning in adaptation through their lifetime." Intellectual disability "really affects learning," and people in the mild range have "a capacity to learn many things but they have a great deal of difficulty remembering learned information and even more difficulty applying the information to new settings." People with intellectual disability "benefit the most from structure and systematic instruction" but may have difficulty paying attention and staying focused, may miss important details, may have "a deficient knowledge base to draw from" when making decisions, and may have difficulty with certain executive functions like problem solving and "flexible thinking." Social characteristics of people with intellectual disability include impaired social judgment, suggestibility, gullibility, and naivety. Because people in the mild range "understand that they have deficits relative to other people, . . . there is a strong desire to please and to fit in." People with intellectual disability are overly trusting of others, are not attuned to social cues and nuances, and might be described by a lay person "as being more child like" in their approach to social situations. People

with intellectual disability may have an "inability to perceive consequences and learn from mistakes," which leads to "repeating the same thing over and over again." However, Dr. Everington testified that limitations coexist with strengths and that a person with mild intellectual disability is not expected to be "uniformly low in all activities and human capabilities." Dr. Everington testified that people with mild intellectual disability need support, such as reminders, explanations, assistance with "complex activities of daily living," and assistance with developing "coping skills and problem solving" in stressful situations. Dr. Everington testified that "[a] benefactor is someone that does provide supportive assistance," but Petitioner did not have such a person in his life. People with intellectual disability may be able to graduate from high school or obtain a GED with "repeated instruction assistance," though the drop-out rate is "significantly higher." People with intellectual disability may also learn vocational skills and work habits with ongoing support.

Dr. Everington testified that adaptive behavior is defined as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives" and as the "degree to which an individual meets community standards for independent functioning and social responsibility." Dr. Everington testified that it is important to assess a person's typical, rather than maximum, level of performance. Dr. Everington testified that both the DSM-5 and the AAIDD manual require significant deficits in at least one of three domains: conceptual, social, and practical. Dr. Everington testified that although people with intellectual disability may have some strengths, the focus of the assessment is on their deficits since that is part of the definition. Dr. Everington testified that while the DSM-5 requires adaptive deficits to be "directly related to intellectual impairments," the position of the AAIDD is that it is "impossible" to show a causal relationship rather than just a correlation between the two.

According to Dr. Everington, the professional consensus on adaptive assessments is that it is important to use multiple informants who have known the individual over time and in different settings, preferably from the same socio-cultural background. Dr. Everington testified that convergent validity is determined by using as many sources as possible and giving each one the appropriate weight. Dr. Everington testified that academic functioning is given less weight than the actual application of those skills. Dr. Everington explained that an assessment of adaptive behavior looks at performance rather than potential, explaining that "someone telling you that they can do something and actually doing it in a setting are very different because a setting is very complicated very frequently and requires a different level of conception and choice making and so forth." Dr. Everington testified that self-report is given very little weight and "should be avoided when possible or only used in a corroborative way" because people with intellectual disability "are notoriously poor historians on their own behavior." Dr. Everington testified that a person's adaptive deficits in a community setting are given more weight than those in a restrictive prison setting.

Dr. Everington testified that the AAIDD manual requires the use of standardized tests of adaptive behavior whenever possible "because they provide a reference for the individual skills in relation to the expectations for the culture and age groups." In this case, Dr. Everington used the Adaptive Behavior Assessment System, Third Edition ("ABAS"), which is usually administered to a single informant to determine a person's "current behavior in the community." However, Dr. Everington testified that *Atkins* cases require a nonstandard administration because of the need to conduct a "retrospective assessment" of a person who may have been incarcerated for a long period of time. Dr. Everington testified that "a nonstandard administration can give some important information" but should not be relied upon as the "only piece of information." Dr. Everington explained that the results of the assessment should be compared with other sources of information, such as interviews and records, in order to determine validity.

In this case, Dr. Everington administered the ABAS to three informants: Alma Rockett, Petitioner's aunt; Michael Rockett, Petitioner's cousin; and Marsha McMillan, Petitioner's family member and work supervisor. Dr. Everington testified that Michael Rockett was the primary informant and that Alma Rockett "contributed a few things." However, because they were unable to answer questions about Petitioner's behavior in a work setting, Dr. Everington conducted a follow-up interview with Ms. McMillan. Dr. Everington testified that while administering the rating scale to these informants, "a lot of the interview was general discussion of their memories and recollections of [Petitioner] at different points in his life and their memories and recollections of . . . skills that he could and couldn't do," which provided "helpful corroborative information." Dr. Everington testified that she used Petitioner's age at the time he was initially incarcerated in this case to determine his score because that was the last time he lived in the community. Petitioner scored extremely low, less than the first percentile, across all domains.

Dr. Everington also relied on a plethora of social history interviews, both those she conducted in person and summaries provided by post-conviction counsel. Dr. Everington testified that she focused on how long the person knew Petitioner and in what context rather than on the person's background and criminal record. Dr. Everington testified that she also took into account an informant's potential bias and explained that it was important to look at other sources of information besides family members. Dr. Everington testified that the in-person interviews allowed her to develop a rapport with the informant and assess their body language, which wouldn't be possible with a phone interview. Dr. Everington interviewed friends and family members who knew Petitioner as a child and as an adult. Additionally, post-conviction counsel provided summaries of "extensive interviews that had a lot of detail." Dr. Everington testified that "there was a lot of continuity" among the various interviews, which contributed to their validity. Dr. Everington acknowledged that many of the informants were Petitioner's peers from the South Memphis community, including other impoverished young black men who perhaps

used drugs. Dr. Everington testified that "within that community [Petitioner] stands out as being different."

Dr. Everington testified regarding some examples of Petitioner's deficits in the conceptual domain as relayed by various informants, noting that each example "by itself would not be a problem but you're looking at a collection of deficits here." Petitioner could follow simple directions but had difficulty following directions with two or more steps. One informant described an incident where Petitioner was told not to use a saw because he might cut himself, but Petitioner got the saw and did cut himself. Petitioner had difficulty with communication, could not answer questions that required careful thought or opinion, could not hold an intelligent conversation, and sometimes stared off into space. Petitioner did not pay bills, did not have a bank account or credit cards, and did not save or budget his money. Petitioner's former girlfriend reported that she frequently gave Petitioner money because he spent all of his on marijuana. A childhood friend reported that Petitioner was unable "to provide for himself on the street." In his job at Patterson Warehouse, Petitioner had difficulty cutting cardboard boxes to the correct measurement, matching serial numbers when unloading pallets, and putting the correct number of items in boxes. Petitioner needed assistance filling out job applications, and he got the job at Patterson Warehouse through either his mother or Ms. McMillan. Petitioner could not pass the GED. With regard to self-direction, Petitioner had difficulty concentrating, arriving places on time, and completing tasks efficiently, often quitting or becoming discouraged if a task was too hard. Petitioner had difficulty resisting pressure from others to do things that might endanger him and was susceptible to suggestion. Petitioner was often taken advantage of by others, both as a child and as an adult, even when told not to trust certain people. Petitioner did not manage his time well and spent "enormous amounts of time playing on the computer." In summary, Dr. Everington testified that Petitioner had "significant deficits in the application of functional academics, communication[,] and self-direction. He has some strengths in academics . . ., but the problem is application of those in a real life setting."

Dr. Everington testified regarding some examples of Petitioner's deficits in the social domain as relayed by various informants. Petitioner had some basic social communication skills, such as greeting others and being friendly. However, Petitioner lacked social judgment and failed to avoid friends or social settings that might be dangerous, even though it was important to be careful about who you associated with in the Fowler Homes neighborhood. Several informants stated that Petitioner had no friends other than his cousins while growing up. Petitioner could identify basic emotions like happy and sad, which a child can do, but had difficulty identifying more complicated emotions or talking about his feelings. Petitioner had difficulty understanding the perspective of other people and would not refrain from saying or doing something that might embarrass someone. Petitioner did childish and risky things in the work setting to gain attention. Petitioner was easily tricked and manipulated by other people, often falling prey to scams as both a child and an adult. Petitioner was described as more of a follower than a leader. Petitioner had

difficulty following rules and obeying laws. Petitioner did have good leisure skills, such as being able to play card games like Spades, playing video games, enjoying music, and being a good dancer. However, Petitioner sometimes had trouble understanding certain games. Petitioner did not display age-appropriate skills, like organizing an activity for others or participating in team sports. Petitioner had difficulty with social problem solving due to his limited intellectual resources and had difficulty avoiding the triggers for criminal offenses. In summary, Dr. Everington testified that Petitioner "had significant deficits in all aspects of the domain," particularly "in understanding social situations [and] appropriately conforming his behavior[.]"

Dr. Everington testified that when most people think of adaptive deficits, they think of deficits in the practical domain, such as the inability to live independently; however, most people with mild intellectual disability "do really well comparatively in this area." Dr. Everington testified regarding some examples of Petitioner's deficits in the practical domain as relayed by various informants. Petitioner did not have a driver's license, and there were no reports of Petitioner driving on a regular basis. Petitioner primarily walked or took the bus, but he had difficulty with the bus schedules and often got lost or arrived late. Petitioner did not shop for his own clothes, go for haircuts, or go to the grocery store. Petitioner could not use a map or an ATM, and he did not use community resources like the post office or library. Petitioner could use a microwave and make simple foods that did not require cooking. Petitioner did not wash his own clothing or help clean the house. Petitioner had to be specifically told to perform simple household tasks, like taking out the trash. Petitioner did not attend to his health care needs by going to the doctor or drug store and had to be reminded to take medication. Petitioner did not always dress appropriately for the weather. Several informants reported that Petitioner had poor hygiene, such as wearing urine-soaked clothes as a child even after other children made fun of him. Petitioner never sustained full-time employment for any length of time, and those jobs he did have were obtained through family members. Petitioner was able to perform menial tasks with supervision but had difficulty with more complex tasks. Petitioner rushed through tasks, did not seek help if he had difficulty, talked to himself and others rather than working quietly, needed reminders to follow the daily schedule, and did not check to see if his work needed improvement. Dr. Everington stated that it was significant that Petitioner had never lived independently or contributed to the support of others. One informant said, "I know a lot of people who have been locked up who could make it on their own but [Petitioner] wasn't like that," and another reported that Petitioner "had a hard time functioning in the world." Dr. Everington explained that "there was some of this notion among the people that [Petitioner] really had some deficits that would prevent him from totally being independent." Dr. Everington testified that Petitioner had significant deficits in the practical domain.

Dr. Everington testified that she administered some academic assessments to Petitioner for additional information about his conceptual skills. Dr. Everington explained that while such information is helpful, the practical application of those

skills in a community setting was more important. Additionally, Dr. Everington explained that results of such tests should be interpreted carefully because Petitioner has "been going to school every day, been doing academic skills" while he was incarcerated, which would improve his academic skills. Moreover, the tests demonstrate Petitioner's current abilities rather than his functioning at the time of the offense. Dr. Everington testified that Petitioner did "well," with scores in the average and below average range for reading, spelling, and math, which was more advanced than the majority of people who have an intellectual disability. However, Dr. Everington testified that these results did not preclude finding a deficit in the conceptual domain. Dr. Everington testified that Petitioner's scores on the achievement tests administered by Dr. Craddock and Dr. Steinberg were "more in line with expectations" for "somebody functioning in this I.Q. range." Petitioner also scored within the range of someone with an intellectual disability on a test of written and spoken language, which was similar to the results found by Dr. Steinberg. Dr. Everington explained that while Petitioner has learned some vocabulary through his experiences, particularly medical vocabulary, his understanding of analogies, word similarities, and opposites is "severely deficient in comparison to other adults." Dr. Everington testified that Petitioner's "real understanding of language and his ability to comprehend anything complex . . . is lacking." Dr. Everington administered the Independent Living Scales ("ILS"), which is a test designed to gather information about what someone knows about certain tasks, like managing money, maintaining a home, transportation, health, and safety. Dr. Everington testified that Petitioner scored within the range for a person with intellectual disability. Dr. Everington explained that because of the difference between knowing what to do and actually doing it, she gave the results of this test very little weight.

With regard to evidence of manifestation during the developmental period, Dr. Everington testified that several informants who knew Petitioner during childhood reported that Petitioner was "different and . . . ha[d] difficulty in learning and that there's some issue with mental capacity." Dr. Everington noted that although Petitioner repeated first grade, he subsequently made passing grades until middle school. Petitioner had variable TCAP scores, although he did achieve some high scores above the ninetieth percentile. However, in seventh grade, Petitioner's "grades fell off and other problems emerged at that point." Petitioner was socially promoted to the eighth grade despite failing grades and low TCAP scores. Dr. Everington noted that she had some concerns with the validity of the school records given that several informants reported "questionable testing administration practices" and cheating. Additionally, Dr. Everington noted that Petitioner attended a Title I school in a high poverty area, so the grade expectations may have been different. Dr. Everington testified that Petitioner "basically stopped attending" school in seventh grade, which was around the same time that Petitioner began to heavily use marijuana.

On cross-examination, Dr. Everington denied that the AAIDD was an advocacy group and stated that "[i]t is a professional organization that serves the profession

of a wide variety of people that work in this area." Dr. Everington authored two chapters in the AAIDD's 2015 book regarding intellectual disability assessment in death penalty cases. As on direct, Dr. Everington testified that the AAIDD had taken issue with the statement in the DSM-5 that adaptive deficits must "directly relate" to intellectual functioning. Dr. Everington testified that both definitions state that intellectual deficits are "associated with" or "accompanied by" adaptive deficits, but the position of the AAIDD was that "one doesn't cause the other" and that "[e]ach are assessed separately[.]" Dr. Everington denied that more people would meet the definition of intellectual disability under the AAIDD criteria than under the DSM-5 criteria, explaining that "the definitions are virtually identical. That sentence occurs at a different point in the discussion of that definition in the DSM. It is not in the definition itself."

Dr. Everington agreed that some of the quotes used in her presentation came from interview summaries provided by post-conviction counsel, which were "fairly detailed but they weren't verbatim[.]" Dr. Everington acknowledged that people can lie during interviews, but she testified that the consistency of the interviews led her to believe that they were valid and not rehearsed. Dr. Everington testified that she focused on objective examples of observed behavior over subjective opinions and that she would corroborate the information by interviewing multiple people and looking at additional sources of information. Dr. Everington testified that she always has concerns about potential bias when interviewing family members, so she determines an informant's credibility based upon whether they provide detailed information and examples and whether that information is consistent with other information she has. Dr. Everington did not know whether the people she interviewed had been told that their responses could help Petitioner avoid the death penalty, and she did not know how that might influence their responses.

Dr. Everington testified that standardized adaptive behavior assessments, such as the ABAS and others, are "imperfect in an *Atkins* kind of situation because of the retrospective nature of it." Dr. Everington testified that in many cases, standardized tests are unable to be used, so greater reliance is placed on the interviews. Dr. Everington agreed that under the protocols for the ABAS, if an informant cannot answer three or more questions in a section, then the score for that section is not valid. Dr. Everington explained that "within the *Atkins* hearings and so forth people tend to use adaptive scales more loosely because of this problem" with finding an informant who can complete the entire rating scale. Dr. Everington testified that she does not rely exclusively on the test but that it can give a piece of information regarding the person's functioning across a "wide variety" of areas even if the score is not compared to the norm. Dr. Everington testified that in this case, her report included a comparison of the Petitioner's ABAS score to the norm with "a caveat" regarding "the retrospective testing and the alternative use of it," explaining that she was "very straight-forward" with the "nonstandard administration" of the test. Dr. Everington testified that the ABAS manual states that it can be used in a "clinical format" to gather information about the various skills assessed on the test, which she testified is what she did in this case. Dr. Everington testified that

interviewing informants together and recording their answers on the same score sheet was "a nonstandard use of the test." Dr. Everington testified that Michael Rockett was the primary informant and that she believed that she noted which responses came from Alma Rockett and Marsha McMillan. Dr. Everington testified that if Michael and Alma Rockett provided different responses to the same question, she would use her judgment based on "who could give me an example" of the particular behavior in order to give "some indication that the rating that they were giving was accurate." Dr. Everington testified that Alma Rockett was "not the best" informant and only provided one comment on the ABAS score sheet, although she did provide more information during an open-ended interview.

Dr. Everington testified that she followed the standardized testing protocol when she administered the ILS to Petitioner. Dr. Everington agreed that the ILS is normed to the general population rather than to the community in which Petitioner was raised. Dr. Everington scored Petitioner's response as incorrect when he could not remember his telephone number from prior to his incarceration and, after being asked a couple of times, gave his brother's number without the area code. Dr. Everington conceded that she did not know if Petitioner had a telephone but stated that he always lived with someone who did have a telephone. Petitioner was unable to answer questions about social security benefits, filing income tax returns, or the purpose of a will, even though he may not have had any personal experience with those things. Dr. Everington scored Petitioner's response that you could get checks or money orders "from the check-cashing place" as incorrect, even though it may have been possible to do so in Petitioner's community. Dr. Everington agreed that she could not conclude whether Petitioner's incorrect responses were the result of an intellectual disability or the environment in which he was raised. Dr. Everington testified that the ILS was "just a piece of information. It doesn't really tell you . . . how [Petitioner] used that information that he had."

Dr. Everington explained that while standardized rating scales are normed based on the general population, it was important to have the rating scale completed by someone from the same community in order to get "their viewpoint in the community." Dr. Everington explained that interviews are also important to determine if "the people in environment saw this person was functioning differently than other people within the environment." Dr. Everington obtained most of her information about the community from her interviews and from the materials provided by post-conviction counsel rather than from independent research. Dr. Everington testified that Petitioner grew up in a "high poverty," "chaotic," and "somewhat violent environment." Dr. Everington testified that several of the interviews indicated that "everyone" in the Fowler Homes neighborhood smoked marijuana, but she did not know how much they consumed in comparison to Petitioner. Dr. Everington testified that she did not ask the informants about selling drugs because of the difficulty in getting information about that topic. Dr. Everington testified that she did not "know how successful [Petitioner] was" at selling drugs other than comments that he was "not a good criminal" and "put himself in situations where he was easily caught." Dr. Everington testified that

although Petitioner was in a gang, he was not very "accomplished" within the gang, especially in comparison to his brother, "who apparently functioned much better." Dr. Everington testified that Petitioner's criminal record evidenced adaptive deficits both in terms of a failure to obey rules and laws as well as "[i]n terms of problem-solving, making choices, making kind of rational solutions to his problems."

Dr. Everington denied that mental illness could underlie both Petitioner's low I.Q. scores and his adaptive deficits given the evidence of a cognitive disability "throughout his lifetime." Dr. Everington denied that Petitioner's adaptive deficits were directly related to the fact that he dropped out of school. Dr. Everington testified that while a lack of school attendance would affect academic skills, it "would not affect learning across the board in all areas" the way that intellectual disability does. Dr. Everington testified that while Petitioner's adaptive deficits were "to a certain degree" related to his being neglected as a child, "there are other people in that same environment who do not display that degree of deficits." Dr. Everington conceded that she did not interview Petitioner's surviving siblings, who were raised in the same home environment. Dr. Everington testified that she did not interview Vivian Pruitt, Petitioner's mother, because she was deceased.

Dr. Everington testified that substance abuse could be an underlying cause of Petitioner's low I.Q. scores and adaptive deficits in that "damage to the brain . . . can cause problems in thinking and cognitive issues." Dr. Everington testified that based on the information she had, Petitioner "likely had some deficits in childhood" that were "made worse . . . through the heavy ingestion of marijuana during that critical developmental time where his brain was still developing." When the State asked whether the various examples of adaptive deficits mentioned during Dr. Everington's direct testimony could have been the direct result of Petitioner's "incredibly high marijuana usage on a daily basis," Dr. Everington responded that she considered the effect of marijuana on Petitioner's overall functioning but not whether it caused any specific behavior. Dr. Everington testified that the examples she gave were consistent with somebody who had a cognitive disability, "which is likely related to the marijuana usage." With regard to certain reported deficits in communication (unable to hold an intelligent conversation, staring off, not listening, etc.) and work (difficulties with measurements and counting), Dr. Everington conceded that she did not know whether Petitioner was under the influence during those times described by the informants. Dr. Everington testified that while she was aware of studies showing the long-term effects of marijuana on the developing brain, she was not aware of any research on the short-term effects of marijuana intoxication on adaptive behavior.

Dr. Everington testified that the individual examples of behavior she discussed on direct examination were simply "indicators" of adaptive deficits. For example, Petitioner's failure to tell people where he was going was an indicator of responsibility, his failure to limit his time playing on the computer was an indicator of time management, and his failure to clean his fingernails was an indicator of

hygiene. Dr. Everington testified that she was "looking at the totality of skills" rather than each one in isolation. Dr. Everington explained that while adaptive strengths may be noted, the focus of an evaluation is on whether the person has deficits that effect their "independent living" and "successful social adaptation" because the definition of intellectual disability requires a showing of adaptive deficits.

The State presented Dr. Everington with Petitioner's letter to his mother in which he gave directions for checking his girlfriend's voice messages and asked whether that contradicted Dr. Everington's finding that Petitioner had a deficit with regard to giving directions involving multiple steps. Dr. Everington responded that she had not previously seen the letter and that she did not know the context in which the letter was written, whether someone helped Petitioner write it, or whether he was copying something.

With regard to the fact that Petitioner did not pay bills and did not have a bank account or credit cards, Dr. Everington testified that "[t]hose are skills that are typically displayed by . . . adults," even though Petitioner had spent the majority of his adulthood incarcerated. Dr. Everington also considered the use of an ATM to be "very common" for adults both in Petitioner's community and in the general population, even though Petitioner did not have a bank account. With regard to whether Petitioner's difficulties providing for himself were considered a deficit within an impoverished community, Dr. Everington noted that the person who reported lending Petitioner money "was in the same community and was able to function more successfully than [Petitioner] . . . in terms of hustling on the streets." The State asked whether it was common for inmates to spend all of their commissary money and have to borrow from others, and Dr. Everington responded that many of the inmates with whom she had worked over the years "actually are able to tell you to the penny what they've got, and they tell you how much soap costs and they tell you how much shampoo is, and they do budget . . . within the commissary setting because those little items are so important." Dr. Everington agreed that she did not know how much money Petitioner had in his commissary account when he spent it all at once.

Dr. Everington testified that Petitioner had difficulty maintaining full-time employment, which she described as "enough to support yourself independently," though she was not aware of the unemployment rate for Shelby County. Dr. Everington denied that Petitioner's difficulties in maintaining employment or obtaining a GED were due to a lack of interest. Petitioner had mentioned that his goal was to obtain his GED, and the records indicated that he had completed a food safety program and a six-week hospitality and culinary arts program while incarcerated on a prior robbery charge. Petitioner "was concerned about not having enough money and wanting to work," and he was pressured to get a job while he was living with Alma Rockett. Ms. McMillan reported that Petitioner did a good job cleaning a house while she was with him, and Dr. Everington explained that Petitioner "would probably be able to do a very menial job like that." Additionally,

Petitioner worked for a period of time at Patterson Warehouse, though Dr. Everington did not recall how long Petitioner had that job. Dr. Everington agreed that Ms. McMillan was the only source of her information about Petitioner's behavior in a work setting even though Petitioner's girlfriend also worked with him at Patterson Warehouse. With regard to the fact that Petitioner habitually arrived late to work on certain days, Dr. Everington explained that "people with intellectual disabilities have difficulty with temporal kinds of things[, w]ith being on time, with organizing their life." Ms. McMillan also "observed quite a number of things about [Petitioner's] work habits and difficulties that he had . . . in the work setting, which are consistent with somebody with an intellectual disability in terms of following directions" and other "work habits that would enable you to be successful." Dr. Everington did not know if Petitioner was using marijuana before going to work or how that would have affected his performance on the job. Although there were various explanations for why Petitioner lost his job at Patterson Warehouse – either due to a fight over a girl, abuse of break time, or an argument with a supervisor – Dr. Everington considered it an example of "difficulty in social problem-solving" in that it demonstrated "not really understanding social protocol and so forth . . . in a work setting."

Dr. Everington testified that Petitioner was described as more of a follower than a leader and explained that people with intellectual disability tend to "look to other people for cues and assistance with things and tend to be overly reliant on other people." Dr. Everington testified that there were several examples of Petitioner being taken advantage of and tricked, both as an adult and as a child, even after he was warned not to trust certain people. Dr. Everington relayed one example where Petitioner was performing on Beale Street and other children joined him with the promise to split their money, but then they cheated Petitioner out of his fair share. Dr. Everington testified that Petitioner was often "the fall partner for his peers who would hatch a plan to steal things" and then abandon Petitioner. Dr. Everington testified that this happened repeatedly, but Petitioner "never learned. He'd keep doing it. He was a pushover for them." Dr. Everington gave another example of a woman who took advantage of Petitioner while he was in prison even though a family member had warned him not to give her any money. Dr. Everington agreed that she did not know how much money Petitioner gave the woman but explained that she was "looking at [Petitioner's] being taken advantage of and not understanding the motives of other people" regardless of the amount of money risked.

Dr. Everington agreed that Petitioner suffered from severe neglect during his childhood. The State asked whether Petitioner's attending school in urine-soaked clothes could have been due to a lack of adult support at home. Dr. Everington explained that she considered it an example of an adaptive deficit because Petitioner "was made fun of by the other kids and continued to do that," whereas "someone else, likely, would have found a way to get clean clothes." Dr. Everington explained that this showed Petitioner's lack of problem-solving skills and a lack of awareness about his appearance even if he did not have access to an abundance of

clothing. Dr. Everington noted that Petitioner's brother was reported as dressing in clean clothes, though he was older than Petitioner. Dr. Everington also noted that it was unusual for someone in elementary school to be urinating in their clothing. Dr. Everington testified that Petitioner was also reported as having difficulty with making friends during this same period.

As on direct examination, Dr. Everington testified that there were no reports of Petitioner driving as a regular mode of transportation. Dr. Everington agreed that Petitioner did not own a car but testified that "[i]t is unusual for someone in his age group to not drive or to want to have a car." Dr. Everington testified that in her experience "with people from impoverished neighborhoods in these cases, almost all of them drive and almost all of them have a car," even if they did not have a driver's license. Dr. Everington acknowledged that the trial testimony indicated that Petitioner drove the victim's car away from the scene and that he had been charged with car thefts as a juvenile. Dr. Everington clarified that "driving and getting around using a car are two different things" and that Petitioner "could probably drive." Dr. Everington testified that Petitioner walked to most places in his community and that he rode the bus to work, though he had difficulty with the bus schedules and sometimes got lost after taking the wrong bus. When asked if she investigated whether using public transportation in Memphis was difficult, Dr. Everington responded that the "inference was that most people could do that and [Petitioner] could not."

With regard to the fact that Petitioner did not shop for his own clothing, Dr. Everington explained that is "an important skill" and that it was unusual, "particularly for a young man," to not want to have nice clothes or tennis shoes. Dr. Everington acknowledged that Petitioner's girlfriend reported that he spent the money he had on marijuana. Dr. Everington also testified that it was unusual for an adult to not shop for groceries, even though Petitioner was living with his sister or his aunt. With regard to the fact that Petitioner did not wash his clothes or clean the house while he was living with his aunt, Dr. Everington testified that she did not know if that was because his aunt offered or Petitioner refused to do those things for himself. Even though she did not know exactly how much of Petitioner's adult life he spent out of custody, Dr. Everington found it "notable that there's a perception that [Petitioner] would need help. That other people could function independently, but that he would need help."

### ***State's Expert Witness***

The State called Dr. Tucker Johnson, a clinical psychologist, who testified that in her opinion, Petitioner was not intellectually disabled. To reach that conclusion, Dr. Johnson conducted a clinical interview of Petitioner as well as intelligence testing, an adaptive screening, achievement testing, and a test of response style. Dr. Johnson ensured that Petitioner understood that she had been retained by the prosecution and that his responses would not be held in confidence. Dr. Johnson also reviewed the same records, reports, and social histories that were provided to

the defense experts. Finally, Dr. Johnson conducted several phone interviews of informants who knew Petitioner in different settings throughout his life.

With regard to Petitioner's medical history, Dr. Johnson reviewed Petitioner's birth records and did some research into the conclusions drawn therefrom by some of the other experts. Dr. Johnson testified that although Petitioner's head circumference was in the fifth percentile, it was not listed as an abnormal finding in his birth records. Dr. Johnson testified that the defense experts' characterizations of Petitioner's sagittal suture opening was "inaccurate" and that based on her research, Petitioner's sagittal suture opening was average rather than abnormal. Dr. Johnson testified that when Petitioner was evaluated by MTMHI, his mother spoke with a forensic social worker and reported "that there were no complications with her pregnancy or delivery and that [Petitioner] met developmental milestones within a normal time frame." Although Petitioner's mother reported to the social worker that Petitioner was dropped on his head as an infant, Dr. Johnson did not have any medical records about that incident. Dr. Johnson did have medical records of Petitioner's being admitted to the hospital when he was eleven years old and having an x-ray of his spine, which may have been related to his mother's report to the social worker that Petitioner was admitted to the hospital after being "knocked out" as a young teenager. Dr. Johnson also had medical records where Petitioner was hospitalized after he overdosed on marijuana, cocaine, and pills.

Dr. Johnson testified that although Petitioner "clearly [had] a mental health history," it was "unclear" from the records "exactly when problems started arising with his mental health." Petitioner had never received mental health treatment while in the community. Petitioner's pretrial jail records reflected that Petitioner complained of paranoia, visual and auditory hallucinations (including commands to hurt himself), intermittent suicidal ideation, depression, and sleep disturbance. Petitioner reported that he had previously attempted suicide by overdose and had threatened to hang himself. When Petitioner was evaluated by MTMHI, he was diagnosed with schizophrenia and prescribed anti-psychotic medication; however, there was a note that Petitioner "was probably exaggerating some symptoms" and "embellishing features of an existing disorder." When Petitioner was transferred to prison after his conviction, he eventually stopped taking the anti-psychotic medication. Petitioner reported that "it had been some years since he experienced hallucinations," and he continued to believe that he did not require mental health medication. However, Petitioner continued to experience periods of depression and suicidal ideation. Petitioner's prison medical records also included "several unusual complaints, including bugs crawling in his stomach, worms, sores under his skin, and fluid leaking and moving in his body," which Dr. Johnson testified was "probably an indication of a residual symptom of psychosis." Additionally, Petitioner frequently complained about pain in his back, and he "was diagnosed by a neurologist with somatoform pain disorder, which is a disorder where somebody is reporting pain . . . but they can find no medical substantiation for that." Based upon these records, Dr. Johnson concluded that Petitioner "was displaying some

symptoms of . . . a major mental illness of psychotic proportions" around the time of the offense in this case but that those symptoms had since stabilized.

With regard to Petitioner's social history, Dr. Johnson testified that it was "abundantly clear that the household in which [Petitioner] was raised was chaotic" and that Petitioner did not "have any role models who exhibited adequate adaptive functioning for him to learn it." Dr. Johnson testified that Petitioner's mother had "a number of legal problems," "a significant addiction to drugs and alcohol," and was often away from home, "so a lot of the parenting was apparently incumbent upon the grandmother, who had a major mental illness." Petitioner's childhood home was "very busy," with a lot of people coming through to buy and use drugs. Dr. Johnson also noted the "severe" domestic violence between Petitioner's mother and the different men with whom she was involved, as well as the violence in the neighborhood. Dr. Johnson testified that Petitioner sometimes had to beg for food and performed backflips on Beale Street as a means of earning money to eat. Dr. Johnson testified that as a teenager, Petitioner lost several friends in a severe car accident, which qualified as a traumatic event regardless of whether he saw it or heard about it. Dr. Johnson testified that Petitioner reported that he was a member of the Vice Lords gang. Dr. Johnson asked Petitioner about the Gangland episode where he discussed being in the Lemoyne Gardens Mafia, and Petitioner told her that he did not consider it to be a gang but simply the housing project where he lived at the time. Dr. Johnson noted that in the episode, Petitioner used an analogy (comparing the death of a gang leader to cutting the head off of an animal), which Dr. Johnson testified requires "a little more complicated thinking."

Dr. Johnson also reviewed Petitioner's school records. Dr. Johnson testified that Petitioner attended Title One schools where many of the students were impoverished and the teachers provided additional support, "act[ing] much as social workers; having a clothes closet, feeding these children." One of Petitioner's former teachers reported that it was common for kids to start school in the first grade being unable to read because of the lack of Kindergarten and PreK services. Petitioner repeated the first grade after receiving low grades and TCAP test scores, but both improved significantly the following year. Petitioner generally received good grades and positive comments from teachers throughout elementary school, though there were some notes about excessive absences and poor conduct. Additionally, Petitioner's scores on TCAP tests remained relatively high, including several scores over the ninetieth percentile. However, Petitioner's grades dropped significantly in middle school, and his seventh grade TCAP scores were all well below the fiftieth percentile. Dr. Johnson testified that Petitioner's low grades and TCAP scores from his first time through the first grade and in middle school did not seem consistent with the reports of widespread grade inflation and TCAP cheating, and Petitioner's former teachers with whom she spoke denied that they personally engaged in such practices. During Dr. Johnson's interview with Petitioner, he reported that he took medication for ADD while in school but that he did not receive special education services. Petitioner did not know why his academic performance declined in the seventh grade, and he could not explain why

he dropped out of school in the eighth grade. Dr. Johnson testified that Petitioner's memory was "pretty good" and "corresponded with the school records that we had."

Dr. Johnson testified that Petitioner's employment history as an adult was limited to his employment with a temp agency in 2005. It was through this agency that Petitioner obtained a job at Patterson Warehouse for three or four months. Petitioner indicated that his job duties included unloading boxes from trucks and that his supervisors were generally pleased with his performance. Petitioner reported that he was fired from that job because a supervisor lied about Petitioner's abuse of break time. The temp agency then sent him to another job where he was also responsible for unloading trucks, but Petitioner did not like that job and did not return after the first day. Soon thereafter, Petitioner was arrested in this case. Dr. Johnson asked Petitioner how he got money when he was not working, and Petitioner told her that his mother gave him money or that he "engaged in illegal activities that could bring him money."

Dr. Johnson spoke to Marsha McMillan about Petitioner's job performance at Patterson Warehouse. Ms. McMillan described Petitioner as "mentally slow." She reported that Petitioner "seemed to forget instructions and had to redo tasks and could not read written directions." Ms. McMillan described an incident during which Petitioner was working on a task but "was not doing it very well and a stack of boxes fell on him." Ms. McMillan reported that Petitioner was shy and asked her to tell a girl who worked with them that he was attracted to her. Dr. Johnson asked Ms. McMillan if she was aware whether Petitioner was using drugs on the job, and Ms. McMillan reported that she was not aware at the time but was later told by some associates that Petitioner had used cocaine and heroin. After her initial interview with Ms. McMillan, Dr. Johnson attempted to schedule a follow-up interview in order to administer an ABAS rating scale but was unsuccessful.

Dr. Johnson interviewed Petitioner's aunt, Alma Rockett, with whom Petitioner had lived for about 4 or 5 months prior to his incarceration in this case. Ms. Rockett had known Petitioner since his birth, but she had moved away for a period of 14 years and did not see Petitioner during much of his childhood and teenage years. Ms. Rockett reported that her sister, Vivian Pruitt, drank heavily and used illicit drugs during her pregnancy with Petitioner. Ms. Rockett described Petitioner as "real hyper as a child and then was fidgety, nervous and restless as an adult." Ms. Rockett reported that Petitioner would "sometimes burst out laughing for no discernible reason," "star[e] off into space," or talk to himself. Ms. Rockett believed that Petitioner had paranoid schizophrenia based on her experience with her mother, who displayed symptoms of a major mental illness and was periodically hospitalized.

Dr. Johnson was able to get some general information about some of Petitioner's adaptive behaviors while he lived with Ms. Rockett. Ms. Rockett reported that Petitioner took out the trash but did not cook or perform other household chores. Ms. Rockett reported that Petitioner would offer to help around the house, and she

knew that Petitioner could do those chores because he had done them while living with his mother. However, Ms. Rockett did not want him to help with chores because "she wanted them done a certain way" and "she preferred to do it herself in her home." Ms. Rocket reported that Petitioner had a job for a short period of time and that he took the bus to work. Dr. Johnson testified that Dr. Everington's report had indicated that Ms. Rockett would lock Petitioner out of her house while she was away because she was afraid that he would hurt himself due to his low functioning. However, when Dr. Johnson asked Ms. Rockett about this, Ms. Rockett said that someone had told her that Petitioner said he was going to rob her and kill her and her mother, so she locked Petitioner out because she was afraid for her mother's safety. Ms. Rockett reported that she had not had any contact with Petitioner since he entered prison.

Dr. Johnson attempted to administer an ABAS rating scale to Ms. Rockett to try to replicate Dr. Everington's findings. Dr. Johnson testified that "Ms. Rockett cooperated for a little bit, but she kept saying, 'I already told this information to these other people.'" Ms. Rockett stated that she was told by the defense team that the information she provided could help Petitioner avoid the death penalty. After explaining the importance of each side doing an independent assessment, Dr. Johnson was able to get through several adaptive domains before Ms. Rockett said that she did not want to do it anymore. In each adaptive domain that was completed, there were a number of items on which Ms. Rockett responded "I don't know" even after being encouraged to guess by Dr. Johnson. This resulted in Dr. Johnson being unable to score the test; however, Dr. Johnson was still able to use the information provided in the questions that Ms. Rockett did answer in forming her opinion. Dr. Johnson noted that there were no "I don't know" answers on Dr. Everington's ABAS, so Dr. Johnson did not believe that Ms. Rockett's ratings could be considered reliable, meaning similar across administrations.

Dr. Johnson testified that while "adaptive functioning has to also be assessed kind of retrospectively," she believed that "adaptive functioning in a prison environment is relevant to a current status of intellectual disability since that's supposedly a lifelong disorder." Dr. Johnson explained that because of the structure of the prison environment, "[y]ou can't assume necessarily that the person has an ability to independently follow any sort of structure in his life, but you can look at whether or not there are any -- anything outstanding that correctional officers have noted that would be indicative of intellectual disability, such as an inmate having trouble understanding, speaking very slowly, sometimes not responding at all, needing directions repeated a number of times, having trouble following multiple step directions." Dr. Johnson noted that intellectually disabled inmates tend to be "preyed upon by more sophisticated inmates." The correctional counselor with whom Dr. Johnson spoke considered Petitioner to be "an average inmate" who "functioned comparable to other inmates." Petitioner followed the rules, was on the highest level of privileges, and had not had a disciplinary infraction since 2013. Petitioner did well with preparing his cell for inspection and did not demonstrate problems with personal hygiene. Petitioner generally got along with the prison staff

and other inmates, and there were no reports of Petitioner's "being shunned or bullied or taken advantage of or being preyed upon." Petitioner engaged in leisure activities like playing dominoes, basketball, and handball, and he was able to answer Dr. Johnson's question about how to know who wins a game of handball. The correctional counselor reported that although Petitioner sometimes spoke slowly, "he didn't demonstrate any problems with expressing himself," "what he said was very logical and understandable[,] and he seemed to understand all conversations."

Dr. Johnson testified that Petitioner was currently attending classes to obtain his GED so that he would be eligible to work in the prison. Dr. Johnson testified that Petitioner was taking adult basic education classes as a precursor to the GED classes. Dr. Johnson testified that "there was a lot of variability in [Petitioner's test] scores," which were expressed in terms of grade equivalency. The correctional teacher reported that Petitioner's effort also varied and that some of the very low scores may have been because he was not trying. The teacher reported that Petitioner put forth more effort and scored higher on his most recent testing because he was interested in a barber job that might become available. The teacher reported that Petitioner would occasionally miss problems that he knew how to do, which suggested to Dr. Johnson that Petitioner had "some persisting attention deficits." Petitioner generally scored higher in math skills and language than he did in reading. Dr. Johnson testified that although Petitioner dropped out of school in the eighth grade, there were several tests on which Petitioner scored above an eighth-grade equivalency, which "would not be expected of someone with intellectual disability." Dr. Johnson noted that one of the defense experts had said that Petitioner "appeared to be learning and obtaining more knowledge as a result of ... his educational instruction[.]"

Dr. Johnson testified that she administered an adaptive screening to Petitioner, which she had used several times in the past but conceded was not standardized. Dr. Johnson testified that the questions primarily focused on the conceptual and practical domains, but she also gathered any information she could about the social domain. Dr. Johnson explained that the screening "looks at [Petitioner's] ability to display the behaviors that I asked about" and that a correct answer indicates that Petitioner has a skill in that area, although "[i]t doesn't necessarily indicate that he always displayed that in the community."

Dr. Johnson testified that Petitioner knew the date, was able to correctly spell the day of the week and the month, correctly wrote his Social Security Number from memory, correctly spelled his first and last name, and correctly wrote the address of the prison. Petitioner was able to accurately identify the current and previous presidents and discuss a current event in the news. Petitioner was able to provide the name and phone number of a family member with whom he remained in contact. Petitioner was able to draw simple shapes and write a sentence with correct capitalization and punctuation. Petitioner was able to perform calculations in his

head to determine the correct amount of change. Petitioner was able to indicate the correct time on an analogue clock face.

Petitioner indicated to Dr. Johnson that he had never washed his clothes in a washing machine because his aunt performed this task for him. Additionally, Petitioner stated that he never cooked using a stove or oven or followed a recipe because he "didn't have to" when all of his meals were prepared by his mother, grandmother, or aunt. Petitioner indicated that he knew how to use a microwave, that he swept and mopped as part of keeping a house clean, and that he showered to keep himself clean. Dr. Johnson believed that Petitioner's response about going to a hospital in order to see a doctor was "pretty consistent with his sociocultural environment." Petitioner knew to call 911 in an emergency, indicating that he had done so in the past after an incident where his mother was stabbed. Petitioner stated that he sometimes drove a car, although he never obtained his driver's license, which Dr. Johnson stated was not unusual based on her experience with people from impoverished areas of Memphis. Petitioner stated that his brother taught him how to drive, and he was able to explain what different traffic signs meant. Petitioner testified that his mother showed him how to catch a bus, and he explained that he would get off when he recognized the area; however, Petitioner "gave some conflicting information" about what he would do if he went somewhere unfamiliar.

Petitioner indicated that he had experience using a computer to search the internet and a cellphone for texting. He was able to answer questions about ordering food at a restaurant, shopping, using public restrooms, and what to do in various emergency situations. Petitioner knew how much money was in his inmate account and how much he was paid per hour for attending school. When Petitioner was employed in the community, he would cash his paycheck at a check-cashing place and keep the money on his person. Petitioner never had a bank account or filed tax returns, which Dr. Johnson did not believe was unusual in more the impoverished areas of Memphis.

Dr. Johnson testified that Petitioner "did a pretty good job of relating his history" with regard to his medical history, childhood, and schooling, which involved the use of long-term memory. Dr. Johnson noted that "a fair amount of the time intellectually disabled people will have some problems with recalling their history comprehensively and putting together timeframes." However, Dr. Johnson did not notice any "striking abnormalities in [Petitioner's] ability to recall and provide information that was relative to events in his life."

Dr. Johnson contrasted some of her observations of Petitioner with some of the ratings on the ABAS conducted by Dr. Everington. Dr. Johnson testified that Petitioner displayed good social skills during the interview, such as pouring water for Dr. Johnson and asking her if she wanted some food when he received his lunch, although he had been rated as "never or almost never" offering food or beverage to guests. Dr. Johnson testified that although Petitioner was rated as "sometimes" speaking clearly and distinctly and "never or almost never" listening closely for

more than five minutes, she did not experience any difficulties with him in these areas. With regard to the question of "[p]articipat[ing] in conversations without talking too much or too little," Petitioner was rated as "never or almost never." Dr. Johnson testified that she found "some of [Petitioner's] answers were abbreviated, but when I asked him to elaborate, he had no trouble with elaborating, giving me an adequate amount of information." Dr. Johnson noted that "there's such a thing as a skill deficit and a performance deficit, but in these areas I definitely didn't see a skill deficit." Dr. Johnson testified that she believed it was important to take into account the context of whether there was an opportunity or a need to perform a skill, such as Petitioner's not washing his clothes or cooking his meals because others did those things for him.

Dr. Johnson administered a comprehensive standardized I.Q. test to Petitioner, as well as an achievement test and tests of response style and effort. Dr. Johnson testified that Petitioner had a full-scale I.Q. score of 75, with a 95 percent confidence interval of 71 to 80, which "puts him in the borderline range." Dr. Johnson testified that Petitioner's "verbal comprehension was also in the borderline range at 72, which was not unexpected given that he has the difficulty with reading." Petitioner's other composite scores for perceptual reasoning, working memory, and processing speed were all in the low average range. Dr. Johnson testified that Petitioner "didn't get any scores in the low range that are consistent with intellectual disability." Petitioner's scores on the achievement test administered by Dr. Johnson were similar to those on the test administered by Dr. Everington and were "above what you would expect from someone with an intellectual disability." Dr. Johnson also administered the Validity Indicator Profile, a test of response style and effort that can also give an estimate of cognitive ability because the questions get progressively more difficult. Petitioner's response style was rated as "compliant," which "indicated that he was both intending to do well on the test and exhibiting the adequate effort," and his adjusted score was "significantly above" the average score of adults with known intellectual disability.

Dr. Johnson testified that she disagreed with Dr. Auble's testimony that Petitioner may have scored higher on the Matrix Reasoning subtest by guessing, noting that the probability of Petitioner answering three of the more difficult items correctly in a row by just guessing was "extremely low." Dr. Johnson believed that Petitioner's incorrectly answering some of the easier items on the test was "probably consistent with the attention deficits" that the correctional teacher had noticed. Additionally, Dr. Johnson observed Petitioner's behavior while he was taking the test, and he appeared to be "behaving exactly as I would expect" of someone considering each answer rather than guessing. Dr. Johnson testified that Petitioner got a perfect score on the Test of Memory Malingering, which meant that he was "exhibiting adequate effort." Based on Dr. Johnson's observations, Petitioner appeared to be giving adequate effort on all of the tests in that he would not answer too quickly and would change responses if he realized one was incorrect. Dr. Johnson testified that she was not concerned about the validity of any of the scores she obtained on the cognitive testing.

Dr. Johnson believed that there were "some problems with interpreting the prior I.Q. test[s] . . . and the prior diagnoses [of mild mental retardation] because of various ancillary issues." Dr. Johnson believed it was "odd" that even though Dr. Rutledge issued a report for juvenile court saying that Petitioner had mild mental retardation, she did not assess Petitioner's adaptive functioning and only testified at trial to adaptive deficits that occurred after her evaluation. Dr. Johnson also noted that both Dr. Craddock and Dr. Steinberg concluded that Petitioner's "general intellectual functioning was within the borderline range, rather than extremely low," despite I.Q. scores below 70, because "there was no evidence to suggest that [Petitioner] demonstrated significant deficits [in] adaptive functioning." Dr. Johnson testified that both marijuana use and mental illness can affect a person's performance on an I.Q. test. Dr. Johnson noted that Petitioner was reported as "using marijuana all day, every day" and was experiencing symptoms of a psychotic disorder at the time he was arrested and initially evaluated in this case. Because Petitioner's mental illness had stabilized and he was no longer using marijuana by the time she tested him, Dr. Johnson believed that she obtained a more accurate I.Q. score.

Dr. Johnson testified that the DSM-5 requires adaptive deficits to "arise from the intellectual deficits," which she explained "provides a little more conservative estimate" because "if it doesn't matter where those arise from – the diagnosis is going to be given to more people." Dr. Johnson testified that in Petitioner's case, it was unclear if "what's reported as deficits actually were due to a problem with intellectual functioning" as opposed to drug use or mental illness. As an example, Dr. Johnson explained that "if someone's high on marijuana, they are going to have problems with all of those things on the job" that were described by Ms. McMillan, such as working slowly and not understanding directions. Additionally, Dr. Johnson noted that Petitioner was fired from his job at Patterson Warehouse for abusing break time, not because of poor job performance, and speculated that Petitioner may have been using marijuana on his breaks. Dr. Johnson testified that it was "not clear from the record that [Petitioner] required support rather than choosing it." As an example, Dr. Johnson testified that Petitioner "was content to have his relatives launder[ ] his clothes and didn't attempt to learn this skill, although his intelligence that I measured in the borderline range suggests he could learn that skill if given the opportunity."

Dr. Johnson agreed with Dr. Everington that the ABAS could be used to conduct a retrospective assessment of adaptive functioning even though that is not a standard administration. However, Dr. Johnson was concerned that Dr. Everington's report listed only a single set of scores for all three respondents. Dr. Johnson explained that multiple informants should be given separate rating forms, otherwise it is not clear who provided what information. Dr. Johnson testified that while a nonstandard administration of the ABAS is permissible, the report should clearly explain "the nature and purpose of the nonstandard administration" and "provide appropriate cautions regarding use or nonuse of the scores." Dr. Johnson testified

that Dr. Everington's report did not contain such a notation, and Dr. Johnson was not aware of the nonstandard administration until she looked at the raw data. Dr. Johnson testified that "when you start making exceptions to standardized procedures, the more you make, the more potentially unlikely that your scores actually reflect the functioning of the individual."

Dr. Johnson agreed with Dr. Auble's opinion that Petitioner did not appear to have been intellectually disabled early in life. However, Dr. Johnson disagreed with Dr. Auble's opinion that Petitioner developed marijuana induced persisting dementia, now known as neurocognitive disorder under the DSM-5. Dr. Johnson testified that while being intoxicated or experiencing withdrawal from marijuana use can affect a person's performance on an I.Q. test, recent studies suggested that the cognitive decline associated with marijuana use "pretty much disappears after 72 hours." Dr. Johnson noted that the diagnostic criteria for dementia required an impairment in memory and the ability to learn new information, but Petitioner was able to recall his social history and "demonstrated that he is able to improve his academic functioning with instruction." Dr. Johnson testified that if the "influence [on Petitioner's memory] has been less over time, I think that calls into question whether or not there's an intellectual disability that was precipitated by a . . . cannabis induced neurocognitive disorder, major or mild." Additionally, Dr. Johnson could not find any academic literature or "research study that marijuana use was associated with dementia."

On cross-examination, Dr. Johnson testified that as part of her role with the Shelby County Juvenile Court, she was familiar with the ACEs study and had attended many trainings related to trauma. Dr. Johnson agreed that the more ACEs a person had, the more likely they were to have negative mental and physical health outcomes. Reviewing the same records and social history interviews as Petitioner's expert witnesses, Dr. Johnson agreed that Petitioner lived in a home with severe domestic violence, prevalent drug use, frequent arrests, mental health issues, and various forms of abuse and neglect, all of which are ACEs. Additionally, Petitioner grew up in an impoverished neighborhood where violence and crime were prevalent. Dr. Johnson testified that as a young child, Petitioner might not have been fully aware of everything that was going on but that he eventually became more aware as he got older. Dr. Johnson testified that unresolved trauma in children can lead to behavioral disturbances, problems with learning, a heightened threat response, substance abuse, and anxiety and mood disorders. Dr. Johnson agreed that Petitioner did not have nurturing people in his life to help him build resilience.

Dr. Johnson reviewed several portions of the AAIDD's manual and user guide with post-conviction counsel. Dr. Johnson agreed with the AAIDD's manual where it cautioned against relying exclusively on an individual's self-report of adaptive deficits. While Dr. Johnson agreed that many people with intellectual disability may attempt to appear more competent than they are, she did not know if that was necessarily true for defendants in the criminal justice system. Dr. Johnson agreed that "practice effects," which can increase I.Q. scores when a person has been tested

multiple times, should be taken into consideration if a person is retested within one to two years of a previous test administration. Dr. Johnson testified that she "partially agreed" with the AAIDD manual's recommendation that "past criminal behavior" should not be used to "infer level of adaptive behavior." Dr. Johnson testified that while she does not "look at sophistication of criminal behavior," certain crimes, like aggravated assaults, may be related to communication deficits and displays of aggression seen in "the lower ranges of intellectual disability." Dr. Johnson disagreed with the AAIDD manual's recommendation to not take into account a person's "street smarts," explaining that the DSM-5 states that adaptive skills, or the "ability to adapt to your surroundings," should be assessed in relation to "socioculturally matched individuals." Dr. Johnson testified that "in some of the more dangerous neighborhoods, it takes some adaptive skill that would not be on the ABAS, but it still is relevant." Dr. Johnson agreed that a person's behavior while in jail or prison "needs to be considered within the context of a structured environment." Dr. Johnson acknowledged that Petitioner possessed many of the prenatal, perinatal, and post-natal risk factors for intellectual disability listed in the AAIDD's manual.

Dr. Johnson testified that the DSM-5 defines the I.Q. component of intellectual disability as "about 70 plus or minus five." Dr. Johnson explained that because of this range, "[t]here can be someone whose I.Q. is above 70, but they experience such the bare academic deficits that . . . they would potentially be eligible for a diagnosis of intellectual disability." Conversely, someone with an I.Q. below 70 who does not demonstrate significant adaptive deficits would not be diagnosed as intellectually disabled. Dr. Johnson testified that while the DSM-5 requires significant deficits in only one of three domains of adaptive behavior, she "really wouldn't expect if somebody had significant deficits in one of the domains that the other two would be strong" because some of the behaviors in each domain overlap. Dr. Johnson noted that the DSM-4TR was the "diagnostic bible" in use at the time of the offense in this case and that it required deficits in more than one area of adaptive behavior, which was divided into more narrow categories. Dr. Johnson testified that there was "some disagreement [among experts performing *Atkins* evaluations] about which diagnostic manual to use" when determining if a person was intellectually disabled at the time of the offense. Dr. Johnson agreed that both she and the defense experts relied upon the DSM-5 in this case.

Dr. Johnson testified that "there are a number of different etiologies for intellectual disability" and that, particularly in the mild range, there may be no specifically identifiable cause. Dr. Johnson agreed that people with intellectual disability have "a wide spectrum of disabilities and abilities" and can range from totally dependent on the severe end to nearly independent on the mild end. Dr. Johnson agreed that the majority of people with intellectual disability would be classified as mild. However, even for mild intellectual disability, a person's adaptive deficits must "be significant enough to require some support." Dr. Johnson agreed that the onset of intellectual and adaptive deficits must occur during the developmental period and that some people may develop such deficits as adolescents.

Dr. Johnson agreed that Petitioner received an I.Q. score of 66 when he was sixteen years old and in the Shelby County Jail. Dr. Johnson noted that Dr. Rutledge did not administer "concomitant measures of effort" but indicated that Petitioner "obviously considered the procedure a joke," so Dr. Johnson was not sure that the resulting I.Q. score was "accurate." However, Dr. Johnson testified that if the score was accurate, it indicated that Petitioner "has problems with learning, memory, executive functioning, planning." Dr. Johnson noted that Petitioner was tested by Dr. Craddock in August of 2006 and received an I.Q. score of 68, which Dr. Craddock believed was a fair representation of his intellectual ability. Dr. Johnson testified that an I.Q. test is not designed to specifically look at executive functioning the way neuropsychological testing does. Dr. Johnson testified that neuropsychological tests are useful for determining a person's specific strengths and weaknesses in order to properly tailor the supports a person receives. Dr. Johnson agreed that providing supports is not a factor in an *Atkins* evaluation where the only issue is the person's eligibility for the death penalty.

Dr. Johnson testified that the Test of Memory Malingering is a test of response style and effort, which is designed "as a way to understand what the examinee's approach to the cognitive testing is" and determine if they are malingering or exaggerating their cognitive impairment. Dr. Johnson administered only the first trial of the test to Petitioner, even though the test protocol requires at least two trials, because she believed that "trial two is not going to give me any additional information" after Petitioner received a perfect score on the first trial, indicating that he was "fully cooperating." Dr. Johnson explained that the test does not measure a person's memory or cognitive abilities but instead tests the person's "willingness to show me his memory abilities." Dr. Johnson testified that the Validity Indicator Profile is "the only malingering test that . . . gives you some read [on] cognitive skills, if the person is being compliant." Both tests indicated that Petitioner "did not appear to be malingering."

Dr. Johnson agreed that Petitioner was initially evaluated in this case by Midtown Mental Health, who referred him to MTMHI due to concerns about his competency. While at MTMHI, Petitioner was diagnosed schizophrenia and prescribed medication. Dr. Johnson testified that in her experience with West Tennessee Forensic Services, a defendant discharged from a psychiatric hospital may have a recommendation for follow-up care in the jail, but she did not know if that occurred in Petitioner's case. Dr. Johnson disagreed with Dr. Dudley's opinion that Petitioner was receiving an excessively high dosage of Risperdal but conceded that she did not know how Petitioner may have responded to that dosage. Dr. Johnson agreed that psychiatric disorders occur at a higher rate in the intellectually disabled population than in the neurotypical population.

Dr. Johnson agreed that the DSM-5 recommends using standardized and culturally appropriate measures of adaptive functioning whenever possible. Dr. Johnson agreed that the ABAS is a standardized test and testified that "if you administer it

according to the standardized procedures, then you get some pretty good data relative to the normal sample." However, Dr. Johnson testified that because the ABAS was normed to the general population, it may not necessarily be socioculturally appropriate for the environment in which Petitioner was raised. Dr. Johnson explained that the ABAS included many skills that may not be relevant or required for adaptive functioning in that environment, which would result in the rater giving a lower score on those skills. Dr. Johnson acknowledged that this was an issue with most standardized assessments of adaptive behavior. Dr. Johnson clarified that she did not choose to not administer the ABAS to Petitioner in this case because of "sociocultural issues" but because she prefers to administer standardized assessments to collateral informants.

Dr. Johnson conceded that the adaptive screening she administered to Petitioner is not a standardized test. She explained that the questions were designed to assess similar skills as the ABAS and the Vineland, another standardized test of adaptive behavior. However, rather than asking Petitioner to rate a particular skill on a numerical scale, she asked him information about those skills, such as how to wash clothes, make change, or tell time. Dr. Johnson testified that she had developed the adaptive screening while working at the Department of Intellectual and Developmental Disabilities ("DIDD") and that it was not copyrighted. Dr. Johnson testified that she did not assign any weight to the questions a priori; instead, she would focus on questions that showed the person had a significant deficit in a particular area without penalizing the person for having a strength in a different area, which was consistent with the diagnostic criteria. Dr. Johnson acknowledged that, with the exception of a few questions where she asked Petitioner to perform a certain skill, she mostly had to rely on his self-report about what he could do. Dr. Johnson agreed that the majority of the questions discussed in her report focused on the practical domain. Dr. Johnson noted that the DSM-4TR in use at the time of Petitioner's arrest did not require the use of standardized assessments of adaptive behavior.

Dr. Johnson testified that at the time she conducted the adaptive screening, she was still hoping to complete an ABAS rating scale with Alma Rockett. Because Petitioner had lived with Ms. Rockett for a few months prior to the offense in this case, Dr. Johnson believed that she would be the most familiar with his functioning at home and in the community during that time. Dr. Johnson also wanted to administer at least the work component of the ABAS to Marsha McMillan but had difficulty scheduling with her. Dr. Johnson explained that she also wanted to administer the ABAS to Ms. Rockett in order to compare her results to Dr. Everington's administration, explaining that "it is important that standardized procedures be able to be replicated." However, after reviewing Dr. Everington's raw data, Dr. Johnson realized that such comparison would not be possible.

Dr. Johnson recognized the potential for bias with using Ms. Rockett as an informant. Dr. Johnson noted that Ms. Rockett stated that she had been told by the defense team that her responses could help Petitioner avoid the death penalty.

> Additionally, Dr. Johnson testified that Ms. Rockett's reasoning for not kicking Petitioner out of her home after learning that he allegedly threatened to rob and murder her was because he was family, which indicated that she "still remains pretty attached" to Petitioner. However, Dr. Johnson also acknowledged that Ms. Rockett could be biased against Petitioner because she had testified for the State at trial and had not been in contact with Petitioner since he went to prison. During one of Dr. Johnson's interviews with Ms. Rockett, she stated that she did not want any involvement with Petitioner because he had "disappointed" her and caused her son to lose his job. Dr. Johnson did not consider using Michael Rockett as an informant even though he had spoken to Dr. Everington.
>
> Dr. Johnson agreed that Petitioner's best school performance was while he attended Larose Elementary, which was located within walking distance of his home, provided "a number of services to try to take care of the children," and acted as a "safe haven" for Petitioner. Dr. Johnson also agreed that Petitioner's school performance and attendance suffered when he entered middle school because he and his friends were often attacked when they walked through a different housing project. Dr. Johnson agreed that Petitioner's grandmother was his primary caregiver because "she was the person there in the home absolutely more than anyone else," but Dr. Johnson did not "know how much caregiving she could provide consistently" with her mental illness. Ms. Rockett reported to Dr. Johnson that Petitioner's mother "was a party type [who] drank heavily" and "would go away for weeks at a time." Dr. Johnson agreed that Petitioner had a long history of arrests as both a juvenile and adult, and there were reports that Petitioner was susceptible to impulsive behavior. Dr. Johnson did not see any medical or school reports that Petitioner was diagnosed with ADHD. Dr. Johnson agreed that Petitioner had a very deprived childhood.
>
> On redirect examination, Dr. Johnson testified that the presence of various ACEs in Petitioner's life did not change her opinion that he is not intellectually disabled. Based on her experience in both the adult and juvenile courts in Memphis, Dr. Johnson testified that it was "rare to find someone in the system who doesn't have [a] significant number of ACEs." Likewise, Dr. Johnson testified that it was "quite common" for the people she encountered to have many of the risk factors for intellectual disability identified in the AAIDD's manual.

*Pruitt,* 2022 WL 1439977, at *13-*55 (footnotes omitted).

## IV. ISSUES PRESENTED FOR REVIEW

1. Whether the state court reached a decision contrary to or involving an unreasonable application of federal law when it concluded that Petitioner is not intellectually disabled and, thus, not ineligible for the death penalty.

2. Whether Petitioner's stand-alone claim of prosecutorial misconduct by exercising peremptory challenges against Black potential jurors, in violation of *Batson v. Kentucky,* 476 U.S. 79 (1986), is procedurally defaulted and barred from review.

3. Whether Petitioner's stand-alone claim of prosecutorial misconduct by making improper arguments is procedurally defaulted and barred from review.

4. Whether the state court reached a decision contrary to or involving an unreasonable application of federal law when it concluded that Petitioner had not established a personal conflict of interest on the part of the then-District Attorney such that his due process rights were violated.

5. Whether Petitioner's jury misconduct claims are procedurally defaulted and barred from review.

6. Whether Petitioner's stand-alone claim that the State's settlement offer of a life imprisonment sentence without the possibility of parole renders his eventual death penalty sentence unconstitutional under federal law is procedurally defaulted and barred from review.

7. Whether the state court reached a decision contrary to or involving an unreasonable application of federal law when it concluded that Petitioner's capital sentence is not unconstitutionally disproportionate.

8. Whether Petitioner's claim that the prosecution abused its discretion and could have violated double jeopardy by seeking dual convictions for first-degree premeditated murder and first-degree felony murder is procedurally defaulted and barred from review.

9. Whether the state court reached a decision contrary to or involving an unreasonable application of federal law when it rejected Petitioner's various claims of ineffective assistance of counsel on post-conviction review.

10. Whether Petitioner can show cause to excuse the procedural default of a claim of ineffective assistance of trial counsel under *Martinez v. Ryan,* 566 U.S. 1 (2012).

## V. STANDARD OF REVIEW

### A. Merits Review

Pursuant to 28 U.S.C. § 2254(a), a federal district court may entertain a petition for writ of habeas corpus relief by a person in custody as a result of a state-court conviction "only on the ground that he is in custody by violation of the Constitution or law or treaties of the United States." However, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits the

availability of habeas corpus relief "with respect to any claim" that a state court "adjudicated on the merits." 28 U.S.C. § 2254(d). Before granting relief, the court must first assess whether the petitioner has overcome deferential review of the state court's merits adjudication of the claim, specifically looking to "the last state-court adjudication on the merits of the petitioner's claim." *Brown v. Davenport,* 598 U.S. 118, 141 (2022) (cleaned up). This deferential review is limited to the record presented in state court. *Cullen v. Pinholster*, 563 U.S. 170, 181-83 (2011); 28 U.S.C. § 2254(d)(2).

Under AEDPA deference, a district court may not grant relief on a federal claim "adjudicated on the merits in state court" unless the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This "highly deferential standard" ensures that state-court decisions are "given the benefit of the doubt." *Woodford v. Viscotti,* 537 U.S. 19, 24 (2002) (cleaned up). Habeas corpus review and relief is available only when the state court's merits adjudication on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Ritcher*, 562 U.S. 86, 103 (2011).

A state court's decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Metrish v. Lancaster*, 569 U.S. 351, 357 n.2 (2013). The state court's decision cannot be construed as "contrary to" a holding from the

Supreme Court if there is not a Supreme Court case that confronts the specific question presented to the state court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (citing *Lopez v. Smith*, 574 U.S. 1, 6 (2014)).

An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle in existence at the time" but "unreasonably applies that principle to the facts of the [petitioner's] case." *Pinholster*, 563 U.S. at 182 (cleaned up); *see also Richter*, 562 U.S. at 103. The state court's ruling must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald,* 575 US. 312, 316 (2015) (per curiam). The relevant inquiry "is not whether a federal court believes the state court's determination . . . was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (cleaned up). This "highly deferential" review "demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (cleaned up). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter,* 562 U.S. 86, 102 (2011).

Under 28 U.S.C. § 2254(d)(1), "clearly established Federal law" includes only the holdings, but not dicta, in effect at the time of the state court's adjudication of the claim. *Greene v. Fisher*, 565 U.S. 34, 38-40 (2011); *see also Pinholster*, 563 U.S. at 182; *White v. Woodall,* 572 U.S. 415, 419 (2014).

As for an "unreasonable determination of facts in light of the evidence presented in the State court proceeding," 28 U.S.C § 2254(d)(2), "a state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow,* 571 U.S. 12, 18 (2013) (cleaned up). Instead, the record must "'*compel* the conclusion that the [state] court had no permissible alternative' but to arrive at the

contrary conclusion." *Carter v. Bogan*, 900 F.3d 754, 768 (6th Cir. 2018) (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006) (emphasis added)). The reviewing federal court must accord the state court "substantial deference." *Brumfield v. Cain*. 576 U.S. 305, 314 (2015). "[T]he question for this court to answer 'is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Hill v. Shoop*, 11 F.4th 373, 384 (6th Cir. 2021) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

With AEDPA deference, relief is unavailable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). And "[i]f this rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision." *Mays v. Hines*, 592 U.S. 385, 391 (2021). The reviewing federal court "may not flyspeck state-court opinions" when "[t]he goal is to protect against extreme malfunctions in the state criminal justice system, not to create a grading system for state-court opinion writing." *Rogers v. Mays*, 69 F.4th 381, 391-92 (6th Cir. 2023) (cleaned up).

Again, review under 28 U.S.C. § 2254(d) is limited to the record presented to the state court that resolved the claim. *Pinholster*, 563 U.S. at 181-83. "*Pinholster* plainly bans [any] attempt to obtain review of the merits of claims presented in state court in light of facts that were not presented in state court." *Moore v. Mitchell,* 708 F.3d 760, 785 (6th Cir. 2013); *see also Sheppard v. Bagley,* 657 F.3d 338, 343-44 (6th Cir. 2011) (applying *Pinholster* and § 2254(e)(2) to decline consideration of testimony from habeas petitioner's evidentiary hearing). "This ensures that the 'state trial on the merits' is the 'main event, so to speak, rather than a tryout on the road

for what will later be the determinative federal habeas hearing.'" *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

Even beyond AEDPA deference, a reviewing federal court generally must presume the correctness of state court determinations of factual issues, unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption of correctness includes factual findings made by a state appellate court after that court's review of trial court records. *Johnson v. Genovese*, 924 F.3d 929, 938 (6th Cir. 2019) (citing *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012)).

**B. Exhaustion and Procedural Default**

Pursuant to 28 U.S.C § 2254(b), a federal habeas corpus petitioner must exhaust the available state-court remedies prior to seeking federal habeas corpus relief. 28 U.S.C § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004). If, at the time a petition is filed, a state-court remedy is still available under the state law, such state-court remedies will not be considered exhausted, under 28 U.S.C. § 2254(c). In Tennessee, state-court remedies are deemed exhausted once a claim has been presented to the Tennessee Court of Criminal Appeals or the Tennessee Supreme Court and relief has been denied. Tenn. R. Sup. Ct. 39; *see Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003). A failure to exhaust the available state-court remedies could result in the denial of a petition for habeas corpus relief on the merits. 28 U.S.C § 2254(b)(2).

To properly exhaust a claim, a petitioner must fairly present the federal claim through the state's appellate court system. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). A claim is fairly presented when the substance of the federal habeas claim has first been presented to the state courts. *Picard v. Connor,* 404 U.S. 270, 276 (1971). Federal law does not need to be cited "book and verse" to fairly present a claim, but the factual and legal underpinnings of the claim must be

presented to alert the court of the claim's federal nature. *Pudelski v. Wilson,* 576 F.3d 595, 605 (6th Cir. 2009); *Reese,* 541 U.S. at 29. Claims that make general appeals to broad constitutional principles in state court are considered insufficient to fairly present and exhaust a federal claim. *Gray v. Netherland*, 518 U.S. 152, 162-32 (1996).

The exhaustion requirement is rooted in "longstanding policies of comity and respect between state and federal courts" that "a habeas petitioner must give the state courts the first opportunity to consider and rule upon the federal claims the [petitioner] wishes to use to attack [the] state court conviction."[1] *Pudelski*, 576 F.3d at 605 (6th Cir. 2009) (citing *Connor,* 404 U.S. at 275). When considering whether a petitioner fairly presented both the factual and legal basis for the federal claim in state court, the Sixth Circuit looks at the following "significant" actions:

> (1) [R]eliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Whiting v. Burt,* 395 F.3d 602, 613 (6th Cir. 2005) (citations omitted).

The procedural-default rule is related to the exhaustion requirement. *Edwards v. Carpenter,* 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion requirement and the procedural-default doctrine); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Procedural default can appear in two ways. First, if a federal habeas corpus petitioner never presented a claim in state court, and no state-court remedy remains available to review the merits of the claim, then the claim is "technically exhausted" but procedurally defaulted. *Coleman v.*

---

[1] The Supreme Court has explained that deferential review under 28 U.S.C. § 2254(d) "compliments the exhaustion requirement and the [procedural default rule] to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding." *Richter,* 562 U.S. at 103-104.

*Thompson,* 501 U.S. 722, 732 (1991); *see also Atkins v. Holloway,* 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483-84 (6th Cir. 2012)).

A claim is also procedurally defaulted when a state procedural rule prohibits a state court from reaching the merits of the claim. *Seymour v. Walker,* 224 F.3d 542, 549-550 (6th Cir. 2000) (citing *Sykes,* 433 U.S. at 87-88). In this regard, procedural default occurs when the petitioner failed to comply with a state procedural rule, the state court enforced the rule, and the state procedural rule was an adequate and independent state ground for denying review of a federal constitutional claim. *Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010). When considering whether a state procedural rule was applied to bar a federal claim, the reviewing federal court should look to the "last reasoned state court-decision disposing of the claim" to see if there was an "unambiguous state-court reliance on a procedural default." *Henderson v. Palmer,* 730 F.3d 554, 560-61 (6th Cir. 2013) (quoting *Guilmette v. Howes,* 624 F.3d 286, 291 (6th Cir. 2010)).

There are two exceptions under which a federal habeas corpus petitioner could seek review of a barred claim, regardless of the scenario in which a claim is procedurally defaulted. First, a federal court may consider a procedurally defaulted claim if a petitioner demonstrates "cause" to excuse his failure to present the claim and "actual prejudice" stemming from the alleged constitutional violation. *Coleman*, 501 U.S. at 748. To show cause, the petitioner bears the burden of proving that some external impediment frustrated his ability to comply with the state's procedural rule. *Murray v. Carrier,* 477 U.S. 478, 488 (1986). Cause could be satisfied by a showing of "interference by officials that makes compliance with the procedural rule impracticable, or attorney error rising to the level of ineffective assistance of counsel, or a factual or legal basis for a claim that was not reasonably available." *Jalowic v. Bradshaw,* 657 F.3d 293, 302 (6th Cir. 2011) (citing *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991)). To show prejudice,

the petitioner must prove that the outcome of the trial would have been different. *Gaither v. Lane*, 169 F.4th 716, 726 (6th Cir. 2026) (citing *Jones*, 801 F.3d at 563).

Second, a federal court may consider a procedurally defaulted claim if non-consideration of the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. This narrow exception is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley,* 541 U.S. 386, 388 (2004); *Carrier*, 477 U.S. at 496. An actual innocence claim "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). From this, the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*. at 327. Actual innocence in this context means "factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623 (1998).

**C. Attorney Error in State Collateral proceedings as Cause to Excuse Procedural Default**

The Supreme Court considered in *Coleman* whether attorney-error in a state-court collateral proceeding might constitute cause to excuse procedural default, even though there is no constitutional right to effective assistance of counsel in state-court collateral proceedings. 501 U.S. at 752-755. At that time, the Court held that a petitioner cannot claim constitutionally ineffective assistance of counsel in post-conviction proceedings because there is no constitutional right to an attorney in state post-conviction proceedings. *Id.*

Over twenty years later, in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Court recognized a "narrow exception" to *Coleman*'s general rule. In *Coleman*, the Court had considered "whether

ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for procedural default in a federal habeas proceeding." *Martinez,* 566 U.S. at 9. The Court qualified the previous statement in *Coleman* and held narrowly that the "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. However, in order to rely on ineffective assistance by initial collateral review counsel to show cause for excusing the procedural default of a claim of ineffective assistance of trial counsel, the petitioner must establish that the underlying trial-counsel claim is substantial, meaning that it "has some merit." *Id*. at 14

Also, *Martinez* narrowly applies "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding" and "there was no counsel or counsel in that proceeding was ineffective." *Id.* at 17.[2] In *Trevino v. Thaler*, 569 U.S. 413, 429 (2013), the Court extended *Martinez* to apply when a state's procedural framework makes it "highly unlikely" that a petitioner will have a "meaningful opportunity" to bring ineffective assistance of trial counsel claims on direct appeal. The Sixth Circuit has concluded that *Martinez* applies in Tennessee. *Sutton v. Carpenter,* 745 F.3d 787, 792-95 (6th Cir. 2014). However, review under *Martinez* remains limited to procedurally defaulted claims of ineffective assistance of trial counsel. *See Davila v. Davis*, 582 U.S. 521, 529 (2017) (declining to extend *Martinez* to procedurally defaulted claims of ineffective assistance of appellate counsel.).

To help guide district courts in Tennessee, the Sixth Circuit has set forth the following roadmap for reviewing a procedurally defaulted claim of ineffective assistance of counsel under *Martinez*:

---

[2] Under Tennessee law, every indigent person whose post-conviction petition survives summary dismissal on preliminary consideration has the right to counsel in litigation the petition. Tenn. Code. Ann § 40-35-107(b)(1).

> [T]he district court should determine . . . (1) whether state-post conviction counsel was ineffective and (2) whether [the petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of *Martinez, Sutton,* and *Trevino*. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [the petitioner] can demonstrate prejudice. Finally, the last step is (4) if the district court concluded that [the petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits. Under this framework, which is consistent with Supreme Court precedent and our holding in *Sutton*, [the petitioner] has a long way to go before a district court could even evaluate the merits of his claims. Moreover, even "[a] finding of cause and prejudice does not entitle the [petitioner] to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted."

*Atkins,* 792 F.3d at 660 (internal citations omitted).

When a habeas corpus petitioner relies on *Martinez* to excuse the procedural default of a claim of ineffective assistance of trial counsel and when the petitioner failed to develop the factual predicate of the claim in state court, the federal court may not consider evidence beyond the state-court record when assessing the merits of the claim unless the petitioner satisfies the requirements in 28 U.S.C. § 2254(e)(2).[3] In *Shinn v. Ramirez,* the Supreme Court clarified that a petitioner may not reply upon the alleged negligence and ineffective assistance of post-conviction counsel to excuse application of 28 U.S.C. § 2254(e)(2). 596 U.S. 366, 381-84 (2022); *see also Rogers*, 69 F.4th at 396 ("If post-conviction counsel negligently fails to develop the state-court record, that failure is attributed to the petitioner.").

Furthermore, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*" unless the petitioner meets one of

[3] 28 U.S.C. § 2254(e)(2) sets forth two narrow exceptions:

(A) the claim relies on (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

the exceptions in 28 U.S.C. § 2254(e)(2). *Id*. at 389. This is because the later-developed evidence could not ultimately serve as competent proof to support a claim, and "a *Martinez* hearing is improper if the newly developed evidence never would 'entitle [the prisoner] to federal habeas relief.'" *Id*. at 389-90 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). As the Sixth Circuit succinctly explained in *Rogers*,

> [A] petitioner who has procedurally defaulted his claims of ineffective assistance by trial counsel may in some limited circumstances rely on *Martinez* to excuse his procedural default. But he must provide evidence to show his claims are substantial. And that evidence must come from the state-court record unless the petitioner can satisfy the stringent requirements of 28 U.S.C. § 2254(e)(2).

*Rogers*, 69 F.4th at 397.

## VI. ARGUMENT

In his amended petition, Pruitt raises seventeen claims for relief. (*Ref. generally* ECF No. 38). As argued by Respondent, and incorporated by reference here, undersigned renews the previously-made argument that Pruitt's petition is time-barred and because Pruitt did not plead any basis for excusal from the statute of limitations, equitable tolling, or some other legal basis to excuse the untimeliness, the petition should be dismissed with prejudice. (*See* ECF No. 50-1.) Respondent's assertion of the above threshold procedural defense aside, Respondent now address each of Pruitt's bases for belief. For the reasons set forth below, if this Court determines that Pruitt is entitled to be excused from the untimeliness, the Court should reject the claims and deny the petition.

### A. The Attorney General Recently Certified Tennessee's Mechanism for Providing Counsel in the Post-Conviction Review for Capital Cases, and Pruitt Was Provided Counsel Under The Certified Mechanism. Therefore, Chapter 154 of Title 28 Governs This Court's Review and Resolution of Pruitt's Petition.

Within AEDPA, Congress enacted Chapter 154 of Title 28 establishing special procedures applicable to habeas corpus petitions filed under 28 U.S.C. § 2254 in capital cases. These

procedures apply, as relevant here, when two circumstances are met: (1) the Attorney General of the United States "certifies that a State has established a mechanism for providing counsel in post-conviction proceedings," and (2) "counsel was appointed pursuant to that mechanism." 28 U.S.C. § 2261(b). On July 10, 2026, the Attorney General certified that Tennessee has established such a mechanism, as of July 1, 1997. 91 Fed. Reg. 42761, 42762 (Jul. 10, 2026). The Attorney General expressly declined to stay his certification decision pending judicial review. Id. at 42774-75.

Pruitt received appointed counsel under Tennessee's certified mechanism, from the Office of the Post-Conviction Defender, which represented him throughout the entirety of his post-conviction review process. That Office was appointed to represent Pruitt in 2014, shortly after the filing of his initial pro se post-conviction petition (prepared with assistance from counsel in that Office). It then represented him through the Tennessee Supreme Court's denial of review in his post-conviction appeal in 2022. (ECF No. 12-20, PageID# 4317-4324; ECF No. 12-23, PageID# 4804-4818; ECF No. 13-31, PageID# 10715.)

Consequently, the special procedures in Chapter 154 apply in this case. "Where the chapter applies, federal habeas review is conducted in conformity with special provisions relating to stays of execution, the time available for federal habeas filing, the scope of federal habeas review, and the time for completing the adjudication of federal habeas petitions." 91 Fed. Reg. at 42762.

The special procedures make a number of deviations to otherwise generally applicable procedures for federal habeas corpus review. First, 28 U.S.C. § 2262 imposes a mandatory stay of execution that concludes once a capital petitioner (1) fails to file a timely federal habeas corpus petition, (2) waives the right to file a petition, or (3) files a timely petition "and fails to make a substantial showing of the denial of a Federal right or is denied relief in the district court or at any subsequent stage of review." 28 U.S.C. § 2262(b). Once "one of the conditions in subsection (b)

has occurred, no Federal court thereafter shall have the authority to enter a stay of execution in the case, unless the court of appeals approves the filing of a second or successive application under 2244(b)." 28 U.S.C. § 2262(c).

The automatic stay provisions do not impact Pruitt's case at this time. He does not currently have an execution date set while his federal habeas corpus petition is ongoing. And under state law, the Tennessee Attorney General may not file a motion in the Tennessee Supreme Court to set an execution date until Pruitt "has pursued at least one unsuccessful challenge to [his] conviction and sentence through direct appeal, state post-conviction, and federal habeas corpus proceedings" and "has completed the standard three-tier appeals process." Tenn. Sup. Ct. R. 12(4)(A). Specifically, "[t]he motion shall be considered premature if filed prior to the expiration of the time for filing a petition for writ of certiorari or a petition to rehear the denial of a petition for writ of certiorari in the United States Supreme Court." Id. So no automatic stay under § 2262 practically impacts Pruitt's case at this time.

Second, 28 U.S.C. § 2263(a) directs that the federal habeas corpus petition be filed "not later than 180 days after final State court affirmance of the conviction and sentence on direct review or the expiration of the time for seeking such review." This time is tolled (1) "from the date that a petition for certiorari is filed in the Supreme Court until the date of final disposition of the petition," (2) "from the date on which the first petition for post-conviction review or other collateral relief is filed until the final State court disposition of such petition," and (3) for 30 additional days if the district court grants an extension motion, upon a showing of good cause. 28 U.S.C. § 2263(b).

As already explained fully in Respondent's motion to dismiss, the petition is untimely under the standard one-year statute of limitations in 28 U.S.C. § 2244(d) and should be dismissed

for that reason alone. Any stricter timeliness requirement imposed by § 2263 is in addition to the timeliness bar that already forecloses Pruitt's petition under § 2244(d). And for the reasons laid out in the motion to dismiss—which is fully incorporated by reference here—the Court should dismiss the untimely petition. (ECF No. 50, PageID# 10991-10992; ECF No. 50-1, PageID# 10993-11001.)

Third, 28 U.S.C. § 2264(a) limits this Court's review to "claims that have been raised and decided on the merits in the State courts," unless the petitioner's failure to raise the claims properly in state court was (1) "the result of State action in violation of the Constitution or laws of the United States," (2) "the result of the Supreme Court's recognition of a new Federal right that is made retroactively applicable," or (3) "based on a factual predicate that could not have been discovered through the exercise of due diligence in time to present the claim for State or Federal post-conviction review." The Court then considers "the claims properly before it" under the review mandated by AEDPA in "subsections (a), (d), and (e) of section 2254." 28 U.S.C. § 2264(b).

Pruitt's procedurally defaulted claims are barred from review by § 2264(a) because they do not fall within one of the three above, narrow circumstances, and this Court's review of his exhausted claims under § 2264(b) remains limited by AEDPA. Although none of the exceptions in § 2264(a) remove the bar, Respondent nevertheless addresses in this answer whether Pruitt can overcome any default by showing cause and prejudice or by satisfying the fundamental miscarriage of justice exception. As shown more fully below, he cannot overcome any default, even if he could assert the defaulted claims.

Fourth, 28 U.S.C. § 2266 places time restrictions for the district courts and the courts of appeals to resolve federal habeas corpus actions promptly. Specifically, the district court must

decide the action "no later than 450 days after the date on which the application is filed, or 60 days after the date on which the case is submitted for decision, whichever is earlier," with this time expandable by 30 additional days 28 U.S.C. § 2266(b)(1). And the petition may not be amended after the filing of the answer "except on the grounds specified in section 2244(b)," the same grounds under which a second or successive habeas corpus petition may be authorized. 28 U.S.C. § 2266(b)(3)(B). Related limitations apply on the court of appeals' resolution of an appeal from a petition's grant or denial, with the appeal decided within 120 days of the reply brief's filing. 28 U.S.C. § 2266(c)(1)(A).

Here, the case is proceeding apace under the Court's current scheduling order that concludes in February 2027. And the Court has already notified the parties that further extension requests "will be viewed skeptically and will not be granted absent unforeseen good cause, which does not include general busy-ness." (ECF No. 53, PageID# 11010-11014.)

For the reasons stated, the special procedures in Chapter 154 apply to this case, based upon the Attorney General's certification decision and Pruitt's provision of counsel from the Office of the Post-Conviction Defender in his post-conviction review proceeding. However, the stay provision in Chapter 154 is not directly implicated, and Pruitt's petition is already untimely under the general one-year statute of limitations provided by § 2244(d). While Pruitt's procedurally defaulted claims are now barred, Pruitt cannot overcome the default of those claims in any event. And the case is proceeding to conclusion in an expeditious fashion.

**B. For Pruitt's Claims Adjudicated On The Merits During The Post-Conviction Review, Pruitt Cannot Show That The State Court Unreasonably Determined The Facts Under 28 U.S.C. § 2254(D)(2) Based Upon His Rejected Claim Of Judicial Bias.**

In Claim 18 of his amended petition, Pruitt raises not a federal claim but an argument against AEDPA deference based upon the trial court's alleged bias, predicated on facts that he previously relied upon in his rejected recusal motion. Specifically, Pruitt argues that § 2254(d)(2)

does not bar relief on any exhausted claim raised and rejected on post-conviction review because the post-conviction trial judge's alleged "bias or appearance of bias" "rendered the post-conviction fact-finding process that he oversaw procedurally unreasonable." (ECF No. 38, PageID 10953-56.)

In support of his argument that the Court must consider de novo all claims adjudicated on post-conviction review, Pruitt relies on the fact that the trial judge—who presided at Pruitt's trial and post-conviction proceeding—testified in an unrelated Tennessee Board of Professional Responsibility disciplinary hearing concerning the prosecutor in Pruitt's post-conviction proceeding. Pruitt claims that this "demonstrate[d] a degree of partiality that is irreconcilable with his position and responsibilities in Mr. Pruitt's proceedings[.]" (*Id.* at PageID 10956.)

But to overcome AEDPA deference, Pruitt must sufficiently demonstrate that the state court's merits adjudication on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ritcher*, 562 U.S. at 103. And under § 2254(d)(2), he must show an unreasonable determination of facts and "that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White,* 660 F.3d 242, 250 (6th Cir. 2011). He cannot do so.

AEDPA's "highly deferential" review "demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (cleaned up). "[A] federal court must carefully consider all the reasons and evidence supporting the state court's decision." *Hines,* 592 U.S. at 391. Again, "the question for this court to answer 'is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Hill*, 11 F.4th at 384 (quoting *Schriro*, 550 U.S. at 473). And "[f]actual findings made by the state courts based on the trial record are entitled to a presumption

of correctness that may be rebutted by clear and convincing evidence." *Id*. (citing 28 U.S.C. § 2254(e)(1)).

Despite Pruitt's argument to the contrary, none of this is overcome because Judge Craft testified at an unrelated disciplinary hearing regarding the prosecutor in Pruitt's post-conviction proceeding. Indeed, this was not even a basis for the trial court's recusal, as confirmed by the state-court rejection of his recusal motion. Prior to Pruitt's post-conviction evidentiary hearing, Pruitt filed a motion to recuse Judge Craft. (ECF No. 12-20, PageID 4507-22). He argued that Judge Craft's testimony in the unrelated disciplinary hearing as to the prosecutor's reputation "created a reasonable appearance of partiality" that weighted in favor of the prosecution. (*Id.* at PageID 4516). Pruitt also alleged that, although Judge Craft did not refer to post-conviction trial counsel by name during his testimony, Judge Craft "commented on [the] case and cast an unfavorable light on petitioner's counsel." (*Id.* at PageID 4517.) In a footnote, post-conviction trial counsel clarified that counsel assumed that Judge Craft had commented on counsel within the judge's testimony because (1) "more than one attorney present at the public disciplinary hearing alerted undersigned counsel" that Judge Craft "had referenced counsel's pending capital post-conviction case" and (2) post-conviction trial counsel was "aware of no other pending post-conviction capital cases" before Judge Craft. (*Id.* at PageID 4519).

In denying Pruitt's recusal motion, Judge Craft stated that Pruitt's post-conviction matter would be "tried and decided on the facts of the case presented to the judge using the applicable law, and not on the judge's opinion, if any, on the character of the attorneys." (*Id.* at PageID 4526.) Judge Craft also stated that the court "has never commented disapprovingly as to the conduct of the petitioner's counsel in this case, and has no reason to doubt their integrity." (*Id.* at PageID 4525.)

Pruitt next petitioned the Tennessee Court of Criminal Appeals for an interlocutory appeal pursuant to Tenn. Sup. Ct. R. 10B. (ECF No. 12-1). In affirming the denial of Pruitt's recusal motion, the appellate court stated that "the statements in support of [the prosecutor] would not exhibit bias to necessitate the recusal of Judge Craft[]" because the judge's testimony that he believed the prosecutor to be "honest and ethical" would not place the prosecutor in a "higher standard than any attorney appearing in his courtroom." (ECF No. 12-8, PageID 3884.) The appellate court reasoned that Judge Craft would afford "the same presumption as stated in [his testimony]" to "any attorney who abides by the Rules of Professional Conduct," which direct attorneys to be honest and not knowingly make false statements to the court. (*Id.* at PageID 3883-84.)

Turning to Pruitt's argument that Judge Craft's testimony reflected negatively against his post-conviction counsel, the appellate court aptly noted that Judge Craft's testimony did not reference Pruitt's case or counsel by name. But even if counsel's assumptions here were correct, Judge Craft's statement "does not show bias or prejudice to rise to the level of recusal." (*Id.* at PageID 2884).[4]

The appellate court recognized that the testimony referenced disagreements between opposing counsel, which is commonplace because "our justice system is an adversarial system[.]" (*Id.*) Judge Craft's testimony "stated his opinion that there was discovery that should have been

---

[4] The challenged statement is as follows:

> We had a hearing last month on a death penalty case, and the defense is not—a post-conviction death penalty case. The defense was not giving him timely the things he was supposed to have and he was really frustrated because the rules need to be everything.

*Id*. at PageID 3883.

given" to the prosecutor, who "was upset over the failure to deliver" reciprocal discovery. But he "went no further than [] any judge [would] in ruling on a pre-trial discovery matter." (*Id.*) Judge Craft "did not specifically state a dislike or prejudice against whomever the counsel was," nor did the statement "contain a bias or statement of condemnation or belief of explicit dishonesty." Instead, the judge "merely [gave] an opinion that the discovery was not delivered timely.". (*Id.*) Indeed, even if Pruitt's post-conviction counsel had been specifically named here, "such opinion would not be a basis for recusal as adverse rulings by a trial court are not usually sufficient grounds to establish bias." Plus, any bias "would be as a result of the actual observance of Judge Craft of the actions of counsel arising during litigation[.]" (*Id.* at PageID 3884-85.) Upon the intermediate appellate court's affirmance, the Tennessee Supreme Court denied Pruitt's application for permission to appeal. (ECF No. 12-19).

At its base, these recusal proceedings resulted in state-court factual findings that the presiding judge was not biased in favor of the State (and its counsel) and was not prejudiced against Pruitt (and his counsel). At this late juncture, Pruitt cannot rebut the presumption of correctness afforded to those factual findings, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). And there is no contrary evidence. Thus, the factual premise underlying Pruitt's deference argument—that the trial judge was so biased and so prejudiced that any factual determination made by that judge was necessarily unreasonable, regardless any supportive evidence in the state court record —does not exist.

In the end, Pruitt cannot show that, as a consequence of his own failure to prove a sound basis for recusal, his post-conviction proceedings are rendered a nullity under his contrived "unreasonable determination" argument, such that this Court must review de novo any claim rejected on the merits on post-conviction review. Pruitt fully availed himself of the post-conviction

review process through an evidentiary hearing conducted after the state courts rejected his recusal motion. The record from his post-conviction proceedings consists of twelve volumes of hearing transcripts and 180 exhibits, reflecting the extensiveness of the evidentiary hearing proceedings. (ECF Nos. 12-36 – 12-47; ECF Nos. 13-1 – 13-13.) Upon this record, the trial court thoroughly analyzed Pruitt's post-conviction claims and rejected Pruitt's petition in a detailed 179-page order. (ECF No. 12-21, PageID 4588-4767.)

Pruitt's argument that this extensive fact-finding process was somehow "procedurally unreasonable" based upon his rejected recusal motion is unsupported. The cases on which he relies do not apply because he has proven no deficiency in the state court's fact-finding process. Again, he cannot overcome the presumption of correctness on the state-court factual findings that the trial judge was not biased or prejudiced. With no support for his argument, this Court should reject it. If the Court ultimately determined that the state courts unreasonably determined the facts in some way, such that AEDPA deference is overcome as to some claim under § 2254(d)(2), it will be due to the facts developed in state court and not due to Pruitt's failed recusal motion.

### C. The State Court Did Not Unreasonably Apply Federal Law When It Concluded Pruitt Is Not Intellectually Disabled and, Thus, Is Not Ineligible for the Death Penalty.

In Claim 1, Pruitt argues that he meets the intellectual disability standard set forth by the Supreme Court in *Atkins v. Virginia,* 526 U.S. 304 (2002), and its progeny. (ECF No. 38, PageID 10793-10813.) In his view, he is ineligible for the death penalty under the Eighth Amendment. (ECF No. 38, PageID 10793.) Pruitt also argues that he is entitled to de novo review of this claim because the Tennessee Supreme Court "restrict[ed] their review to the applicability of a state statutory provision." (*Id.*)

Pruitt's arguments fail, and he is not entitled to de novo review. AEDPA deference readily applies here. As stated more fully below, the Tennessee Supreme Court's decision on direct

appeal, consistent with *Atkins,* discussed the constitutionality of Pruitt's death sentence and whether Pruitt satisfied the three-pronged statutory framework dictated by *Atkins.* The state court resolved his federal claim against him. Under AEDPA deference, the state court did not reach a decision contrary to federal law. Further, the state court neither unreasonably applied federal law nor made an unreasonable determination of the facts.

**1. The Tennessee Supreme Court did not inadvertently overlook Pruitt's federal constitutional claim on direct appeal, as he claims, and AEDPA deference applies on the state court's rejection of his federal claim.**

Pruitt asserts that the is entitled to de novo review of his *Atkins* claim because, "despite fairly presented [his Eighth Amendment] claim in the state courts, they failed to adjudicate it." (*Id.* at PageID 10811.) Pruitt is mistaken because the state courts rejected his Eighth Amendment claim on direct appeal. His treatment of the Tennessee Supreme Court's consideration and rejection of his intellectual disability claim fails to give appropriate regard to the state court's actual treatment of his intellectual disability claim.

Here, despite his argument to the contrary, Pruitt exhausted state-court remedies on his federal claim that the Eighth Amendment bars his execution due to intellectual disability during his direct appeal. This is why the Tennessee Court of Criminal Appeals rightly concluded in the post-conviction appeal that his intellectual disability claim was previously determined on direct appeal.[5] *Pruitt,* 2022 WL 1439977, at *59-*60.

A review of his direct appeal briefing confirms that the federal claim was squarely presented for review. Within Pruitt's brief before the Tennessee Supreme Court, as Issue 1, he argued, "The Trial Court Erred In Determining That The Defendant Was Not Intellectually

[5] Pruitt did not dispute that his stand-alone claim that he is ineligible for the death penalty due to intellectual disability was previously determined on direct appeal. (ECF No. 13-14, PageID 9885-86.)

Disabled and Thereby Eligible For The Death Penalty." (ECF No. 11-32, PageID 3239.) Pruitt's introductory paragraph laid out the issue as follows:

> The execution of intellectually disabled persons, formerly mentally retarded persons, constitutes cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L.Ed.2d 335 (2002); *Van Tran v. State*, 66 S.W.3d 790, 800 (Tenn. 2001). Corinio Pruitt respectfully submits that the trial court erred when it ruled that he was not intellectually disabled and thus eligible for the death penalty.

(*Id.*) Pruitt then proceeded to argue why, under Tenn. Code Ann. § 39-13-203, Pruitt is intellectually disabled and thus ineligible for the death penalty. (*Id.* at PageID 3239-49.) Pruitt now argues that the Tennessee Supreme Court "evaluated Mr. Pruitt's entitlement to relief under the state statute, Tenn. Code Ann. § 39-13-203, and not under the Eighth Amendment[,]" but that misconstrues what both *Atkins* requires and what the Tennessee Supreme Court actually did on his asserted *Atkins* claim.

At the time of the Tennessee Supreme Court's direct appeal opinion in 2013, *Atkins* was the clearly established federal law. In *Atkins,* the Supreme Court very clearly left "to the State[s] the task for developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentence." 536 U.S. at 317. In so doing, the Court emphasized a general consensus among the states conforming their statutes to the clinical definitions of "mental retardation," which generally required (1) subaverage intellectual functioning, (2) significant limitations in adaptive skills such as communication, self-care, and self-direction, and (3) manifestation of these disabilities before eighteen years of age. *Id.* at 317-18, n. 22.

Over a decade before *Atkins* was decided, Tennessee passed legislation to prohibit the death penalty for intellectually disabled persons convicted of first-degree murder. *Coleman v. State,* 341 S.W.3d 221, 232 (Tenn. 2011). The statutory criteria passed in 1990 modeled the framework that the Supreme Court later emphasized in *Atkins*. *See* Tenn. Code Ann. §39-13-203; 1990 Tenn. Pub.

Acts, ch. 1038, §§ 1, 2; *see also Atkins,* 526 U.S. at 314. What is more, the Tennessee Supreme Court applied this statutory framework one year before the U.S. Supreme Court decided *Atkins* when the state supreme court concluded that imposing the death penalty against an intellectually disabled person violates state constitutional protections against cruel and unusual punishment. *Van Tran v. State,* 66 S.W.3d 790, 812 (Tenn. 2001); *see also Pruitt,* 2011 WL 2417856, at *24. Thus, when *Atkins* was decided, Tennessee already applied the same standard contemplated by *Atkins* under state law and under the state constitution for assessing intellectual disability. And because *Atkins* left it to the states to define intellectual disability, Tennessee continued to use that same definition post-*Atkins* and at the time of Pruitt's direct appeal. Stated differently, the question presented to the state courts in Pruitt's direct appeal was whether state law, the state constitution, and the Eighth Amendment all prohibit Pruitt's execution under the three-prong standard delineated in Tenn. Code Ann. § 39-13-203. Again, this is how Pruitt framed the issue before the Tennessee Supreme Court.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter,* 562 U.S. at 98. Such presumption is appropriate here because the only reasonable construction of the Tennessee Supreme Court's decision is that it actually resolved the Eighth Amendment claim that Pruitt presented to the court when the court applied § 39-13-203 and concluded that Pruitt is not intellectually disabled and, thus, not ineligible for the death penalty. The Tennessee Supreme Court did not need further segment out how the same claim under the same analysis was grounded in state law, the state constitution, and the Eighth Amendment.

This is further confirmed by the Tennessee Supreme Court's application of *Coleman v. State*, 341 S.W.3d 221 (Tenn. 2011), and *State v. Howell*, 151 S.W.3d 450 (Tenn. 2004), when resolving Pruitt's intellectual disability claim. *Pruitt*, 415 S.W.3d at 202. Each case concerned the governing standards for intellectual disability claims raised under state law, the state constitution, and the Eighth Amendment. Prevailing state precedent can be "viewed as fully incorporating [the] related federal constitutional right." *Johnson v. Williams,* 568 U.S. 289, 298 (2013). "In this situation, a state appellate court may regard its discussion of the state precedent as sufficient to cover a claim based on the related federal right." *Id.* at 299.

For these reasons—and particularly due to Tennessee's preexisting statutory bar on the execution of intellectually disabled persons and *Atkins*'s incorporation of state law standards for defining intellectual disability, the Tennessee Supreme Court clearly adjudicated Pruitt's asserted Eighth Amendment claim predicated on *Atkins* when it concluded that Pruitt is not intellectually disabled under § 39-13-203. And because the state court adjudicated the claim on the merits, AEDPA deference applies on this Court's review of Pruitt's intellectual disability claim.[6]

**2. The state supreme court rightly rejected Pruitt's *Atkins* claim.**

Pruitt cannot overcome that deferential review on the state-court adjudication of his intellectual disability claim under the record presented to the state court.[7] On direct appeal, Pruitt first presented his *Atkins* claim to the Tennessee Court of Criminal Appeals. (ECF No. 11-26,

[6] Relatedly, because Pruitt's intellectual disability claim was exhausted and adjudicated on the merits in state court, the claim is not defaulted and, thus, is not amenable to review under the miscarriage of justice exception, as he alleges, under *Sawyer v. Whitley*, 505 U.S. 333 (1992), and *Frazier v. Jenkins*, 770 F.3d 485 (6th Cir. 2014). (ECF No. 38, PageID 10812-10814.)

[7] Because AEDPA deference applies, this Court's review under § 2254(d) is limited to the record presented in the direct appeal and does not include the record later developed on post-conviction review, despite Pruitt's reliance on this additional proof in his answer. *Pinholster*, 563 U.S. at 181.

PageID 3019-23.) There, Pruitt argued that the trial court "erroneously 'incorporated a range of error measurement in the test scores' . . . in finding that his I.Q. score of 66 by Dr. Rutledge and his I.Q. score of 68 by Dr. Craddock were unreliable." *Pruitt,* 2011 WL 2417856, at *14. Regarding adaptive deficits, Pruitt argued that the proof at the post-trial evidentiary hearing established that "he was unable to live independently, could not keep a job, and was unable to abide by society standards because of his frequent arrests." *Id.* Finally, Pruitt argued that his intellectual disability manifested before the age of eighteen. *Id.* After an extensive summary of the applicable legal standard, the evidence presented at the post-trial evidentiary hearing, and the decision of the trial court, the Tennessee Court of Criminal Appeals rejected Pruitt's claim, finding that he had not satisfactorily met the statutory criteria under § 39-13-203(a)(1)-(3). *Id.* at *14-*29.

On automatic review, the Tennessee Supreme Court reviewed Pruitt's intellectual disability claim anew. *Pruitt,* 415 S.W.3d at 201. The court noted that review of Pruitt's claim "ha[d] been made more difficult by [his] timing in raising the issue at trial." Still, the state supreme court ultimately determined that, while the evidence preponderated against the trial court's determination that Pruitt failed to prove he had significantly subaverage general intellectual functioning, Pruitt did not establish that he had deficits in his adaptive behavior and that the intellectual disability manifested prior to the age of eighteen. *Id.* at 203-204. This adjudication against Pruitt on the second and third prongs is not contrary to or an unreasonable application of federal law. Nor does it involve an unreasonable determination of the facts.

In *Atkins,* the Supreme Court decided whether executions of "a mentally retarded criminal" are "'cruel and unusual punishments' prohibits by the Eighth Amendment to the Federal Constitution." 536 U.S. 307. Upon reviewing "the consistency of the direction of change" in the thirteen years since the Court decided *Penry v. Lynaugh,* 492 U.S. 302 (1989), the Court found

that there was "powerful evidence" that "society views mentally retarded offenders as categorically less culpable than the average criminal[,]" going so far to say that "a national consensus has developed against it." *Id.* at 315-16. With this, the Court held that, in "[c]onstruing and applying the Eighth Amendment in light of out 'evolving standards of decency,'" "such a punishment is excessive and that the Constitution places a substantive restriction" on the execution "of a mentally retarded offender." *Id.* at 321.

The Court, however, did not announce a bright-line test for the states to utilize in determining whether a convicted person is intellectually disabled. The Court aptly recognized that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. Adopting the same approach taken in the context of determining whether a defendant is competent to be executed, the Court decided to "leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentence." *Id.* Although not providing any clearly delineated test, the Court did provide guidance, pointing out that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.*

As the *Atkins* Court recognized, Tennessee enacted a statute in 1990 that prohibited the execution of a "mentally retarded" person. *Id.* at 314. While Pruitt's direct appeal was pending before the Tennessee Court of Criminal Appeals, the statute was amended in 2010 to replace the term "mental retardation" with "intellectual disability." *See* 2010 Tenn. Pub. Acts, ch. 734, §§ 1-3. The amended Tenn. Code Ann. § 39-13-203 applicable at the time of Pruitt's direct appeal provided, in part:

(a) As used in this section, "intellectual disability" means:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3) The intellectual disability must have manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a)(1)-(3).

Here, the state court decision is not contrary to federal law. As shown, *Atkins* announced the governing standard on Pruitt's Eighth Amendment, and *Atkins* directs that state law standards for intellectual disability apply. Again, when applying those state law standards, the Tennessee Supreme Court applied *Coleman* and *Howell*—state precedent that, in turn, applied *Atkins*. Clearly, the state court applied *Atkins* when rejecting Pruitt's intellectual disability claim, and for that reason, it cannot be said that the state court decision is contrary to federal law.

Likewise, the state court decision is not an unreasonable application of federal law. Instead, the state court reasonably applied governing state law as directed by *Atkins*. The court's application of this "clearly established Federal law" was not unreasonable, as the court's ruling did not "unreasonably app[ly] that principle to facts of the [petitioner's] case." *Pinholster,* 563 U.S. at 182. And a fairminded jurist presented with the same factual record could resolve Pruitt's claim just as the Tennessee Supreme Court did here. Nor does the evidence show an unreasonable determination of the facts under § 2254(d)(2), such that every reasonable jurist presented with the same facts would be compelled to reach a different factual conclusion.

Again, the state court correctly identified and applied the governing statutory criteria that *Atkins* left to the states for determining intellectual disability. *Id.* And there can be no genuine

dispute that the state statute fully incorporated the "clearly established Federal law" as announced by the Supreme Court in *Atkins*.

***a. Significant subaverage general intellectual functioning.*** Beginning with the first prong of Tenn. Code Ann.§ 39-13-203, the Tennessee Supreme Court recognized that § 39-13-203(a)(1) "does not require raw test scored to be accepted at face value." *Pruitt,* 415 S.W.3d at 202. Rather, "[c]ourts may consider competent expert testimony that a particular test score does not accurately reflect a person's functional I.Q. or that the raw score is artificially inflated or deflated." *Id.* (citing *Coleman,* 341 S.W.3d at 224). Harkening back to its recent decision in *Coleman,* wherein the Tennessee Supreme Court conducted an extensive review of § 39-13-203 and its application, the Court stated that an expert may testify to "several challenges" recognized by the American Association on Intellectual and Developmental Disabilities ("AAIDD") that can affect "the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q." *Id.* (citing *Coleman,* 341 S.W.3d at 242 n.55). Further, the plain language of the statute requires that "'an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range . . . but must be expressed specifically[.]'" *Id.* (quoting *Coleman,* 341 S.W.3d at 242; *see also Howell v. State,* 151 S.W.3d 450, 458 (Tenn. 2004)).

Section § 39-13-203(a)(1)'s then-requirement of an I.Q. score of seventy or below was consistent with the Supreme Court's decision in *Atkins*, in which the Supreme Court pointed favorably to both the American Association on Mental Retardation (AAMR) and the American Psychiatric Association's definitions of mental retardation. *Atkins,* 536 U.S. at 308 n.3. The American Psychiatric Association then defined "'mild' mental retardation" as "people with an IQ level of 50-55 to approximately 70." *Id.*

As the Tennessee Supreme Court explained, the proof presented during the penalty phase of the trial and the post-trial hearings on this first point established that Pruitt had raw I.Q. test scores below seventy. *Pruitt,* 415 S.W.3d at 202. As the state court explained:

> Dr. Rebecca Rutledge testified that when she administered the Slosson test in 1996, twelve years prior to Mr. Pruitt's trial, Mr. Pruitt was sixteen years old and obtained a score of sixty-six. Dr. Sam Craddock administered the WAIS test in 2006 during Mr. Pruitt's inpatient evaluation prior to trial. Mr. Pruitt's score on the WAIS test was sixty-eight.
>
> Dr. Rutledge testified that she believed the results were "slightly below [the defendant's] ... true level of cognitive functioning" because he did not appear to take the test seriously. Dr. Craddock stated in his psychological report that Mr. Pruitt appeared to be making a good effort on the tests. However, he occasionally gave quick answers, without taking time to think through the questions. Although both experts stated that Mr. Pruitt may not have given his best effort on the tests, neither testified that Mr. Pruitt's I.Q. would have been higher than seventy if his effort had been greater. *See Coleman,* 341 S.W.3d at 247 (discussing presentation of evidence of "malingering"). Dr. Rutledge specifically stated that she thought Mr. Pruitt would have been in the mildly mentally retarded range even if he had given more effort on the test she administered. Dr. Craddock testified that he believed Mr. Pruitt's I.Q. was higher than the test results indicated. Dr. Craddock, however, presented no testimony that Mr. Pruitt's I.Q. exceeded seventy, the statutory threshold above which an individual is not considered intellectually disabled.
>
> Neither expert testified that Mr. Pruitt's test scores were "unreliable." The trial court, however, found that the scores on the tests administered were unreliable based on Mr. Pruitt's school records and on the opinions of both experts that Mr. Pruitt did not put forth his best effort during the testing process. Having rejected both test scores, the trial court concluded that Mr. Pruitt had failed to prove by a preponderance of the evidence that his I.Q. was seventy or below.
>
> The trial court rendered its decision on Mr. Pruitt's intellectual disability on May 22, 2009, nearly two years before we clarified in *Coleman* the process and criteria a trial court should use in making a determination of a defendant's eligibility for the death penalty due to an intellectual disability. We note that, unlike in *Coleman,* Mr. Pruitt's two I.Q. scores in this case satisfied the first prong of Tennessee Code Annotated section 39–13–203(a). Although the scores in this case were called into question by the trial court, neither expert opined that Mr. Pruitt's I.Q. was greater than seventy, whether through lack of effort or on some other basis for adjustment of the raw score. Neither expert testified that the tests had an element of unreliability in their administration.

> Under these circumstances, we are unwilling to uphold a finding that the tests are of no value in determining whether Mr. Pruitt has met his burden in showing that his I.Q. is seventy or below, pursuant to Tennessee Code Annotated section 39–13–203(a)(1). The evidence showed that Mr. Pruitt had I.Q. test scores below seventy. In the absence of expert testimony that his I.Q. was above seventy, we hold that the evidence preponderates against the trial court's determination that Mr. Pruitt failed to prove that he had significantly subaverage general intellectual functioning as evidenced by a functional I.Q. of seventy or below.

*Id.* at 202-03. Central to the court's disinclination to uphold the trial court's finding against significant subaverage intellectual functioning is the court's intervening decision in *Coleman*. *Id.* at 203. At the time of the trial court's decision in 2009, the "process and criteria" that should be used in making this determination had not yet been clarified. *Id.*

During both the penalty phase of the trial and the subsequent evidentiary hearing on intellectual disability, Dr. Rebecca Rutledge testified regarding a psychological screening of Pruitt conducted in 1996. (ECF No. 11-16, PageID 2072; ECF No. 11-21, PageID 2444-45.) Pruitt was 16 years old at the time of the evaluation. (ECF No. 11-21, PageID 2444.) Specifically during the penalty phase of the trial, Dr. Rutledge testified that the results of the intelligence testing "yielded an IQ of 66, which is in the mildly mentally retarded range, the upper range, but mild mental retardation." (*Id.* at PageID 2073.) During the intellectual disability evidentiary hearing, Dr. Rutledge testified fairly consistently that she believed the IQ numerical score was 68, still "in the mild mentally retarded range." .(ECF No. 11-21, PageID 2445.)

Dr. Sam Craddock also testified as the State's expert at the intellectual disability evidentiary hearing. Dr. Craddock testified that in 2006, the State asked for Pruitt to be evaluated to determine his competency to stand trial, not to determine intellectual disability. (*Id.* at PageID 2378; 2382.) Among the tests administered, Dr. Craddock administered the Wechsler adult intelligence scale, third edition. (*Id.* at PageID 2379.) Dr. Craddock testified that Pruitt's "full scale IQ" score was 68. (*Id.* at PageID 2397.) Dr. Craddock testified that he "wrote down that

[he] thought [Pruitt] was giving quick responses where he didn't give time to think through the answers." (*Id.*) At the conclusion of the evaluation, Dr. Craddock testified that the "diagnostic impression" for Axis II was "mental retardation mild," but that he wrote a note that that was "in error, as it was also in the psychological report, and it was corrected to borderline intellectual functioning." (*Id.* at PageID 2382-83.) Dr. Craddock testified that the reason Pruitt was diagnosed with borderline intellectual functioning was because between his testing "as well as material from the Department of Corrections which had a score of 81 and that falls within the borderline level of intellectual functioning." (*Id.* at PageID 2387.)

Based on this testimony, the Tennessee Supreme Court held that the evidence presented did not preponderate against a finding that Pruitt's full scale I.Q. scores fell below seventy and, under § 39-13-203(a)(1) at that time, his scores would satisfy the criterion for subaverage general intellectual functioning. *Pruitt,* 415 S.W. 3d at 203.

***b. Deficits in adaptive behavior.*** Pruitt cannot overcome AEDPA deference on the state court's conclusion that he did not prove deficits in adaptive behavior. As to this second prong of Tenn. Code Ann. § 39-13-203(a), the Tennessee Supreme Court stated that, to establish intellectual disability, "a defendant must not only establish significantly subaverage general intellectual functioning but must also establish '[d]eficits in adaptive behavior.'" *Pruitt,* 415 S.W.3d at 203. The court described "deficits in adaptive behavior" as "the inability of an individual to adapt to surrounding circumstances." *Id.* at 203-04 (citing *State v. Smith,* 893 S.W.2d 908, 918 (Tenn. 1994)). The court further explained that the "accepted clinical definition of adaptive functioning holds that an intellectually disabled person 'will have significant limitations in at least two of the following basic skills: 'communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills,

work, leisure, health, and safety.'" *Id.* at 204 (citing *Van Tran,* 66 S.W.3d at 795 (Tenn. 2001) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 39 (4th ed. 1994))).

The state court decision was not contrary to *Atkins*. And it was not an unreasonable application of federal law because a fairminded jurist presented with the same factual record could resolve this point just as the Tennessee Supreme Court did. Nor does the record "compel the conclusion" that the state court was required to make a contrary factual findings, such that there was an unreasonable determination of the facts. *Rice,* 456 U.S. at 341-42. Considering the accepted clinical definition, the Tennessee Supreme Court held that Pruitt presented "little evidence" that he had deficits in adaptive behavior. *Id.* The court explained that:

> In this case, little evidence was presented concerning Mr. Pruitt's adaptive behavior. Dr. Rutledge testified that Mr. Pruitt was unable to live independently, retain employment, and to abide by community standards. She admitted, however, that she spent only an hour with him twelve years prior to her testimony, when he was only sixteen years old. She recognized that Mr. Pruitt had spent a significant amount of time in the juvenile justice system by the time she had observed him and arguably had not had the opportunity to demonstrate whether he could manage on his own. To the contrary, once Mr. Pruitt was released from prison after serving his sentence for the 1996 aggravated robbery charges, he obtained employment and was employed on the day of the carjacking. He was living with his aunt at the time of the carjacking and had previously lived with his mother and sister, but the record does not indicate that he lived with them due to a deficit in adaptive behavior. Additionally, Dr. Craddock expressly testified that he did not observe Mr. Pruitt to have any significant adaptive deficits. The record supports the trial court's finding that Mr. Pruitt failed to prove by a preponderance of the evidence that he had deficits in adaptive behavior.

*Id.* In so doing, the Tennessee Supreme Court adopted the Tennessee Court of Criminal Appeals' accreditation of the findings of fact made by the trial court:

> In this case, the trial court determined that the Appellant failed to prove by a preponderance of the evidence that he had deficits in adaptive behavior. Specifically, the trial court noted that '[n]o deficits in adaptive behavior of the defendant were ever shown in the proof, either at trial or during the hearings on the motion.' The Appellant disputes this finding of the trial court and cites to Dr. Rutledge's testimony that she was aware that the Appellant was unable to live

> independently, to retain employment, and to abide by community standards as evidenced by numerous arrests. The State responds that, as recognized by the trial court, Dr. Rutledge was unable to make such assertions regarding any deficits in adaptive behavior because she was only able to observe the Appellant during her one-hour screening of him in 1996. The State further asserts that Dr. Rutledge conceded that she could not state that the Appellant actually suffered from these deficits. Finally, the State emphasizes that Dr. Craddock, at the post-trial hearing, testified that he was unable to identify any deficits in the Appellant's adaptive behavior.
>
> Our review of this issue is challenged by the dearth of evidence offered to show that the Appellant suffered from any deficits in adaptive behavior. Neither of Drs. Rutledge or Craddock actually evaluated the Appellant for the purpose of discerning any deficits in adaptive behavior. Thus, the Appellant relies primarily on the testimony of his family members to establish that he was unable to live independently, unable to maintain employment, and unable to abide by community standards. The proof at trial and at the posttrial hearing fails to support the Appellant's claims.
>
> First, while the record demonstrates that the Appellant lived with his sister and, after his sister refused to let him remain at her home, with his aunt, the record is absent any proof that the Appellant was not able to live independently. Next, the Appellant's mother testified inconsistently regarding the Appellant's employment history. She testified that he had 'never held a job for more than a month' and that he 'stayed working. He was doing fine.' In a report to Dr. Craddock she explained that the Appellant was terminated because he was abusing his break privileges and not an inability to comprehend instructions. Moreover, Dr. Rutledge admitted on cross-examination that the Appellant was gainfully employed at the time he committed the offense in this case.
>
> Finally, the Appellant asserts that he is unable to abide by community standards. The Appellant relies upon exclusively on his extensive history of arrests in support of this assertion. While the record does amply illustrate the Appellant's extensive criminal history, we reject the implication that an extensive history of criminal convictions is demonstrative of adaptive deficits. Furthermore, the record establishes, based on his school records, that the Appellant was able to abide by community standards. Thus, we conclude that the trial court's findings of fact are amply supported by the record. Accordingly, the Appellant has failed to establish by a preponderance of the evidence that he suffered from deficits in adaptive behavior.

*Pruitt,* 2011 WL 2417856, at *28.

The record fully supports the trial court's observations about the lack of evidence presented during both the penalty phase of trial and the intellectual disability evidentiary hearing post-trial

as to deficits in adaptive behavior. During the penalty phase, Dr. Rutledge explained that "someone with mental retardation" could have "different levels of adaptive functioning that may be impaired." (ECF No. 11-16, PageID 2073.) Dr. Rutledge explained generally the ways in which adaptive functioning can reveal itself in someone who was in the range of "mild mental retardation." (*Id.* at PageID 2075-77.) Specific testimony to Pruitt himself at the age of sixteen was much more limited. Dr. Rutledge stated that "[s]ome of the testing" "suggested that he was a little isolated, a little cut off from other people." (*Id.* at PageID 2077.) Dr. Rutledge agreed that, at that time, Pruitt was "behind in his schooling." But she "didn't have a lot of information about him at that time" so she didn't know "what the entire situation was." (*Id.*) But contradicting Dr. Rutledge's opinion that Pruitt was unable to live independently, Pruitt's mother testified that, at the time of the homicide, Pruitt had just moved out of his sister's house and had moved in with his aunt. (*Id.* at PageID 2120-21.)

At the following evidentiary hearing, Dr. Rutledge minimally testified as to what her findings were twelve years prior regarding Pruitt's deficits in adaptive functioning but rather testified as to what Dr. Craddock's report stated. (ECF No. 11-21, PageID 2446-47.) Dr. Rutledge stated she knew that that Pruitt's math scores "were at the third-grade level[,]" agreed that Pruitt was "unable to live independently[,]" was "unable to remain gainfully employed[,]" and "could not refrain from abiding by community standards[.]" (*Id.*) Dr. Rutledge conceded that she was aware Pruitt was gainfully employed at the time he committed the murder. (*Id.* at PageID 2449.) Dr. Rutledge also conceded that she had never seen Pruitt's school records and that her assessment was based on the short time spent evaluating him twelve years prior. (*Id.*)

To the contrary, Dr. Craddock testified at the evidentiary hearing that, when Pruitt was 18 and underwent a "Beta test" by the Tennessee Department of Corrections, Pruitt scored "an eighth-

grade reading level, high school level spelling, and then . . . fifth-grade math." (ECF No. 11-20, PageID 2387-88.) Pruitt reported that he had a "formal" ninth-grade education. (*Id.* at PageID 2388.) Dr. Craddock testified that the school records contained no evidence that Pruitt was in special educations classes, which would be expected for someone who is "retarded." (*Id.*) Further, Pruitt never claimed to be in special education classes. He was receiving "A's and B's" and scoring "satisfactory and excellent reports on his report cards right up to the sixth grade." (*Id.* at PageID 2388-89.) Dr. Craddock testified that, at the time Pruitt "started [to] deteriorate[e]" at the age of fourteen, the provided materials showed that Pruitt "started using drugs around that time and [had] less interest in school[,]" apparently reflecting a change in values. (*Id.* at PageID 2428.)

Regarding Pruitt's employment, Dr. Craddock testified that Pruitt's mother disclosed that Pruitt had been working but "was let go, not because he couldn't comprehend the instructions or what was expected, but he was abusing his break privileges." (*Id.* at PageID 2389.) Another interesting point to Dr. Craddock as for why it would be "unjustified" to consider Pruitt "mentally retarded[]" was that Pruitt stated that he was interested in playing chess, which is "not consistent with somebody who is mentally retarded." (*Id.* at PageID 2431.) Overall, Dr. Craddock testified that the doctors at MTMHI "did not see any significant deficits." (*Id.* at PageID 2390.)

Under this record, a fairminded jurists could conclude that Pruitt failed to demonstrate he had deficits in adaptive behavior when minimal proof was presented on this latter criterion. Given Pruitt's extensive experience in the criminal justice system as a juvenile, he had not had the opportunity to demonstrate whether he could live independently or not. There was no evidence presented that Pruitt's living arrangements with his mother and sister were due to anything other than his recent release from prison and lack of monetary funds to support himself upon release. Moreover, Pruitt's continued involvement with the criminal justice system as a juvenile coincided

with the change in his grades at school. At the time he was screened by Dr. Rutledge, Pruitt had received his "fourteenth charge" in the juvenile criminal justice system. (ECF No. 11-16, PageID 2086.) Thus, Pruitt can show no unreasonable application of federal law nor does that evidence show an unreasonable determination of the facts under § 2254(d)(2) such that every reasonable jurist would be compelled to reach a different conclusion.

***c. Manifestation before the age of eighteen.*** Finally, the third prong of Tenn. Code Ann. § 39-13-203 requires that there be proof that the intellectual disability manifested during "the developmental period or by the age of eighteen." Tenn. Code Ann. § 39-13-203(a)(3). The record reflects that Pruitt failed to do so. A fairminded jurist presented with the same factual record could reach the same conclusion as the Tennessee Supreme Court did here, and every reasonable jurist would not be compelled to reach a different conclusion.

The record fully supports the state court's factual findings on this point that Pruitt failed to establish that any intellectual disability manifested during his developmental period or before he reached the age of eighteen. The state supreme court resolved this issue as follows:

> Mr. Pruitt did not establish by a preponderance of the evidence that he had deficits in adaptive behavior and therefore has not demonstrated that he had an intellectual disability that manifested during his developmental period or before he reached the age of eighteen. Accordingly, we affirm the trial court's determination that Mr. Pruitt has not demonstrated an intellectual disability pursuant to Tennessee Code Annotated section 39–13–203. Mr. Pruitt is therefore eligible for the death penalty.

*Pruitt,* 415 S.W.3d at 204. In its resolution, the Tennessee Supreme Court adopted the Tennessee Court of Criminal Appeals' accreditation of the trial court's factual findings:

> The trial court found that "[a]s the defense has not proved its burden of showing either of the first two prongs by a preponderance of the evidence, it has also not shown that they were manifested by the time the defendant was 18 years of age." We agree. Because the proof does not establish by a preponderance of the evidence that the Appellant's I.Q. was below seventy (70) and that he demonstrated deficits in adaptive behavior, we conclude that no manifestation of intellectual disability was present by the age of eighteen. Accordingly, the Appellant is not entitled to relief regarding his claim that he is ineligible for the death penalty due to his

> intellectual disability. Upon our de novo review, we conclude that the trial court did not err in finding that the Appellant was not intellectually disabled pursuant to section 39–13–203(a).

*Pruitt,* 2011 WL 2417856, at *29.

Dr. Rutledge testified that, at the time she met with Pruitt, he was sixteen years old in the juvenile court system. (ECF No. 11-16, PageID 2072, 2074-75; ECF No. 11-21, PageID 2448.) As stated above, Dr. Rutledge was a psychologist for the Shelby County Juvenile Court and was asked for perform screening on those "charged with more violent crimes to determine if they were competent and if there were any signs of mental illness or anything else that [] may need to be address[ed] by the system." (ECF No. 11-26, PageID 2071-72.) She was unable to testify specifically to any particular deficits in adaptive behavior. Moreover, at the time Pruitt was evaluated by MTMHI to determine his competency to stand trial for the murder here, Pruitt was over the age of eighteen. Dr. Craddock testified that "nothing came across [their] desk[s]" at MTMHI to indicate that the onset of subaverage intellectual functioning or deficits in adaptive behavior occurred before the age of eighteen. (ECF No. 11-20, PageID 2390.)

The state-court record supports that Pruitt presented little evidence that any intellectual disability manifested before the age of eighteen. The state court decision contains no legal error, nor does the record facts "compel" a factual determination contrary to the factual findings adopted by the Tennessee Supreme Court. For this reason, Pruitt is not entitled to relief under § 2254(d) as he can show no unreasonableness here.

**D. Pruitt's *Batson* Claim Is Procedurally Defaulted and Barred From Review.**

In Claim 5,[8] Pruitt argues that the prosecution engaged in racial discrimination during the jury selection process by its exercise of peremptory challenges against four Black potential jurors,

[8] Undersigned has addressed Pruitt's claims in a slightly different order than originally set forth to better consolidate claims raised under the same legal principle.

in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). (ECF No. 38, PageID 10884-91.) Pruitt correctly reports that this claim was presented to the trial court and to the Tennessee Court of Criminal Appeals in the post-conviction review process. Those courts (rightly) determined that Pruitt waived the claim under state post-conviction law by failing to raise it on direct appeal. (*Id.* at PageID 10891.) Direct review was Pruitt's first proceeding when this claim could have been presented before a "court of competent jurisdiction," and his failure to raise it in that proceeding resulted in its waiver on post-conviction review. *See* Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceedings before a court of competent jurisdiction in which the ground could have been presented[.]").

At this juncture, Pruitt's *Batson* claim is procedurally defaulted for two reasons. First, the claim is procedurally defaulted because Pruitt failed to exhaust state court remedies while they remained available to him, during the direct appeal. Second, Pruitt's claim is procedurally defaulted because, once he belatedly raised in on post-conviction review, the Tennessee Court of Criminal Appeals actually applied a state procedural rule that prohibited its review at that late juncture. Because state court remedies are no longer available to exhaust on this claim, it is procedurally defaulted.

The Tennessee Court of Criminal Appeals explained in the post-conviction appeal that Pruitt did not raise his *Batson* claim on direct appeal, and it was waived on post-conviction review under Tenn. Code Ann. § 40-30-106(g). Thus, he could only challenge the effective assistance of counsel in failing to properly prosecute a *Batson* claim, which Pruitt raised on post-conviction review and separately raises here in Claim 6. As the court stated:

> Petitioner argues that the State committed prosecutorial misconduct by exercising peremptory challenges against four African American potential jurors in violation

> of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that trial counsel rendered ineffective assistance by failing to adequately object to the State's discriminatory use of peremptory challenges, resulting in structural defects that require a new trial. Specifically, Petitioner claims that after raising a *Batson* objection during jury selection, trial counsel failed to argue that the explanation provided by the State with regard to three of the jurors was pretextual and failed to insist upon the State providing a race-neutral explanation with regard to the fourth juror. Petitioner further complains that trial counsel did not raise the *Batson* claims in the motion for new trial and that appellate counsel failed to raise the *Batson* claims on appeal. The post-conviction court found that Petitioner waived any stand-alone *Batson* claim related to the State's use of peremptory challenges by failing to raise the issue on direct appeal. *See* T.C.A. § 40-30-106(g). The post-conviction further found that Petitioner failed to present any proof to establish that trial counsel or appellate counsel rendered ineffective assistance. We agree that the stand-alone prosecutorial misconduct claim is waived and shall analyze the issue only in the context of ineffective assistance of counsel.

*Pruitt,* 2022 WL 1439977, at *77.

Because Pruitt failed to exhaust state court remedies in the direct appeal, the claim is technically exhausted but defaulted, and because the state court actually applied the post-conviction waiver rule against him—which is an adequate and independent state law ground barring post-conviction review of the claim—the claim is doubly defaulted on that basis. "Under the procedural default doctrine, a federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Munson v. Kapture,* 384 F.3d 310, 313-14 (6th Cir. 2004).

Certainly, the Tennessee's waiver rule is independent of the merits of Pruitt's *Batson* claim. *See Glossip v. Oklahoma*, 604 U.S. 226 (2025) ("A state ground of decision is independent only when it does not depend on a federal holding, and also is not intertwined with questions of federal law.") And it is adequate in that it is firmly established and regularly followed. *Keller v. Genovese*, 65 F.4th 785, (6th Cir. 2023). The Sixth Circuit has long concluded that Tennessee's state post-conviction waiver rule in § 40-30-106(g) is adequate. *Cone v. Bell,* 243 F.3d 961, 969 (6th Cir.

2001), *overruled on other grounds by Bell v. Cone,* 535 U.S. 685 (2002); *see also Hodges v. Bell,* 548 F. Supp. 2d 485, 561-63 (M.D. Tenn. 2008), and *King v. Bell*, 392 F. Supp. 2d 964, 1015 (M.D. Tenn. 2005). Occasional "due process exception[s]" to Tennessee's post-conviction procedural rules do not render those rules inadequate. *Hutchison v. Bell*, 303 F.3d 720, 738-39 (6th Cir. 2002). And the Tennessee Court of Criminal Appeals has repeatedly followed and applied this mandatory state procedural rule against other capital defendants like Pruitt. *See e.g. Davidson v. State,* E2019-00541-CCA-R3-PD, 2021 WL 3678797, at *43 (Tenn. Crim. App. Aug. 19, 2021); *Stephenson v. State,* E2012-0133-CCA-R3-PD, 2014 WL 108137, at *21 (Tenn. Crim. App. Jan. 13, 2014); *Bane v. State,* W2009-01653-CCA-R3-PD, 2011 WL 2937350, at *37-*38, *39 (Tenn. Crim. App. July 21, 2011); *Stevens v. State,* M2005-00096-CCA-R3-PD, 2006 WL 3831264, at *37 (Tenn. Crim. App. Dec. 29, 2006).

One cannot genuinely argue that this claim is not defaulted. In fact, Pruitt does not even attempt to do so. And for the reasons stated, his *Batson* claim is procedurally defaulted. He identifies no basis to overcome the default, and Respondent knows of none. He makes no attempt to show cause and prejudice, and there is no cause and prejudice here. Due to the overwhelming evidence of his guilt, Pruitt certainly cannot show that consideration of the claim is necessary in order to avoid a fundamental miscarriage of justice. *House v. Bell,* 547 U.S. 518, 536-39 (2006). The claim is defaulted and barred from review, and the Court should deny it on that basis. *See Hugueley v. Westbrooks*, No. 2017 WL 3325008, at *20-*23 (W.D. Tenn. Aug. 3, 2017) (concluding that contemporaneous objection waiver rule in Tenn. R. App. P. 36(a) was adequate and that procedural default from its application barred review of *Batson* claim in capital habeas corpus case).

**E. Pruitt's Claim of Prosecutorial Misconduct By Making Improper Statements and Arguments is Procedurally Defaulted and Barred From Review and Adequate and Independent State-Law Grounds.**

As part of Claim 7, Pruitt argues that one of his trial prosecutors committed prosecutorial misconduct by making improper arguments during both the guilt and penalty phases of trial. (ECF No. 38, PageID 10902-16.) In support of this claim, Pruitt argues that the prosecutor "misstated the law, dehumanized [him], and inflamed the passions and prejudices of the jury." (*Id.* at PageID 10902.) Pruitt correctly states that the Tennessee Court of Criminal Appeals determined that the claim was waived on post-conviction review under § 40-30-106(g) because he failed to raise it on direct appeal, when he could have done so. *Pruitt,* 2022 WL 1439977, at *79.

For the same reasons that Pruitt's *Batson* claim is procedurally defaulted, *supra IV.D,* at this juncture, Pruitt's claim of prosecutorial misconduct by making improper statements and arguments is likewise procedurally defaulted and barred from review. Pruitt failed to exhaust state court remedies on this claim during direct appeal, and he may not return to state court to do so. Thus, the claim is defaulted on that basis. Additionally, the state court appropriately relied on a state procedural rule of waiver when it determined that it could not review the issue on post-conviction review. That rule is an adequate and independent state law ground supporting the post-conviction claim's rejection. Pruitt's prosecutorial misconduct claim is procedurally defaulted and barred from review.

Pruitt makes no attempt to overcome the default, and Respondent knows of no reason to excuse it. There is no cause and prejudice supporting an excusal, and the fundamental miscarriage of justice exception does not apply here. *House,* 547 U.S. at 536-39. For these reasons, Pruitt's prosecutorial misconduct claim based on alleged improper statements and argument should be dismissed as procedurally defaulted and barred from review.

## F. The State Court Reasonable Applied Federal Law When It Concluded That Pruitt Did Not Establish A Personal Conflict Of Interest By the Prosecutor in Violation of Due Process.

In Claim 12, Pruitt effectively argues that the state court unreasonably applied federal law when it determined that the prosecutor had a personal conflict of interest that resulted a denial of due process by Pruitt. (ECF No. 38, PageID 10930-35.) Pruitt argues that the prosecutor "had undisclosed, personal reasons" to seek the death penalty in this case and that her "improper motivations undermined the integrity of [his] trial[.]" (*Id.* at PageID 10930.) This revolved around the prosecutor's husband's prior representation of the victim and another family member of the prosecutor being a church acquaintance of the victim. On post-conviction appeal, the Tennessee Court of Criminal Appeals held that Pruitt had not established "any personal conflict of interest" depriving him of "a fair trial or his right to due process." *Pruitt,* 2022 WL 1439977, at *85. Although Pruitt argues that this Court may review this claim because the state court's decision was an unreasonable determination of the facts under § 2254(d)(2), AEDPA deference readily applies here. And because he cannot overcome AEDPA deference, the Court should reject the claim.

### 1. The state court did not unreasonably apply federal law when it found no personal conflict of interest.

First, Pruitt does not argue that the state court unreasonably applied federal law when it determined that Pruitt failed to establish any personal conflict interest that would rise to the level of a due process violation. And it is understandable that he did not do so. No unreasonable application of federal law can be otherwise established because a fairminded jurist presented with the same factual record could resolve Pruitt's claim just as the Tennessee Court of Criminal Appeals did here.

After discussing state law surrounding ethical concerns that would justify disqualification of a prosecutor, the court correctly identified and applied the governing standard to determine

whether an allegedly conflicted prosecutor violates a defendant's constitutional rights such that the conviction and sentence are deemed void or voidable. *Id.* at *82.[9] The court explained:

> Regardless of any ethical concerns justifying disqualification of a prosecutor, the question this court must answer in the post-conviction context is whether the involvement of an allegedly conflicted prosecutor violated Petitioner's constitutional rights such that his conviction and sentence are rendered void or voidable. *See* T.C.A. § 40-30-103. The Due Process Clause protects a defendant's right to a fair and impartial tribunal. *See Marshall v. Jerrico, Inc*., 446 U.S. 238, 242 (1980). However, the same degree of impartiality expected of judges does not apply to prosecutors. *Id*. at 248 ("Prosecutors need not be entirely 'neutral and detached.'") (citation omitted); *see also Young v. U.S. ex rel. Vuitton et Fils S.A*., 481 U.S. 787, 810 (1987) (noting that "the standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers"). Although "prosecutors are expected to be impartial in the sense that they must seek the truth and not merely obtain convictions," they are still advocates within an adversarial system who "are expected to prosecute criminal offenses with zeal and vigor within the bounds of the law and professional conduct." *Culbreath*, 30 S.W.3d at 314 (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)); *see also Marshall*, 446 U.S. at 248 ("In an adversary system, [prosecutors] are necessarily permitted to be zealous in their enforcement of the law."). However, a defendant's right to due process may be implicated "where enforcement decisions are motivated by personal interest, financial or otherwise," on the part of the prosecutor. *State v. Eldridge*, 951 S.W.2d 775, 782 (Tenn. Crim. App. 1997) (citing *Marshall*, 446 U.S. at 249-250).

*Id.*

There can be no genuine dispute that the Tennessee Court of Criminal Appeals correctly identified the "clearly established Federal law," as announced by the Supreme Court, relating to due process violations caused by a prosecutor's conflict of interest. And the court's application of this "clearly established Federal law" was not unreasonable, as the court's ruling did not "unreasonably app[ly] that principle to the facts of the [petitioner's] case." *Pinholster,* 563 U.S. at 182. As the appellate court further explained:

> Courts of this state have found due process violations when a private prosecutor was compensated by a special interest group and acted with very little oversight from the District Attorney, *Culbreath*, 30 S.W.3d at 318, and when a privately retained prosecutor also represented the victim in a civil suit arising from the same

[9] For this reason, it cannot be said that the state court adjudication is contrary to federal law.

incident as the criminal prosecution, *Eldridge*, 951 S.W.2d at 782. Unlike the special prosecutors in *Culbreath* and *Eldridge*, Gen. Weirich was a public prosecutor employed full-time by the District Attorney's Office, and she did not have a competing duty of loyalty to the victim as a client or a financial interest in the outcome of this case. *See State v. Johnson*, 538 S.W.3d 32, 55 (Tenn. Crim. App. 2017) ("The prosecutor is not an advocate for the victim of a crime or the witnesses for the State but is instead the representative of the sovereign state of Tennessee[.]"). To the extent that her husband's representation of the victim with regard to the victim's will and estate created a conflict of interest that could be imputed to Gen. Weirich, we do not believe that this conflict rose to the level of a due process violation given that the outcome of the criminal prosecution was completely irrelevant to the outcome of the probate case, which had concluded months before Gen. Weirich became involved in the trial of this case. *Cf. State v. Grover L. Parks*, No. E2010-02557-CCA-R3-CD, 2012 WL 525500, at *6 (Tenn. Crim. App., at Knoxville, Feb. 17, 2012) (finding no conflict of interest or due process violation when "[t]he special prosecutor received the fixed fee from [the victim] prior to the commencement of these criminal proceedings against the [d]efendant, and the fee was not tied to the outcome of the criminal case").

This case does not involve a conflict of interest in the traditional sense of competing loyalties to current or former clients. Instead, Petitioner complains that Gen. Weirich had a personal interest in the outcome of this case beyond her professional interest as a representative of the State of Tennessee. As characterized by the Second Circuit Court of Appeals, "the claim is not that the prosecutor had an interest in opposition to [her] proper one in securing an indictment and a conviction; it is rather that [s]he had an additional and impermissible reason in forwarding the prosecution." *Wright v. United States*, 732 F.2d 1048, 1056 n.7 (2d Cir. 1984). It would appear that this is an issue of first impression in Tennessee. From what this court can gather, most jurisdictions that have addressed the issue of prosecutorial disqualification due to a personal relationship with the victim have done so based upon either general ethical concerns or a local statutory rule rather than constitutional due process principles. *See* Christopher Vaeth, Annotation, *Disqualification or Recusal of Prosecuting Attorney Because of Relationship with Alleged Victim or Victim's Family*, 12 A.L.R.5th 909 (1993). From those cases that do address the constitutional implications of a prosecutor's personal conflict of interest, it would appear that the burden is on Petitioner to show not merely the appearance of impropriety created by the existence of a relationship, but actual misconduct on the part of the prosecutor that rendered Petitioner's trial unfair.

For example, in *Newman v. Frey*, 873 F.2d 1092, 1093-94 (8th Cir. 1989), the Eighth Circuit Court of Appeals held that the defendant's claim regarding the prosecutor's personal conflict of interest would not warrant federal habeas corpus relief because the defendant did "not suggest the prosecutor's relationship with the murder victim led to any misconduct" and the state court had found that he was not deprived of a fair trial. The factual allegations in Newman are strikingly similar to the case at bar. On direct appeal of the defendant's conviction, the Missouri

Supreme Court noted that the prosecutor's personal and professional relationship with the victim included serving as a pallbearer at the victim's funeral and representing the victim's wife in an estate matter. *State v. Newman*, 605 S.W.2d 781, 787 (Mo. 1980). Additionally, the defendant cited the prosecutor's "rather emotional" closing argument as evidence that he had not received a fair trial. *Id*. The Missouri Supreme Court concluded that the trial court did not abuse its discretion in denying the defendant's motion to disqualify the prosecutor because the defendant failed "to produce any action on the part of the prosecutor which was unfair or reflected excessive personal concern in the outcome of the case." *Id*. at 787-88.

In *Wright*, 732 F.2d at 1055, the Second Circuit Court of Appeals examined a collateral attack on an indictment alleging that the prosecutor who presented the defendant's case to the grand jury was married to a political opponent of the defendant who had actively sought investigation and prosecution of the defendant's alleged corruption. The court stated that the defendant was entitled to a "disinterested" prosecutor, which although "not altogether easy to define," did not include one who "has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Id*. at 1056. However, the court noted that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id*. at 1056 (quoting *United States v. Addonizio*, 442 U.S. 178, 184 (1979)). The court found that the competing interest on the part of the prosecutor's wife "was not a pecuniary interest in utilizing the criminal process to further her position in civil litigation but a public one in the condemnation of a man whom she thought, whether for good reasons or for bad, to have violated the public trust." *Id*. at 1058 (comparing the case to the "manifest impropriety" in *Ganger v. Peyton,* 379 F.2d 709 (4th Cir. 1967), where a prosecutor simultaneously represented the defendant's wife in a divorce proceeding and offered to dismiss an assault charge in exchange for a favorable property settlement). The court concluded that in the absence of any evidence of selective prosecution or specific misconduct, the prosecutor's participation in the defendant's case, though "ill advised," did not deprive the defendant of due process of law. *Id*.

In *People v. Vasquez*, 137 P.3d 199, 203 (Cal. 2006), the Supreme Court of California held that recusal of the District Attorney's office was warranted under a state statute when the parents of one of the defendants were long-time employees of that office and the prosecutor on the case admitted that concern about the appearance of that relationship influenced her discretionary decisions, even though she denied knowing the parents personally. However, the court concluded that "the error was not of constitutional dimension." *Id*. at 206. After noting that "a number of courts have declined to find a due process violation where the prosecutor is alleged merely to have a personal interest that might add to his or her zeal," *id*. at 208 (discussing *Wright*, 732 F.2d at 1055-58), the *Vasquez* court eloquently explained its reasoning as follows:

> That personal influences on a prosecutor are not always regarded as creating so substantial a conflict as to deprive the defendant of fundamental fairness is not surprising. District attorneys, as people, inevitably hold individual personal values and allegiances and feel varying emotions relating to their work. As public officeholders, they may also have political ambitions or apprehensions. But that a public prosecutor might feel unusually strongly about a particular prosecution or, inversely, might hesitate to commit to a prosecution for personal or political reasons does not inevitably indicate an actual conflict of interest, much less a constitutional bar to prosecution. . . .
>
> Even as regards judicial disqualification, the United States Supreme Court has distinguished between "matters of kinship [and] personal bias," which "seem generally to be matters merely of legislative discretion," and a judge's "direct, personal, substantial pecuniary interest in reaching a conclusion against" a defendant, which deprives the defendant of due process. . . .
>
> The Supreme Court's postulate that pecuniary conflicts of interest on a judge's or prosecutor's part pose a constitutionally more significant threat to a fair trial than do personal conflicts of interest may be somewhat counterintuitive, for common experience tells us that personal influences are often the strongest. But according "matters of kinship [and] personal bias" dispositive constitutional importance in this context would import into constitutional law a set of difficult line-drawing problems. As neither judges nor prosecutors can completely avoid personal influences on their decisions, to constitutionalize the myriad distinctions and judgments involved in identifying those personal connections that require a judge's or prosecutor's recusal might be unwise, if not impossible. The high court's approach to judicial conflicts generally leaves that line-drawing process to state disqualification and disciplinary law, with "only the most extreme of cases" being recognized as constitutional violations.

*Id*. at 209-10 (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)) (other internal citations omitted). The court concluded that the prosecutor's conflict of interest in that case did not rise to the level of a due process violation because the prosecutor did not have "a direct, substantial interest in the outcome or conduct of the case separate from [her] proper interest in seeing justice done" and because the defendants did not establish "any specific prosecutorial actions taken as a result of the conflict that deprived them of a fundamentally fair proceeding." *Id*. at 210.

> Applying the rationale of these cases to the present case, we hold that Petitioner has not established any personal conflict of interest on the part of Gen. Weirich that rises to the level of a due process violation. There is no evidence that the victim's church family had any kind of personal vendetta or "axe to grind" against Petitioner. *See Wright*, 732 F.2d at 1056. In fact, lead counsel testified that Mr. Leech told him they were "not out for blood," and the defense attempted to present evidence during the sentencing hearing that the Catholic Church is generally opposed to the imposition of the death penalty. Additionally, many of the major enforcement decisions, such as whether to seek the death penalty and whether to offer a plea bargain, were made prior to Gen. Weirich's involvement in Petitioner's case. As discussed more fully above, Petitioner has not established that Gen. Weirich committed any prosecutorial misconduct in either her peremptory challenges or her closing arguments sufficient to render his trial fundamentally unfair. In short, Petitioner has not shown that Gen. Weirich had "a direct, substantial interest in the outcome or conduct of the case separate from [her] proper interest in seeing justice done." *Vasquez*, 137 P.3d at 210. Even if this court were to agree that Gen. Weirich's participation in Petitioner's trial was "ill advised" given her family's connections to the victim, Petitioner has not established that he was deprived of a fair trial or his right to due process. *Wright*, 732 F.2d at 1058. Accordingly, Petitioner is not entitled to post-conviction relief on this claim.

*Id.* at *83-*85.

The record fully supports the court's observation that, "[t]o the extent that [the prosecutor's] husband's representation of the victim" in an estate matter created some conflict of interest imputable to her, any such hypothetical conflict did not create "a competing duty of loyalty to the victim as a client or a financial interest in the outcome of the case." *Id*. at *83. A fairminded jurist could reach the same conclusion here. *Id.* at *83.

Pruitt argues that the prosecutor had an "undisclosed, personal interest" "based on the close, personal ties." (ECF No. 38, PageID 10931.) However, the proof developed during post-conviction proceedings reveals that the "close, personal ties" were speculative.

First, the prosecutor's husband's attorney-client relationship with the victim did not result in a personal conflict of interest that would "bring irrelevant or impermissible factors into the prosecutorial decision" and "raise serious constitutional questions." *Marshall v. Jerrico,* 446 U.S. 23, 249-50 (1980). The victim hired the prosecutor's husband for the purpose of drawing up a

will, and the prosecutor's mother-in-law confirmed that the victim did not hire him out of a close personal relationship. (ECF No. 12-36, PageID 5496.) The prosecutor's husband advertised legal services at the church where the victim attended and where the prosecutor's mother-in-law worked as the administrator. (*Id.* at PageID 5495.) The prosecutor's mother-in-law did not arrange for the victim to solicit her son's legal services; the victim did this independently. (*Id.* at PageID 5459.) And the victim's will was executed on August 12, 2002—four years before the murder. (*Id.* at 5496.)

Pruitt argues that the prosecutor had interests "that went well beyond her professional role" because her husband was co-executor of the victim's estate and, as such, was involved in the probate process after his death. (ECF No. 38, PageID 10931.) But the prosecutor's husband did not serve as a co-executor because of any close personal relationship with the victim. Rather, it was out of legal necessity. The victim wanted his friend, Mr. Leech, to serve as the executor of his will. (ECF No. PageID 5500.) But Mr. Leech lived in Mississippi and, at the time of the will's drafting, Tennessee did not allow for an out-of-state executor. (*Id.*) As he had done in a few other similar situations, the prosecutor's husband acted as the in-state co-executor. (*Id.* at PageID 5500-01.) In fact, because the law had changed by the time of the victim's death, the prosecutor's husband sought renunciation of his co-executor status, which the probate court denied. (*Id.* at PageID 5500-01.)

The record also supports the fact that the prosecutor's husband did not personally financially benefit here. The five-thousand-dollar fee paid to him was for "fees and expenses related to the administration of the estate[,]" which is to say, reimbursement for administrative expenses that he covered out-of-pocket. (*Id.* at PageID 5499.) Whatever the eventual result of Pruitt's trial had no impact on the probate matter. As the prosecutor's husband stated, "It made no

difference for purposes of probate, death is death." (*Id.* at PageID 5505.) The victim's estate was closed on September 18, 2007, which was months before the prosecutor became involved in Pruitt's case. (*Id.* at PageID 5501; 5488.)

Thus, throughout the probate proceedings, the prosecutor was not involved in Pruitt's case. Nor was she involved in the prosecution's decision to seek the death penalty. (*Id.* at PageID 5480.) One of the two original trial prosecutors reviewed the facts of Pruitt's case, and it was her decision to approach then-district attorney general and ask permission to go forward with the death penalty. (*Id.* at PageID 5487.) The notice to seek the death penalty was filed on January 30, 2006. (*Id.* at PageID 5467; ECF No. 11-1, PageID 269-71.) Originally, that prosecutor and a second prosecutor planned to try Pruitt's case together. (*Id.* at PageID 5483.) But once that second prosecutor resigned, the prosecutor-in-question was asked to join the prosecution team. (*Id.*) This occurred one or two weeks before trial. (*Id.* at PageID 5483-84; 5488.) The prosecutor-in-question came into the matter "in the ninth inning[]" and only picked up the casefile to read it "the weekend before" trial started on the following Monday. (*Id.* at PageID 5510-11.) And at no point during her involvement in the case did she have knowledge regarding the probate of the victim's estate. (*Id.* at PageID 5520.)

Contrary to Pruitt's implications, the prosecutor, her family, the Leeches, and the victim did not all have "close ties" simply because they attended the same church. (ECF No. 38, PageID 10932.) The prosecutor's mother-in-law was the director of a church choir in which the victim was a member. (ECF No. 12-36, PageID 5457.) But she was unable to say anything personal about the victim, as she explained:

> He was a very private person. He was in my choir, but I can't say that I knew him other than he was always there to come and sing. Never did anything with him personally. He more or less that's all. I mean, I never did socialize with him at all. He was very kind of introspective.

(*Id.* at PageID 5458.) And while she arranged the victim's funeral and directed its choir, (ECF No. 38, PageID 10932), she did not do it due to a close, personal connection. These were her work tasks.(*Id.* at PageID 5459-60.)

Additionally, the record fully supports that the prosecutor and her husband had no close personal relationship with the victim as the two were attending different churches beginning in 2002. Due to a residential move, the prosecutor no longer attended that church, while her husband attended there and served as a lector.. (*Id.* at PageID 5503-04.) And she was never a parishioner of the church. (*Id.* at PageID 5518.)

Finally, there was no friendship-in-common creating a personal conflict of interest here. The prosecutor's in-laws were friends and congregation members with the Leeches, who were "essentially family members" with the victim. (*Id.* at PageID 5458-59). Their daughter was one of four godchildren named beneficiaries in the victim's will. (*Id.* at PageID 5496-97.) But no proof was ever developed to show close relationship between all of these persons. The prosecutor did not socialize with the Leeches; if she saw them, it was at church or a function that would expectantly involve other mutual connections, such as funerals or weddings. (*Id.* at PageID 5529.)

Simply stated, a fairminded jurist could conclude under this record that the prosecutor did not have a personal conflict of interest such that Pruitt was deprived of his right to due process or a fair trial. The state court's thorough and incisive analysis on the unique factual and legal issues presented here reflects no unreasonable application of federal law.

**2. Section 2254(d)(2) bars de novo review.**

Pruitt argues that § 2254(d)(2) "does not bar this Court from remedying this injustice[]" because the state court's decision was an unreasonable determination of the facts. (ECF No. 38, PageID 10936.) To support his argument, Pruitt argues that he has sufficiently demonstrated that the prosecutor committed prosecutorial misconduct during jury selection and in closing arguments

and, thus, that the state court's conclusion that her conduct was not improper is "belied by the record[.]" (*Id.*) But at base, the record does not "compel the conclusion" that the state court was required to reach a different conclusion, and this Court may not now second-guess its factual findings as "unreasonable determinations." *Rice,* 546 U.S. at 341-42.

Pruitt's curious argument for why the state court's decision *on this issue* was based upon an unreasonable determination in the facts is based upon actions at issue in separate claims of prosecutorial misconduct. As discussed above, *supra IV.D* and *IV.E,* those claims are procedurally defaulted and now barred from review. But those claims, and the factual allegations underlying them, say nothing about whether the prosecutor did or did not have a personal interest in the case due to the tenuous church connections between the victim and family members of the prosecutor. More to the point, they play no role in this Court's limited fact-finding function under § 2254(d)(2).

The facts developed in state court on this claim—concerning those various family and church connections between the prosecutor and the victim—were largely undisputed. Thus, what Pruitt actually challenges here is not any particular factual finding reached by the trial court acting as trier of fact but, instead, the legal significance of those undisputed facts. Thus, he attempts to raise a challenge under § 2254(d)(1) through the venire of § 2254(d)(2). But as already shown above, under a proper application of § 2254(d)(1), Pruitt cannot show that the state court's adjudication of this claim under the undisputed facts presented to it was contrary to or an unreasonable application of clearly established federal law.

Nevertheless, confronting this claim under § 2254(d)(2) as Pruitt chooses to request, the record of undisputed evidence developed on this claim does not provide one of those exceedingly rare instances that "compel[s] the conclusion" that the state courts must have found, as a matter of fact under these undisputed facts, that the prosecutor had a personal conflict of interest sufficiently

rising to the level of qualifying as a deprivation of due process and a fair trial due to certain family and church connections.. *Rice,* 546 U.S. at 341-42. And the unrelated factual allegations on his defaulted prosecutorial misconduct claims in no way inform this inquiry.

Pruitt can show no unreasonable determination of these undisputed facts. And for all of the reasons stated, he cannot overcome AEDPA deference on the state court's rejection of this claim. Thus, the Court should deny the claim.

### G. Pruitt's Jury Misconduct Claim Is Procedurally Defaulted and Barred From Review As The Claims Were Never Fully and Fairly Presented in State Court.

In Claim 13, Pruitt alleges numerous ways in which the jury purportedly engaged in misconduct. (ECF No. 38, PageID 10937-44.) Pruitt alleges "[o]n information and belief" that the jury in his case committed misconduct by providing "incomplete or misleading information during voir dire," engaging in premature deliberations, and considering "erroneous and extraneous information" during sentencing deliberations. (*Id.*) Pruitt acknowledges that this jury misconduct claim was not presented in state court. (*Id.* at PageID 10937 n.15.)

The parties agree that this claim was never presented in state court. At this juncture, Pruitt's allegations are procedurally defaulted and barred from review. State-court remedies are no longer available on these claims due to the one-year statute of limitations and, more importantly, the one-petition rule for filing a petition for post-conviction relief. *See* Tenn. Code Ann. § 40-30-102. Thus, he cannot return to state court at this late juncture to exhaust, meaning that the claim is technically exhausted but procedurally defaulted. Importantly, a juror misconduct claim requires exhaustion and will be regarded as defaulted if a habeas corpus petitioner failed to exhaust state court remedies on it. *See Hodges v. Colson*, 727 F.3d 517, 529-32 (6th Cir. 2013) (analyzing cause and prejudice to excuse default of juror misconduct claim never raised in state court).

Pruitt makes no argument that he can overcome the default, and he cannot do so. There is no readily apparent cause and prejudice to do so, and due to the overwhelming evidence of his guilty, he cannot show that consideration of the claim is necessary to avoid a fundamental miscarriage of justice. *House,* 547 U.S. at 536-39.

Relatedly, even if Pruitt could assert some basis for the Court to reach the merits of the claim, the state-court record does not include pertinent evidence to establish the claim, primarily because he never raised it in state court. This is indicated by his notable reliance on "information and belief," apparently meaning that he is relying on some heretofore unidentified evidence outside of the state-court record to support his claim. But any absence or omission of proof from the state-court record is due to Pruitt's own failure to develop the proof. This is explained by his failure to raise the claim and develop explicit proof on it at some point, such as at the post-conviction evidentiary hearing conducted under Tenn. Code Ann. § 40-30-110.

As more fully explained previously, *supra V.C.*, Pruitt may not seek further evidentiary development at this juncture unless he satisfies the narrow circumstances of 28 U.S.C. § 2254(e)(2), under *Ramirez*. Applying § 2254(e)(2), no new constitutional law is implicated here, and the factual predicate of the claim could have been previously discovered through the exercise of due diligence, especially considering Pruitt complains of juror conduct that occurred at trial. And under the limited state-court record, no juror misconduct is shown.

In any event, for these reasons stated, the claim is procedurally defaulted, and Pruitt has shown no basis to excuse the default. Thus, it is barred from review, and the Court should deny the claim on this basis.

### H. Pruitt's Claim That The State's Settlement Offer Of A Sentence of Life Imprisonment Without The Possibility Of Parole Renders His Death Penalty Sentence Unconstitutional Is Procedurally Defaulted And Barred From Review.

As part of Claim 14, Pruitt alleges that the imposition of the death penalty against him is somehow unconstitutional because the State engaged in the purportedly-egregious conduct of making a settlement offer. The State offered to settle the case with a sentence of life imprisonment without the possibility of parole if Pruitt pled guilty. And he elected not to do so. (ECF No. 38, PageID 10944-45.) In support of this claim, Pruitt relies on *U.S. v. Jackson,* 390 U.S. 570 (1968), to allege he was "unconstitutionally burdened" by the State because he "chose to exercise his constitutional right to trial[.]" (*Id.*) Pruitt acknowledges that he never raised this in state court. (*Id.* at PageID 10944 n.16).

There can be no dispute that the claim is defaulted. He may not return to state court to exhaust state-court remedies on this claim due to the statute of limitations and the one-petition rule in § 40-30-102. Thus, the claim is technically exhausted but nevertheless procedurally defaulted.

Pruitt offers no explanation as to how he might be able to overcome the default. He alleges no cause and prejudice to do so. Although Pruitt alleges that trial counsel was ineffective for failing to introduce evidence of the State's settlement offer at the penalty phase, Pruitt does not precisely offer this argument as a basis for the defaulted nature to be excused but rather as a separate ground for relief. (*Id.* at PageID 10945.) He does not precisely claim that trial counsel was ineffective in failing to challenge the trial court's imposition of the death sentence on account of the State's settlement offer that he rejected.

In any event, for these reasons stated, the claim is procedurally defaulted, and Pruitt has shown no basis to excuse the default. There is no cause and prejudice supporting an excusal, and the fundamental miscarriage of justice exception does not apply here. *House,* 547 U.S. at 536-39.

For these reasons, Pruitt's defaulted claim that his death sentence is somehow unconstitutional because the State offered to settle the case is barred from review and should be dismissed.

**I. Even If Somehow Considered Cognizable and Not Procedurally Defaulted, Pruitt's Claim That The Tennessee Supreme Court's Comparative Proportionality Review Violated His Federal Constitutional Rights Is Not Contrary To Federal Law.**

Pruitt alleges that the state court's decision that his death sentence is not constitutionally disproportionate is contrary to federal law. (ECF No. 38, PageID 10949.) Relying on the Tennessee Supreme Court's dissenting opinion on direct appeal, he argues that the court's "modified approach to [comparative] proportionality review" "is incompatible with the [U.S.] Supreme Court's precedent protecting against the arbitrary and disproportionate imposition of the death penalty." (*Id.* at PageID 10947-48.) Further, Pruitt states that his death sentence is "disproportionate given the rarity of its imposition for nonintentional homicides[.]" (*Id.*) He alleges that AEDPA deference does not apply here because the decision was contrary to the Supreme Court precedent in *Gregg v. Georgia,* 428 U.S. 153 (1976), and *Woodson v. North Carolina,* 428 U.S. 280 (1976). (*Id.* at PageID 10949.)

In essence, Pruitt takes issue with how the state court construed and applied state comparative proportionality law, following the Tennessee Supreme Court's decision in *State v. Bland,* 958 S.W.2d 651 (Tenn. 1997).[10] (*Id.* at PageID 10945-48.) To the extent that his claim is considered a challenge under that state law, it is not a cognizable federal claim under § 2254(a). Still, he appears to enunciate his claim as one grounded in federal law. (ECF No. 11-32, PageID 3264-86.) But if there is a federal claim raised here, it does not appear that Pruitt exhausted state

[10] To any extent Pruitt's invocation of the Fourteenth Amendment was intended to suggest that Tennessee's mandatory death-penalty review creates a federal due process liberty interest, the Sixth Circuit has rejected that argument. *See Coe v. Bell,* 161 F.3d 320, 352 (6th Cir. 1998).

court remedies on a distinct claim grounded in federal law, as opposed to one raised under state law, while those remedies remained available to him.

During Pruitt's automatic direct appeal, after oral argument, the Tennessee Supreme Court ordered the parties to submit additional briefing and oral argument on three issues: (1) "whether the absence of an intent to kill should render the death penalty disproportionate;" (2) "whether the proportionality analysis adopted by the majority of the Court in *State v. Bland* should be modified;" and (3) "whether the category of cases considered in our proportionality analysis should be broadened." *Pruitt,* 415 S.W.3d at 207. In his supplemental brief, Pruitt did not squarely respond to any of the state supreme court's requested issues. (ECF No. 11-35, PageID 3363-73.) Instead, Pruitt stated that he "intend[ed] to augment only the issue of whether he is intellectual disabled and therefore ineligible for the death penalty" and that he had no intent "to file any other supplemental arguments." (*Id.* at PageID 3362.) The Tennessee Supreme Court resolved this claim, finding no merit and concluding that Pruitt's death sentence was not disproportionate under state comparative proportionality law. *Pruitt,* 415 S.W.3d at 208-23.

Although Pruitt cites to *Gregg* for the proposition that the Supreme Court "approved" and otherwise thereafter required comparative proportionality review under the federal constitution, Pruitt overlooks the Supreme Court's decision in *Pulley v. Harris,* wherein the Supreme Court held that a defendant does not have an Eighth Amendment right to proportionality review comparing their sentences to those imposed in similar cases. 465 U.S. 37, 42-43, 44-45 (1984). The Court clearly specified that *Gregg* "did not establish a constitutional requirement of proportionality review," which was "made clearer by" the decision announced the same day in *Jureck v. Texas,* 428 U.S. 262 (1976). Contrasting its decision in *Gregg,* the Court recounted that their decision in *Jureck* "upheld a death sentence even though neither the [state] statute, . . . nor

the state case-law, . . . provided for comparative proportionality review." *Id.* at 48. To be sure, the Court went on to state that, "[in] view of *Jurek,* we are quite sure that at that juncture the Court had not mandated comparative proportionality review whenever a death sentence was imposed." *Id.* at 50.

For these reasons, any comparative proportionality challenge that Pruitt had and made in state court was one grounded in state law, making the purported federal claim now raised really a non-cognizable state law claim. But again, if his present claim is treated as a federal claim distinct from the state law claim, he never exhausted state court remedies on it, rendering it procedurally defaulted. He identified no basis for excusing the default, and Respondent knows of none. There is not cause for, and prejudice from, the default. And the fundamental miscarriage of justice exception does not appeal here. Any federal claim now raised is defaulted and barred on that basis.

But if any portion of the claim raised and considered by the state supreme court on direct appeal could conceivably be considered a cognizable federal claim on which state-court remedies were exhausted, then AEDPA deference applies under § 2254(d). And Pruitt cannot overcome that deferential review. The state supreme court's application of its statutory comparative proportionality review cannot be "contrary to" federal law. The Supreme Court has never overturned *Pulley* to otherwise hold that a defendant *does* have an Eighth Amendment right to proportionality review. And the state supreme court's comparative proportionality review framework is not inconsistent with the minimum standards set in *Gregg.* No relief is warranted here.

Under Tenn. Code Ann. § 39-13-206(c)(1)(D), Tennessee's appellate courts on direct appeal must review whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." The General

Assembly first enacted this mandatory review process in 1977 for capital cases. 1977 Tenn. Pub. Acts, ch. 51, § 4. At that time, it was presumed to be constitutionally required, but the Supreme Court later clarified in *Pulley* that the Eighth Amendment does not require comparative proportionality review in capital cases. *Bland,* 958 S.W.2d at 663. Indeed, after *Pulley,* several states repealed their own state-law proportionality review processes. *Id.* at 663 n.11. Tennessee has not.

In *Bland*, the Tennessee Supreme Court addressed comparative proportionality review, explaining that "the universe from which we choose the pool of 'similar cases' for comparison includes 'all cases in which the defendant is convicted of first-degree murder." *Id*. at 666. Next, "we eliminate from the 'universe' and include in the more narrow 'pool' for comparison only those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death . . . regardless of the sentence actually imposed." *Id*. The Tennessee Supreme Court here affirmed that the "pool" is limited to first-degree murder cases in which the State sought a death sentence. *Pruitt,* 415 S.W.3d at 214-17.

When "selecting similar cases from the pool" for comparative proportionality analysis, "consideration of the aggravating and mitigating circumstances as revealed by the [Tennessee Supreme Court] Rule 12 reports is a crucial element of the process." *Bland*, 958 S.W.2d at 667. The following factors are also "relevant to identifying similar cases and conducting proportionality review":

> (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims.

*Id.*

The court also identified other "criteria relevant to a comparison of the characteristics of defendants" which includes:

> (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation.

*Id.*

In conducting its comparative proportionality review in Pruitt's direct appeal, the Tennessee Supreme Court applied these same guiding factors here:

> In this case, Mr. Pruitt is an African–American male from Shelby County, Tennessee. He was twenty-five years old when he committed this offense. Mr. Pruitt made the decision to steal a car from someone he perceived to be a vulnerable victim. His attempt to elicit the participation of sixteen-year-old Courtney Johnson was unsuccessful. Mr. Pruitt stood in front of the Apple Market and watched for someone to exit the store. He found his opportunity in seventy-nine-year-old Mr. Guidroz, who was exiting the store and returning to his vehicle. Mr. Pruitt followed the elderly victim to the vehicle and pushed Mr. Guidroz into the vehicle. Mr. Guidroz apparently resisted giving Mr. Pruitt the keys to the vehicle. Mr. Pruitt and Mr. Guidroz "tussled" inside the front seat of the vehicle with Mr. Guidroz's feet dangling out of the door of the vehicle. Eventually, Mr. Pruitt successfully retrieved the keys from his elderly victim and threw Mr. Guidroz to the ground.
>
> The evidence was sufficient for the jury to conclude that Mr. Pruitt struck repeated blows to Mr. Guidroz. The medical examiner noted three separate skull fractures caused by three separate blows. A number of ribs were also fractured. Mr. Guidroz's body revealed scratches across his torso. The witnesses at the scene saw blood coming from Mr. Guidroz's head and ears. Mr. Pruitt fled the scene without rendering aid to Mr. Guidroz. Mr. Guidroz died as a result of the injuries suffered during the incident.
>
> Mr. Pruitt drove the car he had taken from Mr. Guidroz for several days and repeatedly attempted to obscure the car from police view. Mr. Pruitt offered acquaintances rides in the car and provided differing accounts of how he came into possession of the car. He admitted that he had planned to sell parts from the car. When the police converged at Mr. Johnson's home, Mr. Pruitt fled the scene to prevent his apprehension. Mr. Pruitt later learned that Mr. Guidroz was dead. He turned himself in to police the next day and expressed remorse.

Mr. Pruitt's testimony at trial was completely contrary to the other evidence presented in the case. He utilized an expert witness to cast doubt on the extent of the beating suffered by Mr. Guidroz and to suggest that Mr. Guidroz had pre-existing conditions that hastened his death. The jury accredited the State's evidence and found Mr. Pruitt guilty of second degree murder and first degree felony murder. The evidence during the sentencing phase revealed that Mr. Pruitt had borderline intellectual functioning with an I.Q. score below seventy. He had an extensive prior record, including three aggravated robberies in 1996, a robbery and an attempted robbery in 2003, and theft over $500. The jury found Tennessee Code Annotated section 39–13–204(i)(2), (i)(7), and (i)(14) as aggravating circumstances and imposed the death penalty.

We now consider prior capital cases with similarities to Mr. Pruitt's case. We are mindful that comparative proportionality review is not a rigid, objective test. *Bland*, 958 S.W.2d at 668. A reviewing court must also rely on the experienced judgment and intuition of its own members. *Bland*, 958 S.W.2d at 668.

In *State v. Barber*, 753 S.W.3d 659, Mr. Barber was twenty-nine years old at the time of his offense and resided with his parents. Mr. Barber planned to burglarize the home of his seventy-five-year-old victim. He solicited assistance from his brother-in-law and his brother, who had worked for the victim on several occasions. Mr. Barber wore a ski mask and knocked out the window of the back door of the home with a crescent wrench. When the victim recognized Mr. Barber's brother and moved toward the telephone, Mr. Barber hit the elderly victim on the head four or five times with the wrench. The victim died as a result of her injuries. The medical examiner opined that the five blows to the victim's head and resulting brain damage was the cause of death. Mr. Barber did not render aid. Mr. Barber was overheard telling his mother that the killing was necessary because the victim had recognized him. The trial court instructed the jury on two mitigating circumstances regarding Mr. Barber's age and his capacity for rehabilitation. The jury returned a death sentence based on the (i)(5) and (i)(7) aggravating circumstances. Tenn.Code Ann. § 39–2–203(i)(5), (7) (1982).

In *State v. Barnes*, 703 S.W.2d 611 (Tenn.1985), the ninety-one-year-old victim was in good health and lived alone. The victim was beaten during the burglary of her home. The victim's nose and jaw were fractured and both eyes were swollen shut. She had multiple bruises over her entire body. The victim had no skull fracture but suffered a brain injury resulting in convulsive seizures. An examining physician said that the injuries could have been caused by blows from a human fist. While in the hospital, the victim contracted pneumonia and died as a result of sepsis. The jury convicted Mr. Barnes of felony murder and imposed a death sentence based on the (i)(2), (i)(5), and (i)(7) aggravating circumstances. Tenn. Code Ann. § 39–2–203(i)(2), (5), (7) (1982).

In *State v. McNish*, 727 S.W.2d 490 (Tenn.1987), Mr. McNish, a thirty-year-old white male, killed his seventy-year-old victim, who resided alone in the same apartment complex as Mr. McNish's parents and girlfriend. The victim was described as frail, weighing less than 100 pounds, but capable of living alone. Mr. McNish weighed approximately 165 pounds and had a black belt in karate. Mr. McNish was unemployed and had abused prescription drugs for a number of years. He frequently borrowed money from others, including his elderly victim. The victim suffered head injuries inflicted by a glass vase belonging to the victim. The vase was shattered, and the victim's skull was fractured in several places. Although the victim was found alive, she died a short time later as a result of her head injuries. A jury convicted Mr. McNish of first degree murder. At the sentencing hearing, Mr. McNish presented the testimony of friends and family and offered as mitigating circumstances the absence of a prior criminal record and his extreme mental or emotional disturbance. The jury sentenced him to death based on the (i)(5) aggravating circumstance. Tenn.Code Ann. § 39–2–203(i)(5) (1982).

In *State v. Cone*, 665 S.W.2d 87 (Tenn.1984), Mr. Cone was thirty-three years old when he was convicted of the beating deaths of a ninety-three-year-old man and his seventy-nine-year-old wife. Mr. Cone had engaged in a series of criminal episodes at the time he burglarized the home of the elderly victims. At trial, Mr. Cone claimed mental incompetence. Mr. Cone, an honor graduate of the University of Arkansas, had been accepted into law school, having scored in the ninety-sixth percentile on a law school admission test. Mr. Cone had been honorably discharged from the Army and had received a bronze star for his service in Vietnam. He had been previously convicted of armed robbery. The jury found him guilty and sentenced him to death. This Court upheld the sentence based on the (i)(2), (i)(5), and (i)(6) aggravating circumstances. Tenn.Code Ann. § 39–2–203(i)(2), (5), (6) (1982).

In *State v. Campbell*, 664 S.W.2d 281 (Tenn.1984), Mr. Campbell was convicted of killing a seventy-two-year-old male resident of a retirement home during the perpetration of a robbery. Mr. Campbell and the victim had been drinking at a tavern when Mr. Campbell called a taxi to take the victim home with him. The taxi driver last saw the two men walking toward a wooded area near an apartment complex. Mr. Campbell stole the victim's watch, ring, and wallet before killing him. The victim had been beaten severely on the head with a blunt object and had defensive wounds on his hands. The autopsy revealed that the victim had suffered at least eight blows to his head, fracturing his skull and resulting in a brain hemorrhage. Mr. Campbell was convicted of first degree felony murder and sentenced to death based on the (i)(2), (i)(5), and (i)(7) aggravating circumstances. Tenn.Code Ann. § 39–2–203(i)(2), (5), (7) (1982).

In *State v. Johnson*, 698 S.W.2d 631 (Tenn.1985), Mr. Johnson went to the home of his eighty-four-year-old victim and demanded the return of two rifles Mr. Johnson had pawned earlier to the victim. When the victim refused, Mr. Johnson hit the victim on the head with a heavy glass candlestick. Mr. Johnson also took

the rifles and some cash found on the victim's person. He confessed to the killing but denied that he intended to kill or rob the victim, claiming he acted out of fear and anger. Mr. Johnson was convicted of first degree murder. In mitigation, Mr. Johnson presented evidence that he had been a model prisoner, that he was a juvenile runaway due to abuse by his father, that he had an alcohol and drug abuse problem, and that the victim had struck him first. The jury imposed the death penalty based on the (i)(2) and (i)(7) aggravating circumstances. Tenn.Code Ann. § 39–2–203(i)(2), (7) (1982).

In *State v. Smith*, 695 S.W.2d 954 (Tenn.1985), Mr. Smith, almost twenty-three years of age, was "cruising" with his friends when they saw the seventy-one-year-old victim carrying a sack of groceries. Mr. Smith, who was armed, accosted the victim and demanded his money. The victim resisted and wrestled with Mr. Smith, possibly attempting to apprehend him. Mr. Smith shot the victim twice and fled without rendering aid to his elderly victim who was lying helpless and bleeding on the sidewalk. The victim died some hours later. Approximately seven months after the incident, Mr. Smith was taken into custody. He admitted that he shot and killed the elderly victim but contended that the shooting was accidental, rather than intentional. The jury convicted Mr. Smith of felony murder and sentenced him to death based on the (i)(7) aggravating circumstance. Tenn.Code Ann. § 39–2–203(i)(7) (1982).

These cases, though not identical, share a number of similarities with Mr. Pruitt's case. The victims in these cases were vulnerable due to age and were apparently selected due to their known vulnerability. A number of the defendants were close in age to Mr. Pruitt at the time of commission of the offense. A great disparity existed between the physical strength of the defendants and that of the victims. Most of the victims died as a result of having been beaten. Many of the defendants took no weapon to the scene but used an object found at the scene. One of the defendants used his fists. Most of the victims were left injured and bleeding and some died later in the hospital. None of the defendants rendered aid to the victim. We are mindful of Mr. Pruitt's claim that the killing of Mr. Guidroz was unintentional. He suggests that because he did not intend to kill anyone while intending to steal a vehicle, the death penalty is disproportionate when compared to other cases. The jury heard Mr. Pruitt's testimony and rejected his version of the events. It found Mr. Pruitt guilty of both second degree murder, which required a "knowing" killing, and felony murder. As discussed, first degree felony murder requires no culpable mental state other than the intent to commit the underlying felony. The proof adduced at trial further negates Mr. Pruitt's suggestion that Mr. Guidroz died as a result of unintentional or accidental conduct. A witness saw the "tussle" between Mr. Guidroz and Mr. Pruitt inside the vehicle. The elderly Mr. Guidroz was "slammed" to the ground by Mr. Pruitt. The medical proof established that Mr. Guidroz's injuries included skull fractures resulting from three separate blows or impacts to his skull.

> Some of the defendants in the similar cases went to the scene with the intent to commit a felony but arguably not an intent to kill. Some found a "weapon" on the scene or used human fists to accomplish the killing when the victim resisted or attempted to alert authorities. *Cf. State v. Nesbit*, 978 S.W.2d 872 (Tenn.1998) (affirming Mr. Nesbit's first degree premeditated murder conviction and death sentence after a jury rejected his claim that the shooting was accidental).
>
> . . .
>
> After a review of prior decisions and a comparison with similar cases, we are of the opinion that Mr. Pruitt's case, taken as a whole, is not plainly lacking in circumstances consistent with other cases in which the death penalty has been imposed. We therefore conclude that his sentence of death is not disproportionate.

*Pruitt,* 415 S.W.3d at 217-21, 223.

Tennessee district courts have repeatedly held that the Constitution does not require proportionality review. *See e.g. Hugueley v. Westbrooks,* No. 1:09-cv-1181, 2017 WL 3325008, at *55 (W.D. Tenn. Aug. 3, 2017) ("The United States Supreme Court has held that the Constitution does not require proportionality review, but only requires proportionality between the punishment and the crime, not between the punishment in this instance and that exacted in other cases."); *Hodges v. Bell,* 548 F.Supp.2d 485, 552 (M.D. Tenn. 2008) (citing and applying *Pulley*). Even still, the state supreme court's decision not to broaden the pool of cases to be considered in the comparative proportionality analysis does not contravene federal law. "Since proportionality review is not required by the Constitution, state have greater latitude in defining the pool of cases used for comparison." *Williams v. Bagley,* 380 F.3d 932, 962. And the Sixth Circuit has held that "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed" falls within a state's "great[] latitude." *Id.* at 963.

Tennessee's comparative proportionality review framework does not contravene *Gregg* and *Pulley.* Again, while comparative proportionality review by a state appellate court is not required under the federal constitution, proportionality review is "considered to be an additional

safeguard against arbitrarily imposed death sentences[.]" *Pulley,* 465 U.S. at 50. "Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner." *Gregg,* 428 U.S. at 195. As outlined above, Tennessee created a mandatory review process and has maintained its own proportionality review process even though it is not constitutionally required.

Pruitt offers no Supreme Court precedent supporting an argument that the Tennessee Supreme Court was objectively unreasonable in deciding not to broaden the pool of cases to be considered as part of proportionality review. Applying AEPDA deference to the state supreme court's comparative proportionality analysis, Pruitt is not entitled to relief on the claim—even if the claim was cognizable and was not procedurally defaulted.

### J. Pruitt's Claim That The Grand Jury's Alternative Counts of First-Degree Premeditated Murder and First-Degree Felony Murder Is Procedurally Defaulted and Barred From Review On Adequate and Independent State Law Grounds.

In Claim 17, Pruitt alleges, in part, that his prosecution on alternative counts of first-degree premeditated murder and first-degree premeditated murder somehow violated constitutional guarantees against double jeopardy. (ECF No. 38, PageID 10952-53.) As explained above, the grand jury indicted Pruitt on these two alternative charges. At the end of the guilt phase, the jury convicted Pruit of first-degree felony murder, as charged, and of second-degree murder, as a lesser-included offense of first-degree premeditated murder. The trial court merged the second-degree murder conviction into the first-degree felony murder conviction, and the case proceeded to the sentencing phase of the trial on the first-degree felony murder charge. With no supporting on-point authority, Pruitt apparently believes that those proceedings somehow violated double jeopardy even though, due to merger, he has not been subjected to two murder convictions.

During Pruitt's post-conviction proceedings, the trial court concluded that this double jeopardy claim was waived under § 40-30-106(g) because Pruitt never raised it at any time prior to post-conviction review. (ECF No. 12-21, PageID 4761.) The Tennessee Court of Criminal Appeals agreed that it was waived. *Pruitt,* 2022 WL 1439977, at *76. It held that the trial court rightly determined that Pruitt's double jeopardy claim was waived from consideration on post-conviction review under § 40-30-106(g). *Pruitt,* 2022 WL 1439977, at *76. Instead, the state appellate court reviewed this issue only through the lens of ineffective assistance of counsel, which Pruitt has raised as a separate claim for habeas corpus relief and is separately addressed in this answer. *Id.*

But on the underlying double jeopardy claim, as explained more fully above, *supra VI.D.*, the post-conviction waiver rule qualifies as an adequate and independent state-law ground that precluded the claim's consideration on post-conviction review because Pruitt could have raised it on direct appeal. Furthermore, the claim is defaulted because he did not raise in the direct appeal when he could and should have done so.

Pruitt does not present an argument for why the procedurally defaulted nature of this claim should be excused due to cause and prejudice, nor does he contend that this Court's failure to review the claim would result in the fundamental miscarriage of justice. *House,* 547 U.S. at 536-39. Respondent knows of no means for the Court to reach the merits of this defaulted claim. State-court remedies are no longer available due to the statute of limitations and the one-petition rule in § 40-30-102. Because this claim is procedurally defaulted and barred from review, the claim should be dismissed on that basis.

### K. The State Court Did Not Unreasonably Apply Federal Law When It Rejected Petitioner's Claims Of Ineffective Assistance Of Counsel On Post-Conviction Review.

On post-conviction appeal, Pruitt raised a plethora of ineffective assistance of counsel claims, alleging both ineffective assistance on the part of trial counsel and appellate counsel. *Pruitt,* 2022 WL 1439977, at *61-*70, *73-*75, *85-*96. Pruitt raises a number of these same claims in his amended petition. (ECF No. 38, PageID 10814-84, 10891-902, 10913-19, 10923-27, 10949-53.) For the reasons addressed below, the state court decision rejecting Pruitt's ineffective assistance of trial counsel claims and ineffective assistance of appellate counsel claims is not an unreasonable application of federal law, was not an unreasonable application of the facts in light of the evidence presented at the post-conviction evidentiary hearing, and thus meritless.

To establish ineffective assistance in violation of the Sixth Amendment, a petitioner must show that counsel's performance was deficient and that prejudice resulted from the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 685 (1984). The deficiency component requires a showing that the lawyer's performance "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id.* at 687–88. As for prejudice, counsel's performance qualifies as prejudicial only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. As this standard reflects, "[j]udicial scrutiny of trial counsel's performance must be highly deferential." *Id.* at 689. "[E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Under AEDPA, the showing becomes even more difficult. A federal court faced with an ineffective-assistance challenge to a state court decision likewise applies a "doubly deferential" review framework. *Rogers v. Mays,* 69 F.4th 381, 389 (6th Cir. 2023) (en banc). "When § 2254(d)

applies, the question is not whether counsel's actions were reasonable;" "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. This showing is nearly impossible to make. The *Strickland* standard and § 2254(d) are both, individually, "highly deferential," and when the two are applied together, review is "doubly" so. *Id.* (internal citations omitted). The Supreme Court has also cautioned that "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Knowles*, 556 U.S. at 123. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (internal quotation marks omitted).

As it relates to all of Pruitt's ineffective assistance of counsel claims discussed below, the Tennessee Court of Criminal Appeals' opinion cannot be deemed "contrary to" federal law. The Tennessee Court of Criminal Appeals correctly identified that *Strickland* set forth the governing standard for ineffective assistance of trial counsel claims. The court explained the *Strickland* standard as follows:

> Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392 (Tenn. 2014). Inherent in this right to counsel is the right to the effective assistance of counsel both at trial and on direct appeal. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Evitts v. Lucey*, 469 U.S. 387, 397 (1985). In order to sustain a claim of ineffective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *see also State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." *Id.* (citing *Strickland*, 466 U.S. at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996)).

> The test for deficient performance is whether "counsel's acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" *Dean v. State*, 59 S.W.3d 663, 667 (quoting *Strickland*, 466 U.S. at 688). "Counsel's performance is not deficient if the advice given or the services rendered 'are within the range of competence demanded of attorneys in criminal cases.'" *Davidson*, 453 S.W.3d at 393 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner bears the burden of overcoming "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Id*. This court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). Indeed, "[t]he fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369). "However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *Id*. As the *Strickland* Court explained, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91.
>
> Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. We note that "[a] 'reasonable probability' is a lesser burden of proof than a 'preponderance of the evidence.'" *Davidson*, 453 S.W.3d at 394 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Indeed, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 694.

*Pruitt,* 2022 WL 1439977, at *58-*59. The court also discussed the standard when assessing a claim of ineffective assistance of appellate counsel:

> Like claims of ineffective assistance of trial counsel, claims of ineffective assistance of appellate counsel are subject to the *Strickland* standard set forth above. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). In other words, a petitioner must establish both that appellate counsel was deficient for failing to raise an issue on appeal and that there was a reasonable probability that had the issue been properly raised, it "would have affected the result of the appeal." *Campbell v. State*, 904 S.W.2d 594, 597 (Tenn. 1995). However, an attorney is "not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887; *see Jones v. Barnes*, 463 U.S. 745 (1983). The determination of which issues to raise is a strategic decision "within appellate counsel's sound discretion" and "should be given considerable deference." *Carpenter*, 126 S.W.3d at 887. In evaluating whether the decision to omit a particular issue was an unreasonable one, this court will consider a non-exhaustive list of factors, such as whether the issue was "significant and obvious"; whether it was "clearly stronger" than the issues that were raised; whether there was an objection at trial preserving the issue or whether the issue would be reviewed for plain error; and whether appellate counsel testified regarding appeal strategy and provided a reasonable justification for the omission. *Id*. at 888. Additionally, the petitioner must establish that the omitted issue had some merit; otherwise, counsel's failure to raise it on appeal would not have been deficient and the petitioner would have suffered no prejudice. *Id*. at 887-88.

*Id.* at *59. The court's application of this "clearly established Federal law" was not unreasonable, as the state court's ruling properly applied "that principle to the facts of the [petitioner's] case." *Pinholster,* 563 U.S. at 182.

1. **The state court did not unreasonably apply federal law when it concluded that trial counsel was not ineffective in the investigation regarding deficits in adaptive behavior for intellectual disability because Pruitt was not prejudiced by trial counsel's actions.**

In Claim 2, Pruitt alleges that the state court contravened clearly established federal law and unreasonably applied federal law when it concluded that Pruitt failed to establish prejudice from any deficient investigation by trial counsel into adaptive deficits for intellectual disability. (ECF No. 38, PageID 10824.) Pruitt sets forth four reasons why the state court decision was an unreasonable application of *Atkins, Hall* and *Moore*. (*Id.* at PageID 10824-32.) Passingly, Pruitt also argues that the factual determinations were unreasonable under § 2254(d)(2). (*Id.* at PageID 10824, 10832.) As shown more fully below, Pruitt cannot overcome AEDPA's deferential review

on the state court's rejection of his ineffective-assistance claim and its conclusion that Pruitt failed to prove prejudice regarding adaptive deficits on post-conviction review.

In its review of Pruitt's intellectual disability claim on direct appeal, the Tennessee Supreme Court concluded that Pruitt established that he has significantly subaverage general intellectual functioning under Tenn. Code Ann. § 39-13-203(a)(1), as in effect at the time of his direct appeal. But Pruitt failed to show that he has deficits in adaptive behavior and that an intellectual disability manifested by the age of 18, under § 39-13-203(a)(2) and (3). *Pruitt*, 415 S.W.3d at 201-04.

On post-conviction review, the trial court found deficient performance in trial counsel's failure to adequately investigate and present evidence regarding Petitioner's alleged deficits in adaptive behavior. *Pruitt*, 2022 WL 1439977, at *61. But the trial court concluded that Pruit failed to prove prejudice because, during the extensive evidentiary hearing conducted on his petition for post-conviction relief, Pruitt failed to prove that he has deficits in adaptive behavior under § 39-13-203(a)(2). *Id.*

On appeal, the State did not contest the trial court's finding of deficient performance, and the Tennessee Court of Criminal Appeals agreed with that finding. *Id.* It likewise agreed with the trial court's conclusion that Pruitt was not prejudiced by the deficient performance because he failed to prove adaptive deficits. *Id.* *67-*70. Because of this decision, the Tennessee Court of Criminal Appeals did not assess whether Pruitt's alleged intellectual disability manifested before the age of 18. *Id.* at *70.

Here, Pruitt argues that trial counsel provided ineffective assistance of counsel by failing to fully investigate and present evidence on his alleged deficits in adaptive behavior. Respondent does not challenge the state court's finding of deficient performance. But Pruitt was not prejudiced

by any deficient performance on the part of trial counsel concerning deficits in adaptive behavior because Pruitt failed to prove those alleged adaptive deficits. For that reason, the Court should dismiss his claim.

More precisely, the state court appropriately concluded under the extensive, competing proof presented to it at Pruitt's involved post-conviction evidentiary hearing conducted under § 40-30-110 that Pruitt failed to prove adaptive deficits. This state court adjudication neither contravened nor unreasonably applied clearly established Supreme Court precedent. Nor did it involve an unreasonable determination of the facts developed in state court. And as discussed more fully below, the state appellate court did not unreasonably apply federal law on the four broad categories that Pruitt asserts within his amended petition. Applying AEDPA deference to the state court's rejection of this claim, the Court should deny it because Pruitt is not entitled to relief on it.

At the onset, there can be no genuine dispute that the Tennessee Court of Criminal Appeals correctly identified the "clearly established Federal law," as announced by the Supreme Court, relating to intellectual disability claims. The appellate court recited as follows the evolution of intellectual disability caselaw between Pruitt's direct appeal and post-conviction appeal:

> In 2014, after Petitioner's direct appeal proceedings had concluded, the United States Supreme Court released its opinion in *Hall v. Florida*, striking down the Florida Supreme Court's interpretation of the "significantly subaverage general intellectual functioning" requirement as excluding those with I.Q. test scores above 70. 572 U.S. at 711-12. The Court stated that even if "the views of medical experts" do not "dictate" a court's determination regarding intellectual disability, the determination must be "informed by the medical community's diagnostic framework." *Id*. at 721. The Court relied on DSM-5 and AAIDD-11, the then-current versions of the leading diagnostic manuals, and concluded that the Florida court had violated the Eighth Amendment by "disregard[ing] established medical practice." *Id*. at 712-14, 722-23. As the Court later recognized, "*Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards." *Moore I*, 137 S. Ct. at 1049.

In *Moore I*, the Court reversed the Texas Court of Criminal Appeals' ("TCCA") holding that the petitioner was not intellectually disabled based, in part, on the TCCA's deviation "from prevailing clinical standards and from the older clinical standards the court claimed to apply" when finding no adaptive deficits. *Id*. at 1050. The TCCA reversed a state habeas court that applied the current medical standards, the DSM-5 and AAIDD-11, in determining that the petitioner was intellectually disabled. *Id*. at 1045-46. The TCCA instead reaffirmed its holding in a prior case, *Ex parte Briseno*, in which the TCCA had adopted the definition and standards for assessing intellectual disability included in the 1992 edition of the American Association on Mental Retardation ("AAMR") manual, the predecessor to the AAIDD-11 manual; incorporated the AAMR's requirement that adaptive deficits be "related" to intellectual functioning deficits; and set forth "seven evidentiary factors" to be considered in determining whether a defendant has satisfied the relatedness requirement. *Id*. at 1046 (citing *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004)).

In *Moore I*, the Supreme Court determined that TCCA acted improperly when it "overemphasized [the petitioner's] perceived adaptive strengths," including the petitioner's living on the streets, mowing lawns, and playing pool for money, and when it concluded that, "in the [T]CCA's view," the petitioner's adaptive strengths overcame "the considerable objective evidence" of the petitioner's adaptive deficits. *Id*. at 1050. The Supreme Court stated that "the medical community focuses the adaptive-functioning inquiry on adaptive deficits." *Id*. (citing American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Support* (11th ed. 2010); American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)) (emphasis in original). The majority opinion noted that the dissenting opinion suggested a disagreement in medical authorities about the role of adaptive strengths in the adaptive-functioning inquiry. *Id*. at n.8. The majority opinion stated that even if clinicians considered adaptive strengths and adaptive weaknesses within the same adaptive-skill domain, Texas and the dissent did not identify "any clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths in which the [T]CCA engaged." *Id*.

The Supreme Court held that the TCCA improperly "stressed" the petitioner's improved behavior in prison when clinicians caution against relying upon adaptive strengths in a controlled setting, such as a prison. *Id*. at 1050 (citing DSM-5, at 38; AAIDD-11 User's Guide, at 20). The Court also held that the TCCA improperly concluded that the petitioner's record of academic failure and childhood abuse "detracted from a determination that his intellectual and adaptive deficits were related" when the medical community considered traumatic experiences to be "'*risk factors*' *for* intellectual disability." *Id*. at 1051 (citing AAIDD-11, at 59-60) (emphasis in original). The Court determined that the TCCA "departed from clinical practice" in requiring the petitioner to establish that his adaptive deficits were not related to a personality disorder when mental health professionals

recognized that many who are intellectually disabled also have personality disorders or mental health issues and that the existence of such issues is not evidence that a person is not intellectually disabled. *Id*. (citing DSM-5, at 40; AAIDD-11, at 58-63).

Finally, the Court held that the TCCA erred in relying upon the seven evidentiary factors set forth in *Briseno*, where the court had "advanced lay perceptions of intellectual disability." *Id*. at 1051-52. The Court concluded that "[b]y rejecting the habeas court's application of medical guidance and clinging to the standard it laid out in *Briseno*, including the wholly nonclinical *Briseno* factors, the [T]CCA failed adequately to inform itself of the 'medical community's diagnostic framework.'" *Id*. at 1053 (quoting *Hall*, 572 U.S. at 721). We note that some opinions of this court also cited to the *Briseno* factors in analyzing the adaptive deficits element of intellectual disability. *See Michael Wayne Howell v. State*, No. W2009-02426-CCA-R3-PD, 2011 WL 2420378, at *18 (Tenn. Crim. App., at Jackson, June 14, 2011), *abrogated by Moore I*, 137 S. Ct. at 1052; *Michael Angelo Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 WL 118696, at *24 (Tenn. Crim. App., at Jackson, Jan. 13, 2010), *rev'd* 341 S.W.3d 221 (Tenn. 2011); *Heck Van Tran*, 2006 WL 3327828, at *24. However, the Tennessee Supreme Court did not apply the *Briseno* factors in *Coleman* or in its opinion in Petitioner's direct appeal. *See Pruitt*, 415 S.W.3d at 203-04; *Coleman*, 341 S.W.3d at 248-53. Furthermore, this court did not cite to the *Briseno* factors in either our opinion in Petitioner's direct appeal nor subsequent opinions. *See, e.g. Sidney Porterfield v. State*, No. W2012-00753-CCA-R3-PD, 2013 WL 3193420, at *25-27 (Tenn. Crim. App., at Jackson, June 20, 2013); *Corinio Pruitt*, 2011 WL 2417856, at *27-28.

On remand following *Moore I*, the TCCA again determined that the petitioner failed to demonstrate intellectual disability, and the United States Supreme Court again reversed the TCCA's decision. *Moore II*, 139 S. Ct. at 667. The Court noted too many instances in which the TCCA repeated, with small variances, the same analysis that the Court had determined in *Moore I* to be flawed. *Id*. at 670. The Court stated that the TCCA continued to rely less upon the petitioner's adaptive deficits, which had been cited by the state habeas court, than upon the petitioner's apparent adaptive strengths. *Id*. The TCCA emphasized the petitioner's capacity to communicate, read, and write based in part upon papers that the petitioner filed pro se in court, and the Court stated that while such evidence was relevant, it lacked "convincing strength" absent a determination that petitioner wrote the papers on his own. *Id*. at 671. The Court also stated that the TCCA continued to rely heavily upon the petitioner's adaptive improvements made while in prison and continued to conclude that the petitioner failed to show that the "'cause of [his] deficient social behavior was related to any deficits in general mental abilities' rather than 'emotional problems.'" *Id*. Finally, the Court determined that despite the TCCA's statement that it was abandoning its reliance on the *Briseno* factors, the TCCA seemingly used many of the factors in reaching its conclusion. *Id*.

Although the Tennessee Supreme Court issued its opinion in *Coleman* after Petitioner's trial, this court and the Tennessee Supreme Court applied *Coleman* to

> Petitioner's intellectual disability claim on direct appeal. *See Pruitt*, 415 S.W.3d at 202-04; *Corinio Pruitt*, 2011 WL 2417856, at *25-27. Thus, we will apply *Coleman* in determining whether trial counsel's failure to present evidence related to the adaptive deficits element of the intellectual disability statute resulted in prejudice. Whether this court also should apply the opinions of the United States Supreme Court issued years after Petitioner's trial and direct appeal concluded is not as clear. At the time of Petitioner's trial, the controlling Supreme Court authority was *Atkins v. Virginia*, which gave no comprehensive definition of intellectual disability and left the task of developing appropriate means of enforcing the constitutional restrictions to the states. *See* 536 U.S. at 317. The Supreme Court recently rejected the Sixth Circuit's conclusion that *Moore I*'s holding was "merely an application of what was clearly established by *Atkins*." *Shoop v. Hill,* 139 S. Ct. 504, 508 (2019) (internal quotations omitted). In doing so, the Supreme Court reversed the Sixth Circuit's conclusion that a state court's decision that a defendant failed to establish intellectual disability violated "clearly established law" set forth in *Moore I* even though the state court's decision predated *Moore I* by several years. *Id*. at 506-08. The Supreme Court explained that although "*Atkins* noted that standard definitions of mental retardation included as a necessary element 'significant limitations in adaptive skills . . . that became manifest before age [eighteen],' . . . *Atkins* did not definitively resolve how that element was to be evaluated but instead left its application in the first instance to the States." *Id*. at 508 (quoting *Atkins*, 536 U.S. at 317-18). Because the Supreme Court's opinions issued after Petitioner's trial and direct appeal were not merely an application of law clearly established by *Atkins*, it does not appear that these opinions are applicable to this court's determination regarding the effect of the evidence of adaptive deficits presented at the post-conviction hearing had trial counsel presented similar evidence at trial. Nevertheless, the overarching principles set forth by the Supreme Court are similar to those expressed by the Tennessee Supreme Court in *Coleman* in that a trial court's findings should be guided by expert testimony and clinical standards and practices customarily used to diagnose intellectual disability.

*Pruitt,* 2022 WL 1439977, at *64-*66 (footnotes omitted). Under this backdrop, the Tennessee Court of Criminal Appeals held that the post-conviction court's findings did not "run afoul of *Hall, Moore I,* and *Moore II*." *Id.* at *67.

The court's application of this "clearly established Federal law" was not unreasonable, as outlined to address Pruitt's allegations below, because the ruling did not "unreasonably app[ly] that principle to the facts of the [petitioner's] case." *Pinholster,* 562 U.S. at 182.

***a. Unreasonable application of Atkins, Hall, Moore I, and Moore II.*** Pruitt raised four specific reasons why the state court decision's application of *Atkins, Hall, Moore I,* and *Moore*

*II* were objectively unreasonable. First, Pruitt argues that the state court's decision unreasonably applied and contravened *Moore* because the court "focused on [his] supposed adaptive strengths rather than his deficits[.]" (ECF No. 38, PageID 10825.) Pruitt purports that the post-conviction court's opinion "reads as if it is offering counterpoints, even arguments, in the form of purported strengths," in opposition to the purported deficits offered by his experts. (*Id.*) Pruitt characterized this as an "approach of cancelling out adaptive deficits with adaptive strengths" which is "contrary to that of the medical community and, accordingly the Supreme Court precedent." (*Id.* at PageID 10826.)

Second, Pruitt argues that the post-conviction court's accreditation of the State's rebuttal expert, Dr. Tucker Johnson, and the appellate court's decision affirming this credibility termination, is objectively unreasonable because Dr. Johnson's "lack of qualifications and methodology placed her evaluation of Mr. Pruitt well outside what 'prevailing clinical standards' would permit." (ECF No. 38, PageID 10829.) Pruitt compares Dr. Johnson to his expert to support his claim, yet he fails to mention that the post-conviction court found Dr. Everington to be equally credible. (*Id.*) Pruitt also ignores his own expert's testimony that the ABAS required nonstandard administration in cases of this nature and that she indeed deviated from standard administration. (ECF No. 12-42, PageID 6264-69.)

Third, Pruitt argues that the appellate court's adoption of the post-conviction court's findings was objectively unreasonable because the post-conviction court purportedly "rejected the standardized scientific instruments used to assess Mr. Pruitt's adaptive behavior deficits because of inchoate concerns that they were skewed by Mr. Pruitt's poverty, race, and social background." (ECF No. 38, PageID 10829.) Lastly, Pruitt argues that the state court's decision was objectively unreasonable because the post-conviction court allegedly "us[ed] its own theories and standards

in lieu of 'the medial community's diagnostic framework." (ECF No. 38, PageID 10831.) Stated differently, Pruitt argues that "the trial court required [him] to not only prove that he manifested deficits in adaptive behavior, but to prove other imagined explanation for the examples provided." (*Id.*)

The underlying theme connecting all four arguments is Pruitt's dissatisfaction with the trial court's factual findings and the trial court, at times, accrediting the State's expert over his own. But the post-conviction court often times equally considered both Dr. Everington and Dr. Johnson. *Pruitt,* 2022 WL 1439977, at *62-*63. As the state appellate court concluded:

> Unlike the TCCA in *Moore I* and *Moore II*, which rejected expert testimony based upon current medical standards and instead made its own findings based upon outdated standards and factors based upon lay perceptions of intellectual disability, the post-conviction court here relied upon contemporary medical expert testimony, weighed the evidence, made credibility determinations, and concluded that Petitioner failed to establish that he had deficits in adaptive behavior. *See Wright v. State*, 256 So.3d 766, 777 (Fla. 2018) (upholding a trial court's findings regarding adaptive deficits when, unlike the TCCA in *Moore I*, the trial court's findings were based upon expert testimony regarding contemporary medical standards). Although Petitioner asserts that the post-conviction court failed to consider Dr. Auble's testimony, the post-conviction court acknowledged that Dr. Auble testified about adaptive deficits but found the testimony of Dr. Everington and Dr. Johnson to be "credible and informative," thus essentially finding their testimony to be more credible and carry more weight than Dr. Auble's testimony. This finding regarding witness credibility and the weight and value of the testimony was within the exclusive purview of the post-conviction court, and this court is without authority to overturn this finding. *See Henley*, 960 S.W.2d at 578-79. Petitioner also claims that Dr. Everington was more qualified than Dr. Johnson and that the post-conviction court should have given Dr. Everington's testimony greater weight as a result. However, the post-conviction court's decision regarding the weight afforded to the testimony of each expert also was within the court's exclusive purview. *See id.*

*Pruitt,* 2022 WL 1439977, at *67. Despite Pruitt's selective arguments to the contrary, this does not evidence an unreasonable application of *Atkins, Hall, Moore I,* and *Moore II.* A fairminded jurist could have applied these decisions to the facts presented as the state courts did here.

In essence, Pruitt's arguments amount to flyspecking specific sentences from the post-conviction court's order and overly scrutinizing it in an attempt to evade AEDPA deference. But the Sixth Circuit has squarely rejected this very kind of flyspecking in federal-court review of a state-court opinion. *Rogers*, 69 F.4th at 391-92. Pruitt makes no persuasive argument that this state-court adjudication actually represents "an extreme malfunction of the state criminal justice system." *Id*.

What is more, the Tennessee Court of Criminal Appeals squarely addressed Pruitt's arguments about an improper focus on adaptive strengths rather than adaptive deficits. The court disagreed with Pruitt's position and rejected his argument, as follows:

> The Petitioner argues that the post-conviction court and Dr. Johnson improperly focused on his adaptive strengths rather than his adaptive deficits. The Supreme Court in *Moore I* observed that there was no "clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths," but the Court also assumed for the sake of analysis that "clinicians would consider adaptive strengths alongside adaptive weaknesses within the same adaptive skill domain." *Moore I*, 137 S. Ct. at 1050 n.8. Dr. Johnson, whose opinions upon which many of the post-conviction court's findings were based, did not balance unconnected strengths against weaknesses but, instead, weighed evidence of Petitioner's strengths against evidence of his limitations within the same domain to determine whether Petitioner had significant adaptive deficits within that particular domain. *See Sasser v. Payne*, 999 F.3d 609, 619-20 (8th Cir. 2021) (holding that the district court's weighing of evidence of related strengths and weaknesses to determine whether the defendant met his burden of establishing an adaptive deficit in a single skill domain did not run afoul of *Moore I*); *Wright*, 256 So.3d at 777 (holding that unlike the TCCA in *Moore I*, the court "did not arbitrarily offset deficits with unconnected strengths" but, instead, relied upon expert testimony regarding connected adaptive deficits and strengths and credibility determinations made by the lower court).
>
> Although Dr. Johnson agreed that the AAIDD Manual cautioned against relying exclusively on an individual's self-report of adaptive deficits as that individual may attempt to appear more competent than he or she actually is, Dr. Johnson did not believe this concern was necessarily warranted for defendants in the criminal justice system. The record also established that Dr. Johnson did not rely exclusively upon Petitioner's self-report to reach her conclusion that Petitioner had "mild deficits" that did not rise to the level of significant deficits in adaptive functioning. In light of the post-conviction court's factual findings in which the court made credibility determinations and resolved conflicts in the competing expert testimony, we

> conclude that the evidence does not preponderate against the post-conviction court's finding that Petitioner failed to establish that he has significant deficits in the social domain. As it applies to the practical domain of adaptive functioning, the post-conviction court found that even if Petitioner had some adaptive deficits, such deficits did not amount to significant adaptive deficits such that Petitioner met the adaptive deficits requirement of the intellectual disability statute. The post-conviction court's finding is supported by Dr. Johnson's conclusion in her report that although "some mild deficits in adaptive functioning were noted," these mild deficits "appear[ed] consistent with either deficits displayed by some individuals with [b]orderline intellectual functioning or the behavior exhibited by individuals in similar sociocultural circumstances." Based upon Dr. Johnson's testimony, the post-conviction court found that due to the sociocultural environment in which he was raised, Petitioner should not be faulted for not having a driver's license, not using a library, cashing paychecks at check-cashing businesses rather than a bank, and for having difficulty with the Memphis public transportation system. Additionally, the post-conviction court did not accredit Dr. Everington's testimony that Petitioner's failure to perform some household chores was evidence of an adaptive deficit regardless of whether Petitioner was unable or simply unwilling to perform the tasks. Instead, the court accredited Dr. Johnson's testimony that Petitioner may have been able to perform the tasks but did not do so because someone else completed the tasks for him. Ms. Rockett told Dr. Johnson that when Petitioner lived with her, Petitioner offered to help her around the house and that she knew he was able to perform the chores because he had done so while living with her mother. Ms. Rockett did not want Petitioner to help her because she wanted the chores "done a certain way" and preferred "to do it herself in her home." The post-conviction court also discounted Dr. Everington's testimony about Petitioner's wearing urine-soaked clothes to school, finding that there was no evidence whether the incident was a common or infrequent occurrence and whether Petitioner had other clothes available, was taught how to clean his clothes, or requested to have his clothes cleaned and his request was denied.

*Pruitt,* 2022 WL 1439977, at *69.

Contrary to Pruitt's arguments, the court correctly stated its conclusion that Pruitt failed to prove adaptive deficits and, thus, failed to prove *Strickland* prejudice from trial counsel's deficiency. This was no extreme malfunction of the state court review process, and it did not run afoul of federal law. *Pruitt,* 2022 WL 1439977, at *67. More precisely, the state court reasonably applied all applicable standards.

***b. Trial counsel's deficiency did not prejudice Pruitt because he failed to demonstrate adaptive deficits***. Pruitt cannot otherwise establish an unreasonable application of

federal law because a fairminded jurist presented with the same factual record could resolve Pruitt's *Strickland* prejudice claim just as the Tennessee Court of Criminal Appeals did here. The appellate court analyzed the proof presented as it relates to each domain of adaptive functioning separately. And it reasonably concluded that Pruitt failed to meet his burden for proving *Strickland* prejudice.

Beginning with the evidence relating to the conceptual domain, which includes "such skills as functional academics and memory," the state appellate court reasoned as follows why the proof did not support significant adaptive deficits in this domain:

> [T]he evidence relating to the conceptual domain reflects that although Petitioner repeated the first grade, he performed well academically throughout the rest of elementary school. While attending Larose Elementary, Petitioner consistently made A's and B's, had standardized tests scores as high as the ninety-eighth percentile, and often made the honor roll and principal's list. Several teachers commented on his report card that Petitioner was "smart" and "a good learner," and there was no evidence that Petitioner was enrolled in special education or resource classes. Although Dr. Everington speculated that Petitioner's grades and standardized test scores may have been inflated, there was no direct evidence to support this supposition.
>
> Petitioner's grades and test scores then declined suddenly in the seventh and eighth grades, and Petitioner dropped out of school. The post-conviction court found that Petitioner's decline in grades coincided with Petitioner's increased drug use and involvement in the juvenile court system. Both *Moore I* and *Coleman* caution a court against faulting a defendant for failing to establish that an adaptive deficit is related to the defendant's deficits in intellectual functioning. *See Moore I*, 137 U.S. at 1050; *Coleman*, 341 S.W.3d at 249-52. However, the evidence in this case, unlike in *Moore I* and *Coleman*, included testimony from both Dr. Everington and Dr. Johnson that the DSM-5 includes a provision requiring that adaptive deficits be directly related to intellectual impairments. Dr. Everington maintained that the AAIDD Manual, which did not include such a requirement, was the proper standard, while Dr. Johnson maintained that the DSM-5 provided the appropriate standard. The post-conviction court, through its findings, credited Dr. Johnson's testimony and applied the standard set forth in the DSM-5. Furthermore, the post-conviction court's findings were supported by Dr. Johnson's conclusion in her report that Petitioner's performance in the classroom and on standardized tests from his second year in the first grade through the fifth grade was "inconsistent" with those who are intellectually disabled and suggested that "some other variable(s)" were related to his lower grades during middle school. Dr. Johnson, like the post-

> conviction court, observed that Petitioner's lower academic performance coincided with Petitioner's increased drug use.
>
> The record reflects that Petitioner obtained average or low average scores on achievement tests administered by both Dr. Everington and Dr. Johnson. Dr. Johnson testified that the Petitioner's test scores were "above what you would expect from someone with an intellectual disability," and Dr. Everington admitted that Petitioner's academic skills were "more advanced than the majority of individuals who have an intellectual disability." Although Petitioner scored poorly on a test that required him to interpret proverbs administered by Dr. Auble, Dr. Johnson testified that Petitioner's use of an analogy during his *Gangland* interview demonstrated "more complicated thinking" than would be expected of someone with an intellectual disability. Dr. Johnson stated that although intellectually disabled individuals often have problems recalling their history in a comprehensive manner and "putting together timeframes," Petitioner was able to accurately recall his medical history, childhood, and educational history. Dr. Johnson did not observe any "striking abnormalities" in Petitioner's ability to recall and provide information relative to the events in his life. In light of the post-conviction court's factual findings and credibility determinations, we conclude that Petitioner failed to establish that he has significant deficits in the conceptual domain.

*Pruitt,* 2022 WL 1439977, at *67-*68.

The record fully supports the courts analysis and undermines Pruitt's invocation of an unreasonable determination of the facts. Pruitt made good grades in school as a child, and the severe drop in grades as he approached middle school was consistent with his frequent absences, drug use, and involvement with the juvenile justice system. (ECF No. 12-39, PageID 5895; ECF No. 12-45, PageID 6825-30.) Notably, although Pruitt did not complete the eleventh grade, many of his grade-level scores exceeded an eighth-grade level, above those typically seen by one who is intellectually disabled. (ECF No. 12-46, PageID 6887-88.) Indeed, Riverbend's academic performance scores yielded an eleventh grade for language, fifth grade for reading, twelfth grade for applied math, sixth grade for math computation, nineth grade for total math, and ninth grade equivalency for the entire battery of tests. (ECF No. 12-46, PageID 6885-86.) Pruitt's scores thereafter showed improvement after a barber position opened at the prison that required a GED. (*Id.*) Pruitt's own use of language in an interview for a television show, using a simile to liken the

killing of a gang leader to the decapitation of an animal, displayed complex thinking. (*Id.* at PageID 6963-64.) The record fully supports the state court's finding here.

Next, with regard to evidence relating to the social domain—including skills such as "communication , social skills, and understanding of social situations"—the state appellate court explained as follows why the accredited proof did not show significant adaptive deficits here:

> With respect to the social domain of adaptive functioning, we note that in addition to the post-conviction court's general findings with respect to Dr. Everington's nonstandard administration of the ABAS and reliance upon summaries of interviews provided by post-conviction counsel, the court found that some of the "purported evidence" of Petitioner's adaptive deficits was "undermined" by other evidence introduced during the evidentiary hearing. The court found that although Dr. Everington testified that Petitioner's only friends in his youth were family members, her report identified some of the informants as non-family friends, and some of Petitioner's non-family friends testified at the evidentiary hearing. Dr. Johnson testified that some of her observations of Petitioner conflicted with the ratings obtained by Dr. Everington in her administration of the ABAS. Dr. Johnson said Petitioner displayed good social skills during the interview, such as pouring water for her and offering food to her when he received his lunch, even though Dr. Everington's report reflected that Petitioner had been rated as "never or almost never" offering food or beverages to guests. Although Petitioner was rated as "sometimes" speaking clearly and distinctly and "never or almost never" listening closely for more than five minutes, Dr. Johnson did not experience any issues with Petitioner in these areas. Petitioner also was rated as "never or almost never" participating in conversations without talking too much or too little, but Dr. Johnson found that while some of Petitioner's answers were "abbreviated," he was able to elaborate when prompted. Dr. Everington testified that Petitioner displayed basic social skills and was friendly, and Dr. Johnson testified that Petitioner listened closely when someone else was speaking, discussed a current event, and waited for others to finish speaking without interrupting. Although Dr. Everington testified that Petitioner had difficulty avoiding social situations that might be dangerous, the post-conviction court credited Dr. Johnson's testimony that avoiding potentially dangerous situations would have been difficult for Petitioner because such situations were prevalent in the neighborhood in which Petitioner was raised.

*Pruitt,* 2022 WL 1437799, at *68.

Still, the record fully supports the state appellate court's adoption of the post-conviction court's factual findings in this regard. The testimony provided by Dr. Everington and Dr. Johnson on this point greatly conflicted with each other, and the record weigh against the trier of fact's

accreditation of one expert's testimony over another, upon consideration of the competing live testimony. Curiously, even though Pruitt presented multiple witnesses who were not related to him and who claimed to be his childhood friends, Dr. Everington testified that she learned Pruitt had no friends aside from his family members. (ECF No. 12-42, PageID 6281.) Pruitt was also reported quite differently from each witness's interview with him. For Dr. Everington, she reported that Pruitt spoke clearly and distinctly "sometimes when needed" and that he "never or almost never" listened closely to people when needed. (ECF No. 12-46, PageID 6920.) This directly contradicted Dr. Johnson's reporting that Pruitt had no trouble with speaking clearly and distinctly and that he listened closely to people when needed. (*Id.*)

In the same vein, Dr. Everington reported that Pruitt waited for others to finish speaking only "sometimes when needed," but Dr. Johnson found that Pruitt did not interrupt her. (*Id.* at PageID 6920-21.) Dr. Everington reported that Pruitt "never or almost never" offered guests food or beverages, but he did offer Dr. Johnson food, poured water for her, and refilled her glass when it was low. (*Id.* at PageID 6918-19.) Additionally, Dr. Johnson reported Pruitt performed tasks that were inconsistent with adaptive deficits. (*Id.* at PageID 6911-16.) Tellingly, Dr. Everington reported that Pruitt "never or almost never" knew about a current event; however, Pruitt broached the prospects of then-pending healthcare legislation with Dr. Johnson. (*Id.* at PageID 6910, 6920.)

To the extent that the experts' respective experiences with, and testimony about, Pruitt differed, it was for the trial court to resolve any credibility disputes. And once the trier of fact did so, the state appellate court resolved this domain in a way that a fairminded jurist could do, upon assessment of the same record and application of the same facts. *See e.g. Hill v. Shoop,* 11 F.4th 373, 386-95 (6th Cir. 2021) (en banc) (applying AEDPA deference to a state court's decision that

relied on accredited factual findings of two experts over another and determined Hill failed to prove adaptive deficits under Ohio law not an unreasonable application of federal law).

Finally, as to the third domain—the practical domain—which includes skills such as "daily living, personal care, vocational skills, and recreation," the court explained as follows that significant adaptive deficits were not shown:

> The record indicates that in the short amount of time Petitioner lived in the community between periods of incarceration, he found employment through a temporary agency and worked at Patterson Warehouse for several months. Although Ms. McMillan described issues with Petitioner's job performance, Dr. Johnson testified that it was unclear whether Petitioner's poor job performance was the result of issues with intellectual functioning or his drug use. Petitioner lost his job due to abuse of break time or an argument with a supervisor rather than due to poor job performance. In light of the post-conviction court's factual findings and credibility determinations resolving conflicts in the competing expert testimony, we conclude that Petitioner failed to establish that he has significant deficits in the practical domain.

*Pruitt,* 2022 WL 1439977, at *70.

The record continues to fully support the state appellate court's decision under the proof accredited by the trial court as the trier of fact. Dr. Johnson reported that Pruitt had been employed, was able to cash his paycheck at a cash checking retailer, prioritized buying food or something for his mother, and kept any money earned on his person. (ECF No. 12-46, PageID 6917, 6926.) Pruitt was ultimately let go from working at the warehouse because he had abused break time. (*Id.* at PageID 6926.) It was also reported that a coworker told a supervisor at the temp agency that Pruitt was using cocaine and heroin at work. (*Id.* at PageID 6927.) It was unclear the precise cause of his poor work performance.

A complete review of the record confirms that a fairminded jurist, if presented with the same factual record and credibility findings, could reach the same resolution as the Tennessee Court of Criminal Appeals reached on the question of whether trial counsel's deficiency in failing

to investigate and present proof on adaptive deficits prejudiced Pruitt under *Strickland*. Pruitt cannot prove an unreasonable application of federal law. The record evidence does not foreclose the possibility that what one expert reports to be an adaptive deficit is not cause by intellectual disability at all. Had trial counsel presented this same evidence, under this record, there is not a reasonable probability that the trial outcome would have been different.

Finally, to the extent that Pruitt argues that the state court unreasonably determined the facts under § 2254(d)(2), the record facts do not "compel" a factual determination contrary to that made by the trier of fact and adopted by the Tennessee Court of Criminal Appeals. It was for the trial court, as the trier of fact, to weigh the credibility of a host of witnesses—expert and lay—called by the parties and presenting competing proof. Just as state law limited the state appellate court's ability to look beyond those credibility determinations, so too does § 2254(d)(2) limit this Court's ability to do so. This includes accepting one expert witness's credibility over another's when the trier of fact already made a credibility determination between the competing proof here. Pruitt can show no unreasonable determination of facts here. And for the reasons stated, Pruitt is entitled to no relief on this claim, due to the state court's finding of no *Strickland* prejudice in view of his failure to prove significant deficits in adaptive behavior.

**2. The state court did not unreasonably apply federal law when it concluded that trial counsel was not ineffective in investigating and presenting mitigating evidence.**

In Claim 3, Pruitt alleges that trial counsel was ineffective for "failing to conduct the reasonable investigation into mitigation evidence that the Sixth Amendment requires." (ECF No. 38, PageID 10832.) In support of this claim, Pruitt argues that trial counsel committed "multiple deficiencies within two broad categories:" (1) "fail[ing] to interview readily available lay witnesses and obtain social history record" (*Id.*at PageID 10839-56), and (2) "fail[ing] to uncover and present evidence that Mr. Pruitt suffers from profound neurocognitive impairment." (*Id,* at

PageID 10857-63.) Pruitt extensively argues against the applicability of AEDPA deference at this juncture. (*Id.* at PageID 10864-68.)

Pruitt's arguments fail, and he is not entitled to de novo review. The state court neither unreasonably applied federal law (*i.e.*, *Strickland, Wiggins, Rompilla*) nor made an unreasonable determination of the facts. Specifically, Pruitt's argument that the state court unreasonable applied federal law and unreasonably determined the facts as it relates to Dr. Steinberg's report is based upon a misstatement of the record. (*Id.* at PageID 10866.) The Tennessee Court of Criminal Appeals' well-reasoned determination under the presented proof that trial counsel made a reasonable investigation into any available mitigation evidence is not an unreasonable determination of the facts. Applying AEDPA deference to the state court's adjudication, the Court should reject the claim.

***a. Unreasonable application of federal law.*** Pruitt cannot otherwise establish an unreasonable application of federal law because a fairminded jurist presented with the same factual record could resolve Pruitt's ineffectiveness claim just as the state appellate court did here. That court first summarized the scope of Pruitt's mitigation-related claim, as raised in the post-conviction appeal, and identified and applied the governing standard for ineffectiveness relating to mitigation evidence investigation and presentation:

> Petitioner argues that trial counsel were deficient because they conducted "a minimal mitigation investigation" consisting of "only a handful" of "cursory" interviews, failed to effectively prepare Vivian and Quiana Pruitt's testimony by refreshing their memories with various records, failed to call additional witnesses to testify regarding Petitioner's social history, and failed to adequately investigate and present evidence of Petitioner's mental health and cognitive impairments. Petitioner argues that he was prejudiced because "if counsel had conducted the constitutionally mandated investigation, they would have discovered compelling mitigation reasonably likely to have persuaded at least one juror to spare [Petitioner's] life."

The State responds that "trial counsel presented significant mitigating evidence about the difficult circumstances of [P]etitioner's childhood and his diagnosis of mental illness." The State argues that trial counsel made reasonable strategic decisions regarding their investigation and presentation of mitigating evidence and that their performance "should not now be deemed incompetent simply because post-conviction counsel were able to build upon it." Additionally, the State argues that Petitioner failed to demonstrate prejudice because the mitigating evidence presented at the post-conviction hearing, though more detailed, was merely cumulative of the evidence presented at trial and would not have outweighed the strength of the aggravating circumstances.

"Capital defendants possess a constitutionally protected right to provide the jury with mitigation evidence that humanizes the defendant and helps the jury accurately gauge the defendant's moral culpability." *Davidson*, 453 S.W.3d at 402 (citing *Porter v. McCollum* 558 U.S. 30, 41 (2009); *Williams*, 529 U.S. at 393). "[A]lthough there is no requirement that defense counsel present mitigating evidence in the penalty phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and sentencing phases." *Id*. at 395 (quoting *Goad*, 938 S.W.2d at 369-70). Accordingly, "counsel should make an effort to discover all reasonably available mitigating evidence and all evidence to rebut any aggravating evidence that the State might introduce." *Id*. at 402 (citing *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)). However, counsel "is not required . . . to run down every conceivable line of potentially mitigating evidence." *Id*. at 395 (citing *Wiggins*, 539 U.S. at 533). Instead, counsel has a duty to "make either a reasonable investigation or a reasonable decision that particular investigations would be unhelpful or unnecessary." *Id*. at 402 (citing *Wiggins*, 539 U.S. at 521). Counsel's performance will be "reviewed for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Detrick Cole v. State*, No. W2008-02681-CCA-R3-PD, 2011 WL 1090152, at *36 (Tenn. Crim. App., at Jackson, Mar. 8, 2011) (citing *Wiggins*, 539 U.S. at 523). "To determine whether counsel's actions were reasonable, a reviewing court should 'consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.'" *Davidson*, 453 S.W.3d at 402 (quoting *Wiggins*, 539 U.S. at 527).

If counsel's performance in this regard is found to be deficient, a reviewing court must determine if there is a reasonable probability that the presentation of additional mitigating evidence would have resulted in a different outcome. *See id*. In other words, the petitioner "must show that 'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Nichols v. State*, 90 S.W.3d 576, 598 (Tenn. 2002) (quoting *Strickland*, 466 U.S. at 695). The Tennessee Supreme Court has identified the following factors that should be considered by a reviewing court:

> > (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination.
>
> *Id*. (citing *Goad*, 938 S.W.2d at 371); *see also Davidson*, 453 S.W. 3d at 403; *Henley*, 960 S.W.2d at 580.

*Pruitt,* 2022 WL 1439977, at *73-*74.

Next, the appellate court summarized the factual findings made by the trial court on post-conviction review after considering all of the evidence:

> In this case, the post-conviction court found that Petitioner presented at the post-conviction hearing "potential mitigating evidence about which trial counsel should have known and could have presented during the capital sentencing phase." In particular, the post-conviction court noted the evidence of Petitioner's excessive marijuana use as a teenager and its potential effects on his developing brain, as well as evidence of his mother's drug and alcohol use during pregnancy, which she did not specifically recall at trial. The post-conviction court stated that because this evidence was available before trial and "could have given the jury a better view of Petitioner's potential mental illness and could have placed the low I.Q. scores testified to by Dr. Rutledge in a better context," "it can be said that trial counsel's not presenting it in their presentation of mitigation to the jury may have constituted deficient performance." However, rather than resolve whether trial counsel were indeed deficient, the post-conviction court focused on Petitioner's failure to prove that he was prejudiced. *See Henley*, 960 S.W.2d at 580. The post-conviction court found that "much of the potential mitigation proof presented at the post-conviction hearing was cumulative to the mitigation presented at Petitioner's trial." Moreover, the post-conviction court found that two of the three statutory aggravating factors proved by the State – Petitioner's prior convictions for violent offenses and the victim's age – "appear to have carried significant weight" with the sentencing jury. The post-conviction court concluded:
>
> > While conceivably the extra mitigation evidence identified at the post-conviction hearing but not presented at trial might have further "humanized" Petitioner and offered some sort of potential context for explaining Petitioner's violent tendencies, the number of the aggravating circumstances found by the jury and the strong proof supporting them and the weight the jury would give them, causes this court to find that there is not a reasonable probability that the jury would have returned a sentence other than death had the additional mitigating evidence identified by post-conviction counsel been presented at trial.

*Id.* at *74.

Having set for the governing legal standard and summarized the trial court's relevant factual findings, the Tennessee Court of Criminal Appeals expressly rejected Pruitt's argument that trial counsel was deficient in the investigation and presentation of available mitigating evidence. As the state court explained:

> Based on our review of the evidence presented at the post-conviction hearing, we conclude that trial counsel conducted a reasonable mitigation investigation and made reasonable strategic decisions regarding the presentation of mitigating evidence during the sentencing phase. Trial counsel and their investigators met with Petitioner and several members of his family on multiple occasions to discuss Petitioner's social history. The defense team obtained Petitioner's school, employment, medical, mental health, and juvenile and adult arrest records. Trial counsel also obtained Vivian Pruitt's arrest records since Petitioner's birth, even though lead counsel did not believe that the jury would necessarily view her frequent arrests as mitigating. After Petitioner was evaluated by MTMHI, trial counsel obtained an independent psychological evaluation by Dr. Steinberg, although they ultimately concluded that Dr. Steinberg's testimony would not be helpful. Additionally, lead counsel and former lead counsel presented Petitioner's case at a conference specifically designed to brainstorm possible mitigation theories. Based on this investigation and preparation, the defense team developed a mitigation theory related to Petitioner's "bad family situation" and "horrendous childhood," in addition to his diagnosis of schizophrenia and mild mental retardation from MTMHI. There were several indications that Petitioner's family, particularly Alma Rockett, were reluctant to help, and trial counsel relied on Ms. Stanback "to marshal the family" to Petitioner's defense. Trial counsel also made the strategic decision to present Quiana Pruitt as the "family historian." Although trial counsel were deficient in establishing the statutory criteria for intellectual disability, as discussed above, they were able to introduce as mitigating circumstances evidence of Petitioner's low cognitive functioning and mental illness through Dr. Rutledge's testimony. *See* T.C.A. §§ 39-13-203(e); -204(j)(8).
>
> In determining whether trial counsel's investigation was reasonable, this court "must consider the limited time and resources of counsel." *Perry Anthony Cribbs v. State*, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *48 (Tenn. Crim. App., at Jackson, July 1, 2009). Moreover, this court must "resist the urge to evaluate counsel's performance using '20-20 hindsight.'" *Davidson*, 453 S.W.3d at 393 (quoting *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013)). Although Petitioner presented significantly more evidence during the post-conviction hearing regarding his background and mental health, he did not indicate what information in trial counsel's possession would have led a reasonable attorney to investigate further in order to develop such evidence. *See id*. at 402 (quoting *Wiggins*, 539

> U.S. at 527). For instance, Petitioner faults trial counsel for failing to obtain an expert to conduct neuropsychological testing to evaluate Petitioner's deficits in executive functioning, but Dr. Steinberg's report specifically stated that such testing was not necessary in this case. Similarly, there is no indication that many of the lay witnesses who testified at the post-conviction hearing were specifically identified by Petitioner, his family members, or in any of the records as potential mitigation witnesses that should have been sought out by trial counsel. Moreover, some of them were deemed "somewhat less credible" by the post-conviction court due to their own criminal records.

*Id.* at *74-*75.

Despite difficulties with witness cooperation, trial counsel produced mitigating evidence in three broad categories: mental illness and intelligence, difficult childhood, and the impact of execution on his loved ones. (ECF No. 12-37, PageID 5579-80.) Both trial counsel and their mitigation investigator, Jeannette Stanback, met with Pruitt at least once per month in preparation for trial, and his trial counsel met with him more frequently. (ECF No. 12-38, PageID 5733.) Almost immediately, Ms. Stanback encountered resistance in her investigation; Pruitt was "stoic" to the point of being "unpenetrable" (*sic*). (*Id.* at PageID 5731.) He remained stoic during the trial, not expressing feelings, thoughts, or personality. (*Id.* at PageID 5731-32.) By the time of sentencing, Ms. Stanback found that he had become angry, hostile, and unresponsive to her. (*Id.* at PageID 5732.) Pruitt's own stoicism undoubtedly contributed to any overall lack of participation in the mitigation investigation, as reflected by the fact that the (cumulative) lay witnesses presented at the post-conviction evidentiary hearing were people known to Pruitt at the time of trial.

Trial counsel and co-counsel faced difficulties working with Pruitt's family members and faced their unwillingness to help. (ECF No. 12-39, PageID 5862.) Because of this, counsel relied upon Ms. Stanback to "marshal the family." (*Id.*) Despite the family's resistance and unwillingness, counsel still met with members of Pruitt's family members. (ECF No. 12-37,

PageID 5622.) Co-counsel met with Shirley Pruitt, who told him that Pruitt's grades dropped sometime around the sixth grade and that his parents struggled with substance abuse and alcohol addiction. (ECF No. 12-39, PageID 5866.) She also indicated that there was physical violence in the home, recalling an incident when Pruitt's mother had stabbed a boyfriend. (*Id.* at PageID 5867.) Co-counsel met with Vivian Pruitt and Antonio Pruitt. (*Id.* at PageID 5868.)

Eventually, due to having to navigate the familial difficulties, counsel settled on the tactic of presenting a "family historian" during the mitigation case. (*Id.*) Through the use of a family historian, trial counsel made strategic choices on what evidence to present to the jury based on how favorably the jury might view it. (ECF No. 12-37, PageID 5641.) Trial counsel chose not to center his effort to show that Pruitt's family environment was negative solely due to Pruitt's mother and elected not to present her extensive arrest history, since a jury may not necessarily view that as mitigating. (*Id.* at PageID 5641, 5643.)

Also, through the course of the team's investigation, Ms. Stanback collected a plethora of records relating to Pruitt. (ECF No. 13-4, PageID 8047.) Trial counsel collected his mother's arrest records from the time Pruitt was born, even though this was not evidence that counsel believed the jury would find mitigating. (ECF No. 12-37, PageID 5574-75.) Moreover, Ms. Kent, who was original trial counsel, obtained an independent forensic evaluation of Pruitt. (ECF No. 12-41, PageID 6153.) Also, prior to leaving the case, Ms. Kent, Ms. Stanback and trial counsel presented Pruitt's case at a conference, seemingly with a group of people unrelated to the case, in Memphis, Tennessee, in an effort to discuss mitigation. (ECF No. 12-41, PageID 6183.)

In evaluating counsel's performance in this context, "prevailing professional norms" in preparing for the penalty phase of trial is viewed against what counsel's job is at that stage—"to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla v.*

*Beard,* 545 U.S. 374,380-81 (2005). Counsel was able to present mitigation evidence through the theme of "horrendous childhood." (ECF No. 13-5, PageID 8231.) Counsel's strategic decision to present mitigation evidence through a "family historian" allowed the mitigation evidence counsel felt the jury would be most sympathetic to come through without the distraction of an uncooperative witness.

More importantly, Pruitt did not develop any proof on post-conviction review against the reasonableness of trial counsel's stated strategy that could overcome the "heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691. The record fully supports the conclusion that trial counsel engaged in a reasonable investigation, despite its challenges, and made reasonable decisions about what evidence would be best received by the jury as mitigation evidence. *Wiggins,* 529 U.S. at 521. Pruitt cannot overcome AEDPA deference on the state court's finding of no deficient performance.

Not only was the state court's opinion as to trial counsel's reasonable performance a reasonable application of federal law, but a fairminded jurist could likewise conclude under the same record that, even if trial counsel's investigation were deficient in some way, any unreasonableness in the investigation did not prejudice Pruitt. As the state appellate court explained, the evidence presented at the post-conviction evidentiary hearing was cumulative to the mitigation evidence presented by trial counsel during the penalty phase of trial:

> Further, as found by the post-conviction court, Petitioner failed to establish that he was prejudiced by any alleged deficiency. The mitigation evidence presented by Petitioner at the post-conviction hearing was largely cumulative of the evidence presented during the sentencing phase at trial. *See Nichols*, 90 S.W.3d at 601. Through Vivian and Quiana Pruitt, the jury heard about Petitioner's difficult childhood, which included testimony regarding the family's poverty, including periods without electricity; his mother's drug use and frequent arrests, including an aggravated assault for shooting Petitioner's father; the extensive family history of mental illness, including Petitioner's grandmother who was responsible for raising Petitioner while his mother was incarcerated or "in the streets"; the absence of

Petitioner's biological father and abandonment by his stepfather; and the trauma experienced by Petitioner when he lost several friends to a violent car crash. The jury also heard about Petitioner's behavioral issues as an adolescent, including the fact that he dropped out of school, used marijuana, and had an extensive juvenile record. Through Dr. Rutledge, the jury heard that Petitioner had low I.Q. scores both as a juvenile and as an adult and that he was diagnosed with mild mental retardation, schizophrenia, and substance abuse disorder. While the evidence presented at the post-conviction hearing added additional detail regarding Petitioner's social history and mental health, it did not paint a significantly different picture. *Cf. Detrick Cole*, 2011 WL 1090152, at *37 (concluding that trial counsel rendered ineffective assistance in presenting mitigation evidence because "the true picture of the Cole family was the antithesis of the loving family presented by trial counsel.").

Finally, to the extent that Petitioner presented evidence that may not have been cumulative of the evidence presented at trial, such as evidence of the violence within both Petitioner's home and community, Petitioner has not established that it would have affected the jury's determination in light of the strength of the aggravating circumstances, particularly his prior conviction for violent felonies and the vulnerability of the victim due to his age. Petitioner argues that this court should "abandon the strength of the aggravating evidence factor," which was first articulated by the Tennessee Supreme Court in *Goad*, 938 S.W.2d at 371, because he asserts that it is inconsistent with more recent United States Supreme Court cases, such as *Wiggins*, 539 U.S. 510, and *Williams*, 529 U.S. 362, which do not include a discussion of the aggravating factors when determining whether counsel was ineffective for failing to present additional mitigating evidence. Petitioner asserts that in *Davidson*, the Tennessee Supreme Court's most recent case on the issue, "the Court only made passing reference to the *Goad* analysis, but effectively applied the correct constitutional standard found in United States Supreme Court jurisprudence." *See* 453 S.W.3d at 402-03. However, the *Davidson* court not only articulated all three factors as the applicable standard for determining prejudice, *see id*. at 395, they specifically stated that they had considered the strength of the aggravating factors in concluding that the petitioner was prejudiced by trial counsel's deficient performance in presenting mitigating evidence. *Id*. at 406. Accordingly, we cannot conclude that the third *Goad* factor has been implicitly overruled or abrogated. As an intermediate court, we are bound by the decisions of the Tennessee Supreme Court with regard to constitutional questions. *See State v. Pendergrass*, 13 S.W.3d 389, 397 (Tenn. Crim. App. 1999). Moreover, this factor is consistent with the statement in *Strickland* that a petitioner must show "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death" in order to establish prejudice. *Strickland*, 466 U.S. at 695 (emphasis added). The post-conviction court did not err in applying this factor to Petitioner's case, and the evidence in the record does not preponderate against the post-conviction court's conclusion. Because Petitioner failed to establish either that trial counsel rendered deficient performance with regard to their investigation

> and presentation of mitigating evidence or that he was prejudiced thereby, he is not entitled to relief on this issue.

*Pruitt,* 2022 WL 1439977, at *75.

A fairminded jurist could conclude that, had trial counsel presented any of the noncumulative evidence at trial, the record does not support reaching the alternative conclusion that there is a reasonable probability that the jury during the penalty phase of the trial "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695. Although Pruitt presented new witnesses to add further detail to the nature of his childhood, Pruitt did not establish a reasonable probability that the jury would have found that any new, not cumulative, mitigation evidence outweighed the aggravating circumstances. There is no question that Pruitt had prior convictions for robbery, aggravated robbery, and attempted robbery or that the victim was 79 years old. *Pruit,* 415 S.W.3d at 205. Thus, the proof of the aggravating circumstances was strong. And there is nothing more than speculation that presentation of the non-cumulative portion of the mitigating evidence developed in the post-conviction record would have impacted the jury's sentencing decision. The state court understandably concluded that Pruitt failed to prove *Strickland* prejudice.

As for Pruitt's argument that the state court unreasonably applied *Rompilla,* this argument actually involves is a misstatement of the record. Pruitt argues that the state court's application was unreasonable because trial counsel never provided Dr. Steinberg with MTMHI records and thus, trial counsel could not have reasonably relied upon his expert opinion that no testing was needed. (ECF No. 38, Page 10867.) Further, Pruitt states that counsel "could not have made their decision" based on the expert's report because the master file in the public defender's office file did not contain the report. In his view, this must mean that counsel "blindly [relied] upon outgoing counsel Kent's assurance that it would not be helpful." (*Id.* at PageID 10866.)

But this is contrary to the state of the record, as explained by the state appellate court. In a footnote, the Tennessee Court of Criminal Appeals provided the following, accurate depiction of the evidence supported by the record:

> Although it is unclear why a copy of Dr. Steinberg's report could not be located in the Public Defender's Office's file prior to the post-conviction hearing, it is clear from the testimony that former lead counsel was familiar with the report and that she discussed her impressions of Dr. Steinberg's opinion with co-counsel when he replaced her on Petitioner's defense team. Additionally, lead counsel testified that he had several conversations with Dr. Steinberg regarding the evaluation of Petitioner; thus, he too would have been familiar with any recommendations as to whether further testing was necessary.

*Pruitt,* 2022 WL 143997, at *75 n.15. As laid out more fully below, *supra [],* the appellate court's assessment of the record here is factually accurate. It is solely Pruitt's conjecture that counsel "blindly" followed any opinions proffered by Ms. Kent, considering that trial counsel's own evidentiary hearing testimony reveals that he spoke to Dr. Steinberg on more than one occasion. Indeed, for whatever reason, Pruitt elected not to elicit testimony from trial counsel as to his presumed strategic reasoning in relying upon Dr. Rutledge alone. He cannot now rely on perceived gaps in a record of his own making when the proof that is in that record fully indicates that trial court was informed about Dr. Steinberg's opinions. And as shown, the state court's decision was not objectively unreasonable, meaning that AEDPA deference may not be avoided.

Furthermore, Pruitt's *Rompilla* argument is misaligned with the facts of his own case. In *Rompilla,* trial counsel was found to be ineffective for failing to investigate his prior conviction file because counsel knew that one of the aggravating factors the prosecution intended to use hinged upon his history of felony convictions. 545 U.S. at 383. And because Romilla's counsel failed to investigate the prior conviction casefile used against him, counsel did not uncover readily available mitigation evidence that could not have been discovered elsewhere. *Id.* at 390-92.

These facts are materially distinguishable from the case here. To be sure, the subsequent testing Pruitt complains was not done at the time of trial only resulted in higher IQ scores, with his average IQ yielding a result above 70. (ECF No. 12-40, PageID 6101-03.) Even if it could be said that trial counsel failed to uncover a "range of mitigation leads" through further testing after receiving Dr. Steinberg's report, Pruitt's later completion of the testing did not provide fruitful mitigation evidence for him to show a lack of capacity to appreciate the criminality of his conduct.

It is plain why Pruitt's AEDPA argument fails. Pruitt's disagreement with the reasoned decision reached is woefully insufficient to establish a rare unreasonable application of federal law.

***b. Unreasonable determination of the facts presented in state court.*** Interwoven with the above argument, Pruitt argues that the state appellate court's deference to the trial court's factual findings on post-conviction review amounts to an unreasonable determination of the facts under § 2254(d)(2). As partial support his argument, Pruitt points to the dissenting opinion by the Tennessee Supreme Court in Pruitt's direct appeal, when two justices dissented in part based on a disagreement with the majority opinion's application of Tennessee's proportionality state statute. *Pruitt,* 415 S.W.3d at 223. However, the dissent's opinion does not, as he claims, "belie[] the post-conviction court's decision that 'the strength of the aggravating circumstances' would outweigh" the purportedly "powerful mitigation evidence" Pruitt exhaustively set forth in his claim. (ECF No. 38, PageID 10868.) These are not one in the same. The state court's factual findings on this point are not an unreasonable factual determination in light of the (cumulative) evidence presented at the post-conviction evidentiary hearing and during the penalty phase of trial.

The state court record fully supports the appellate court's deference to the trial court's factual finding that the evidence presented during mitigation was substantially similar to the

evidence presented on post-conviction review—that Pruitt had intellectual deficits, suffered from mental illness, and had a terrible childhood involving parental neglect, poverty, drug abuse, and violence in the home. Despite Pruitt's argument to the contrary, the mitigation evidence developed on post-conviction review was "largely cumulative" to that presented at trial—even if that issue were considerable as a factual finding amenable to review for an unreasonable determination under § 2254(d)(2).

During the penalty phase, Dr. Rutledge testified that she had measured Pruitt's IQ at 66 and believed him to be "mildly mentally retarded." (ECF No. 11-16, PageID 2073.) She also reviewed reports from 2006 by Dr. Farooque and Dr. Craddock, who reached the same decision. (*Id.* at PageID 2082.) Trial counsel entered a report during her evidentiary hearing testimony that indicated a diagnosis of schizophrenia, a prescription for antipsychotic medication after complaining of visual and auditory hallucinations, and a history of cannabis use that began in Pruitt's early teenage years. (ECF No. 11-23, PageID 2686-90.) Dr. Rutledge testified that Pruitt was likely to be impulsive, have difficulty considering the consequences of his actions, and was likely to follow along with group actions. (ECF No. 11-16, PageID 2074, 2076).

Building upon this mental health evidence, Pruitt's mother testified at trial that mental illness ran in their family. She recalled that Pruitt's grandmother suffered from mental illness and had been in and out of mental institutions. (ECF No. 11-16, PageID 2110; 2114-15.) She shared that she had also been institutionalized. (*Id.* at PageID 2111.) And she was one of four siblings out of nine who had been institutionalized for paranoid schizophrenia. (*Id.* at PageID 2150-51.) Ms. Pruitt also spoke of her sister who had attempted suicide, practiced self-harm, was mentally ill, and abused drugs. (*Id.* at PageID 2116; 2149.)

The jury also heard evidence about Pruitt's poverty and childhood neglect. Pruitt's sister testified that, as a child, Pruitt experienced a difficult childhood and periods of time without electricity in the home. (*Id.* at PageID 2147.) She described their childhood as not "a good life." (*Id.*) Pruitt and his siblings were persistently told that that their mother neglected them because she was "in and out of the street" on drugs and was absent for extended periods of time because their mother "just didn't want" them. (*Id.*) This recollection of their childhood was reinforced by Pruitt's mother who confirmed at trial that she smoked while pregnant, possibly drank, and often left Pruitt in the custody of his grandmother while she was in prison. (*Id.* at PageID 2122-24; 2128.) Pruitt's mother recalled that her domestic relationship with Pruitt's stepfather was "difficult" and that he, too, spent several periods of time in jail during their marriage. (*Id.* at PageID 2125.) The jury heard that Pruitt's stepfather later abandoned the family. (*Id.*)

The jury also heard additional evidence of parental neglect during childhood and behavioral issues during adolescence. The jury learned that Pruitt suffered a head injury in the fifth grade and was denied treatment for headaches thereafter because his mother did not believe the injury to be serious. (ECF No. 11-17, PageID 2223.) Pruitt's mother also described Pruitt's behavior declining after four of his best friends died in a gruesome car wreck involving multiple decapitations and severed limbs. (*Id.*) Pruitt went to the scene of that accident and personally observed their injuries. (*Id.*) The jury learned that, around the same time, Pruitt was "in and out of juvenile," dropped out of school in the seventh grade, and left home at the age of 13 or 14. (ECF No. 11-16, PageID 2151, 2155). Pruitt's mother told the jury that he did not know right from wrong, and she acknowledged that it is likely she devoted insufficient attention to him as a child. (ECF No. 11-17, PageID 2224-25.)

Pruitt argues that, had the jury also heard evidence about childhood sexual assaults, physical abuse from his mother, prostitution in his childhood home, and neighborhood violence, there is a reasonable probability of a different sentence. (ECF No. 38, PageID 10840-49, 10855-56.) Even though this additional evidence—in addition to the mitigation evidence presented during the sentencing phase—is largely undisputed, Pruitt nevertheless tries to discern an unreasonable factual determination from the state court's post-conviction adjudication and its understandable observation that the evidence was "largely cumulative." The pertinent inquiry here is whether counsel was deficient in failing to develop and present the additional evidence and whether its absence was prejudicial. Those are legal issues whose resolution did not involve an unreasonable application of federal law, as explained above. None of this is truly a challenge to the state court's fact-finding process.

Still, even if Pruitt could somehow convert this legal dispute into a claim of an unreasonable factual determination on largely undisputed mitigation evidence, the state court record does not "compel the conclusion" that the state courts must have reached any different factual determination here. And it does not "compel the conclusion" that the new evidence is *not* "largely cumulative" to that presented at trial.

On post-conviction review, Pruitt presented various lay witnesses who grew up in the same housing project as he, who recalled what the neighborhood was like and who gave their impressions about what Pruitt's childhood was like. *Pruitt,* 2022 WL 1439977, at *24. As with Pruitt's sister, there was a shared consensus that Pruitt's childhood was filled with neglect and poverty. *Id.* While the penalty jury heard about Pruitt's parental neglect, the jury did not hear about the other loving mothers who attempted to provide support for Pruitt. Two of Pruitt's childhood friends testified that their own mothers attempted to care for Pruitt, given his mother's

neglect, and that there were safer, less dysfunctional homes where Pruitt sought refuge. *Id.* at *25*26. But the post-conviction court, upon hearing that testimony, determined that the credibility of two of the lay witnesses was "somewhat less credible" due to their own criminal history, incarceration status, and gang officiation. (ECF No. 12-21, PageID 4602.)

Simply stated, the record facts do not "compel" any factual determination contrary to that made by the state court during post-conviction and by the appellate court when adopting the post-conviction court's factual findings. The finding that the new mitigation testimony was "largely cumulative" to that presented before the jury was not an unreasonable determination of the facts, in light of the evidence presented at the evidentiary hearing. *See Keith v. Mitchell,* 455 F.3d 662, 670 (6th Cir. 2006) (applying AEDPA deference to hold a state court's rejection of Keith's ineffectiveness claim a reasonable application of federal law because the "so-called additional evidence" was already given to the jury). "A petitioner does not establish prejudice if he shows only that his counsel failed to present 'cumulative' mitigation, that is, evidence already presented to the jury." *Beuke v. Houk,* 537 F.3d 618, 645 (2008). Pruitt can show no unreasonable determination of the facts here.

And for all of the reasons stated here, Pruitt cannot overcome AEDPA deference on the state court's rejection of his claim of ineffective assistance of counsel in failing to present additional, cumulative mitigation evidence developed on post-conviction review. The Court should deny the claim.

**3. The state court did not contravene or unreasonably apply federal law—nor did it unreasonably determine the facts—when it concluded trial counsel was not deficient regarding successive and duplicative assessment Pruitt's competency to stand trial.**

In Claim 4, Pruitt argues that trial counsel was ineffective for failing to "request a [second] competency evaluation before trial." (ECF No. 38, PageID 10869-84.) In support of this claim,

Pruitt alleges that trial counsel "ignored myriad indicia of his incompetency," and because of trial counsel's failure, Pruitt "proceeded to a death penalty trial that should never have occurred[.]" (*Id.* at PageID 10869.) Further, Pruitt argues that "had [trial counsel] performed reasonably, [they] would have been aware" that Pruitt was "unable to meaningfully and rationally consult with them to a 'reasonable degree of rational understanding,'" despite the prior finding that he was competent to stand trial. (*Id.* at PageID 10871-72.) And had trial counsel requested a second competency evaluation, he would have finally been found incompetent to stand trial. (*Id.* at PageID 10879.)

As it relates to review before this Court, Pruitt states that he is entitled to de novo review of the claim and that review is not deferential under § 2254(d) because of certain proffered quibbles with the analysis by the Tennessee Court of Criminal Appeals in the post-conviction appeal. (*Id.* at PageID 10879-84.) But AEDPA deference readily applies here, and Pruitt cannot overcome it. For that reasons, the Court should deny relief on this claim.

***a. Contrary to federal law.*** The state court decision on this ineffectiveness claim is certainly not contrary to federal law when the state court applied *Strickland*, the prevailing decision on ineffective assistance of counsel. The state court did not "arrive at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or arrive at an opposite result having "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court[.]" *Williams,* 529 U.S. at 405. AEDPA's "contrary to" clause means "'diametrically different,' 'opposite in character or nature,' or mutually opposed.'" *Id.*

Pruitt states that the appellate court's decision "contravened clearly established Supreme Court precedent[,]" namely, *Drope v. Missouri,* 420 U.S. 162 (1975), in concluding that—in his words—"trial counsel was not required to question [his] competency before his February 2008 trial because an expert found him competent seventeen months prior." (ECF No. 38, PageID

10879-80.) Pruitt also states the appellate court's decision was contrary to federal law because the court "simply ignored" *Dusky v. United State,* 362 U.S. 402 (1960). (*Id.* at PageID 10881.) However, a fulsome review of the state-court adjudication shows that he cannot establish that the state court contravened federal law when he identified *Strickland* and the governing standard for an ineffectiveness claim and applied it to the particular facts presented regarding whether counsel should have requested a redundant competency evaluation. The state court decision did not contravene federal law.

***b. Unreasonable application of federal law.*** Nor did it unreasonably apply prevailing federal law, including any binding precedent in *Dusky* and *Drope*. Regarding *Dusky*, Pruitt claims that the state court misconstrued that decision. But that case concerned the standard for competency, while the relevant inquiry here is whether, under *Strickland*, trial counsel was ineffective by not requesting a second competency assessment. *Dusky* does not precisely answer that question.

As for *Drope*, Pruitt makes too much of a passing statement there, in dicta, that "even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope,* 420 U.S. at 181. Certainly, competency can devolve over time, which no one disputes and which, most importantly here, the state appellate court did not reject. No fair reading of the state appellate court's opinion leads to the conclusion that the court actually dismissed the possibility of that occurring in a particular case. Pruitt's argument that the state court "suggest[ed]" otherwise is wrong. (*Id*. at PageID 10880.)

Furthermore, review under § 2254(d)(1) concerns the holdings, but not dicta, from binding Supreme Court precedent in effect at the time of the state court's adjudication of the claim.

*Pinholster*, 563 U.S. at 182. The relevant sentence from *Drope* concerns the potential for competency to devolve, but the issue presented and resolved in *Drope* was whether the trial court's initial competency finding was supported by the record. Plus, the Court acknowledged that case did not concern "the effective assistance of counsel, a claim which [was] not before" the Court. *Drope*, 420 U.S. 169.

Pruitt's reaching arguments amount to nothing more than the very kind "flyspecking" of state-court opinions that federal courts on habeas corpus review must avoid. *Rogers,* 69 F.4th at 391-92. And his reliance on *Drope* adds nothing to the pertinent question of whether the state-court adjudication is a rare "extreme malfunction of the state criminal justice system." *Id.* A review of the Tennessee Court of Criminal Appeals' analysis here readily shows it certainly is not.:

Simply put, Pruitt cannot establish an unreasonable application of federal law because a fairminded juror presented with the same factual record could resolve Pruitt's ineffective assistance of counsel claim just as the state appellate court did here. Resolving this claim in conjunction with other related ineffective assistance of counsel claims (not raise here), the state court explained its decision as follows:

> Although Petitioner was determined to be competent to stand trial when he was evaluated by MTMHI in 2006, Petitioner asserts that he was rendered incompetent due to the sedative-like effects of his anti-psychotic medication by the time of the February 2008 trial, which affected his ability to consider a plea offer, assist in his defense, and testify coherently. In order to be competent to stand trial, "a defendant must possess the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Wilcoxson v. State*, 22 S.W.3d 289, 305 (Tenn. Crim. App. 1999). In order to determine whether trial counsel was deficient for failing to challenge a defendant's competency, "we must determine whether [trial] counsel had reasonable cause to raise the issue[.]" *Id*. at 306.
>
> Despite the fact that Petitioner presented several witnesses who testified that Petitioner seemed "doped up" and "out of it" in the jail prior to trial, the post-conviction court accredited the testimony of both lead counsel and co-counsel that Petitioner did not seem noticeably impaired and seemed to understand the nature of

> the proceedings. This court must "defer to the credibility determinations of the [post-conviction] court, which had the opportunity to hear the testimony of" the witnesses. *Arroyo v. State*, 434 S.W.3d 555, 561 (Tenn. 2014). Additionally, trial counsel had access to the report from MTMHI that found Petitioner to be competent to stand trial despite his cognitive limitations and other psychiatric issues, for which he was prescribed medication at the time of the evaluation. As this court has previously held, counsel "is not required to question a diagnosis put forth by a professional expert in the field." *Christa Gail Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App., at Knoxville, Apr. 25, 2011). The post-conviction court also noted its own observations during trial that Petitioner was "well-behaved" and "often consulted with his attorneys." Although trial counsel both testified that Petitioner's testimony was not helpful, the post-conviction court found that Petitioner presented no evidence that his testimony was incoherent. Petitioner argues that trial counsel should have questioned his competency because many of his decisions were "irrational," including his rejection of an offer to plead to a life sentence and his "unrealistic" belief that at most he should have been charged with manslaughter. However, the post-conviction court accredited trial counsel's testimony that Petitioner understood, but was unwilling to accept, the fact that felony murder was first degree murder and that Petitioner was adamant that he was unwilling to plead guilty. Petitioner did not produce any proof otherwise. Petitioner has not established that trial counsel were deficient for failing to request an additional competency evaluation of Petitioner.

*Pruitt,* 2022 WL 1439977, at *89. As the court aptly noted in a footnote:

> We note that Petitioner did not testify at the post-conviction hearing, even though Tennessee Code Annotated section 40-30-110(a) requires a post-conviction petitioner to "give testimony at the evidentiary hearing if the petition raises substantial questions of fact as to events in which petitioner participated." *See Keough v. State*, 356 S.W.3d 366, 370 (Tenn. 2011) ("The Act contemplates that the petitioner's testimony will be necessary to satisfy th[e] burden of proof.").

*Id.* at *89 n.25.

Contrary to Pruitt's argument there is ample evidence that supports the state court's holding that trial counsel was not deficient and that trial counsel, under the accredited prove, was not required to request a redundant competency evaluation.

At the time of initial representation, Ms. Kathy Kent was trial counsel. Within months of indictment, Ms. Kent retained Dr. Steinberg for the purpose of conducting an independent evaluation "due to concerns she has concerning the defendant's mental health based on prior examinations performed on the defendant while he was a juvenile." (ECF No. 12-41, PageID

6153.) Although Dr. Steinberg's forensic report was not in the Public Defender's master file at the time of the hearing, Dr. Steinberg's forensic report was dated on or about December 20, 2006—long before trial. (ECF No. 13-7, PageID 8609-20.) Ms. Kent could not recall why Dr. Steinberg was not in the master file but did recall certifying that the work for which he was contracted had been completed, leading her to be sure she did receive his report "at some point in time." (ECF No. 12-41, PageID 6162.)

Occurring somewhat simultaneously, Pruitt was evaluated at Midtown Mental Health Center by order of the trial court. (ECF No. 13-7, PageID 8487.) Both Ms. Kent and the prosecution signed an agreed order for Pruitt to be evaluated for competency to stand trial and for a possible insanity defense. (ECF No. 12-36, PageID 5468-69.) In a letter from Dr. Whirley at Midtown in 2006, it was expressed that there were "concerns" about Pruitt's competency to stand trial, and it was recommended that he be transferred to Middle Tennessee Mental Health Institute (MTMHI) in Nashville for evaluation. (*Id.*)

Shortly after Pruitt was transferred to MTMHI, Ms. Kent received a request from the Direct of Forensic Services requesting specific information. (*Id.* at PageID 8490.) What appears to be in response to MTMHI's request, Ms. Kent faxed the requested information to the Director. (ECF No. 12-41, PageID 6151.) Notably, the handwritten note from Ms. Kent to the mitigation specialist seems to imply that Ms. Kent wanted to send these same records to Dr. Steinberg but could not because she could not find his fax number. (*Id.* at PageID 6151-52.) While Pruitt was at MTMHI, Ms. Kent sent a request to the Director of Forensic Services requesting information be sent regarding Pruitt while he was at the facility. (*Id.* at PageID 8494.) Ultimately, MTMHI found Pruitt to be competent to stand trial. (ECF No. 11-26, PageID 2686-90.)

Trial counsel, who assumed representation from Ms. Kent, was aware of a letter authored by Dr. Whirley to the trial court. (ECF No. 12-37, PageID 5577.) Trial counsel was co-counsel at the time this letter was authored and had access to the case file. (*Id.*) Although trial counsel did not have a specific memory of meeting with Dr. Steinberg, he recalled talking to him "many times" and ultimately opining that Dr. Steinberg would not be helpful to Pruitt's case. (ECF No. 12-37, PageID 5580.) Although trial counsel did not obtain Pruitt's MTMHI records prior to trial, he was still aware of Pruitt's drug regimen, which he understood to include psychotropic drugs. (*Id.* at PageID 5576-77.) Not only was trial counsel aware of Pruitt's drug regimen at the time of trial, but he was also aware of the dosage Pruitt was receiving from the jail. (*Id.* at PageID 5625.)

Certainly, trial counsel and co-counsel did not turn a blind eye after MTMHI and Dr. Steinberg deemed Pruitt competent to stand trial. Both trial counsel and co-counsel continued to observe Pruitt. Trial counsel did not notice any behavior or a lack of ability to communicate that would have indicated to him that Pruitt was experiencing some sort of difficulty due to his prescribed medication, which might affect his competency. (*Id.* at PageID 5648.) Nor did trial counsel, especially in the days close to trial and during trial, notice anything about Pruitt's demeanor indicating to counsel that Pruitt's competency might be affected because he was intoxicated by his medication. (*Id.*) Trial counsel was firm that, had he noticed anything suspicious, he would have addressed it with the trial court. (*Id.*)

Similarly, co-counsel stated that he never observed anything that would have made him think that Pruitt's ability to communicate with him was affected by his medication. (ECF No. 12-39, PageID 5894.) Co-counsel also affirmed that, had he gotten an indication that there was something interfering with Pruitt's ability to interact and communicate, he would have taken some sort of action. (*Id.*)

This record clearly supports the state court's conclusion that trial counsel was not ineffective for not requesting Pruitt be evaluated for a second time prior to trial to determine his competency. Trial counsel relied on more than one forensic evaluation of Pruitt, both of which found him to be competent to stand trial while taking into account his medication. Trial counsel was entitled to rely on the opinions of both experts to determine Pruitt's competency to stand trial.

From the testimony presented, the trial court—as trier of fact—accredited the testimony by Pruitt's counsel, and from that accredited testimony, the state courts reasonably applied *Strickland* to find that trial counsel's performance did not fall below objective standard of reasonableness required by relying on such experts reports. *See e.g. Hall v. Mays,* 7 F.4th 433, 448 (6th Cir. 2021) (finding no substantial claim of deficient performance when trial counsel relied upon expert evaluations and opinions that capital defendant was competent for trial). Based on accredited testimony by both trial counsel and co-counsel's close-in-time, continued observations and communication with Pruitt, their ability to consult with him, a fairminded jurist could come to the same conclusion as the Tennessee Court of Criminal Appeals did here.

***c. Unreasonable determination of the facts presented in state court.*** Next, Pruitt argues that the state court's deference to the post-conviction trial court's finding that, at the time of trial, Pruitt "did not seem noticeably impaired and seemed to understand the nature of the proceedings" was an unreasonable determination of the facts under § 2254(d)(2). (ECF No. 38, PageID 10882.) In support of this claim, Pruitt argues that the court's factual finding is "flatly inconsistent with the vast majority of the evidence," and cites to various pieces of evidence presented at the post-conviction hearing or from the trial record. (*Id.* at PageID 10882-84.)

Pruitt may now not second-guess a state court's determination of how to weigh the evidence and make credibility determinations as an "unreasonable determination." The record

does not "compel the conclusion" that the state court was required to make contrary factual findings as to trial counsel's performance. *Richter,* 546 U.S. at 341-42.

Just as Pruitt can show no unreasonable application of federal law, so too does he fail to establish that a misapplication of the governing legal standard infected the state court's factual determinations. Without question, the record supports the appellate court's deference to the trial court's factual findings regarding Pruitt's supposed incompetency at the time of trial. While Pruitt lists out various pieces of the state court record that he asserts should outweigh the credibility given to trial counsel's observations, much of the evidence he relies upon is either too remote from the time of trial—which is the time at which he asserts trial counsel should have requested a second competency evaluation—or are observations from witnesses who did not observe Pruitt close in time to the trial. None of that evidence shows an unreasonable determination of the facts under § 2254(d)(2) such that every reasonable jurist would be compelled to reach a different conclusion. More to the point, the trial court was not compelled to accredit Pruitt's post-hoc hand-picked selection of record evidence over other live testimony presented to the trier of fact at the post-conviction evidentiary hearing.

At that hearing, Pruitt produced witnesses who were incarcerated with him while he was awaiting trial or settlement. One witness testified that he and Pruitt were incarcerated together until 2007. (ECF NO. 12-45, PageID 6718.) This witness testified that Pruitt was "doped up on so much psych meds that he was out of it." (*Id.*) He described Pruitt one occasion as "drooling, slobbering, coming out of his mouth," and "eyes rolling up in the back of his head." (*Id.*) However, this is woefully insufficient to render the state courts deference to the factual findings unreasonable. This witness' proffered observations ceased in 2007—almost one year prior to Pruitt's trial. This observations, assuming its truthfulness, is too remote in time to call into

question trial counsel and co-counsel's observations and interactions with Pruitt as his February 2008 trial date grew closer. Of course, it was always for the trier of fact to weigh the credibility of any presented evidence.

And the state court did not just afford deference to the credibility determination as to trial counsel and co-counsel's testimony. The appellate court also deferred to the post-conviction trial court's recollection of Pruitt's demeanor, behavior, and communication during trial. The post-conviction trial court recalled that Pruitt often consulted with his attorneys during trial, that it saw no impairment during trial, and that it observed none of the proffered "dazed" or "out of it" behavior when the court engaged with Pruitt during the *Momon* hearing concerning his election whether to testify at trial. (ECF No. 12-21, PageID 47754-56.) Indeed, the court found that Pruitt (could and did) knowingly and intelligently elect to testify at trial, and the court observed Pruitt appropriately engage with trial counsel. (ECF No. 11-13, PageID 1780-86.) And if Pruitt had wished to testify at the post-conviction evidentiary hearing to bolster his claim of incompetency at the trial of trial, he certainly could done so. And by deciding not to do so, the record lacks whatever he might have to say on that issue. Under the full record presented on post-conviction review, none of the impressions or observations made by trial counsel, co-counsel, and the trial court were refuted or, at the very least, called into question.

Finally, it bears noting that the expert reports that simultaneously opine on Pruitt's intellectual functioning and find him competent to stand trial do not lend to the conclusion that there was an unreasonable factual finding here. The record evidence makes clear that the experts who authored those reports could conclude that, to whatever extend Pruitt underperformed intellectually, he was still competent to stand trial. All of these examples undermine Pruitt's

assertions that the state court made an unreasonable determination of the facts, such that every fairminded jurist would agree with the determination's unreasonableness.

The state court's factual findings are not an unreasonable factual determination in light of the evidence presented at the evidentiary hearing. As stated above, the state court determination contains no legal error and therefore no flawed fact finding. And the record facts do not "compel" a factual determination contrary to that made by the trier of fact who heard live testimony and by the appellate court when adopting the trial court's factual findings. Pruitt can show no unreasonable determination of the facts here.

For all of the reasons stated, Pruitt cannot overcome AEDPA deference on the state court's conclusion that he failed to prove deficient performance here. For that reason alone, the Court should deny the claim. But even if Pruitt could somehow overcome deference, he certainly cannot prove *Strickland* prejudice, for essentially the same reasons that trial counsel was not deficient. Even if counsel had requested a second, redundant competency evaluation, there is certainly no reasonable probability that the request would have been granted, much less that another evaluation would have established his incompetency for trial. His claim is subject to dismissal for this reason, as well.

**4. The state court did not unreasonably apply federal law when it concluded that neither trial counsel's or appellate counsel's assistance was ineffective by electing not to litigate the prosecution's use of preemptory challenges.**

Pruitt alleges that trial counsel was ineffective for failing to "develop and present readily available evidence" that would have shown the prosecutor had "pretextual" reasons for using peremptory challenges to strike four Black potential jurors. (ECF No. 38, PageID 10892-10902). Relatedly, Pruitt alleges that appellate counsel was ineffective for failing to raise this issue on direct appeal. (*Id.* at PageID 10893-94.) Pruitt argues he is entitled to de novo review on both claims because the Tennessee Court of Criminal Appeals opinion is contrary to an unreasonable

application of both *Batson* and *Strickland* and is based upon an unreasonable determination of the facts. (*Id.* at PageID 10894-902.)

Pruitt's arguments fail, and he is not entitled to de novo review. The state court neither contravened nor unreasonably applied federal law nor was the state court's decision based upon an unreasonable determination of the facts. Pruitt's arguments that attempt to paint the Tennessee Court of Criminal Appeals' opinion as an unreasonable application of *Batson* and *Strickland* amounts to nothing more than excessive and inapplicable criticism at opinion writing practices. But this kind of flyspecking of state-court opinions is expressly disallowed under AEDPA, and an assessment of the appellate court's opinion readily shows that the state court did not unreasonably apply federal law and any associated progeny. Further, the state court's reasoned determination under the presented proof is not an unreasonable determination of the facts. Applying AEDPA deference, the Court should reject both claims.

As noted above, the Tennessee Court of Criminal Appeals correctly identified the "clearly established Federal law," as announced by the Supreme Court, setting the framework for evaluating ineffective assistance of counsel claims. *Pruitt,* 2022 WL 1439977, at *58-*59. Regarding *Batson,* the Tennessee Court of Criminal Appeals correctly identified that *Batson* set the governing prerequisites that must be met to establish that a prosecutor challenged a potential juror solely on the basis of race. When considering Pruitt's related ineffectiveness claim, the court analyzed *Batson* and the ineffectiveness claim presented to it as follows:

> In *Batson v. Kentucky*, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race. . . ." 476 U.S. at 89. The following prerequisites must be met to establish a *Batson* violation: (1) the defendant must establish a prima facie case of purposeful discrimination; (2) the State must be given the opportunity to rebut the prima facie case by offering a race-neutral explanation for the exercise of the peremptory challenge; and (3) the trial court must determine whether the defendant has established purposeful discrimination. *State v. Kiser*, 284 S.W.3d 227, 255 (Tenn.

2009). The State's race-neutral explanation must be reasonable and specific but need not be persuasive. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995); *see State v. Hugueley*, 185 S.W.3d 356, 368 (Tenn. 2006). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Purkett*, 514 U.S. at 768 (citations omitted); *see Hugueley*, 185 S.W.3d at 368. The trial court, however, must consider the explanation in light of all evidence to ensure that the explanation is not pretextual. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *Hugueley*, 185 S.W.3d at 369. "Because the core issue is the prosecutor's discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'" *State v. Ellison*, 841 S.W. 2d 824, 827 (Tenn. 1992) (quoting *Batson*, 476 U.S. at 98). On appeal, a trial court's findings on the issue of discriminatory intent is accorded great deference and will be sustained unless clearly erroneous. *Hugueley*, 185 S.W.3d at 369.

During jury selection, the State used four peremptory challenges against African American prospective jurors. Trial counsel raised a *Batson* challenge to all four strikes. The trial court noted that the State struck one African American prospective juror in the first round and three in the second round. The trial court then asked the State to provide a race-neutral reason for the three jurors stricken by the State in the second round. The State responded that all three jurors "gave hesitant, reluctant answers on the death penalty question," and additionally that one of the jurors had "bad bod[y] language from the minute he was called up into the jury box" until he was excused. The trial court agreed that all three prospective jurors appeared "hesitant" despite answering that they could vote for the death penalty, noted that one of the jurors appeared "unhappy to be there," and found these to be race-neutral reasons for striking the prospective jurors. Trial counsel argued against the trial court's consideration of the body language of the prospective jurors but did not dispute the State's reason to strike the jurors because they were "reluctant."

Petitioner complains that trial counsel were deficient for failure to pursue a race-neutral explanation for the State's striking the African American juror in the first round. While the trial court made no explicit finding that trial counsel had made a prima facie showing of discrimination regarding any of the jurors in question, our supreme court in *Woodson* concluded that had the trial court determined that no prima facie showing was made, the court would not have required the State's race neutral explanation for the challenge. *Woodson v. Porter Brown Limestone Co., Inc.*, 916 S.W.2d 896, 905 (Tenn. 1996). Thus, we conclude that the court implicitly found that trial counsel had satisfied the first prong of the *Batson* test with regard to the three jurors stricken in the second round, but not the juror stricken in the first round.

Petitioner further claims that trial counsel were ineffective for failing to challenge the prosecutor's statement that the prospective jurors "all used the word 'reluctantly,'" when the transcript reflected that none of the jurors actually used that word in their responses regarding their willingness to impose the death penalty. However, a single misstatement by the prosecutor does not amount to

> discriminatory intent. "To be sure, the back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2250 (2019). While the record does not show that any of the prospective jurors in question used the word "reluctant" in their answers about the death penalty, the record does indicate that the trial court found the jurors to be hesitant and not "as vocal as the other jurors." Subjective explanations for a peremptory challenge, such as a prospective juror's demeanor, are permitted but must be "carefully scrutinized" for "facial validity." *State v. Carroll*, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000) (internal citations omitted). The trial court found the State's explanation to be credible in light of the trial court's own observation of the three challenged jurors.
>
> Moreover, Petitioner failed to present any evidence during the post-conviction hearing that contradicts the trial court's findings of a race-neutral reason for the State's peremptory challenges to support his claim that trial counsel were ineffective in failing to further pursue the *Batson* challenge after the trial court's ruling. Likewise, Petitioner failed to present any evidence that if trial counsel were deficient, that alleged deficiency affected the outcome of the proceedings. Petitioner argues that he was not required to present evidence at the post-conviction hearing because the *Batson* issues are all "record based." However, the United States Supreme Court has cautioned against this approach. *See Massaro v. United States*, 538 U.S. 500, 505 (2003) (noting that the "record may reflect the action taken by counsel but not the reasons for it"). Moreover, Petitioner has the burden of proving the factual basis of his claims for post-conviction relief by clear and convincing evidence. *See* T.C.A. § 40-30-110(f); *Momon*, 18 S.W.3d at 156. Petitioner did not question any of the attorney witnesses – either the prosecutors or trial counsel – about their actions regarding the *Batson* issues, nor did he present any of the stricken jurors as witnesses to refute the trial court's ruling on the issue. Accordingly, Petitioner has failed to establish that trial counsel were deficient in failing to challenge the make-up of the jury and that any deficiency resulted in prejudice. The trial court was in the best position to judge the credibility of both the prospective jurors and the prosecutors because the trial court has the opportunity to observe their demeanor. *Smith*, 893 S.W.2d at 914. The record supports the trial court's acceptance of the State's race-neutral reason for excluding the prospective jurors. Petitioner is not entitled to relief on this issue.

*Pruitt,* 2022 WL 1439977, at *77.

***a. Contrary to federal law***. In an attempt to avoid AEDPA deference on this particular claim, Pruitt argues that the state appellate court's decision was contrary to *Strickland* because the opinion "seems to imply that prejudice could only be established by the testimony of stricken jurors and attorneys—presumably to show that the result of the trial would have been different had

those jurors been seated." (ECF No. 38, PageID 10900.) Stated differently, Pruitt alleges that the appellate court's decision was contrary to *Strickland* because the court's applied standard required Pruitt to show that the outcome of the trial would have been different when, instead, he only needed to prove that the result of trial counsel's *Batson* challenge would have been different. (*Id.* at PageID 10899-900.)

On this point, the Tennessee Court of Criminal Appeals' opinion cannot be deemed "contrary to" federal law because the state court's decision cannot be construed as "contrary to" a holding from the Supreme Court when there is not a Supreme Court case that directly confronts the specific question. *Donald*, 575 U.S. at 317. As Justice Sotomayor recently indicated, the Supreme Court has not resolved what the precise prejudice analysis is in this context, and courts have taken different approaches when assessing prejudice. *See Clark v. Mississippi*, 146 S. Ct. 1529, 1530 (2026) (Sotomayor, J., statement respecting denial of certiorari). That there not, at the time of the state-court adjudication, an on-point Supreme Court decision regarding this particular nuance of a *Batson* claim raised through the lens of ineffective assistance of counsel is also indicated by Pruitt's reliance solely on non-Supreme Court decisions, which he relies on as persuasive authority to support this argument. Still, one case is an unpublished Sixth Circuit decision that applied *Strickland* to an ineffectiveness claim related to *Batson* claim and that stated that, for prejudice, the petitioner must show that the outcome of the trial would have been different, not just the *Batson* challenge. (*Id.*); *see Parks v. Chapman,* 815 Fed. Appx. 937, 943 (6th Cir. 2020). Pruitt's reliance on non-Supreme Court opinions further undercuts the veracity of his argument that the state court opinion was "contrary to" *Strickland.*

Arguing that the appellate court's decision is contrary to federal law, Pruitt alleges that the court "misinterpreted *Flowers* as holding that 'a single misstatement by the prosecutor does not

amount to discriminatory intent.'" (ECF No. 38, PageID 10895) (referring to *Flowers v. Mississippi,* 588 U.S. 284 (2019)). Pruitt argues that, had the appellate court "identified the correct holdings of *Flowers,*" their decision would have been different because the appellate court would have been required to "acknowledge and analyze *all* evidence of discriminatory intent alongside of Ms. Weirich's incorrect statement" and conduct a "textual analysis of the voir dire to determine prosecutorial intent[.]" (*Id.* at PageID 10895-96.) Pruitt also alleges that the state court opinion is "contrary to" *Miller-El* and *Snyder v. Louisiana,* 552 U.S. 472 (2008), as part of this *Flowers* argument. (*Id.* at PageID 10895-98.)

Pruitt proffers that *Flowers* "stands for the proposition that 'incorrect statements of that sort may show the State's intent: When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent.'" (*Id.* at PageID 10895.) But Pruitt takes the holding in *Flowers* farther than the Court intended. The Supreme Court very clearly concluded its opinion by stating, "In reaching [our] conclusion [that the trial court committed clear error here], we break no new legal ground. We simply enforce and reinforce *Batson* by applying it to the extraordinary facts of this case." *Flowers,* 588 U.S. at 316.

Contrary to Pruitt's argument that the appellate court "nonetheless deferred to the trial court's incorrect observations instead of reviewing the record as required by *Snyder*[,]" the state court opinion readily refutes this statement. (ECF No. 38, PageID 10898.) In the sentences immediately preceding, the appellate court also discussed its own review of the record: "While the record does not show that any of the prospective jurors in question used the word 'reluctant' in their answers about the death penalty, the record does indicate that the trial court found the jurors to be hesitant and not 'as vocal as other jurors.'" *Pruitt,* 2022 WL 1439977, at *78. Further, the appellate court *relied on its own reading of the record* to conclude that "[t]he record supports

the trial court's acceptance" of the prosecution's race-neutral reason for striking the latter three prospective jurors.

Simply stated, "the state court did not arrive at a conclusion opposite to that reached by [the Supreme Court] on a question of law nor did the state court decide this case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. An examination of the other decisions relied upon by Pruitt are materially factually distinguishable from the present case. It is readily apparent from the facts of Pruitt's case that the conduct the Supreme Court criticized and rejected throughout its application of *Batson* in *Flowers* did not occur here. Pruitt's case does not contain an extraordinary set of facts like those seen in *Flowers* or in *Batson* and its progeny. Pruitt cannot show the state court opinion was "contrary to" federal law.

***b. Unreasonable application of federal law.*** Pruitt cannot otherwise establish an unreasonable application of federal law because a fairminded jurist presented with the same factual record could resolve Pruitt's ineffective assistance of trial claim just as the Tennessee Court of Criminal Appeals did here.

As set forth above, there can be no genuine dispute that the state court correctly identified the "clearly established Federal law," as announced in *Strickland* and *Batson.* And the court's application of this "clearly established Federal law" was not unreasonable, as the court's ruling did not "unreasonably app[ly] that principle to the facts of the [petitioner's] case." *Pinholster,* 563 U.S. at 182. And as the appellate court explained, the trial record supports the trial court's decision to accept the prosector's race-neutral reason for striking the three jurors in the second round.[11]

[11] Although the appellate court also briefly discussed Pruitt's ineffectiveness claim concerning the stricken juror the first round, at this juncture, Pruitt is only challenging trial counsel's conduct as it relates to the three jurors struck in the second around.

*Pruitt,* 2022 WL 1439977, at *78. Under this record, a fairminded jurist could have resolved the claim as the state appellate court did.

Pruitt nevertheless argues that trial counsel's performance was ineffective because he "failed to develop and present readily available evidence that would have revealed that [the prosecutor's] ostensibly race-neutral reasons for her strikes were pretextual[,]" which Pruitt alleges trial counsel should have done by using "comparative arguments" to rebut the proffered race-neutral reasoning. (ECF No. 38, PageID 10892.) But the record fully supports the state appellate court's determination that Pruitt failed to present sufficient evidence on post-conviction review to prove deficient performance and prejudice.

The record supports the appellate court's conclusion that Pruitt "failed to establish that trial counsel were deficient in failing to challenge the make-up of the jury and that any deficiency resulted in prejudice." *Pruitt,* 2022 WL 1439977, at *78. Pruitt's post-conviction proceedings were robust. At his evidentiary hearings, both trial counsel testified, and the prosecutor who handled voir dire testified. However, this captive audience of witnesses was never asked any question by Pruitt about their handling of the *Batson* challenge. Nor did Pruitt bother to call any of the stricken jurors as witnesses to refute the trial court's findings that their answers as to the imposition of the death penalty were given with hesitation or reluctance. Because a transcript can be, at times, flat in affect—especially in a circumstance where there is a dispute over the delivery of a one-word answer—it was reasonable for the state appellate court to conclude that, absent any proof developed to the contrary, there was no record evidence of trial counsel's ineffectiveness.

At this juncture, any absence or omission of proof from the state-court record is explained by, and due to, negligence of Pruitt and/or post-conviction counsel in not developing explicit proof on this point when he could have done so in the post-conviction evidentiary hearing conducted

under § 40-30-110. A fairminded jurist could conclude that, under the record actually developed in state court, Pruitt failed to show that trial counsel's alleged failure to develop and present comparable arguments to refute the prosecutor's race-neutral reasoning for excluding three jurors in the second round was deficient performance and was prejudicial. More to the point, Pruitt can show no unreasonable application of *Strickland*.

Upon the trial court excusing prospective jurors Mallet, Freeman, and Braxton, trial counsel immediately raised a *Batson* challenge to the prosecution's use of preemptory strikes to excuse these three Black prospective jurors. (ECF No. 11-6, PageID 801). Trial counsel noted that the prosecution struck a single Black juror in the first round and that, with these three prospective jurors, this would make four prospective Black jurors struck by the State. (*Id.*) In response, the trial court asked the prosecution for race-neutral reasons for the three prospective jurors she wished to exclude in round two. (*Id.*) In response, the prosecutor stated:

> Mr. Freeman, Ms. (sic) Mallet and Mr. (sic) Braxton all gave hesitant, reluctant answers on the death penalty question. Mr. Mallet had bad bodily language from the minute he was called up into the jury box until the last minute when you excused him. He sat with his head down and looked mopey and upset to be here, and gave very bad vibes, and Mr. Freeman gave a very reluctant answer on the death penalty, as Ms. Braxton did.

(*Id.* at PageID 801-02.) Having sat observing voir dire, the trial court agreed with the prosecution that all three prospective jurors appeared "hesitant" despite answering that they could vote for the death penalty. (*Id.* at PageID 802.) Trial counsel pushed back on the trial court's reliance on body language; however, the trial court held that this was appropriate, noting that Mr. Mallet appeared "unhappy to be here." (*Id.* at PageID 802-03.)

The record readily refutes Pruitt's allegation that the prosecutor "fail[ed] to ask any follow-up questions of the black jurors she struck." (ECF No. 38, PageID 10888.) In questioning

prospective juror Freeman as to his ability to return a sentence of death if the State met its burden, his answer was initially equivocal. That exchange unfolded as follows:

> [PROSECUTOR]: Mr. Freeman, if the State of Tennessee proves to you that an aggravating circumstance exists beyond a reasonable doubt and that it outweighs and all mitigating circumstances beyond a reasonable doubt, could you sentence the Defendant to death and sign your name?
>
> PROSPECTIVE JUROR FREEMAN: Yes, I could follow the law, but I don't believe that is punishment. To punish him, I think life in prison would be more punishment, but I can follow the state law.
>
> [PROSECUTOR]: And that's really that brings up an interesting issue, that it is not about what you as an individual may feel on the topic. As Judge Craft was talking about earlier about people who come down here to hear drug cases who feel that marijuana should be legalized, that doesn't mean they can't follow the law. That may be their personal opinion when they leave here and when they're talking with friends and family and that kind of thing, but at the same time, when it comes down to it, they can follow the law of the State of Tennessee, and that's all we're asking of you, all of you today, that you can follow the law, even though you may not necessarily agree with it.
>
> PROSPECTIVE JUROR FREEMAN: Yes.

(*Id.* at PageID 694-95.) This exchange also refutes Pruitt's argument that "the record confirms that none of the four stricken jurors was equivocal[.]" (ECF No. 38, PageID 10887.) And although the record demonstrates that the prosecutor was mistaken when she indicated all three stricken juror used the word "reluctantly" in their answers on the death penalty, as the Supreme Court acknowledged in *Flowers*:

> [P]rosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination. But when considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling.

588 U.S. at 314.

Here, the record is clear that the prosecutor first identified that the three potential juror's answers as "hesitant" and "reluctant" before misspeaking that all three used the word "reluctantly".

There is no "series of factually inaccurate explanations" here that could lend any support to the claim that there is evidence of discrimination, certainly sufficient to show an unreasonable application of federal law.

Pruitt alleges that the appellate court "misunder[stood] the context of *Massaro*" and that its application created a "heightened burden of proof" to prove a *Batson* violation in the ineffective assistance of counsel context. (ECF No. 38, PageID 10898.) But *Massaro* did no such thing, and, most importantly, the appellate court's reference to *Massaro* did not place any additional or heightened burden on him. *Pruitt,* 2022 WL 143997, at *78.

This argument is the very kind of flyspecking of a state-court opinion in federal-court review that the Sixth Circuit has squarely rejected. *Rogers,* 69 F.4th at 391-92. It offers no insight into whether a state-court adjudication, viewed as a whole, actually represents "an extreme malfunction of the state criminal justice system." *Id.* The Tennessee Court of Criminal Appeals, in rejecting Pruitt's argument that he did not have to present any evidence to support this Sixth Amendment claim during the evidentiary hearing, simply commented that the Supreme Court has cautioned appellate courts against relying on cold trial court records because the evidence to prove an ineffective assistance of counsel claim may not be readily apparent, especially if the claim is one of omission. *Massaro,* 538 U.S. at 505. After applying the *Strickland* standard, the appellate court held that Pruitt "failed to present any evidence that if trial counsel were deficient, that alleged deficiency affected the outcome of the proceedings." *Pruitt,* 2022 WL 143997, at *78.

Simply stated, a fairminded jurist could conclude under this record that Pruitt proved neither deficient performance nor prejudice. Even if Pruitt had demonstrated deficient performance, that any deficiency did not result in prejudice because no *Batson* violation occurred and certainly there is no reasonable probability of a different trial result. More to the point, Pruitt

can show no unreasonable application of federal law. His vehement disagreement with the reasoned decision reached in state court is woefully insufficient to establish a rare unreasonable application of federal law.

***c. Unreasonable determination of the facts presented in state court.*** Relatedly, Pruitt argues that the state court opinion relied upon "two factual determinations that are unreasonable and rebutted by clear and convincing evidence to the contrary." (ECF No. 38, PageID 10900-01). Pruitt states the two unreasonable factual determinations are (1) the appellate court's finding that the trial court agreed that the three prospective jurors appeared to be hesitant despite answering affirmatively that they could vote for the death penalty and (2) the appellate court found that the trial court did not err in denying Pruitt's *Batson* challenge. (*Id.*)

The state court record does not "compel the conclusion" that the state courts must reached a different factual conclusion here. As discussed at length above, the record does not undermine the trial court's acknowledgment of the potential jurors' "hesitance." The record demonstrates the trial court's agreement with the prosecution that the potential jurors were hesitant. (ECF No. 11-6, PageID 801-02.) That exchange went as follows:

> [PROSECUTOR]: Mr. Freeman, Ms. (sic) Mallet and Mr. (sic) Braxton all gave hesitant, reluctant answers on the death penalty question. Mr. Mallet had bad bodily language from the minute he was called up into the jury box until the last minute when you excused him. He sat with his head down and looked mopey and upset to be here, and gave very bad vibes, and Mr. Freeman gave a very reluctant answer on the death penalty, as Ms. Braxton did.
>
> THE COURT: Well, the three of them all appeared, not equivocal, but hesitant. They said they could vote for death, but they were hesitant to do that. They weren't as vocal as the other jurors.

(*Id.*)

Isolating the trial court's comment does not "compel the conclusion" that a different factual finding must have been reached. As stated above, the state court's decision contains no legal error

and therefore no flawed factual finding. And contrary to Pruitt's argument, the record fully supports the appellate court's findings that the trial court correctly determined there was no *Batson* violation here. (ECF No. 38, PageID 10901.) At base, a state court's determination of how to weigh the evidence is an ordinary, run-of-the-mill credibility determination by a trier of fact that this Court may not now second-guess as an "unreasonable determination."

None of this shows an unreasonable determination of the facts under § 2254(d)(2) such that every reasonable jurist would be compelled to reach a different factual conclusion. At this late juncture, Pruitt cannot rebut the presumption of correctness afforded to those factual findings, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). The record does not "compel the conclusion" that state court was required to make contrary factual findings. *Rice*, 546 U.S. at 341-42. Pruitt can show no unreasonable determination of facts here.

***d. Ineffective assistance of appellate counsel.*** Finally, Pruitt alleges appellate counsel was deficient for failing to raise a stand-alone *Batson* claim on direct appeal, following the rejection of his *Batson* challenge during juror voir dire.[12] (ECF No. 38, PageID 10893-94.) In support of his argument, Pruitt states that he has "made [the] showing" that appellate counsel was "objectively unreasonable" for not raising this issue on direct appeal because, given the prosecutor's purportedly "discriminatory peremptory strikes," "there is a reasonable probability that [Pruitt] would have been granted a new trial." (*Id.* at PageID 10894.) The Tennessee Court of Criminal Appeals rejected Pruitt's same argument on post-conviction appellate review, as follows:

> Petitioner further claims that appellate counsel rendered ineffective assistance by failing to raise the *Batson* claims on direct appeal, asserting that there is a reasonable probability that this court would have vacated Petitioner's conviction and remanded the case for a new trial. However, Petitioner offered no proof

[12] Pruitt also raises this claim as part of Claim 16. (ECF No. 38, PageID 10949.)

> regarding appellate counsel's decisions with regard to which issues were addressed on appeal and further offered no proof that Petitioner suffered prejudice from appellate counsel's failure to raise the *Batson* issue on direct appeal. Accordingly, we conclude that the record supports the post-conviction court's finding that Petitioner failed to establish deficiency or prejudice as a result of appellate counsel's failure to raise the *Batson* issues on appeal. Petitioner is not entitled to relief on this issue.

*Pruitt,* 2022 WL 143997, at *79.

For the same reasons stated above, the record fully supports the court's finding that Pruitt failed to demonstrate appellate counsel's deficiency or prejudice. It is clear from a review of the state court record that no proof was developed at the post-conviction evidentiary hearing as to why appellate counsel elected not to raise this issue on direct appeal. And finding deficiency under this record is would be unfounded. The prosecutor's single misstatement does not demonstrate discriminatory intent. While stating that the potential jurors had used the word "reluctantly" was indeed incorrect, it was not the primary basis for the prosecution's reasoning in striking the jurors. As mentioned above, citing demeanor and body language, the prosecutor explained that the potential jurors appeared hesitant to impose the death penalty. And the trial court—who was in the best position to evaluate the prospective jurors demeanor—already agreed that the prospective jurors in question gave signs of reluctance—or at least hesitation—to impose the death penalty despite responding in the affirmative about their ability to do so.

Any alleged deficiency aside, if a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue when assessing prejudice. *See, e.g., Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). As fully developed above, the record does not support a finding of prejudice caused by appellate counsel's omission of this issue on direct appeal. Given the deference afforded to counsel and the underdeveloped record, a fairminded jurist could conclude under this record, as

the state appellate court did, that Pruitt failed to show any ineffectiveness on the part of appellate counsel. Pruitt cannot show a rare instance of unreasonable application of federal law here.

**5. The state court did not unreasonably apply federal law when it concluded that trial counsel was not deficient in failing to respond to alleged improper arguments by the prosecution.**

As part of Claim 7, Pruitt argues that trial counsel was ineffective for failing to object to the prosecution's "misstatements about mitigation and the dehumanizing and inflammatory characterizations" of Pruitt as "a hunter seeking prey." (ECF No. 38, PageID 10913-16.) He also incorporates the remainder of Claim 7, to be reviewed through the lens of ineffective assistance of counsel. (*Id*. at 10902.) Although trial counsel testified at the post-conviction evidentiary hearing that he objected to the prosecution's statements "a bunch," Pruitt argues that "a bunch was not enough[]" because "failure to object falls outside the bounds of reasonable professional judgment and prejudiced Mr. Pruitt." (*Id.* at PageID 10913.) Pruitt states that, had trial counsel objected to the prosecution's "varied and repeated misconduct[,]" "there is a reasonable likelihood that Mr. Pruitt would not have been convicted of first-degree murder and that at least one juror would have voted to spare his life." (*Id.* at PageID 10914.) Pruitt also argues that the Tennessee Court of Criminal Appeals' decision on this point was an unreasonable application of federal law. (*Id.* at PageID 10914-15.)

AEDPA deference readily applies here. First, contrary to Pruitt's argument that the appellate court misapplied *Caldwell v. Mississippi,* 472 U.S. 320, 340 (1985), the appellate court did not apply *Caldwell* in its assessment of Pruitt's ineffectiveness claim relating to the prosecutor's statements regarding mitigation evidence. The portion of the appellate court's opinion Pruitt cites does not reflect any application—let alone an unreasonable one—of *Caldwell.* (ECF No. 38, PageID 10914.) And the state court's adjudication is not an unreasonable application of the legal principle in *Caldwell*, a case that did not involve a claim of ineffective assistance of

counsel akin to the one raised here. Whether a prosecutor's statements in some way rendered a death sentence unconstitutional is a distinct inquiry from whether trial counsel acted so unreasonably by not objecting to certain prosecutor statements that counsel was no longer operating as counsel for the defendant. Regardless, that *Caldwell* may disallow affirmance of a death sentence due to prosecutorial arguments in a particular case under a given set of facts does not necessarily mean that the state court under these facts must have concluded that trial counsel was ineffective—especially when trial counsel explained that the election to lodge no objection was tactical. *Pruitt*, 2022 WL 1439977, at *80-*81.

Second, the appellate court did not unreasonably apply *Strickland* here. (*Id.* at PageID 10915-16.) The appellate court's comment that the court "do[es] not second-guess tactical decisions" is not an unreasonable application for federal law. It is not a blanket refusal that would ignore any conditionality that could be read from *Strickland*. Moreover, Pruitt's continued misrepresentation that trial counsel completely failed to object is unsupported, and his secondary argument as to why the appellate court unreasonably applied *Strickland* is, thus, unsupported by the record. In short, Pruitt cannot show that the state court's *Strickland's* ruling here was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter,* 562 U.S. at 103. AEDPA deference applies on this Court's review of the state court's rejection of his various ineffectiveness allegations concerning perceived misconduct by the prosecutor.

***a. Failure to object to misstatements about mitigation.*** On post-conviction review, Pruitt argued, in relevant part, that trial counsel failed to object when the prosecutor improperly defined and denigrated mitigating evidence during voir dire and in closing argument. *Pruitt,* 2022 WL 1439977, at *80, *87. Although these related claims were raised separately in state court,

Pruitt incorporates them into the same sub-claim here. (ECF No. 38, PageID 10905-08.) Based on the state court's reasoned decision, Pruitt cannot otherwise establish an unreasonable application of federal law here. He is not entitled to relief.

As noted above, the Tennessee Court of Criminal Appeals correctly identified the "clearly established Federal law," as announced by the Supreme Court, setting the framework for evaluating ineffective assistance of counsel claims. *Pruitt,* 2022 WL 1439977, at *58-*59. As the appellate court explained, the proof presented at the evidentiary hearing—or lack thereof—demonstrated neither deficient performance nor prejudice. As it relates to Pruitt's argument that trial counsel failed to object to the prosecutor's "misleading statements" during voir dire, the court rejected it as follows:

> Like the previously discussed issues, this claim suffers for a lack of proof since Petitioner failed to ask trial counsel any questions regarding this issue. Moreover, Petitioner has not established that any proposed objections would have been sustained. [. . .] Additionally, while the post-conviction court agreed that the prosecutor's characterization of mitigation evidence as "something that makes it not so bad" was an inaccurate statement of the law, the court noted that it was used only once during voir dire and found, as discussed above in the context of the prosecutor's closing argument, that it did not prejudice Petitioner because the proper definition was given in the trial court's instructions. *See Reid*, 164 S.W.3d at 346 ("The jury is presumed to follow instructions."). Petitioner also complains that the prosecutor improperly denigrated the role of mitigation by telling the jurors "we don't judge people, we don't act as jurors, we don't assess your credibility based upon . . . how sorry we might feel for you because of what you might have been through[.]" However, as found by the post-conviction court, this statement was taken out of context and is actually part of a larger statement where the prosecutor was telling the jurors that "[t]here is no room for sympathy nor prejudice in this courtroom," which is consistent with the law. *See Smith*, 893 S.W.2d at 921.

*Id.* at *87. As it relates to Pruitt's argument that the trial court failed to object to the prosecutor's statements during closing arguments, the court rejected it as follows:

> Petitioner also claims that trial counsel were deficient for failing to object to the prosecutor's arguments during the sentencing phase of the trial. The Petitioner asserts that the prosecutor mischaracterized mitigating evidence as "things that make it not so bad," [ . . .]. The post-conviction court found that the State's sentencing phase arguments were not so inflammatory as to require the Court to set

> aside Petitioner's death sentence. [ ] Further, the trial court properly instructed the jury regarding its consideration of mitigating evidence, and the jury is presumed to follow the instructions of the court. *See State v. Reid*, 164 S.W.3d 286, 346 (Tenn. 2005).

*Id.* at *80.

The record fully supports the Tennessee Court of Criminal Appeals' rejection of Pruitt's consolidated claim regarding trial counsel's objections to the prosecutor's statements as to mitigation evidence. The proof developed on this point during the post-conviction evidentiary hearing is minimal at best. At that hearing, post-conviction trial counsel asked trial counsel about the definition of mitigation that he used during his opening statement. (ECF No. 12-39, PageID 5879.) Trial counsel stated that, "Mitigation is anything to choose life over death[,]" and counsel agreed that the explanation given at trial was that mitigation is anything "that a jury may have to extend mercy[.]" (*Id.*) Trial counsel stated that he did not make a "conscious strategic decision" not to object to "the State's use of that definition of mitigation in voir dire[.]" (*Id.*)

Even though trial counsel did not object to the substantial similar definition of mitigation used by the prosecution during voir dire, this does not automatically constitute deficient performance. In the limited line of questioning, it was demonstrated that trial counsel and the prosecution presented a similar definition of mitigation during voir dire. Trial counsel stated that mitigation is anything that would allow a jury to extend mercy to the defendant. Similarly, the prosecution described mitigation is a something that makes the offense "not so bad." (ECF NO. 11-5, PageID 656.) There is certainly a reasonable argument that counsel satisfied *Strickland's* deferential standard. *Richter,* 562 U.S. at 105. A fairminded jurist presented with the same lacking factual record could resolve this question just at the appellate court did here.

Furthermore, even if there was a genuine question as to trial counsel's deficiency, the record unquestionably supports that there is no prejudice here. The prosecution referred to

mitigating evidence as something that makes a situation "not so bad" only once, during a lengthy voir dire. (ECF No. 11-5, PageID 656.) More importantly, in full context, it is clear that the prosecutor's intent was not to "denigrate" mitigating evidence. At the start of the explanation, the prosecutor states: "Okay, I've just thrown a lot of information at you. Let me break it down a little bit and talk about some of these words." (*Id.* at PageID 655). It is clear from the prosecutor's stated intent that she was attempting to break down what can be a complex or confusing legal principle for prospective jurors into understandable, digestible pieces of information. Additionally, trial counsel used nearly the same language to describe the difference between aggravating circumstances and mitigation. Trial counsel summarily defined the two as: "Aggravating things, things that make it worse, and mitigation, things that make it less bad." (*Id.* at PageID 792.) The record does not support a finding that, had counsel objected, that that objection would have been sustained given his use of nearly the same language. Certainly, there is no reasonable probability of a different result at trial.

Moreover, putting the second statement at issue into proper context, it is clear that the prosecution was not denigrating the role of mitigation as he suggests. The prosecutor's statement in full is as follows:

> [PROSECUTOR]: All right. There are two things that this courtroom has no room for, nor any other courtroom in the State of Tennessee. One is sympathy, and the other is prejudice. They have no place in the criminal justice system. It is why when you see statues of Lady Liberty, she's blindfolded, because we don't judge people, we don't act as jurors, we don't assess your credibility based upon your personality or the way you look, all right, or how sorry we might feel for you because of what you might have been through, or maybe, because of what you've been through, we just don't really like you. That's not what this is about. There is no room for sympathy nor prejudice in this courtroom. Can all of you promise to leave those outside?

(ECF No. 11-6, PageID 726-27.)

Pruitt did not avail himself of the opportunity to develop proof to support his claim when it was available to him on post-conviction review; therefore, the state court opinion that he failed to demonstrate any deficient performance is not an unreasonable application of federal law. A fairminded jurist could conclude, evaluating the statement in its full and proper context, that the prosecutor was not belittling the role of mitigation. Instead, she was telling the prospective jurors that the job of a juror is to evaluate the evidence objectively and not to judge based on personal biases or prejudices. And Pruitt developed no proof that, even if counsel would have objected under some legal basis to either of these cherrypicked statements, such objection would have been sustained and the trial result would have differed.

For much of the same reasons, the state court decision that trial counsel was not ineffective for failing to object to prosecution statements regarding mitigation during closing arguments was not an unreasonable application of federal law. *Pruitt,* 2022 WL 1439977, at *80. Again, Pruitt's argument as to the prosecution's statement to the jury during closing argument at the conclusion of the penalty phase, when placed in their proper context, is not condescending or otherwise inflammatory. Concluding her argument as to why the State sufficiently proved at least one statutory aggravating circumstance, the prosecution moved on to arguing against mitigation. (ECF No. 11-17, PageID 2270.) The prosecutor's full argument, of which Pruitt only selects a small part of, was as follows:

> We must prove to you that they outweigh the mitigating factors beyond a reasonable doubt.
>
> Mitigating factors are different. They are not created by statute. They're pretty much whatever you can think of, and the very last one is, "And anything else you can think of that you might think would be mitigating."
>
> Well, first of all, ladies and gentlemen, I would suggest to you that you have to find that these things exist. Do you believe that what they've listed is true? And do you believe they are mitigating circumstances?

> Aggravating circumstances are things that make what happened much worse, make what the Defendant did to Mr. Guidroz so much worse. That he attacked a seventy-nine-year-old man, that he did it knowingly while committing a robbery, and that he had five prior convictions of violence.
>
> Mitigating things are things that make it not so bad. They mitigate against it. Yes, he killed seventy-nine-year-old Mr. Guidroz, but it's not so bad, it's not so serious because –
>
> I would suggest to you, ladies and gentleman, that none of the things that they've listed make it not so bad.

(*Id.* at PageID 2270-72.) The prosecution then went on to argue why Pruitt's mitigation evidence was insufficient to outweigh the aggravating circumstances. (*Id.* at PageID 2273-75.)

Although trial counsel was asked questions about various parts of the prosecution's closing during the guilt phase and penalty phase, none of those questions concerned her argument against the sufficiency of Pruitt's presented mitigation evidence. Under § 2254(d), "the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter,* 562 U.S. at 105. Here, Pruitt has not and cannot provide evidence to the contrary that there is not a reasonable argument that counsel's performance satisfies this deferential standard.

***b. Failure to object to derogatory statements***. Pruitt alleges that trial counsel was ineffective for failing to object to the prosecutions "dehumanizing and inflammatory characterizations of their client as a hunter seeking prey." (ECF No. 38, PageID 10913.) In support of this claim, Pruitt challenges as deficient trial counsel's response that he knew "unduly prejudicial statements" were made during closing arguments and that he had already objected "a bunch" to the prosecution's closing argument. (*Id.* at PageID 10913.)

A fairminded jurist could resolve this claim under the same record just as the Tennessee Court of Criminal Appeals did. In rejecting this claim, the appellate court stated as follows:

> Petitioner also argues that trial counsel were deficient in responding to alleged prosecutorial misconduct during the prosecution's closing arguments at both the

guilt and sentencing phases of the trial. The argument of an advocate must be temperate, predicated upon evidence introduced during the trial, and pertinent to the issues that must be resolved by the jurors. *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Id.* (citing *U.S. v. Young*, 470 U.S. 1, 11-13 (1985)). Indeed, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.*; *see also Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). The reviewing court should consider the following factors:

> (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

At the post-conviction hearing, co-counsel testified that he objected to some of the State's closing arguments but not to others, including the use of the term "hunter," because he had "objected a bunch" already and did not want the jury to hold other objections against him. He also stated that he did not want to risk interrupting the State's argument when it was close to being finished, which could cause the prosecutor to "restart and get her going again." The post-conviction court found trial counsel's strategy to be reasonable, and the evidence does not preponderate against the post-conviction court's findings.

Petitioner also claims that trial counsel were deficient for failing to object to the prosecutor's arguments during the sentencing phase of the trial. The Petitioner asserts that the prosecutor [ . . .] referred to Petitioner as the "hunter" becoming the "hunted," and referenced facts not in evidence. The post-conviction court found that the State's sentencing phase arguments were not so inflammatory as to require the Court to set aside Petitioner's death sentence. The record reflects that trial counsel did object during the State's arguments during the sentencing phase, including an objection to references to facts not in evidence. Further, the trial court properly instructed the jury regarding its consideration of mitigating evidence, and the jury is presumed to follow the instructions of the court. *See State v. Reid*, 164 S.W.3d 286, 346 (Tenn. 2005).

> Trial counsel did not object to the State's references to Petitioner as a "hunter" who became "hunted." As set forth above, co-counsel testified that he did not object for tactical reasons, and we do not second-guess tactical decisions. *See Henry Floyd Sanders v. State*, No. M2019-00397-CCA-R3-PC, 2020 WL 2394992, at *11 (Tenn. Crim. App., at Nashville, May 12, 2020). We note that it is improper for a prosecutor to characterize a defendant as an animal or a beast. *Darden v. Wainwright*, 477 U.S. 168, 180 (1986); *see also State v Thomas*, 158 S.W.3d 361, 413-14 (Tenn. 2005) (holding prosecutor repeatedly referring two co-defendants as "greed and evil" was improper); *State v. Bates*, 804 S.W.2d 868, 881 (Tenn. 1991) (holding prosecutor's reference to defendant as a "rabid dog" was "patently improper"); *State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *129 (Tenn. Crim. App., at Knoxville, June 28, 2002) (holding prosecutor's reference to defendant as a "human predator" was "derogatory and improper"); *State v. Tyson*, 603 S.W.2d 748, 754 (Tenn. Crim. App. 1980) (holding prosecutor's referring to defendant as a "rat" was improper). However, Petitioner has cited no authority to support his argument that "hunter" has the same animalistic connotation as "predator." The prosecutor used the word "predator" one time in closing argument in reference to the jury as the "ultimate of predators," not in reference to Petitioner.

*Pruitt,* 2022 WL 1439977, at *79-*80.

The record does not belie the state court's decision here. At the post-conviction evidentiary hearing, trial counsel identified the word "predator" circled at the top of notes, he did this because he believed it was "an improper argument, improper way of describing" Pruitt. (ECF No. 12-39, PageID 5885.) Trial counsel also notated the phrase "the ultimate of predators" in his notes for the same reasons. (*Id.*) But when asked why he did not object, trial counsel explained that he "probably" made a conscious decision not to object because he had "objected a bunch" and because he believed that "at a certain point the jury holds it against you when you interfere. (*Id*. at PageID 5886.) As he explained, the prosecutor "was about to close, be done anyway so I didn't want to stop her and have her restart and get her going again." (*Id.*) Knowing that this specific prosecutor allegedly "had a history of making inflammatory improper and prejudicial closing arguments," trial counsel testified that the prosecutor was "really good at what she did," and counsel "just had to be on [their] toes to catch her where [they] could." (*Id.*)

*Strickland* reminds reviewing courts that it is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." 466 U.S. at 689. While Pruitt argues that trial counsel's decision not to object for his stated reason deviates from prevailing professional norms, deviation is not the question. *Id.* The state court's decision here accepting this tactical decision reflects a reasonable application of federal law, as there is no evidence in the record to compel every fairminded jurist to conclude that counsel's representation amounted to incompetence under "prevailing professional norms." *Id.* at 690. Pruitt is not entitled to relief.

***c. Personal outrage.*** To the extent that trial counsel also claims that trial counsel was ineffective for failing to challenge an alleged "personal, emotional reaction" statement in rebuttal to trial counsel's closing argument, (ECF No. 38, PageID 10911-12), at this juncture, this claim is procedurally defaulted and barred from review.

On post-conviction review, Pruitt argued a corresponding, albeit conflicting claim, of ineffective assistance of counsel, which is discussed later in this answer. But as it relates to this claim, state court remedies are no longer available on this claim due to the statute of limitations and the one petition rule for a post-conviction petition under § 40-30-102. Although he does not argue for such, Pruitt is not entitled to further consideration of this claim under *Martinez,* discussed more fully *infra L.1.,* because under the state-court record, he cannot establish cause to overcome the default. As discussed in Pruitt's corresponding claim, *supra K.7*, at the very least this claim is not a substantial claim. Further, any absence or omission of proof from the state-court record is explained by, and due to, negligence of Pruitt and/or post-conviction counsel in not developing explicit proof on this point when the opportunity was available to him in his post-conviction evidentiary hearing conducted under, § 40-30-110. As more fully explained previously, *supra V.C.,* Pruitt may not seek further evidentiary development at this juncture unless he satisfies the

narrow circumstances of § 2254(e)(2). Applying the statute, no new constitutional law is implicated here, and the factual predicate of the claim could have been previously discovered through the exercise of due diligence, especially considering Pruitt complains of conduct that occurred at trial. Pruitt is not entitled to review and relief on this claim.

***d.*** ***Related appellate counsel claims***. Separately, in Claim 16, Pruitt raises associated ineffective assistance of appellate counsel claims. (ECF No. 38, PageID 10949.) Pruitt argues that, for the same reasons trial counsel was deficient for failing to object to the instances of prosecutorial misconduct discussed above, appellate counsel was deficient for failing to raise these allegedly meritorious claims for relief on direct appeal. (*Id.* at PageID 10950.) Pruitt argues that the Tennessee Court of Criminal Appeals' rejection of these same claims on post-conviction review was an unreasonable application of federal law because "[t]here is no requirement that appellate counsel testify about the decision to raise an issue[]" and application of such standard is "contrary to Supreme Court precedent[.]" (*Id.* at PageID 10951-52.)

The state court's decision is not contrary to, or an unreasonable application of, *Strickland.* To the extent that he argues for the removal of deference due to how the state court enunciated its standard for reviewing factual and legal claims, the Sixth Circuit has aptly noted that how Tennessee applies state post-conviction law is not an unreasonable application of federal law. *Johnson v. Genovese,* 924 F.3d 929, 935-36 (6th Cir. 2019). There, the court aptly recognized that Tennessee's clear and convincing evidence standard applies only to a post-conviction petitioner's burden of proving factual allegations at a post-conviction hearing. And saying so is not an unreasonable application of federal law because the clear and convincing evidence standard applies only to factual allegations, not legal determinations under *Strickland*. Here, AEDPA deference is in no way disturbed by the state court's application of state post-conviction law. More

to the point, the state court did not unreasonably apply federal law by making the unsurprising observation that a litigant must provide factual support in order to prove a legal claim. (ECF No. 38, PageID 10951-52.)

For much the same reasons that a fairminded jurist could conclude, as the state court did, that Pruitt's related ineffective assistance of trial counsel claims were meritless, so too could a fairminded jurist conclude that the record does not ineffective assistance by appellate counsel. The state appellate court rejected the claim as follows:

> Petitioner also claims that appellate counsel failed to raise any preserved or unpreserved claims of prosecutorial misconduct on direct appeal, despite trial counsel raising seven separate instances of misconduct in the motion for new trial. Again, Petitioner failed to present any evidence during the post-conviction hearing regarding appellate counsel's strategy in handling the appeal. Appellate counsel did not testify, and Petitioner presented no evidence to overcome the presumption that appellate counsel made a reasonable strategic decision as to which issues to raise on appeal. *See Carpenter*, 126 S.W.3d at 887-88. Additionally, because Petitioner has not established any prejudice resulting from these statements by the prosecutor, he has not established that he would have been entitled to plain error relief had the issue been raised on direct appeal. *See Jerry Phillips v. State*, No. E2016-01083-CCA-R3-PC, 2017 WL 3475529, at *8 (Tenn. Crim. App., at Knoxville, Aug. 14, 2017).

*Pruitt,* 2022 WL 1439977, at *81.

A reviewing court, when applying *Strickland,* must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. 466 U.S. at 688. Pruitt, having presented no evidence to prove his factual allegations, failed to rebut the "strong presumption" provided to counsel. And under the developed state court record, there is no evidence that these claims would have been meritorious on direct appeal had appellate counsel raised them. It was not an unreasonable application of federal law to conclude that appellate counsel was not ineffective by omitting futile claims in the direct appeal. And certainly a decision on an ineffectiveness claim grounded in *Strickland* does not contravene clearly established federal law. Pruitt is not entitled to relief here.

**6. The state court did not unreasonably apply federal law when it concluded that trial counsel was not ineffective by failing to "life qualify" prospective jurors.**

In Claim 8, Pruitt argues that trial counsel was ineffective for "fail[ing] to ensure that his jurors would consider imposing a sentence less than death for an aggravated murder." (ECF No. 38, PageID 10916-19.) In support of his claim, he argues that trial counsel's conduct fell below ABA Guidelines and that he did not ask eight of the twelve jurors "whether they would automatically impose a death sentence upon finding an aggravated circumstance, and did not ask the jurors whether they would properly consider mitigating evidence." (*Id.* at PageID 10917-18) Pruitt argues that § 2254(d) does not bar relief because the state court decision involved an "unreasonable interpretation" of clearly established federal law and involved an objectively unreasonable determination of the facts. (*Id.* at PageID 10918-19.)

Both § 2254(d)(1) and 2254(d)(2) bars relief here. First, § 2254(d)(1) does not contain the language "unreasonable interpretation." To the extent that Pruitt uses alternative language to argue the state court's decision contravened or unreasonably applied federal law, Pruitt's argument conflates two Supreme Court holdings. In *Morgan v. Illinois*, the Court held that the trial court must allow defense counsel to ask jurors whether they believe the death penalty should be imposed "*ipso facto* upon conviction on a capital case." 504 U.S. 719, 735 (1992). Importantly, this does not require counsel to do so. *See Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001) ("*Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case."). To the contrary, "*Morgan* suggests that there are instances where defense counsel might choose not to ask life-qualifying questions as a matter of strategy." *Id.* And while the Supreme Court in *Wiggins v. Smith* stated that ABA guidelines are "guides to determining what is reasonable[,]" the ABA Guidelines are just that—a guide. 539 U.S. 510, 524 (2003). Neither Supreme Court opinion *requires* counsel to ask life-qualifying questions simply because the ABA Guidelines speak to

doing so. And the Court has never abdicated to the ABA responsibility for defining what the Sixth Amendment requires of defense counsel in a criminal case. "[T]he state court did not arrive at a conclusion opposite to that reached by [the Supreme Court] on a question of law nor did the state court decide this case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413.

Pruitt's argument that § 2254(d)(2) removes AEDPA deference is unavailing and flyspecks the state appellate court's reasoning. (ECF No0. 38, PageID 10918.) Pruitt's grievance is not well taken because it is by his own doing that the state court record has limited proof on this issue. The state court resolved this claim on the available facts before it in the record. At this late juncture, Pruitt cannot rebut the presumption of correctness afforded to the factual findings made based upon the limited record, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). And there is no contrary evidence. Pruitt's nitpicking that the state court referenced trial counsel asking "questions" when trial counsel asked one "question" is far-reaching.

Applying AEDPA deference, a fairminded jurist could resolve this claim in the same manner as the state court did based upon the same record. On post-conviction review, the Tennessee Court of Criminal Appeals rejected Pruitt's "conclusory assertion" that trial counsel was ineffective because he failed to "life qualify" jurors because Pruitt failed to develop any proof at the evidentiary hearing to support his claim. The court explained, in relevant part:

> Petitioner argues that trial counsel rendered ineffective assistance during jury selection. "The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial." *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (quoting *State v. Hugueley*, 185 S.W.3d 356, app. 390 (Tenn. 2006)). "By posing appropriate questions to prospective jurors, a defense lawyer is able to exercise challenges in a manner that ensures the jury passes constitutional muster." *William Glenn Rogers v. State*, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *36 (Tenn. Crim. App., at Nashville, Aug. 30, 2012) (citing *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973)). However, "there is no requirement that counsel ask any specific questions of potential jurors during the voir dire process[.]" *Smith*,

> 357 S.W.3d at 347. As this court has previously recognized, trial counsel's "actions during voir dire are considered to be matters of trial strategy," which is generally entitled to deference "unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *William Glenn Rogers*, 2012 WL 3776675, at *36 (quoting *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)). Even if a petitioner were to establish that counsel's performance during voir dire was objectively unreasonable, he would not be entitled to post-conviction relief unless he establishes that the resulting jury was not impartial. *Smith*, 357 S.W.3d at 348.
>
> As an initial matter, we agree with the post-conviction court's assessment that Petitioner's "ability to show prejudice is limited" because he failed to present the testimony of any members of the jury pool or any other evidence that the jury that ultimately rendered a verdict in this case was not impartial. Petitioner presented no proof that any of the jurors were actually biased, nor alleged any of the limited circumstances in which bias may be presumed. *See id*. (holding that the court had "never presumed bias absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias, and we decline to do so now"). This failure to establish prejudice alone would be a sufficient basis on which to deny this claim for relief. *See Henley*, 960 S.W.2d at 580.
>
> . . .
>
> Petitioner makes a conclusory assertion that trial counsel were ineffective because they failed to "life qualify" jurors [ ]. As the Sixth Circuit has recognized, "*Morgan [v. Illinois*, 504 U.S. 719 (1992)] does not mandate that life-qualifying questions be asked of potential jurors in every case" and suggests that the decision to ask such questions is "a matter of strategy"; thus, "failure to life-qualify a jury is not per se ineffective assistance of counsel." *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001); *see also Tyrone Chalmers v. State*, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *27 (Tenn. Crim. App., at Jackson, June 25, 2008) (citing *Hartman v. State*, 896 S.W.2d 94, 105 (Tenn. 1995)). In fact, trial counsel did ask questions regarding the potential jurors' ability to consider a life sentence and to weigh mitigating evidence. Petitioner failed to present any proof at the post-conviction hearing to overcome the presumption that trial counsel's failure to ask additional questions was a strategic decision or to show that such failure resulted in prejudice.

*Pruitt,* 2022 WL 143997, at *85-*86, *87.

The state court record confirms that it is silent as to counsel's rationale for his performance. For whatever reason, Pruitt elected not to question trial counsel about this issue during the post-conviction hearing, thus failing to demonstrate that counsel's election or unintentional omission amounted to incompetence under prevailing professional norms. *Strickland,* 466 U.S. at 690. A

conclusory allegation with no record development is woefully insufficient to establish that trial counsel's performance was deficient, much less to show an unreasonable application of *Strickland* in a state court's rejection of the claim based on the deficient record.

Setting aside the failure to develop further evidence on post-conviction review, the record before the state court fully supports the Tennessee Court of Criminal Appeals' analysis and undermines Pruitt's weak invocation of an unreasonable determination of the facts. The trial record reveals that trial counsel engaged potential jurors more than Pruitt admits. Trial counsel first engaged all jurors by setting the stage for his first question:

> MR. NANCE: We've also talked about the death penalty in this case, but I want you to understand that this is not a case necessarily where everybody agrees that the death penalty is the appropriate sentence. Does anybody on this panel right now feel that a life sentence or a sentence of life without parole is not a severe enough sentence for someone who is convicted of first-degree murder? Do any of you feel that way?
>
> PROSPECTIVE JURORS: (Varying responses.)
>
> MR. NANCE: Some people may, and that's a valid feeling, but it's not necessarily one that belongs here. Anybody want to talk about that?

(ECF No. 11-6, PageID 789-90.) Trial counsel then went on to have one-on-one exchanges with two potential jurors who did want to voice their opinions on this topic. (*Id.* at PageID 790-91.) Trial counsel concluded this exchange by reminding the potential jurors that the judge will charge them that there may or may not be aggravating circumstances and mitigating circumstances, both of which are issues for the jury to weigh. (*Id.* at PageID 792-93.) Finally, trial counsel asked a "life-qualifying" question by asking the potential jurors collectively if they were "up to it," meaning that they "can decide whether something is aggravating or mitigating and weigh it against the other things[.]" (*Id.* at PageID 793.)

Thus, the available state court record supports the appellate court's decision and does not compel a different conclusion. (ECF No. 38, PageID 10949.) Pruitt cannot show neither an

unreasonable application of federal law nor that an unreasonable determination of the facts in light of the evidence presented below. AEDPA deference applies, and Pruitt cannot overcome it. The Court should deny the claim.

**7. The state court did not unreasonably apply federal law when it concluded that trial counsel was not ineffective during his guilt-phase closing arguments.**

In Claim 10, Pruitt alleges that trial counsel was ineffective during closing arguments in the guilt phase of trial by "callously argu[ing] that the victim had no one who cared about him." (ECF No. 38, PageID 10923.) In support of this claim, Pruitt argues that, by "denigrat[ing] his memory and those who cared for him[,]" trial counsel "opened the door to powerful rebuttal argument from" the prosecutor. (*Id.* at PageID 10924.) Pruitt states that, as a result, trial counsel's "comments undermined the potential to persuade the jury in Mr. Pruitt's favor" and "opened the door" for the prosecution to take his "inflammatory and inappropriate comments and turn them into a major theme of her summation, increasing the prejudicial impact." (*Id.* at PageID 10925.) Pruitt argues that § 2254(d)(1) does not bar relief because the state court unreasonably applied *Strickland* when it "failed to take into account the prejudicial impact of [the prosecutor's] arguments in response[.]" (*Id.* at PageID 10926.)

As previously established, the Tennessee Court of Criminal Appeals correctly identified the "clearly established Federal law" here, *Strickland*. The court's application of this "clearly established Federal law" was not unreasonable, as the state court's ruling properly applied "that principle to the facts of the [petitioner's] case." *Pinholster,* 563 U.S. at 182. As the state court explained:

> Petitioner argues that trial counsel rendered deficient performance by referring to the victim's lack of family during the guilt phase closing argument, which prejudiced Petitioner because "the State focused on this commentary in rebuttal closing at both the guilt/innocence and sentencing trials, to [Petitioner's] detriment." During closing argument of the guilt phase, while summarizing the testimony, lead counsel stated, "The first witness, Mr. Leech, testified Mr. Guidroz

was a devout Catholic, and he principally went to St. Paul's Church, had no family here, plenty of friends." Later in his argument, lead counsel stated:

> What went on out there at [the victim's] car? Was he beaten and body-slammed or just pushed and his keys taken away from him? What really happened to Lawrence Guidroz in this case? *No family here. Did nobody care about Mr. Guidroz?*

(Emphasis added). The State responded directly to this statement multiple times during its rebuttal closing argument in both the guilt and sentencing phases. The prosecutor stated, "[lead counsel] told you all that nobody cared about Lawrence Guidroz. As a citizen of this community, I take offense to that. As a representative of the State of Tennessee, I take deeper offense to that." The prosecutor further argued that Petitioner did not "get a half-off coupon . . . because you happened to kill a nice old man that never married and had kids." Later in her argument, the prosecutor stated, "You heard that from T.J. Leech, who was like a son to Mr. Guidroz, the same Mr. Guidroz that [lead counsel] wants you to think nobody cared about. You've seen them there all week, the rows full of people." Then, during rebuttal closing argument for the sentencing phase, the prosecutor responded to lead counsel's argument about closure by stating, "How ironic today -- this is from the same individual who said yesterday nobody cared about Mr. Guidroz. Now, all of a sudden, let's worry about Mr. Guidroz's loved ones."

As explained by the United States Supreme Court, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003); *see also Torrez Talley v. State*, No. W2009-02036-CCA-R3-PC, 2011 WL 1770485, at *4 (Tenn. Crim. App., at Jackson, May 9, 2011). Although lead counsel was asked if he recalled making the statement that "nobody care[d]" for the victim, he was not asked about his reasoning for making such a statement. However, when lead counsel's statement is read in its full context, it is clear that lead counsel was not trying to disparage the victim but was trying to emphasize the lack of investigation in this case. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *See Goad*, 938 S.W.2d at 369.

However, even if we were to agree with the post-conviction court that "making that statement may be said to be deficient performance" because it "opened the door to damaging rebuttal argument by the State," Petitioner has failed to establish prejudice. The brief statement by lead counsel, and even the responses by the State that drew several objections, cannot be said to have affected Petitioner's convictions given the strength of the State's case with regard to the elements of felony murder, including Petitioner's testimony admitting that he intended to steal the car. Further, the post-conviction court found that "the comment had no effect on the sentencing decision of the jury, due to the strength of the State's case and

> the rest of the proof and argument in the trial." The evidence presented during the post-conviction hearing does not preponderate against this finding, and Petitioner has not established that there is a reasonable probability that the outcome of his trial would have been different but for this statement by lead counsel. Accordingly, Petitioner is not entitled to post-conviction relief on this claim.

*Pruitt,* 2022 WL 1439977, at *93.

As the court aptly noted, when trial counsel's statement is put into its full context, it appears that the statement was not one intended to disparage the victim. Of course, that is not entirely clear because Pruitt did not inquire of trial counsel at the post-conviction evidentiary hearing about the reason for this statement. Still, there can be no real dispute under the record that trial counsel was attacking the investigation at this point in his closing. This is confirmed by referencing the paragraphs immediately preceding and following the statement that Pruitt now isolates.

In his closing argument, trial counsel discussed memorialization and argued why it is important:

> But what is the purpose of memorialization? Why do all those things in the first place? We don't do those things in our ordinary life. We don't put everything down, take pictures of everything or preserve things, necessarily. Why was it important here? Well, the basis of science is being able to duplicate the results that you find. It's being able to take that doctor's report and the things that they should have preserved correctly and make a decision, whether it's the same opinion that the original doctor made or not. It goes to the validity of the process itself.

(ECF No. 11-15, PageID 1963.) Trial counsel then references trial testimony as an example to support his argument. (*Id.*) Continuing to highlight his argument that memorialization is important and that it was not adequately done in the investigation of this case, trial counsel argued:

> What went on during that less than one minute? And I assume it took five or ten seconds for Mr. Guidroz to walk to his car. What went on out there at his car? Was he beaten and body-slammed or just pushed and his keys taken away from him? What really happened to Lawrence Guidroz in this case?
>
> No family here. Did nobody care about Mr. Guidroz?
>
> You look at it. The crime scene investigation where this was supposed to have occurred, happened, nothing done. The autopsy that was supposed to have

> preserved the evidence so that you would know what did or did not happen, it's not preserved. Mr. Guidroz deserved better, and Corinio deserved better.

(*Id.* at PageID 1963-64.)

When counsel's argument is appropriately placed in its full context, it is evident that counsel was not questioning why the victim had no family present at trial. Instead, trial counsel was questioning why law enforcement did not conduct a thorough investigation into the victim's murder—a very common argument made by defense counsel in all criminal cases. This was a strategy on the part of trial counsel and one that falls within prevailing professional norms.

If any question remained as to whether this statement was made within the context of trial counsel's reasoned strategy, trial counsel's closing argument notes eliminate all doubt. (ECF No. 13-4, PageID 7943.) In his outline, trial counsel intended to call attention to a potential reason for alleged investigatory deficiencies and not to insult the victim. Counsel typed: "WHAT HAPPENED HERE, TO LAWRENCE GUIDROZ?" (*Id*) Handwritten underneath, trial counsel wrote: "No family—[unintelligible] Mr. Leech friends. Stephanie Berryman – is he still alive – they don't want to touch him. Take Pruitt 911. Didn't do any crime scene – Ofc. Charmell Smith [unintelligible]." (*Id.*) During the post-conviction evidentiary hearing, trial counsel was asked to identify his notes on things that he wanted to discuss during closing arguments, but for whatever reason, Pruitt elected not to question counsel about the isolated statement challenged here and any reason for making it. (ECF No. 12-37, PageID 5630-63.)

The record fully supports the court's conclusion that this phrase extracted from trial counsel's closing argument was part of a not-unreasonable strategy. Simply because the prosecution argued this statement out of context in rebuttal does not change the strategy's reasonableness under the Sixth Amendment. The state court understandably found no deficient

performance here, and Pruitt can show no unreasonable application of federal law relating to the state court's decision that he failed to demonstrate deficient performance.

Moreover, for much of the same reasons, a fairminded jurists could conclude that any deficiency did not result in any prejudice, just as the state appellate court found here. Trial counsel's closing argument strategy was "FACT OR FICTION." (ECF No. 13-4, PageID 7943.) Trial counsel's statement did not speak to any element of the offenses the jury was charged to decide the guilt or innocence of. Nor did this prejudice Pruitt's sentencing phase because this in no way related to any aggravating circumstance or mitigating factor. The prosecution's use of trial counsel's words during the sentencing phase in rebuttal closing argument drew two consecutive objections from counsel. A fairminded jurist could conclude, as the state appellate court did, that there is no reasonable probability of a different trial result on account of trial counsel's isolated statement during the guilty phase closing argument. (ECF No. 11-15, PageID 1969-71.) Pruitt is not entitled to relief on this claim.

**8. The state court did not unreasonably apply federal law when it concluded that trial counsel was not deficient in failing to file a pretrial motion for an election of offenses.**

As part of Claim 17, Pruitt argues that trial counsel was ineffective for failing to file a pretrial motion requesting that the trial court require the State to make an election of offenses with regard to his alternative indicted charges of first-degree premeditated murder or first-degree felony murder. (ECF No. 38, PageID 10952.) In support of his claim, Pruitt states that "[t]rial counsel should have filed a pretrial motion for the State to elect between the premeditated murder and felony murder theories in order to protect [his] rights to due process, a fair trial, and to be free from double jeopardy." (*Id.* at PageID 10953.) Despite dual convictions for first-degree never being imposed against him—indeed, never being returned by the petit jury—he nevertheless claims that the Double Jeopardy Clause somehow barred the petit jury's consideration of these charges, as

indicted by the grand jury. He relies on dicta Relying on dicta from a 1995 opinion from the Tennessee Court of Criminal Appeals, *State v. Zirkle,* Pruitt alleges that "[t]rial counsel should have been cognizant of the warning in *Zirkle* that dual charging in a capital case may violate double jeopardy." In his view, trial counsel "should have moved pretrial to strike the death notice" and moved for a pretrial hearing on the State's alleged "abuse of discretion in seeking a death sentence." (*Id.*)

Pruitt raised this claim on post-conviction review, and the Tennessee Court of Criminal Appeals rejected it on the merits. *Pruitt,* 2022 WL 1439977, at *76. As previously established, the Tennessee Court of Criminal Appeals correctly identified the "clearly established Federal law" here, *Strickland.* And that court's application of federal law was not unreasonable. The state court explained as follows that the ineffectiveness claim lacks merit:

> With regard to the prosecutor's decision to charge Petitioner with both felony and premeditated first degree murder, Petitioner relies upon dicta in this court's opinion in *State v. Zirkle*, in which this court affirmed the merger of dual convictions as a "cure[ ]" for the "double jeopardy problem" but noted that "[p]erhaps the merger procedure would have been prejudicial if the jury had chosen to impose the death penalty." 910 S.W.2d 874, 889 (Tenn. Crim. App. 1995). However, even in the context of death penalty cases, "our supreme court has held that the State is not required to elect between first degree premeditated murder and felony murder charged in separate counts of the indictment for a single offense, and both theories of first degree murder may be submitted to the jury." *State v. Joel Richard Schmeiderer*, No. M1999-02546-CCA-R3-CD, 2000 WL 1681030, at *9 (Tenn. Crim. App., at Nashville, Nov. 9, 2000) (citing *State v. Hurley*, 876 S.W.2d 57, 69-70 (Tenn. 1993); *State v. Henley*, 774 S.W.2d 908, 916 (Tenn. 1989)); *see also State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998). Additionally, the supreme court has approved of merger as the appropriate remedy "when a jury returns guilty verdicts on two counts representing alternative theories of the same offense." *State v. Davidson*, 509 S.W.3d 156, 217 (Tenn. 2016) (citing *Cribbs*, 967 S.W.2d at 788). Thus, Petitioner has not established any deficient performance on the part of trial counsel for failing to file a pretrial motion for the State to elect between felony murder and premeditated first degree murder. Moreover, the jury ultimately acquitted Petitioner of premeditated first degree murder and, as a result, only considered and imposed the death penalty for one count of first degree murder.

> Thus, Petitioner has failed to establish that he was prejudiced. Petitioner is not entitled to relief on this issue.

*Pruitt,* 2022 WL 143997, at *77.

During his post-conviction proceedings, Pruitt presented no caselaw to support this specific ineffectiveness argument. Nor did he develop any proof at the evidentiary hearing as to any strategic decision—or lack thereof—by trial counsel with regard to counsel not filing a pretrial motion asking the trial court to force the State to pick one of two alternative theories for first-degree murder returned by the grand jury. Having insufficiently developed a factual basis to support his claim, Pruitt failed to prove any deficient performance on the part of trial counsel. What is more, Pruitt's insufficient record provides no reason for how the filing of such motion would have impacted the proceedings, especially considering that filing such a frivolous motion would have been pointless and Pruitt was not convicted on dual first-degree murder charges in any event.

Pruitt can show no unreasonable application of federal law relating to the state court's decision that he failed to demonstrate any ineffectiveness. He cites to no on-point authority to show that the state appellate court's decision here was objectively unreasonable. Under the state-court record, a fairminded jurist could have concluded, as the state appellate court did, that Pruitt proved neither deficient performance nor prejudice here. Applying AEDPA deference, Pruitt is not entitled to relief on this claim.

**9. Pruitt's claim of cumulative error, if cognizable, was rightly determined by the state supreme court to be meritless.**

Pruitt's stand-alone claim of cumulative error is not a cognizable claim on federal habeas review because the Supreme Court has not spoken on this issue. Importantly, the Sixth Circuit has long held that, "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker,* 425 F.3d 250, 256 (6th

Cir. 2005); *see also Moreland v. Bradshaw,* 699 F.3d 908, 931 (6th Cir. 2012) (applying *Moore* to deny review of a cumulative error argument in the context of *Strickland*). This claim should be dismissed on cognizability grounds.

Pruitt's reliance on *United State v. Dado*, 759 F.3d 550 (6th Cir. 2014), for the proposition that the cumulative error doctrine survives the enactment of AEDPA deference in § 2254 is misplaced. First, *Dado* was a direct appeal of a federal conviction in which the defendant raised ineffective assistance of counsel claims and the federal district court directly applied *Strickland.* 759 F.3d at 563. That case did not involve AEDPA deference. It is true that the Sixth Circuit, in assessing *Strickland* prejudice, stated that examination of an ineffective assistance of counsel claim "requires the court to consider 'the combined effect of all acts of counsel to be found to be constitutionally deficient, in light of the totality of the evidence in the case.'" *Id.* (quoting *Lundgren v. Mitchell,* 440 F.3d 754, 770 (6th Cir. 2006)).

However, *Dado* misstated what *Lundgren* purportedly stood for. In *Lundgren*, a habeas corpus case decided under § 2254, the Sixth Circuit simply recited the *Strickland* standard, held that the state court's conclusions were not contrary to federal law, and summarily rejected the cumulative error claim. 440 F.3d at 774-775. An although *Strickland* directs "a court hearing an ineffectiveness claim" to "consider the totality of the evidence before the judge or jury[,]" this is not a directive from the Supreme Court that a stand-alone claim of cumulative errors of counsel is a cognizable constitutional claim post-AEDPA. 466 U.S. at 695. And it certainly does not constitute as "binding Supreme Court precedent" on the matter of whether the cumulative effect doctrine applies in federal habeas litigation in the context of *Strickland*.

Even still, Pruitt would not be entitled to such relief here. As demonstrated through discussion of each sub-claim above, Pruitt has not shown the existence of a single constitutional

error—under *Strickland* or otherwise. Thus, there is nothing to cumulate. *See Baze v. Parker,* 371 F.3d 310, 330 (6th Cir. 2004) ("Because Baze cannot establish any error to cumulate and because his theory that errors can be considered in the aggregate depends on non-Supreme Court precedent, this claim is also without merit.").

Finally, even if the claim were cognizable and applicable here, it is meritless. The Tennessee Court of Criminal Appeals held in the post-conviction appeal that Pruitt was not entitled to relief for cumulative error, because there was not more than one actual error committed during the trial proceedings. *Pruitt,* 2022 WL 1439977, at *97. This merits adjudication would be subject to AEDPA deference, and Pruitt simply cannot overcome that review. The Court should dismiss this claim.

**L. Pruitt's Procedurally Defaulted Claims of Ineffective Assistance of Trial Counsel Are Barred From Review.**

In Claim 9, Pruitt claims that trial counsel was ineffective for "fail[ing] to object to his appearing shackled in view of the jury during his trial." (ECF No. 38, PageID 10919.) Pruitt's claim is based on "information and belief" from "[a]t least one juror" who "recall[ed] seeing leg shackles when Mr. Pruitt walked into the courtroom and handcuffs while he was seated in his chair." (*Id.* at PageID 10921.) Pruitt states that "[t]his claim was not raised in state court due to the ineffective assistance of Mr. Pruitt's post-conviction counsel, and there is therefore cause and prejudice for any procedural default." (*Id.* at PageID 10920.) Incorporated with Claim 14, Pruitt claims trial counsel was ineffective for "failing to introduce proof of the state's offer at the penalty phase of trial[.]" Pruitt argues that introducing proof of the State's settlement offer would "support [] an argument that the mitigating circumstances were not outweighed by the aggravating circumstance beyond a reasonable doubt." (*Id.* at PageID 10945.) Pruitt presents both of these claims for the first time before this Court.

At this juncture, Pruitt's never-before presented claims are procedurally defaulted and barred from review. State court remedies are no longer available on these claims due to the statute of limitations and the one-petition rule for a post-conviction petition under § 40-30-102. Although he does not argue for such, Pruitt is not entitled to further consideration of these claims under *Martinez* because under the state-court record, he cannot establish cause to overcome the default. At the very least, his underlying ineffectiveness claims are not substantial. Pruitt is not entitled to review of these claims, and the Court should dismiss them as defaulted.

Pruitt may not rely on *Martinez* to excuse the default here because he cannot establish, under the state-court record, substantial claims of trial counsel's performance. Because he never litigated the claims in state court, there is little, if any, evidence in the state court record to support it. Specifically relating to Claim 9, this is shown by Pruitt's reliance on factual allegations qualified by his own "information and belief," indicating that any proof to support this claim is outside the state court record. And he may not rely on evidence outside the state court record to show cause for excusing a default under *Martinez*, as the Sixth Circuit has already concluded. *See Rogers*, 69 F.4th at 397 (concluding that habeas corpus petitioner relying on *Martinez* "must provide evidence to show his claims are substantial," which "must come from the state-court record unless the petitioner can satisfy the stringent requirements of" § 2254(e)(2)).

Any absence or omission of proof from the state-court record is explained by, and due to, negligence of Pruitt and/or post-conviction counsel in not developing explicit proof on this point when the opportunity was available to him in his post-conviction evidentiary hearing conducted under § 40-30-110. As more fully explained previously, *supra V.C.*, Pruitt may not seek further evidentiary development at this juncture unless he satisfies the narrow circumstances of § 2254(e)(2). Applying that statute, no new constitutional law is implicated here, and the factual

predicate of the claim could have been previously discovered through the exercise of due diligence, especially considering Pruitt complains of conduct that occurred at trial.

Under the state-court record, there are no substantial claims of ineffective assistance of trial counsel here, and at the very least, he cannot show cause to excuse the default because the unexplained claims are not substantial. Pruitt is not entitled to review and relief on these claims.

## VII. CONCLUSION

For the aforementioned reasons, the petition for writ of habeas corpus should be dismissed with prejudice.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*<u>/s/ Sarah J. Stone</u>*
SARAH J. STONE
Assistant Attorney General
Federal Habeas Corpus Division
P.O. Box 20207
Nashville, Tennessee 37202
P: (615) 253-1967
B.P.R. No. 038824
Sarah.Stone@ag.tn.gov

**CERTIFICATE OF SERVICE**

I certify that the foregoing Answer to the Amended Petition for Writ of Habeas Corpus was filed electronically on August 24, 2026. A true and correct copy of that filing was forwarded on the same day by this Court's ECF system to: Counselor's for Petitioner, Gerald W. King, Jr., and Gretchen L. Swift, Capital Habeas Unit for the Fourth Circuit; 129 W. Trade Street, Suite 300, Charlotte, North Carolina, 28226; gerald_king@fd.org; gretchen_swift@fd.org.

*/s/ Sarah J. Stone*
SARAH J. STONE
Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CORINIO PRUITT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cv-02855-BCL-atc** |
| | ) | |
| **KENNETH NELSEN, Warden,** | ) | **CAPITAL CASE** |
| | ) | |
| **Respondent.** | ) | |

**RESPONDENT'S RESPONSE IN OPPOSITION TO PETITIONER'S MOTION TO SUSPEND SCHEDULING ORDER**

Respondent opposes Pruitt's motion to suspend the operative scheduling order pending collateral litigation related to the Attorney General's recent certification of Tennessee's method for providing counsel in capital post-conviction cases, under Chapter 154 in Title 28 of the United States Code. (ECF No. 56.) The Court need not delay this case for that litigation when its resolution is not necessary to resolve Pruitt's habeas corpus petition. Even if Pruitt were successful there—or if Chapter 154 were found not to apply in his case for some reason—the Court still must deny the petition upon review of the record, the positions of the parties, and the governing law pre-certification. The interests of justice do not weigh in favor of further delay on Pruitt's habeas corpus case for his collateral litigation on the Attorney General's certification decision when the Court can resolve the petition now without regard to Chapter 154. A statutory mechanism intended to expedite habeas corpus review of capital cases should be no basis for delaying resolution of this capital case. *See Lindh v. Murphy*, 521 U.S. 320, 330-31 (1997) ("Chapter 154 provides for expedited filing and adjudication of habeas applications in capital cases when a State has met certain conditions.").

Under 28 U.S.C. § 2261, the Attorney General recently certified that Tennessee has established a mechanism for providing counsel in capital post-conviction proceedings. 91 Fed. Reg. 42761 (Jul. 10, 2026). This certification places certain limitations on a district court's review of a Tennessee capital habeas corpus petition if Tennessee provided post-conviction counsel to the petitioner under that mechanism. 28 U.S.C. § 2261(b)(2). The Attorney General declined to stay its certification decision pending judicial review. *Id*. at 42774-75. Pruitt has petitioned for judicial review of the Attorney General's certification decision in the United States Court of Appeals for the District of Columbia Circuit, as authorized by 28 U.S.C. § 2265(c). In Pruitt's view, his success in that action "would obviate any need to determine whether Chapter 154 applies to his petition;" therefore, "the interests of judicial economy support a suspension of briefing while Tennessee's certification is under its statutorily required review." (ECF No. 56, PageID 11280.)

However, as Respondent explained in his answer, Pruitt's petition is readily subject to dismissal as untimely and meritless even absent certification and consideration of Chapter 154. (ECF No. 55, PageID 11140-44.) In Respondent's answer to Pruitt's amended petition, Respondent notified the Court and Pruitt of the Attorney General's recent certification of Tennessee's mechanism for providing post-conviction counsel in capital cases. (*Id*.) Because the Attorney General certified that Tennessee has established a qualifying mechanism, as of July 1, 1997, and because Tennessee provided Pruitt counsel through that mechanism via the Office of the Post-Conviction Defender, Respondent indicated that the special procedures in Chapter 154 apply to Pruitt's case. (*Id.*) Still, Respondent explained the minimal impact those procedures could have on Pruitt's case because (1) Pruitt's petition is already untimely under 28 U.S.C. § 2244(d), and (2) he has shown no basis to overcome the procedural default of certain claims, even if he could attempt to do so. (*Id*.) Respondent then proceeded to address Pruitt's various

claims without regard to Chapter 154. Thus, the logic of Pruitt's own motion supports the Court addressing these grounds for dismissal outside of Chapter 154, as doing so "would obviate any need to determine whether Chapter 154 applies to [Pruitt's] petition" and further "the interests of judicial economy" by allowing the Court to resolve the petition without having "to resolve several [supposedly] novel and complex issues of law and fact." (ECF No. 56, PageID 11280, 11284.)

Because Pruitt's petition fails even absent Chapter 154, the Court need not delay this case further when it may resolve (and dismiss) the petition without applying Chapter 154. Nothing now inhibits Pruitt's ability to reply to the arguments advanced in Respondent's answer on his various claims. Should the Court decline to stay the proceedings at this juncture and then should the Court later determine in its review of the case that application of Chapter 154 is somehow dispositive to the case's resolution, then at that point, the interests of judicial economy might weigh in favor of a stay and then briefing by the parties on Chapter 154's impact. But at this juncture, Pruitt has identified no persuasive reason to delay the current proceedings, and the Court should deny Pruitt's motion to suspend the scheduling order.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*<u>/s/ Sarah J. Stone</u>*

SARAH J. STONE
Assistant Attorney General
Federal Habeas Corpus Division
P.O. Box 20207
Nashville, Tennessee 37202
(615) 253-1967
Sarah.Stone@ag.tn.gov
B.P.R. No. 038824

## CERTIFICATE OF SERVICE

I certify that the foregoing Response in Opposition was filed electronically on September 18, 2026. A true and correct copy of that filing was forwarded on the same day by this Court's ECF system to: Counselors for Petitioner, Gerald W. King, Jr. and Gretchen L. Swift, Capital Habeas Unit for the Fourth Circuit, 129 W. Trade Street, Suite 300, Charlotte, North Carolina, 28226; gerald_king@fd.org; gretchen_swift@fd.org.

*/s/ Sarah J. Stone*
SARAH J. STONE
Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

**CORINIO PRUITT**,

*Petitioner*,

v. Case No. 2:22-cv-2855-BCL-atc

**KENNETH NELSON**,

*Respondent*.

---

**ORDER GRANTING MOTION TO SUSPEND SCHEDULING ORDER**

---

The Court is in receipt of Petitioner's Motion to Suspend Scheduling Order (Doc. 56), by which Petitioner seeks to suspend the scheduling order pending the outcome of separate litigation challenging application of Chapter 154 of Title 28 of the United States Code, which in some respects alters the standards applicable to a federal habeas petition in cases where the state post-conviction mechanism was certified under that Chapter. Respondent opposes the Motion, primarily on the ground that Petitioner's claims should fail even under the pre-Chapter 154 standard. Doc. 59.

The Motion is **GRANTED**. The Court recognizes that a statutory mechanism designed to streamline habeas review in some respects generally should not slow that review down. But for the limited universe of cases pending when certification occurred, a challenge to the certification can significantly impact the analysis. Here, Respondent has invoked Chapter 154, and it would be wasteful to bifurcate proceedings so that claims and defenses are resolved first under the pre-Chapter 154 standard and then, second and if necessary, under the Chapter 154 standard.

Therefore, it is **ORDERED**:

Further proceedings on the merits are **STAYED** pending the Court of Appeals of the District of Columbia Circuit's resolution of Petitioner's challenge to the Attorney General's certification under Chapter 154, in keeping with Congress' decision to route challenges to certification to that venue.

Notwithstanding the stay described in the preceding paragraph, the Parties **SHALL** alert the Court within seven days concerning whether Chapter 154, or the certification litigation related to it, has any potential impact on resolution of Respondent's motion to dismiss based on the statute of limitations. Such filings **SHALL** be limited to three pages.

**IT IS SO ORDERED**, this 24th day of September, 2026.

s/ *Brian C. Lea*
BRIAN C. LEA
UNITED STATES DISTRICT JUDGE